GB79FLO1                        Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          15 Cr. 765 (PAC)

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

            Defendants.
------------------------------x

                                        New York, N.Y.
                                        November 7, 2016
                                        9:32 a.m.

Before:

                    HON. PAUL A. CROTTY,

                                        District Judge

                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EMIL J. BOVE III
BRENDAN F. QUIGLEY
     Assistant United States Attorneys

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant Campo Flores
RANDALL W. JACKSON
JOHN T. ZACH
JOANNA CHRISTINE WRIGHT

SIDLEY AUSTIN LLP
     Attorneys for Defendant Flores de Freitas
DAVID M. RODY
ELIZABETH A. ESPINOSA
MICHAEL D. MANN

ALSO PRESENT:

HUMBERTO GARCIA
MIRTA HESS
Spanish Interpreters

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated.

3          The jurors haven't arrived yet but there's some

4   preliminary matters we can take up.  I'll go first and if

5   there's anything else, you can bring it up while we're waiting

6   for the jurors.

7          With regard to the government's letter of November 3,

8   I will give the limiting instructions as proposed by the

9   government, page one of their letter and at page two, dealing

10  with the Bruton issue.

11         With regard to the defendants' letter of November 4,

12  I'm not going to allow Exhibits 1 and 2.  I will allow Exhibits

13  56 and 61 to the introduced.

14         With regard to the second letter from the defendants

15  of November 4, the words "not guilty" should precede guilty.  I

16  agree with that.  And that will be done.

17         With regard to the weight.  We'll take that up later

18  on.  I don't think that has to be covered this morning.

19         With regard to the manufacture jurisdiction.  I agree

20  with the government's position.  The issue is whether the

21  defendants agreed not to introduce the item for discussion.  So

22  I'm going to grant the government's motion.

23         MR. JACKSON:  Excuse me, your Honor.

24         THE COURT:  I'm going to grant the government's motion

25  to preclude any opening statement or argument about manufacture

GB79FLO1                          Trial

1    jurisdiction.

2              MR. JACKSON:  Your Honor, we -- on the manufacture

3    jurisdiction we understand the Court's ruling and of course we

4    won't make any reference in opening statement to it.

5              But we did have a response to what the government

6    argued in its letter that's more substantive that we would

7    request permission to submit to the Court for further

8    discussion about the requested charge.

9              THE COURT:  That's all right with me, Mr. Jackson.

10             MR. JACKSON:  Thank you very much.

11             THE COURT:  You won't mention it in the opening

12   statements.

13             MR. JACKSON:  We will not mention it in the opening

14   statement.

15             THE COURT:  That's good enough for today.

16             MR. JACKSON:  Thank you, your Honor.

17             THE COURT:  Does the government want to take up

18   anything?

19             MR. BOVE:  No, your Honor.  Thank you.

20             THE COURT:  How long will your opening be?

21             MR. BOVE:  About fifteen minutes.

22             THE COURT:  Mr. Jackson, how about you?  Are you

23   opening, Mr. Zach?

24             MR. ZACH:  It will be about 30 minutes, your Honor.

25             THE COURT:  Mr. Mann?

GB79FLO1                     Trial

1           MR. MANN:  It's going to be about fifteen minutes,

2    your Honor.

3           THE COURT:  Fine.  Is the jury here.

4           THE DEPUTY CLERK:  Not yet, no.

5           THE COURT:  As soon as the jury gets here we'll -- I

6    will give my opening instructions, which will take about five

7    minutes, and then we'll go immediately to the openings.

8           (Recess)

9           THE COURT:  Please be seated.

10          Marlon, bring in the jury.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning.  Please be seated.  Ladies

3   and gentlemen, I want to take a few minutes to give you some

4   rules which will govern how we're going to proceed and talk to

5   you a little bit about your duties as jurors.  After all the

6   evidence is in, and the lawyers have summed up, I will give you

7   final instructions on the law and then you can begin your

8   deliberations.  I may also give you instructions during the

9   trial.  Unless I specifically tell you otherwise, all such

10  instructions -- both those I give you now and those I give you

11  later -- are equally binding on you and you have to follow

12  them.

13         Your duty is to find from the evidence what the facts

14  are.  You and you alone are the judges of those facts, and then

15  you apply the law, as I give it to you, to the facts, as you

16  find them, to reach your verdict.  You have to follow the law

17  whether you agree with it or don't agree with it.  Now, please

18  remember that nothing I may say or do during the course of the

19  trial is intended to indicate or should be taken by you to

20  indicate what your verdict should be.  What your verdict should

21  be will be strictly up to you.

22         I have already told you about the charges alleged in

23  this case.  The defendants, Efrain Antonio Campo Flores and

24  Franqui Francisco Flores de Freitas are charged with conspiring

25  to violate the narcotics laws of the United States.  They were

GB79FLO1                    Trial

indicted by a grand jury sitting in this district.  The

indictment charges that in or about August of 2015 through in

or about November 2015, Mr. Campo Flores and

Mr. Flores de Freitas conspired to import five or more

kilograms of cocaine into the United States, and also conspired

to manufacture or distribute five or more kilograms of cocaine,

knowing and intending that it would be imported into the United

States.

          Mr. Campo Flores and Mr. Flores de Freitas deny these

allegations.  The government must prove the charges in the

indictment beyond a reasonable doubt.

          The evidence from which you are going to find the

facts will consist of the testimony of witnesses who will

testify in this witness chair right here; documents and other

things that will be received in evidence; and occasionally

facts that the parties may agree to, something we call

stipulations.

          Now, certain things are not evidence and you should

not consider them.  I'm going to list them for you.  First of

all, the attorneys' arguments are not evidence.  The attorneys

are not sworn as witnesses.  They do not testify.  The

attorneys' statements and questions are not evidence either.

Let me emphasize this again.  It is not the question that the

lawyer asks; what is important is the witness's answer to the

question.  Secondly, the objections to questions are not

evidence.  It is the duty of the attorney for each side of the

case to object when the other side offers testimony or other

evidence the attorney believes is not properly admissible.  But

don't be influenced by the objection or my ruling on it.  If

the objection is sustained, you'll hear me say sustained and

you should ignore the question.  If I overrule the objection,

then you should treat the answer just like any other answer.

My job is to rule on what the evidence is that comes in at

trial, but I have no view on what your verdict should be,

because that is strictly up to you, the jury.

        If I instruct you that some items of evidence are

being received for a limited purpose only, you have to follow

that instruction, as you must follow all of my instructions.

If I give a limiting instruction, I will explain it to you at

the time and will give you instructions as clearly as I

possibly can on what the limitations are.  I may tell you that

I'm excluding evidence or tell you to disregard testimony.

When I do that, it means you have to follow my instructions and

ignore the testimony as it is not in evidence.  In addition,

anything you may have seen or heard outside this courtroom is

not evidence and should be disregarded.  You are to decide this

case solely on the admissible evidence that is presented here

in the courtroom.

        There are two kinds of evidence, direct evidence and

circumstantial evidence.  Direct is the direct proof of the

fact.  As an example, I say that testimony of an eyewitness,

somebody who actually saw the events as they occurred.

Circumstantial evidence is proof of a fact or facts from which

you may infer or conclude that some other fact or facts exist.

Obviously, I am going to give you further instructions on this

and more details on these and other matters at the end of the

case, but just keep in mind that you can consider both kinds of

evidence, direct and circumstantial.

        An important task for every jury is to determine the

credibility of witnesses.  And it is going to be up to you to

decide which witnesses to believe, which witnesses not to

believe, and how much of any witness's testimony to accept or

reject.  Again, in my instructions to you at the end of the

trial, I will give you some guidelines which I hope will be

helpful in determining witness credibility.

        Remember what we discussed earlier.  First, a law

enforcement witness's testimony gets no greater or lesser

weight because of their law enforcement status.  Second, the

testimony of a cooperating witness can be considered but, as I

will instruct you, it should be considered with great care.

        Now this is a criminal case.  You must know that there

are three basic rules about criminal law that you have to keep

in mind:  First, the defendants are presumed innocent; second,

the government has the burden of proof; and third, the

government must prove its case beyond a reasonable doubt.

GB79FLO1                        Trial

1          Let me through each of these now.  First, as I

2    mentioned earlier, the defendants are presumed innocent until

3    proven guilty.  The indictment against the defendants brought

4    by the government is only an accusation and nothing more.  It

5    is not proof of guilt or anything else.  The defendants,

6    therefore, start out with an absolutely clean slate.

7          Second, the burden of proof is on the government.  The

8    defendants have no burden to prove their innocence or present

9    any evidence or to testify.  Since they have the right to

10   remain silent, the law prohibits you from arriving at your

11   verdict by considering that the defendants may not have

12   testified.

13         Third, the government must prove the defendants' guilt

14   beyond a reasonable doubt.  Again, I will give you further

15   detailed instructions on this point later, but bear in mind

16   that in this respect, a criminal case is different from a civil

17   case.  The criminal standard of proof is proof beyond a

18   reasonable doubt.

19         From time to time during the trial it may become

20   necessary for me to talk with the lawyers out of the hearing of

21   the jury, either by having a conference at the bench when the

22   jury is present in the courtroom -- that's what we call a

23   sidebar and you saw an example of that during jury selection --

24   or by calling a recess.  Please understand that while you are

25   waiting, we are working.  The purpose of any conference outside

your viewing is to -- is not to keep relevant information from

you, but to decide certain procedural issues or how certain

evidence is to be treated under the rules of evidence and to

avoid confusion and error.  I'll do my best to limit sidebar

conferences as much as possible by working with the lawyers to

take up these matters during lunchtime and during recess time.

          Now, just a few words about your own conduct as

jurors.  First of all, do not discuss the case with anyone or

permit anyone to discuss it with you.  Most of you probably use

computers.  My instructions to not discuss the case includes

discussing the case in person, in writing, by phone, or

electronic means, via text messaging, e-mail, Facebook,

Twitter, blogging, or any other form of social media.  This

even includes the discussing the case with your fellow jurors

in the jury room while the trial is going on.  You cannot

deliberate on your verdict until after you are charged by me,

and that takes place at the end of the trial.  Until then, you

can talk about anything you want but don't talk about the case.

          This probably seems a little strange to you.  Here is

the reason:  Obviously the evidence can be presented one

witness at a time and one exhibit at a time, and we don't want

you to start talking to each other and reaching conclusions

before you've had an opportunity to see and hear all of the

evidence in this case and hear my instructions on the law.

That is why we tell you at the end of each day to keep an open

mind and not to begin your deliberations until you are properly

charged.  Until that time, do not have any discussions about

this case.  Think of the case like you would a painting, where

you cannot tell from one stroke or one color what the painting

will look like.  You have to wait until it's finished to make a

judgment, and that's what we ask you to do.

         If at any time during the course of the trial, any

person attempts to talk to you or communicate with you about

this case, either inside or outside the courtroom, you should

immediately report such an attempt to me.  Don't tell other

jurors.  Just send a note to me directly.

         Also the lawyers -- I told you this last week -- also

the lawyers and other participants at counsel table have been

instructed already not to have any communication with you as

jurors.  That's the rule.  You may not say hello or even wave.

That goes for you, the lawyers, and the witnesses.  In this

courthouse you may see people in elevators.  So if you run into

one another, please don't acknowledge them or expect them to

acknowledge you.  They are under instructions not to have any

communication, and they are going to observe the rule.

         If at any point in the trial you recognize someone in

the courtroom, including a friend or family member, please let

me know immediately.  If this occurs while the trial is in

session, simply raise your hand.

         Don't read or listen to anything touching upon this

GB79FLO1                          Trial

case in any way.  Don't try to do any research on your own or

conduct your own investigation.  This means, for example, that

you should not consult a dictionary for the meaning of a word,

search the internet, websites, or blogs, or use any electronic

tools to obtain information about this case.  If you see

something about this case in the newspaper, please don't read

the article.  You must avoid watching television discussions

about this case or issues involved in this case.  Your sworn

duty is to decide the case solely and wholly on evidence

presented in this courtroom.

        Now if you wish, you can take notes while the evidence

is being presented.  Some people find that taking notes helps

them focus on the testimony being given.  But you should not

try to summarize the testimony however.  We have excellent

court reporters who take down everything that is said

throughout the trial.  Your job is to listen to the testimony

and assess the credibility of witnesses.  If you do take notes,

don't let it distract you from your task.  Moreover, your notes

are for your private use only, as a way to help you recall the

testimony when you begin your deliberations.  Your notes are

not entitled to any greater weight than the recollection of a

juror who does not take notes.  Finally, you may not take your

notes away from the court.  Leave them in the jury room at the

end of each day and certainly at the end of trial.

        Let me tell you how important your service is and how

much we appreciate it.  During a trial, all of us have to be

here before any work can be done; that includes the attorneys,

the witnesses, the court reporter, the judge, and you, the

jury.  If one person is missing, nothing can move forward.

That's what makes this a little bit different than work.  This

is not a situation where you can simply call in sick.  There

are, of course, extraordinary circumstances that may excuse you

from serving on this jury.  But in all other circumstances we

need you to be here everyday and on time.  I understand this

may impose a burden.  As I have said, this is an important

service, and one that is greatly appreciated.

        We start our trial days at 9:30 in the morning.

Before that, we open up the jury room at 9 and provide you with

a light breakfast.  We also provide you with an afternoon snack

when we take our afternoon break.  We cannot provide you with

lunch.  The morning session will last until 12:45, 9:30 to

12:45 on Monday through Friday, we will resume at 2 and go

until 4:30.  We may start a little bit earlier on Friday, and

end earlier as well.  There are breaks in the morning and

afternoon for fifteen minutes.  The trial is going to last

about ten days.

        On Tuesday, which is Election Day, we're going to vary

that schedule a little bit and start our day at 10:30, not at

9:30, and we'll finish at 3:30 so those of you who want to vote

in the morning and vote in the afternoon will have plenty of

GB79FLO1                        Opening - Mr. Bove

1    time.  So we're going to start tomorrow at 10:30 and finish at

2    3:30.  And because tomorrow is something of a holiday we're

3    going to be able to serve you lunch.  So that will cut down on

4    luncheon time.

5              On Friday, which is Veterans Day, we will not sit.

6              Now here's how we're going to proceed.  The government

7    will make an opening statement, which is an outline of what

8    they hope to prove and help you understand the evidence as it

9    comes in.  Next the defendants may make opening statements but

10   they do not have to because they have no burden of proof.

11   Please remember as you listen to the lawyers' opening

12   statements that the statements are not evidence.  After

13   openings, the government will start presenting its witnesses

14   and the defendants -- the defense may cross-examine those

15   witnesses.  Following the government's case, the defendants

16   may, if they wish, present witnesses, but they do not have to

17   do so.  After all the evidence is in, each side will have an

18   opportunity to get up again and present their closing arguments

19   to you.  In these arguments, they are going to summarize and

20   interpret the evidence for you and then, of course, I'll

21   instruct you on the law and then you can begin your

22   deliberations.

23             All right.  We'll have openings now by the government.

24             Mr. Bove.

25             MR. BOVE:  Thank you, your Honor.

1      Good morning, ladies and gentlemen.  One morning about

2  a year ago two men got on a jet in Venezuela.  They had some

3  serious plans.  They were going to fly to Haiti to pick up

4  millions of dollars in cash.  They were going to bring that

5  money back to Venezuela.  And then they were going to send

6  800 kilograms of cocaine from Venezuela to Honduras so that

7  those drugs could be brought to the United States and sold

8  because here 800 kilos of cocaine is worth tens of millions of

9  dollars.

10      These are the men who made those plans.  This is

11  Efrain Antonio Campo Flores.  I'm going to refer to him this

12  morning by his last name, Campo.  And this is Franqui Francisco

13  Flores de Freitas.  I'll refer to him as Flores.

14      You will learn that these men are the nephews of the

15  First Lady of Venezuela and they believed that they were so

16  powerful in their country that they could ship almost a metric

17  ton of cocaine from one airport to another without a problem.

18      But there was a problem.  Not in Venezuela.  It

19  happened when they got to Haiti.  Before the defendants could

20  pick up any cash, they were arrested.  Their plan was stopped

21  by law enforcement before it could be completed.  Their plot

22  was neutralized.  And the defendants did leave Haiti that day

23  on a jet, but it belonged to the U.S. Drug Enforcement

24  Administration, the DEA.

25      Ladies and gentlemen, this is a case about

GB79FLO1                    Opening – Mr. Bove

international drug traffickers.  The defendants are charged

with participating in a conspiracy, in other words with joining

an agreement, an agreement to import drugs into the United

States and an agreement to distribute drugs knowing and

intending that they would be brought here.

          During this trial we will present a great deal of

evidence to establish to you that the defendants are guilty of

this charge beyond a reasonable doubt.

          This opening statement is my opportunity to give you a

preview of that evidence so you'll have some context as it

comes in.  As I do that I'm going to mention some names and

some dates and some places.  You don't have to memorize them.

          During this trial you will learn all that you need to

know about this crime and the people who committed it.  At the

end of this trial we'll come back to this podium and explain

how the evidence fits together and establishes that the

defendants are guilty.

          You're going to learn a lot about drug trafficking in

the Americas region, South America, Central America, and the

United States.  You'll learn that most of the cocaine in this

region is produced around Colombia and that a lot of it is

shipped north to Central America.

          The evidence will show that about 90 percent of the

cocaine that makes it that far north is imported into the

United States.

1          You will learn that one of the ways that drugs are

2     shipped along the Central America route is to use planes.  But

3     most drug traffickers don't have the power or the authority to

4     get large loads of cocaine into real airports so they send drug

5     flights in secret from clandestine airstrips.  These hidden

6     runways are often made of dirt or grass.

7          The evidence will show that the defendants had a

8     better and more secure way to ship cocaine along the Central

9     Americas route.  They were going to send private jets packed

10    with cocaine from one major airport to another.

11         You'll learn that by October of 2015 the defendants

12    were in contact with a man in Honduras, a man named Sentado, a

13    man they believed was a type of drug trafficker who could

14    receive one of these plans at a major airport in his country.

15         On October 3 of 2015 the defendants took a jet to

16    Honduras to meet with Sentado, to discuss this cocaine

17    shipment.

18         But what the defendants didn't know was that Sentado

19    was helping the DEA.  And after that meeting on October 3 the

20    DEA sent two confidential sources to Venezuela to meet with the

21    defendants to continue to negotiate this deal.

22         A confidential source is someone who provides

23    assistance to law enforcement, often in exchange for pay.

24         In late October of 2015 the confidential sources met

25    with the defendants several times in Caracas, the capital of

Venezuela.  They pretended to be Sentado's drug trafficking

bosses from Mexico and they wore hidden recording equipment

during these meetings.

        We'll play for you some of the recordings of the

meetings that happened in Caracas.  You'll hear the defendants

talk about sending hundreds of kilograms of cocaine from

Venezuela to Honduras.  You'll hear the sources tell the

defendants that they bring those drugs to the United States.

        You'll hear Flores assure the sources that the DEA had

no presence in Venezuela and, therefore, could not interfere

with their drug trafficking activities.

        You'll learn that the defendants were excited about

this deal and committed to it, so much so that they brought a

sample of cocaine to one of the meetings.  They brought that

cocaine to show the sources the quality of the drugs that they

intended to provide.  And you will see Campo on video holding a

kilo of cocaine.

        After the meetings in Venezuela, Flores took a jet to

Honduras.  He went there in early November of 2015 to make the

final plans for this cocaine shipment.  Sentado was at that

meeting.  So was another confidential source who used hidden

recording equipment.  And you'll learn that there was a

Honduran drug trafficker there, a man named Roberto Soto.  The

evidence will show that Soto had major connections at an

airport in Honduras.  And you'll hear and see Flores talk to

1   Soto in detail about how and when that cocaine shipment was

2   going to be sent.  They agreed at that meeting to send the

3   drugs late in the afternoon on November 15 of 2015.

4           You'll hear Flores brag that he had complete control

5   of the airport in Venezuela.  And he assured the people at the

6   meeting that the drugs would be sent from the presidential

7   hangar at that airport, the hangar controlled by the President

8   of Venezuela.

9           Days after the meeting in Honduras and just days

10  before the cocaine was scheduled to be shipped the defendants

11  took that jet to Haiti, the one that I mentioned in the

12  beginning.  They went there to meet with one of the sources to

13  pick up millions of dollars in cash.  That source used hidden

14  recording equipment during the meeting.

15          You'll hear the defendants explain that the drugs had

16  already been packeted in suitcases.  They were ready to go.

17  And after that part of the conversation they spoke with the

18  source in more detail about his ways for importing drugs into

19  the United States.

20          When that meeting was over, ladies and gentlemen,

21  you'll learn that the defendants were arrested.

22          So that's what the evidence will show.  Between about

23  August of 2015 and November of 2015 the defendants worked

24  together and with others to send a load of cocaine from

25  Venezuela to Honduras that they believed would be brought to

1    the United States.

2            So how are we going to prove that to you?

3            The evidence will come in many forms.  You will hear

4    testimony about the defendants' own admissions regarding this

5    crime.  The first DEA agent to take the stand at this trial

6    will explain to you that both defendants confessed while they

7    were being brought from Haiti to the United States.  During

8    separate interviews Campo and Flores each admitted to agreeing

9    to participate in this cocaine shipment and each defendant

10   admitted to understanding that those drugs were going to be

11   brought to the United States.

12           You'll also see physical evidence, things like

13   pictures of the jets that the defendants took to these

14   meetings, stamps on their passports reflecting their travel

15   from Venezuela to Honduras and to Haiti to negotiate this deal.

16           And you will see a great deal of evidence from the

17   defendants' phones, phones that were seized in Haiti on the day

18   the defendants were arrested.  You will learn from these phones

19   that the defendants used them to talk about their drug

20   trafficking activities, both with each other and with

21   coconspirators.  They used the phones to send chats and text

22   messages, messages that they thought were secret, messages they

23   thought were secure, messages they never expected would end up

24   in the hands of the DEA being presented to you in this

25   courtroom.  And you will learn from those communications that

GB79FLO1                          Opening - Mr. Bove

1    the defendants were working hard to put this cocaine

2    transaction together.  They were doing that even when they

3    weren't meeting with confidential sources.

4            But we're going to play some of the recordings from

5    the defendants' meeting with those sources too.  And you'll

6    learn from those recordings that the defendants were caught

7    red-handed joining this conspiracy.

8            Bless you.

9            JUROR:  Thank you.

10           MR. BOVE:  You'll see Campo with that kilo of cocaine.

11   You will see Flores agree specifically when the cocaine was

12   going to be shipped.  And you will see the defendants arrive in

13   Haiti and tell the source the drugs are ready to go, they're in

14   the suitcases.

15           Ladies and gentlemen, you're also going to hear from

16   cooperating witnesses and from people who act as confidential

17   sources during the investigation.  These are people who either

18   met with the defendants or participated in the crime.  For

19   example, you'll hear from a Honduran man who used to be an air

20   traffic controller and also a drug trafficker.  He'll explain

21   to you that although he never met the defendants he was part of

22   the plan for receiving their cocaine shipment.  He and other

23   people at his airport agreed to help receive that shipment in

24   exchange for $600,000.  And this witness will tell you all

25   about the mechanics of sending a drug flight like this because

GB79FLO1                        Opening – Mr. Bove

1    he had done it before.

2              You'll also hear from witnesses who acted as

3    confidential sources.  They'll tell you what happened before,

4    during, and after their meetings with the defendants.  These

5    are people who worked for the DEA for a long time.  And you'll

6    learn that they were paid a lot of money for that work.

7              You're also going to learn that after the defendants

8    were arrested the DEA found out that two of these sources had

9    been committing drug trafficking crimes and concealing those

10   crimes from their handling agents.  You will learn that those

11   two sources were arrested.  They've been convicted of serious

12   crimes and they're in prison.

13             None of the witnesses in this category are going to be

14   testifying at the trial out of the goodness of their hearts.

15   It's a confidential source's job to testify.  And you'll learn

16   that the cooperating witnesses have entered into agreements,

17   agreements to provide information and testimony in the hopes

18   that they'll receive less jail time when they're sentenced.

19             At the end of the trial the question won't be whether

20   you like these witnesses; it will be whether you believe their

21   testimony about their dealings with the defendants and their

22   partners in crime.

23             So, please listen carefully when they testify.

24   Scrutinize what they say.  Ask yourselves whether that

25   testimony is consistent with and supported by the other

1    evidence in the case, things like the recordings of the

2    defendants' meetings, the chats from their phones, and the

3    defendants' confessions.

4            After you have seen and heard all of that evidence you

5    will be convinced beyond a reasonable doubt that these two men

6    entered into an agreement.  They joined a conspiracy to import

7    drugs into the United States and to distribute those drugs

8    knowing and intending that they would be brought here.

9            Now, I'm about to sit down.  Before I do that I'm

10   going to ask that you do three things during the course of this

11   trial.  Please pay careful attention to the evidence as it

12   comes in.  Please follow Judge Crotty's instructions on the

13   law.  And, finally, please use your common sense during the

14   case, the same common sense that you use to make important

15   decisions in your everyday life.  If you do those three things,

16   then these defendants will get a fair trial, and the government

17   will get a fair trial, and at the end of that trial we'll ask

18   you to return the only verdict that's consistent with the

19   evidence:  These defendants are guilty.  Thank you.

20           (Continued on next page)

21

22

23

24

25

GB75flo2                        Opening — Mr. Zach

 1          THE COURT:  Mr. Zach?

 2          MR. ZACH:  Thank you, your Honor.

 3          Good morning.

 4          THE JURY:  Good morning.

 5          MR. ZACH:  Now, Mr. Bove just told you a great story

 6   but that's all that it is, it is a story, it is not reality.

 7   He left out some of the most critical aspects of this

 8   investigation.  It doesn't even come close to giving you a full

 9   picture of what actually happened in this case.  And what was

10   left out is critical evidence that shows the extremely serious

11   problems with the government's witnesses, with their

12   investigation, and with its case as a whole.  What was left

13   out, will leave you, ladies and gentlemen, with tremendous

14   doubts that would make it impossible for the government to meet

15   its extremely high burden of beyond a reasonable doubt in this

16   case.

17          Now, I want to jump right in to what were those things

18   that were left out were.  The first thing that was left out was

19   the prosecutor failed to call this case what it actually is:  A

20   sting operation.  And the prosecutor failed to tell you that

21   this sting operation was a failure.  The entire purpose of a

22   sting is to seize drugs.  That's why the DEA puts these sorts

23   of things together.  You have probably seen in your normal,

24   everyday lives in newspapers or on TV, pictures of seized drugs

25   as part of these types of operations.  Now, during this trial

1    you will wait for the moment when the government will present

2    the most important evidence in any narcotics case:  Actual

3    narcotics.  And you will wait, and you will wait, and you will

4    wait some more.  But the government will never offer that proof

5    because the DEA failed to obtain any narcotics in this case

6    even though this was a sting that they scripted and put

7    together from the beginning.  The fact that the DEA failed to

8    seize any drugs at all in the sting operation, by itself, is

9    reasonable doubt.  It means that the investigation was a

10   failure and that the case is broken.

11          Second, the prosecutor left out that the entire case

12   will depend on your ability to trust and to believe the

13   informants who even the government has charged as liars.  They

14   literally have brought federal criminal charges against their

15   own informants for lying.

16          You see, because the government and the DEA botched

17   this investigation and failed to obtain any narcotics

18   whatsoever, the government is going to be relying on those

19   informants to prove its case.  The government is going to stand

20   up here at the end of the case and ask you to disregard the

21   serial perjury that these informants engaged in.  The

22   government is going to ask you to ignore their constant lying.

23   This will not be possible.  The lying is so pervasive by these

24   informants that it has failed to the government case and they

25   will not be able to meet their incredibly high burden.

GB75flo2                          Opening - Mr. Zach

1          Now, in his opening the prosecutor also left out some

2     crucial information about these informants.  These informants

3     were hand-picked by the DEA.  The DEA chose to bring these

4     informants into this case.  Now, the DEA has an entire roster

5     of informants like these guys who they pay lots of money, who

6     are basically DEA employees, who serve as bounty hunters and

7     they get paid for the DEA making arrests based on their

8     information.

9          Now, these informants are explicitly instructed that

10    they cannot engage in unauthorized criminal conduct, they can

11    only do things when it has been authorized.  And you will see

12    that they signed and swear that they won't do that when they

13    are working for the DEA.

14         Now, the particular informants that you will hear a

15    lot about in this case were among the most trusted informants

16    that the DEA had and in a particular unit of the DEA called the

17    Special Operations Division.  And you will see that while they

18    posed as loyal informants for the DEA as they met repeatedly

19    with DEA agents and looked them in the eye, they were in fact

20    running their own secret, massive drug operation right under

21    the DEA's nose.

22         So, what does that mean in this case?  It means that

23    the government is going to ask you to take these men seriously

24    when they come in here, when they raise their hands and they

25    swear to tell the truth and nothing but the truth even though

GB75flo2                         Opening - Mr. Zach

1    these informants have lied thousands of times to the government

2    and to federal agents.  At least one of these informants, you

3    will learn, actually took the stand in a different criminal

4    trial in front of different defendants and gave testimony even

5    though the whole time he had been lying to the DEA in operating

6    this huge, massive drug organization.

7            Third, the prosecutor left out the fact that the

8    problems with these informants that you just heard about were

9    ignored until right before this trial.  The government had to

10   arrest and charge their most trusted informants literally right

11   before this trial began.  When they take the stand in this case

12   they will have just pled guilty to participating in a scheme to

13   repeatedly lie to the federal government for an astounding four

14   years.  But, because nearly every piece of evidence in this

15   case is created by them, you will see that the government had

16   to give them a sweetheart deal that are essentially a

17   get-out-of-jail-free card to testify here in court.

18           Now, the use of these informants will raise tremendous

19   doubts for you, ladies and gentlemen, about the integrity of

20   the DEA's case and the government's ability to prove its case

21   beyond a reasonable doubt.

22           Fourth.  The prosecutor left out the fact that the

23   recordings in this case are -- contain meandering conversations

24   in which the informants dominate the talking.  With the

25   informants running these conversations you will see that the

GB75flo2                    Opening — Mr. Zach

informants are being intentionally confusing.  You will see

that the supposed agreement that the government just told you

about does not actually exist.  And, you will see during this

trial, that nowhere on those tapes that the government just

talked about do either of the defendants say anything about

intending to send narcotics to the United States.  The closest

the government will get are vague references made by the

corrupt informants about imaginary buyers who are in locations

such as Canada or other countries and some cities in America.

It will all be vague, it will all be non-specific.  It will not

relate to any agreement.

You will see and hear the informants scheming on these

tapes as they are produced here in court and you will see them

conniving to set up the defendants.  None of it -- none of

it -- will demonstrate any clear plan that relates to what is

actually charged in this case, what the actual charges in this

case are which is a conspiracy to import narcotics into the

United States.  This will also mean, independently, that the

government will again have failed to meet its burden be beyond

a reasonable doubt.

Now, while the prosecutor spent some time in his

opening on the so-called confessions of Efrain and Franqui, he

failed to mention that the proof of these confessions,

so-called confessions, is extremely problematic.  The

prosecutor didn't mention that these so-called confessions were

GB75flo2                         Opening – Mr. Zach

1   observed by only one person, the sole Spanish-speaking agent

2   who was involved in the case.  Even more importantly, the

3   prosecutor failed to mention that this agent will admit, when

4   he takes the stand, that he is not sure whether he took

5   accurate or complete notes about what was actually said in

6   those Spanish conversations.  And, most importantly with regard

7   to these so-called confessions, the prosecutor also failed to

8   tell you that the agent chose not to videotape the statement

9   even though he had all of the necessary equipment with him

10  right there on the plane that was going from Haiti to the

11  United States.  Now, when you see that he made that decision in

12  the context of this botched investigation, this will be yet

13  another basis for you to determine that this case and the

14  government have not met its burden to prove its case beyond a

15  reasonable doubt.

16         Sixth.  The prosecutor also ignored the truth about

17  who my client is.

18         Efrain is 30 years old.  He has lived his entire life

19  in Venezuela.  In Venezuela he went to college and he studied

20  to be a lawyer but, really, he is a guy that runs small

21  businesses.  He consults sometimes for people who are dealing

22  with the government and he runs a taxi business in Panama.  He

23  is married to a hard-working woman and they have two young

24  kids.  Efrain has no position whatsoever in the Venezuelan

25  government.  Efrain doesn't run some agency in the Venezuelan

1    government.  Efrain doesn't live in the Venezuelan White House.

2    Instead, he lives in a normal apartment in a normal part of

3    Caracas.  Efrain has no criminal record.  Efrain was never

4    arrested in his life until he was thrown on a plane by the DEA.

5    And, he has never before been in any trouble with the United

6    States.

7            Now, as the prosecutor did say, he is related to some

8    very important politicians in Venezuela.  Cilia Flores, who is

9    the First Lady of Venezuela, is Efrain's aunt.  To be clear,

10   his family is not some ruling dynasty that has ruled Venezuela

11   going back decades and decades.  They all come from simple

12   background, and Ms. Flores is married to a man named Nicholas

13   Maduro who is the president of Venezuela and he has been the

14   president of Venezuela for a few years now.

15           And it is not a secret to say that the Venezuelan

16   government is politically at odds with the United States.  So,

17   let me put it simply and frankly:  The two countries do not get

18   along at all.  However, Efrain is absolutely not the drug

19   kingpin the government is trying to make him out to be.  And

20   this will be clear from the government's own witnesses.  You

21   will see the informants all immediately recognize that Efrain

22   and Franqui have no idea what they are doing.  You will see the

23   informants and the DEA agents actually mock Efrain.  You will

24   see that they make fun of him for being inexperienced, for

25   being incompetent, and the rest of the DEA, after they arrest

GB75flo2                      Opening - Mr. Zach

1    him, they come to the same conclusion.  This is all evidence

2    that you will see, I expect, as this trial progresses.

3         Now, seventh.  The prosecutor left out the reality of

4    the environment in which this all took place.  This didn't

5    happen in Yonkers.  When the informants chose to target Efrain

6    and Franqui, Efrain was living, as I just said, with his family

7    in Caracas, Venezuela.  And that's important because Caracas is

8    unlike any place that you may have ever lived in the United

9    States.  It is a place where murder, kidnappings, and assaults

10   happen on the street with alarming frequency.  It is one of the

11   most dangerous cities in the world and it is filled with

12   unrest.

13        Now, because of all that, Efrain lived in constant

14   fear for his family and for himself.  He lived with the

15   heightened danger because of who he is, who his extended family

16   was, and because of that Efrain, just like all of the members

17   of the president's extended family, had security guards there

18   to protect him and that danger, you will see, is the reason

19   that everyone in Caracas is more comfortable with guns than

20   people in many parts of the United States, and that danger is

21   also why the informant's offer of tens of millions of dollars

22   to him meant something very significant to Efrain as a person

23   living with his family in, essentially, a war zone.

24        And, ladies and gentlemen, the final and most

25   important thing that the government left out is this:  The

1    evidence will show that Efrain never had any intention or

2    ability to import 800 kilograms of cocaine into the United

3    States.  He never made a single statement on those recordings

4    saying he intended, that he wanted to have any narcotics

5    shipped to the United States but he was targeted by these

6    conniving informants.

7         Now, these are just some of the things that the

8    government left out of its opening statement.  These are some

9    of the things that are going to come out over the next few days

10   as we go through this trial.  Now, each one of them, standing

11   alone, creates reasonable doubt.  Combined they show an

12   investigation that has no integrity and an utter failure of

13   proof on the part of the government.

14        So, I want to take a moment now and step back just for

15   a few minutes to talk about what really happened here.  To put

16   it bluntly, it comes down to a handful of stupid -- stupid --

17   decisions by my client and his cousin that do not equal a

18   criminal conspiracy.

19        Sometime in the middle of 2015 the DEA and the U.S.

20   Attorney's office here in New York managed to sort of hook a

21   big fish.  They were able to put charges on a bigtime Honduran

22   drug trafficker who was a huge player in the narcotics world.

23   This is a guy who was dealing this a massive amounts of real

24   drugs worth millions and millions of dollars.  He was one of

25   the biggest traffickers in Honduras.  He was also a bigtime

money launderer but the DEA didn't arrest him.  They didn't

throw him on a plane and take him to the United States.

Instead, the DEA gave him a tremendous deal.  The DEA and the

prosecutors got on a plane in New York and they flew to him in

Honduras and when they got there the DEA said to him, if you

can go out and help us get some other people, we won't arrest

you.  And if we ever do arrest you, we will give you a good

deal at sentencing.

          Of course this was an amazing deal for that Honduran

trafficker; he got to keep his business and got to put a

get-out-of-jail-free card in his back pocket.  All he had to do

was find some people to hand over to the DEA.  There was just

one problem.  Because he was still a real drug dealer he

couldn't set up a bunch of real drug dealers that he was still

doing deals with.  That would mess up his business.  Instead,

he needed to set up some marks.  He needed to go set up some

guys who might be willing to talk to him but who were

expendable and stupid.

          As you will see, he was operating with basically zero

oversight by the DEA and he had the freedom to manipulate the

situation however he wanted.  And you are going to learn that

the people he decided to set up and hand over were Franqui and

Efrain, the defendants in this case.  And you are going to

learn that in the fall of 2015 that Honduran trafficker

arranged to have Franqui and Efrain fly to Honduras to meet

GB75flo2                         Opening – Mr. Zach

1    with him.

2           Now, Franqui and Efrain didn't own private planes.

3    They did not have planes at their beck and call.  Like a lot of

4    people who have political connections in Venezuela, they had

5    friends who would allow them to fly on their private planes and

6    the Honduran drug trafficker insisted that they come down to

7    Honduras in a private plane.  And they were stupid enough to

8    agree to do that.  And this is where the sting operation

9    actually begins.

10          You see, at this point the Honduran began

11   communicating with the DEA and he identified that he had now

12   seen these politically connected targets, politically connected

13   to Venezuela, and Agent Gonzalez at this point entrusted the

14   Honduran trafficker who was already operating with the DEA, to

15   be point person who was going to be running the sting

16   operation.  There was one critically important thing that Agent

17   Gonzalez told the Honduran trafficker to do:  Record the

18   meeting.  Record the meeting.  And you will see, over the

19   course of this trial, that he told him to record the meeting

20   because in any sting operation the initial, first meeting is

21   the most important meeting.  It needs to be recorded.

22          Now, just to clarify, you have all probably heard the

23   term "sting" before.  Now, a sting is where law enforcement

24   sets up a fictional scenario and the targets of the sting are

25   surrounded by actors playing roles.  It is different from the

GB75flo2                              Opening – Mr. Zach

normal case in that the DEA is not solving a crime that's

already happened.  The DEA in this case did not find a stash of

drug money with fingerprints all over it and go from there to

try and figure out whose money that was.  They did not find any

real drugs at all or infiltrate a real drug organization that

had actually been sending drugs to the United States.  Instead,

they ran a sting operation.  They used the informants to act

out roles and they targeted Franqui and Efrain and you will see

exactly what disastrous effect that had in this investigation

as you sit through the trial.

        Now, going back to the first meeting between the

Honduran trafficker who set up the whole sting and the

defendants, you will learn that this, again, was the single

most important meeting because this was the meeting where the

Honduran trafficker set up the whole supposed fake deal that

was going to be done.  The deal that the government claims is

the conspiracy in the case, it is what they're charging.

        So, this is where the Honduran made his proposal.

Even more importantly, this is the meeting where the defendants

made clear to the Honduran trafficker that they had no ability

to execute the type of plan that he had proposed to them.  This

is where they showed that they were complete novices and

totally inexperienced when it came to international drug

trafficking.

        The Honduran trafficker, though, set things up so the

1    defendants basically would not have to do anything.  He would

2    provide everything.  He told them that he was going to give

3    them tens of millions of dollars to essentially do nothing.

4    And he also told the defendants something very important.  He

5    informed Efrain and Franqui that he was going to send two other

6    serious men to meet with them and that Efrain and Franqui could

7    not expose themselves to be rank amateurs when they met with

8    those serious men.

9          For Efrain and Franqui, that was going to be their

10   ticket to getting millions of dollars.  This was the most

11   important meeting, as I have said.  And the Honduran trafficker

12   recorded it.  But there was just one problem.  The recording

13   would show that the defendants were too inexperienced, they

14   were too stupid about the drug trade, too lacking in the

15   ability to actually secure drugs to be of value to the DEA.

16   So, what did the Honduran drug trafficker do?  He destroyed the

17   recording.  And when Special Agent Gonzalez asked him about it,

18   the Honduran trafficker told a complete lie that made no sense

19   and was flatly contradicted by the evidence.

20         So, what happened next is simple and it is sad.  The

21   DEA sent a set of different corrupt informants to meet with

22   Efrain and Franqui in Venezuela and have a bunch of

23   conversations with them.  In those conversations the informants

24   acted like seasoned pros and that they were in control.

25         Now, there are many hours of recordings and the

1    government is going to play a recording after recording after

2    recording in this case in the hopes of lulling you to sleep

3    about the big picture.  Remember, this was a scripted sting and

4    there is never any delivery of drugs, it is just talk dressed

5    up with a few flights on planes.  Even more importantly -- even

6    more importantly, ladies and gentlemen -- you will learn that

7    the informants who were choreographing these meetings destroyed

8    critical evidence.

9          You are going to learn that the two key informants

10   that were sent to Venezuela knew that they stood to make a huge

11   amount of money if they could bring in these targets, but in

12   their meetings, even though Franqui and Efrain were trying

13   their best to act big time, it was obvious that the defendants

14   had no ability to actually deliver on what was being discussed.

15         Let me say one thing about 800 kilograms of cocaine.

16   Ladies and gentlemen, you may or may not be familiar with

17   quantities of drugs from TV or newspapers but 800 kilograms of

18   cocaine is an enormous, gigantic amount of drugs worth probably

19   more than $20 million.  There are very few people in the world

20   who can actually get their hands on 800 kilograms of cocaine.

21   Franqui and Efrain were not two of them.  They never were and

22   that was obvious to the informants.  So, the informants started

23   selectively de-activating their recordings when it suited them

24   and this is in spite of the fact that they had clear

25   instructions that they were supposed to record everything.  And

1    you are going to see that many important parts of conversations

2    are just missing for no good reason.  You are also going to see

3    that those meetings, discussions, and recordings are

4    orchestrated by the informants.

5              So, as you listen to the evidence in this case, keep

6    in mind that almost all of it is being gathered by the

7    government informants acting out roles and trying to get the

8    defendants to join in.  The informants were on a mission.  They

9    get paid for making criminal arrests and they are trying hard

10   to get the defendants to play along here.

11             You are also going to see that in one evening the

12   defendants actually brought a bag of a substance, that was not

13   cocaine, as a supposed sample.  This happens after the

14   informants had been pressing them to find a sample.  And, you

15   are going to see that it was so obvious to the informants that

16   this was not cocaine that the informants destroyed the sample

17   before any testing at all could be done on it.  That's right.

18   The only sample of supposed drugs in this case was destroyed by

19   the informants and it was destroyed because the informants knew

20   it would imperil their reward.  No real cocaine, no real

21   reward.

22             By the way, you are also going to learn over and over

23   again that numerous DEA rules were broken during the course of

24   all of this madness.  The agents broke DEA rules, the

25   informants broke DEA rules, evidence was destroyed, indeed the

GB75flo2                          Opening – Mr. Zach

1    amount of evidence that the informants will admit to having

2    destroyed will shock you.  They deleted critical text messages,

3    they de-activated recorders.  They engaged with all manner of

4    improper activity.  They managed to secure absolutely no

5    cocaine but somehow, when they were in Venezuela, they did find

6    time to do lots of cocaine themselves and to indulge in the use

7    of prostitutes.  And what you are going to see is that the

8    informants lied almost every time they opened their mouths to

9    the federal agents in this case.

10            You are also going to see, unfortunately, that the

11   informants controlled the investigation.  They were in charge

12   of Agent Gonzalez.  Agent Gonzalez was not in charge of this

13   investigation.  They flipped it around.  That's not the way

14   stings are supposed to operate.  And due to that poor

15   supervision, due to that total mismanagement of these

16   witnesses, the extent of the botched sting only came out right

17   before this trial, as I told you before.  The government

18   ultimately had to throw its own employees, its star witnesses

19   in jail and this was after, by the way, the government had paid

20   them nearly $2 million for their work.

21            Now, all of these problems, all of this awful conduct

22   underscores where the charges in this case should never have

23   been brought.

24            Efrain and Franqui have been charged with conspiring

25   to import narcotics into the United States.  This is a very

GB75flo2                      Opening - Mr. Zach

1    specific charge.  It requires proof of knowledge or intent to

2    actually import drugs into the United States.  Why is that?

3    Well, the U.S. and the DEA do not generally have jurisdiction

4    to go around arresting people in foreign countries.  They can

5    prosecute narcotics trafficking only if it takes place here in

6    the U.S. or if the trafficking involves intentional importation

7    into this country.

8           So, here there is no actual 800 kilograms of cocaine.

9    There is not going to be any evidence that Efrain and Franqui

10   are connected to any drugs that ever actually came to the

11   United States.  You will hear that no one involved in this

12   entire case even set foot anywhere near the United States.

13   Every meeting occurred in this case happened in a different

14   country -- in Venezuela, in Haiti, and in Honduras, and neither

15   Efrain nor Franqui say anything about wanting to import

16   narcotics into the United States.

17          So, the question you may ask is if there was no intent

18   to actually execute this deal, why did the defendants do all of

19   this?  First of all, there isn't really any all of this.  Okay?

20   When you scrutinize it over the course of this trial, the

21   evidence will show that the defendants didn't do that much.

22   They met with informants a handful of times and they took a

23   handful of flights.  We are asking you, ladies and gentlemen,

24   to scrutinize the evidence as it comes in during this case.  It

25   doesn't amount to all that much.

GB75flo2                    Opening - Mr. Zach

1          And, the reality is that Efrain and Franqui thought

2     they would be able to get money for nothing.  The informants

3     were promising them that they would hand over 20, sometimes $50

4     million in cash and the defendants were dumb enough to think,

5     well, let's just do what we need to do to get this cash even if

6     we don't have any way to get all of these drugs.

7          So, ladies and gentlemen, we are imploring you not to

8     prejudge the case and to keep your minds open until the end of

9     the trial.  By the end of this one thing will be clear to you,

10    and that is how utterly clueless Efrain is.  It is almost

11    embarrassing.  You will see -- you will see -- all of the

12    obvious things any real drug dealer would have recognized were

13    off about the informants.  You will see how preposterous the

14    whole setup for the sting operation is.  It will be obvious to

15    you -- obvious to you, ladies and gentlemen of the jury -- that

16    any real drug dealer would have sniffed this out in about 20

17    seconds, but Efrain and Franqui were too stupid and too

18    inexperienced to do that.

19         You will see that this entire case is about some very

20    bad men who had everything to gain by convincing a couple of

21    very stupid men to have conversations with them.  You will see

22    that my client and his cousin never could have laid eyes on let

23    alone produce the 800 kilograms of cocaine that the prosecutor

24    told you about in his opening statement, and this was obvious

25    to everyone, to the informants, and to the DEA, and that is why

1    this case, this sting operation was taken down before any drugs

2    were actually received.  The DEA knew darn well that there was

3    never going to be any 800 kilograms of cocaine in this case but

4    they arrested them anyways.

5           Now, this is a summary of what we expect the evidence

6    to show in this case.  The picture that the prosecution painted

7    to you in its opening is simply not the reality of what

8    occurred here.  Those things that they failed to tell you about

9    is the critical evidence that is going to undermine their case.

10   It is the evidence that shows that there never was any

11   conspiracy to import cocaine into the United States.  It is the

12   evidence that shows a complete lack of integrity in the DEA's

13   investigation.

14          Now, in order to meet their burden the government is

15   going to have to prove to you that its witnesses can be

16   trusted.  They are not going to be able do that.  In order to

17   meet their burden the government is going to have to prove to

18   you that the defendants actually had the intent to do the crime

19   they've been charged with by putting some drugs on the table by

20   actually introducing some real drugs in this case.  They're not

21   going to be able to do that.  They're going to have to explain

22   to you why you should ignore all of their failings and problems

23   when a man's life is at stake in this trial.

24          This is a terribly serious to Mr. Campo Flores and to

25   his family.  This is the most serious thing that has ever

1    happened to him in his life.  The United States government is

2    claiming that he was actually trying to bring in 800 kilograms

3    of cocaine into the United States which would make him a drug

4    kingpin.  The government is not going to be able to get up here

5    and credibly attempt to prove to you that he is actually the

6    drug kingpin they described in their opening.  The government

7    is not going to be able to convince you that Mr. Flores' life

8    is so insignificant it can be disregarded on the strength of

9    corrupt witnesses and a botched investigation.

10           So, the only real question at the end of the this case

11   will be whether you, ladies and gentlemen of the jury, are

12   willing to follow the Judge's instruction that you must find

13   the defendants not guilty if you have reasonable doubts -- and

14   you will have tremendous doubts at the end of this case about

15   nearly every aspect of the sting and all of the important

16   witnesses and we submit when you have those doubts, ladies and

17   gentlemen, you must find the defendants not guilty.

18           Thank you for your time.

19           THE COURT:  Mr. Mann?

20           MR. MANN:  Thank you, your Honor.

21           Good morning.

22           THE JURY:  Good morning.

23           MR. MANN:  On behalf of Mr. Franqui Flores, I want to

24   follow up on a few other things that Mr. Zach just said to you.

25   Let me reiterate up front:  Like his cousin, Franqui Flores is

GB75flo2                        Opening - Mr. Mann

not guilty of the charge against him.  He is innocent and we re

confident that at the end of this case you will reach the same

conclusion and you will send him home to his family and life in

Venezuela.

          In our view, this case is about three men:  One who

wanted to avoid a huge prison sentence after being caught by

the DEA running millions of dollars worth of drugs into the

United States, and two others, a father/son duo who wanted to

cover up their own drug business while earning nearly $2

million from the U.S. government.  These three men are the

government's key informants in this case.  None of them are in

this courtroom today but, make no mistake, they're the reason

why we are all here and they will loom large over this entire

trial.  Let me explain.

          For starters, Efrain and Franqui would not be in the

United States without these government informants who executed

the government's sting operation and introduced a crime where

none existed before.

          You will learn that despite supposedly working at the

direction of the DEA, these three informants effectively

controlled the entire investigation.  They initiated contact

with the defendants, they controlled recordings that the

government referenced in their opening statements.  In fact,

these three informants were virtually the only source of

information for the government about the defendants.  The

evidence will show that these three informants made all of the
critical decisions in this case.  They are the ones who chose
to film and in many cases not to film their meetings with the
defendants.  They chose to record and in many cases not to
record their conversations.  They chose what information and
evidence to pass along to the DEA and what happened to hide or
destroy.  Two of these informants -- the father son duo -- took
a sample of a substance that they will suggest was narcotics
but they decided on their own not to keep that evidence so that
it could be tested which, as Mr. Zach noted, certainly
indicates that they, themselves, did not believe that the
substance was cocaine or could otherwise be helpful to their
case.

          The evidence will show that these informants lied and
deceived not only the defendants to get them arrested in Haiti,
but they lied to their DEA handlers.  They lied to the
prosecutors in this case.  They even lied to the Court all to
hide their own separate and unrelated criminal activity and to
receive reward money and huge benefits from the U.S.
government.

          Now, Mr. Bove told you that two of these three
informants pled guilty to their crimes but he didn't tell you
the half of it.  These two informants, the father son duo, were
previously paid informants registered with the DEA who were,
together, paid almost $2 million by the U.S. government.  They

1    got caught and pled guilty this past summer after years and

2    years of lies and illegal, unauthorized, drug trafficking that

3    they committed right underneath the DEA's nose.  And when they

4    did plead guilty, these two career criminals not only admitted

5    to trafficking in major quantities of cocaine, heroin, crystal

6    meth, but they also pleaded guilty to lying to the U.S.

7    government.  But, it gets worse.  You will learn that these two

8    paid informants, now admitted liars, continued to lie even

9    after their guilty pleas and right up until this trial.  At

10   another proceeding in this very courtroom only a few weeks ago

11   they sat up on that witness stand over there and they lied

12   again, under oath.

13          Now, at this trial they're going to come into this

14   courtroom and raise their right hand again and swear that this

15   time they're going to tell you the truth.  It is just

16   remarkable.  The government will ask you to rely on the

17   testimony of these two repeat liars and send these two young

18   men away to a United States prison.

19          Now, I will come back to the DEA's informants in a

20   moment but before I do, let me take a step back and properly

21   introduce myself and Franqui Flores.

22          As Judge Crotty mentioned during jury selection, my

23   name is Michael Mann, and along with Dave Rody and Elizabeth

24   Espinosa, we will be representing Mr. Flores during the course

25   of this trial.  On behalf of all three of us, I can say that it

1    is our privilege and honor to represent Mr. Flores.

2              During this trial you will learn that Franqui Flores

3    is a citizen of Venezuela and a resident of Caracas, the

4    capital city.  Before he was brought here by the DEA, Franqui

5    had been to the U.S. only once on a visit to Universal Studios

6    in Orlando, Florida, as a tourist with his girlfriend and now

7    8-year-old son.  This case is Franqui's first brush with the

8    law.  He has no prior criminal record and before this he had

9    never even been arrested.

10             You have already heard that Franqui and Efrain are

11   both nephews of the first lady of Venezuela.  Well, you are

12   going to see that the political connections go to the very

13   heart of this prosecution.  You will see that the DEA and its

14   informants were actually enthusiastic and excited, almost giddy

15   to be pursuing these two young men.  Why?  Because of who they

16   were.  Because of the country that they came from.  To the

17   three informants in particular you will see that Franqui and

18   Efrain presented a tremendous opportunity to get paid a lot of

19   money and adhere themselves to the DEA, a win-win situation,

20   all while avoiding scrutiny of their own separate, criminal

21   activity that has only recently come to light.

22             Now, let me be clear.  The government's own witnesses

23   will testify that neither Franqui nor Efrain have experience in

24   the drug trade; they were utter novices, ripe for exploitation

25   and you will see that played out repeatedly on the recordings

1    and the number of times that they actually have to ask the

2    DEA's informants who, remember, a real drug trafficker is being

3    paid by the DEA to explain what in the world the informants

4    were even talking about on the tapes.

5            Also, while they certainly are better off than many of

6    their fellow countrymen, they do not lead lives of luxury.

7    Franqui doesn't live in the presidential palace or on some

8    fancy estate.  He lived in a modest two-bedroom apartment with

9    a roommate in Caracas.  He worked in a cell phone repair store

10   and did all kinds of odd jobs just to get by and to provide for

11   his son.

12           Now let's talk a little bit more about what the

13   evidence will show in this trial.

14           As Mr. Zach just mentioned, you will learn that

15   everything that occurred in this case took place outside of the

16   United States of America.  Every relevant meeting, every

17   conversation or recording occurred outside of the U.S.  Not

18   only that, every witness, with the exception of the DEA agents,

19   is from Latin America, and no witness will come into this

20   courtroom and credibly tell you that these two defendants

21   agreed to import drugs into the United States.  It certainly

22   does not occur on any of the tapes that Mr. Bove told you so

23   much about.  In fact, you will see that the only part of this

24   case that concerns the United States is the part that comes out

25   of the mouths of the government's own informants.  Let me say

GB75flo2                        Opening - Mr. Mann

1    that again.  The only scattered bits of evidence here that in

2    any way relate to the United States -- and you will see that

3    they're only passing, isolate and sporadic references -- were

4    said by the government's own informants.  They tricked these

5    guys.  They set them up.  And you can see it for yourself on

6    the tapes.  Franqui and Efrain never demonstrate any intent to

7    import narcotics into the United States.

8          Now, at the end of this trial I expect Judge Crotty

9    will instruct you that in order to convict the defendants you

10   will need to find beyond a reasonable doubt that they knew and

11   intended to import drugs into the United States.  When you see

12   the evidence in this case you will see that the government's

13   proof falls woefully short of that standard.

14         Now, the government will show you lots of

15   communications in this trial including audio and videotapes of

16   the defendants.  You will see that the quality of these

17   communications and these tapes are just awful, they're hard to

18   hear, the participants are constantly talking over one another,

19   and they talk in vague language and it is often difficult to

20   figure out what they're even talking about.  But, still, you

21   won't like some of what you see.  On the tapes the defendants

22   are talking about moving drugs from Venezuela to Honduras.

23   Sometimes they show off and brag.  And sometimes they try to

24   sound like big shots, like they know what they are doing and

25   are in control.  It is pure bluster, bragging, to sound

1    important, to sound connected.

2         Remember the context of these conversations, who they

3    are speaking with, and the fact that they're in Venezuela.

4    Franqui and Efrain live in one of the most violent and

5    difficult environments in the western hemisphere.  Venezuela

6    today has one of the highest poverty and murder rates in the

7    entire world.  Efrain and Franqui often had to be accompanied

8    by bodyguards with guns just to avoid getting kidnapped for

9    ransom.  And they're talking with two informants who are posing

10   as senior members of the Sinaloa drug cartel, so bragging in

11   those conversations should come as no surprise.

12        Now, you will see that the defendants did participate

13   in conversations with the informants.  It was the dumbest

14   mistake they ever made.  But, scrutinize the evidence

15   carefully.  Look at what is actually said and not said in those

16   conversations.  The government is asking to you believe what

17   they say and not what you see and hear on those tapes.

18        The government has charged a drug conspiracy but, as

19   Mr. Zach told you, in this case there never were any drugs.

20   The evidence will show there never were any 800 kilos of

21   cocaine.  There never was a plane loaded with any amount of

22   drugs at all.  There never were any men, for example, observed

23   standing on the tarmac in Venezuela or Honduras waiting to load

24   drugs onto or off of airplanes, and no agent is going to come

25   into this courtroom and testify that he seized drugs from a

1    truck or a warehouse that was in any way connected to these two

2    defendants.  No agent will testify that they saw drugs, tested

3    drugs, recovered packaging material for drugs, or saw any other

4    kind of drug paraphernalia.  No.  This is a case about

5    conversations and conversations alone.  The government's proof,

6    quite literally, is all talk, talk that was initiated and

7    instigated by the government's own informants.  And you will

8    see that most of that talk comes from the informants, not the

9    defendants.  Some, but not all of that talk, is recorded on

10   tape.  You will learn that the government's informants turned

11   the tape on and off at seemingly random times.  We have no idea

12   what was actually said by the informants at those times because

13   the informants themselves chose not to record it.

14          Everything we know about what happened in this case,

15   except for the plane ride from Haiti to New York, came straight

16   from the mouths of the informants.  In fact, the plane ride

17   back from Haiti was the first and only time that the DEA had

18   any real involvement in or control over this investigation.

19          That's the government's proof in this case.  There is

20   no evidence of violence.  There is no evidence of drug

21   organizations.  There is no evidence that the defendants ever

22   agreed or intended to import cocaine into the United States.

23   And there certainly won't be evidence of the quality or caliber

24   necessary to find the defendants guilty of the crimes charged

25   beyond a reasonable doubt.

1          Indeed, you are going to have a lot of unanswered

2     questions at the end of this trial and one of the primary

3     reasons is that this case is bookended by significant

4     investigative failures.  For example, Mr. Zach mentioned to you

5     a first meeting that the defendants had in Honduras with one of

6     the government's three main informants, the Honduran trafficker

7     known as El Sentado.  It was El Sentado who offered Efrain and

8     Franqui, two young guys from Caracas, the enormous sum of $20

9     million for virtually no work at all.  You will learn that the

10    DEA agent, who was the handler for this informant, El Sentado,

11    was Special Agent Gonzalez.  Agent Gonzalez directed El Sentado

12    to record that first meeting but, as Mr. Zach said, El Sentado

13    refused, or he refused to hand over the recording, or he

14    destroyed that recording.  So, today the DEA will tell you that

15    they have no audio or video of that meeting.  Instead, the DEA

16    will say that all they have now is a single still photograph

17    that appears to show the defendants and El Sentado talking to

18    one another outside in the dark.  You will also learn that

19    there were even more images taken of that meeting but you won't

20    see them.  The DEA asked El Sentado for the photos but he

21    simply never handed them over.  And remember, this was the

22    kickoff meeting for the entire alleged conspiracy, the critical

23    initial planning session for this supposed crime.

24          And here we are at trial, over a year later, and the

25    government doesn't have a clue as to what took place at that

1    meeting.  They did not even prepare a report summarizing it.

2    You will be left with just a single photograph.  There is just

3    no useful evidence at all.  And this is the story of the whole

4    case.

5            So, that was the investigative failure at the

6    beginning of the case.  You will learn of numerous other

7    failures along the way but there was another absolutely

8    critical failure at the end of the case.

9            Mr. Bove told you about the defendant's supposed

10   confessions but he didn't tell you the full story about the

11   circumstances in which they occurred, how the defendants were

12   held for hours without food, blocked from contacting home or

13   their consul or even obtain a lawyer, and how they were quickly

14   loaded onto a DEA private jet, handcuffed, without explanation

15   as to what was happening, or even to where they were going and

16   how miraculously, several hours into the flight, the defendants

17   supposedly confessed.

18           Mr. Bove didn't tell you that the evidence will show

19   that there was only one DEA agent on that plane who understood

20   Spanish and that was interviewing the defendants, and that this

21   one agent was the only person on the plane who understood what

22   was asked and what was said by the defendants.

23           You will also learn that this agent and his supervisor

24   made a strategic decision on that plane that affects these

25   young men's lives to this very day.  You will learn that the

GB75flo2                      Opening – Mr. Mann

agent decided not to do the simple thing that 16-year-old kids

all over the country and around the world do whenever they see

something important taking place -- they take out their phone

and they record it.  Nope.  In this case you will see that the

DEA agent made an inexplicable decision not to record the

defendant's statements and the agents did that despite the fact

that they had phones and all other kinds of recording equipment

at hand while on the private airplane.

       So, while you will hear much about the defendants'

supposed confessions you will not get to hear defendants'

actual words, see their demeanor when they spoke to the agents,

assess the conditions of the in-flight interrogation, and

generally see whether they were even advised of their

constitutional rights.  And when that agent tells you what he

recalls of those hour-long statements a year later, you will

have only his word for it without any way to verify what he is

saying.

       Again, between the lack of evidence about what

occurred at the defendant's first critical meeting with the

government informants and the agent's failure to record their

post-arrest statements, this case is bookended by investigative

failures.

       At the end of the day, ladies and gentlemen, the

government has the burden of proving their case beyond a

reasonable doubt.  Hold them to their burden.  In this case

GB75flo2                         Opening - Mr. Mann

1    they have charged a drug conspiracy but they will show you no

2    drugs.  They have alleged a conspiracy to import drugs to the

3    United States but their primary evidence, those secretly

4    recorded video and audio tapes, show no such agreement.  The

5    government simply does not have the proof necessary to convict

6    these two men of the crime charged.  Not here, not in this

7    case.

8         The defendants are not guilty.  These two young men

9    were brought to this country a year ago by the DEA.  Enough is

10   enough.  At the end of this case my colleague, Dave Rody, will

11   speak to you and will ask you to return a not guilty verdict

12   and send Mr. Flores and Mr. Campo home to their families and

13   lives in Venezuela.

14        Thank you very much for your attention.

15        THE COURT:  Ladies and gentlemen, we will take our

16   morning recess now.  We will resume in about 10 or 15 minutes

17   with the government's first witness.

18        Will the audience stay in place?  Please, in the back

19   of the room there, don't move.

20        (Jury not present)

21        THE COURT:  See you in about 10 minutes.

22        (Recess)

23

24

25

GB79FLO3

```
 1              (Jury not present)

 2              THE COURT:  Somebody want to take something up?

 3              MR. BOVE:  Yes, your Honor.  Thank you.

 4              There are two issues.

 5              THE COURT:  We have to wait for the interpreters.

 6              THE INTERPRETER:  Ready.

 7              THE COURT:  Okay.  Thank you.

 8              Mr. Bove.

 9              MR. BOVE:  Thank you, your Honor.  We wanted to raise
```

10   two issues that will potentially impact the testimony of

11   Special Agent Gonzalez, our second witness this morning.  The

12   first related -- both of these are issues that we feel the door

13   was opened during opening statements and in particular the

14   Flores opening statement.

15              The first relates to the current status of Sentado.

16   We had said in previous submissions that it was not our

17   intention to elicit that he was deceased, that he is deceased.

18   We feel that some of the arguments made during the openings

19   have opened the door to that and in particular the argument

20   that the government doesn't have a clue what happened at this

21   October 3 meeting more than a year later here during this

22   trial.  We think that we should be entitled to present to the

23   jury, not the circumstances of why he's deceased but the fact

24   that he is deceased and that that happened in early December of

25   2015.

GB79FLO3

1          THE COURT:  Mr. Mann or Mr. Rody.

2          MR. RODY:  Thank you.

3          They would not be able to -- the statement that the

4    government has no clue about that meeting is because there was

5    no recording of the meeting.

6          The problem is there is no recording of the meeting.

7    Sentado is not a witness here.  Even if he was around to be

8    debriefed, no agent can get on the stand and say what Sentado

9    said.

10         THE COURT:  I don't think you opened up the door.  I

11   think it's a statement that says, as Mr. Rody suggests, that

12   the meeting was not recorded.  And that's coming in, right.

13   The fact that the meeting was not recorded, Sentado said that.

14         What's the next one?

15         MR. BOVE:  The next one, your Honor, is that we also

16   feel that defense has opened the door to the admissibility of

17   Special Agent Gonzalez's reports, his DEA reports, and the

18   underlying notes relating to the confessions of the defendants

19   pursuant to 801(d)(2) as prior consistent statements.

20         THE COURT:  Were they produced as 3500 material?

21         MR. BOVE:  Yes, your Honor.  I can give you the 3500

22   identifiers if you'd like to review them.

23         THE COURT:  What are they?

24         MR. BOVE:  With respect to defendant Campo it's

25   3508-19 is the report.  And 3508-08 are the notes.  For Flores

GB79FLO3

1    the report is 3508-20.  And the notes are 3508-09.

2              THE COURT:  Defense want to be heard on this?

3         MR. RODY:  I do, Judge.  Maybe Mr. Jackson will say

4    something.  I would say the following, Judge.  This is not a

5    case where there is a signed confession by any of the

6    defendants.  So any testimony about that would have to be just

7    that, testimony from the agent about what they said.  I would

8    expect in any circumstance like that if he can't recall

9    everything that was said he can refresh his recollection with

10   one of his -- with his prior notes or his report.  That would

11   be the appropriate procedure.  He could do that to his heart's

12   content to the extent he can't remember anything on the stand.

13   And that's the formal procedure when -- when someone has given

14   an oral statement and they have prior notes, they are allowed

15   to refresh their recollection with those prior notes.

16             THE COURT:  Mr. Jackson.

17        MR. JACKSON:  Yes, your Honor.  I would just add that

18   the exception that allows hearsay for the admission -- for the

19   admission of a hearsay statement to rebut a claim of recent

20   fabrication is only available if the creation of the statement

21   at the time undercuts the specific argument that is being made

22   about the credibility of what the expected testimony or what

23   the testimony was.  Here, we are arguing from the beginning

24   only that the -- that what Agent Gonzalez says happened during

25   the -- during that meeting is not a complete and accurate

GB79FLO3

1    description of what happened.  And the fact that he wrote it

2    down at that time doesn't alter that equation at all.

3            I would just also add, your Honor, that if it were the

4    case that any attempt to question the credibility of the

5    completeness and accuracy of a postarrest opened the door to

6    the DEA 6 coming in, then the DEA 6 would literally come in in

7    every trial and that can't be the law.

8            MR. RODY:  I apologize for the Whac-A-Mole nature of

9    this but I believe that one of the preconditions for the prior

10   recorded recollection exception is that the person who took the

11   notes be able to affirm that they took accurate notes.  And I

12   believe that the prior testimony at the earlier proceeding from

13   Agent Gonzalez was that he could not say that he took fully

14   accurate notes of those statements.  So that would eliminate

15   one of the preconditions for that exception.

16           THE COURT:  Mr. Bove.

17           MR. BOVE:  Judge, the argument by Mr. Mann was that

18   well after -- approximately a year after the confession Special

19   Agent Gonzalez's recollection can no longer be trusted as to

20   what was said on the airplane.  These are notes and reports

21   that were created immediately following the confession and the

22   reports created shortly thereafter.

23           We think that it's that -- the argument about relying

24   on his recollection as it stands today and that recollection

25   being incomplete was an argument that was presented by the

GB79FLO3

```
1    defense and is fairly rebutted pursuant to the documents that I

2    identified.  The rule was actually expanded in 2014.  There is

3    a (i) that relates to rebutting an expressed or implied charge.

4              THE COURT:  What are you reading from?  What are you

5    citing from?

6              MR. BOVE:  801(d)(1)(B.)

7

8              THE COURT:  801.

9              MR. BOVE:  (d)(1)(B).  So I think that the provision

10   that's been referenced so far today is (i) referring to a

11   recent fabrication.

12             (ii) is a recent amendment that allows for a broader

13   application of the rule we feel under the circumstances

14   presented here by the opening statements.

15             THE COURT:  I'll allow it.

16             Marlon, call in the jury.

17             THE DEPUTY CLERK:  Yes, your Honor.

18             (Continued on next page)

19

20

21

22

23

24

25
```

1             (Jury present)

2             THE COURT:  Government call its first witness.

3             MR. QUIGLEY:  Your Honor, the government calls

4    Stevenson Barbot.

5             THE COURT:  Somebody going to go get him?

6             MR. QUIGLEY:  Your Honor, we also have a Haitian

7    interpreter here.

8             THE COURT:  Anybody want the interpreter sworn?

9             MR. QUIGLEY:  Yes, your Honor.  Please.

10            (Interpreter José Voigt sworn)

11      STEVENSON BARBOT,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14            THE COURT:  Please sit down.  Speak right into the

15    microphone.

16            Proceed, Mr. Quigley.

17   DIRECT EXAMINATION

18   BY MR. QUIGLEY:

19   Q.  Good morning, sir.

20   A.  Good morning.

21   Q.  Where do you work?

22   A.  TCPJ BLTS.

23   Q.  Is that an organization of the Haitian police?

24   A.  Yes.

25   Q.  How long have you been with the Haitian police?

GB79FLO3                         Barbot - direct

1   A.  Three years.

2   Q.  And directing your attention to November 10, 2015.  Were

3   you involved in an arrest that day?

4   A.  Yes.

5   Q.  What role did you play in the arrest?

6   A.  I was responsible for handcuffing the defendants during the

7   arrest.

8   Q.  What were you doing that day immediately before the arrest?

9   A.  We were in the office and then we left the office in the

10  direction of the Servotel.

11          MR. QUIGLEY:  Your Honor, may I approach?

12          THE COURT:  Yes, you may.

13  Q.  Sir, I'm handing you what's been marked for identification

14  as Government's 52, 50, and 54.  Take a look at no. 52 first.

15  Do you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is the entrance to the Servotel.

19  Q.  Is that around the area where you were prior to the arrest

20  in this case?

21  A.  Yes.

22          MR. QUIGLEY:  Your Honor, the government offers

23  Government Exhibit 52.

24          THE COURT:  Any objection?

25          MR. JACKSON:  No objection.

GB79FLO3                          Barbot - direct

<pre>
 1                THE COURT:  52 is in evidence.
 2                (Government's Exhibit 52 received in evidence)
 3                MR. QUIGLEY:  Mr. Calabrese, publish Government's
 4      Exhibit 52.
 5                THE COURT:  Yes, you may.
 6      Q.  Approximately how many other officers were with you in your
 7      vehicle that day?
 8      A.  Three officers.
 9      Q.  And what type of uniform were you wearing?
10      A.  BLTS uniform.
11      Q.  What does that consist of?
12      A.  It is a BDU, the vest, and T-shirt, cask, a helmet.
13      Q.  Sir, if you could look at Government Exhibit's 50?  Do you
14      recognize that -- the uniforms in that photograph?
15      A.  Yes.
16      Q.  Does that fairly and accurately depict the kind of uniform
17      you were wearing on November 10, 2015?
18      A.  Yes.
19                MR. QUIGLEY:  Your Honor, the government offers
20      Government Exhibit 50.
21                THE COURT:  Any objection?
22                MR. JACKSON:  No objection.
23                THE COURT:  50 is in evidence.
24                MR. QUIGLEY:  May we publish?
25                THE COURT:  Yes, you may.
</pre>

GB79FLO3                        Barbot - direct

1              (Government's Exhibit 50 received in evidence)

2     Q.  Sir, were you carrying a weapon that day?

3     A.  Yes.

4     Q.  What kind?

5     A.  A rifle 556 caliber, a nine millimeter gun.

6     Q.  Do you see in the picture some of the officers are wearing

7     masks.  Were you wearing a mask that day?

8     A.  Yes.

9     Q.  Why do you wear a mask during the course of your duties?

10    A.  We wear the mask for our protection because sometimes after

11    you arrest someone you may bump into that person on the streets

12    or in the market.

13    Q.  Now, you mentioned there were three officers in your

14    vehicle.  Were there any other police vehicles in the vicinity

15    of the Servotel?

16    A.  Yes.

17    Q.  Did there come a time when you went into the Servotel?

18    A.  Yes.

19    Q.  What caused you to go into the Servotel?

20             THE INTERPRETER:  I'm sorry.  Could you repeat.

21    Q.  What caused you to go into the Servotel?  Why did you go

22    into the Servotel?

23    A.  We receive an alert to go inside and to arrest two

24    individuals.

25    Q.  How many officers in addition to you actually went into the

GB79FLO3                        Barbot - direct

1    hotel?

2    A.    There were about two.

3    Q.    And where did you go once you got inside the hotel?

4    A.    We went into the restaurant of the hotel.

5    Q.    Can you describe what happened when you got into the

6    restaurant.

7    A.    Okay.    When we went into the hotel the supervisor already

8    had the description of the individuals.    So he went directly to

9    that -- to where they were seated.

10            So when he got there he said police.    He spoke with

11   them in Spanish.    And then we proceeded to the arrest.

12   Q.    Before they were arrested what, if anything, did you see

13   them do with any objects on the table?

14   A.    When the officer said "police," one of them reached out to

15   grab a telephone.

16   Q.    Sir, how did you go about handcuffing the defendants?

17   A.    When I went to handcuff them, one of them indicated that he

18   has a problem with his wrist, hand.    And so instead of

19   handcuffing him in the back I handcuff him in the front.

20   Q.    Where did you take the defendants once you arrested them?

21   A.    To the office.

22   Q.    And how were they taken there?

23   A.    By car.

24   Q.    Did you have any other interaction with them once they got

25   into the office?

GB79FLO3                         Barbot - direct

1    A.  No.

2    Q.  Did you hit either of the defendants that day?

3    A.  Oh, no.  Never.

4    Q.  Did you see anyone else hit either of the defendants that

5    day?

6    A.  No.  We don't hit people.

7    Q.  Sir, did you have any involvement in this investigation

8    other than your involvement in this arrest?

9    A.  No.

10   Q.  Sir, could you just take a look at -- sorry.  One last

11   question.  Take a look at Government Exhibit 54.  What's that a

12   photograph of?

13   A.  This is exactly the Servotel restaurant.

14   Q.  Does that fairly and accurately depict the restaurant where

15   the defendants were arrested?

16   A.  Yes.

17           MR. QUIGLEY:  Your Honor, the government offers

18   Government Exhibit 54.

19           MR. JACKSON:  No objection.

20           THE COURT:  54 is in evidence.  You can display it.

21           (Government's Exhibit 54 received in evidence)

22           MR. QUIGLEY:  No further questions, your Honor.

23           THE COURT:  Ms. Espinosa.

24           MS. ESPINOSA:  May I have one moment, your Honor?

25           THE COURT:  Yes.

GB79FLO3                          Barbot – cross

1   CROSS-EXAMINATION

2   BY MS. ESPINOSA:

3   Q.  Good morning, officer.

4   A.  Good morning.

5   Q.  Now you arrested Mr. Flores and Mr. Campo at the direction

6   of the DEA, correct?

7   A.  Yes.

8   Q.  And the DEA told you who to arrest and where they were,

9   correct?

10  A.  Yes.

11  Q.  You didn't personally have any evidence that these

12  defendants had committed a crime in Haiti, did you?

13  A.  No.

14  Q.  After you arrested Mr. Flores and Mr. Campo did you search

15  them?

16  A.  Search them, no.  You touch them because you arrest someone

17  you have to see if they have objects on them and what kind of

18  objects they have on them.

19  Q.  And you did not find any weapons or drugs on the

20  defendants, did you?

21  A.  No.

22  Q.  Officer, are you aware of whether your fellow officers

23  searched the plane that the defendants arrived on?

24          MR. QUIGLEY:  Objection.  Calls for hearsay.

25          THE COURT:  Overruled.

GB79FLO3                        Barbot - cross

1          THE WITNESS:  No.  I don't know.

2   Q.  Are you aware that others were taken into custody at the

3   same time as the defendants?

4   A.  There were -- simply called them but they weren't -- they

5   didn't take them into custody.

6   Q.  Now when you went into the hotel to arrest the defendants

7   you were aware that they were not dangerous, correct?

8   A.  Yes, apparently.

9   Q.  And you had participated in briefings prior to the arrest?

10  A.  Yes, some -- just a normal procedure.

11  Q.  And the DEA agents were present at those briefings?

12  A.  No.

13         THE COURT:  Would you speak up a little bit, please,

14  so we can hear you.

15         MS. ESPINOSA:  Yes, Judge.  I apologize.

16  Q.  Are you aware if the DEA agents briefed your supervisors?

17  A.  Maybe.

18  Q.  And your supervisors advised you that the defendants were

19  not dangerous?

20  A.  Apparently not dangerous.  That's what we were told.

21  Q.  Could we go back for a moment to the Government Exhibit 50,

22  please.

23         Officer, are you in this photo?

24  A.  When I look at the picture, there is one that looks like

25  me, has my style, but I cannot confirm whether it's me.  I

GB79FLO3                        Barbot - cross

1   don't know when that photograph was taken.

2   Q.  So this is a photo of your fellow officers?

3   A.  Yes.

4   Q.  Now the patches on your uniform that say police, those

5   patches can be removed, correct?

6   A.  Yes.

7   Q.  And are there any patches on the front of your uniform?

8   A.  Yes.  That is a patch in the front.  There's a patch in the

9   back.

10  Q.  What does the patch on the front say?

11  A.  BLTS.  That's what it says in front.

12          MS. ESPINOSA:  May I have one moment, your Honor.

13          (Pause)

14  Q.  Officer, normally does it say police on the front of your

15  uniform or just on the back?

16  A.  Police is in the back.

17          MS. ESPINOSA:  I have no further questions.

18          THE COURT:  Mr. Quigley.

19          MR. QUIGLEY:  No redirect.  Thank you.

20          MR. JACKSON:  Your Honor.

21          THE COURT:  I'm sorry, Mr. Jackson.  I didn't mean to

22  overlook you.

23  CROSS-EXAMINATION

24  BY MR. JACKSON:

25  Q.  Good morning, sir.  How are you?

GB79FLO3                          Barbot – cross

1    A.  Good morning.

2    Q.  Have you had a good trip to New York?

3    A.  Yes.

4    Q.  Now, sir, let me just ask you:  The flight that came in

5    that led to the arrest that you testified about, you were aware

6    that this was a DEA investigation, right?

7    A.  I have nothing to do with the flight.  I don't understand.

8    Q.  Sure.  So you understood that the defendants had come in on

9    a flight, right, into Haiti?

10   A.  Yes.

11   Q.  And as far as you know there was absolutely no cocaine

12   obtained from either the defendants or the airplane, correct?

13   A.  I know that nothing was found on them but as for the plane

14   I don't know what was on the plane.

15   Q.  To your knowledge you have no knowledge of any cocaine

16   being found, right?

17   A.  Where?

18   Q.  Anywhere.

19   A.  I can talk about the individuals we arrested but as for the

20   plane I cannot comment on it because I wasn't there.

21   Q.  Sure.  And it's a fact, right, that you're not aware of the

22   DEA asking you if you could assist with any forensic analysis

23   of any of the plane or anything like that, right?

24   A.  I have no direct contact with the DEA.  I have contact with

25   my supervisor.

GB79FLO3                              Barbot - cross

1    Q.  Right.

2    A.  So I receive my instructions from my supervisor.

3    Q.  And your supervisor didn't advise you anything about that,

4    right?

5    A.  Anything about what?

6    Q.  Doing any forensic analysis?

7    A.  No.

8    Q.  And the DEA didn't ask you to help them seize the plane,

9    right?

10   A.  No.

11   Q.  And the DEA actually didn't explain to you anything about

12   why these people were actually going to be arrested, right?

13   They didn't explain anything to you?

14   A.  Maybe to my supervisor but to me, no.  As I explained to

15   you -- as I explained before, I have no direct contact with the

16   DEA.

17   Q.  When you said maybe to your supervisor what you mean is you

18   have no knowledge of any conversation like that with regard to

19   your supervisor either, right?

20   A.  There will be anyway.

21        MR. JACKSON:  I'm sorry.  I couldn't understand the

22   interpreter.

23        THE INTERPRETER:  There will be anyway.

24   Q.  Right.  You have no knowledge, correct?

25   A.  No.

GB79FLO3                          Barbot - cross

1    Q.  And you also have no knowledge of any drug trafficking

2    involvement of either Mr. Campo Flores or Mr. Flores de Freitas

3    in any drug trafficking in Haiti, right?

4    A.  No.  I have no knowledge of that.

5    Q.  Last question.  You've been involved in a number of

6    different investigations of drug trafficking in Haiti?

7    A.  Yes.

8    Q.  And as far as you know you never received any information

9    from any of those investigations that implicated either

10   Mr. Campo Flores or Mr. Flores de Freitas, right?

11   A.  There's something called top secret.  Depending upon the

12   nature of the information, it -- it may reach the chain but to

13   my level I may not be aware of any of that.

14   Q.  Right.  You don't have any knowledge of that, right?

15   A.  No.

16          MR. JACKSON:  No further questions.  Thank you,

17   Mr. Barbot.

18          THE COURT:  Mr. Quigley.

19          MR. QUIGLEY:  No redirect, your Honor.

20          THE COURT:  Thank you very much, Officer.

21          (Witness excused)

22          MR. QUIGLEY:  Government may collect the exhibits?

23          THE COURT:  Yes.

24          MR. BOVE:  The government calls Special Agent

25   Gonzalez.

GB79FLO3                    Gonzalez - direct

1        SANDALIO GONZALEZ,

2            called as a witness by the Government,

3            having been duly sworn, testified as follows:

4                THE COURT:  Mr. Gonzalez, please sit down, make

5    yourself comfortable.

6                MR. BOVE:  Your Honor, for the sake of efficiency may

7    I leave this packet of exhibits with the witness?

8                THE COURT:  Yes.

9    DIRECT EXAMINATION

10   BY MR. BOVE:

11   Q.   Special Agent Gonzalez, where do you work?

12   A.   I work for the Drug Enforcement Administration.

13   Q.   And what's your current position at the DEA?

14   A.   Special agent.

15   Q.   Where within the DEA are you currently assigned?

16   A.   I'm assigned to the bilateral investigations unit of the

17   special operations division.

18   Q.   Is the special operations division sometimes referred to as

19   SOD, the initials?

20   A.   Yes, sir.

21   Q.   What does SOD do?

22   A.   SOD is one of the field divisions within DEA.

23   Q.   Now you mentioned that within SOD you're assigned to the

24   bilateral investigations unit?

25   A.   Yes, sir.

GB79FLO3                          Gonzalez - direct

1    Q.  What does the bilateral investigations unit do?

2    A.  It's a small unit within the special operations division

3    that's tasked with investigating international crimes in the

4    South America, Central America, Mexico, the Americas region,

5    large drug trafficking with ties to the United States.

6    Q.  When were you assigned to that unit?

7    A.  Approximately the spring, summer of 2010.

8    Q.  And prior to your work at the bilateral investigations unit

9    did you work in other parts of the DEA?

10   A.  Yes, sir.

11   Q.  Could you please tell the jury where else you worked within

12   the DEA and the years that you were there?

13   A.  I worked in the San Ysidro office which is on the border of

14   California and Mexico from 2000 to middle of 2003.

15          After that I was assigned to the San Diego field

16   division from sometime 2003 to end of 2005.

17          And then beginning of 2006 to 2010 I was assigned to

18   the Caracas, office in Caracas, Venezuela.

19   Q.  What did you do before you began to work at the DEA?

20   A.  I was a contract linguist for DEA.

21   Q.  In what language?

22   A.  Spanish.

23   Q.  Where did you grow up?

24   A.  My dad was a DEA agent so I grew up a lot of places in the

25   United States:  Costa Rica, Mexico, Panama.

GB79FLO3                    Gonzalez – direct

1    Q.  What if any foreign language experience did you have when

2    you were growing up?

3    A.  Been speaking English and Spanish my entire life.

4    Q.  Have you ever taken the proficiency test in Spanish that's

5    administered by the government?

6    A.  Yes, I have.

7    Q.  When approximately did you take it?

8    A.  Sometime in 2005 prior to my foreign assignment.

9    Q.  Do you recall your score?

10   A.  Yes.

11   Q.  What was it?

12   A.  Four.

13   Q.  What does that mean?

14   A.  It's a four out of five; that I'm technically fluent,

15   proficient in all aspects of my job.

16   Q.  And would you say your Spanish has gotten better or worse

17   since you took that test in 2005?

18   A.  Better.

19   Q.  Why?

20   A.  Just speaking Spanish daily for my job.

21   Q.  Let's pick up where the last witness left off.  Where were

22   you on November 10 of 2015?

23   A.  I was in Port-au-Prince, Haiti.

24   Q.  And in that Redweld there is a document marked for

25   identification as Government Exhibit 21.  Could you take a look

1   at that, please.  What is that?

2   A.  That's a map of the Americas region.

3           MR. BOVE:  The government offers 21, your Honor.

4           MR. JACKSON:  No objection.

5           THE COURT:  21 is received in evidence.

6           (Government's Exhibit 21 received in evidence)

7           MR. BOVE:  Can we publish that, Mr. Calabrese.

8   Q.  Special Agent Gonzalez, do you see Haiti on this map?

9   A.  Yes, sir.

10  Q.  Where?

11  A.  Right in the middle next to Dominican Republic.

12  Q.  Why were you in Haiti on November 10 of 2015?

13  A.  For a potential arrest operation.

14  Q.  Did the DEA have authority to make an arrest in Haiti that

15  day?

16  A.  No, sir.

17  Q.  Why not?

18  A.  We are not authorized or empowered to make arrests in

19  foreign countries.  They have their own jurisdictions.

20  Q.  Did other DEA agents travel to Haiti for that operation?

21  A.  Yes, sir.

22  Q.  Who else went?

23  A.  My supervisor, Special Agent Robert Zachariasiewicz,

24  Special Agent Kimojha Brooks, Special Agent Leith Habayeb.

25  Q.  To make it easier on both of us I'm going to refer to

GB79FLO3                          Gonzalez – direct

1    Special Agent Zachariasiewicz as Special Agent Zach going

2    forward.  Is that all right?

3    A.  Thank you.

4    Q.  Does the DEA have an office in Haiti?

5    A.  Yes, sir.

6    Q.  Where is that?

7    A.  In Port-au-Prince.

8    Q.  Did anyone from the Port-au-Prince office participate in

9    the operation on November 10?

10   A.  They were present, yes.

11   Q.  And who was present from the Port-au-Prince office?

12   A.  Special Agent Flores, Jacinto Flores.

13   Q.  Now other than the agents that you've described, did anyone

14   else travel to Haiti in connection with the operation that day?

15   A.  Yes, sir.

16   Q.  Who else?

17   A.  A confidential source of the DEA.

18   Q.  What was the confidential source's name?

19   A.  Jose Santos Pena.

20   Q.  What is a confidential source?

21   A.  It's an individual who works for DEA in providing

22   assistance in drug trafficking investigations, usually for

23   monetary compensation.

24   Q.  So how did your workday start on November 10 of 2015?

25   A.  We were picked up at our hotel.  We took Mr. Santos Pena to

1   meet with a Haitian undercover officer who was going to be

2   driving him around that day.  And then we went to the Haitian

3   BLTS office.

4   Q.  And what was the purpose of the trip to the Haitian BLTS

5   office?

6   A.  To meet with the Haitian BLTS team leader and go over an

7   operational plan for the day.

8   Q.  Did the DEA have input in that operational plan?

9   A.  Yes.

10  Q.  Why?

11  A.  Well it was our informant, Mr. Santos Pena, that was going

12  to be participating in an activity there.  So we obviously

13  participate in the planning of it because we have to insure his

14  safety.

15  Q.  Who was actually in charge of the operation on November 10

16  of 2015 as a formal matter?

17  A.  The BLTS team leader.

18  Q.  What was that operational plan?

19  A.  The defendants were arriving in a plane that morning and

20  they were to meet with Mr. Santos Pena, have some negotiations,

21  and then hopefully be taken into custody.

22  Q.  Where did you go after the operational briefing at the BLTS

23  office?

24  A.  We went to the Servotel.

25  Q.  And how did you get to that hotel?

GB79FLO3                    Gonzalez – direct

1    A.  It was in the vehicle with the BLTS team leaders.

2    Q.  Was there anyone else in the car?

3    A.  I believe there were a couple other individuals in the car.

4    Q.  Where did those individuals work?

5    A.  They were BLTS officers.

6    Q.  What was the BLTS team leader dressed like that day?

7    A.  He was dressed in plainclothes.

8    Q.  What were the other BLTS personnel dressed like?

9    A.  They were dressed in, I would call them urban fatigues

10   boots, helmets, police gear.

11   Q.  You said you went to a hotel after the operational

12   briefing?

13   A.  Yes.

14   Q.  Were there other DEA personnel present in the area of that

15   hotel?

16   A.  Yes, sir.

17   Q.  Which other agents were in the area?

18   A.  The other agents I mentioned Special Agent Flores, Special

19   Agent Zach, Special Agent Brooks, and Special Agent Habayeb.

20   Q.  And what was the name of the hotel again?

21   A.  The Servotel.

22   Q.  There's a document in that Redweld marked as Government

23   Exhibit 32.  Would you please take a look.  What's that?

24   A.  It's an overhead map of the area near the airport in

25   Port-au-Prince.

GB79FLO3                        Gonzalez – direct

1              MR. BOVE:  The government offers 32, your Honor.

2              MR. JACKSON:  No objection.

3              MR. RODY:  No objection.

4              THE COURT:  32 is in evidence.

5              (Government's Exhibit 32 received in evidence)

6              MR. BOVE:  May we publish that, your Honor?

7              THE COURT:  Yes, you may.

8   Q.  Is the Servotel marked on this map, Special Agent Gonzalez?

9   A.  Yes, sir.

10  Q.  Where?

11  A.  Just off to the right of the airport towards the middle.

12  Q.  And about how far from the airport was the Servotel?

13  A.  I'm not sure.  It was a short drive.  Ten minutes, maybe

14  less.

15  Q.  There is another document in the Redweld marked as

16  Government Exhibit 53.  What's that?

17  A.  It's a picture of the Servotel entrance.

18             MR. BOVE:  Government offers 53, your Honor.

19             MR. JACKSON:  No objection.

20             MR. RODY:  No objection.

21             THE COURT:  53 is in evidence.

22             (Government's Exhibit 53 received in evidence)

23             MR. BOVE:  Take a look Mr. Calabrese.

24  Q.  What do we see here?

25  A.  It's a vehicle parked in front of the entrance to the I

1   guess lobby restaurant area of the hotel.

2   Q.  And when approximately did you get to the hotel on

3   November 10 of 2015?

4   A.  Late morning.

5   Q.  Where in relation to this photograph were you initially

6   stationed?

7   A.  Off to the right.

8   Q.  Did the defendants arrive in Haiti on November 10?

9   A.  Yes.

10  Q.  How?

11  A.  Via private aircraft from Caracas.

12  Q.  There's a document on the witness stand marked as

13  Government Exhibit 55.  Would you please take a look.  What's

14  that?

15  A.  That's the aircraft that the defendants arrived in.

16  Q.  Does that photograph fairly and accurately depict the plane

17  that the defendants arrived in?

18  A.  Yes.

19          MR. BOVE:  The government offers 55.

20          MR. JACKSON:  No objection.

21          MR. RODY:  No objection.

22          THE COURT:  55 is in evidence.

23          (Government's Exhibit 55 received in evidence)

24  BY MR. BOVE:

25  Q.  Now that plan is marked YV2030.  Do you see that?

GB79FLO3                    Gonzalez - direct

1    A.  Yes, sir.

2    Q.  Do you know what the letters YV signify about that plane?

3    A.  Yes, I do.

4    Q.  What do they signify?

5    A.  That's the registration for an aircraft that's registered

6    in Venezuela, designation of Venezuela.

7    Q.  Do you know if there's a prefix like that for registration

8    numbers of aircraft registered in the United States?

9    A.  Yes.

10   Q.  What is that?

11   A.  It's the letter N commonly referred to as November.

12   Q.  Now how did you find out that the defendants had arrived in

13   Port-au-Prince on November 10 of 2015?

14   A.  Mr. Santos Pena was in communication with them and he was

15   also in communication with me and he notified me once he was

16   told they arrived.

17   Q.  And Santos Pena is a confidential source you said?

18   A.  Yes.

19   Q.  How were you communicating with him that day?

20   A.  Via BlackBerry messenger.

21   Q.  What happened after Santos Pena informed you of the

22   defendants' arrival in Port-au-Prince?

23   A.  We went to the hotel, waited.

24   Q.  Did Santos Pena contact you again at some point?

25   A.  Yes, he did.

GB79FLO3                    Gonzalez - direct

1    Q.   Why?

2    A.   It was after they had been -- he had been meeting with the

3    defendants for some time to let me know that the meeting was

4    about to conclude.

5    Q.   What happened next?

6    A.   He contacted me again shortly thereafter to notify me that

7    the meeting had concluded.

8    Q.   What did you do based on that information?

9    A.   I told the Haitian team leader that the confidential source

10   had indicated the meeting was over and it was safe for them to

11   enter.

12   Q.   What happened after you made that notification to the BLTS

13   team leader?

14   A.   We drove the vehicle up to the front of the hotel.

15   Q.   What happened next?

16   A.   The BLTS team leader indicated that he was going to go in

17   and talk to the manager of the hotel briefly and let him know

18   that they were about to make entry into the hotel.

19   Q.   Did the team leader enter the hotel?

20   A.   Yes, he did.

21   Q.   What happened after that?

22   A.   He came out rather soon, rather quickly and motioned to

23   some of the other individuals and then they went back inside.

24   Q.   And about how many BLTS officers went into the hotel at

25   that point?

GB79FLO3                        Gonzalez - direct

1    A.  I remember about four or so.  Four or five.

2    Q.  What, if anything, did you do?

3    A.  I sat in the car.

4    Q.  Did any DEA personnel enter the hotel at that point?

5    A.  No.

6    Q.  Why not?

7    A.  Because they were conducting an arrest operation and we

8    can't participate in that.

9    Q.  What happened after the BLTS officers went into the hotel?

10   A.  They came back outside with the defendants.

11   Q.  About how long were they in there?

12   A.  A couple of minutes at most.  It was kind of fast.

13   Q.  When you first saw the defendants coming out of the

14   Servotel were they restrained?

15   A.  Yes, they were.

16   Q.  How?

17   A.  They were handcuffed in the front.

18   Q.  Did you speak to either of the defendants at that point?

19   A.  No.

20   Q.  What happened next with the defendants?

21   A.  They were placed inside the vehicles.

22   Q.  Did you go into the hotel at some point?

23   A.  At that point, yes, I did.

24   Q.  Where in the hotel did you go?

25   A.  I went to the restaurant.

GB79FLO3                    Gonzalez - direct

1              MR. BOVE:  Mr. Calabrese, if we could take a look at

2      54 in evidence.

3      Q.  You can use your screen, Special Agent Gonzalez.

4              What do we see here?

5      A.  That's the inside of a restaurant.

6      Q.  What did you do inside the restaurant at the Servotel after

7      the defendants were arrested?

8      A.  We met with Mr. Santos Pena.

9      Q.  Why?

10     A.  To see how the meeting had gone and to collect the

11     recording devices from him.

12     Q.  What was the purpose of checking on how the meeting had

13     gone at that point in the investigation?

14     A.  We just wanted to make sure that he was safe and everything

15     was concluded.

16     Q.  We'll come back to the recording equipment later.

17             What did you do after you met with Santos Pena?

18     A.  I collected the recording equipment from him.

19     Q.  And after that?

20     A.  Sent him to his hotel.

21     Q.  Did you leave the hotel at some point?

22     A.  Yes, sir, I did.

23     Q.  Where did you go?

24     A.  We got back in the vehicles and we went back to the BLTS

25     office where we had gone earlier in the morning.

GB79FLO3                         Gonzalez - direct

1    Q.  You said we.  Who else went?

2    A.  The other special agents that I mentioned before, Special

3    Agent Zach, Brook, Habayeb, and Flores.

4    Q.  Did you see either defendant when you arrived at the BLTS

5    office?

6    A.  Yes.

7    Q.  Was this the same office where you had had the operational

8    briefing earlier?

9    A.  Yes.  It wasn't the same room.  But it was the same general

10   building.

11   Q.  With respect to the defendants, what did you see when you

12   got back?

13   A.  I saw Mr. Campo in one room and then I saw Mr. Flores taken

14   to another room.

15   Q.  Did you speak to either defendant at that BLTS office?

16   A.  No.

17   Q.  Did you know if the defendants were permitted to make any

18   phonecalls at that point?

19   A.  No.

20   Q.  Whose decision was that?

21   A.  The Haitian BLTS.

22   Q.  From your perspective at that point of the investigation

23   were there any risks associated with allowing the defendants to

24   make phonecalls?

25   A.  Yes.

GB79FLO3                          Gonzalez - direct

1  Q.  What were they?

2  A.  Well, we believed at the time, we were told at the time

3  they were politically connected in Venezuela and we feared that

4  a call to Venezuela could have potentially interfered with the

5  rest of the operation and put people and their safety at risk.

6  Q.  You referenced interference.  What do you mean?

7  A.  In the past the Venezuelan government has impeded the

8  extradition of Venezuelan nationals from countries outside of

9  Venezuela to the United States so we feared that would happen

10  again.

11           MR. JACKSON:  Objection, your Honor.

12           THE COURT:  Overruled.

13  Q.  You also referenced a safety concern.  How if at all did

14  the decision not to allow the defendants to make phonecalls

15  impact safety concerns at that point?

16  A.  Well Mr. Santos Pena was still in Haiti.  He had not yet

17  departed Haiti for the United States.

18  Q.  Were there any issues with respect to the anticipated

19  transport of the defendants?

20  A.  Yes.

21  Q.  Please describe.

22  A.  We were hoping to then be able to transport the defendants

23  aboard a DEA plane to the United States so we didn't want

24  anybody knowing that that was going to occur.

25  Q.  Did anyone from the DEA leave the BLTS office before you

GB79FLO3                    Gonzalez - direct

1   did that day?

2   A.  Yes.

3   Q.  Who?

4   A.  Special Agent Zach and Special Agent Flores.

5   Q.  Why did they leave?

6   A.  They went to the U.S. embassy in Port-au-Prince to draft a

7   letter to the Haitian government.

8   Q.  Do you know what the purpose was of that letter?

9   A.  Yes.

10  Q.  Please describe.

11  A.  The purpose of the letter was to request the Haitian

12  government turn over custody to -- of the two defendants to the

13  DEA.

14  Q.  Why was that request necessary at that point?

15  A.  Because the two defendants were in the custody of the

16  Haitians.

17  Q.  Do you know if that request was, in fact, made?

18  A.  Yes, it was.

19  Q.  How, if at all, did Haiti respond?

20  A.  They granted the request.

21  Q.  What happened after Haiti granted the request?

22  A.  Special Agent Zach and Special Agent Flores returned to the

23  BLTS office.

24  Q.  What happened next?

25  A.  We all got in vehicles and proceeded to another police or

GB79FLO3                    Gonzalez - direct

1     government office of the BLTS for -- they indicated they needed

2     to process the two defendants.

3     Q.   Did you participate at all in that processing?

4     A.   No.

5     Q.   Did you speak to either defendant at the second BLTS

6     location?

7     A.   No.

8     Q.   What happened when that processing was complete?

9     A.   The defendants came back out to the vehicles and we drove

10    to the airport.

11    Q.   About what time that day did you get to the airport?

12    A.   I believe approximately four o'clock in the afternoon.

13    Q.   What happened when you arrived?

14    A.   We got out of the vehicles.  The Haitians took their cuffs

15    off of the defendants.  We placed our handcuffs on them and leg

16    irons.  We took a couple pictures.  And then we boarded the

17    plane.

18    Q.   There's a document on the witness stand marked as

19    Government Exhibit 56.  Could you please take a look.

20          What is that?

21    A.   That's a picture that was taken prior to departing in the

22    aircraft.

23          MR. BOVE:  The government offers 56, your Honor.

24          MR. JACKSON:  Previous objection, your Honor.

25          THE COURT:  It's overruled.

GB79FLO3                    Gonzalez - direct

1          MR. RODY:  Same, Judge.

2          THE COURT:  Same ruling.

3          (Government's Exhibit 56 received in evidence)

4          MR. BOVE:  Mr. Calabrese, can we take a look at 56,

5    please.

6    Q.  Now towards the center of this photo there's someone

7    wearing a jacket marked DEA.  Do you see that?

8    A.  Yes.

9    Q.  Who is that?

10   A.  That's Special Agent Flores.

11   Q.  And then there are others wearing masks in the photo?

12   A.  Yes.

13   Q.  Who are they?

14   A.  They are BLTS team members.

15   Q.  And before you left Haiti on November 10 did the BLTS turn

16   over any evidence?

17   A.  Yes, they did.

18   Q.  What were some of the things that were turned over?

19   A.  The defendants' passports and several phones.

20          MR. BOVE:  Your Honor, may I approach?

21          THE COURT:  Yes, you may.

22   Q.  I'm showing you what's been marked for identification as

23   Government Exhibits 104 and 105.  What are these?

24   A.  These are the two defendants' passports.

25          MR. BOVE:  Your Honor, the government offers 104 and

GB79FLO3                        Gonzalez - direct

1    105.

2              MR. RODY:  No objection.

3              THE COURT:  104 and 105 are received in evidence.

4              (Government's Exhibits 104 and 105 received in

5    evidence)

6              MR. BOVE:  Mr. Calabrese, can we start with page one

7    of Government Exhibit 104, please.

8              If we could take a look at page three, now.  And zoom

9    in on the bottom half.

10   Q.  So Government Exhibit 104 is the passport obtained from

11   defendant Campo Flores?

12   A.  Yes, sir.

13             MR. BOVE:  Could we take a look at page seven now,

14   please.

15             And if we could zoom in on page eleven of the passport

16   itself reflected on this page.

17   Q.  Directing your attention to the bottom right corner of the

18   image on the screen, what do we see there?

19   A.  Entry stamp to Haiti on November 10, 2015.

20             MR. BOVE:  Mr. Calabrese, if we could take a look at

21   Government Exhibit 105 now please.  And page three.  Zoom in on

22   the bottom, please.

23   Q.  So 105 is the passport from Mr. Flores de Freitas?

24   A.  Yes, sir.

25             MR. BOVE:  Mr. Calabrese, if we could take a look at

GB79FLO3                          Gonzalez – direct

1    page seven, please.  And zoom in on page ten of the passport

2    itself.  Rotate that.  Well done.

3    Q.  What do we see in the top left of the image on the screen?

4    A.  That's an entrance stamp to Port-au-Prince on November 10,

5    2015.

6    Q.  Now about what time did the DEA leave Haiti that day?

7    A.  I believe around 4:30.

8    Q.  And what was the intended destination for that flight?

9    A.  White Plains, New York.

10   Q.  What type of plane was used?

11   A.  It was a Learjet.

12   Q.  And who from the DEA was on the flight?

13   A.  Myself, Special Agent Zach, Special Agent Brooks, special

14   agent Habayeb, and the two DEA pilots.

15   Q.  If you could take a look at the documents on the witness

16   stand marked for identification as Government Exhibits 57, 58,

17   and 59, please.

18           What are these?

19   A.  I have 57.  You said 58 and 59 too?

20   Q.  Yes, please.

21   A.  These are pictures of the inside of the Learjet.

22   Q.  Does those pictures fairly and accurately depict the cabin

23   of the Lear that you used to transport the defendants on

24   November 10 of 2015?

25   A.  Yes, sir.

GB79FLO3                        Gonzalez – direct

1          MR. BOVE:  The government offers 57, 58, and 59, your

2     Honor.

3          THE COURT:  Objection?

4          MR. RODY:  No objection.

5          MR. JACKSON:  No objection.

6          THE COURT:  57, 58, and 59 are received in evidence.

7          (Government's Exhibits  57, 58 and 59 received in

8     evidence)

9          MR. BOVE:  Mr. Calabrese, can we take a look at

10    Government Exhibit 57.

11    Q.  What do we see here?

12    A.  It's a picture taken from the front of the plane of the

13    rear of the plane, the interior.

14    Q.  Please describe generally where you were seated when the

15    plane took off from Port-au-Prince?

16    A.  I was seated in one of the rear seats.

17    Q.  Where were the defendants?

18    A.  They were seated in front of me, facing me.

19         MR. BOVE:  Mr. Calabrese, can we take a look at

20    Government Exhibit 58.

21    Q.  What do we see here?

22    A.  The rear seats.

23    Q.  Are there four seats on the rear of the plane facing each

24    other?

25    A.  Yes, sir.

1  Q.  And about how much space is between the seats that are

2  facing each other?

3  A.  About three, four feet, I assume.

4  Q.  Now when the plane took off from Port-au-Prince were the

5  defendants still restrained?

6  A.  Yes.

7  Q.  How?

8  A.  They were handcuffed in the front and they had handcuffs on

9  their legs, leg irons.

10      MR. BOVE:  Your Honor, at this point I request that

11  the Court give the limiting instruction relating to the

12  defendants' statements.

13      THE COURT:  All right.  You're going to hear now from

14  Agent Gonzalez certain statements or admissions made by each of

15  the defendants after they were arrested and charged in the

16  indictment.  I instruct you if you find such statements were

17  made, the statements can be used only against the defendant who

18  allegedly made them and not against the other defendant; in

19  other words, you can consider the statements of Campo against

20  Campo and the statements by Flores de Freitas against

21  Flores de Freitas.  All right.

22      MR. BOVE:  Thank you, your Honor.

23      MR. JACKSON:  Excuse me, your Honor.  May I just note

24  for the record instruction given at 12:28.  Thank you, your

25  Honor.

GB79FLO3                        Gonzalez – direct

1               THE COURT:  12:28.

2               MR. JACKSON:  It's just for the record, your Honor.  I

3     can discuss with the Court later.  Thank you.

4               THE COURT:  Okay.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB75flo4                              Gonzalez – direct

1   BY MR. BOVE:  (continuing)

2   Q.  What happened after the plane took off?

3   A.  Mr. Flores and Mr. Campo were speaking to each other in

4   Spanish.  I remember what they said that caused me to look up

5   and Mr. Campo noticed that I had looked up, so he asked me if I

6   spoke Spanish.

7   Q.  Did you respond?

8   A.  Yes, I did.

9   Q.  How?

10  A.  I told them that I did.

11  Q.  What happened next?

12  A.  Mr. Campo asked if he could ask me some questions and if we

13  could talk.

14  Q.  What did you say?

15  A.  I told him we could but that I had to make him aware of his

16  rights first.

17  Q.  What happened next?

18  A.  He asked me if I had to make him aware of his rights, and I

19  said yes.

20  Q.  What happened next?

21  A.  I told him we could talk to him a little bit after the

22  plane leveled off.

23  Q.  About how long did it take the Learjet to level off?

24  A.  I guess around 20, 30 minutes.  Something like that.

25  Q.  What happened after the plane leveled off?

GB75flo4                    Gonzalez – direct

1    A.  Mr. Campo had kept looking at me, I took to mean he wanted

2    to know when we were going to start talking.  So, I asked him

3    if he was ready to go and talk and he said yes.

4    Q.  What happened next?

5    A.  We shuffled around in the plane.  I escorted Mr. Campo up

6    to the front and some of the other agents that were in the

7    front moved to the back.

8    Q.  Mr. Calabrese, can we take a look at Government Exhibit 59

9    in evidence?

10          What is depicted in this photo?

11   A.  Those are the two seats where myself and Mr. Campo

12   relocated to on the plane.

13   Q.  Why did you relocate to these bench seats?

14   A.  For more privacy so we could talk and I could actually

15   hear, and to separate him from Mr. Flores.

16   Q.  Was there anyone else in the area of these bench seats at

17   the time you sat down with Campo?

18   A.  Yes.

19   Q.  Who?

20   A.  Special Agent Zach was seated kind of in front of us, I

21   guess.

22   Q.  Does Special Agent Zach speak Spanish?

23   A.  Not really, no.

24   Q.  What was Campo's demeanor like as he changed seats from the

25   back of the plane to the bench seat?

GB75flo4                          Gonzalez - direct

1   A.  He was antsy, like kind of excited.  He wanted to talk, he
2   wanted to sit down.
3   Q.  After he sat down, did you speak to him?
4   A.  Yes.
5   Q.  What language did you use during that conversation?
6   A.  Spanish.
7   Q.  How did the conversation begin?
8   A.  I pulled out the advice of rights form and I provided it to
9   him.
10  Q.  Were any words exchanged?
11  A.  No.
12  Q.  After you handed Campo the advice of rights form, what
13  happened?
14  A.  I asked him if he wanted me to read him the form or if he
15  could read it himself.  He said he would read it himself.
16  Q.  What happened next?
17  A.  He read the form, I asked him if he understood it, he said
18  he did and commented that he was an attorney, and then he
19  signed the form.
20  Q.  Did anyone else sign the form?
21  A.  Yes.
22  Q.  Who else?
23  A.  I signed it and then Special Agent Zach signed it.
24  Q.  There is a document on the witness stand marked Government
25  Exhibit 102; would you please take a look at that?

1          What is Government Exhibit 102?

2    A.  It is a copy of the advice of rights form that I provided

3    to Mr. Campo.

4          MR. BOVE:  The government offers 102, your Honor.

5          MR. JACKSON:  No objection.

6          THE COURT:  102 is received in evidence.

7          (Government's Exhibit 102 received in evidence)

8    BY MR. BOVE:

9    Q.  Mr. Calabrese, can we please publish that?

10         I would like to direct your attention, Special Agent

11   Gonzalez, to the top right corner of this document.  Who wrote

12   that information?

13   A.  I did.

14   Q.  What do we see here?

15   A.  The initials of the defendant, the place where the form was

16   provided to him, the date and the time.

17   Q.  And the time referenced on the form is 5:15 p.m.?

18   A.  Yes, sir.

19   Q.  What happened at that point?

20   A.  That is when Mr. Campo signed the form.

21   Q.  Now let's take a look at the bottom of this document.

22   Thank you.  What do we see here?

23   A.  Mr. Campo's signature on the right, a check mark on the top

24   left, and then myself and Special Agent Zach's signature, along

25   with the time.

GB75flo4                         Gonzalez - direct

1    Q.   There is a document up there marked as Government Exhibit

2    102T.  Do you see that?

3    A.   Yes.

4    Q.   What is it?

5    A.   It is a translation of the advice of rights form.

6    Q.   Have you had an opportunity to review that translation?

7    A.   Yes.

8    Q.   Is it a fair and accurate translation into English of the

9    Spanish language form marked as Government Exhibit 102?

10   A.   Yes, sir.

11             MR. BOVE:  The government offers 102F, your Honor.

12             MR. JACKSON:  No objection.

13             THE COURT:  102T is received in evidence.

14             (Government's Exhibit 102T received in evidence)

15   BY MR. BOVE:

16   Q.   Can we take a look at that, Mr. Calabrese?

17             This is a translation of the document we were just

18   looking at, correct?

19   A.   Yes, sir.

20   Q.   Mr. Calabrese, if you could zoom in on the paragraph that

21   begins:  Before asking you any questions?

22             Could you please read that to the jury, Special Agent

23   Gonzalez?

24   A.   Before asking you any questions, you need to understand

25   your rights.  You have the right to remain silent.  Anything

1   you say can be used against you in a court of law.  Before

2   asking you any questions, you have the right to speak to an

3   attorney.  You have the right to have an attorney present

4   during questioning.  If you cannot afford an attorney and you

5   wish to have one, the attorney will be provided to you before

6   any questions are asked.  Did you understand your rights?  Are

7   you willing to answer some questions?

8   Q.  Mr. Calabrese, if we can go back to the main form now and

9   if you can zoom in on the paragraph titled Waiver of Rights?

10           Special Agent Gonzalez, could you please read that?

11  A.  Yes.

12           Waiver of rights.  I have read the rights mentioned

13  above and I understand what my rights are.  At the present time

14  I am willing to answer freely and voluntarily any questions

15  without an attorney present.

16  Q.  Now, when you read that, you skipped the part that said "I

17  have been read" without the checked box.  Why?

18  A.  Because that box is not checked.

19  Q.  Now, after Campo reviewed this form, did he ask you any

20  questions about it?

21  A.  About that form?  No, sir.

22  Q.  What happened after Campo signed the form marked Government

23  Exhibit 102?

24  A.  I asked him basic biographical questions.

25  Q.  Why did you start the interview that way?

GB75flo4                        Gonzalez – direct

1    A.  We always have to obtain basic biographical information as

2    a matter of course when someone is taken into custody, and it

3    would have been needed also upon arrival into the United States

4    for Customs and Border Protection processing.

5    Q.  Did Campo say how old he was at that point in the

6    interview?

7    A.  Yes.

8    Q.  What did he say?

9    A.  I believe he said he was 30 years old.

10   Q.  Did he say where he lived?

11   A.  Yes, he did.

12   Q.  Where did he say he lived?

13   A.  He said he lived in Caracas, Venezuela.

14   Q.  Did you ask Campo's telephone number?

15   A.  Yes, I do.

16   Q.  Do you remember the number that he provided?

17   A.  No.

18          MR. BOVE:  One moment?

19          (Pause)

20   BY MR. BOVE:

21   Q.  We will come back to that.

22          Did you ask Campo any questions about the identities

23   of his relatives?

24   A.  Yes, I did.

25   Q.  What were some of the things that you asked him about?

1  A.  As part of basic biographical information you obtained you

2  ask them who their mother, their father, brother, sisters,

3  spouse, children.

4  Q.  What did Campo say initially when you asked him who his

5  mother was?

6  A.  He said that his mother was Cilia Flores.

7  Q.  Are you familiar with that name?

8  A.  Yes, sir.

9  Q.  Who is Cilia Flores?

10  A.  She is the current First Lady of Venezuela.

11  Q.  At that point in the interview did you ask Campo any

12  followup questions?

13  A.  Yes, I did.

14  Q.  What did you ask him?

15  A.  I asked him if Ms. Flores was his actual birth mother.

16  Q.  How, if at all, did Campo respond?

17  A.  He stated that she was not his birth mother but had raised

18  him from a young age.

19  Q.  And you said that around the time the plane took off, Campo

20  said that he wanted to ask some questions?

21  A.  Yes.

22  Q.  Did he ask any questions during the interview?

23  A.  Yes, he did.

24  Q.  Please give us an example.

25  A.  One of the first questions he asked was what he was being

GB75flo4                          Gonzalez – direct

1    charged with.

2    Q.  And how did you respond?

3    A.  I told him that he was charged with conspiracy to import

4    narcotics.

5    Q.  Did Campo ask any other questions?

6    A.  Yes, he did.

7    Q.  What else did he ask?

8    A.  He asked me what if someone went down the path to commit a

9    crime but then repented before committing the crime.

10   Q.  What did you understand Campo to mean when you asked that

11   question?

12            MR. JACKSON:  Objection.

13            THE COURT:  Overruled.

14            THE WITNESS:  I understood him to be referring to the

15   specific cocaine transaction that he had been arrested to prior

16   to delivering cocaine.

17   BY MR. BOVE:

18   Q.  How did you respond to the question?

19   A.  I told Mr. Campo that -- let me see.  I told Mr. Campo that

20   there were recordings of the meetings; that he had traveled to

21   Honduras, he had connected to Venezuela, and he traveled to

22   Haiti.

23   Q.  When you mentioned there were recordings, what happened?

24   A.  He had asked me if we had recordings of these meetings.

25   Q.  And you told him that you did?

GB75flo4                    Gonzalez - direct

1   A.  Yes, I did.

2   Q.  What happened next?

3   A.  I pulled out my phone and showed him a picture.

4   Q.  If you can take a look at Government Exhibit 60 which is on

5   the witness stand?

6           May I approach, your Honor?

7           THE COURT:  Yes, you may.

8   Q.  Showing you what's been marked for identification as

9   Government Exhibit 60; what is that?

10  A.  That's the picture that I showed Mr. Campo.

11          MR. BOVE:  The government offers Government Exhibit

12  60.

13          MR. JACKSON:  No objection.

14          THE COURT:  60 is received in evidence.

15          (Government's Exhibit 60 received in evidence)

16  BY MR. BOVE:

17  Q.  Can we take a look, Mr. Calabrese?

18          Where did this picture come from?

19  A.  My phone.

20  Q.  And where did you get the picture from your phone?

21  A.  It was taken -- it was a still image taken from a video.

22  Q.  Did you ask Campo any questions about Government Exhibit

23  60?

24  A.  Yes, I did.

25  Q.  What did you ask him?

GB75flo4                        Gonzalez – direct

1    A.  I asked him who was the person in the picture.

2    Q.  How did Campo react when you asked him that question?

3    A.  He hung his head and he said it is me.

4    Q.  Did you ask Campo anything else about the photo marked

5    Government Exhibit 60?

6    A.  Yes, I did.

7    Q.  What else did you ask him?

8    A.  I asked him what he was holding in the picture.

9    Q.  How did Campo respond?

10   A.  He said you know what that is.

11   Q.  What did you understand Campo to mean when you said that?

12          MR. JACKSON:  Objection.

13          THE COURT:  Overruled.

14          You don't have to yell, that's why we have

15   microphones.

16          MR. JACKSON:  Sorry, your Honor.

17   BY MR. BOVE:

18   Q.  I'm sorry.  What was your answer?

19   A.  I understood him to be referring to cocaine.

20          MR. JACKSON:  Your Honor, I move to strike.

21          THE COURT:  Overruled.

22   Q.  Did you ask Campo anything else about the package depicted

23   in Government Exhibit 60?

24   A.  Yes, I did.

25   Q.  What did you ask him?

GB75flo4                        Gonzalez – direct

1    A.  I asked him where he obtained the drugs from.

2    Q.  How did Campo respond?

3    A.  He stated that an individual named Gocho had provided it to

4    him.

5    Q.  Now, based on the way that Campo pronounced that in the

6    interview, how would you spell Gocho?

7    A.  E-L, another word, G-O-C-H-O.

8    Q.  Did you ask Campo if he knew Gocho's real name?

9    A.  Yes, I did.

10   Q.  How did he respond?

11   A.  He stated he did not.

12   Q.  There is a document on the witness stand marked Government

13   Exhibit 3.  Would you please take a look at that?

14          May I approach, your Honor?

15          THE COURT:  Yes, you may.

16   Q.  Showing you another copy of Government Exhibit 3; would you

17   please take a look?  What is that?

18   A.  That's a faceplate silhouette representing El Gocho.

19          MR. BOVE:  The government offers 3, your Honor.

20          MR. JACKSON:  Your Honor, I don't think a foundation

21   has been established yet.

22          THE COURT:  What is the purpose?  Lay some foundation

23   for this, will you please?

24   BY MR. BOVE:

25   Q.  Did you ask Campo how he met Gocho?

GB75flo4                      Gonzalez – direct

1    A.  Yes, he did.

2    Q.  How did Campo respond?

3    A.  Campo stated that he was introduced to El Gocho by an

4    individual by the name of Hamudi.

5    Q.  Did he say when that introduction was made?

6    A.  Yes; several months earlier, I believe it was around August

7    2015.

8    Q.  And based on what Campo said, how would you spell Hamudi?

9    A.  I would spell it H-A-M-U-D-I.

10   Q.  Did you ask Campo for Hamudi's real name?

11   A.  Yes, I did.

12   Q.  How did he respond?

13   A.  He stated that he did not know it.

14   Q.  What, if anything, did Campo say about Hamudi's whereabouts

15   at the time of the interview?

16   A.  He stated that Hamudi had recently been killed.

17           THE COURT:  Okay.  We will take our luncheon recess

18   now and will resume at 2:00.

19           (Continued on next page)

20

21

22

23

24

25

GB75flo4                          Gonzalez – direct

1                (Jury not present)

2                THE COURT:  Mr. Jackson, you referred to something

3    before, 1228?

4                Please, be seated.

5                MR. JACKSON:  Thank you, your Honor.

6                Your Honor, that item is no longer relevant and I

7    don't need to discuss it with the Court.  I don't need to waste

8    the Court's time.

9                THE COURT:  All right.

10                MR. JACKSON:  Your Honor, may I briefly raise the

11    issue that was the subject of an objection?

12                THE COURT:  Yes.

13                MR. JACKSON:  Your Honor, I find myself deeply

14    surprised that the prosecutors would elicit from the agent an

15    interpretation of the defendant's statement during a

16    post-arrest.  I have never heard of that happening and I

17    believe that there is case law which indicates that is an

18    improper speculation on part of a witness and I would ask the

19    Court for leave to submit a short letter outlining my

20    understanding of that.

21                THE COURT:  Certainly.  You can always submit a

22    letter.

23                MR. JACKSON:  Thank you very much, your Honor.  I hope

24    the Court has a good lunch.

25                THE COURT:  Now, what about the faceplate for Gocho?

GB75flo4                          Gonzalez - direct

1   How does that help the jury, Mr. Bove?

2            MR. BOVE:  It helps the jury to become familiar with

3   the aliases of the individuals described by the defendants.

4   Both of them described people only by aliases during the

5   interviews.  It helps them to follow along with the testimony

6   about the post-arrest statements.

7            THE COURT:  A blank?  A blank?

8            MR. BOVE:  The testimony, your Honor, was that

9   Mr. Campo failed or he was not able to identify fully Mr. Gocho

10  so that is the way in which Gocho is known to the government

11  and, presently, to the jury.

12           THE COURT:  Okay.  You are going to finish with

13  Special Agent Gonzalez today?

14           MR. BOVE:  I expect so, your Honor.

15           THE COURT:  We talked about this briefly the other day

16  and I know that both the defendants are going to have, will

17  have a substantial attack on Agent Gonzalez through

18  cross-examination.  I ask that you not repeat questions.

19           MR. JACKSON:  Absolutely, your Honor.  We have already

20  discussed that and we are going to make every attempt to not be

21  repetitive.

22           THE COURT:  Okay.  Thank you.  We will see you at

23  2:00.

24           MR. JACKSON:  Thank you, your Honor.

25           (Luncheon recess)  (Continued on next page)

1              A F T E R N O O N   S E S S I O N

2                          2:10 p.m.

3              THE COURT:  Special Agent Gonzalez.

4              MR. BOVE:  Your Honor, if I could raise one issue?

5              THE COURT:  Yes.

6              MR. BOVE:  With respect to Special Agent Gonzalez'

7    notes and the report that he created following the defendant's

8    post-arrest statements, we reviewed those materials over the

9    lunch break and determined that there are some additional

10   redactions that need to be made to comply with your Honor's

11   Bruton ruling.  What we propose to do is to lay the foundation

12   for these materials pursuant to the Court's ruling in the

13   morning during the testimony from Special Agent Gonzalez, offer

14   those exhibits but not publish them to the jury, and then,

15   tonight, hopefully come to an agreement with defense counsel

16   about appropriate redactions.

17             THE COURT:  That's fine.

18             MR. JACKSON:  That's fine with Mr. Campo.

19             MR. ZACH:  Your Honor, we have one other issue which

20   is while on lunch break, one of the jurors went to that jury

21   room over there where our sort of defense team room is.  She

22   opened the door.  I don't think she heard anything or saw

23   anything.

24             THE COURT:  You weren't doing anything?

25             MR. ZACH:  We were just sitting there eating lunch

GB75flo4                              Gonzalez - direct

1   mostly behaving ourselves and she -- I don't think she saw

2   anything but I wanted to flag that for the Court.  I'm 90

3   percent sure it is the last alternate but once --

4          THE COURT:  So, what do you want me to do, Mr. Zach?

5   Just tell them to make sure when you go into the jury room it

6   is the right jury room?

7          MR. ZACH:  We are going to put a sign on our door so

8   they know it is not the jury room.

9          THE COURT:  Thank you very much.

10         Marlon, call the jury in.

11         What do they say in Dante's inferno, Mr. Zach?  Beware

12   all ye who enter these places?

13         MR. ZACH:  I think that's right.

14         THE COURT:  Is that what you are going to put up

15   there?

16         MR. ZACH:  Exactly; big, block letters.

17         (Continued on next page)

18

19

20

21

22

23

24

25

GB75flo4                          Gonzalez – direct

1            (Jury present)

2            THE COURT:  Mr. Bove?

3            MR. BOVE:  Thank you, your Honor.

4     SANDALIO GONZALEZ, continued

5    BY MR. BOVE:

6    DIRECT EXAMINATION

7    BY MR. BOVE:

8    Q.  Special Agent Gonzalez, this morning I asked you a question

9    about whether you remembered off the top of your head the phone

10   number that Campo provided during the interview.  Do you recall

11   that question?

12   A.  Yes, sir, I do.

13   Q.  Did you take notes during your interview of Campo on the

14   airplane?

15   A.  Yes, I did.

16   Q.  Did you subsequently prepare a report relating to that

17   interview?

18   A.  Yes, I did.

19            MR. BOVE:  May I approach, your Honor?

20            THE COURT:  Yes, you may.

21   Q.  I'm showing you what's been marked for identification as

22   Government Exhibit 2000 and 2001.  What is 2000?

23   A.  The notes that I took of the interview of Mr. Campo.

24   Q.  And what is 2001?

25   A.  It's the report that I generated.

GB75flo4                          Gonzalez - direct

1    Q.  When did you complete that report?

2    A.  November 13th, 2015.

3            MR. BOVE:  Your Honor, the government offers

4    Government's Exhibits 2000 and 2001.

5            MR. JACKSON:  No objection.

6            MR. RODY:  Voir dire, your Honor?

7            THE COURT:  Yes.

8    VOIR DIRE EXAMINATION

9    BY MR. RODY:

10   Q.  Agent, you said that you took -- you wrote the report on

11   the 13th; is that right?

12   A.  Yes.

13   Q.  When did you take the notes?

14   A.  On the 10th.

15   Q.  Did you take the notes in the plane?

16   A.  Yes, sir.

17   Q.  Were any part of the notes written on any day other than

18   the 10th?

19   A.  I'm not sure I follow.

20           THE COURT:  Did you write all the notes on the 10th?

21   Did you supplement them between the time you took the notes and

22   prepared your final report?

23           Is that the question, Mr. Rody?

24           MR. RODY:  Yes, Judge.  Thanks.

25           THE WITNESS:  I think I added maybe a question mark on

GB75flo4                         Gonzalez - direct

1   the side, possibly, but it doesn't appear I took any additional

2   notes.

3           MR. RODY:  Does any of the material in the notes come

4   from conversations with other agents?

5   A.  It doesn't appear so, sir.

6           MR. RODY:  No further questions, Judge.  Thanks.

7           THE COURT:  2000 and 2001 are received in evidence.

8           (Government's Exhibits 2000 and 2001 received in

9   evidence)

10  BY MR. BOVE:

11  Q.  Special Agent Gonzalez, if you could take a look at page 2,

12  paragraph 4 of Government Exhibit 2001?  What was the telephone

13  number that Campo provided on November 10th of 2015?

14  A.  (58) 414-286-5397.

15  Q.  Thank you.  I am going to take back 2000 and 2001.

16          You said that the phone number began with the digits

17  58?

18  A.  Yes, sir.

19  Q.  Do you recognize those digits?

20  A.  Yes, I do.

21  Q.  What do they signify?

22  A.  That's the country code for Venezuela.

23  Q.  That's the country code that is used to dial the telephone

24  number?

25  A.  Yes, sir.

1    Q.  Do you know what the country code is for Honduras?

2    A.  504?

3    Q.  Mr. Calabrese, can we publish Government Exhibit 60,

4    please?

5            Now, before the break you said that you asked Campo

6    who provided him with this package and he told you someone

7    named El Gocho?

8    A.  Yes, sir.

9    Q.  Did you ask Campo how he met Gocho?

10   A.  Yes, I did.

11   Q.  What did Campo say?

12   A.  Campo stated that an individual by the name of Hamudi

13   introduced him to El Gocho.

14   Q.  Did Campo say where that introduction occurred, between

15   Gocho, Hamudi, and himself?

16   A.  Yes, sir.

17   Q.  What did Campo say?

18   A.  He stated that it occurred in Caracas, Venezuela.

19   Q.  Did Campo say if there was anyone else involved in

20   introducing him to El Gocho?

21   A.  Yes, de.

22   Q.  What did Campo say about that?

23   A.  Campo mentioned that an individual, Juan Jose –– he used

24   both of those names –– was an intermediary.

25   Q.  Now, in Spanish are there any common nicknames associated

GB75flo4                        Gonzalez - direct

1   with the name Jose?

2   A.  Yes?

3   Q.  What is that?

4   A.  I know of one:  Pepe.

5   Q.  Pepe?

6   A.  Yes.

7   Q.  Did Campo say anything about other meetings with El Gocho?

8   A.  Yes.

9   Q.  Had a did he say about that topic?

10  A.  Campo stated they met approximately five times.

11  Q.  During this interview, did you ask Campo about the location

12  of the cocaine?

13  A.  Yes, I did.

14  Q.  What did you ask Campo?

15  A.  I asked Campo where he was holding the 800 kilos.

16  Q.  How did Campo respond?

17  A.  He stated that El Gocho had only given him the one kilo, he

18  didn't have the 800 kilos yet.

19  Q.  Did he say anything about how he expected to obtain the 800

20  kilos?

21  A.  Yes.

22  Q.  What did he say?

23  A.  Campo stated that El Gocho was reluctant to provide him the

24  full amount at that time because it was the first time they had

25  done business together, but that El Gocho was going to provide

GB75flo4                        Gonzalez – direct

1   that and he would El Gocho when he received payment.

2   Q.  Did you ask Campo where Gocho had gotten the cocaine?

3   A.  Yes, I did.

4   Q.  How did Campo respond to that question?

5   A.  Campo stated that Gocho told him the cocaine was coming

6   from the FARC.

7   Q.  Do you know what the FARC is?

8   A.  Yes, I do.

9   Q.  Please tell the jury what the FARC is.

10  A.  The FARC is a Colombian paramilitary organization operating

11  in Colombia, Venezuela, Ecuador, known to be one of the largest

12  producers of cocaine in the world.

13  Q.  Did you ask Campo any questions about Honduras?

14  A.  Yes, I did.

15  Q.  What did you ask Campo about Honduras?

16  A.  I asked Campo who introduced him to the drug traffickers in

17  Honduras.

18  Q.  How did Campo respond?

19  A.  Campo stated that Hamudi introduced him to an individual

20  that went by the name Negrito or El Flacco.

21  Q.  Did Campo provide a legal name for the name he described as

22  Negrito or Flacco?

23  A.  No, he did not.

24  Q.  Based on his pronunciation during the interview, how would

25  you spell Negrito?

1    A.  N-E-G-R-I-T-O.

2    Q.  Did Campo provide any further information about Negrito?

3    A.  Yes.

4    Q.  What else did he say?

5    A.  He stated he was Colombian.

6    Q.  Did Campo say whether he had ever met Negrito?

7    A.  Yes, he did.

8    Q.  What did he say about that?

9    A.  Campo said he met Negrito for first time when he traveled

10   to Honduras earlier, in October.

11   Q.  Did you ask Campo anything about airports in Venezuela

12   during the interview?

13   A.  Yes, I did.

14   Q.  What did you ask him?

15   A.  I asked Campo how he was planning to get the drug shipment

16   out of the Simón Bolívar International Airport in Caracas,

17   referred to as Maiquetía.

18   Q.  How did Campo respond to that question?

19   A.  Well, I asked him if he was going utilize, recruit the help

20   of any other officials and he stated that he was going to do it

21   himself, that he didn't need anybody's help to do it, that he

22   could do it because of who he was and the access that he had at

23   the airport.

24   Q.  Now, there are documents up there on the witness stand

25   marked as Government's Exhibits 25, 26, and 33.  Do you see

1  those?

2  A.  I have 26 --

3          MR. BOVE:  May I approach, your Honor?

4          THE COURT:  Yes, you may.

5  Q.  Showing you documents marked for identification as

6  Government Exhibits 25, 26, and 33.  Here they are.  What are

7  these?

8  A.  25 is a map of Venezuela, 26 is a closer map of Venezuela,

9  and 33 is an aerial shot of Simón Bolívar airport.

10          MR. BOVE:  The government offers 25, 26, and 33.

11          MR. RODY:  No objection.

12          MR. JACKSON:  No objection.

13          THE COURT:  25, 26 and 33 are received in evidence.

14          (Government's Exhibits 25, 26 and 33 received in

15  evidence)

16  BY MR. BOVE:

17  Q.  Can you please publish 25?

18          So, this is the map of Venezuela?

19  A.  Yes, sir.

20  Q.  Could you please point out to the jury where Simón Bolívar

21  Airport is on this map?

22  A.  It is right down there where Caracas is.

23  Q.  So, just above Caracas on the coast?

24  A.  Yes, sir.

25  Q.  Can we please take a look at Government's Exhibits 26?

GB75flo4                      Gonzalez - direct

1    Does that red pin reflect the approximate location of the

2    airport?

3    A.  Yes.  I believe that's the national terminal for flights

4    within Venezuela and the international terminal is just right

5    next to it, but they're basically in the same location.

6    Q.  And now if we can take a look at 33, please?

7            This is the overhead shot of the airport?

8    A.  Yes, sir.

9    Q.  Based on your experience, what is the relative size of this

10   airport compared to others in Venezuela?

11   A.  It is one of the largest if not the largest airports in

12   Venezuela.

13   Q.  During the interview of Campo, did you ask him any

14   questions about why he got involved?

15   A.  Yes, I did.

16   Q.  What did you ask him?

17   A.  I asked Mr. Campo why he got involved in this deal, in

18   specific selling cocaine to a Mexican who was going to be

19   distributing the cocaine in the United States.

20   Q.  How did Campo initially respond to that question?

21   A.  Campo initially responded that he did not know the drugs

22   were going to the United States and that those words never came

23   out of his mouth.

24   Q.  Did you reply to that?

25   A.  Yes, I did.

GB75flo4                        Gonzalez – direct

1  Q.  What did you say?

2  A.  I reminded him that there are recordings of his meetings

3  and that he didn't necessarily have to say it himself but he

4  knew that the Mexican individual had said that.

5  Q.  How did Campo respond after you told him that?

6  A.  He said, yes, but -- he said yes, but I didn't emphasize

7  it.

8  Q.  Now, a moment ago you referred to the Mexican.

9  A.  Yes.

10 Q.  That's somebody that Campo referenced during the interview?

11 A.  Yes, sir.

12 Q.  Who did you understand him to be talking about when he said

13 that?

14 A.  He was talking about the confidential source, Mr. Santos

15 Peña.

16 Q.  Did you ask Campo anything else about why he participated

17 in the deal?

18 A.  Yes.

19 Q.  How did Campo respond?

20 A.  I asked him again why he got involved in this deal and he

21 said because he didn't have $10,000 to his name.

22 Q.  Did you ask Campo any other questions about Cilia Flores?

23 A.  Yes, I did.

24 Q.  What else did you ask him about Ms. Flores?

25 A.  Again, I mentioned to him what the repercussions would be

GB75flo4                        Gonzalez – direct

1   about this, him doing this cocaine deal for her to finance her

2   campaign, as he had said.

3   Q.  And when you asked that question, what campaign were you

4   referring to?

5   A.  Her upcoming campaign for the national assembly.

6   Q.  And when was that election to be held?

7   A.  I believe it was December 2015.

8   Q.  When you put that question to Campo, how did he respond?

9   A.  Campo stated that he knew he had said that, he acknowledged

10  he said that, but he said that the money was actually for him.

11  Q.  Did Campo say why he made those comments about the

12  election?

13  A.  Yes, he did.

14  Q.  What did he say?

15  A.  Campo stated that his friend in the drug business had told

16  him to say that in order to protect himself from getting

17  robbed.

18  Q.  Did you talk to Campo about cooperation?

19  A.  Yes, I did.

20  Q.  How did that topic come up?

21  A.  Campo asked how it would work to cooperate with the

22  government.

23  Q.  How did you respond to that question?

24  A.  I kind of gave some general examples about cooperation.

25  Q.  Did Campo mention any topics that he might be able to

GB75flo4                          Gonzalez – direct

1   provide information about to the government?

2   A.  Yes, he did.

3   Q.  What did he say?

4   A.  Campo asked me if the DEA would be interested in

5   information about money laundering.

6   Q.  How did you respond?

7   A.  I told him that we would and I asked him if he wanted to

8   provide any information.

9   Q.  What happened next?

10  A.  He kind of just, like, you know, smiled and winked at me

11  and said not right now, he wanted to talk about it later.

12  Q.  Now, at any point during the interview of Campo did he

13  describe having been coached by a man named El Sentado in

14  Honduras?

15  A.  No.

16  Q.  About how long did the interview take?

17  A.  I think it was about two hours.

18  Q.  And where was Flores sitting while you were interviewing

19  Campo?

20  A.  He was seated in the back of the plane.

21  Q.  And from where you were sitting in the bench seat, could

22  you see what Flores was doing while you were interviewing

23  Campo?

24  A.  Yes.

25  Q.  What did you see?

GB75flo4                          Gonzalez - direct

1    A.  He was talking with Special Agent Brooks.

2    Q.  And could you describe Flores' demeanor based on what you

3    saw?

4    A.  Sure.

5             At first it was kind of serious and then it didn't

6    take long and they were laughing and joking.

7    Q.  What happened after you were done speaking to Campo?

8    A.  I escorted him to the back to trade places with Mr. Flores

9    and escorted Mr. Flores to the front.

10   Q.  And where did Flores sit in the front?

11   A.  In the same seat where Mr. Campo had been sitting.

12   Q.  That bench seat?

13   A.  Yes, sir.

14   Q.  What happened after Flores sat down?

15   A.  I provided him with an advice of rights form, again in the

16   Spanish language, and asked him if he wanted me to read it to

17   him.

18   Q.  Is that another copy of the same form you provided to

19   Campo?

20   A.  Yes, sir.

21   Q.  In what language did you use when you spoke to Flores?

22   A.  Spanish.

23   Q.  What happened after you gave him the form?

24   A.  He read the form.  I asked him if he understood it.  He

25   said he did.  And then we all signed the form.

GB75flo4                        Gonzalez - direct

1    Q.  You say we all signed the form; what do you mean?

2    A.  Mr. Flores signed it, then I signed it, and then Special

3    Agent Zach signed it.

4            MR. BOVE:  May I approach, your Honor?

5            THE COURT:  Yes, you may.

6    Q.  I'm showing you what has been marked for identification as

7    Government's Exhibits 103 and 103T; what are these?

8    A.  103 is a copy of the form I provided to Mr. Flores, and

9    103T is the translation used for that form.

10           MR. BOVE:  The government offers 103 at this time,

11   your Honor.

12           MR. RODY:  No objection.

13           THE COURT:  103 is in evidence.

14           (Government's Exhibit 103 received in evidence)

15   BY MR. BOVE:

16   Q.  Please publish that, Mr. Calabrese.

17           Now, other than the handwriting you said this is the

18   same form you provided to Campo?

19   A.  Yes, sir.

20   Q.  I would like to direct your attention to the top right of

21   Government Exhibit 103.  Who made these indications?

22   A.  I did.

23   Q.  Are there any differences between the way you completed the

24   form marked as 103 from the way you completed the form marked

25   as 102, the form that Campo signed?

GB75flo4                    Gonzalez – direct

1  A.  Yes, sir.

2  Q.  Please describe.

3  A.  In the form here with Mr. Flores I noticed the time when I

4  provided him the form and then the time when he finished.  In

5  the previous form with Mr. Campo I had not noticed what the

6  time was when I gave him the form so it has the same time for

7  when he signed it.

8  Q.  Can we take a look at the bottom of this document?

9        Who signed this?

10  A.  Mr. Flores on the right side, and then myself and Special

11  Agent Zach on bottom left.

12  Q.  Now, if you take a look at 103T, is that a fair and

13  accurate translation into English of Government's Exhibits 103,

14  the Spanish language form?

15  A.  Yes, sir.

16        MR. BOVE:  The government offers 103T.

17        MR. RODY:  No objection.

18        THE COURT:  103T is in evidence.

19        (Government's Exhibit 103T received in evidence)

20  BY MR. BOVE:

21  Q.  If we can publish 103T, please?

22        After Flores signed the waiver, did you ask him

23  biographical questions like you did for Campo?

24  A.  No, I did not.

25  Q.  Why not?

GB75flo4                        Gonzalez - direct

1    A.   Because Special Agent Brooks had already done that.

2    Q.   Did you take notes during your interview of Flores?

3    A.   Yes, sir.

4    Q.   And did you later prepare a report of that interview?

5    A.   Yes, sir.

6              MR. BOVE:  May I approach, your Honor?

7              THE COURT:  Yes, you may.

8    Q.   Showing you what have been marked for identification

9    Government's Exhibits 2002 and 2003; what are these?

10   A.   2002 are my notes and 2003 is the report that I wrote.

11             MR. BOVE:  The government offers 2002 and 2003.

12             MR. RODY:  Same questions, if I may, your Honor?

13             THE COURT:  Yes.

14   VOIR DIRE EXAMINATION

15   BY MR. RODY:

16   Q.   With respect to the notes, Agent, when did you make the

17   notes?

18   A.   At the time I was interviewing Mr. Flores.

19   Q.   Does anything in those notes reflect conversations with

20   anyone other than Mr. Flores?

21   A.   It would not appear so, no.

22             MR. RODY:  Thank you.

23             No objection, Judge.

24             THE COURT:  2002 and 2003 are received in evidence.

25             (Government's Exhibits 2002 and 2003 received in

GB75flo4                    Gonzalez – direct

evidence)

          MR. BOVE:  Thank you, your Honor.  I am going to take

those back from Special Agent Gonzalez.

          THE COURT:  All right.

BY MR. BOVE:

Q.  And Mr. Calabrese, we can take that exhibit down.

          After Flores signed a waiver, what was one of the

first things that you discussed with him?

A.  I asked Mr. Flores why he got involved in this deal.

Q.  How did Flores respond?

A.  He stated very matter of factly:  To make money.

Q.  Did you ask him a follow-up question?

A.  Yes, I did.

Q.  What did you ask him?

A.  I asked him how much money.

Q.  How did Flores respond?

A.  Flores stated that $5 million was going to be made on this

shipment of which I believe $560,000 was for him.

Q.  During the interview, did Flores describe the total number

of kilos of cocaine that he believed would be involved in this

shipment?

A.  Yes, he did.

Q.  What did Flores say?

A.  That it would be 800 kilos.

Q.  What, if anything, did Flores say about the price that he

1    expected for those kilos of cocaine?

2    A.  Flores stated that the Mexican was going to be paying

3    $12,000 per kilo.

4    Q.  And when Flores referred to the Mexican, who did you

5    understand him to be referring to?

6    A.  To our informant, Mr. Santos Peña.

7    Q.  Did you ask Flores about the intended destination for the

8    cocaine?

9    A.  Yes, I did.

10   Q.  What did you ask him?

11   A.  I asked Flores if he knew where the cocaine was going.

12   Q.  How did Flores respond?

13   A.  Mr. Flores stated that the Mexican had told him the cocaine

14   was going to Mexico and then to the United States, and several

15   cities within the United States.

16   Q.  During the interview of Flores, did he refer to anyone as

17   Pepero?

18   A.  Yes, he did.

19   Q.  And based on what Flores said, how would you spell Pepero?

20   A.  I would spell it P-E-P-E-R-O.

21   Q.  Did Flores provide Pepero's legal name?

22   A.  No, he did not.

23   Q.  Did Flores say how Pepero got involved in the cocaine

24   shipment?

25   A.  Yes, he did.

GB75flo4                        Gonzalez – direct

1   Q.  What did Flores say about that?

2   A.  Mr. Flores stated that he had talked to Pepero about this

3   potential deal that he had in mind and Pepero then introduced

4   him to El Gocho.

5   Q.  Did Flores say whether he had met El Gocho in person?

6   A.  Yes, he did.

7   Q.  What did Flores say?

8   A.  He stated that he met with him in Caracas.

9   Q.  Did Flores mention a man named Hamudi during the interview?

10  A.  Yes, he did.

11  Q.  Based on the way Flores said that name, how would you spell

12  it?

13  A.  I would spell it H–A–M–U–D–I.

14  Q.  What did Flores say during the interview about Hamudi?

15  A.  I asked Flores how he had gotten in contact with the people

16  in Honduras, and he said that Hamudi introduced him to a man by

17  the name of El Flacco in Honduras.

18  Q.  Did Flores provide any further identifying information for

19  the man he referred to as El Flacco?

20  A.  Yes.

21  Q.  What else did he say?

22  A.  He said he was Colombian.

23  Q.  Did Flores say anything else about Flacco's role?

24  A.  Yes.

25  Q.  What?

GB75flo4                          Gonzalez – direct

1    A.   He stated that Flacco introduced him to El Sentado and that

2    El Sentado introduced him to the Mexican.

3    Q.   Did Flores say anything to describe El Sentado?

4    A.   Yes, sir.

5    Q.   What did he say?

6    A.   He said El Sentado was in a wheelchair.

7    Q.   When Flores referred to El Sentado, who did you understand

8    him to be talking about?

9    A.   Carlos Amilcar Leva Cabrera.

10   Q.   Did Flores say anything during the interview about having

11   been coached by El Sentado about how to interact with the

12   Mexican?

13   A.   No.

14   Q.   During this interview, did you ask Flores about how he

15   planned to transport the cocaine?

16   A.   Yes, sir.

17   Q.   What were some of the things that you asked him?

18   A.   I asked him how he was planning on getting the drugs out of

19   the airport, again if he was going to utilize the help of any

20   other officials.  And he stated that he was not.

21   Q.   Did you ask Flores any further questions about that topic?

22   A.   Yes, I did.

23   Q.   What else did Flores say?

24   A.   I asked him who else knew about the shipment and he stated

25   that his bodyguards knew and that they were going to help him

GB75flo4                          Gonzalez – direct

1    load the cocaine onto the plane.

2    Q.  Did Flores provide an estimate of the number of bodyguards

3    during the interview?

4    A.  I believe he said six.

5    Q.  Did you ask Flores any questions about the elections

6    relating to the Venezuelan National Assembly?

7    A.  Yes, I did.

8    Q.  What did you ask Flores?

9    A.  I asked Mr. Flores if the cocaine -- proceeds from the

10   cocaine was going to be used to fund the campaign for the

11   national assembly.

12   Q.  How did Flores respond?

13   A.  He stated that it was not.

14   Q.  How did the interview end?

15   A.  As we were getting ready to land.

16   Q.  Special Agent Gonzalez, did you take any steps to record

17   the interviews of Campo or Flores?

18   A.  No, I did not.

19   Q.  Why not?

20   A.  Well, we were transporting prisoners, it is two agents to a

21   prisoner, it is a very serious undertaking.  There is no level

22   of danger that one knows prior to transporting somebody.

23   They're all prisoners and that was the primary concern.

24   Q.  Did you have a personal cell phone on the flight that day?

25   A.  Yes, I did.

GB75flo4                        Gonzalez - direct

Q.  From your perspective, would it have been feasible, in the

context of that operation, to use the phone to record the

interviews?

A.  No.

Q.  Why not?

A.  Well, I was sitting next to Mr. Campo right then and there

I was very close to him, we were seated right by the cockpit of

the plane.  If I am recording something I just don't think it

is very safe, considering the location where we were at.

Q.  Where did the plane land that night?

A.  White Plains, New York.

Q.  What happened when the plane landed?

A.  We were met by agents from the New York field division and

we went into the Customs and Border Protection processing area.

          MR. BOVE:  May I approach, your Honor?

          THE COURT:  Yes, you may.

Q.  I'm showing you a photograph marked for identification as

Government Exhibit 61.  Do you recognize that?

A.  Yes, sir.

Q.  What is that?

A.  That's a picture taken of the defendants as they deplaned

in White Plains.

          MR. BOVE:  The government offers 61.

          MR. JACKSON:  No objection, your Honor.

          MR. RODY:  No objection.

GB75flo4                          Gonzalez - direct

1               THE COURT:  61 is in evidence.

2               (Government's Exhibit 61 received in evidence)

3    BY MR. BOVE:

4    Q.  Please, publish that?

5               Did you speak to either defendant after they got off

6    the plane?

7    A.  Yes.

8    Q.  What happened?

9    A.  Mr. Campo was asking if we would allow him to make a phone

10   call home.

11   Q.  How did you respond?

12   A.  We talked it over and we determined that it would be safe

13   and okay at that time to allow him to make a phone call.

14   Q.  What happened after that determination was made?

15   A.  He indicated he didn't want to speak to his wife, that he

16   would prefer to speak to, I guess, his father-in-law.  So, we

17   allowed him to make a phone call to his father-in-law.

18   Q.  What happened after the call?

19   A.  He thanked us for allowing him to make the call, he was

20   very grateful.  He commented that he was just surprised that we

21   allowed him to do that and we were treating him the way we

22   were.  And he commented that we wouldn't have been treated the

23   same way had that happened to us in his country.

24   Q.  Did you speak with Flores around the same time?

25   A.  Yes, sir.

GB75flo4                          Gonzalez - direct

1    Q.  And what was the substance of that conversation?

2    A.  We then asked Mr. Flores if he wanted to make a call home

3    as well since we allowed Mr. Campo.

4    Q.  How did he respond?

5    A.  He indicated that he did not want to.

6    Q.  What happened after that conversation?

7    A.  I believe the officers finished processing Mr. Campo and

8    Mr. Flores and we departed.

9    Q.  When you say we departed, who are you referring to?

10   A.  Myself and Special Agent Zach and Special Agent Habayeb.

11   Q.  Do you know what happened with the defendants that night?

12   A.  They were transported to jail here.

13   Q.  Who was responsible for that transaction?

14   A.  Special Agent Brooks.

15   Q.  Now I would like to take a step back.  How did this

16   investigation begin?

17   A.  In early October I was contacted by El Sentado about a

18   potential investigation.

19   Q.  Was that October of 2015?

20   A.  Yes.  I'm sorry.

21        MR. BOVE:  Your Honor, at this time I request that the

22   Court give a limiting instruction relating to El Sentado.

23        THE COURT:  All right.

24        Now, the statements that you are going to hear from

25   CW 1 as encountered by Special Agent Gonzalez are not being

GB75flo4                        Gonzalez – direct

1    offered to prove the truth of the matters he asserted to the

2    special agent, but rather to provide context for the

3    investigative steps taken by Special Agent Gonzalez and the

4    Drug Enforcement Administration.  So, it is not being offered

5    for the truth, just to give you background on what steps were

6    taken as a result of the investigation which you will hear from

7    Javier.

8            MR. BOVE:  Thank you, your Honor.

9    Q.  When El Sentado contacted you in early October of 2015,

10   where was he based?

11   A.  Near San Pedro Sula, Honduras.

12   Q.  Mr. Calabrese, can we take a look at Government Exhibit 21,

13   please?

14           Do you see Honduras on the map?

15   A.  Yes, sir.

16   Q.  Would you please point that out to the jury?

17   A.  It is just to the left of center where it says Caribbean

18   Sea, above Nicaragua, next to El Salvador.

19           MR. BOVE:  May I approach, your Honor?

20           THE COURT:  Yes, you may.?

21   Q.  Showing you what's been marked for identification as

22   Government Exhibit 27.  Do you recognize that?

23   A.  Yes, sir.

24   Q.  What is that?

25   A.  It is a map of Honduras.

GB75flo4                        Gonzalez – direct

1            MR. BOVE:  The government offers 27.

2            MR. RODY:  No objection.

3            MR. JACKSON:  No objection.

4            THE COURT:  27 is in evidence.

5            (Government's Exhibit 27 received in evidence)

6    BY MR. BOVE:

7    Q.  Please take a look at 27.  Special Agent Gonzalez, could

8    you please point out San Pedro Sula on this map?

9    A.  Yes, sir.  It is top left near the water on the border with

10   Guatemala near Puerto Cortes.

11   Q.  Now, in October of 2015, what was the nature of the

12   relationship between the DEA and El Sentado?

13   A.  El Sentado had been charged with a drug trafficking crime

14   in the Southern District of New York and he was in the initial

15   stages of trying to provide information, cooperate, in exchange

16   or hopefully to get a break in his sentence down the line.

17   Q.  Do you know if there were any firm understandings between

18   the government and El Sentado at that point?

19   A.  No.

20   Q.  Prior to October 2015, had El Sentado disclosed information

21   about himself to the DEA?

22   A.  Yes, sir.

23   Q.  Generally speaking, what did he disclose?

24   A.  I believe it is just the general background of his drug

25   trafficking activities to that date.

GB75flo4                        Gonzalez – direct

1    Q.  Was El Sentado given any instructions with respect to those

2    drug trafficking activities?

3    A.  Yes.

4    Q.  What were the instructions?

5    A.  That he could no longer engage in his drug trafficking

6    activities and if he were approached by an associate or

7    potential associate, that he had to notify us.

8    Q.  What would have happened if El Sentado ignored that

9    instruction and engaged in unauthorized drug trafficking

10   activities?

11   A.  That would have been illegal.

12   Q.  Did you ever meet El Sentado in person?

13   A.  No, sir.

14   Q.  How did you typically communicate with him?

15   A.  Via Blackberry messenger.

16   Q.  Did you ever speak to him on the phone?

17   A.  Yeah.  Sometimes on the phone.

18   Q.  Were there any particular challenges that you faced in

19   managing the relationship with El Sentado?

20   A.  Yes.

21   Q.  Could you please describe some of them?

22   A.  Well, he was confined to a wheelchair, he had a handicap.

23   He had other physical ailments, I believe a hernia or something

24   to that effect.  He was undergoing treatment for his condition.

25   He had therapy often.  Also, because as I mentioned I never had

GB75flo4                          Gonzalez – direct

1    a chance to meet with him in person, I felt that was a very

2    limiting factor in being able to establish trust with --

3    between us and him having trust in me in what he was doing.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB79FLO5                        Gonzalez – direct

1    Q.   You mentioned some of the physical challenges that Sentado

2    faced.  Did he have people helping him or assisting him with

3    those challenges?

4    A.   Yes, sir.  Due to the fact that he was confined to a

5    wheelchair he always had assistance and bodyguards that were

6    with him 24/7 showing him around, taking him to places, helping

7    him bathe, you name it.

8    Q.   Did these assistants and bodyguards pose a challenge to his

9    attempted assistance?

10   A.   I believe so, yes.

11   Q.   How?

12   A.   Well they were always on top of him and for him it would

13   have been difficult to communicate openly and freely with us on

14   the phone or with me on the phone.

15   Q.   Did the DEA authorize any of Sentado's bodyguards or aids

16   to act at the direction of the United States?

17   A.   No.

18   Q.   Before Sentado contacted you in early October of 2015, had

19   you authorized him to communicate with any Venezuelans?

20   A.   No.

21   Q.   Before Sentado contacted you, had you been investigating

22   the defendants at all?

23   A.   No.

24   Q.   Did you even know who the defendants were at that time?

25   A.   No, sir.

GB79FLO5                    Gonzalez - direct

1   Q.  Did anyone direct you to target the defendants?

2   A.  No, sir.

3   Q.  Now I'd like to direct your attention to October 3 of 2015.

4   Did Sentado provide information to you on that day?

5   A.  Yes.

6   Q.  Based on that information what were some of the things that

7   you did?

8   A.  I told him to record an upcoming meeting he was expecting

9   to attend.

10  Q.  Had the DEA given Sentado recording equipment?

11  A.  No, sir.

12  Q.  How did you instruct him to record the meeting then?

13  A.  With his telephone.

14  Q.  Was that an ideal situation from your perspective?

15  A.  No, it was not ideal.

16  Q.  Why not?

17  A.  Well, the equipment that we use for recording undercover

18  recordings are specifically designed for surreptitious

19  recordings.  They're not overt.  So it's not very easy to

20  recognize when someone is being recorded.  Using a telephone is

21  not an ideal device and many people don't like using it, don't

22  use it because you just don't know how it's going to I guess

23  behave or act for lack of a better word.

24  Q.  After Sentado contacted you on October 3, 2015 did you

25  instruct him to contact anyone else?

GB79FLO5                        Gonzalez – direct

1    A.  Yes, I did.

2    Q.  What instruction did you give?

3    A.  I instructed him to contact another cooperating witness

4    that was also located in Honduras.

5    Q.  Why did you give that instruction.

6    A.  So there could be another person present at the meeting

7    that he was going to attend.

8    Q.  Why -- to what end did you want another person present at

9    the meeting?

10   A.  To be another witness to what was occurring.

11   Q.  What is your understanding of whether Sentado was able to

12   get in touch with that other person?

13   A.  He was not able to.

14   Q.  Other than Sentado, did you contact anyone else about the

15   information that Sentado provided on October 3, 2015?

16   A.  Yes, sir.

17   Q.  Who?

18   A.  I contacted our office in Tegucigalpa, Honduras.

19   Q.  Can you point out Tegucigalpa on the map that's on the

20   screen, Government Exhibit 27?

21   A.  Yes, sir.  It's towards the bottom middle of the map with

22   the red little square.

23   Q.  Other than in Tegucigalpa, are there other DEA offices in

24   Honduras?

25   A.  No, sir.

GB79FLO5                          Gonzalez – direct

1   Q.  Could agents from the Tegucigalpa office have provided

2   Sentado with recording devices on October 3?

3   A.  No, sir.

4   Q.  Why not?

5   A.  They didn't have any in their office.

6   Q.  What is your understanding of how long it takes to drive

7   from Tegucigalpa to San Pedro Sula?

8   A.  I believe it's upwards of three hours.

9   Q.  Did you ask the agents in the Tegucigalpa office to surveil

10  Sentado's activities on October 3, 2015?

11  A.  No, sir.

12  Q.  Why not?

13  A.  Well it was a Saturday and our agents are not authorized to

14  conduct surveillance or activities like surveillance on their

15  own in Honduras and I did not believe that they would be able

16  to get their counterparts looped in in enough time to do that.

17  Q.  Were there any safety risks that could be posed by a

18  surveillance operation like that?

19  A.  Yes, sir.

20  Q.  What are they?

21  A.  Well due to the fact that Sentado had all those bodyguards,

22  none of which who knew that he was working for us, I felt that

23  assigning or requesting a surveillance team to surveil a

24  meeting would have posed a safety risk because those men are

25  generally -- and by "those men" I mean the security -- are

1    armed.  And usually part of their job is to protect the person

2    that they're with.  And in my opinion there was a high

3    likelihood of a surveillance being identified and putting

4    Sentado at risk.

5    Q.  What about risks to those conducting the surveillance?

6    A.  Also.  Those bodyguards were more than likely armed.

7              MR. BOVE:  Mr. Calabrese can we take a look at

8    Government Exhibit 104, Mr. Campo's passport.  If you could go

9    to page seven and focus on page ten of the passport.

10   Q.  There's an entry there marked October 3, 2015.  Do you see

11   that?

12   A.  Yes, sir.

13   Q.  What is that?

14   A.  That's an exit stamp from Venezuela on October 3, 2015.

15             MR. BOVE:  Can we take a look at page eleven of this

16   exhibit now -- excuse me, page seven.  Page seven of the

17   exhibit, page eleven of the passport.

18   Q.  Directing your attention to the left side of this entry.

19   What do we see here?

20   A.  Entrance stamp to San Pedro Sula, Honduras on October 3,

21   2015.

22   Q.  Is that entrance stamp timestamped?

23   A.  Yes, it is.

24   Q.  What timestamp?

25   A.  13:35:21.

GB79FLO5                          Gonzalez – direct

1    Q.  Is that in military time?

2    A.  Yes, sir.

3    Q.  Would you convert that for us please?

4    A.  1:35.

5    Q.  And then underneath the date and time stamp there's an

6    entry that reads SAP.  Do you see that.

7    A.  Yes, sir.

8    Q.  Do you know what SAP stands for?

9    A.  Yes, sir.  It's a designation for the San Pedro Sula

10   airport.

11   Q.  Now there's another stamp below the one you just described.

12   What does that indicate?

13   A.  That's a departure stamp from Honduras.

14   Q.  What's the date of the stamp?

15   A.  October 3, 2015.  Sorry.

16   Q.  And the time?

17   A.  21:17:46.

18   Q.  Is that 9:17 p.m.?

19   A.  Yes, sir.

20   Q.  If we could now take a look at page eleven of the exhibit.

21   Page ten of the passport.

22           There's an entry here marked October 4, 2015 in the

23   top right.  Do you see that?

24   A.  Yes, sir.

25   Q.  What's that?

GB79FLO5                    Gonzalez – direct

1    A.   That's entry stamp into Venezuela.  October 4, 2015.

2    Q.   So this is Campo's passport, right?

3    A.   Yes, sir.

4    Q.   Let's take a look at Flores's passport, Government Exhibit

5    105.  Starting at page five.

6         MR. BOVE:  Now if you could rotate that and take a

7    look at page seven of the passport itself.

8    Q.   What do we see in the bottom right?

9    A.   It's an exit stamp from Venezuela on October 3, 2015.

10        MR. BOVE:  Now take a look at page seven of Government

11   Exhibit 105.  This is page ten of the passport.

12   Q.   Starting with the top left, what is that entry?

13   A.   It's an entry stamp into San Pedro Sula, Honduras on

14   October 3, 2015 at 1:31 p.m.

15   Q.   And what about in the center?

16   A.   It's an exit stamp from San Pedro Sula on October 3, 2015

17   at 21:18.

18        MR. BOVE:  And one last one.  If we could take a look

19   at page six, please, of Exhibit 105.

20   Q.   What's the entry in the top left?

21   A.   The entry into Venezuela on October 4, 2015.

22   Q.   Now you said that Sentado reached out to you early on

23   October 3.  Did he reach out to you again that day?

24   A.   Yes, sir.

25   Q.   Based on that contact did you give Sentado any further

GB79FLO5                        Gonzalez – direct

1   instructions?

2   A.  Yes, sir.

3   Q.  What did you instruct him to do?

4   A.  I told him to send me pictures.

5   Q.  Did Sentado send you any photographs?

6   A.  Yes, sir.

7   Q.  How many?

8   A.  He sent me one photograph.

9   Q.  And when approximately did he send that photograph?

10  A.  Approximately two days later on October 5, 2015.

11          MR. BOVE:  May I approach, your Honor?

12          THE COURT:  Yes, you may.

13  Q.  I'm showing you what's been marked for identification as

14  Government Exhibit 110.  Do you recognize that?

15  A.  Yes, sir.

16  Q.  What is it?

17  A.  It's the photograph that Sentado sent me.

18          MR. BOVE:  The government offers 110.

19          MR. JACKSON:  No objection.

20          MR. RODY:  No objection.

21          THE COURT:  110 is received in evidence.

22          (Government's Exhibit 110 received in evidence)

23  Q.  Take a look.  Special Agent Gonzalez, do you recognize

24  anyone in this photo?

25  A.  Yes, I do.

GB79FLO5                          Gonzalez – direct

1   Q.  Please describe who you recognize.

2   A.  First individual on the right in the wheelchair is Sentado.

3   The individual to his right is an individual we believe to be

4   Cesar Orlando Daza Cardona.

5           MR. RODY:  Objection.

6           THE COURT:  Overruled.

7           THE WITNESS:  Next to him is Mr. Campo and then around

8   on the other side in the red shirt is Mr. Flores.

9   Q.  So Campo has his leg on the bench?

10  A.  Yes, sir.

11  Q.  And Flores is in the red shirt?

12  A.  Yes, sir.

13  Q.  Do you know who took this photograph?

14  A.  No, sir.

15  Q.  Other than Sentado, did you authorize anyone else to act at

16  the direction of the DEA on October 3, 2015?

17  A.  No, sir.

18  Q.  Now you mentioned somebody named Daza Cardona?

19  A.  Yes, sir.

20  Q.  Has that man ever provided assistance to the DEA?

21  A.  No, sir.

22          MR. BOVE:  You can take that down.

23  Q.  After you communicated with Sentado in early October of

24  2015, what steps did you take next?

25  A.  I contacted a confidential source to see if he could travel

GB79FLO5                        Gonzalez – direct

1   to Venezuela.

2   Q.   Now from your perspective was there an entire roster of

3   confidential sources capable of completing that assignment?

4   A.   No, sir.

5   Q.   Who did you contact?

6   A.   I contacted Mr. Santos Pena.

7   Q.   Is that the same source who was in Haiti on November 10 of

8   the 2015?

9   A.   Yes, sir.

10  Q.   In late 2015 did Santos Pena typically work with any other

11  sources?

12  A.   Yes, sir.

13  Q.   Who?

14  A.   With Jose Santos Hernandez.

15  Q.   Why did Santos Pena and Santos Hernandez typically work

16  together?

17  A.   Because they were father and son.

18  Q.   In late 2015 were those two sources providing assistance to

19  other DEA offices?

20  A.   Yes, sir.

21  Q.   And what about other law enforcement?

22  A.   Also to local, several local PD police departments near

23  where they lived.

24  Q.   Where were some of the places that they were providing

25  assistance?

1   A.  I believe Riverside, Las Vegas, Richmond, San Bernardino,

2   Los Angeles, possibly.

3   Q.  Now you said that you asked Santos Pena to travel to

4   Venezuela?

5   A.  Yes.

6   Q.  Were there any operational challenges for sending sources

7   to Venezuela at this point?

8   A.  Yes, sir.

9   Q.  What were some of them?

10  A.  Well the sources couldn't have any contact with U.S.

11  personnel in Venezuela.  There would be no contact or

12  notification to Venezuelan officials.  And there were political

13  sensitivities due to the fact of who the targets were.

14  Q.  Now one of the first things you mentioned was that the

15  sources could not have contact with U.S. personnel in

16  Venezuela.

17  A.  Yes, sir.

18  Q.  Was there a DEA office in Venezuela at the time of this

19  operation?

20  A.  Yes, there was.

21  Q.  What was the main purpose of that office?

22  A.  Right now that office's main purpose is advisement for

23  ambassador liaison with the state department and a limited

24  liaison with certain designated Venezuelan officials.

25  Q.  Why couldn't the sources have contact with the U.S. law

1    enforcement personnel at that office?

2    A.  Because our personnel in Caracas don't meet with

3    informants.  It would have been a safety risk.

4    Q.  Why was it a safety risk?

5    A.  Well, it's been my experience the -- that the Venezuelan

6    government is more interested in who our informants are rather

7    than doing joint investigations of that nature.

8    Q.  You referred to your experience.  What do you mean?

9              MR. JACKSON:  Objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  During my time in Venezuela there were

12   many times that were surveilled, my activities outside the

13   embassy.

14   Q.  Surveilled by whom?

15   A.  Venezuelan officials.

16   Q.  Now you also said that another operational risk was that

17   the DEA was not going to notify the Venezuelan government of

18   the operation?

19   A.  Correct.

20   Q.  Why not?

21   A.  There isn't -- those sorts of operations aren't authorized

22   or are not undertaken jointly in Venezuela.

23   Q.  Why not?

24   A.  Again, the Venezuelan government is not doing those types

25   of enforcement activities with DEA.

1    Q.  You also mentioned that there were political sensitivities

2    associated with the targets of this source operation.

3    A.  Yes, sir.

4    Q.  How, if at all, did that bear on your assessment of the

5    operational risks?

6    A.  Well we fully expected that the defendants, being who they

7    were, were going to have a security contingent, which at any

8    given time would have been easily able to stop our sources,

9    search then, identify just strictly as a matter of protecting

10   the two defendants because of who they were.

11   Q.  Did Santos Pena and Santos Hernandez travel to Venezuela in

12   connection with this case?

13   A.  Yes, sir.

14   Q.  Before they did so were they provided with any equipment?

15   A.  Yes, sir.

16   Q.  What were they given?

17   A.  They were given two recording devices, one capable of

18   recording audio-video and another capable of recording audio

19   only.

20   Q.  So let's refer to the audio-video recorder as device one,

21   okay?

22   A.  Okay.

23   Q.  And the audio-only recorder as device two.

24           How were device one and device two provided to the two

25   sources, Santos Pena and Santos Hernandez?

GB79FLO5                    Gonzalez - direct

1   A.   They were sent to them via FedEx by one of the agents in my

2   office.

3   Q.   Were the sources provided with my other equipment before

4   they left for Venezuela?

5   A.   No.

6   Q.   Do you have experience using device one and device two in

7   investigations?

8   A.   Yes.

9   Q.   Do those devices have enough capacity to record the

10  source's entire trip to Venezuela?

11  A.   Well we didn't know how long the trip was going to be but

12  the devices do have a limit to their battery life and to their

13  recording memory.

14  Q.   When approximately did Santos Pena and Santos Hernandez

15  travel to Venezuela?

16  A.   October 19, I believe, 2015.

17  Q.   How did the sources travel to Venezuela?

18  A.   Via commercial airliner.

19  Q.   Were you able to communicate with either of them while they

20  were in Venezuela?

21  A.   I communicated with Santos Pena.

22  Q.   How?

23  A.   Via BlackBerry messenger.

24  Q.   Did those communications pose a risk to the investigation?

25  A.   Yes.

GB79FLO5                    Gonzalez - direct

Q.   Why?

A.   If at any time Santos Pena was stopped by law enforcement
or by any of the people working for the defendants those
communications could have been discovered and put him at great
risk.

Q.   What, if any, steps are typically taken to mitigate a risk
like that?

A.   Oftentimes sources will erase their chats after having them
with controlling agents so no one would see what was -- what
they had on there.

Q.   Special Agent Gonzalez, how would you describe the tone of
Santos Pena's communications with you during the investigation?

A.   Vulgar.

Q.   Why did you communicate with him in that way?

A.   Well, the DEA has many different types of sources, all
walks of life, all shapes and sizes, educated, uneducated,
proper, improper.  Mr. Santos Pena in this case he was a
Sinaloan drug trafficker with a fourth grade education who was
crude, crass, and vulgar.  And I communicated, I spoke his
language with him.

Q.   Why?

A.   Well he was about to go do some of the more dangerous work
of any source in the DEA and I wanted him to be confident.  I
wanted him to not be second guessing himself.  I wanted him to
be himself and I allowed him to be himself.

GB79FLO5                    Gonzalez – direct

1   Q.  Did the confidential sources return to the United States at

2   some point?

3   A.  Yes, they did.

4   Q.  When approximately was that?

5   A.  October 29.

6   Q.  And do you know if Santos Pena or Santos Hernandez

7   communicated with others during the investigation?

8   A.  Yes.

9   Q.  How do you know?

10  A.  They provided me with those communications.

11              MR. BOVE:  May I approach, your Honor?

12              THE COURT:  Yes, you may.

13  Q.  I'm showing you documents marked for identification as

14  Government Exhibits 300 through 310.  And Government Exhibits

15  300-T through 310-T.  Let's start with 300 and 303.  What are

16  these?

17  A.  These are some of the communications that Santos Pena sent

18  me via BBM.

19  Q.  Now if you could take a look at 301, 302, and 304 through

20  310.  What are these?

21  A.  These are more -- these are communications that Santos Pena

22  sent me via e-mail.

23              MR. BOVE:  The government offers 300 through 310, your

24  Honor.

25              THE COURT:  Any objection?  300 through 310 are

1    received.

2              MR. JACKSON:  Excuse me, your Honor.  I believe that

3    there is a expert testimony that's relevant to these that if I

4    could just confer with the prosecutor for a moment I can get

5    clarity on what he's trying to do.

6              THE COURT:  All right.

7              (Pause)

8              MR. JACKSON:  Subject to that limitation, your Honor,

9    we have no objection.

10             THE COURT:  Okay.  300 through 310 are received in

11   evidence.

12             (Government's Exhibits 300 through 310 received in

13   evidence)

14             MR. BOVE:  Thank you, your Honor.  Could we please

15   take a look at 300 and zoom in to the top five lines or so.

16   Q.  Special Agent Gonzalez, what BlackBerry messenger screen

17   name did Santos Pena use during the investigation?

18   A.  Negro.

19   Q.  And the other screen name here is Rayo.  Do you see that?

20   A.  Yes, sir.

21   Q.  Did anyone using that alias or screen name provide

22   assistance to the DEA during the investigation?

23   A.  No, sir.

24   Q.  And there's a date on this document.  Where did that date

25   come from?

GB79FLO5                           Gonzalez - direct

1   A.  I believe that's the date that Santos Pena sent me the chat

2   there.

3   Q.  So he sent this to you through the BlackBerry messenger

4   app?

5   A.  Yes, sir.

6           MR. BOVE:  Can we take a look at 301 now, please.

7   Zoom in to the top half.

8   Q.  What is this?

9   A.  That's a chat that Mr. Santos Pena sent me via e-mail.

10  Q.  And so it says from Negro U.  Who is that?

11  A.  That's Mr. Santos Pena.

12  Q.  And down in the communication itself there's a screen named

13  HRCF.  Do you see that?

14  A.  Yes, sir.

15  Q.  Do you know what those initials stand for?

16  A.  Yes, sir.

17  Q.  What do they stand for?

18  A.  Hugo Rafael Chávez Frías, the former president of

19  Venezuela.

20  Q.  Do you know if Chávez sent these text messages?

21  A.  No, sir.

22  Q.  Now if you could take a look at Government Exhibits 300-T

23  through 310-T off on the side.  What are these?

24  A.  These are translations of Government Exhibits 300 through

25  310.

GB79FLO5                          Gonzalez – direct

1    Q.  Did you prepare these translations?

2    A.  No, sir, I did not.

3    Q.  Did you have any role in preparing the documents marked as

4    300-T through 310-T?

5    A.  Yes, sir.

6    Q.  What role did you play?

7    A.  I did the attributions and verified that the Spanish

8    language text was properly cut and pasted from that document to

9    this document and verified the date.

10   Q.  So you would take the Spanish from, for example, Government

11   Exhibit 300 and make sure it was correctly pasted into 300-T?

12   A.  Yes, sir.

13   Q.  Now I'm going to show you in a moment documents marked for

14   identification as Government Exhibits 403-T through 409-T,

15   416-T, 417-T, and 502-T through 518-T.

16             If I could have one second to confer with defense

17   counsel, your Honor.

18             THE COURT:  Yes.

19             (Pause)

20             MR. BOVE:  May I approach, your Honor?

21             THE COURT:  Yes, you may.

22             MR. BOVE:  I'm going to place the documents that I

23   just described on the witness stand.  Could you take a look at

24   those.

25             We can take 301 down, Mr. Calabrese.  Thank you.

GB79FLO5                        Gonzalez - direct

1   Q.  Do you recognize these?

2   A.  Yes, sir.

3   Q.  What are they?

4   A.  These are translations of messages, chats, downloaded from

5   defendant Flores -- Mr. Flores' and Mr. Campo's telephone.

6   Q.  Did you prepare these translations?

7   A.  No, sir.

8   Q.  Did you have any role in preparing these documents?

9   A.  Yes, sir.

10  Q.  What role did you play?

11  A.  Again, I did the attributions.  I verified the Spanish

12  language text was properly cut and pasted over to this

13  document, and verified the date, and changed the time on the

14  documents.

15  Q.  Let's talk a little about the time change.  Are you

16  familiar with Universal Coordinated Time?

17  A.  Yes, sir.

18  Q.  And during this investigation in late 2015 what was the

19  difference between Universal Coordinated Time and the time zone

20  in Venezuela?

21  A.  The time zone in Venezuela is four-and-a-half hours behind

22  the Universal Coordinated Time.

23  Q.  What about the difference between Universal Coordinated

24  Time and the time in Honduras?

25  A.  The time in Honduras was six hours behind.

GB79FLO5                          Gonzalez – direct

1    Q.  So you said that you did some conversions of the times

2    reference in the exhibits that are in front of you right now?

3    A.  Yes, sir.

4          THE COURT:  Is Universal Coordinated Time the same as

5    Spanish European Time?

6          THE WITNESS:  Kind of the same.

7          THE COURT:  Kind of the same?

8          THE WITNESS:  Pretty much.

9    Q.  What conversion did you make?

10   A.  I subtracted the time, four-and-a-half hours.

11         MR. BOVE:  Thank you.  You can put those down.

12   Q.  So you said that Santos Pena and Santos Hernandez returned

13   from Venezuela in late October of 2015?

14   A.  Yes, sir.

15   Q.  What happened when they got back?

16   A.  They went home and then they came over to our office for a

17   debriefing.

18   Q.  When approximately was that debriefing?

19   A.  November 1, November 2, thereabouts.

20         MR. BOVE:  Could we take a look at Government Exhibit

21   60, please.

22   Q.  During the debriefing in early November of 2015 did either

23   source provide any physical evidence relating to the package

24   that we see in this picture?

25   A.  No, sir.

1   Q.  Did that surprise you?

2   A.  No, sir.

3   Q.  Why not?

4   A.  They wouldn't have been able -- they weren't instructed to

5   do so and they were not -- they wouldn't have been able to

6   bring us any sort of evidence of cocaine out of Venezuela.

7   Q.  Why not?

8   A.  Well, if they would have taken possession of it the minute

9   they leave that meeting walking around the street going to the

10  hotel they could have been stopped and searched and arrested.

11  Going to an airport to try and fly out, again, they'd be

12  subject to a search where the contraband could be discovered.

13  Crossing the border into the United States, again, they're

14  subject to search where they could have been arrested with that

15  contraband.  It was not safe.

16  Q.  Now you said that there are law enforcement -- U.S. law

17  enforcement personnel in Venezuela?

18  A.  Yes, sir.

19  Q.  Why couldn't the sources have taken some evidence from this

20  package and provided it to those law enforcement personnel in

21  Venezuela?

22  A.  First, they wouldn't be meeting with him; and second, our

23  personnel in Caracas are not authorized to take possession of

24  any illegal narcotics.

25          MR. BOVE:  We can take that down.

GB79FLO5                          Gonzalez – direct

1    Q.  Did the sources provide any evidence relating to the trip

2    to Venezuela?

3    A.  Yes, sir.

4    Q.  What did they provide?

5    A.  They returned device one and device two that we had

6    previously given to them.

7    Q.  Those are the recording devices that they took?

8    A.  Yes, sir.

9    Q.  What happened with those devices after the sources returned

10   them?

11   A.  They were taken to our office, downloaded -- and downloaded

12   onto our network.

13   Q.  What happened after the contents of the devices were put on

14   the network?

15   A.  I downloaded them onto the compact disks or hard drives and

16   processed them as evidence.

17   Q.  Could you please describe the process or processing an item

18   like that into evidence at the DEA.

19   A.  Sure.  We generate a document that is used to reflect the

20   acquisition of evidence.  It assigns a number to the evidence.

21   The document details when the evidence was taken into custody.

22   It's provided to my supervisor for signature.  And then that

23   document, along with the evidence which is sealed in a bag, is

24   provided to our evidence custodian.

25   Q.  Is there an evidence custodian at SOD?

GB79FLO5                          Gonzalez - direct

1    A.  Yes, sir.

2    Q.  And that's the special operations division?

3    A.  Yes, sir.

4    Q.  Where does the evidence custodian at SOD store evidence

5    like that?

6    A.  He has a vault, a big room where all the evidence that's

7    seized from each respective investigation is stored pursuant to

8    the specific investigation file title number.

9    Q.  Now were there other recordings obtained during the

10   investigation other than the ones that the sources brought back

11   from Venezuela?

12   A.  Yes.

13   Q.  Was there other recording equipment used other than device

14   one and device two?

15   A.  Yes.

16   Q.  What else was used?

17   A.  There was another device used that was also capable of

18   recording audio-video.

19   Q.  So let's refer to that one as device three, okay?

20   A.  Okay.

21          MR. BOVE:  May I approach, your Honor?

22          THE COURT:  Yes, you may.

23   Q.  I'm showing you a document marked for identification as

24   government 700.  What is this?

25   A.  It's a summary of recording exhibits on October 2015

1     meetings in Caracas, Venezuela.

2     Q.   Take a look at page two of that document.

3     A.   Recordings of November 2015 in San Pedro Sula and the

4     November 10, 2015 meeting in Haiti.

5     Q.   Does Government Exhibit 700 fairly and accurately summarize

6     some of the attributes of the recordings that are in evidence

7     related to this case?

8     A.   Yes, sir.

9     Q.   And by "in evidence" I mean in evidence with the DEA

10    evidence custodian.

11    A.   Yes, sir.

12              MR. BOVE:  Your Honor, the government offers 700.

13              THE COURT:  Any objection?

14              MR. JACKSON:  Your Honor, we would only ask if the

15    prosecutor could develop a bit more foundation as to the

16    witness's basis for knowledge of the actors.

17              THE COURT:  One more question, Mr. Bove.

18              MR. BOVE:  Excuse me, your Honor?

19              THE COURT:  Ask him one more question.

20    Q.   How do you know that that chart is accurate?

21    A.   Because I pulled all the evidence from the evidence

22    custodian and I verified that these are all recordings

23    contained within the evidence in our case.

24              MR. JACKSON:  No objection.

25              THE COURT:  Received in evidence.

GB79FLO5                           Gonzalez – direct

1              (Government's Exhibit 700 received in evidence)

2              MR. BOVE:  Could we please take a look at 700 and zoom

3      in to the top set of entries relating just to the October 23

4      date.

5      Q.  Could you please describe the columns in this chart?

6      A.  Yes, sir.

7              On the far left GX denotes Government Exhibit or the

8      Government Exhibit number.

9              Next to that is the approximate date when the

10     recording was made.

11             The third column is which device was utilized to make

12     the recording.

13             The fourth column is the recording type; either video,

14     audio-video or audio.

15             And, finally, the last column is the approximate

16     duration of the recording.

17     Q.  So focusing on the entry that begins Government Exhibit

18     200, that relates to a recording created on device one, with

19     video only, 19 minutes and 51 seconds of duration?

20     A.  Yes.  On October 23, 2015.

21     Q.  Now, if we could take a look at page two at the bottom of

22     the chart.  I'd like to look at the entries relating to

23     Government Exhibits 229, 230, and 231.

24             There is an asterisk by the row -- by the Government

25     Exhibit No. 231.  Do you see that?

GB79FLO5                       Gonzalez - direct

1    A.  Yes, sir.

2    Q.  Why is that?

3    A.  Because that particular government exhibit is an excerpt, a

4    19 minute, 32 second excerpt of the one-hour one-minute

5    ten-second recording.

6    Q.  So the recording collected by the source is one hour and

7    one minute and ten seconds?

8    A.  Yes, sir.

9    Q.  And how long is the recording in evidence as -- excuse me

10   the recording marked as Government Exhibit 231?

11   A.  It's 19 minutes and 32 seconds.

12   Q.  Have you reviewed all of the recordings reflected in this

13   chart?

14   A.  Yes, sir.

15   Q.  Did you find any indication that the recordings were

16   altered or tampered with by the users of the devices?

17   A.  No, sir.

18   Q.  Have you used device one, device two, and device three in

19   other investigations?

20   A.  Yes, sir.

21   Q.  And in your experience have the de-- have the recordings

22   provided by those devices proven to be reliable?

23   A.  Yes, sir.

24           MR. BOVE:  May I approach, your Honor?

25           THE COURT:  Yes, you may.

GB79FLO5                    Gonzalez – direct

1   Q.  I'm showing you disks marked as Government Exhibits 200

2   through 231.  What are these?

3   A.  These are the recordings –– the disks containing the

4   recordings summarized on the recording exhibits on Government

5   Exhibit 700.

6   Q.  How do you know that the recordings on these disks are the

7   same as the recordings that are in evidence?

8   A.  Because I pulled the recordings from evidence and compared

9   the contents of all of these disks with the contents of the

10  recordings that were in evidence.

11  Q.  You said that Government Exhibit 231 is an excerpt from one

12  of those recordings?

13  A.  Yes, sir.

14          MR. BOVE:  Your Honor, the government offers 200

15  through 231.

16          MR. RODY:  May I have one moment?

17          (Pause)

18          THE COURT:  I think we'll take our afternoon recess

19  now.  We'll resume in ten or fifteen minutes.

20          (Continued on next page)

21

22

23

24

25

GB79FLO5                          Gonzalez – direct

1          (Jury not present)

2          THE COURT:  Mr. Bove, do you have translations of the

3     200-T series?

4          MR. BOVE:  I do, your Honor.  I'll be laying a bit of

5     a foundation through this witness for those translations but

6     they will be offered during the testimony of an expert witness

7     that we expect to testify later.

8          THE COURT:  I don't have them in my book is all I'm

9     saying.

10          MR. BOVE:  We'll get those to you, your Honor.

11          THE COURT:  See you in about ten minutes.

12          (Recess)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Mr. Bove.

3           MR. BOVE:  Thank you, your Honor.

4           Your Honor, based on the foundation laid before the

5    break I'm going to offer Government Exhibits 200 through 214

6    and 229 through 231.  Those are the recordings that relate to

7    the meetings in Venezuela and in Haiti.

8           THE COURT:  All right.  They're received.

9           (Government's Exhibits 200 through 214 and 229 through

10   231 received in evidence)

11          MR. BOVE:  I'm also going to offer 215 through 228,

12   recordings of the meetings in Honduras subject to connection.

13          MR. RODY:  No objection.

14          THE COURT:  215 through 228 are received in evidence.

15          (Government's Exhibits 215 through 228 received in

16   evidence)

17          MR. BOVE:  Mr. Calabrese, can we take a look at page

18   two of Government Exhibit 700.

19          THE COURT:  What exhibit, Mr. Bove?

20          MR. BOVE:  Government Exhibit 700.

21   BY MR. BOVE:

22   Q.  Special Agent Gonzalez, with respect to the entries for

23   Government Exhibits 229 and 230 there's a device reference

24   three there?

25   A.  Yes.

GB79FLO5                    Gonzalez – direct

1    Q.  Is that correct?

2    A.  No, sir.

3    Q.  What should it say?

4    A.  It should say device one.

5    Q.  Are device one and device three both audio-video recorders?

6    A.  Yes, sir.

7              MR. BOVE:  May I approach, your Honor?

8              THE COURT:  Yes, you may.

9    Q.  I'm showing you documents marked for identification as

10   Government Exhibits 62, 63, and 64.  Let's start with 62.

11   What's that?

12   A.  These are still images taken from Government Exhibit 202.

13             MR. BOVE:  Mr. Calabrese, can we take a look at page

14   one of 700 to follow along.

15   Q.  These are still images from which recording exhibit?

16   A.  Government Exhibit 202.

17             MR. BOVE:  Your Honor, the government offers 62.

18             THE COURT:  Any objection?

19             MR. JACKSON:  No objection.

20             THE COURT:  62 is received in evidence.

21             (Government's Exhibit 62 received in evidence)

22             MR. BOVE:  Can we publish 62, please.

23   Q.  Who are the individuals in these photographs?

24   A.  The individual on the left is Mr. Campo and the individual

25   on the right is Mr. Flores.

GB79FLO5                        Gonzalez - direct

1   Q.  And if you could now take a look at Government Exhibit 63.

2   What is that?

3   A.  These are still images taken from Government Exhibit 204.

4                MR. BOVE:  The government offers 63, your Honor.

5                MR. JACKSON:  No objection.

6                THE COURT:  63 is received in evidence.

7                (Government's Exhibit 63 received in evidence)

8                MR. BOVE:  Publish that, please.

9   Q.  Who is reflected in these photos?

10  A.  Mr. Campo on the left and Mr. Flores on the right.

11  Q.  And these are from the recording marked Government Exhibit

12  204?

13  A.  Yes, sir.

14  Q.  Now if you could take a look at Government Exhibit 64.

15  What is Government Exhibit 64?

16  A.  Still images obtained from Government Exhibit 213.

17                MR. BOVE:  The government offers 64, your Honor.

18                THE COURT:  64 is received in evidence.

19                MR. JACKSON:  No objection.

20                THE COURT:  64 is in evidence.

21                (Government's Exhibit 64 received in evidence)

22                MR. BOVE:  Publish that, please.

23  Q.  Who is reflected in these photos?

24  A.  Again on the left it's Mr. Campo and on the right

25  Mr. Flores.

1   Q.  And these are still images from the recording marked

2   Government Exhibit 213?

3   A.  Yes, sir.

4   Q.  During the course of your career have you become familiar

5   with the types of planes used to transport cocaine in the

6   Americas region?

7   A.  Generally, yes.

8            MR. BOVE:  May I approach, your Honor?

9            THE COURT:  Yes, you may.

10  Q.  I'm showing you documents marked for identification as

11  Government Exhibits 69 through 73.  What are these?

12           Well, let's start with Government Exhibit 69.  What's

13  that?

14  A.  69 that's a photograph of Gulfstream V jet.

15  Q.  Is that sometimes referred to as a GV?

16  A.  Yes, sir.

17           MR. BOVE:  The government offers 69, your Honor.

18           MR. JACKSON:  No objection.

19           THE COURT:  69 is in evidence.

20           (Government's Exhibit 69 received in evidence)

21  Q.  Please take a look at 69.

22           Now, Special Agent Gonzalez, if you could take a look

23  at Government Exhibit 70.  What is that?

24  A.  That's a picture of a Gulfstream II jet.

25  Q.  Is that sometimes referred to as a GII?

1   A.  Yes, sir.

2           MR. BOVE:  The government offers 70, your Honor.

3           MR. JACKSON:  No objection.

4           THE COURT:  70 is received in evidence.

5           (Government's Exhibit 70 received in evidence)

6           MR. BOVE:  Please publish 70.

7   Q.  What is Government Exhibit 71, Special Agent Gonzalez?

8   A.  It's a Cessna 402.

9           MR. BOVE:  Government offers 71, your Honor.

10          MR. JACKSON:  No objection.

11          THE COURT:  71 is in evidence.

12          (Government's Exhibit 71 received in evidence)

13  Q.  Please take a look at that.

14          Special Agent Gonzalez, what is Government Exhibit 72?

15  A.  I believe that's a Cessna 404.

16          MR. BOVE:  Government offers 72.

17          THE COURT:  72 is in evidence.

18          (Government's Exhibit 72 received in evidence)

19          MR. BOVE:  Mr. Calabrese, please.  Thank you.

20  Q.  Lastly, Special Agent Gonzalez what is Government Exhibit

21  73?

22  A.  That's a Falcon jet.

23  Q.  Is that sometimes called a Dassault Falcon?

24  A.  Yes, sir.

25          MR. BOVE:  The government offers 73.

1              MR. JACKSON:  No objection.

2              THE COURT:  73 is in evidence.

3              (Government's Exhibit 73 received in evidence)

4              MR. BOVE:  Please publish 73.  Thank you.  You can

5    take that down.

6    BY MR. BOVE:

7    Q.  Special Agent Gonzalez, you testified today about two

8    confidential sources named Santos Pena and Santos Hernandez?

9    A.  Yes, sir.

10   Q.  Where are they today?

11   A.  In jail here in New York.

12   Q.  Why?

13   A.  Because after the investigation we received information

14   that they were involved in unsanctioned drug trafficking

15   activities.

16   Q.  What do you mean by unsanctioned?

17   A.  They were basically doing drug deals behind our backs as

18   not part of a DEA or police investigation.

19   Q.  Is that information that you received in approximately

20   April of 2016?

21   A.  Yes, sir.

22             MR. RODY:  Objection to leading, your Honor.

23             THE COURT:  Sustained.

24   Q.  When did you first learn of the activities that you just

25   described?

1    A.  Approximately in April of 2015 –– 2016, excuse me.

2    Q.  Upon learning that information what were some of the steps

3    that you took?

4    A.  We conducted interview of the person who was providing us

5    the information.  It wasn't extremely detailed so we tried to

6    follow up as best we could.  We contacted some of our other

7    offices.  We interviewed Santos Pena and Santos Hernandez just

8    as a matter of debriefing to try and obtain information on the

9    alleged individuals who they were dealing with that we were not

10   aware of.  Again, we followed up on that information.  We did

11   some telephone analysis.  We did some border checks.  We did

12   travel histories on both the sources and then finally we

13   interviewed them again, a confrontation regarding the

14   information we had received.

15   Q.  What happened when the investigation was complete?

16   A.  They were incarcerated.

17   Q.  Based on what?

18   A.  We had interviewed them, like I say, we confronted them

19   about the information, the allegations that they were involved

20   in.  They admitted to having been involved in these drug deals.

21   Q.  And were they charged with crimes?

22   A.  Yes, they were.

23   Q.  Do you know what the status of those charges is?

24   A.  They've pled guilty.

25   Q.  Now other than Santos Pena and Santos Hernandez, were there

GB79FLO5                      Gonzalez - direct

1   any other confidential sources involved in this investigation?

2   A.  Yes.

3   Q.  How many other sources?

4   A.  One.

5   Q.  What was his name?

6   A.  Juan Gomez.

7   Q.  What did Mr. Gomez do to assist the investigation?

8   A.  He traveled to Honduras in early November to attend

9   meetings.

10  Q.  Now at any point in the investigation had you sent

11  Santos Pena or Santos Hernandez to Honduras?

12  A.  No.

13  Q.  Why did you send Gomez to Honduras?

14  A.  Because he was going there as a representative of

15  Santos Pena and because we could provide him -- so we could

16  provide him with the recording equipment.

17  Q.  Did you provide Gomez any instructions with respect to

18  Sentado?

19  A.  Yes.

20  Q.  What did you instruct Gomez to do?

21  A.  He was to meet with Sentado and attend meetings.

22  Q.  Did Gomez take any equipment with him to Honduras?

23  A.  Yes, he did.

24  Q.  What equipment did he take?

25  A.  Again he took a device capable of recording audio-video and

1   another device capable of recording audio.

2   Q.  Is the audio device the device two that we discussed

3   earlier?

4   A.  Yes, sir.

5   Q.  And the audio-video device, is that the device three?

6   A.  Yes, sir.

7   Q.  Did device three or device two have enough capacity to

8   record Gomez's entire trip to Honduras?

9   A.  Again, I didn't know.  I didn't know how long his trip was

10  going to take.

11  Q.  So what steps were taken in that event in light of the

12  capacity of the devices?

13  A.  I believe Sentado was also at the meetings.

14  Q.  Do you know if Gomez traveled to Honduras during the

15  investigation?

16  A.  Yes, sir, he did.

17  Q.  And did he obtain evidence in Honduras?

18  A.  Yes, sir, he did.

19  Q.  What did he obtain?

20  A.  He obtained recordings of meetings that he attended.

21  Q.  If we could take a look at 700, please.

22          Page two.  And what do we see in section two of

23  Government Exhibit 700?

24  A.  A summary of the exhibits corresponding to the

25  November 2015 meetings in San Pedro Sula, Honduras.

GB79FLO5                    Gonzalez - direct

1    Q.  So these are the recordings that Gomez obtained?

2    A.  Yes, sir.

3              MR. BOVE:  May I approach, your Honor?

4              THE COURT:  Yes, you may.

5    Q.  I'm showing you documents marked for identification as

6    Government Exhibits 65 and 66.  What are these?

7    A.  (No response).

8    Q.  Start with 65.

9    A.  65 is a still image obtained from Government Exhibit 215.

10             MR. BOVE:  The government offers 65, your Honor.

11             MR. RODY:  No objection.

12             THE COURT:  65 is in evidence.

13             (Government's Exhibit 65 received in evidence)

14             MR. BOVE:  Please publish that, Mr. Calabrese.

15   Q.  Who is this?

16   A.  It's a still image of Roberto de Jesus Soto.

17   Q.  Now if you can take a look it's Government Exhibit 66 that

18   I just handed you.  What is 66?

19   A.  66 is a still images obtained from Government Exhibit 220.

20             MR. BOVE:  The government offers 66, your Honor.

21             MR. RODY:  No objection.

22             THE COURT:  66 is in evidence.

23             (Government's Exhibit 66 received in evidence)

24   Q.  So what was the date of the meeting that is reflected on

25   the screen Government Exhibit 65?

GB79FLO5                    Gonzalez – direct

1   A.   November 6, 2015.

2   Q.   The one in Government Exhibit 65 that's on the screen?

3   A.   I'm sorry.  I apologize.  November 5, 2015.

4   Q.   Now if we could publish Government Exhibit 66.  What do we

5   see here?

6   A.   Still images obtained from Government Exhibit 220.

7   Q.   And these are from a meeting on November 6 of 2015?

8   A.   Yes, sir.

9   Q.   Who are these individuals?

10  A.   The image on the left, on the far left is Mr. Daza Cardona.

11  Next to him is Mr. Flores.  The image on the right is Mr. Soto.

12          MR. BOVE:  We can take that down.

13  Q.   Were arrest warrants for the defendants obtained at some

14  point?

15  A.   Yes, sir.

16  Q.   When approximately was that?

17  A.   Early November.

18  Q.   Of 2015?

19  A.   2015.

20  Q.   After the meetings in Honduras, what happened next in the

21  investigation?

22  A.   We began making plans for a meeting in Haiti and a

23  potential arrest.

24  Q.   Is that the arrest operation you described earlier in your

25  testimony?

GB79FLO5                              Gonzalez – direct

1    A.  Yes, sir.

2    Q.  Why did you plan an arrest at that point in the

3    investigation?

4    A.  Well, all investigations kind of have a natural end state

5    where either the drug traffickers are requesting payment, in

6    this case several millions of dollars which the DEA wasn't

7    going to pay, or drugs get seized.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BOVE:  (Continuing)

2    Q.  And so, why do those conversations cause you to plan an

3    arrest operation?

4    A.  At this time the defendants were requesting payment for the

5    cocaine and if -- there had been, if the operation had gone a

6    different way and there had been a seizure, then the defendants

7    at that point, like in most investigations, would have started

8    suspecting their partners, i.e. our informants, and there is a

9    lot of mistrust that occurs at that stage and sometimes it is

10   very difficult to effect an arrest after that point and they

11   probably would have never left Venezuela.

12   Q.  Why not pursue the defendants' arrest in Venezuela?

13   A.  There is no formal extradition between Venezuela and the

14   United States for a Venezuelan citizen.

15   Q.  Was there a confidential source in Haiti during the

16   operation?

17   A.  Yes, sir.

18   Q.  That was Mr. Santos Peña, right?

19   A.  Yes, sir.

20   Q.  Was he provided any recording equipment before the

21   operation?

22   A.  Yes, he was.

23   Q.  Was that Device 1 and Device 2?

24   A.  Yes, sir.

25   Q.  And you said that you met with Santos Peña on November 10th

GB75flo6                         Gonzalez - direct

1   at the ServHotel?

2   A.  Yes, sir.

3   Q.  I think you said earlier in your testimony that you went

4   inside of the hotel after the BLTS arrested the defendants?

5   A.  Yes, sir.

6   Q.  Did you collect anything from Santo Peña inside the hotel?

7   A.  Yes, I did.

8   Q.  What did you collect?

9   A.  Collected the recording devices from him.

10  Q.  What happened with those devices?

11  A.  They were transported back to our office and, again,

12  downloaded onto our network and then processed as evidence.

13          MR. BOVE:  May I approach, your Honor?

14          THE COURT:  Yes, you may.

15  Q.  I am showing you a document marked Government Exhibit

16  marked for identification 67.  With you take a?

17  A.  These are still images obtained from Government Exhibit

18  229.

19          MR. BOVE:  The government offers 67, your Honor.

20          MR. JACKSON:  No objection.

21          THE COURT:  67 is in evidence.

22          (Government's Exhibit 67 received in evidence)

23  BY MR. BOVE:

24  Q.  Can you please publish that?

25          Who is reflected in these photos?

GB75flo6                         Gonzalez – direct

1    A.  On the left is Mr. Campo and on the right is Mr. Flores.

2    Q.  And these are still images from a recording in

3    Port-Au-Prince on November 10th, 2015?

4    A.  Yes, sir.

5    Q.  Now, we have stalked a lot about the recordings marked as

6    Government's Exhibits 200 through 231.  Generally speaking,

7    what language was spoken on those recordings?

8    A.  Spanish.

9    Q.  I'm going to show you documents marked for identification

10   as Government's Exhibits 201T, 202T, 203T, 205T through 208T,

11   210T through 213T, 230T through 231T.  What are these?

12   A.  These are Spanish transcriptions and translations of the

13   recordings reflected on the first page of the government

14   exhibit.

15   Q.  Did you assist in the translations that are reflected in

16   these transcripts?

17   A.  No, I did not.

18   Q.  What, if any role, did you play in the preparation of those

19   documents?

20   A.  Again, I did the attributions just to say I verified to the

21   best of my abilities that the speakers were accurately

22   reflected in these documents.

23   Q.  Were there places where you were unable to identify a

24   speaker during the recordings?

25   A.  Yes, sir.

GB75flo6                          Gonzalez – cross

1    Q.  What did you do when you encountered a situation like that?

2    A.  Just marked it blank or unintelligible.

3    Q.  Did you sometimes refer to them as unidentified?

4    A.  Yes.

5            MR. BOVE:  If I can have one moment, your Honor?

6            THE COURT:  Yes.

7            (Pause)

8            MR. BOVE:  Nothing further.

9            THE COURT:  Mr. Jackson?

10            MR. JACKSON:  Thank you, your Honor.

11            May I inquire, your Honor?

12            THE COURT:  Yes, you may.

13            MR. JACKSON:  Thank you.

14    CROSS EXAMINATION

15    BY MR. JACKSON:

16    Q.  Good afternoon, Agent Gonzalez.

17    A.  Good afternoon, sir.

18    Q.  Agent Gonzalez, how many times have you gone over your

19    testimony, your planned testimony today, with the prosecutors

20    in this case?

21    A.  I don't know.  A couple times.

22    Q.  Can you give us your best estimate?

23    A.  Four or five times.

24    Q.  Four or five different occasions?

25    A.  Yes, sir.

GB75flo6                          Gonzalez - cross

1    Q.  How many hours did you meet for on each of those occasions?

2    A.  I don't know, sir.

3    Q.  Do you have any estimate?

4    A.  I couldn't say accurately, no.

5    Q.  Could it have been several hours on each occasion?

6    A.  Possibly.

7    Q.  Could it have been more than four or five occasions that

8    you met with the prosecutors to go over your testimony?

9    A.  I don't think so.

10   Q.  You think it was probably just four or five occasions?

11   A.  That's my best guess, sir.

12   Q.  When was the most recent time that you went over the

13   testimony that you were going to give with regard to the

14   supposed post-arrest statements were made?

15   A.  A couple of days ago.

16   Q.  How long did you go over that?  How long was that meeting

17   with the prosecutors?

18   A.  I don't remember.  A couple of hours.

19   Q.  Now, Agent Gonzalez, there are a number of things that went

20   wrong in this investigation, correct?

21   A.  There are things we learned about after the investigation,

22   yes.

23   Q.  Right.

24        And there are things during the investigation that you

25   would agree with me did not go optimally, correct?

GB75flo6                         Gonzalez - cross

1    A.  During the investigation, I'm not sure.

2    Q.  Well, there are some steps that you take, that you took

3    during the investigation that at this point you would not take

4    if you had an opportunity to go over it again, correct?

5    A.  Correct.

6    Q.  One of those steps has to do with the way in which you

7    managed the money that was flowing between the DEA and the two

8    corrupt informants that you talked about during your direct

9    testimony, correct?

10   A.  No, sir.

11   Q.  That has nothing to do with any of that?

12   A.  What?

13   Q.  Let me just back up.

14        How much money, in total, has the DEA paid for their

15   CS activity to CS 1 and 2, the two Joses, the father and son?

16   A.  I don't know the exact amount, sir.  I would have to see

17   the file.

18   Q.  You have seen the file before, haven't you?

19   A.  I haven't memorized that amount, no.

20   Q.  Right.

21        My question is you have seen the file before though,

22   right?

23   A.  Yes.

24   Q.  And amount is in the file, right?

25   A.  Not as a final figure, no.

GB75flo6                     Gonzalez - cross

1    Q.  Right, the various payments are in the file?

2    A.  Yes.

3    Q.  And you are aware that that is something that the

4    prosecutors had to tabulate in connection with these

5    proceedings, right?

6    A.  I believe so.

7    Q.  And you are aware that the number that they came up with is

8    more than $1.5 million combined, correct?

9    A.  I'm not aware of that.

10   Q.  You are not aware of that?

11   A.  No, sir.

12   Q.  Okay.

13        What is your understanding of how much money they got?

14   Do you have a rough understanding as the case agent of how much

15   money they got?

16   A.   I don't know how much money they got.

17   Q.  Okay.

18        The money that we are talking about, the more than

19   $1.5 million that they received, that would only be reflective

20   of payments to them, correct?

21        MR. BOVE:  Objection.

22        THE COURT:  Overruled.

23        THE WITNESS:  Can you repeat your question please,

24   sir?

25   BY MR. JACKSON:

GB75flo6                    Gonzalez - cross

1   Q.  Well, are you aware of the fact that on top of monies that

2   they received, they also were given money for so-called

3   expenses, correct?

4   A.  That's part of the money they received.

5   Q.  So the money that was calculated by the trial team here

6   includes the expenses that were paid to these individuals?

7   A.  I assume.  I don't know how they calculated it.

8   Q.  You don't actually know.

9   A.  I didn't watch them calculate it; no, sir.

10  Q.  How much money in expense money did you personally

11  authorize or give to the two informants, Jose, Sr. and Jose,

12  Jr.?

13  A.  From what time period, sir?

14  Q.  In total.

15  A.  I don't know.

16  Q.  You have no idea?

17  A.  No, sir.

18  Q.  Agent Gonzalez, it is an exceptional event, isn't it, when

19  the DEA has to throw in jail two long-term cooperating sources,

20  right?

21  A.  Yes.

22  Q.  That's not something that happens every day?

23  A.  No, it is not.

24  Q.  That is something that it's the only time it ever happened

25  in your career, right?

GB75flo6                    Gonzalez - cross

1    A.   No.

2    Q.   Well, you have had to throw CSs in jail, long-term CSs?

3    A.   Not long-term CSs, no.

4    Q.   Right.

5         This is the only time in your career that you have had

6    to throw long-term CSs in jail, right?

7    A.   Yes.

8    Q.   And for you, as the primary handling agent, that's an

9    important development, right?

10   A.   I was one of their handling agents, not the primary.  There

11   were several.

12   Q.   You were one of the handling agents?

13   A.   Yes.  As I said, they were established in different

14   offices.

15   Q.   Agent Gonzalez, it has been important to you, hasn't it, to

16   go back and try to make sure that to whatever degree there were

17   mistakes made that could have compromised the investigation,

18   you could have compromised defendants' rights as a result of

19   these informants' bad activities, it has been important to you

20   it try to go back and try to correct any problems, right?

21   A.   I realize that we became aware of the problems with these

22   informants after the investigation and we took the necessary

23   steps to deal with those problems.  It was not an ideal

24   situation, we didn't know about it until afterwards.

25   Q.   And you haven't gone back and tried to figure out how much

GB75flo6                          Gonzalez - cross

1    money went to these informants?

2    A.  No.

3    Q.  You are aware that they were engaging in, at least as far

4    as what they've admitted, the importation of methamphetamine

5    into the United States, correct?

6    A.  Yes.

7    Q.  You are aware that they admitted to the importation of

8    cocaine into the United States?

9    A.  Yes.

10   Q.  Right.

11            They admitted to the actual importation of heroin into

12   the United States, right?

13   A.  I believe so.

14   Q.  And they've admitted to you that they had highly developed

15   contacts that have been going on for some time period with

16   members of Mexican organized crime, right?

17   A.  I don't know those specific details.

18   Q.  Okay.

19            Now, Agent Gonzalez, it's a fact, right, that some of

20   the money that you paid to these informants for supposed

21   expenses was likely used, based on your investigation, to

22   actually invest in importation of drugs into the United States,

23   right?

24   A.  I do not know that.

25   Q.  Have you asked?

GB75flo6                        Gonzalez - cross

1    A.  I believe it was asked.  I'm not sure.

2    Q.  You personally haven't asked?

3    A.  I did not conduct their interrogations, no.

4    Q.  Have you spoken with either Jose, Sr. or Jose, Jr. since it

5    first came to light that they had been deceiving the DEA about

6    these facts?

7    A.  I have spoken to them, yes.

8    Q.  Right.

9            In fact, you have had extensive conversations with

10   them even since the time period when this first started to

11   emerge, right?

12   A.  No, I have not had extensive conversations with them.

13   Q.  Okay.  You have had a number of different communications

14   with them?

15   A.  Very few, actually.

16   Q.  Right.

17           At no point did you ask them did you utilize any of

18   the monies that I gave you to invest in the importation of

19   drugs behind our back?

20   A.  Again, I did not ask them that question.

21   Q.  I see.

22           Now, you are not sure of the exact amount of money

23   that you gave them?

24   A.  No, sir.

25   Q.  But it is a six-figure sum at least, correct?

GB75flo6                          Gonzalez – cross

1    A.  It could be.

2    Q.  Well, you are giving the money $10,000 at a time, correct?

3    A.  Not every time.

4    Q.  On certain occasions, right?

5    A.  On certain occasions.

6    Q.  And it is a fact, Agent Gonzalez, that even as you were

7    giving them the $10,000, that was not being appropriately

8    documented in terms of the DEA's procedures for authorizing

9    money for expenses, right?

10   A.  No.

11   Q.  You gave them money on occasion in advance for expenses,

12   right?

13   A.  Correct.

14   Q.  And on certain occasions, after you gave them money in

15   advance for expenses, you didn't ask for whatever money was not

16   used on expenses back after you gave them the money, right?

17   A.  We asked for receipts of the expenses that they incurred,

18   yes.

19   Q.  Right.  That was not my question, though.

20          My question is there are occasions when you fronted

21   them $10,000, right?

22   A.  Yes.

23   Q.  When you fronted them $10,000, if they did not use the

24   entire $10,000 on expenses, did you get that money back?

25   A.  No.  They would keep that for future expenses.

GB75flo6                        Gonzalez – cross

1    Q.  I see.

2           So, they kept that money and it is your testimony now

3    that the reason that they kept it was for future expenses?

4    A.  Generally the amount --

5    Q.  I'm sorry, sir.  If you could answer that question first

6    yes or no, then we can move on to the next question.

7    A.  Can you please repeat it, sir?

8    Q.  My question is you fronted them that money and it is your

9    understanding now that the portion of the money that they

10   didn't use for expenses they kept for future expenses, correct?

11   A.  Yes.  That's possible.

12   Q.  Okay.

13          You don't actually know what they did with the money,

14   right?

15   A.  No.

16   Q.  And there were occasions when you fronted them money

17   knowing that it wasn't actually expense money, right?

18   A.  No.

19   Q.  Well, November 6, 2015, that's during the time period of

20   this investigation, correct?

21   A.  Yes.

22   Q.  This is only a few days before you arrested the defendants

23   and renditioned them to New York?

24   A.  I don't think rendition is an accurate term for it.

25   Q.  You brought them to New York without any extradition?

GB75flo6                      Gonzalez – cross

1    A.   Yes.

2    Q.   Now, on November 6 you communicated with Jose, Sr. via

3    written communication about expenses to be paid, correct?

4    A.   I don't recall.

5    Q.   Well, do you recall saying to him:  $10,000 is being

6    processed for you --

7              MR. BOVE:  Objection.

8              THE COURT:  Overruled.

9    BY MR. JACKSON:

10   Q.   $10,000 is being processed for you and $10,000 for Junior

11   now.  I think with that we are up-to-date with all expenses.

12   Followed by a smiley face emoticon with a winky signal on it.

13             Do you remember that?

14   A.   I don't remember the emoticons, no.

15   Q.   You don't remember the winky face?

16   A.   No, I don't.

17   Q.   I would like to show you something that we have marked as

18   DX- 628 and I would ask if it refreshes your recollection.

19             Your Honor, may I approach?

20             THE COURT:  Yes.

21             MR. JACKSON:  Thank you.

22             THE COURT:  Have you looked at it?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  What is the question?

25             MR. JACKSON:  Your Honor, may I?

1           THE COURT:  Go ahead and ask your question now.

2           MR. JACKSON:  Thank you, Judge.

3    BY MR. JACKSON:

4    Q.  You had a chance to look at the document?

5    A.  Yes.

6    Q.  Does that refresh your recollection that you made

7    statements I referenced before followed by a winky face

8    emoticon?

9    A.  Yes.

10   Q.  And the point of the winky face emoticon behind the

11   statement:  I think with that we are up-to-date with all

12   expenses, is that you understood that this was not really

13   expense money, right?

14   A.  No.

15   Q.  Well, that's what the wink was designed to signal, correct?

16   A.  No, sir.

17   Q.  Okay.

18          MR. JACKSON:  Your Honor, we would like to offer

19   Exhibit DX- 628.

20          MR. BOVE:  Objection.

21          THE COURT:  Sustained.

22   BY MR. JACKSON:

23   Q.  Now, one of the things that you also became aware of with

24   regard to the finances of these informants is that they made a

25   significant amount of money in terms of the drug dealing that

GB75flo6                          Gonzalez - cross

1    they were doing on top of what the DEA was paying them, right?

2    A.  No.

3    Q.  Okay.

4         You are aware that what the DEA was paying them, I

5    know you said you don't know the exact amount but you do know

6    it was a six-figure amount in terms of the total amount that

7    they got, right?

8    A.  I don't remember.  I thought you said six figure.

9    Q.  No, I'm talking about the total amount that the DEA paid

10   CS-1 and CS-2; you are aware that is a seven figure amount,

11   right?

12   A.  I'm not aware.

13   Q.  You haven't taken any steps to understand how much money

14   they made?

15   A.  If you would like to tell me the amount and show it to me I

16   will agree if I see it.

17   Q.  That's fine.

18        Let me ask you about the person that you mentioned who

19   is known as El Sentado.  Did you front any money to him for

20   expenses?

21   A.  No, sir.

22   Q.  Are you aware of whether the DEA fronted any money to him

23   for expenses?

24   A.  They did not.

25   Q.  Now, have you maintained documentation anywhere of all of

GB75flo6                        Gonzalez – cross

1    the expense money that you gave to Jose, Sr. and Jose, Jr.?

2    A.   The expense money is documented in the payment receipts.

3    Q.   Right.

4            So you have a tabulation somewhere of the -- all of

5    the expense money that was given to them?

6    A.   It should be in a file, yes.

7    Q.   It should be.  You are not sure?

8    A.   I don't maintain files.  There was a specific person that

9    does that.

10   Q.   I see.

11           Now, one of the things that they admitted to is that

12   in 2016, just a few months after they set up Efrain and

13   Franqui, they participated in a scheme to import two kilograms

14   of heroin into the United States, right?

15   A.   What was the date, sir?

16   Q.   In 2016, a few months after the investigation.

17   A.   Yes, sir.  I believe so.

18   Q.   Right.

19           And you are familiar with drug pricing as a result of

20   your role as a long-term federal agent, right?

21   A.   Depends on the region.

22   Q.   Well, you are aware that two kilograms of heroin can have a

23   street value that's as much as $120,000, right?

24   A.   Again, I guess it depends on the region.

25   Q.   In some regions, right?

1   A.  It's possible.

2   Q.  It's possible or?

3   A.  Depends on the quality, depends on the price at the time.

4   Q.  All I am asking you is in some regions heroin, two

5   kilograms, would have a value of $120,000 or more, yes?

6   A.  It's possible.

7   Q.  It's correct, isn't it?

8   A.  It's possible, sir.  Yes.

9   Q.  Okay.  Yes.

10          Now --

11          THE COURT:  That's not the witness' answer, it is your

12  answer.

13          MR. JACKSON:  That's fine, your Honor.

14          THE COURT:  Because you are not testifying, so.

15          MR. JACKSON:  Absolutely, Judge.

16  BY MR. JACKSON:

17  Q.  Now, you have recovered the money that they made on that

18  deal, correct?

19  A.  Who?

20  Q.  Jose, Sr. and Jose, Jr., the 2 kilogram heroin deal.  You

21  have recovered it?

22  A.  I don't know if they successfully accomplished that deal or

23  not.

24  Q.  You have no idea whether or not they actually successfully

25  accomplished that deal?

GB75flo6                          Gonzalez – cross

1    A.  No.

2    Q.  And you have no idea, no information indicating that the

3    DEA recovered the money that they made from that deal to

4    whatever extent they made it?

5    A.  No, I do not know.

6    Q.  Okay.

7           There was also a deal in 2016 involving 10 pounds of

8    methamphetamine, right?

9    A.  I don't recall the exact amount.  It is possible.

10   Q.  You don't remember the exact amount but you remember it was

11   a large quantity of marijuana, right?

12          THE COURT:  You said methamphetamine.

13   Q.  I'm sorry.

14          Of methamphetamine.

15   A.  Yes, sir.

16   Q.  And you are aware that you can get about $20,000 a pound

17   for methamphetamine in parts of the United States?

18   A.  Depends on the type of methamphetamine and quality.

19   Q.  What are the ranges you have seen for a pound of

20   methamphetamine?

21   A.  When I was involved in those investigations, anywhere from

22   $2,000 to $10,000 a pound.

23   Q.  You never saw $20,000?

24   A.  I never did.  No, sir.

25   Q.  Okay.

GB75flo6                         Gonzalez - cross

1         And going with those figures, this is several thousand

2    to perhaps more than six figures in terms of the value of just

3    this deal with 10 pounds of methamphetamine, the value of it,

4    right?

5    A.  Okay.

6    Q.  Is that correct?

7    A.  Okay.  Yes.

8    Q.  And the DEA, I assume, has recovered from Jose, Sr. and

9    Jose, Jr. any of the money that they made on that

10   methamphetamine deal?

11   A.  Again, I don't know if those deals are were successful.

12   Q.  Sir, you are the case agent responsible for the

13   investigation in dealing with those witnesses, right?

14   A.  Yes.

15   Q.  One of your responsibilities as the case agent is to be the

16   steward of the dealings with the witnesses, right?

17   A.  Yes.

18   Q.  And so, you haven't looked into whether or not they were

19   successful with the drug deals that they admitted to taking

20   place in underneath the DEA's nose?

21   A.  Somebody else conducted the interview.  I did not recall if

22   those deals were successful or not.  We incarcerated the

23   defendants.

24   Q.  Have you participated in any witness prep with Jose, Sr.

25   and Jose, Jr. for this trial?

1    A.  No, sir.

2    Q.  You haven't participated at all?

3    A.  No, sir.

4    Q.  Okay.

5        Now, one of the people that they mentioned who he was

6    involved in the drug dealing involving the methamphetamine and

7    the heroin was a person known as Tres Rego, right?

8    A.  Can you repeat that, please?

9    Q.  It was a person who they identified as Tres Rego, correct?

10   A.  I don't remember that alias.

11   Q.  You don't remember that name at all?

12   A.  Not that alias, no.

13   Q.  Okay.

14       Do you remember that there was a person that they said

15   that they had gotten the drugs from?

16   A.  Yes.

17   Q.  And has that person been apprehended by the DEA?

18   A.  Not that I'm aware of.

19   Q.  Okay.

20       So, they also talked about several other deals, right;

21   a five kilogram deal for meth that they participated in?

22   A.  I believe so.

23   Q.  And they also talked about another three kilogram deal

24   involving cocaine, correct?

25   A.  I believe so.

GB75flo6                      Gonzalez - cross

1   Q.  And there was some other individuals who were involved in

2   these.  There was a guy that they identified as being involved

3   known as El Gordito, right?

4   A.  Possibly.

5   Q.  You don't remember El Gordito?  That is a memorable name,

6   isn't it?

7   A.  Not really, no.

8   Q.  You don't remember that at all?

9   A.  No, I don't.

10  Q.  And do you know whether El Gordito has been arrested?

11  A.  I don't think so.

12  Q.  Okay.

13          Do you know if any of the people that they identified

14  as their supposed suppliers have been identified by the DEA and

15  actually placed in custody?

16  A.  No, I don't think so.

17  Q.  Okay.

18          And when was it that they first came clean after being

19  exposed by the other CS?

20  A.  I believe that was April 2016 that I testified to.

21  Q.  Okay.

22          And in April 2016, that's when they first started to

23  come clean, right?

24  A.  I believe so.

25  Q.  I don't want to get too deep into it but at that time they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GB75flo6                         Gonzalez - cross

1   started to tell the DEA that they were engaging in drug

2   trafficking but they didn't tell all of the story, right?

3   A.  Well, they didn't come right out and tell us, we had to

4   confront them.

5   Q.  Right; you had to confront them after you got information

6   from another CS, right?

7   A.  Yes, sir.

8   Q.  And the information that they initially gave was false,

9   right?

10  A.  No, it was incomplete.

11  Q.  Just incomplete, not false?

12  A.  I believe it was just incomplete.

13  Q.  Okay.

14          Now, just turning back to we have a significant amount

15  of money; you have no idea how much but a significant amount of

16  money that the DEA actually paid to these individuals, right?

17  A.  Yes, sir.

18  Q.  You have a significant amount of money that they made from

19  multiple drug deals, real drug deals importing actual narcotics

20  into the United States, right?

21  A.  Again, I don't know if they're successful in those deals.

22  Q.  You know that they participated in those deals, right?

23  A.  Yes, sir.

24  Q.  And they didn't participate pro bono, right?

25  A.  No, sir.

1    Q.  It was for money?

2    A.  Yes, sir.

3    Q.  Right.

4            And so, how much money of the vast amount of money

5    that these guys have gotten have you recovered from these

6    individuals?

7    A.  None.

8    Q.  Zero?

9    A.  Correct.

10   Q.  I see.

11           Have you looked at their bank records?

12   A.  I personally haven't, no.

13   Q.  You personally haven't taken a look at their bank records?

14   A.  No, sir.

15   Q.  Even though you had the bank record information, right?

16   A.  Yes.

17   Q.  Because you actually put money into their bank accounts,

18   right?

19   A.  Yes.

20   Q.  You have no idea how much, though?

21   A.  How much what?

22   Q.  You actually put into their bank accounts?

23   A.  In sum total I do not know the exact amount.

24   Q.  Okay.

25           Now, I want to talk just a bit about the supposed

GB75flo6                          Gonzalez - cross

1    post-arrest statement that you told us about a little bit

2    earlier and I just want to turn back, just understanding the

3    mechanics of what you were describing in terms of the

4    post-arrest statements and why you made some of the decisions

5    that you made.

6             May I ask if the government can recall the exhibit

7    that they pulled up that was the interior of the airplane?

8             THE COURT:  You want the picture of the airplane?

9             MR. JACKSON:  Yes, your Honor, if I may?

10            MR. BOVE:  67.

11   BY MR. JACKSON:

12   Q.  Now, this is the interior of the plane, correct?

13   A.  Yes, sir.

14   Q.  And this is where you conducted the post-arrest interview

15   that you talked about, right?

16   A.  Yes, sir.

17   Q.  How many recording devices were on this plane at the time

18   that you conducted that interview?

19   A.  Four or five.

20   Q.  Four or five DEA-authorized recording devices, right?

21   A.  No.  Authorized recording devices, I believe there were

22   two.

23   Q.  So, there were two DEA surreptitious recording devices,

24   right?

25   A.  Yes.

GB75flo6                        Gonzalez – cross

1    Q.  These are the devices that you can utilize to record a

2    conversation secretly, right?

3    A.  Yes.

4    Q.  And that's something that the DEA sometimes does in

5    post-arrest statements, right?

6    A.  Not on airplanes that I'm aware of.

7    Q.  Well, I'm just asking generally, is that something that you

8    do?

9    A.  Surreptitious recordings of post-arrest statements, I'm not

10   aware of that.

11   Q.  It's possible though, right?

12   A.  I assume it is possible.

13   Q.  And you also had your phone, right?

14   A.  Yes.

15   Q.  You also had, there were other agents' phones there, right?

16   A.  Yes.

17   Q.  You actually had your phone in your hand as you were

18   conducting this interview, right?

19   A.  Not the entire time, just for a brief moment.

20   Q.  Where was it during the other moments?

21   A.  In my pocket or in my bag.

22   Q.  So, at all times the phone that you had was either in your

23   pocket, in the bag next to you, or actually in your hand during

24   the interview?

25   A.  Yes.

GB75flo6                         Gonzalez - cross

1   Q.  Now, the defendants were actually shackled on this plane,

2   correct?

3   A.  Yes.

4   Q.  They were -- can you describe what the shackling was?

5   A.  Handcuffs for their feet, long chains.

6   Q.  So they were shackled at their legs and their arms?

7   A.  Yes.

8   Q.  Did they have any weapons on them?

9   A.  No.

10  Q.  You searched them for weapons before they got on the plane,

11  right?

12  A.  Yes, sir.

13  Q.  And the DEA had advised the Haitian authorities anyway and

14  believed that they didn't impose significant safety risk?

15  A.  I don't recall advising of them.

16  Q.  So they were shackled, no weapons, and your testimony is

17  that the reason that you didn't record the interview is because

18  you were concerned about the safety situation?

19  A.  Yes, sir.

20  Q.  Now, sir, there is no -- there was no expectation or belief

21  that you discussed with any of the other agents that these

22  defendants were trying to take over the plane, right?

23  A.  We are transporting prisoners, sir, there is two agents to

24  a prisoner.  We don't take that lightly.

25  Q.  Right.

GB75flo6                    Gonzalez - cross

1          And they were being calm on the plane for the most

2     part, right?

3     A.   Yes.

4     Q.   Except during some parts where you were talking about the

5     potential penalties that they faced, right?

6     A.   They were calm at that time, true.

7     Q.   Well, they were crying at some of those points, right?

8     A.   I recall one of the defendants crying when he made his

9     phone call.

10    Q.   I see.

11         So it had nothing to do with the discussion that you

12    had about the fact that they were facing life in prison?

13    A.   I never said they were facing life in prison.

14    Q.   You advised them of the penalties that they were facing,

15    right?

16    A.   I believe so.

17    Q.   And what did you advise them?

18    A.   That I believe there was a minimum penalty of 10 years.

19    Q.   And did you advise them of what you thought the maximum

20    penalty was?

21    A.   I don't recall saying that.

22    Q.   It is possible that you said that, right?

23    A.   I don't think so.

24    Q.   You don't think so but you are not sure.

25    A.   I think if I would have said that I would remember.

1  Q.  My question to you is you don't think so but you are not

2  sure, correct?

3  A.  Correct.

4  Q.  Now, one of the reasons that you are not sure is because

5  you were just taking notes during the interview, right?

6  A.  Yes.

7  Q.  You were actually posing questions as you were taking

8  handwritten notes, right?

9  A.  I wasn't talking while I was taking notes.

10 Q.  So you would speak and then you would take a note?

11 A.  Yes.

12 Q.  And sometimes when the defendant was speaking, then you

13 would take notes?

14 A.  Yes.

15 Q.  Agent Gonzalez, you knew when you were doing this that this

16 was going to be much less than a verbatim transcript of the

17 actual conversation on the plane, right?

18 A.  Yes.

19 Q.  And there was no rule that prohibited you from recording on

20 that plane, right?

21 A.  No.

22 Q.  So, you made the decision to produce a record that you knew

23 would be less than the most useful record for court, right?

24 A.  I produced my notes, sir.

25 Q.  My question is you made a decision to create a record that

1   you knew would be less than the most useful record for court,

2   right?

3   A.  No, that's not the decision I made.  I made a decision to

4   take notes of the interview.

5   Q.  Well, you also made a decision explicitly not to record the

6   interview, right?

7   A.  Yes.

8   Q.  And the reason that you did that is because you did not

9   want to preserve all of the conversations you were having with

10  the defendants, right?

11  A.  No.

12  Q.  Well, you didn't want the techniques that you were

13  utilizing in terms of the conversation to be preserved on

14  video, correct?

15  A.  No.

16  Q.  Your testimony is that the only reason that you didn't

17  record it is because you were afraid for safety?

18  A.  Yes, sir.

19  Q.  Did you think that one of the defendants would be able to

20  seize control of your phone and use it as a weapon?

21  A.  No.

22  Q.  Did you think that they would perhaps use the phone to call

23  in an air strike on the plane if they could get ahold of it?

24  A.  No.

25  Q.  So the safety scenario that you are talking about actually

1    doesn't make any sense, right?

2    A.  I disagree.

3    Q.  What was the safety concern?

4    A.  We were sitting by the front of the cockpit, we are on a

5    plane at 30,000 feet, transporting two prisoners.  We don't

6    take that lightly.

7    Q.  I'm trying to understand what the safety issue would have

8    been with regard recording.

9    A.  If I am holding a recording device then I am exposed.  If

10   someone else is holding a recording device, they're exposed.  I

11   was sufficiently exposed sitting next to him taking notes.

12   Q.  Sir, it would have been completely possible, right, for you

13   to press record on any of the several devices and then put it

14   off to the side, correct?

15   A.  It would have been possible.

16   Q.  The defendants wouldn't have even known that you were

17   recording using certain of the devices that you had on the

18   plane, right?

19   A.  Yes.

20   Q.  And so, help me out.  I am trying to understand.  How could

21   that possibly have amplified the safety situation on the plane?

22   A.  To be honest, I didn't think of using the surreptitious

23   recording devices.

24   Q.  So it is your testimony that you didn't think about it even

25   though you had been engaged in a surreptitious recording effort

1    for weeks throughout this entire investigation, right?

2    A.  Yes.

3    Q.  You were one of the people that took custody of the actual

4    devices that were used for the surreptitious recording, right?

5    A.  Yes.

6    Q.  And so you just -- it never occurred to you that you might

7    be able to use those to record the interview?

8    A.  No, it did not.

9    Q.  It did occur to you that you could use your phone, right?

10   A.  Yes.

11   Q.  And you decided holding a phone in my hand is just going to

12   be too dangerous, right?

13   A.  Yes.

14   Q.  Even though the defendants were shackled at their legs and

15   their hands?

16   A.  Yes.

17   Q.  And you made this decision without consulting anyone else

18   on the plane, right?

19   A.  Correct.

20   Q.  And you knew when you made that decision, by the way, that

21   none of the other agents on the plane spoke Spanish, right?

22   A.  No.

23   Q.  Sir, you knew that Agent Zach was not a fluent Spanish

24   speaker, right?

25   A.  Yes.

GB75flo6                          Gonzalez - cross

1    Q.  And you knew that neither of the other agents were fluent

2    Spanish speakers, right?

3    A.  Correct.

4    Q.  And so you are the only person on the plane that is a level

5    4 out of 5 Spanish speaker, right?

6    A.  Yes.

7    Q.  You are the only person on the plane who could really

8    understand the conversation?

9    A.  Yes.

10   Q.  Didn't that give you some pause about not creating a record

11   that would be accurate and complete?

12   A.  I did create a record that was accurate and complete in my

13   notes in the report I generated.

14   Q.  I see.

15          Sir, one of the things that you described in the

16   course of this investigation is the fact that when you first

17   started interacting with El Sentado and the set up of the sting

18   operation, one of the first things that you told him was to

19   record the interview, right?

20   A.  Yes.

21   Q.  Literally, within seconds of him communicating to you that

22   he was going to have this meeting, the light bulb went off in

23   your head record the meeting, right?

24   A.  Yes.

25   Q.  You told him to record the meeting?

1  A.  Yes.

2  Q.  And he explicitly confirmed to you that he was going to

3  record the meeting, right?

4  A.  Yes.

5  Q.  Then, after that meeting -- let me back up.  We will talk

6  about that in a moment.

7        The thing that I am having trouble reconciling and I

8  am just asking you, there is a fundamental inconsistency, isn't

9  there, Agent Gonzalez, between the fact that on, with regard to

10  your dealing with El Sentado, immediately it became apparent to

11  you that this needed to be recorded but on the airplane you had

12  no thought like that with regard to the surreptitious

13  recordings, right?

14  A.  They were two totally different scenarios.

15        THE COURT:  Mr. Jackson, it is 4:30 now.  We are going

16  to have to stop.

17        MR. JACKSON:  Thank you very much, your Honor.

18        THE COURT:  Ladies and gentlemen of the jury, we are

19  going to break now.  Tomorrow is Election Day.  Remember what I

20  said:  We are going to start at 10:30.  Give you time to vote

21  in the morning and we will break at 3:30.  So, if you didn't

22  vote in the morning that will give you time to get home and

23  vote in the afternoon.

24        Remember what I said.  Keep an open mind, don't do any

25  research, don't talk about the case with anybody and we will

GB75flo6                        Gonzalez - cross

1    see you tomorrow morning at 10:30.

2              In the mean time, Mr. Jackson will resume his

3    examination of Mr. Gonzalez tomorrow morning at 10:30.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB75flo6

1          (Jury not present)

2          THE COURT:  Please, be seated.

3          Mr. Gonzalez, you are on cross-examination now so

4    don't talk with the government about your testimony.  All

5    right?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  See you tomorrow morning at 10:30.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Anything else?

10         MR. JACKSON:  No, your Honor.

11         MR. BOVE:  No, your Honor.

12         THE COURT:  Mr. Rody?

13         MR. RODY:  No, Judge.  Thanks.

14         THE COURT:  See you at 10:30 tomorrow morning.

15         MR. JACKSON:  Oh, your Honor?  Very briefly.

16         THE COURT:  Yes.

17         MR. JACKSON:  Your Honor, may we have permission to

18   just, with the marshals -- visitation failed with the

19   defendants and their families this last week, MCC couldn't get

20   it done.  Could we ask the Court for just a few minutes of

21   indulgence for the defendants to be able to greet, right here,

22   their family members?

23         THE COURT:  They can turn around and say hello.  Is

24   that what you want?

25         MR. JACKSON:  Yes, for a couple of minutes to greet

GB75flo6

```
 1   them right there, if that's permissible with the Court.
 2               THE COURT:  Yes.
 3               MR. JACKSON:  Thank you very much, your Honor.
 4               THE COURT:  Do I have to put on the record that nobody
 5   was excluded during the jury selection process?
 6               MR. JACKSON:  I think that's clear, your Honor.
 7               MR. BOVE:  I think the record is clear as well, Judge.
 8               THE COURT:  Pretty clear that we didn't want to
 9   exclude anybody but it is a continuing issue in the Second
10   Circuit.  So, if nobody objects, I'm going to say that nobody
11   was excluded from the courtroom during the jury selection
12   process and, having said that, nobody has made any contrary
13   indication that people were excluded.
14               Thank you very much.
15               MR. JACKSON:  Thank you, Judge.
16               THE COURT:  See you at 10:30 tomorrow morning.
17               (Adjourned to November 8, 2016, at 10:30 a.m.)
18
19
20
21
22
23
24
25
```

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     STEVENSON BARBOT

4    Direct By Mr. Quigley . . . . . . . . . . . .92

5    Cross By Ms. Espinosa  . . . . . . . . . . . .98

6    Cross By Mr. Jackson . . . . . . . . . . . . 100

7     SANDALIO GONZALEZ

8    Direct By Mr. Bove . . . . . . . . . . . . . 104

9    Direct By Mr. Bove . . . . . . . . . . . . . 144

10   Cross By Mr. Jackson . . . . . . . . . . . . 216

11                       GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    52    . . . . . . . . . . . . . . . . . . . .94

14    50    . . . . . . . . . . . . . . . . . . . .95

15    54    . . . . . . . . . . . . . . . . . . . .97

16    21    . . . . . . . . . . . . . . . . . . . 107

17    32    . . . . . . . . . . . . . . . . . . . 111

18    53    . . . . . . . . . . . . . . . . . . . 111

19    55    . . . . . . . . . . . . . . . . . . . 112

20    56    . . . . . . . . . . . . . . . . . . . 121

21    104 and 105  . . . . . . . . . . . . . . . 122

22     57, 58 and 59 . . . . . . . . . . . . . . 124

23    102   . . . . . . . . . . . . . . . . . . . 130

24    102T  . . . . . . . . . . . . . . . . . . . 131

25    60    . . . . . . . . . . . . . . . . . . . 136
```

1    2000 and 2001   . . . . . . . . . . . . . 146

2    25, 26 and 33   . . . . . . . . . . . . . 151

3    103   . . . . . . . . . . . . . . . . . . 157

4    103T   . . . . . . . . . . . . . . . . . 158

5    2002 and 2003   . . . . . . . . . . . . . 159

6    61   . . . . . . . . . . . . . . . . . . 166

7    27   . . . . . . . . . . . . . . . . . . 169

8    110   . . . . . . . . . . . . . . . . . . 179

9    300 through 310   . . . . . . . . . . . . 188

10   700   . . . . . . . . . . . . . . . . . . 197

11   200 through 214 and 229 through 231   . . . . 201

12   215 through 228   . . . . . . . . . . . . 201

13   62   . . . . . . . . . . . . . . . . . . 202

14   63   . . . . . . . . . . . . . . . . . . 203

15   64   . . . . . . . . . . . . . . . . . . 203

16   69   . . . . . . . . . . . . . . . . . . 204

17   70   . . . . . . . . . . . . . . . . . . 205

18   71   . . . . . . . . . . . . . . . . . . 205

19   72   . . . . . . . . . . . . . . . . . . 205

20   73   . . . . . . . . . . . . . . . . . . 206

21   65   . . . . . . . . . . . . . . . . . . 210

22   66   . . . . . . . . . . . . . . . . . . 210

23   67   . . . . . . . . . . . . . . . . . . 214

24

25