GBE9FLO1                        Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                            15 Cr. 765 (PAC)
4
     EFRAIN ANTONIO CAMPO FLORES and
5    FRANQUI FRANCISCO FLORES DE FREITAS,
6                Defendants.
     ------------------------------x
7
                                         New York, N.Y.
8                                        November 14, 2016
                                         9:38 a.m.
9    Before:
10                   HON. PAUL A. CROTTY,
11                                        District Judge
12                       APPEARANCES
13   PREET BHARARA
         United States Attorney for the
14       Southern District of New York
     EMIL J. BOVE III
15   BRENDAN F. QUIGLEY
         Assistant United States Attorneys
16
     BOIES, SCHILLER & FLEXNER LLP
17       Attorneys for Defendant Campo Flores
     RANDALL W. JACKSON
18   JOHN T. ZACH
     JOANNA CHRISTINE WRIGHT
19
     SIDLEY AUSTIN LLP
20       Attorneys for Defendant Flores de Freitas
     DAVID M. RODY
21   ELIZABETH A. ESPINOSA
     MICHAEL D. MANN
22
     ALSO PRESENT:
23   ERIKA DE LOS RIOS
     MIRTA HESS
24   ANNA MARIA RISO
     VIVIAN GOA
25   Spanish Interpreters

GBE9FLO1                     Trial

1              (Trial resumed; jury not present)

2              THE COURT:  I guess the witness is going to be a

3     little bit delayed this morning.

4              MR. QUIGLEY:  We have another witness.

5              THE COURT:  We can tee up another witness?  Is that

6     all right with the defense?

7              MR. JACKSON:  Whatever is efficient for the Court,

8     your Honor.

9              THE COURT:  What's efficient is we keep the jury busy

10    and occupied, so if we have another witness --

11             MR. JACKSON:  May we ask your Honor who would be the

12    next witness if we went out --

13             THE COURT:  You don't want to be surprised?

14             MR. QUIGLEY:  It's Dan Ogden, your Honor.

15             THE COURT:  What is he going to testify to?

16             MR. QUIGLEY:  Cellphone analysis, your Honor.

17             MR. JACKSON:  Can I ask approximately how long is his

18    testimony.  I'm a little -- my only concern is, your Honor, we

19    wouldn't want a witness that's going to take a whole day if

20    there's a shorter witness that's available.

21             THE COURT:  I'm told it's going to be a short witness.

22             MR. QUIGLEY:  He's about an hour-and-a-half, your

23    Honor.

24             THE COURT:  All right.  We'll take him for an

25    hour-and-a-half then we'll put CS-1 on.

1              MR. JACKSON:  Thank you, your Honor.

2              THE COURT:  Is the jury here, Marlon?

3              THE DEPUTY CLERK:  Yes, your Honor.

4              THE COURT:  Now with regard to the government's

5    objection to offering evidence, the confidential source

6    agreements that Mr. Santos Peña signed, I'm going to overrule

7    that objection.  The defendants may offer into evidence the

8    confidential source agreements that Santos Peña signed.

9              Now, my recollection of the testimony is on Thursday

10   and Friday is that Mr. Santos Peña has already testified about

11   confidential source agreements.  He signed several of them.  He

12   didn't start going into business on his own until sometime in

13   2007, 2008.  Is that right?

14             MR. QUIGLEY:  I believe he said 2012, your Honor.

15             THE COURT:  2012?

16             MR. QUIGLEY:  Yes.

17             THE COURT:  Okay.  So the most recent confidential

18   source agreement he signed is appropriate.  Beyond that we'll

19   just see where we go from that.  But certainly the most current

20   confidential source agreement is admissible.

21             All right, Marlon, call in the jury.

22             Call Mr. Ogden.

23             Mr. Rody, you got your haircut?

24             MR. RODY:  I did not, Judge.  It's just extra gel.

25             THE COURT:  Looking very handsome this morning.

GBE9FLO1                        Trial

1              MR. RODY:  Thank you.

2              Are you Mr. Ogden?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Come on up here.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBE9FLO1                          Trial

1              (Jury present)

2              THE COURT:  Good morning.  Please be seated.  Hope

3      everybody had a nice weekend.

4              Mr. Ogden, remain standing.

5              MR. RODY:  Your Honor, I apologize.  Before the

6      witness testifies we do need to take up an application at the

7      sidebar.

8              THE COURT:  All right.  We'll swear the witness first.

9              MR. BOVE:  Your Honor, the government calls Dan Ogden.

10      DANIEL OGDEN,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13             THE COURT:  Please sit down, Mr. Ogden.

14             THE WITNESS:  Thank you, sir.

15             THE COURT:  Now, we're taking Mr. Ogden out of order.

16     The witness that was on the stand on Thursday will be here

17     shortly and we'll put him back on the stand as soon as he

18     arrives.

19             All right, Mr. Rody.

20             (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          MR. RODY:  Thanks, Judge.  I apologize.  But because

3     this witness is coming out of order I did not know, first of

4     all, what this witness was going to do.  I know that he took

5     data off of the phones but I just confirmed with the

6     prosecutors and they said that he is -- they're going to

7     actually display some of the data that was on the phones which

8     includes I guess various chats and photographs.  Among those

9     are photographs of firearms.

10          I know your Honor has already ruled on that.  We had

11    planned before this evidence came in to renew an objection

12    about that based on the total absence of any evidence in the

13    record to date that has connected those semiautomatic weapons

14    and assault rifles and other types of firearms to anything

15    having to do with the case.  There's zero -- there's been zero

16    factual connection in the testimony of any witness to date

17    about those weapons or those types of weapons.

18          THE COURT:  Okay.  I have your point.

19          MR. BOVE:  Judge, we're going to tie it up in two

20    respects.  First the principal communications about obtaining

21    firearms with a man named Gilson, we'll identify him as.

22    Gilson was also the man who helped the defendants procure a

23    private aircraft to travel to Honduras on October 3 to meet

24    with Sentado.  That's a part of the evidence as well.

25          In addition, your Honor, this witness will testify and

GBE9FLO1                    Trial

 1    explain that certain of the photographs of firearms on the

 2    devices that were seized from the defendants were taken using

 3    the phones themselves; therefore, supporting an inference that

 4    they were taken by the defendants and reflect actual possession

 5    of these weapons by the defendants and that those photographs

 6    were taken in late September 2015, squarely within the

 7    timeframe of the charged conspiracy.  And we think we're

 8    permitted to argue, as the Court has already ruled, that that

 9    weapons possession was done not as a matter of general security

10    because of country conditions in Venezuela but in furtherance

11    of the drug trafficking crime as a tool of the trade.

12            On this point I'll also note that during the

13    cross-examination of Special Agent Gonzalez it was elicited by

14    the defense that these defendants had government-backed

15    security teams.  We're permitted to argue, I submit, that the

16    possession of these weapons, which there is no indications that

17    they were sanctioned by the Venezuelan government or part of

18    any kind of Venezuelan-backed security, support an inference

19    that they were procured separately for this crime.

20            THE COURT:  Okay.

21            MR. RODY:  Judge, I would just say that this is all

22    just based on things that are on the phone.  There's been no

23    testimony --

24            THE COURT:  Yes.  But there is no testimony -- he says

25    there is going to be testimony.

1              MR. RODY:  The only testimony is from one person who

2       says that he helped them get a plane, and he's the guy that

3       supposedly helped them get the guns.  That has nothing to do

4       with the drugs, with any drug stash house, with any location

5       where the drugs are maintained, anything like that.  And the

6       tools-of-the-trade line of cases talk about weapons that are

7       used in connection with the drug trade, and that's the critical

8       link they have not established.

9              THE COURT:  Do you want to be heard?

10             MR. ZACH:  Can I is say one thing, your Honor?  This

11      is important.  They've now gone through their main testimony --

12      their main cooperator has now testified about the meeting in

13      which the alleged drugs were present.  There was no testimony

14      at all that anyone possessed a gun at that meeting in

15      furtherance of that meeting.  There's not a single gun here.

16      Their witnesses are meeting with him.

17             So to introduce these guns that are completely

18      extrinsic and in no way linked to any meeting or anyone even

19      seeing the gun --

20             THE COURT:  I have the objection.  I have the

21      response.  The objection is overruled.

22             MR. ZACH:  Thank you, your Honor.

23             (Continued on next page)

24

25

GBE9FLO1                          Ogden - direct

1             (In open court)

2             THE COURT:  All right, Mr. Bove.

3             MR. BOVE:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. BOVE:

6    Q.  Good morning, Mr. Ogden.

7    A.  Good morning, sir.

8    Q.  Where do you work?

9    A.  I work for the Department of Justice Criminal Division in

10   the CCIPS cyber Crime Lab.

11   Q.  What does CCIPS stand for?

12   A.  Computer Crimes and Intellectual Property Section.

13   Q.  What is your position at CCIPS?

14   A.  I'm a digital investigative analyst.

15   Q.  How long have you been a digital investigative analyst at

16   CCIPS?

17   A.  I've been there for just over one year.

18   Q.  Could you please describe your work experience before

19   joining CCIPS.

20   A.  Prior to coming to DOJ, I worked in law enforcement down in

21   Florida for the Brevard County Sheriff's Office, assigned to

22   the federal task force investigating internet crimes against

23   children and computer crimes, doing investigations and computer

24   forensics for the last eleven years of my career.

25   Q.  And could you tell the jury a little bit about your

GBE9FLO1                          Ogden - direct

1   educational background, please.

2   A.  Yes.  I have a master's degree from the University of

3   Central Florida in digital forensics.

4           I have a graduate certificate in computer forensics

5   from the University of Central Florida.

6           I have several hundred training hours in

7   investigations related to mobile devices, mobile device

8   forensics, acquiring and analyzing data.

9   Q.  What are your duties and responsibilities at CCIPS right

10  now?

11  A.  Right now my jobs are to perform computer forensic exams,

12  mobile device exams, and to provide training for prosecutors

13  and judges.

14  Q.  Now you mentioned that you've received some training as

15  well?

16  A.  Yes, I have.

17  Q.  Could you please describe some of that training.

18  A.  Yes.  I've received both classroom training from agencies,

19  went to a training course with the Secret Service.  I went to

20  a -- for on mobile devices, mobile device training at the

21  federal law enforcement training center.

22          I've done several trainings in certain tools that we

23  use for doing our analysis, Cellebrite, BlackLight, to name a

24  few.  And I've done advanced trainings and obtained

25  certificates in those tools.

GBE9FLO1                        Ogden – direct

1   Q.  Now, you mentioned Cellebrite?

2   A.  Yes, I did.

3   Q.  What is Cellebrite?

4   A.  Cellebrite is one of three primary tools used for mobile

5   device examinations.  They are the tool that we use at our

6   lab -- one of the tools that we use at our lab.

7   Q.  Have you received any certifications in the field of

8   examining mobile devices?

9   A.  Yes, I have.

10  Q.  Describe some of those.

11  A.  I've received tools for competency on tools, on their

12  software tools, BlackLight, Mobilyze, Cellebrite.  I've

13  completed my Cellebrite certified mobile examiner training in

14  addition to the logical operator and the physical analyst

15  trainings through Cellebrite.

16  Q.  Have you taught any courses in the field of examining

17  mobile devices?

18  A.  Yes, I have.

19  Q.  Please describe some of those.

20  A.  I teach a logical operators course and a physical analyst

21  course for individuals that are going to be utilizing the

22  Cellebrite software.

23  Q.  What, if any, steps do you take to stay up to date on

24  current technology relating to these examinations?

25  A.  I attend conferences on mobile devices yearly.  I have gone

1    to training during the year on different methods because as new

2    devices come out, new software capabilities come out.  So I

3    stay current on the updated software.  I read articles and I do

4    self-testing on applications by downloading apps and examining

5    the apps to see where data goes.

6    Q.  And during the course of your career about how many times

7    have you participated in the examination of a mobile device?

8    A.  Over a hundred times.

9            MR. BOVE:  Your Honor, I offer Mr. Ogden as an expert

10   in examinations of mobile devices.

11           MR. ZACH:  No objection.

12           MR. RODY:  No objection.

13           THE COURT:  Mr. Ogden is recognized as an expert in

14   mobile devices.

15           MR. BOVE:  Thank you, your Honor.

16   Q.  Sir, what are the basic steps that you undertake in

17   examining a mobile device?

18   A.  When we receive a mobile device and to do an examination we

19   usually break it down or we have to break it down into two

20   steps.  The first step, which is our challenging part, is the

21   actual acquisition of the device, meaning we have to be able to

22   get the data from the device.  And then the second step would

23   be the analysis of that data.

24   Q.  Let's start with the acquisition process.  Are there

25   different types of acquisitions?

1  A.  Yes, there are.

2  Q.  Would you please describe some of them.

3  A.  Yes.  The initial quick acquisition, meaning we're getting

4  limited data but it's rather quick, would be a logical

5  acquisition.  And in that we utilize software to communicate

6  with a device and ask them for limited data based on what the

7  device knows, meaning SMS messages from the default

8  application, images, audio, call logs.

9       And we get them back in a flat file, meaning it's

10  printed out on a piece of paper.  It's a very quick method to

11  get it.  And that's the limited type of acquisition.

12  Q.  You mentioned SMS.  Is that basically like a text message?

13  A.  Yes.

14  Q.  Are you able to obtain data from apps on phones when you

15  conduct a logical acquisition?

16  A.  You could obtain some data from certain apps.  Usually

17  third party apps you do not get any data from because the

18  logical communication with the device, meaning we're speaking

19  to the device in the phone's native language, it may not know

20  where those apps are or that they even exist at the level we're

21  communicating.

22  Q.  Are there other types of acquisitions?

23  A.  Yes, there are.

24  Q.  Could you please describe another.

25  A.  The next level up would be a file system acquisition.  And

GBE9FLO1                         Ogden - direct

1    a file system acquisition is where we utilize tools that

2    communicate with the device.  And we ask it for the file

3    structure of the device, meaning we're going to get -- it's

4    kind of like a computer.  When you look at the yellow folders

5    on a computer under my computer and all the subfolders, that's

6    the file system.  And when we utilize a file system extraction,

7    we get all the folders and subfolders that the device can see.

8    And it brings it out onto our -- into a compressed folder.  But

9    we get all of, not only the SMS messages, but we get the

10   databases in those apps.  We get a lot more information than a

11   logical, but we get the actual databases along with it.  And we

12   great some system files with that.

13   Q.  So these databases that you're talking about, are they

14   basically where the content from the apps on the phone are

15   stored?

16   A.  Yes.  The majority of the apps use a database to store, in

17   each individual app, they have their own database to store

18   data.  And the database is -- resembles like a spreadsheet.  So

19   as you put an entry into your text message, it writes it into a

20   database almost like a line on the spreadsheet.  And as each

21   entry comes in, it makes that line.  And when an entry is

22   deleted, it marks it as deleted but it's not deleting the line.

23   It just skips it until it's overwritten or the database cleans

24   itself out and then it will be gone.  But the line gets marked

25   deleted but the data would still be there and possibly be able

GBE9FLO1                        Ogden - direct

1    to be recovered.

2    Q.  Did do you know what a physical acquisition is?

3    A.  Yes, I do.

4    Q.  Could you please tell the jury about that.

5    A.  Yes.  A physical acquisition is a complete acquisition of

6    the memory chip or chips.  And it goes from zero, the start of

7    the chip, to the end of the chip.  And it copies out all of the

8    binary data into a file which includes not only the logical and

9    the file system but also gives us the area of the data that the

10   file system doesn't see.  And that's referred to commonly as

11   the unallocated space, meaning if you delete a file and -- a

12   complete file and it's not -- it's no longer seen by the file

13   system, it may be recovered in unallocated space because it's

14   available to be written over.  But if it hasn't been written

15   over, the unallocated space is where we would go to look to see

16   if we can recover completely deleted data.

17   Q.  What is the end result of a physical acquisition?

18   A.  Depending on the tool, you get a complete binary dump or a

19   binary file of that image or images.  In the case with

20   Cellebrite it creates a bin file, a .bin file.

21   Q.  So that bin file contains all the data extracted from the

22   device?

23   A.  All the raw data.  When you look at it, you wouldn't see

24   text messages and call logs.  You would just see raw data.  It

25   would be a mixture of numbers and characters in the raw data.

GBE9FLO1                         Ogden - direct

1   Q.  So if you open up a bin file on your computer, you just get

2   numbers and letters?

3   A.  You would have to look at it with a hex editor, but it

4   would just be data that you couldn't read necessarily like you

5   would read a regular file.

6   Q.  Now are there generally accepted steps in your field to

7   ensure the integrity of one of these bin files after a physical

8   acquisition?

9   A.  Yes.

10  Q.  Could you please describe how that works.

11  A.  Yes.  Once we complete a bin file or a physical

12  acquisition, either we do it manually or the tool will do it,

13  it generates a hash.

14      And a hash is a digital fingerprint of that file.  It

15  generates a string of letters and numbers that let us know what

16  the value of that file is.

17      And if you go inside that file and change any minute

18  byte or one little letter of a sentence, then that change would

19  create an a avalanche effect on that string of numbers and

20  completely change it.  It wouldn't just change one letter or

21  number off that hash value.  It would completely change the

22  entire hash value.

23      So we utilize that.  So when we have this data to

24  ensure that we -- if we copy it over to another server, if we

25  transport it to give it to another investigator, they can bring

GBE9FLO1                        Ogden – direct

1    that file in and they can utilize the same hash that we're

2    using MD5 or SHA256 and validate they're dealing with the same

3    file that we have from our original exam.

4    Q.  So are MD5 and SHA56 different types of hash values?

5    A.  It's SHA256.

6            And, yes, they are.

7            There's several different types of hash values.  MD5,

8    SHA1, SHA256.  They each develop or generate their own string

9    of numbers.  But every tool that's utilizing an MD5 hash are

10   going to generate the same hash number as long as the integrity

11   of the file has not changed.

12   Q.  So in your experience what is the likelihood that two

13   separate bin files that are different in any way would have the

14   same hash value?

15   A.  I have never seen that happen but the results of having a

16   file match -- two different files have the same SHA1 and 256 is

17   over 340 billion, billion, billion, billion, which is 340 with

18   36 zeros behind it, to have two files have the same exact

19   match.

20   Q.  So that's some background on the acquisition process?

21   A.  Yes.

22   Q.  Could you please tell the jury a little bit about the

23   analysis process.

24   A.  The analysis process is done with a tool where it will go

25   through and look at that raw data.  And it puts it into a

1   readable format for the user for people to be able to read.

2           So, based on the phone profile, it will have scripts

3   assigned because in our testing we know where certain data is

4   on the several different types of phones that are out there.

5   And we'll write -- we have scripts that will go out and parse

6   this data.  So it will go look for text messages and then put

7   them into a viewable format for text messages.  It goes through

8   and reads the databases and puts all the data into that tool so

9   a user can read it in human readable format.

10  Q.  You used the term parse?

11  A.  Yes.

12  Q.  Could you please tell the jury what that means.

13  A.  Parsing is searching for data.  If we have a parser for

14  text messages, it's set to know what type of text messages are

15  likely to be on that device.  And it will go through and read

16  that device and locate the message body, the to and the from,

17  and then put them into a readable format for us to go through

18  and view.

19  Q.  Do you generally use parsers that are specific to the make

20  and the model of the device you're examining?

21  A.  Yes.  For the most part we utilize parsers based on the

22  device.  We also use parsers based on apps which we include

23  with most devices.

24  Q.  Now how did you initially become involved in this case?

25  A.  First part of the year around March or April I was

GBE9FLO1                          Ogden - direct

1    contacted by the prosecution team about getting an acquisition

2    from a Samsung G925A device.

3    Q.   I'm going to show you what's been marked for identification

4    as Government Exhibit 101 which is a Samsung G925A.  Leave that

5    up here.

6              Do you know if the contents of that device were

7    extracted?

8    A.   Yes, I do.

9    Q.   How?

10   A.   They were sent to me later on but I referred the

11   prosecution team to Cellebrite for the extraction.

12   Q.   Do you know if Cellebrite provided a hash value for the bin

13   file that was extracted from Government Exhibit 101?

14   A.   Yes, I do.

15   Q.   Now were you asked to provide any other assistance on the

16   case?

17   A.   Yes, I was.

18   Q.   What were you asked to do next?

19   A.   I was asked to look at a second phone, a 915A, that I was

20   requested to review for BlackBerry Messenger chats to see if I

21   could recover any of the chat messages off the device.

22   Q.   I'm going to show you an object marked as Government

23   Exhibit 101 which is a Samsung 915A -- excuse me.  Government

24   Exhibit 100.

25              You said you were asked to conduct an analysis to

GBE9FLO1                          Ogden - direct

1    determine if you could locate BlackBerry messages on the bin

2    file extracted from Government Exhibit 100?

3    A.  Yes.  That is correct.

4    Q.  Were you able to do that?

5    A.  Yes, I was.

6    Q.  What data were you provided with in order to conduct that

7    analysis?

8    A.  I was provided with the bin file, the extraction from that

9    device which included a Cellebrite source file along with it

10   which contained the hash value.

11   Q.  What did you do when you received that bin file relating to

12   Government Exhibit 100?

13   A.  The first thing I did was move it over, put a copy on our

14   server, and put a copy on our local machine -- my local

15   machine.

16        I then brought the -- both imagines in and validated

17   the hash to insure that my copy matched the original

18   extraction.

19   Q.  Now after you looked for BlackBerry messages on Government

20   Exhibit 100, were you asked to do any additional work?

21   A.  Yes, I was.

22   Q.  What were you asked to do next?

23   A.  To look at 925A to generate a report and to locate data

24   requested by the prosecution team.

25   Q.  So 925A is Government Exhibit 101?

GBE9FLO1                          Ogden - direct

1    A.  Yes.

2    Q.  And were you provided with any data to conduct analysis

3    relating to Government Exhibit 101?

4    A.  Yes, I was.

5    Q.  What were you given?

6    A.  I was provided with the extraction provided by Cellebrite

7    along with the hash value.

8    Q.  And what did you do when you received those materials?

9    A.  I put the extraction on the server.  I put a copy on my

10   local machine.  I hashed both of those files to ensure that I

11   copied over the complete contents of it.  And both hashes

12   validated.

13   Q.  After you did that work, were you asked to take additional

14   steps?

15   A.  Yes, I was.

16   Q.  What were you asked to do?

17   A.  I was asked to generate two reports, one for each device.

18   Q.  So the devices marked as Government Exhibit 100 and 101?

19   A.  Yes.

20   Q.  How did you go about doing that?

21   A.  I utilized a software tool referred to -- called physical

22   analyzer by Cellebrite.  And what that does is it brings in

23   that bin file.  It parses everything out into readable format,

24   where it will separate text messages, call logs, which are

25   commonly referred to as artifacts.  And once I did that, I

1   generated a complete report for each phone.  And then I

2   generated a selected report based on certain artifacts

3   requested by the prosecution team.

4   Q.  Which bin files did you use to prepare the two reports that

5   you just referenced?

6   A.  The validated copies that were copied over to my local

7   machine that validated, which were the exact same copies from

8   the original extraction.

9   Q.  How do you know that?

10  A.  The hash values validated.  Had there been one byte or one

11  bit changed the hash values wouldn't validate.

12  Q.  So when you say "validated" you mean the fingerprints

13  matched?

14  A.  Yes.  That is correct.  That means the hash value matched.

15  Q.  I'm showing you a document marked for identification as

16  Government Exhibit 400 and I'll ask if you recognize this.

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This is a selected report that was created at the request

20  of the prosecution team for the Samsung N915A phone.

21  Q.  So this is a report that you prepared relating to

22  Government Exhibit 100?

23  A.  Correct.

24          MR. BOVE:  Your Honor, I offer Government Exhibit 400.

25          MR. RODY:  Your Honor, voir dire please?

1              THE COURT:  Yes.

2    VOIR DIRE EXAMINATION

3    BY MR. RODY:

4    Q.  What do you mean selected?

5    A.  I was -- I had the complete report.  The prosecution team

6    asked me to generate a report based on artifacts that they

7    selected.  I generated that report.

8    Q.  So "selected" means selected by the government?

9    A.  Selected by the government.

10              MR. ZACH:  Objection.  Hearsay.

11              THE COURT:  Overruled.

12              (Government's Exhibit 400 received in evidence)

13              MR. BOVE:  Mr. Calabrese, could we take a look at page

14   one of Government Exhibit 400.

15              If you could please zoom in to the summary section of

16   the report.

17   DIRECT EXAMINATION CONTINUED

18   BY MR. BOVE:

19   Q.  What's included in this section?

20   A.  This is the summary of my report.  This is going to include

21   the version number of the physical analyzer that I used, along

22   with the date and time it was created, the time zone settings

23   that were utilized, and then the rest of the information is

24   information that I inputted.

25   Q.  Now you mentioned time zone settings?

1  A.  Yes.

2  Q.  What time zone settings were selected?

3  A.  UTC, Universal Time Zone.

4  Q.  Who made that selection?

5  A.  I did.

6  Q.  Now does that time zone selection apply to every piece of

7  information reflected in your two reports?

8  A.  No.

9  Q.  Are there -- so there are exceptions?

10  A.  Yes.  There are exceptions to certain embedded data, date

11  and times, that were created when -- inside of a file.  That

12  wouldn't have been changed.

13         This was going to affect the file dates and times or

14  the time zone will affect the time of the file on the file

15  system.

16  Q.  And in the top row there's a reference to UFED U-F-E-D.  Do

17  you see that?

18  A.  Yes.

19  Q.  What is UFED?

20  A.  UFED is a Universal Forensic Extraction Device.  It's part

21  of the tool set that Cellebrite puts out.

22  Q.  And then report creation time is the --

23  A.  That is when my report is created.

24         MR. BOVE:  Mr. Calabrese, if we could please zoom in

25  on the source extraction section.

1    Q.   What information is reflected here?

2    A.   This is was the source file created when the bin file was

3    created on this extraction utilizing the Cellebrite software.

4    So this documented when the extraction started, when it

5    stopped, the device that -- and the serial number that was used

6    to create it.

7            It also has the version number.

8            The selected manufacturer and selected device was

9    selected by the operator.  It gives us options.  Based on the

10   thousands of different model phones, we're able to select, to

11   focus in on our extraction.

12           So this was selected as a Samsung GSM and a SMN915A

13   Galaxy Note Edge.  And then the rest of the data is information

14   that they use to connect to the device.

15           MR. BOVE:  Mr. Calabrese, can we look at the image

16   hash details section.

17   Q.   What's indicated here?

18   A.   This is both the MD5 and the SHA256 that was generated when

19   the extraction was made.

20           When I bring in a bin file, this tool knows where this

21   is kept in the source file generated by the Cellebrite tool.

22   So as I hash this to validate to make sure my contents are all

23   together, it's comparing it to the numbers that were created

24   when it was first done when the extraction was completed.  And

25   this just lets it know that it verified, meaning it was an

1    exact match to the creation.

2    Q.   And when you examined the bin file that's described in this

3    report, Government Exhibit 400, were you able to determine

4    whether the bin file was extracted from Government Exhibit 100,

5    the 915A device that's on the witness stand?

6    A.   Yes.

7    Q.   How did you do that?

8    A.   Based on the IMEI that was assigned to this image, it

9    matches the IMEI on the device itself.

10   Q.   What's an IMEI?

11   A.   International Mobile Equipment Identity.  It's a unique

12   number assigned to the device.

13   Q.   Were you -- how were you able to figure out what the IMEI

14   assigned to the physical device was?

15   A.   By searching the bin file for the IMEI, and the results

16   were the -- the only IMEI assigned to this device was the one

17   that was printed on the back of the phone.

18   Q.   So that unique number is printed on the back of the

19   physical exhibit?

20   A.   Yes.

21   Q.   You found that number in the bin file as well?

22   A.   Yes.  That is correct.

23         MR. BOVE:  Mr. Calabrese --

24   Q.   Or actually Mr. Ogden, could you please take a look at

25   pages 221 through 223 of Government Exhibit 400.

1          What type of information is reflected at that part of

2     the report?

3     A.  This is the user accounts that were associated with this

4     device, meaning those were the accounts that were logged in by

5     the user.

6          MR. BOVE:  Mr. Calabrese, can we take a look at page

7     221 and zoom in to entries 1842 through 1844.

8     Q.  Now when you prepare this report are the artifacts or the

9     entries assigned unique numbers?

10    A.  Yes, they were.

11    Q.  Where are those numbers listed?

12    A.  They are on the top left of the box.

13    Q.  So that's 1842 on the top left?

14    A.  Yes.  That is correct.

15    Q.  What's reflected on the screen right now?

16    A.  These are user accounts that were recovered from this

17    device.  The top two are associated with a Twitter account with

18    the user anymore Efrain_Campos_F and a Gmail account

19    Efrain.Campos.F@gmail.com.

20         MR. BOVE:  Mr. Calabrese, could I please have access

21    to the ELMO.

22         Your Honor, at this time we're going to offer a

23    stipulation between the parties.

24         THE COURT:  Yes.

25         MR. BOVE:  The stipulation is marketed as Government

GBE9FLO1                         Ogden - direct

1    Exhibit 1000.  I'm going to put it up on the ELMO so that the

2    jurors can follow along as well.

3         This is a stipulation again between the parties in the

4    case and it reads that:  If called as a witness at the trial, a

5    document custodian from Google would testify that Government

6    Exhibits 600 through 604 are true and accurate copies of

7    business records maintained by Google.

8         Then paragraph two contains similar language relating

9    to Government Exhibits 605 and 606 which are a witness would

10   testify that the business records from Snapchat.

11        Paragraph three contains similar language carrying

12   over onto page two relating to business records of Apple marked

13   as Government Exhibits 607 through 610.

14        Then finally there is a paragraph four that contains

15   some additional language that the parties agree reflects

16   testimony that these witnesses would provide.

17        Your Honor, based on that stipulation I offer

18   Government Exhibit 1000, the stipulation itself, as well as

19   Government Exhibits 600 through 610.

20        MR. ZACH:  No objection.

21        MR. RODY:  No objection.

22        THE COURT:  1000 and 600 through 610 are received in

23   evidence.

24        (Government's Exhibits 1000 and 600 through 610

25   received in evidence)

GBE9FLO1                        Ogden – direct

1          MR. BOVE:  Mr. Calabrese, could we take a look at

2    Government Exhibit 602, please.  Zoom in on the top.

3    Q.  Mr. Ogden, what do we see here?

4    A.  We're looking at Google subscriber information results.

5    Q.  These are Google subscriber information results relating to

6    that e-mail account that we just saw in your report,

7    Efrain.Campos.F?

8    A.  Yes.  That is correct.  With the name Efrain Campos.

9    Q.  Was there a phone number provided in this subscriber

10   information?

11   A.  Yes, there was.

12   Q.  Where do you see that?

13   A.  I see it on the second from the bottom under SMS phone

14   number 58-414-286-5397.

15         MR. BOVE:  Mr. Calabrese, if we could leave this part

16   on the bottom window and then in the top window publish page

17   two of Government Exhibit 2001.  And zoom in on the top few

18   lines.

19   Q.  So there's a reference here to a phone number in the top

20   window, do you see that, ending in 5397?

21   A.  Yes, I do.

22   Q.  Is that the same number that's is in the subscriber

23   information for the e-mail account?

24   A.  Yes, it is.

25         MR. BOVE:  Mr. Calabrese, can we to take a look at

GBE9FLO1                          Ogden - direct

 1  Government Exhibit 603 in evidence in the main window.

 2  Q.  What is this document?

 3  A.  This is part of the Google return which identifies a device

 4  associated with the Gmail account.

 5  Q.  And if we could look at the bottom half first,

 6  Mr. Calabrese.

 7          So based on the Google records there was a 915A model

 8  phone associated with that e-mail account?

 9  A.  Yes.  That is correct.

10          MR. BOVE:  Now if we could take a look at the top

11  half.

12  Q.  This Google record contains an IMEI.  Do you see that?

13  A.  Yes, I do.

14  Q.  Is that the IMEI that you located in a bin file associated

15  with the 915A phone?

16  A.  Yes, it is.

17          MR. BOVE:  Now, Mr. Calabrese, if we could take a look

18  at Government Exhibit 400, page 222.

19          Zoom in please on entry 1853.

20  Q.  What's this?

21  A.  This is a user account logged in for account name Tanner

22  for WhatsApp.  And it has a phone number.

23  Q.  And so that is a mobile phone ending in 3803?

24  A.  Yes.  That is correct.

25  Q.  Now if we could take a look at entry 1859 on page 223.

1           What do we see here?

2     A.   It is a user account for BlackBerry Messenger.  And it has

3     an account name of lowercase e with an exclamation point.  And

4     it has a photo assigned as an avatar.

5     Q.   I'm showing you a document marked for identification as

6     Government Exhibit 400-A.  Do you recognize this?

7     A.   Yes, I do.

8     Q.   What is that?

9     A.   This is the avatar associated with the BlackBerry Messenger

10    account.

11          MR. BOVE:  Your Honor, the government offers 400-A.

12          MR. RODY:  No objection.

13          MR. ZACH:  No objection.

14          THE COURT:  400-A is in evidence.

15          (Government's Exhibit 400-A received in evidence)

16          MR. BOVE:  Could we take a look at 400-A please,

17    Mr. Calabrese.

18          In the bottom window please take a look at page one of

19    Government Exhibit 310-T.

20          Zoom in on the top, please, of 310-T.

21    Q.   In the bottom window we see BlackBerry messages with that

22    same user account e exclamation.  Do you see that?

23    A.   Yes, I do.

24    Q.   Now I'll ask you to go back to Government Exhibit 400 in

25    your report and take a look at pages 223 to 226.

1    A.  Yes.

2    Q.  What information is reflected in that part of the report?

3    A.  These were images that were selected for the report.

4    Q.  Now I'm going to show you documents marked for

5    identification as Government Exhibits 410 through 417.  Do you

6    recognize these?

7    A.  Yes.  These were the images extracted from that image.

8             MR. BOVE:  Your Honor, the government offers 410

9    through 417.

10             MR. RODY:  Objection.

11             MR. ZACH:  Objection.

12             THE COURT:  Overruled.  410 through 417 are received

13    in evidence.

14             (Government's Exhibits 410 through 417 received in

15    evidence)

16             MR. BOVE:  Mr. Calabrese, could we take a look at

17    Government Exhibit 400, page 224, and zoom in on entry 1862.

18    Q.  What do we see here?

19    A.  We see an image of a person taking what appears to be

20    commonly referred to as a selfie.

21    Q.  What other information is reflected in the report relating

22    to that image?

23    A.  This has the file name, the path to where the file was

24    located, the MD5 hash of this particular file.  It also has

25    some additional information about the creation date and time of

GBE9FLO1                        Ogden - direct

the file on the file system and the metadata that was

associated with that file to include the camera make and model,

the Samsung SM915A, the capture time, and other information it

collected.

          MR. BOVE:  Mr. Calabrese, could you highlight for us,

please, the capture time field.

Q.  How does the capture time entry on this part of the report

relate to the created time?

A.  The capture time is in local time.  The creation time would

be in UTC time.

Q.  So is this an example of a place where the time zone

setting that you applied did not affect metadata on files on

the device?

A.  Correct.

Q.  And what, if any, conclusions have you reached about the

photograph that's referenced in entry 1862 and how it was

taken?

A.  Based on the file name, the capture time, if this photo was

taken in Venezuela, this would have had a 4 hour, 30 minute

offset.  So this device would have created -- consistent with

this device creating this picture.

          MR. BOVE:  Mr. Calabrese, could we take a look at

Government Exhibit 411, one of the images from the photo.

Q.  Now Government Exhibit 410, please.

          MR. BOVE:  Now returning back to Government Exhibit

1    400, if you could take a look at page 225, please.  And zoom in

2    on entry 1864.

3    Q.  What is this?

4    A.  This is another file that was extracted from this image of

5    a -- what appears to be an assault rifle.

6    Q.  And based on the capture time reflected in this entry and

7    the created time what, if any, conclusions have you reached

8    about how this photograph was taken?

9    A.  This one was also 4 hours and 30 minutes off, which would

10   be consistent with this phone taking this image had it been in

11   Venezuela.

12          MR. BOVE:  Mr. Calabrese, could we please take a look

13   at Government Exhibit 412.

14   Q.  Now, Mr. Ogden, if you could take -- go back to your report

15   and take a look at Government Exhibit 400, page 224.

16          MR. BOVE:  Mr. Calabrese, if we could go there as well

17   and zoom in on entry 1863.

18   Q.  What do we see here?

19   A.  We see an image of two assault rifles.

20   Q.  Again, comparing the capture time to the created time what,

21   if any, conclusions have you reached about how this photograph

22   was taken?

23   A.  This would be the same.  It was a 4 hour, 30 minute offset.

24          MR. BOVE:  Mr. Calabrese, could we take a look at

25   Government Exhibit 413.

GBE9FLO1                          Ogden - direct

1    Q.  Now, Mr. Ogden, if you could turn to page 225, Government

2    Exhibit 400.

3            MR. BOVE:  If we could go there as well,

4    Mr. Calabrese.  And zoom in on entry 1865.

5    Q.  What is this?

6    A.  This looks like an image of what appears to be an airplane

7    wing.

8    Q.  What is the difference between the capture time and the

9    created time here?

10   A.  Six hours.

11   Q.  And do you know the offset between UTC and the time zone in

12   Honduras?

13   A.  Yes.  It's six hours.

14   Q.  So what, if any, conclusions have you reached about how

15   this photograph was taken?

16   A.  This would be consistent with the -- this device taking

17   this photograph if it was in the Central Time Zone of a

18   six-hour offset.

19           MR. BOVE:  Mr. Calabrese, if we could scroll down to

20   entry 1866.

21   Q.  Mr. Ogden, is there a similar offset between the captured

22   time and the created time here?

23   A.  Yes, there is.

24           MR. BOVE:  Mr. Calabrese, please publish Government

25   Exhibit 414 in evidence.

1              Now 415, please.

2    Q.  Mr. Ogden please take a look at Government Exhibit 400,

3    page 226 this time.

4              MR. BOVE:  If we could zoom in on entry 1867.

5    Q.  What's this?

6    A.  This is a picture of a BlackBerry phone displaying content.

7    Q.  Now let's take a look at that photograph, Government

8    Exhibit 416, please.

9              What are the BlackBerry screen names reflected in this

10   photo?

11   A.  The BlackBerry screen name, it shows Gallo and HRCF.

12             MR. BOVE:  If you could put this one on the left,

13   please, Mr. Calabrese and then publish Government Exhibit 417

14   on the right.

15   Q.  What are the screen names reflected in the photograph

16   marked Government Exhibit 417?

17   A.  The same, Gallo and HRCF.

18             MR. BOVE:  Now, Mr. Calabrese, can we please take a

19   look in the main window at Government Exhibit 416-T.

20   Q.  So these are BlackBerry messages between somebody using a

21   screen name HRCF.  Do you see that?

22   A.  Yes, I do.

23   Q.  And Gallo?

24   A.  Correct.

25   Q.  And this is a translation of the photograph we just looked

GBE9FLO1                          Ogden – direct

1    at marked 416.

2              MR. BOVE:  Please take a look at page two.  Zoom in.

3              Now if we could take a look at 417-T page two and zoom

4    in again.

5              Mr. Calabrese, could you please publish Government

6    Exhibit 3508-43 in evidence.

7              If I could have one moment, your Honor.

8              I'm sorry.  If we could take a look at 3508-38.

9    Q.  Is this a photograph reflecting BlackBerry messages with

10   the screen name HRCF?

11   A.  Yes, it is.

12             MR. BOVE:  Now, Mr. Calabrese, if you could put this

13   image on the left and let's take a look at the translation

14   3508-38-T.

15             Turn to page two, please.  And zoom in on the

16   translation.

17   Q.  Mr. Ogden, could you please take a look at page 134 of

18   Government Exhibit 400.

19             MR. BOVE:  If we could zoom in on entry 1158.

20   Q.  What is this?

21   A.  This is a contact recovered from the image in reference to

22   the name Frank from a WhatsApp contact with the phone number

23   ending in 5405.

24             MR. BOVE:  If we could take a look at page 123 now,

25   entry 1074.

1    Q.  What do we see here?

2    A.  We see a contact for a BlackBerry messenger with the name

3    Don Ramon.  And it has a photo attached as an avatar.

4    Q.  I'm going to show you a document marked for identification

5    as 400-C.  Do you recognize that?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  This is the avatar photo attached to the Don Ramon

9    BlackBerry messenger.

10            MR. BOVE:  Your Honor, the government offers 400-C.

11            MR. RODY:  No objection.

12            MR. ZACH:  No objection.

13            THE COURT:  400-C is in evidence.

14            (Government's Exhibit 400-C received in evidence)

15            MR. BOVE:  Mr. Calabrese, take a look at 400-C,

16   please.

17   Q.  Now, Mr. Ogden, if you could take a scan through pages 3 to

18   90 of Government Exhibit 400.

19   A.  Yes.

20   Q.  What type of information is reflected in that part of the

21   report?

22   A.  This is the call log that was extracted from the image.

23            MR. BOVE:  Mr. Calabrese, can we take a look at page

24   three of Government Exhibit 400 and zoom in on the first entry,

25   number one.

GBE9FLO1                          Ogden - direct

1    Q.   What do we see here?

2    A.   We see a log of an outgoing call from WhatsApp user Tanner

3    to WhatsApp user Frank ending in 5405 and the date that it was

4    made.

5    Q.   What information is reflected in the source column on the

6    right side of the screen?

7    A.   What application was used.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. BOVE:
 2    Q.  Mr. Calabrese, can we take a look at page 5 of Government
 3    Exhibit 400, entry 27?
 4            What does this entry reflect?
 5    A.  This is an outgoing call to mobile phone ending in 5405
 6    with the contact name Frank, the date, the time, and that it
 7    was a cellular call -- regular phone call.
 8    Q.  Now, last, if we can take a look at page 52 of Government
 9    Exhibit 400 and zoom in on entry 525.
10            What do we see here?
11    A.  Incoming call from phone number ending in 5405 using Frank,
12    the date, the time, this was a regular call, and this one
13    indicates that it was deleted.
14    Q.  That's over in the far right?
15    A.  Yes, in red.
16    Q.  Now, if you can take a look at pages 90 through 92 of your
17    report, Government Exhibit 400?  What information is contained
18    there?
19    A.  These were chats that were recovered from the image.
20    Q.  Now, are these all the chats that were on the phone?  Or
21    just the ones that you were instructed to analyze?
22    A.  The ones I was instructed to bring out; yes.
23    Q.  Let's take a look at entry 823 on page 90; what does this
24    entry reflect?
25    A.  This was a chat that was recovered from WhatsApp between

GBE5flo1                         Ogden – direct

phone number 3803 which was the user name Tanner which was

logged into the device, and Frank, ending in 5405.  This also

shows the time that the chat started and the last time a

response or message was sent for November 9th, 2015, and the

number of attachments, along with the source being WhatsApp.

Q.  Now, you said that the entry reflects that the number

ending in 3803 was logged into the phone?

A.  Yes.

Q.  How can you tell that from this entry?

A.  It shows the user name Tanner as the owner.

Q.  Let's take a look at page 91, entry 828; what's this?

A.  This is a Blackberry messenger chat with the participant

lower case E, exclamation point, as the owner communicating

with Don Ramon, reference to Blackberry messenger.  It also has

the start time and the last activity associated with that

conversation.

Q.  I am going to show you documents marked for identification

as Government's Exhibits 403 through 409.  Do you recognize

these?

A.  Yes, I do.

Q.  What are they?

A.  These are excerpts from the chats that were recovered from

the images.

        MR. BOVE:  The government offers 403 through 409, your

Honor.

GBE5flo1                        Ogden - direct

1            MR. ZACH:  No objection.

2            MR. RODY:  No objection.

3            THE COURT:  403 through 409 are received in evidence.

4            (Government's Exhibits 403 through 409 received in

5    evidence)

6    BY MR. BOVE:

7    Q.  Mr. Calabrese, can we pull up 405 and zoom in on the top

8    entry?

9            What information is supplied here?

10   A.  This shows who the message was from, phone ending in 5405,

11   user Frank, the date and time message was stamped in UTC.  The

12   source for this one would be the source app of WhatsApp and the

13   body would be the content of the message.

14   Q.  If we could keep this in the top window, please,

15   Mr. Calabrese, and take a look at 405-T in the bottom window

16   and zoom in on the top of the first page first?  The bottom is

17   the translation of Government Exhibit 405 WhatsApp messenger

18   chats between Campo and Flores.  Then, if we can take a look at

19   page 2 of 405-T, these are the translations.

20           You can take that down, please.

21           I am showing you a document marked for identification

22   as Government Exhibit 500.  Do you recognize that?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  This is the selected report I created for this image, the

GBE5flo1                          Ogden - direct

1    bin file for G925A.

2    Q.  So that 925A phone is the one in front of you on the

3    witness stand marked Government Exhibit 101?

4    A.  Yes.

5              MR. BOVE:  The government offers 500, your Honor.

6              MR. RODY:  No objection.

7              MR. JACKSON:  No objection.

8              THE COURT:  500 is in evidence.

9              (Government's Exhibit 500 received in evidence)

10   BY MR. BOVE:

11   Q.  Were you able to locate the IMEI from Government Exhibit

12   101 in the bin file you analyzed to prepare the report marked

13   Government Exhibit 500?

14   A.  Yes, I was.

15   Q.  If we can take a look at page 1 of Government Exhibit 500

16   and zoom in on the Image Hash Details section?

17             What is reflected here?

18   A.  This is the shell 256 hash.  This extraction, the method it

19   was created in did not create a Cellebrite source file, this

20   was hashed after the extraction.  Once the hash was validated

21   and I received it, I brought it into this tool to validate the

22   hash had not changed.

23   Q.  Now if we can take a look at page 346 of Government Exhibit

24   500 and zoom in on entry 3106; what is this?

25   A.  This is an image that was recovered from this bin file.

GBE5flo1                        Ogden - direct

1    Q.  I'm going to show you documents marked for identification

2    as Government's Exhibits 519 through 529; do you recognize

3    these?

4    A.  Yes, I do.

5    Q.  What are they?

6    A.  They are images from the -- extracted from the bin file for

7    925A.

8    Q.  So, images extracted from Government Exhibit 101?

9    A.  Correct.

10              MR. BOVE:  Your Honor, the government offers 519

11   through 529.

12              MR. RODY:  No objection.

13              MR. ZACH:  No objection.

14              THE COURT:  519 through 529 received in evidence.

15              (Government's Exhibits 519 through 529 received in

16   evidence)

17   BY MR. BOVE:

18   Q.  Were you able to locate the metadata associated with the

19   exhibits 519 through 529 on the bin file?

20   A.  There was no metadata associated with these images.

21   Q.  What, if any conclusions, did you draw about the images

22   based on that?

23   A.  Well, based on their size and their location they were

24   thumbnails, they were not full-size images.

25   Q.  Were you able to locate the full-size images on the bin

GBE5flo1                        Ogden – direct

1    file associated with Government Exhibit 101?

2    A.  No.  There were no full-size images related to these

3    thumbnails.

4    Q.  What, if any conclusions, do you draw based on that fact?

5    A.  That the images had been on that device at one time, they

6    are just no longer on there, but the thumbnails were still

7    present.

8    Q.  Mr. Calabrese, can we take a look at Government Exhibit

9    526, please?  And now 525?  520?  And 521?  Can we now take a

10   look at Government Exhibit 66, please?

11        So, the title here is November 6, 2015 meeting in San

12   Pedro Sula Honduras between Daza, Flores and Soto.  Do you see

13   that?

14   A.  Yes, I do.

15   Q.  Would you take a look at page 348 of Government Exhibit

16   500?

17        Mr. Calabrese, can we take a look at that as well and

18   zoom in on entry 3119?  What is reflected in entry 3119?

19   A.  An image file thumbnail, the file name, the actual

20   thumbnail image itself, and the creation time and other times.

21   Q.  And so, according to this entry the thumbnail was created

22   on November 6 of 2015?

23   A.  Yes.  That is correct.

24   Q.  Mr. Calabrese, can we please take a look at Government

25   Exhibit 527?  If we can now take a look at Government Exhibit

GBE5flo1                     Ogden - direct

1    511-T?

2                These are WhatsApp messenger communications between

3    Flores using that line ending in 5405 and someone named Irma.

4    Let's take a look at page 2.  So this was a photograph sent by

5    Flores on November 6th, 2015; do you see that?

6    A.  Yes, I do.

7    Q.  Can we take a look now at Government Exhibit 513-T?  These

8    are WhatsApp messenger communications between Flores and

9    someone using the screen name Tia Mayerlin.

10                Do you see that?

11   A.  Yes, I do.

12   Q.  Let's take a look at page 2, if we can zoom in on that,

13   please, that row?

14                And so, this is a photograph sent by Flores also on

15   November 6 of 2015?

16   A.  That is correct.

17   Q.  Did you locate chat files -- additional chat files on

18   Government Exhibit 101?

19   A.  Yes, I did.

20   Q.  I am going to show you documents marked for identification

21   as Government's Exhibits 502 through 517.  Take a look and tell

22   us what these are?

23   A.  These are segments of chats that were recovered from the

24   bin file.

25                MR. BOVE:  The government offers 502 through 517.

GBE5flo1                          Ogden – direct

1            MR. RODY:  No objection.

2            MR. ZACH:  No objection.

3            THE COURT:  502 through 517 are received in evidence.

4            (Government's Exhibits 502 through 517 received in

5    evidence)

6    BY MR. BOVE:

7    Q.  Were you able to locate any video files in the extraction

8    of Government Exhibit 101?

9    A.  Yes, I was.

10   Q.  Mr. Calabrese, can we please take a look at page 389 of

11   Government Exhibit 500?  Looking for entry 3121.

12            Mr. Ogden, can you tell what page entry 3121 is on?

13   A.  348.

14   Q.  Thank you.

15            If you can zoom into entry 3121.  What do we see here?

16   A.  This was a video file that was recovered from the image.

17   It shows the file name and the creation time.

18   Q.  And when was this video created?

19   A.  5:56 p.m. UTC on November 7, 2015.

20   Q.  Did you identify other videos in the bin files associated

21   with Government Exhibit 101?

22   A.  Yes.  I selected four videos in this report.

23   Q.  I am going to show you a disk marked for identification as

24   Government Exhibit 531, it contains four files marked as 531-A

25   through D.  Do you recognize that?

1   A.  Yes, I do.

2   Q.  How do you recognize it?

3   A.  I reviewed these video files, and once I was done reviewing

4   them, comparing them to the files extracted in the report, I

5   put my initials on them.

6          MR. BOVE:  Your Honor, the government offers 531 and

7   its contents 531-A through 531-D.

8          MR. RODY:  No objection.

9          MR. ZACH:  Objection on relevance ground.

10          THE COURT:  Overruled.

11          531-A, B, C and D are received in evidence.

12          (Government's Exhibits 531-A, B, C and D received in

13   evidence)

14          MR. BOVE:  I will ask the jurors to pick up their

15   transcript binders and you have one up on the witness stand as

16   well.  Let's turn to Government Exhibit 510-T.

17          THE COURT:  510 you say?

18          MR. BOVE:  Yes, your Honor.

19   Q.  So, these are WhatsApp messenger communications between

20   Flores using the number ending in 5405 and Campo using the line

21   ending in 5397.  Do you see that on page 1?

22   A.  Yes, I do.

23   Q.  Let's take a look at page 16 of this document.  I am going

24   to ask Mr. Calabrese to help me read portions of this.  I will

25   read the part of Campo, and if you can read the part of Flores

GBE5flo1                          Ogden - direct

1   beginning at 7:07:06 p.m.

2           Campo says:

3           "CAMPO:  Doble *rueda* gave me a fantastic idea.

4           "FLORES:  I don't think it is el chavo.

5           "CAMPO:  Tomorrow we'll buy several phones, Blackberry

6   only.

7           "FLORES:  Okay.  Okay.

8           "CAMPO:  At least three for you and three for me.

9           "FLORES:  Let me know through pin."

10  Q.  So, that last entry ends at 7:07:30 p.m.  Do you see that?

11  A.  Yes.

12  Q.  Mr. Calabrese, can we take a look on the screen now at

13  503-T?

14          These are Blackberry messenger communications between

15  Flores and Campo, correct?

16  A.  That is correct.

17  Q.  Let's take a look at page 3.  What is the date and time

18  stamp on that top entry?

19  A.  It is October 4, 2015, 7:08:31.

20  Q.  So, about a minute after the chats we looked at in 510-T?

21  A.  That is correct.

22  Q.  Mr. Calabrese, I will ask you to help me read this one as

23  well, and I will read Campo:

24          "CAMPO:  Don Ramon.  But that thing we were going to

25  buy is exactly like him.  Right there you are going to have the

GBE5flo1                         Ogden – direct

1    one that he told me was his right hand and another one, just

2    you and I to talk, and the other one is for me and for enanito

3    capuchi.

4              "FLORES:  Capiche.  I will buy them tomorrow.

5              "CAMPO:  We need six; two for you, three for me, and

6    one for the enanito capiche but Blackberry because that's the

7    real thing that one can use.

8              "FLORES:  Perfect."

9    Q.  Now, when you examined the bin file associated with

10   Government Exhibit 1, were you able to locate any Internet

11   search history?

12   A.  Yes, I was.

13   Q.  Let's take a look at page 344 of Government Exhibit 500.

14   If we can zoom in on 3082 through 3086?

15             What do we see here?

16   A.  We see search -- correction, web history related to

17   Blackberry and Blackberry 9300.

18   Q.  And those were on October 5, 2015?

19   A.  Yes.  That is correct.

20   Q.  Now, if we can stay on this page at look at entries 3079

21   through 3081?  What do we see here?

22   A.  We see web history related to Honduras, alias El Sentado

23   bus car.

24   Q.  Mr. Calabrese, can we take a look at page 99 of Government

25   Exhibit 500, zoom in on entry 885, please?

GBE5flo1                       Ogden - direct

1              What's reflected in this entry?

2   A.  This is a user account for the 925A utilizing a WhatsApp

3   account that was logged into using the phone number ending in

4   5405.

5   Q.  Now, if we can take a look at page 100 and zoom in on entry

6   86?

7              What is this?

8   A.  The account for the Blackberry messenger along with the

9   name Don Ramon and a avatar photo.

10  Q.  I am going to show you a document marked for identification

11  as 500E; what is that?

12  A.  That is the photo that was associated with this account.

13             MR. BOVE:  The government offers 500E.

14             MR. RODY:  One moment, your Honor?

15             (pause)

16             MR. RODY:  No objection.

17             THE COURT:  500E is in evidence.

18             MR. ZACH:  Wait.  No objection.

19             (Government's Exhibits 500-E received in evidence)

20  BY MR. BOVE:

21  Q.  Can we publish 500-E, please?  If we can put that up next

22  to 400-C?  Now let's take a look at in the main window

23  Government Exhibit 500, page 100, zoom in on entry 892?

24             What do we see here?

25  A.  We see the user account for this device using Gmail at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    flank.flores.f@gmail.com.

2    Q.  Let's publish Government Exhibit 600 and zoom in on the

3    top.

4           What is this?

5    A.  This is Google subscriber information in relation to the

6    name Frank Flores and the e-mail account

7    frank.flores.f@gmail.com.

8    Q.  Does this subscriber information relating to that e-mail

9    address contain a telephone number?

10   A.  Yes, it does.

11   Q.  Where is that?

12   A.  That is on the bottom, second from the bottom, SMS, with

13   the number ending in 5405.

14   Q.  Mr. Calabrese, can we take a look at Government Exhibit

15   601, please, and zoom in on the bottom half?

16          What is this?

17   A.  This is the part of the Google subscriber return reference

18   to the devices associated with the account.  This one shows a

19   device of a Samsung SMG 925A.

20   Q.  That's the model of the phone marked as Government Exhibit

21   101?

22   A.  That is correct.

23   Q.  So this is the document relating to the e-mail account

24   frank.flores.f@gmail?

25   A.  Yes.

GBE5flo1                         Ogden - direct

1   Q.  Let's take a look at the top half; what do you see here?

2   A.  This shows the device ID and the information captured by

3   Google to include the IMEI and the MEID.

4   Q.  Did you find that IMEI on the bin file associated with

5   Government Exhibit 101?

6   A.  Yes, I did.

7   Q.  Mr. Calabrese, can we take a look at page 162 of Government

8   Exhibit 500 and zoom in on entry 1460, please?

9           What's that?

10  A.  This is a contact that was recovered with the name Efrain,

11  it's a WhatsApp contact with a phone number ending in 5397, and

12  it has an avatar photo associated with it.

13  Q.  Showing you a document marked for identification as

14  Government Exhibit 500-A; do you recognize that?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  That is the avatar photo associated with the Efrain

18  contact.

19  Q.  Can we please look at page 182 of Government Exhibit 500

20  and zoom in on entry 161 and 32?

21          What do you see here?

22  A.  We see contacts for the name Gilson to include a mobile

23  phone number ending in 7023 and a WhatsApp entry ending --

24  phone number ending in 7023.

25  Q.  I will ask the jurors to turn to Government Exhibit 407-T.

GBE5flo1                    Ogden - direct

1   These are WhatsApp messenger communications between Campo using

2   the number ending in 3803, and somebody using the screen name

3   Gilson Nuevo.  Do you see that?

4   A.  Yes.

5   Q.  With a number ending in 7023?

6   A.  Yes.

7   Q.  Mr. Calabrese, I will ask that you help me read these back

8   starting at page 2?  If you could read the part of Campo and I

9   will read the part of Gilson?

10          "CAMPO:  Talk to me.  Save this number, it is the new

11   one.

12          "GILSON:  Who is this?

13          "CAMPO:  What do you mean who is this?  You moron.

14          "GILSON:  Ah-ha.  How could I possibly know?  Which

15   one do I erase?

16          "CAMPO:  Just leave 2865397.

17          "GILSON:  Okay."

18          MR. BOVE:  Let's turn to page 3, please:

19          "CAMPO:  Get me one.  Mini Uzi.

20          "GILSON:  Ah ha.  I can get it here.

21          "CAMPO:  How much would it cost over there?

22          "GILSON:  1,000 tops.

23          "CAMPO:  Set that up for me then -- expletive.  Set me

24   up for two, one for me and one for my uncle.  It is Irving's.

25   I'm here with my uncle checking it out and -- expletive -- it

GBE5flo1                        Ogden - direct

1    is -- expletive.

2            "GILSON:  Ah-ha.

3            "CAMPO:  A thousand dollars is not expensive --

4    expletive."

5        MR. BOVE:  Turning on to page 5.  The early entries

6    here reflect incoming calls and let's begin with the entry by

7    Campo at 7:05:51:

8            "CAMPO:  Talk to me.  I have arrived.  Call me now.

9    With silencer?  So beautiful, all of them, buddy.  I was up in

10   el avila, bro and there was no signal.  Mini Uzi.  It's a

11   beauty, right?

12           "GILSON:  Yes."

13       MR. BOVE:  Incoming call.

14           "CAMPO:  Expletive -- all that looks so -- expletive.

15   Buy me a suitcase like that to put mine in, please."

16       MR. BOVE:  Incoming call.

17           "CAMPO:  Ask him for the rifle.

18           "GILSON:  Yes, it was.

19           "CAMPO:  It was what.  Ask him about that one.

20           "GILSON:  Okay.  The one that was over there.  You see

21   I have here both butts.

22           "CAMPO:  Yes -- expletive."

23       MR. BOVE:  Carrying on page 8, entries beginning July

24   12, 2015:

25           "GILSON:  The best one for sniper is 308."

GBE5flo1                        Ogden - direct

1              MR. BOVE:  Turning on to page 9:

2              "GILSON:  That's sick.

3              "CAMPO:  I do not like that color.

4              "GILSON:  But it has a bunch of toys.  Did you see the

5      suitcase?

6              "CAMPO:  Yes -- expletive.  That one is really sick --

7      expletive.  I love everything but the R.  I want my vector.

8              "GILSON:  Okay.

9              "CAMPO:  What are the gloves for?

10             "GILSON:  So it won't leave any print.  Ah-ha.

11             "CAMPO:  You're such a -- expletive."

12             MR. BOVE:  Incoming call:

13             "CAMPO:  What's that?

14             "GILSON:  The toys.  What do you mean?

15             "CAMPO:  What is that?

16             "GILSON:  All the plastic.

17             "CAMPO:  Ah-ha.  And mine."

18             MR. BOVE:  We can carry on to page 12, entries

19     beginning August 3rd, 2015:

20             "GILSON:  What do I do with this?  Damn.

21             "CAMPO:  Bring it to me, gay.  Are those BS?

22             "GILSON:  Yes.  67,000 BS.  How do I take it?

23             "CAMPO:  On the plane.

24             "GILSON:  You're crazy.  I'm scared.  Over there one.

25             "CAMPO:  Well, are you a -- expletive -- or what?  You

GBE5flo1                          Ogden - direct

1    put it on you.  Aren't you all set up?

2            "GILSON:  Yeah, sure.  But regardless.

3            "CAMPO:  And you go through carrying a baby.

4            "GILSON:  We have to go through the machine when we

5    arrive.  It is too big to carry it on me.

6            "CAMPO:  But not the girls, you gay.

7            "GILSON:  You mean in the stroller?  Taken apart?  I'm

8    having bad luck.

9            "CAMPO:  Ah-ha.  Perhaps they will not ask you to put

10   the stroller through the detector.  You put the baby on and

11   done.

12           "GILSON:  Sometimes they do.

13           "CAMPO:  Expletive -- put it on, you idiot, like it

14   were your gun in the front where your pee-pee is located.

15           "GILSON:  It is very big.  Too big.

16           "CAMPO:  It fits there.  You are an idiot.  Take it

17   apart, one part to go there and another part to go somewhere

18   else.

19           "GILSON:  I will send a photo in a little while so

20   that you can, that -- it is impossible.  It is too big.  Now

21   I'm giving the baby girl her bottle because...

22           "CAMPO:  Expletive -- dude, and bring something for me

23   your brother or, look, you were there for five months.

24           "GILSON:  Or better yet, by courier?

25           "CAMPO:  What.

GBE5flo1                          Ogden - direct

 1          "GILSON:  The mini.

 2          "CAMPO:  Dude, you're such chicken -- expletive.  It

 3   is for here, Venezuela, your city.  Call someone a general and

 4   that's it, you gay.  You pass it on top like I'm telling you.

 5   Take it apart and pass it in two pieces.  You leave it on the

 6   plane and later go by to grab it.

 7          "GILSON:  Hee hee.

 8          "CAMPO:  Dude you are such chicken -- expletive.

 9          "GILSON:  Not chicken.

10          "CAMPO:  I thought B was your city.

11          "GILSON:  It's a big problem.

12          "CAMPO:  That it is your back yard, that you do

13   whatever you want.  Well there you have a real test by fire."

14   BY MR. BOVE:

15   Q.  Can we please take a look at Government Exhibit 107?

16   Excuse me, that's not in evidence yet.  Let's take a look at

17   Government Exhibit 500, page 304, entry 2738.

18          Do you recognize that?

19   A.  Yes.  That is a contact recovered from the bin file with

20   the name "SR" or senior, Marco Papalori for a WhatsApp

21   communication, phone number ending in 0167, along with an

22   avatar photo.

23   Q.  I am showing you a document marked for identification as

24   Government Exhibit 500-D.  Do you recognize that?

25   A.  Yes, I do.  That was the image associated with that

GBE5flo1                          Ogden - direct

1   contact.

2                MR. BOVE:  The government offers 500-D, your Honor.

3                MR. JACKSON:  No objection.

4                MR. RODY:  No objection.

5                THE COURT:  500-D is in evidence.

6                (Government's Exhibit 500-D received in evidence)

7   BY MR. BOVE:

8   Q.  Can we take a look at 500-D, please?  Mr. Ogden, if you can

9   to page 5 of Government Exhibit 500 and look at entry 17?

10  A.  Yes.

11  Q.  What's this?

12  A.  This is a SnapChat chat message between Hamudi TRD and

13  Frank Flores F.

14  Q.  Are you generally familiar with the SnapChat application?

15  A.  I am some, yes.

16  Q.  How does it work?

17  A.  It's communication back and forth, messages and pictures

18  with -- some of it has a time to live set to it to delete.

19  Q.  Can the jurors please turn in their binders at 517-T?  This

20  is translation of a chat that was previously up on the screen?

21  A.  Yes.

22  Q.  Take a look at page 2.

23               Mr. Calabrese, can we please take a look at Government

24  Exhibit 605 on the screen and zoom in on the top?

25               What is this?

GBE5flo1                         Ogden - direct

A.  This is a subscriber information reference to SnapChat with

the I.D. Frank Flores F. with the associated e-mail account

frank.flores.f@gmail.com and the phone number ending in 5405.

Q.  Now let's take a look at Government Exhibit 606, please,

and zoom in on the top entries?

        What is reflected here?

A.  This is a SnapChat subscriber information referenced to

I.D. Hamudi TRD with the e-mail address HamudiTRD@gmail.com,

and the phone number ending in 0218.

Q.  Now, if we can please take a look at 604 and zoom in on the

top?  This is subscriber information associated with the e-mail

address we just looked at, Hamudi TRG@gmail.com, right?

A.  That is correct.

Q.  What is the phone number that was provided in this

subscriber information?

A.  This one is 584242294796.

Q.  If we can take a look at page 101 of Government Exhibit

500, please, and zoom in on entry 900?  What's this?

A.  This is a contact that did not have a contact name

associated with it but had the phone number ending in 4796.

Q.  Is that the same phone number that was the one that was

included in the subscriber information we just looked at?

A.  Yes, it was.

Q.  If you can take a look at the right side of the screen,

what was the status of this entry on the phone?

1    A.  This was a deleted entry.

2    Q.  Now let's take a look at page 112 of Government Exhibit

3    500.  If we can zoom in on entries 1009 and 1010; what are

4    these?

5    A.  These are contact entries with the name being the phone

6    number ending in 4796.

7    Q.  What was the status of these entries on the phone?

8    A.  Both of these entries were deleted.

9    Q.  Did you recover WhatsApp communications from the bin file

10   associated with Government Exhibit 101 that had a WhatsApp

11   account with the number ending in 4796?

12   A.  Yes.

13   Q.  Can we take a look at Government Exhibit 509-T on the

14   screen, please?  So these are WhatsApp messenger communications

15   between Flores using 5405 line; do you see that?

16   A.  Yes, I do.

17   Q.  And the WhatsApp account using the number ending 4796?  Do

18   you see that?

19   A.  Yes, I do.

20   Q.  Can you look at page 2 of this document?  So this is a

21   message, a photograph sent by the user of the 4796 account,

22   Hamudi, on June 26 of 2015?

23   A.  Correct.

24   Q.  Let's take a look at page 3, please?  This is another

25   message sent by Hamudi to Flores on June 26 at 2015, right?

GBE5flo1                      Ogden - direct

1   A.  That is correct.

2   Q.  Can we take a look at 519 in evidence?

3          So this is that same photo that we were just looking

4   at except saved on the phone itself?

5   A.  That is correct.

6   Q.  And I believe you testified that this was a thumbnail?

7   A.  Yes.

8   Q.  Mr. Calabrese, can we take a look at page 185 of Government

9   Exhibit 500 and zoom in on entry 661?  What do we see here?

10  A.  This is a contact with the name spelled out to be Hamudi

11  v-e-l-b, a Blackberry messenger contact with a photo attached.

12  Q.  Were you able to locate any Blackberry messages on the

13  extraction from Government Exhibit 101 with this Blackberry

14  contact?

15  A.  No, I was not.

16  Q.  I'm going to show you a document marked as 500-B; what is

17  this?

18  A.  This is the avatar image picture that's depicted in this

19  contact.

20          MR. BOVE:  The government offers 500-B, your Honor.

21          MR. RODY:  No objection.

22          MR. ZACH:  No objection.

23          THE COURT:  500-B is in evidence.

24          (Government's Exhibit 500-B received in evidence)

25  BY MR. BOVE:

GBE5flo1                      Ogden - direct

1   Q.  Mr. Calabrese, can we take a look at Government Exhibit

2   516-T?  These are WhatsApp messenger communications between

3   Flores using the 5405 phone; do you see that?

4   A.  Yes, I do.

5   Q.  And somebody using a WhatsApp account ending in 6889?

6   A.  Yes, that is correct.

7   Q.  Let's take a look at page 2 of this document, please?

8             Now, if the jurors can turn their binders back to

9   Government Exhibit 510-T?  These are WhatsApp messages between

10  Flores using the 5405 line and Campo using the 5397 account?

11  Do you see that?

12  A.  Yes, I do.

13  Q.  Can we turn to page 13 of this exhibit?  I will ask the

14  jurors to read this to themselves.  Thank you.

15            If the jurors can now turn to Government Exhibit 405-T

16  in the binder?  These are WhatsApp messages between Campo using

17  the 3803 account and Flores using the same 5405 account.  Do

18  you see that?

19  A.  Yes, I do.

20  Q.  If we can please turn to page 5 of this Exhibit and I will

21  ask Mr. Calabrese for some help reading this back.  I will read

22  the part of Flores and if you can read Campo?  I'm going to

23  start at the top of page 5:

24            "FLORES:  I ran into pepero.

25            "CAMPO:  Really?  What did he tell you?  Did you get

GBE5flo1                            Ogden – direct

1      the number?

2              "FLORES:  Yep.  He just asked when we could meet, that

3      he's not doing much.  Looking for work.

4              "CAMPO:  Ah-ha, but did he ask you why I had just

5      disappeared?  Remember it was because of that Mexican snitch

6      and his friend el pollo.

7              "FLORES:  And nothing.  I told him that you lost the

8      phone and that he had been looking for it to -- to get in touch

9      with them and he said to me:  Well, nothing.  Write down my

10     number and all.  And he called me back and I will send it in a

11     little while.

12             "CAMPO:  Where did you see him?

13             "FLORES:  Do you know Marcel from the dealership?

14             "CAMPO:  Yes.

15             "FLORES:  At the san ignacio."

16     BY MR. BOVE:

17     Q.  Mr. Calabrese, can you please publish now Government

18     Exhibit 512-T?  These are WhatsApp messages between Flores

19     using the 5405 account and somebody using a screen name Salemi

20     in account ending in 3356.  Do you see that?

21     A.  Yes, I do.

22     Q.  Let's take a look at page 2.

23             I will read the part of Flores and if Mr. Calabrese

24     can read Salemi:

25             "FLORES:  Buddy, please give me Pepero's number.

GBE5flo1                         Ogden – direct

1          "SALEMI:  Right away, buddy.  I had forgotten.

2     04143883275."

3     BY MR. BOVE:

4     Q.  Mr. Calabrese, if we can take a look at Government Exhibit

5     500, page 274 and zoom in on entry 2455?

6          This is a contact that was saved in Government Exhibit

7     101, correct?

8     A.  That is correct.

9     Q.  And it's for that same phone number that we just looked at

10    in Government Exhibit 512-T ending in 3275?

11    A.  Yes; with the user name PPR.

12    Q.  Is there a photograph linked to this contact entry?

13    A.  Yes, there is.

14    Q.  I'm showing you a document marked for identification as

15    Government Exhibit 500-C.  Do you recognize that?

16    A.  Yes, I do.

17    Q.  What is it?

18    A.  That is a photo attached to that contact.

19          MR. BOVE:  The Government offers 500-C.

20          MR. ZACH:  No objection.

21          THE COURT:  500-C is in evidence.

22          (Government's Exhibit 500-C received in evidence)

23    BY MR. BOVE:

24    Q.  Can we please take a look at 500-C, Mr. Calabrese.

25          Now I would like to change gears a bit and go to

GBE5flo1                          Ogden - direct

1    Government Exhibit 400, the report that relates to the other

2    phone.

3    A.   Okay.

4    Q.   If we take a look at page 185 of Government Exhibit 400 and

5    zoom in on entry 1569?  This is a contact entry, right?

6    A.   Yes; it is for user name Pepe on WhatsApp with the same

7    phone number ending in 3275, and this one has a photo attached.

8    Q.   Showing you a document marked for identification as 400-B.

9    Do you recognize is that?

10   A.   Yes, I do.  That was the photo attached to that account.

11   Q.   Mr. Calabrese, can we take a look at --

12           Your Honor, the government offers 400-B.

13           MR. RODY:  No objection.

14           MR. ZACH:  No objection.

15           THE COURT:  400-B is in evidence.

16           (Government's Exhibit 400-B received in evidence)

17   BY MR. BOVE:

18   Q.   If we can look at 500-C next to 400-B, please?

19           If the jurors can please turn in their binders to

20   Government Exhibit 508-T?  These are WhatsApp messenger

21   communications between Campo using the account ending in 3803

22   and that Pepe contact we just looked at using the number ending

23   3275.  Do you see that?

24   A.   Yes, I do.

25   Q.   If the jurors can please turn to page 2?  I will ask you

1    guys to please read that to yourselves.

2            Mr. Calabrese, can we please look at page an page 27

3    of Government Exhibit 408-T?  If we can zoom in on the original

4    communication for the November 1, 2015 entry?

5            So this is a photo that Pepe sent to Campo, correct?

6    A.  That is correct.

7    Q.  What is reflected in this photo?

8    A.  This is a screenshot of call history from a mobile device.

9    Q.  And directing your attention to the top entry in the photo

10   time stamped 10:35; what is the name associated with that

11   contact?

12   A.  Gocho N.

13   Q.  If we can zoom it back out, please, Mr. Calabrese, and go

14   back to page 27?

15           On the entry after Pepe sent that photograph he sent a

16   message to Campo that stated:  Here is the call I made to him,

17   my friend.

18           Do you see that?

19   A.  Yes, I do.

20   Q.  Now, if we can go back to Government Exhibit 500, please,

21   and take a look at page 347 and zoom in on entry 3109?  What is

22   this?

23   A.  It's a photo of a type of machine gun with several

24   magazines and I'm not sure what the white boxes are yet.

25   Q.  When was this thumbnail created on Government Exhibit 101?

1    A.  9-2-2015 at 6:51 UTC time.

2    Q.  If we can now take a look at entry 3112?  What's this?

3    A.  It looks like either a complete rifle or broken down rifle

4    on a orange background.

5    Q.  Mr. Calabrese, can we now look at Government Exhibit 524 in

6    evidence?  This is another one of the photos from Government

7    Exhibit 101.  What do we see here?

8    A.  We see several different weapons and their magazines.

9    Q.  Now 523, please, Mr. Calabrese?  Does that look like the

10   same gun case?

11   A.  It appears to be the same gun case with multiple weapons in

12   it.

13   Q.  If we can now look at 522?

14        If the jurors can please turn in their binders to

15   407-T?  Mr. Calabrese, if we can split the screen and leave

16   this 522 on top and go to 407-T page 9 on the bottom?  And zoom

17   in on entry 8:17:49?

18        The bottom screen here we have a photograph from a

19   chat marked as -- the chat itself is marked as 407-T.  Do you

20   see that?

21   A.  Yes, I do.

22   Q.  This was obtained from Government Exhibit 100, the 915

23   phone?

24   A.  Yes.

25   Q.  How does the photograph marked as 522 from Government

GBE5flo1                        Ogden - direct

1    Exhibit 101 compare to the photo on the bottom of the screen?

2    A.  It appears to be the same photo.

3    Q.  You can take this down.

4            MR. BOVE:  Your Honor, I think I may have made one

5    oversight during the questioning and forgotten to offer

6    Government Exhibit 500-A.  To the extent I didn't, I offer it

7    now.

8            MR. RODY:  No objection.

9            MR. ZACH:  No objection.

10            THE COURT:  500-A is in evidence.

11            (Government's Exhibit 500-A received in evidence)

12            MR. BOVE:  Thank you, your Honor.

13            Nothing further, your Honor.

14            THE COURT:  We will take our morning recess now.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

GBE5flo1                          Ogden - direct

1              (Jury not present)

2              THE COURT:  You may stretch your legs.  Don't talk to

3    the government.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Who is going to be doing the examination?

6    Who is going first.

7              MR. ZACH:  We will discuss that at the break.

8              MR. JACKSON:  Excuse me, your Honor.  Just to you

9    clarify?

10             THE COURT:  Mr. Ogden, you can step down.

11             MR. JACKSON:  Was it your Honor's intention, I think

12   this morning, to resume with CS-1 you said after an hour and a

13   half of direct and we would finish Mr. Ogden after we finish

14   CS-1?

15             THE COURT:  I think we are going to finish Mr. Ogden.

16             MR. JACKSON:  Okay.

17             THE COURT:  Is CS-1 here?

18             THE DEPUTY CLERK:  Yes.

19             THE COURT:  I think we will finish Mr. Ogden and then

20   resume so there will be more continuity to the examination.

21             MR. JACKSON:  Okay.  Thank you very much, your Honor.

22             THE COURT:  See you in 15 minutes.

23             (Recess)

24             (Continued on next page)

25

GBE9FLO3                        Ogden – cross

1          THE COURT:  Who is going first now?

2          MR. ZACH:  I am, your Honor.

3          THE COURT:  Okay.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBE9FLO3                          Ogden - cross

1              (Jury present)

2              THE COURT:  All right, Mr. Zach.

3              MR. ZACH:  Thank you, your Honor.

4              THE COURT:  You're welcome.

5    CROSS-EXAMINATION

6    BY MR. ZACH:

7    Q.  Good afternoon, Mr. Ogden.

8    A.  Good morning, sir.

9    Q.  Mr. Ogden, you are employed by the Department of Justice's

10   Computer Crimes and Intellectual Property Section, right?

11   A.  Yes, sir.

12   Q.  Is that calls CHIPS normally?

13   A.  No, sir.  It's calls CCIPS.

14   Q.  Oh, CCIPS.  Sorry.  At CCIPS you spend most of your time

15   analyzing electronic mediums, telephones, computers and the

16   like, right?

17   A.  Yes, sir.

18   Q.  And what percentage of your time is spent analyzing

19   computers and telephones?

20   A.  75 percent of my time.

21   Q.  That's the primary job that you have with the justice

22   department; isn't that right?

23   A.  Yes, sir.

24   Q.  I want to spend a moment and go back to kind of where we

25   left off.

1           MR. ZACH:  Can we call up, Mr. Calabrese, Government

2    Exhibit 407-T.

3           Can we look at page six.

4    Q.  Now, Mr. Ogden, you spent some time -- the prosecutor

5    mostly spent the time going over some of these photographs that

6    we see on page six, right?

7    A.  I'm assuming the prosecutor spent time going over them,

8    yes.  I did review them.

9    Q.  What we're looking at here are photographs that you

10   obtained from a telephone, right?

11   A.  That is correct.

12   Q.  And these are photographs that were sent to that phone

13   by -- were sent to that phone, right?

14   A.  Correct.

15   Q.  So someone, just like you would text your -- text someone a

16   picture, this is someone texting a picture to that phone,

17   right?

18   A.  Correct.

19   Q.  You, sir, are not a firearms expert, are you?

20   A.  No, sir, I'm not.

21   Q.  And you've never been a firearms expert, right?

22   A.  No, sir.  I have not.

23   Q.  So what we're looking at here you can't tell us one way or

24   another whether that's actually a gun, right?

25   A.  Based on my training, experience, 22 years of law

GBE9FLO3                     Ogden – cross

1    enforcement --

2    Q.  That's not what I asked.  Are you a firearms expert, sir?

3           MR. BOVE:  Judge, I object and ask that he be

4    permitted to finish his answer.

5           THE COURT:  He can answer.

6           THE WITNESS:  Based on my training experience, 22

7    years in law enforcement, handling multiple weapons, I did six

8    years in the Marine Corps, and again handled multiple weapons,

9    that's what I was basing my response on.

10   Q.  Let's go to page 11.  If you look at page 11.

11          MR. ZACH:  Can we blow up that picture, please,

12   Mr. Calabrese.

13   Q.  You see there is some stuff wrapped in plastic, right?

14   A.  It appears to be duct tape but it appears to be covered in

15   something, yes.

16   Q.  And do you see to the left and to the right there are

17   objects next to that canister, right?

18   A.  Yes.

19   Q.  And that's protection gear for paintball and airsoft, isn't

20   it, sir?

21   A.  No, sir.  That appears to be rollerblades, like skates.

22   Q.  Sir, are you familiar with the sport of airsoft?

23   A.  Paintball?

24   Q.  Paintball and airsoft?

25   A.  Somewhat, yes.

1    Q.  And as part of your investigation did you look into the

2    background of this individual named Gilson?

3    A.  No, sir.

4    Q.  Did you know that Gilson is a well known airsoft and

5    paintball player?

6    A.  No, sir.

7    Q.  Did you know that he plays for the Venezuelan national

8    team?

9    A.  No, sir.

10   Q.  Did you know that he travels to Miami to play in that?

11   A.  No, sir.  That was beyond the scope of my request.

12   Q.  Let's then turn to page ten -- sorry.  Stay at the same

13   page.  And let's back out a little bit from the picture.  And

14   let's look for a second at the text below.

15           Do you see what Mr. Campo says?  He said, "What is

16   that?"

17           Do you see that?

18   A.  Yes, sir.

19   Q.  And then Mr. Gilson says "All the plastic."

20           Do you see that?

21   A.  Yes, sir.

22   Q.  And what he's referring to, sir, is that these are airsoft

23   rifles, right?

24   A.  I'm not sure how you came to that.

25   Q.  I'm asking you, sir.  He's saying these are airsoft rifles,

GBE9FLO3                        Ogden - cross

1    right?

2              MR. BOVE:  Objection, your Honor.

3              THE WITNESS:  I don't --

4              THE COURT:  Objection is overruled.  You can answer.

5              THE WITNESS:  I don't see any reference to the words

6    that you're saying, airsoft rifle.  And, again, in the photo I

7    see rollerblades.

8    Q.  Sir, he's referring to plastic, isn't he?

9    A.  Yes.

10   Q.  And you're aware that airsoft rifles are made of plastic,

11   right?

12   A.  Yes, sir, I am.

13   Q.  And to be clear you searched both of these phones and

14   looked at all the photographs, right?

15   A.  No, sir, I did not.

16   Q.  And nowhere in these phones, sir -- well, in these phones

17   you observed, as we saw earlier, selfie pictures that were

18   taken of Mr. Campo and Mr. Flores, right?

19   A.  Can you repeat that question?

20   Q.  You --

21             THE COURT:  Did you see selfie photos?

22             THE WITNESS:  Yes.  I did see some selfie photos.

23             THE COURT:  The two defendants.

24             MR. ZACH:  Of individuals.

25             THE WITNESS:  I didn't know the defendants.  I had

GBE9FLO3                        Ogden - cross

1    never seen them before.  Other than what was on the device.

2    There were selfie photos on the device.

3    Q.  You saw pictures of individuals that were selfies, right?

4    A.  Yes, sir.

5    Q.  And nowhere in this phone at all did you see any picture of

6    Mr. Campo holding a firearm, did you?

7    A.  I did not look for those photos.  I do not know if they're

8    on there.

9    Q.  My question, sir, is nowhere in the photos you have seen in

10   downloading this data did you see a picture of Mr. Campo

11   holding a firearm?

12   A.  I answered your question earlier that I did not look at all

13   the photos.  So I would not have known if it was on there.

14   Q.  Of the pictures that you looked at, did you see any photos

15   of Mr. Campo holding a firearm?

16   A.  Of the photos that were selected for the report, I did not.

17   Q.  Well who selected the pictures, sir, you or the

18   prosecutors?

19   A.  The prosecutors.

20   Q.  So the prosecutors picked the photographs that you just

21   testified about, right?

22   A.  Yes.  That is correct.

23   Q.  And to be clear they also picked the text messages and the

24   like that you testified about, right?

25   A.  Yes, sir.

1    Q.   There was a whole lot more information on the phone than

2    the little snippets that we just went over, right?

3    A.   Yes, sir.  That is correct.

4    Q.   Okay.  And so of the photographs that the prosecutors gave

5    to you, nowhere did you see Mr. Campo holding a firearm?

6    A.   Correct.

7    Q.   And of the photographs that the prosecutors gave to you,

8    nowhere did you see Mr. Flores holding a firearm, did you?

9    A.   That is correct.

10   Q.   And, in fact, nowhere in any of the phones did you see any

11   photograph of either of these defendants holding a firearm?

12   A.   At the photos that I looked at I did not.

13   Q.   And to be clear you understand that airsoft rifles can be

14   hyperrealistic replicas of firearms, right?

15   A.   Yes.

16   Q.   You know that, right?

17   A.   Yes.

18   Q.   And there would be no way, sir, would there be, for you to

19   compare or to determine whether or not a photograph on the

20   phone was an airsoft rifle or was a real firearm, right?

21   A.   Correct.

22   Q.   One other question?

23   A.   Yes, sir.

24   Q.   You know the reports that you showed us earlier on direct

25   examination?

GBE9FLO3                        Ogden - cross

1    A.  Yes, sir.

2    Q.  Did those reports contain all of the web searches that were

3    conducted on those phones or just a selection of them?

4    A.  A selection of them, sir.

5            MR. ZACH:  Thank you.

6            THE WITNESS:  You're welcome.

7            THE COURT:  Mr. Rody.

8            MR. RODY:  Thanks, Judge.

9    CROSS-EXAMINATION

10   BY MR. RODY:

11   Q.  Just a few questions, Mr. Ogden.

12   A.  Yes, sir.

13   Q.  I want to make sure I have this right.  With respect to I

14   think it's Government Exhibit 400, the report you prepared.  Am

15   I correct that you did the data extraction for that in

16   December 2015?

17   A.  No, sir.  The data was extracted in December of 2015 --

18   12-8-2015.

19   Q.  Right.  So the data -- so someone else did the data

20   extraction?

21   A.  Correct.

22   Q.  So the data extraction was done in December 2015.  When did

23   you first receive the data?

24   A.  I received it in approximately May of 2015 -- or I'm sorry

25   2016.  April, May of 2016.

1    Q.  And your report was dated I believe October 23, 2016?

2    A.  Yes.

3    Q.  So, you did not perform your analysis of the data until

4    October 2016?

5    A.  Correct.

6    Q.  And you did that at the direction of the government?

7    A.  Yes.  The initial part was to, as I testified earlier,

8    recover the BlackBerry Messenger chats and then I was requested

9    to perform the further analysis.

10   Q.  And you talked about two phones that you received in order

11   to perform your analysis; is that right?

12   A.  Two images, yes, sir.

13   Q.  You say images.  You mean you received the data -- what you

14   believed to be from two phones?

15   A.  Yes, sir.  Two bin files.

16   Q.  And you didn't receive any other phones in order to do an

17   analysis of those phones, did you?

18   A.  No, sir.

19   Q.  Did you receive any phones from any confidential sources in

20   this case?

21   A.  No, sir.

22   Q.  After August 4th of 2016 were you provided with phones by

23   the prosecution to analyze those phones?

24   A.  No, sir.

25   Q.  Did you receive -- I believe you just called it a bin file

GBE9FLO3                          Ogden - cross

1    from any phones after August 4, 2016?

2    A.  No, sir.

3    Q.  Were you asked to see if you could recover deleted chat

4    messages from any phones after August 4, 2016?

5    A.  No, sir.

6    Q.  At any point did the government ask you to search for

7    photographs of any contraband on any phones from any

8    confidential sources in this matter?

9    A.  No, sir.

10           MR. RODY:  Mr. Calabrese, could you please have

11   Government Exhibit -- I believe it's 527 up, please.

12   Q.  Sir, this is one of the selfie images we saw on direct

13   examination.  Do you recall that one?

14   A.  Yes, sir.

15   Q.  And that's my client, Franqui Flores, over there, right?

16   A.  Okay.  I mean it appears to be him, yes.

17   Q.  Could we get -- I think it is -- and this was created on

18   November 6, 2015; is that right?  Do you have a way of

19   determining that?

20   A.  Can you give me a number of what that image was.

21   Q.  I don't know if it's on there but it's related -- there was

22   a reference to numbers 3119 on page 348 of Government Exhibit

23   400.

24   A.  Yes.

25   Q.  Yes.  Meaning that --

GBE9FLO3                         Ogden - cross

1    A.  That's the number.  It showed the creation as 11-6-2015 UTC

2    time.

3    Q.  So that photo was taken on November 6, 2015, right?

4    A.  No.  It was created on the file system on 11-6-2015.  That

5    thumbnail.

6    Q.  So that doesn't mean it was taken that day?

7    A.  It doesn't mean it was taken at that day or time.  That's

8    just the creation of when that thumbnail was created on that

9    file system.

10   Q.  Meaning that's when this picture hit the phone basically?

11   A.  Yes.  When that image was created on the file system for

12   the first time in this location was 11-6-2015.

13              MR. RODY:  And could we go to Government Exhibit

14   511-T, Mr. Calabrese, please.  And I think it's the next page.

15   Q.  So that's the same photo, right?

16   A.  That is correct.

17   Q.  And that shows that -- so, again, that date where it says

18   November 6, all that means to you is that's the date that that

19   photo appeared on the phone?

20   A.  Well, no.  That's the date it was sent.

21   Q.  Okay.  That's the date it was sent.  Got it.

22              Could we go back to the first page to see who it's

23   sent to.

24              So when it says participants, the first one it says

25   Franqui Francisco Flores de Freitas, right?

1    A.  Correct.

2    Q.  It's sent from his WhatsApp, whatever that is?

3    A.  Number ending in 5405.

4    Q.  Right.  Then it says it's sent to FNU LNU a/k/a Herma,

5    right?

6    A.  Correct.

7    Q.  Did you determine that or did the government determine

8    that?

9    A.  The way the app is set up it determines who the sender was,

10   who the receiver was, the date and time.  That's all in hex.

11   So it's all configured that way.  So it's displayed the way

12   it's displayed on the phone.

13   Q.  So, in other words, this was a photo that Mr. Flores

14   essentially texted to a contact listed on his phone as Herma?

15   A.  Correct.

16   Q.  And you know, sir, that the Spanish word for sister is

17   hermanita?

18   A.  No, sir.

19   Q.  Or hermana?

20   A.  No, sir.

21   Q.  So this was a photo -- did you investigate this phone

22   number?

23   A.  No, sir.

24   Q.  So you know that this is a -- Mr. Flores texting this

25   picture of him in front of a plane to his sister, right?

GBE9FLO3                    Ogden - cross

1    A.  No, sir.

2    Q.  You didn't investigate that?

3    A.  No, sir.

4           MR. RODY:  Could we take a look at Government

5    Exhibit -- it's 513-T.

6           Thank you, Mr. Calabrese.

7           Could we go to the next page.

8    Q.  So now this is another one of the photos you saw on the

9    phone, right?

10   A.  Yes, sir.

11   Q.  And this one was also taken on November 6, 2015 --

12   withdrawn.

13          This is one that is sent from the phone to somebody

14   else at that time and date, correct?

15   A.  Yes, sir.

16   Q.  So this is a picture from inside the plane, right?

17   A.  It looks like a car.

18   Q.  That's a car looking at the plane.  Got it.

19   A.  Yes, sir.

20   Q.  And could we go back to the first page.

21          So, again, this one is sent from the same -- sent from

22   Mr. Flores, right?

23   A.  Yes, sir.

24   Q.  And this one is sent to a contact on his phone that's Tia

25   Mayerlin; is that right?

GBE9FLO3                    Ogden - cross

1    A.  Yes, sir.

2    Q.  And you know tia in Spanish means aunt?

3    A.  No, sir.  I don't know.

4    Q.  You don't speak Spanish?

5         Okay.  Well so you know that Tia Mayerlin is his

6    deceased mother's sister, correct?

7    A.  No, sir.  I don't know his family either.

8    Q.  You didn't investigate to determine that this was

9    Mr. Flores texting that picture to his aunt?

10   A.  No, sir.  I'm not the case investigator.

11        MR. RODY:  Okay.  One more.  Could we go to 405-T,

12   please, Mr. Calabrese.

13        One moment, Judge.

14        Could we go to the next page, please.

15        The next page after that.  Yes.

16   Q.  So this is like a receipt from Banesco Bank.  That's a

17   Venezuelan bank; is that correct?

18   A.  I have no idea.

19   Q.  Are you aware that a person cannot make local payments or

20   withdrawals in U.S. dollars from Banesco in Venezuela?

21        MR. BOVE:  Objection, Judge.

22        THE COURT:  If he knows.

23        THE WITNESS:  I don't know.

24   Q.  So where it says 500,000 there, I think above -- that's in

25   bolívars, correct?

1    A.  I have no idea.

2    Q.  And at the commonly used black market exchange rate,

3    500,000 bolívars is about 319 bucks?

4            THE COURT:  Sustained.

5            THE WITNESS:  I'm not familiar.

6            THE COURT:  He doesn't know this.

7            THE WITNESS:  I'm not familiar with the black market.

8            MR. RODY:  Okay.

9    Q.  And one more.

10           MR. RODY:  Could we have 500-D, please, Mr. Calabrese.

11   Q.  Do you know off the top of your head, Mr. Ogden, whether

12   this photo was sent to anybody?

13   A.  I do not.

14   Q.  Is this -- do you know the date that it was put on the

15   phone?

16   A.  I do not.

17           MR. RODY:  Okay.  We can take that down.

18   Q.  Among -- now, of the photos that were selected by the

19   government for you to describe in your testimony today, were

20   there any photographs of Mr. Flores with his son?

21   A.  In these photographs?

22   Q.  Yes.

23   A.  No, there were not.

24   Q.  Did you see those photographs on the phone?

25   A.  I saw photographs of children, yes.

GBE9FLO3                          Ogden - redirect

1   Q.  And did you see photographs of Mr. Flores with his son at

2   Universal Studios?

3   A.  I do not recall Universal Studios.

4   Q.  Were any of those pictures, pictures of Mr. Flores and his

5   son on vacation in Florida, among the photos that the

6   government selected for you to display to the jury today?

7   A.  No.  The ones that were selected to be displayed were

8   displayed.

9            MR. RODY:  No further questions.  Thanks very much.

10           THE WITNESS:  You're welcome, sir.

11           MR. BOVE:  Briefly, your Honor?

12           THE COURT:  Yes.

13           MR. BOVE:  Mr. Calabrese, could we please take a look

14   at Government Exhibit 412.

15   REDIRECT EXAMINATION

16   BY MR. BOVE:

17   Q.  You testified on direct exam that this was a photo that was

18   actually taken using the phone that is marked as Government

19   Exhibit 100?

20   A.  Yes.

21   Q.  And you were asked some questions on cross-examination

22   about your experience with firearms and your experience with

23   airsoft?

24   A.  Yes.

25   Q.  Could you please describe your experience with firearms?

1  A.  Starting back to 1987 I spent six years in the Marine Corps

2  handling a multitude of weapons.

3          From there I got into law enforcement.

4          I spent time on the SWAT Team handling and carrying

5  for a majority of my career an AR-15 which is similar to this

6  model right here and have owned AR-15s and other assault

7  rifles.

8  Q.  Do you see the shadow at the bottom of the photo?

9  A.  Yes.

10  Q.  What does that look like?

11  A.  It looks like hands holding up a camera, taking a picture.

12  Q.  Are there any features of the object depicted in Government

13  Exhibit 412 that lead you to conclude that it's a firearm

14  rather than a replica?

15  A.  Just the build of it, the large magazine opening.  It

16  appears to be a rifle.

17  Q.  Let's take a look at 413.

18          Now it looks like the object on the top is the same

19  one that was depicted in 412, right?

20  A.  Yes, it does.

21  Q.  Let's take a look at the one on the bottom that appears to

22  be green.  Does that item have any features that lead you to

23  conclude that it's an actual firearm rather than a replica?

24  A.  There's a couple.  One, the safety lever on it; two, the

25  magazine appears to have brass in it and not colored

GBE9FLO3                          Ogden – redirect

1    paintballs.  The double stacked magazine appears to have what

2    appear to be bullets in it.

3    Q.  Let's take a look at Government Exhibit 500, page 347.

4    Zoom in on entry 3109.  Take a look at that thumbnail.  What

5    does that look like to you?

6    A.  It looks like a rifle with four magazines.

7    Q.  And the magazines are on the top left of the photo?

8    A.  Yes.

9    Q.  Does that look like a replica to you?

10   A.  Based on the photo it appears to be a rifle.  I can't tell

11   much from this picture but it appears to be a real rifle.

12           MR. BOVE:  Nothing further, your Honor.

13           THE COURT:  Mr. Ogden, you're excused.  Thank you very

14   much.

15           THE WITNESS:  Thank you.

16           (Witness excused)

17           THE COURT:  Do you want to recall the witness?

18           MR. QUIGLEY:  Mr. Santos Peña, your Honor.

19           THE COURT:  Yes.

20           We'll take a short recess.

21           Don't get too comfortable in the jury room.  This will

22   be a short recess.

23           (Continued on next page)

24

25


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

GBE9FLO3                        Ogden - redirect

1                    (Jury not present)

2                    THE COURT:  Please be seated.  Take about five

3       minutes.

4                    Mr. Rody, are you ready to go?

5                    MR. RODY:  I'm getting ready, Judge.

6                    (Recess)

7                    THE DEPUTY CLERK:  All set, Mr. Rody?

8                    MR. RODY:  Yes, sure.

9                    THE COURT:  Mr. Jackson, did you want to say

10      something?

11                   MR. JACKSON:  Very briefly, your Honor.  I just wanted

12      to note that while the government early on produced to us some

13      web searches from the phone, the complete record of web

14      searching that were conducted by Mr. Ogden we do think is 3500

15      material for Mr. Ogden.  It wasn't marked as such.  I don't

16      think that that was any bad faith on the part of the government

17      but I think it was an oversight and I think it just -- I just

18      want to flag that because we may, after looking at that again,

19      have an additional application for the judge.

20                   THE COURT:  Okay.

21                   MR. JACKSON:  Thank you.

22                   THE COURT:  Marlon, go ahead.

23                   (Continued on next page)

24

25

GBE9FLO3                    Santos Peña – cross

1            (Jury present)

2      JOSE SANTOS PEÑA, resumed.

3            THE COURT:  I remind the witness, you're still under

4      oath.

5            THE WITNESS:  Yes.

6            THE COURT:  All right, Mr. Rody.

7      CROSS-EXAMINATION CONTINUED

8      BY MR. RODY:

9      Q.  Mr. Santos Peña, have you spoken to anyone from the

10     government since the end of your testimony last Thursday?

11     A.  No, sir.

12     Q.  Are you aware, sir, that prior to trial we requested to

13     meet with you and speak with you?

14     A.  Yes, sir.

15     Q.  But we were not given that opportunity, correct?

16     A.  Who are you referring to?

17     Q.  Lawyers for the defendants requested an opportunity to meet

18     with you and speak with you.  Were you aware of that?

19     A.  I don't understand your question.

20     Q.  I will try it one more time.  Are you aware that prior to

21     trial myself and the other lawyers for the defendants requested

22     to meet with you and speak with you?

23     A.  Yes, sir.

24     Q.  Yes, you are aware that we made that request?

25     A.  Yes, sir.

GBE9FLO3                      Santos Peña – cross

1   Q.  But we were denied the opportunity to have that meeting,
2   correct?
3   A.  I.
4   Q.  You didn't want to meet with us, right?
5   A.  I didn't want to.
6   Q.  Now I want to focus your attention on October 2015, okay?
7   A.  Yes, sir.
8   Q.  We talked a little bit last Thursday about the period in
9   October before you went down to Caracas.  Do you recall that?
10  A.  Yes, sir.
11  Q.  You said that you had some conversations with Agent
12  Gonzalez to help prepare you for this assignment, right?
13  A.  Yes, sir.
14  Q.  You understood that you were supposed to go down to Caracas
15  and have some conversations with the targets of Agent
16  Gonzalez's investigation, correct?
17  A.  Yes, sir.
18  Q.  And you understood that this was a sting operation
19  involving two Venezuelans, correct?
20            MR. QUIGLEY:  Objection.
21            THE COURT:  Overruled.
22            THE INTERPRETER:  I'm sorry.  Could you please repeat
23  the question.
24  Q.  You understood that this was a sting operation involving
25  two Venezuelans, correct?

1    A.  I don't understand the question.

2    Q.  Well, you've been involved in other sting operations in the

3    past, correct?

4    A.  I don't understand the word secret.

5    Q.  So this is an operation where there is a proposal about a

6    transaction, correct?

7    A.  I didn't understand.

8    Q.  Do you understand the word transaction?

9    A.  Yes, sir.

10   Q.  Do you understand that the targets of the investigation had

11   a meeting with Sentado in Honduras, right?

12   A.  Yes.  I did know.

13   Q.  And you understood that at that meeting they discussed a

14   transaction, correct?

15   A.  Yes, sir.

16   Q.  But it wasn't a real transaction, correct, because Sentado

17   was cooperating with the government, right?

18   A.  I don't know about that.

19   Q.  You know that Sentado was a cooperating witness, correct?

20   A.  Yes, sir.

21   Q.  For example, you were offering to pay the defendants

22   $20 million if they delivered drugs to Honduras, correct?

23           THE INTERPRETER:  I'm sorry.  Could you please repeat.

24   Q.  You were offering to pay the defendants $20 million if they

25   delivered drugs to Honduras, correct?

GBE9FLO3                          Santos Peña – cross

1    A.  No, sir.

2    Q.  You did not offer to pay $20 million for the delivery of

3    drugs?

4    A.  The 20 million were for a different operation in the

5    future.

6    Q.  Okay.  So you told them you would give them $11 million

7    when they showed up in Haiti, right?

8    A.  Yes, sir.

9    Q.  But you weren't really going to pay them $11 million,

10   right?

11   A.  Of course not.

12   Q.  Of course not because you were working as a confidential

13   source for the government, right?

14   A.  Yes, sir.

15   Q.  This is a sting operation, right?

16   A.  Yes.  Undercover, yes.  I understand it better that way.

17   Q.  Not a secret operation but an undercover operation.  You

18   understand that better?

19   A.  My participation was as an undercover.

20   Q.  Now I want to talk about your understanding of what the

21   proposal was before you went into the meetings in Caracas,

22   okay.

23          You understood, did you not, that what the defendants

24   had discussed with Sentado was a flight carrying 800 kilograms

25   of cocaine from Venezuela to Honduras, right?

GBE9FLO3                          Santos Peña - cross

1    A.  I didn't have precise information of what they had spoken

2    about in the meeting with Sentado.

3    Q.  Well, you spoke to Agent Gonzalez, correct?

4    A.  Yes, sir.

5    Q.  You texted with Agent Gonzalez, right?

6    A.  Yes, sir.

7    Q.  You and Agent Gonzalez and Sentado all texted together,

8    right?

9    A.  Yes, sir.

10   Q.  You also had phonecalls with Sentado, correct?

11   A.  Yes, sir.

12   Q.  So, you understood what the basic proposal for the

13   transaction was, correct?

14   A.  I was not very clear about the details for the operation.

15   My understanding about the defendants Campo and -- well, there

16   were two people.  I didn't know who they were.  Two Venezuelan

17   people were going to have -- carry out a transaction taking

18   drugs from Caracas, Venezuela to Honduras.

19   Q.  Okay.  And was it also your understanding that the

20   agreement between the defendants and Sentado was that Sentado

21   would supply the plane?

22   A.  Before leaving I knew nothing.  Before leaving for Caracas

23   I had no knowledge of any agreements that they had made with

24   Sentado.

25   Q.  Well, at some point you learned that the original proposal

1    was that Sentado would supply the planes, correct?

2              MR. QUIGLEY:  Objection.  Hearsay.

3              THE COURT:  Overruled.

4              THE WITNESS:  I don't remember that.

5    Q.  Well, you remember that Sentado reported that the

6    defendants didn't have airplanes, correct?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  I don't remember.

10             MR. RODY:  May I approach, your Honor?

11             THE COURT:  Yes, you may.

12   Q.  I'm showing you, sir, what is 3504-03, page 59.

13             Just looking generally at this -- withdrawn.

14             You had a number of communications by text message

15   with Agent Gonzalez, correct?

16   A.  Yes, sir.

17   Q.  And I want you to take a look at this line where I'm

18   indicating.  Read it to yourself.  Let me know when you've had

19   a chance to look at that.

20   A.  Yes, sir.

21   Q.  Looking at that line, does that refresh your recollection

22   that the defendants told Sentado that they didn't have

23   airplanes?

24   A.  Yes, sir.

25   Q.  And was it also your understanding initially that Sentado

GBE9FLO3                          Santos Peña – cross

1    would locate the drug supplier for the defendants?

2    A.  I didn't understand.

3    Q.  Did you also understand that the original plan was that

4    Sentado would locate the drug supplier for the defendants?

5    A.  Yes, sir.

6    Q.  Now, one of the things that you discussed with Agent

7    Gonzalez before you went to Venezuela was the role that you

8    would play when you met with the defendants, right?

9    A.  Yes, sir.

10   Q.  And you posed as a member of the Sinaloa cartel; is that

11   right?

12   A.  Yes, sir.

13   Q.  And that's the cartel that you formerly were a member of,

14   right?

15   A.  Yes, sir.

16   Q.  And you testified last week that you are still to this day

17   in contact with members of the Sinaloa cartel; is that correct?

18   A.  No, sir.

19   Q.  Okay.  You didn't testify to that last week?

20   A.  No, sir.

21   Q.  Now, in the meetings you understood that you were supposed

22   to reference the United States, correct?

23   A.  I'm sorry?

24   Q.  You didn't understand that?

25   A.  No, sir.

GBE9FLO3                         Santos Peña - cross

1   Q.  In your meetings with the defendants you understood that

2   you were supposed to reference the United States, correct?

3   A.  Yes, sir.

4   Q.  And that was something that you were doing at the direction

5   of the DEA, correct?

6   A.  Yes, sir.

7   Q.  And you've done that in other operations in the past,

8   correct?

9   A.  Yes, sir.

10  Q.  So, during the conversations with the defendants you were

11  the one who initiated the discussions about bringing drugs into

12  the United States, correct?

13  A.  No, sir.

14  Q.  You're saying that you are not the one who initiated the

15  conversations about bringing drugs into the United States?

16  A.  Yes, sir.

17  Q.  Sir, isn't it true that you're the one who brought up the

18  United States in the conversations?

19  A.  Yes, sir.

20  Q.  Now, when you first learned from Agent Gonzalez that the

21  targets of this investigation were related to the First Lady of

22  Venezuela, you were very happy about that, right?

23  A.  Yes, sir.

24  Q.  Because they were high profile targets, correct?

25  A.  I don't remember why it made me happy but I thought that it

GBE9FLO3                        Santos Peña - cross

```
 1    was an important operation.  That's all I remember.
 2    Q.  Well, when Agent Gonzalez told you who they were, you said
 3    "whoa," right?
 4    A.  It's likely.
 5    Q.  And he said:  I have a job for you.  And you said:  Those
 6    are the ones I like.  Right?
 7    A.  Yes, sir.
 8    Q.  Because you understand that if it's a high profile target
 9    that may mean more money for you, right?
10    A.  Yes, sir.
11    Q.  And that's why you were working as a confidential source,
12    correct, to make money?
13    A.  Yes, sir.
14    Q.  So you had a strong incentive, did you not, to make sure
15    that the defendants got arrested in this case, correct?
16    A.  No, sir.
17    Q.  You didn't want to see them get arrested?
18    A.  No, sir.
19    Q.  Well, you don't get paid unless your targets get arrested,
20    right?
21    A.  No, sir.
22    Q.  You know, sir, that if the cases don't go anywhere you
23    won't make as much money, correct?
24    A.  I don't know.
25    Q.  Well you know that you got paid more for successful
```

GBE9FLO3                         Santos Peña – cross

1    operations, correct?

2    A.  I don't know.  All of the ones I have worked on have been

3    successful.

4    Q.  Well as soon as this operation was over you were asking

5    Agent Gonzalez for money, correct?

6    A.  Sorry?

7    Q.  You didn't understand that question?

8    A.  I didn't understand it.

9    Q.  As soon as this operation was over you were asking Agent

10   Gonzalez for money, correct?

11   A.  Yes, sir.

12   Q.  So the money was very important to you, correct?

13   A.  Yes, sir.

14   Q.  Now, once you started meeting with the defendants in

15   Venezuela you realized that they were very inexperienced,

16   right?

17   A.  Compared to me, no.

18   Q.  Compared to you they were inexperienced, right?

19   A.  Yes, sir.

20   Q.  You discussed with Agent Gonzalez that they were young

21   guys, right?

22   A.  Yes, sir.

23   Q.  You discussed with Agent Gonzalez that they didn't really

24   know what they were doing, right?

25   A.  No, sir.  I didn't tell him that.  I don't remember that.

GBE9FLO3                          Santos Peña – cross

1    Q.   Well do you remember saying to Agent Gonzalez that you

2    thought they were new and that they lacked knowledge?

3    A.   That they were new, I remember that.

4    Q.   And that they lacked knowledge too, correct?

5    A.   Compared to me.

6    Q.   Well that's not what you said to Agent Gonzalez, right?

7    A.   That's what I remember.

8    Q.   Didn't you just say to Agent Gonzalez:  I think they're new

9    because of their lack of knowledge?

10   A.   I remember having told him that they were new.  I do

11   remember that.

12           MR. RODY:  May I approach, your Honor?

13           THE COURT:  Yes, you may.

14   Q.   Let me direct you to page 76.

15           Let me direct you to these two lines.  Read those to

16   yourself.

17           THE COURT:  Mr. Rody, what's the exhibit?

18           MR. RODY:  I'm sorry, Judge.  It is 3504-03.

19           THE WITNESS:  Yes, sir.

20   Q.   Having looked at that, does that refresh your recollection

21   that you told Gonzalez that the defendants were new and that's

22   what you thought because of their lack of knowledge.

23   A.   Let me read it again.

24           Yes, sir.

25   Q.   And you saw that they lacked knowledge when you talked with

1  them, right?

2  A.  Compared to me.

3  Q.  Okay.  You keep saying that.  But you didn't say compared

4  to me when you were discussing this with Agent Gonzalez, right?

5  A.  Agent Gonzalez, he understood.  He must have understood

6  because he didn't ask me.

7  Q.  When you met with the defendants, you saw that they were

8  very inexperienced, right?

9  A.  I repeat again:  Compared with me.

10         MR. RODY:  Could we, Mr. Calabrese, take a look,

11  please, at Government Exhibit 206-T, page eight.

12         Before we bring that up, do you remember,

13  Mr. Santos Peña, having discussions with the defendants about

14  the bajada, the unloading of the drugs in Honduras.

15  A.  Yes, sir.

16         MR. RODY:  Could we see the exhibit, please,

17  Mr. Calabrese.

18  Q.  So, if you take a look at line 9, for example.

19         Mr. Campo was saying to you, "So that was important to

20  me, to confirm the price of the, of, what's it called?  Of

21  landing and unloading.  That was another point on here that is

22  ready."

23         Do you see that?

24         THE INTERPRETER:  The interpreter requests a copy of

25  the transcript, please.

GBE9FLO3                         Santos Peña – cross

 1              THE COURT:  I have a copy.  I will give it to you.

 2              THE INTERPRETER:  Please tell me what line.

 3              MR. RODY:  Line 9.

 4              THE COURT:  Page 8, line 9.

 5              THE WITNESS:  Yes, sir.

 6   Q.  And then you see below that you say to him, "Yes, I'm going

 7   to explain this piece regarding the landing and unloading, so

 8   you can see what it means to land and unload, the costs, what

 9   Sentado told you is dead on, because for us it's the same for

10   one, for a hundred, for five hundred or for five thousand."

11   A.  Yes, sir.

12   Q.  So, what you were explaining to him there was it was the

13   same price to unload the plane whether it was a hundred kilos

14   or a lot more, right?

15   A.  Yes, sir.

16   Q.  And this was something they didn't know, correct?

17   A.  I don't know.

18   Q.  Well you had to explain it to them, right?

19   A.  Because of the costs.

20   Q.  Okay.  And you had to explain about the costs to them,

21   right?

22   A.  Sentado had already explained that point to them.  He, he,

23   Mr. Campo, told me.

24   Q.  Mr. Campo didn't understand it, right?

25              MR. QUIGLEY:  Objection.

1            THE COURT:  Overruled.

2            THE WITNESS:  Please repeat.

3   Q.  Mr. Campo didn't understand it, right?

4   A.  He understood it.

5   Q.  He understood it after you explained it to him, right?

6   A.  I don't know.

7            THE COURT:  Mr. Rody, would this be a convenient place

8   to break for lunch?

9            MR. RODY:  It sure is, Judge.  Thanks.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBE9FLO3                        Santos Peña - cross

```
 1                 (Jury not present)

 2                 THE COURT:  Okay.

 3                 MR. QUIGLEY:  Two things.

 4                 THE COURT:  Yes.  Please sit down.

 5                 MR. QUIGLEY:  Number one.  Just to amplify our basis

 6     for our most recent objection which I know was overruled but

 7     it's going to come up again, I have a feeling.  I don't think

 8     it's appropriate to ask the witness what Mr. Campo understood.

 9     He's not Mr. Campo.  He can be asked -- he doesn't know what's

10     in Mr. Campo's head.

11                 Number two.  I think some of the questions regarding

12     what Sentado said or what the defendants said are getting close

13     to trying to introduce Sentado's statements for the truth of

14     the matter asserted which was one of the subjects of our motion

15     in limine.

16                 THE COURT:  I suggest you make your objections as we

17     go along and I'll rule on them.

18                 MR. QUIGLEY:  Understood, your Honor.  Thank you.

19                 THE COURT:  See you at two o'clock.

20                 (Luncheon recess)

21

22

23

24

25
```

```
 1                  A F T E R N O O N   S E S S I O N

 2                          2:00 p.m.

 3              (Jury present)

 4              THE COURT:  All right, Mr. Rody.

 5              MR. RODY:  Thank you, your Honor.

 6              THE COURT:  You are welcome.

 7   BY MR. RODY:

 8   Q.  Mr. Santos Peña, after you started meeting with the

 9   defendants you found it very easy for you to get them to do

10   what you wanted, correct?

11   A.  Not very easy.  We were discussing a few things until we

12   reached an agreement.

13   Q.  Right, but the agreement was on your terms, correct?

14   A.  No, sir.

15   Q.  Well, you got them to agree to fly to Haiti, right?

16   A.  They had previously already gone to Haiti.

17              I'm sorry, I was getting confused.  They had

18   previously already flown to Honduras.  Haiti, yes, you're

19   right, I made them go to Haiti.

20   Q.  Right; you made them go to Haiti because you told them they

21   were going to receive millions of dollars if they went to

22   Haiti, right?

23   A.  That's what they wanted.

24   Q.  Right; that's what you told them you were going to give

25   them, right?
```

GBE9FLO3                          Santos Peña – cross

1    A.   $11 million.

2    Q.   Right; and you said they didn't have to show up with any

3    drugs, right?

4    A.   No, no.  I don't understand that.

5    Q.   You don't understand that?

6    A.   No, sir.

7    Q.   You told them if they went to Haiti you would give them $11

8    million, right?

9    A.   Yes, sir.

10   Q.   But they didn't have to give you anything in Haiti, right?

11   A.   No, sir.

12   Q.   Right.  And you and Agent Gonzalez had a bet about whether

13   you could actually get them to go to Haiti, right?

14   A.   I proposed it.  I said that I was going to get that.

15   Q.   And you and Agent Gonzalez had a bet about it, right?

16   A.   I proposed the bet.

17   Q.   You were joking with Agent Gonzalez about the defendants,

18   right?

19   A.   On occasions.

20   Q.   Right, because with respect to Haiti, Agent Gonzalez didn't

21   think you would actually be able to get them to travel to

22   Haiti, right?

23   A.   I'm not sure about that.

24   Q.   When you were a member of the Sinaloa Cartel the bosses

25   never traveled anywhere to pick up money without delivering

GBE9FLO3                        Santos Peña – cross

1    drugs, did they?

2    A.  I don't understand that question.

3    Q.  When you were a member of the Sinaloa Cartel, the bosses

4    never traveled anywhere to pick up money without delivering any

5    drugs?

6    A.  Not always.

7    Q.  Matter of fact, the bosses never traveled anywhere to pick

8    up money or deliver drugs, right?

9    A.  Money?  Yes.

10   Q.  Say that again?  What was the translation?

11   A.  Money?  Yes.  Drugs, no.

12   Q.  So, in your experience, in the Sinaloa Cartel, the bosses

13   of the cartel flew to pick up money?  That's your testimony?

14   A.  Yes, sir.

15   Q.  And did you ever fly anywhere for the Sinaloa Cartel to

16   pick up millions of dollars?

17   A.  I don't understand the question.

18   Q.  You said that you and Gonzalez at times made fun of the

19   defendants, right?

20   A.  Who did I say that?

21   Q.  You just said that a few minutes ago here, didn't you?

22   A.  Joking.

23   Q.  Right.

24         You and Gonzalez joked that you had them eating out of

25   your hand, right?

GBE9FLO3                          Santos Peña - cross

1   A.  I was the one who was joking, not Agent Gonzalez.

2   Q.  Okay.

3       But you were joking that you had the defendants eating

4   out of your hand, right?

5   A.  Yes, sir.

6   Q.  You said that you had the defendants bent over, right?

7   A.  I don't remember that word.

8       MR. RODY:  May I approach, your Honor?

9       THE COURT:  Yes, you may.

10  Q.  Directing you to page 76, 3504-03.  Isn't it true that you

11  told Agent Gonzalez that you had the defendant bent over for

12  you?

13      INTERPRETER:  Interpreter's question:  Do you want the

14  interpreter to say exactly what the transcript says?

15      MR. RODY:  I want you to translate what I said.

16  A.  Yes, sir.

17  Q.  In fact, you thought the defendants were so easy for you to

18  manipulate that you asked Gonzalez to give you a more difficult

19  case, right?

20  A.  Probably.  It was a joke for me.

21  Q.  Like you said like one of those cases for spiderman, right?

22  A.  Yes, sir.

23  Q.  You asked Gonzalez:  Or is it that you and I are the shit?

24  A.  I don't understand that.

25      MR. RODY:  May I approach, your Honor?

GBE9FLO3                           Santos Peña – cross

1              THE COURT:  You may.

2    Q.  Page 204.  Take a look at this line, read that to yourself.

3    A.  Yes, sir.

4    Q.  Does that refresh your recollection that you asked

5    Gonzalez:  Or is it that you and I are the shit?

6    A.  Yes, sir.

7    Q.  And Agent Gonzalez responded that nobody escapes us, right?

8    A.  Yes, sir.

9    Q.  You thought that you and Gonzalez were a great team, right?

10   A.  Yes, sir.

11   Q.  And you were friends with Gonzalez, right?

12   A.  Friends?  No.

13   Q.  Well, you were close with him, right?

14   A.  Yes, sir.  I worked for him.

15   Q.  Right, you wished each other a Happy Thanksgiving, right?

16   A.  Yes, sir.

17   Q.  And Merry Christmas?

18   A.  Yes, sir.

19   Q.  And a Happy New Year?

20   A.  Yes, sir.

21   Q.  Now, when you were working as a confidential source -- a

22   paid confidential source, you were playing a role, correct?

23   A.  Yes, sir.

24   Q.  You were posing as a drug dealer, right?

25   A.  Yes, sir.

GBE9FLO3                        Santos Peña – cross

1    Q.  You were obviously very familiar with that role, correct?

2    A.  Yes, sir.

3    Q.  From your years of having been a drug dealer, right?

4    A.  Yes, sir.

5    Q.  Now, when you are a drug dealer you can't go around telling

6    people what you actually do for a living, right?

7    A.  No, sir.

8    Q.  You have to hide what you are doing, right?

9    A.  On occasions.

10   Q.  Well, you can't go tell the police that you're a drug

11   dealer, right?

12   A.  No, sir.  It depends.

13   Q.  Okay.  Well, forget about your years in Mexico.  How about

14   when you were in the United States?

15   A.  I wouldn't tell them.  If it was illegal, I couldn't tell

16   them.

17   Q.  Right.

18           You couldn't tell the tax authorities you were a drug

19   dealer, correct?

20   A.  Yes, sir.

21   Q.  You couldn't tell your bank that you were a drug dealer,

22   right?

23   A.  No, sir.

24   Q.  But you had conversations with your bankers, right?

25   A.  My personal accounts?

1    Q.   Yes.

2    A.   Yes, sir.

3    Q.   And you didn't tell them you were a drug dealer, right?

4    A.   No, sir.

5    Q.   So you lied to them, right?

6    A.   I don't know.

7    Q.   Well, you deceived people about how and where and why you

8    made your money, right?

9    A.   Yes, sir.

10   Q.   Now, when you're a confidential source you also have to

11   deceive people, correct?

12   A.   Yes, sir.

13   Q.   You can't tell people you are meeting with that you are a

14   confidential informant, right?

15   A.   Yes, sir.

16   Q.   You said that you've been successful in every case you did

17   as an informant; is that right?

18   A.   Yes, sir.

19   Q.   So you were able to fool all those other drug dealers,

20   right?

21   A.   Yes, sir.

22   Q.   None of them figured out that you were actually a

23   confidential source, right?

24   A.   No, sir.

25   Q.   So you have become very skilled at deceiving people,

GBE9FLO3                    Santos Peña – cross

1    correct?

2              MR. QUIGLEY:  Objection.

3              THE COURT:  Overruled.

4              Answer the question.

5              THE WITNESS:  The experience allowed me to do that.

6    BY MR. RODY:

7    Q.  Right.  You have become very skilled at deceiving people,

8    correct?

9    A.  Yes, sir.

10   Q.  And you have also become very skilled at manipulating

11   people, correct?

12   A.  I don't know.

13   Q.  Well, when you meet with drug targets you are able to get

14   them to do what you want them to do, right?

15   A.  I try.

16   Q.  And you're always successful, right?

17   A.  In the end?  Yes.

18   Q.  And when you are successful in the end you get paid, right?

19   A.  Yes, sir.

20   Q.  Now, can we go back to something we talked about yesterday

21   life-

22             THE COURT:  Thursday.

23   Q.  Withdrawn; something we talked about on Thursday.

24             When you were arrested in Mexico in 2000.  Do you

25   recall that?

GBE9FLO3                    Santos Peña – cross

1    A.  Yes, sir.

2    Q.  And you said after that you were in house arrest.  Do you

3    recall that?

4    A.  Yes, sir.

5    Q.  But really you were in protective custody of the Mexican

6    government, right?

7    A.  Yes, sir.

8    Q.  You weren't in jail?

9    A.  No, sir.

10   Q.  And isn't it true that over those three years, with the

11   financial support of the Mexican government, you were able to

12   pay off all your debts?

13   A.  Yes, sir.

14   Q.  Paid off your car, right?

15   A.  The car?  No.

16   Q.  You didn't pay off your car?

17   A.  No, sir.

18   Q.  Didn't you tell the government that you paid off your car?

19   A.  No, sir.

20   Q.  You paid off your house, right?

21   A.  Yes, sir.

22   Q.  And your testimony is that you did not tell the government

23   you paid off your car?

24   A.  Which government?

25   Q.  The U.S. government.

1  A.  I don't remember.

2  Q.  You don't remember whether you told the U.S. government

3  that you paid off your car mortgage with the money you got from

4  the Mexican government?

5  A.  I don't remember.

6  Q.  Mr. Santos Peña, regardless whether you remember telling

7  the government, isn't it true that you did pay off your car

8  with the money you got from the Mexican government?

9  A.  Not the car.  I don't remember.  The house?  Yes.

10  Q.  Now, you came to the United States in 2003, correct?

11  A.  Yes, sir.

12  Q.  And did you go to jail then?

13  A.  No, sir.

14  Q.  You stayed out?

15  A.  Out where?

16  Q.  Out free; out of jail?

17  A.  Yes, sir.

18  Q.  And you spoke periodically with DEA agents, correct?

19  A.  Yes, sir.

20  Q.  And in the end of 2007 the DEA signed you up to a

21  confidential source agreement, correct?

22  A.  Yes, sir.

23  Q.  And the confidential source agreement -- withdrawn.

24          And ever since 2007 you have signed one of those

25  agreements every year, correct?

GBE9FLO3                        Santos Peña - cross

1    A.  Yes, sir.

2    Q.  So every year between 2007 and 2016, correct?

3    A.  Yes, sir.

4    Q.  And isn't it true that the DEA signed you up to another

5    confidential source agreement in 2016 even after they found out

6    that you had been lying to them for years?

7    A.  I don't remember.

8              MR. RODY:  May I approach, your Honor?

9              THE COURT:  Yes, you may.

10             MR. RODY:  3504-20, your Honor.

11   Q.  Take a look at this first document, including this page and

12   let me know if this refreshes your recollection that the DEA

13   signed you up to a confidential source agreement in June of

14   2016.

15   A.  Yes, sir.

16   Q.  And they did, right?

17   A.  Yes, sir.

18   Q.  And that was after the DEA confronted you with the fact

19   that you had been lying to them for years, right?

20   A.  Yes, sir.

21   Q.  You had been selling drugs for years, right?

22   A.  Yes, sir.

23   Q.  You had been cheating on your taxes for years, right?

24   A.  Yes, sir.

25   Q.  You had been laundering money for years, correct?

GBE9FLO3                          Santos Peña – cross

1   A.  I don't understand the word laundering.

2   Q.  You don't know what money laundering is?

3   A.  No, sir.

4   Q.  You saved money from the illegal drug deals you did, right?

5   A.  Yes, sir.

6   Q.  You conducted financial transactions with that money,

7   right?

8   A.  Yes, sir.

9   Q.  You didn't tell anybody the true nature and source of those

10  funds, correct?

11  A.  No, sir.

12  Q.  Well, you purchased a house in part with drug money, right?

13  A.  No, sir.

14  Q.  You paid your rent with drug money?

15  A.  Yes, sir.

16  Q.  You purchased cars with money?

17  A.  Yes, sir.

18  Q.  You transferred drug money to other people, correct?

19  A.  No, sir.

20  Q.  You never transferred any money to relatives?

21  A.  Yes, sir.

22  Q.  Part of that was drug money, right?

23  A.  No, sir.

24  Q.  You never transferred the drug money to your family

25  members; that's your testimony?

GBE9FLO3                          Santos Peña – cross

1    A.  Yes, sir.

2    Q.  And you also were using drugs for years, correct?

3    A.  Yes, sir.

4    Q.  And all of that was in violation of your confidential

5    source agreements, correct?

6    A.  Yes, sir.

7    Q.  Now, in addition to deceiving all the drug targets that you

8    met with, you also deceived the DEA, right?

9    A.  Yes, sir.

10   Q.  They never figured out that you were selling drugs on the

11   side, correct?

12   A.  I don't know.

13   Q.  Well, you didn't get arrested until the Sommer of 2016,

14   right?

15   A.  Yes, sir.

16   Q.  And the first time the DEA ever confronted you about your

17   illegal drug dealing was at the end of June 2016, right?

18   A.  Yes, sir.

19   Q.  Now, before that, before the DEA confronted you, did you

20   have periodic reviews with DEA agents?

21   A.  Yes, sir.

22   Q.  With DEA agents who were your handlers?

23   A.  Yes, sir.

24   Q.  Did you have any of those periodic reviews with Agent

25   Gonzalez?

1   A.  Yes.

2   Q.  Did you have them with any other agents?

3   A.  Yes, sir.

4   Q.  Who?

5   A.  With Special Agent Mahoney.

6   Q.  Did you meet with either Agent Gonzalez or Agent Mahoney at

7   least four times a year?

8   A.  Yes, sir.

9   Q.  And they asked you questions about what you were doing,

10  correct?

11  A.  Yes, sir.

12  Q.  They asked you questions about what you were doing to make

13  a living, right?

14  A.  Yes, sir.

15  Q.  And you lied to them, right?

16  A.  Yes, sir.

17  Q.  You lied in their faces, right?

18  A.  Yes, sir.

19  Q.  And they couldn't tell, right?

20  A.  Later on they realized it.

21  Q.  After many years, right?

22  A.  I imagine.

23  Q.  Now, when the DEA first confronted you in late June, you

24  lied to them even then, right?

25  A.  Yes, sir.

GBE9FLO3                         Santos Peña – cross

1    Q.  You did not tell them about all the drugs you had been

2    selling over the previous years, right?

3    A.  Yes, sir.

4    Q.  Let's talk about what you were doing in the years before

5    2016.

6    A.  Yes, sir.

7    Q.  You were involved in several cocaine deals with someone

8    named Javi, is that right?

9    A.  Yes, sir.

10   Q.  And this was in 2016, correct?

11   A.  Yes, sir.

12   Q.  At one point you got three kilograms of from him in L.A.?

13   A.  Yes, sir.

14   Q.  At another point you got two to four kilograms of cocaine

15   from him in Pomona, California?

16   A.  Yes, sir.

17   Q.  Now, when you got those drugs you went with at least two

18   other people, right?

19   A.  Yes, sir.

20   Q.  One of them was this fellow Paul, right?

21   A.  Yes, sir.

22   Q.  That's the same Paul that you went down to Caracas with in

23   the fall of 2015, correct?

24   A.  Yes, sir.

25   Q.  This was your son's friend, correct?

1  A.  Yes, sir.

2  Q.  This fellow from Los Mochis, right?

3  A.  Yes, sir.

4  Q.  And, in addition, when you went to pick up to the two to

5  four kilos from Javi, you also went with someone named Cesar?

6  A.  Yes, sir.

7  Q.  And so these were people that you were involved in drug

8  deals with out in California in 2016, correct?

9  A.  Yes, sir.

10 Q.  There was another few kilos that you picked up for Javi

11 with Paul, correct?

12 A.  Yes, sir.

13 Q.  And there were many other cocaine deals that you brokered

14 or attempted to broker, correct?

15 A.  Yes, sir.

16 Q.  Going back to 2012, right?

17 A.  Yes, sir.

18 Q.  And the totals involved in these deals was hundreds and

19 thousands of kilograms, correct?

20 A.  Not thousands.  Hundreds, yes.

21 Q.  In addition to cocaine you were also involved in importing

22 and distributing other drugs, too, right?

23 A.  Yes, sir.

24 Q.  You did a couple of deals for heroin with someone named

25 Joaquin, right?

GBE9FLO3                          Santos Peña – cross

1  A.  Yes, sir.

2  Q.  You imported, each time, a couple of kilograms of heroin,

3  right?

4  A.  Yes, sir.

5  Q.  And heroin you can sell in the United States for, what?

6  More than $60,000 per kilogram?

7  A.  Depending on the place.

8  Q.  Well, the deals that you did, you were getting good quality

9  heroin, right?

10 A.  No, sir.

11 Q.  It was bad heroin?

12 A.  Yes, sir.

13 Q.  You still sold it, right?

14 A.  Not me personally, another person.

15 Q.  You imported it into the United States, right?

16 A.  I didn't, other people did.  I helped them.

17 Q.  And you received it, right?

18 A.  Yes, sir.

19 Q.  You also did deals for 20 pounds of crystal meth with

20 Joaquin; is that right?

21 A.  Yes, sir.

22        MR. RODY:  One moment, Judge?

23        (pause)

24 Q.  Now, your son participated in these illegal drug deals with

25 you, correct?

GBE9FLO3                          Santos Peña - cross

1    A.  In part.

2    Q.  Well, your son is -- withdrawn.

3           Your son was a confidential source for the DEA like

4    you, right?

5    A.  Yes, sir.

6    Q.  And he got arrested, like you, for lying to the DEA, right?

7    A.  Yes, sir.

8    Q.  And because you both had been selling drugs illegally

9    without the authorization of the DEA, right?

10   A.  Yes, sir.

11   Q.  And you were doing that together, right?

12   A.  Yes, sir.

13   Q.  Now, because of all the lies that you told to the

14   government, the government made you plead guilty to a count for

15   lying, right?

16   A.  That was my decision.

17          MR. RODY:  One moment, Judge?

18          (pause)

19   Q.  Sir, you say it was your decision.  The government

20   presented you with a plea offer, right?

21   A.  Yes, sir.

22   Q.  It had three counts, right?

23   A.  Yes, sir.

24   Q.  Importing drugs into the United States, right?

25   A.  Yes, sir.

GBE9FLO3                          Santos Peña – cross

1   Q.  Distributing drugs in the United States, right?

2   A.  Yes, sir.

3   Q.  And lying to the government, right?

4   A.  Yes, sir.

5   Q.  And if you would not have agreed to the third count you

6   would not have been permitted to plead guilty, right?

7             MR. QUIGLEY:  Objection.

8             THE COURT:  Overruled.

9   A.  I don't know.

10  Q.  In other words, if you wanted to be a cooperating witness

11  you had to plead guilty to that count, right?

12            MR. QUIGLEY:  Objection.

13            THE COURT:  Overruled.

14  A.  I didn't understand the question.

15  Q.  If you wanted to become a -- withdrawn.

16            You are a cooperating witness, right?

17  A.  Not at this moment.

18  Q.  Well, you've pled guilty, right?

19  A.  Yes, sir.

20  Q.  You haven't been sentenced yet, right?

21  A.  No, sir.

22  Q.  You're providing assistance to the government, correct?

23  A.  I have an agreement with them.

24  Q.  Right.

25            You are hoping to get a reduced sentence when you do

1  get sentenced, right?

2  A.  Yes, sir.

3          MR. RODY:  One moment, Judge.  I apologize.

4          (pause)

5  Q.  So, you would not have been permitted to plead guilty if

6  you had not pled guilty to the third count, correct?

7  A.  I don't understand the question.

8  Q.  The government charged you with lying to the government,

9  right?

10  A.  Yes, sir.

11  Q.  And they said if you want to be a cooperating witness you

12  have to plead guilty to that count, right?

13  A.  No, sir.

14  Q.  So, did you suggest it to the government?

15  A.  No, sir.

16  Q.  They told you these are the charges, right?

17  A.  Yes, sir.

18  Q.  Do you recall that during your guilty plea the Judge asked

19  you about the charge of lying to the government?

20  A.  Yes, sir.

21  Q.  He asked you what you did that made you guilty of that

22  charge, right?

23  A.  Yes, sir.

24  Q.  And do you remember telling the Judge that you hid

25  information from the DEA about the crimes that you were

GBE9FLO3                          Santos Peña – cross

1    committing?

2    A.   Yes, sir.

3    Q.   Then do you remember the Judge asked you what types of

4    information you did not tell the DEA?

5    A.   Yes, sir.

6    Q.   And, do you remember responding to the Judge that what you

7    did not tell the DEA was that you were trying to introduce

8    drugs into the United States and trying to distribute drugs

9    within the United States?

10            INTERPRETER:  I'm sorry.  Can you repeat the question?

11   Q.   Sure.

12            Do you remember telling the Judge that what you failed

13   to tell the DEA was that you were trying to introduce drugs

14   into the United States and that you were trying to distribute

15   drugs within the United States?

16   A.   Yes, sir.

17   Q.   But that wasn't all the information that you were hiding

18   from the DEA, right?

19   A.   I had lied to them.

20   Q.   Yes, you had.

21            But, when you said to the Judge that you only lied

22   about drug dealing, that wasn't all the information you hit

23   from the DEA, right?

24            MR. QUIGLEY:  Objection.

25            THE COURT:  Overruled.

GBE9FLO3                    Santos Peña – cross

1                MR. RODY:  You can answer.

2                THE COURT:  You can answer.

3                INTERPRETER:  Can you please repeat the question?

4    BY MR. RODY:

5    Q.  When you told the Judge that you hid information about drug

6    dealing, that was not all the information you hid from the DEA,

7    right?

8    A.  No, sir.

9    Q.  You didn't tell the DEA that you were using drugs, correct?

10   A.  No, sir.

11   Q.  You didn't tell the DEA that you were not paying your

12   taxes, right?

13   A.  No, sir.

14   Q.  You didn't tell the DEA that you were conducting financial

15   transactions with drug money, correct?

16   A.  No, sir.

17   Q.  So, you lied to the Judge when you pled guilty to lying;

18   isn't that right?

19               MR. QUIGLEY:  Objection.

20               THE COURT:  Sustained.

21   Q.  Now, since 2012 have you served as a source of information

22   for the DEA to get search warrants?

23   A.  I don't understand the question.  Search I don't

24   understand.

25   Q.  Just a yes or no question.  Do you know whether the DEA has

GBE9FLO3                         Santos Peña – cross

1    gotten search warrants, based on your information, in the last

2    four or five years?

3    A.  I don't know.

4    Q.  Did you ever get paid for information that you gave to the

5    DEA that enabled them to get a search warrant?

6    A.  I don't know.

7    Q.  How about for local law enforcement in California?

8    A.  Not for searches.  For information?  Yes.

9    Q.  Now, you have testified close to 20 times in court,

10   correct?

11   A.  In the United States?

12   Q.  Well, you tell me.

13   A.  Where?

14   Q.  You have testified approximately 20 times in your life,

15   right?

16   A.  Yes, sir.

17   Q.  And have some of those times been in the United States?

18   A.  Yes, sir.

19   Q.  About how many times have you testified in the United

20   States?

21   A.  Twice.

22   Q.  And this is the second time?

23   A.  No.  Second case.

24   Q.  Okay, well how many times have you -- okay.  Withdrawn.

25          So you have testified in the United States in two

1  different cases?

2  A.  Yes, sir.

3  Q.  And the other time was in Virginia in 2013?

4  A.  Yes, sir.

5  Q.  And in 2013, that's the period when you were selling drugs

6  illegally in the U.S., right?

7  A.  No, sir.

8  Q.  You were not selling drugs illegally in 2013?

9  A.  I was doing illegal drug deals but I was not selling drugs

10  in the United States.

11  Q.  Okay.

12        So, you were conducting illegal drug deals in the

13  United States in 2013, right?

14  A.  Yes, sir.

15  Q.  And you never told the DEA that before you testified in

16  Virginia in 2013, right?

17  A.  No, sir.

18  Q.  You didn't tell the prosecutors that in that case, right?

19  A.  No, sir.

20  Q.  You testified in that courtroom, under oath; right?

21  A.  Yes, sir.

22  Q.  The same oath you took here in this courtroom, right?

23  A.  Yes, sir.

24  Q.  And you lied to everybody in the courtroom, right?

25  A.  Regarding that topic?  We didn't touch on it.  I testified

1    the truth regarding the case.

2    Q.  Well, no, you didn't, because you didn't tell everybody in

3    the courtroom that you were still dealing drugs illegally,

4    right?

5    A.  No, sir.

6    Q.  So, the jury that you were testifying before had an

7    inaccurate view of your criminal history, right?

8    A.  No, sir.

9    Q.  Well, the jury had a false view of your credibility, right?

10   A.  I can't answer that.

11   Q.  You hadn't revealed to them that you were committing

12   crimes, right?

13   A.  No, sir.

14   Q.  So, they had a false view of your credibility, right?

15   A.  Yes, sir.

16   Q.  And when you failed to reveal that you were still

17   committing crimes at that trial that was perjury, right?

18            MR. QUIGLEY:  Objection.

19            THE COURT:  Sustained.

20   Q.  Have you been required by the government to plead guilty to

21   a count of perjury?

22   A.  I didn't know that name, perjury.

23   Q.  You don't know that perjury is when you lie under oath?

24   A.  I didn't know.

25   Q.  But you were not required to plead guilty to a count for

GBE9FLO3                         Santos Peña – cross

1   perjury related to the 2013 trial, right?

2   A.  No, sir.

3   Q.  The government cut you a break on that?

4           MR. QUIGLEY:  Objection.

5           THE COURT:  Sustained.

6   Q.  Now, even after the DEA confronted you in June of 2016 they

7   let you go home that day, right?

8   A.  Yes, sir.

9   Q.  They let you and your son travel practice home, correct?

10  A.  Yes, sir.

11  Q.  And they signed you up to another confidential source

12  agreement, right?

13  A.  Yes, sir.

14  Q.  Matter of fact, they did that the very day they confronted

15  you, right?

16  A.  Yes, sir.

17  Q.  And, after you flew home, you had conversations with

18  Gonzalez about the fact that you had been confronted, correct?

19  A.  Yes, sir.

20  Q.  And he tried to comfort you, right?

21  A.  Yes, sir.

22  Q.  He told you don't worry, right?

23  A.  Yes, sir.

24  Q.  He told you that the prosecutor was angry but he got over

25  it, right?

GBE9FLO3                           Santos Peña – cross

1    A.  Yes, sir.

2    Q.  And you said, yes, that's good.  Right?

3    A.  Yes, sir.

4    Q.  And do you recall that you said to Gonzalez:  We have to

5    organize that thing with the nephew very well so that he

6    forgives us?

7    A.  I don't remember those exact words.

8            MR. RODY:  May I approach, your Honor?

9            THE COURT:  Yes, you may.

10            MR. RODY:  Page 207, your Honor, 3504-03.

11            THE COURT:  What page?

12            MR. RODY:  207, your Honor.

13            THE COURT:  Thank you.

14    BY MR. RODY:

15    Q.  Take a look at that, read that to yourself, let me know

16    when you have read it.

17    A.  Yes, sir.

18    Q.  You have had a chance to look at that?

19    A.  Yes, sir.

20    Q.  Does that refresh your recollection that you told Gonzalez,

21    we have to organize that thing with the nephew very well so

22    that he forgives us?

23    A.  Yes, sir.

24    Q.  And when you said "so that he forgives us" you were talking

25    about the prosecutor, right?

GBE9FLO3                          Santos Peña – cross

1   A.  Yes, sir.

2   Q.  And then you said:  And so that he doesn't scold at us

3   again.

4           Right?

5   A.  Yes, sir.

6   Q.  And again, you were talking about the prosecutor, right?

7   A.  Yes, sir.

8   Q.  And you said:  Count on me.

9           Right?

10  A.  Yes, sir.

11  Q.  And Agent Gonzalez sent you the thumbs up emoticon, right?

12          INTERPRETER:  The what?

13  Q.  The thumbs up emoticon, right?

14  A.  Yes, sir.

15  Q.  And what you were talking about there with Agent Gonzalez

16  was this case, right?

17  A.  Yes, sir.

18  Q.  When you said the nephew, you were talking about the

19  defendants, right?

20  A.  Yes, sir.

21  Q.  And you were saying to Agent Gonzalez that you needed to

22  get your story straight, right?

23  A.  Yes, sir.

24  Q.  Do you recall that you were arrested by the DEA on August

25  3rd, 2016?

1    A.  Yes, sir.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GBE9FLO5                          Santos Peña – cross

1    Q.  And then you went to jail, right?

2    A.  Yes, sir.

3    Q.  And was that the first time that you spent more than a day

4    in jail in your life?

5    A.  Yes, sir.

6    Q.  And your son went to jail also, right?

7    A.  Yes, sir.

8    Q.  But the government allowed you to attempt to become a

9    cooperating witness, right?

10   A.  I don't understand your question.

11   Q.  The government allowed you to proffer?  Do you know that

12   term?

13   A.  No, sir.

14   Q.  Do you recall signing an agreement with the government that

15   gave you certain protections in your meeting with the

16   government?

17   A.  What kind of protection?

18   Q.  Protection for things you said in your meetings with the

19   government.

20   A.  I don't understand the question.

21          MR. RODY:  May I approach, your Honor?

22          THE COURT:  Yes, you may.

23   Q.  Showing you what's marked for identification as 3504-17.

24   Take a look at this document.  Let me know if that refreshes

25   your recollection?

GBE9FLO5                          Santos Peña – cross

1    A.  Yes, sir.

2    Q.  And does that refresh your recollection that you signed an

3    agreement with the government that concerned your meetings with

4    the government?

5    A.  Yes, sir.

6    Q.  That's called a proffer agreement, right?

7    A.  Okay.

8    Q.  And you held a number of proffers with the government

9    before you signed your cooperation agreement, right?

10   A.  Yes, sir.

11   Q.  And during those proffer meetings the government

12   prosecutors and DEA agents asked you a bunch of questions,

13   right?

14   A.  Yes, sir.

15   Q.  And you had several meetings with the government like that,

16   right?

17   A.  Yes, sir.

18          MR. RODY:  May I approach, your Honor?

19          THE COURT:  Yes, you may.

20   Q.  Do you recall that the first of those meetings was on

21   August 10, 2016?

22   A.  I don't remember exactly.

23   Q.  I'm going to point to this line and ask the translator to

24   translate the first paragraph.

25   A.  Yes, sir.

GBE9FLO5                         Santos Peña – cross

1   Q.  So your first meeting with the government under the proffer

2   agreement was August 10, 2016?

3   A.  Yes, sir.

4   Q.  And you also had meetings with them on August 18 and

5   August 31 and September 1, right?

6   A.  Yes, sir.

7   Q.  And you pled guilty on September 1, right?

8   A.  Yes, sir.

9   Q.  And in all those meetings the government told you that you

10  had to tell the truth, right?

11  A.  Yes, sir.

12  Q.  And they told you that you could not commit anymore crimes,

13  right?

14  A.  Correct.

15  Q.  And they said that if you signed the agreement and they

16  found out that you had violated it, the agreement would get

17  ripped up, right?

18  A.  Yes, sir.

19  Q.  And you understand that lying is a violation of the

20  agreement, right?

21  A.  Yes, sir.

22  Q.  And committing additional crimes is a violation of the

23  agreement, right?

24  A.  Yes, sir.

25  Q.  And if the agreement gets ripped up you won't be allowed to

GBE9FLO5                         Santos Peña – cross

1   withdraw your guilty plea, correct?

2   A.   Correct.  Yes, sir.

3   Q.   And you'll face a minimum of ten years in prison, right?

4   A.   Yes, sir.

5   Q.   With a maximum of life, right?

6   A.   Yes, sir.

7   Q.   But you're hoping to do better than that, right?

8   A.   Yes, sir.

9   Q.   You hope to get time served, right?

10  A.   Yes, sir.

11  Q.   And you could get time served, right?

12  A.   I don't know.

13  Q.   Well you know that if the government writes the 5K letter

14  for you the judge can sentence you to whatever the judge wants

15  to, right?

16  A.   Yes, sir.

17  Q.   You said on direct examination that that could be as low as

18  time served, right?

19  A.   That's what I would like.

20  Q.   That's what you think you're going to get, right?

21  A.   No, sir.  That I don't know.  That's up to the judge.

22           MR. RODY:  No further questions, Judge.

23           Thanks.

24           THE COURT:  Mr. Jackson.

25           MR. JACKSON:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. JACKSON:

3    Q.  Good afternoon, sir.

4    A.  Good afternoon.

5    Q.  Now, sir, may I ask you how much money you have made in

6    connection with your work for the DEA?

7    A.  About $750,000.

8    Q.  May I ask you how much money you have made in total from

9    your work on behalf of law enforcement?

10   A.  One million dollars.

11   Q.  It's also the case that your son has made a substantial

12   amount of money from the work that you have done together for

13   the DEA, correct?

14   A.  Yes, sir.

15   Q.  How much money has your son made in connection with his

16   work on behalf of law enforcement?

17   A.  I don't know.

18            MR. JACKSON:  Your Honor, at this time I would like to

19   read a stipulation between the government and the defendants

20   which is marked as DX1000 if it pleases the Court.

21            THE COURT:  Yes.  Go ahead.

22            MR. JACKSON:  It is hereby stipulated and agreed

23   between the United States of America, Preet Bharara, United

24   States Attorney for the Southern District of New York, by and

25   through the undersigned Assistant United States Attorneys,

GBE9FLO5                        Santos Peña – cross

defendant, the defendants, and by and through their attorneys:

One.  Jose Santos Peña has been paid a total of approximately $720,000 by the DEA.  Santos Peña has also been paid approximately $250,000 to $300,000 by local law enforcement entities.  Jose Santos Hernandez has been paid a total of approximately $190,000 by the DEA.  Santos Hernandez has also been paid approximately 150 to -- between approximately 150,000 and 200,000 by local law enforcement authorities.

Three.  Juan Gomez has been paid a total of approximately $434,000 by the DEA.

Signed by all the parties.

Thank you, your Honor.  And I'd like to offer DX1000 in evidence, your Honor.

MR. QUIGLEY:  No objection.

THE COURT:  One thousand is in evidence.

(Defendants' Exhibit 1000 received in evidence)

Q.  Now, sir, the one million dollars that you've been paid by law enforcement, that was paid to you primarily through deposits into bank accounts, right?

A.  Yes, sir.

Q.  It's not the case that Agent Gonzalez ever showed up and gave you like a bag of cash, right?

A.  No, sir.

Q.  He did direct deposits?

GBE9FLO5                        Santos Peña - cross

```
 1   A.  Not all of them.

 2   Q.  Most of them, right?

 3   A.  Yes, sir.

 4   Q.  Sometimes you got a check?

 5   A.  Yes, sir.

 6   Q.  And that check you would deposit into one of your bank

 7   accounts, right?

 8   A.  Yes, sir.

 9   Q.  How much money of the one million dollars that you received

10   from law enforcement have you given back to law enforcement

11   since your many crimes were discovered?

12   A.  I don't understand the question.

13           THE COURT:  It's pretty simple.  How much money did

14   you give them back of the million dollars that you got?

15           THE WITNESS:  Given back to whom?

16           THE COURT:  The government.

17           THE WITNESS:  I don't know.  I don't remember.

18   BY MR. JACKSON:

19   Q.  Sir, you haven't given any of the money back, have you?

20   A.  Very little.

21   Q.  How much have you given back?

22   A.  I have reported most of the checks but I don't have an

23   exact amount.

24           MR. QUIGLEY:  Objection, your Honor.  He's talking

25   about his taxes.
```

1              THE COURT:  Mr. Jackson can explore this.

2              How much money did you give back?

3              It's a pretty simple question.  He either knows or he

4     doesn't know.  If he doesn't know, he can say that.

5              He can probe a little bit more.  So I'm not going to

6     stop Mr. Jackson.

7              MR. JACKSON:  Thank you, your Honor.

8     BY MR. JACKSON:

9     Q.   How much did you give back?

10    A.   The thing is that I can't give you an exact amount because

11    I'm confused.  I mean if I got a check for $276,000 as a reward

12    then I will give a part to my son.  And I would also give

13    another part of it to my son-in-law who also worked as an

14    informant.

15             MR. JACKSON:  Let me stop you for a second, sir.  We

16    don't have to go any further.

17    Q.   Is it your testimony that you cannot tell us as you sit

18    here today how much you've given back to the government?

19    A.   Yes, sir.  I couldn't tell you exactly.

20    Q.   Right.  Now, in the course of your work for the Sinaloa

21    cartel you traveled to Colombia on occasions, right?

22    A.   Yes, sir.

23    Q.   When you went to Colombia who did you meet with?

24    A.   With drug traffickers.

25             You are referring when I was an informant?

GBE9FLO5                          Santos Peña – cross

1    Q.  No, sir.  I'm referring to the decade that you were working

2    for the Sinaloa cartel.

3    A.  I never went to Colombia.

4    Q.  You negotiated with Colombians, right?

5    A.  Yes, sir.

6    Q.  Did you ever visit a laboratory where drugs were made?

7    A.  No, sir.

8    Q.  Never actually saw a drug laboratory anywhere?

9    A.  Physically, no.

10   Q.  Well how might you have seen it apart from physically?

11   A.  You mean drugs?

12   Q.  Drug laboratories, places where drugs are manufactured.

13   A.  Never.

14   Q.  Never.  You are familiar, though, with the process by which

15   cocaine is manufactured, aren't you, sir?

16   A.  Yes, sir.

17   Q.  You're aware that it involves gasoline?

18   A.  Yes, sir.

19   Q.  You're aware that it involves large amounts of bleach?

20   A.  Yes.

21   Q.  What other chemicals are involved?

22   A.  Rat exterminators, fumigant products, and acetone, other

23   chemicals.

24   Q.  When you say rat fumigators, are you talking about rat

25   poison?

GBE9FLO5                        Santos Peña – cross

1   A.  Yes, sir.

2   Q.  So you're familiar with rat poison, gasoline, bleach, you

3   said acetone?

4   A.  I know those products.

5   Q.  What other products?

6   A.  I'm unaware of all of them.

7   Q.  We'll come back to that.

8           Now, during the decade that you were working as a high

9   level person in the Sinaloa cartel did you ever participate in

10  the destruction of evidence?

11  A.  Evidence?  I don't understand the question.

12  Q.  Let me try to ask it in an even more simple fashion.

13          THE COURT:  You don't need the prelude.  You can just

14  ask the question.

15          MR. JACKSON:  Absolutely, Judge.

16  Q.  Did you ever participate in the destruction, the

17  elimination of evidence of any kind?

18          MR. QUIGLEY:  Objection.

19          THE COURT:  Sustained.  Define evidence in what

20  respect?  You mean evidence in a courtroom?  Evidence of what?

21          MR. JACKSON:  That's a good point, Judge.  Let me try

22  to clarify.

23  Q.  Going back to the time that you were working for the

24  Sinaloa cartel, you were arrested at the end of that, right?

25  A.  I was detained.

1   Q.  Right.  You were detained by Mexican law enforcement,

2   right?

3   A.  Yes, sir.

4   Q.  And you didn't voluntarily surrender, right?

5   A.  No, sir.

6   Q.  You got caught?

7   A.  Yes, sir.

8   Q.  And before you got caught you knew that the Mexican

9   authorities were after you for that kidnapping, right?

10  A.  Yes, sir.

11  Q.  You knew that you faced the possibility of prosecution,

12  correct?

13  A.  Yes, sir.

14  Q.  Leading up to that moment did you destroy any of the

15  evidence related to that kidnapping?

16  A.  Not me.

17  Q.  So you didn't destroy your phones?

18  A.  No, sir.

19  Q.  You didn't delete any messages off of those phones?

20  A.  No, sir.

21  Q.  What happened to the body of the person who was murdered?

22  A.  The Mexican authorities found it.

23  Q.  Where was it when they found the body?

24  A.  In a trash bin.

25  Q.  You helped put it in the trash bin, right?

1    A.  No, sir.

2    Q.  You were aware that it had been put in the trash bin?

3             THE INTERPRETER:  I'm sorry?

4    Q.  You were aware that it had been put in the trash bin?

5    A.  Yes, sir.

6    Q.  And during that time period the Sinaloa cartel was known

7    for defacing bodies with acid in order to make it harder for

8    the authorities to identify who the person was, right?

9    A.  Yes, sir.

10   Q.  This body had also been abused by acid, hadn't it?

11   A.  No, sir.

12   Q.  Was anything done to the body to obscure the identity of

13   who the person was that had been killed?

14   A.  No, sir.

15   Q.  Just to be clear the Sinaloa cartel employed thousands of

16   individuals during this time period, right?

17            MR. QUIGLEY:  Objection.

18            THE COURT:  Sustained.

19   Q.  The Sinaloa cartel, you are aware, employed a number of hit

20   men during this period, right, sicarios?

21            MR. QUIGLEY:  Objection.

22            THE COURT:  Sustained.

23   Q.  Now, up until the time of your arrest I think what you told

24   Mr. Rody is that you still maintain contact with numerous drug

25   dealers in the Sinaloa cartel?

GBE9FLO5                    Santos Peña - cross

 1   A.  Yes, sir.

 2   Q.  You also have contact with a number of people who imported

 3   drugs throughout the United States, right?

 4   A.  Yes, sir.

 5   Q.  You have contacts throughout California?

 6        You had contacts in the importation of drugs

 7   throughout California, right?

 8   A.  Yes, sir.

 9   Q.  And throughout the rest of the southwest of America?

10   A.  Yes, sir.

11   Q.  And also on the east coast of America, right?

12   A.  Yes, sir.

13   Q.  You told the prosecutors everything that you know, right?

14   A.  Yes, sir.

15   Q.  That was what they told you that you were required to do,

16   correct?

17   A.  Yes, sir.

18   Q.  You're supposed to tell them everything that you know?

19   A.  Yes, sir.

20   Q.  The first time that you ever heard of Mr. Campo or

21   Mr. Flores de Freitas was when they were introduced to you by

22   Sentado and Agent Gonzalez, correct?

23   A.  Yes, sir.

24   Q.  Now, during the course of your -- how long did your work

25   relationship with Agent Gonzalez last?

GBE9FLO5                          Santos Peña - cross

1    A.  I don't remember exactly but I believe at least five years

2    that I've been working with him.

3    Q.  And at times you work very closely together, correct?

4    A.  Yes, sir.

5    Q.  And you know a lot more about the realities of the drug

6    trade than Agent Gonzalez did, correct?

7              MR. QUIGLEY:  Objection.

8              THE COURT:  Sustained.

9    Q.  There were times that you had to educate Agent Gonzalez

10   about aspects of the way drug trafficking operated, correct?

11             MR. QUIGLEY:  Objection.

12             THE COURT:  Overruled.

13             THE WITNESS:  I don't understand when you say

14   "educate."

15   Q.  Well there were times when you had to -- when you had to

16   teach him things about the way certain things operated in the

17   drug world, right?

18   A.  No, sir.  I would only suggest to him based on my

19   experience.  And he made the decision, either accept my

20   proposal or do how he wanted.

21   Q.  And there were times that he would ask you questions,

22   right?

23   A.  Yes, sir.

24   Q.  There were also times when you would give him instructions

25   about the way things were going to happen in investigations?

GBE9FLO5                          Santos Peña – cross

1   Right?

2   A.  No, sir.

3   Q.  Isn't it true that on one occasion you said to Agent

4   Gonzalez, "I'm putting you in charge of Mateo sending me the

5   recording equipment.  He already has the address of my house"?

6   A.  I don't remember.  I don't understand that question.

7           THE COURT:  Mr. Jackson, we'll take our afternoon

8   break.

9           MR. JACKSON:  Thank you very much, your Honor.

10          (Jury excused)

11          THE COURT:  See you in about ten.

12          (Recess)

13          JOSE SANTOS PEA, resumed.

14          THE COURT:  Is everybody ready now?  Mr. Jackson are

15  you all set?

16          MR. JACKSON:  Yes, your Honor.

17          (Jury present)

18          THE COURT:  Please be seated.

19          Mr. Jackson.  Go ahead.

20          MR. JACKSON:  Thank you, your Honor.

21  BY MR. JACKSON:

22  Q.  Now when we left off, sir -- sorry.  Are you --

23  A.  Yes, sir.

24  Q.  When we left off, sir, I was asking you there was an

25  occasion where you told Agent Gonzalez, "I'm putting you in

1    charge of Mateo sending me the recording equipment," right?

2    A.  I think so.

3    Q.  You think that is something that was said?

4    A.  I'm not certain.

5    Q.  You see the binder that you have in front of you that's

6    3504-3, the binder that you were just looking at?

7              THE INTERPRETER:  This one?

8              MR. JACKSON:  Yes, please.

9    Q.  I'd like to ask you to take a look at page 1 of 3504-3.

10             THE INTERPRETER:  3504?

11             MR. RODY:  If I may, Judge, it's the same exhibit.

12             THE INTERPRETER:  This is 3508.

13             MR. RODY:  It's the same exhibit.

14             THE COURT:  3504 is the same --

15             MR. RODY:  3504-3 and 3508-1 are the identical

16   exhibit.

17             THE INTERPRETER:  Page one you said?

18             MR. JACKSON:  Yes.

19             THE INTERPRETER:  Any specific place?

20             MR. JACKSON:  If he could look at the bottom of the

21   page, I'd like him to just look at that and tell me if it

22   refreshes your recollection.

23             THE WITNESS:  Yes, sir.

24   Q.  And that is something that you said to Agent Gonzalez,

25   right?

1   A.  Yes, sir.

2   Q.  Now, this was another conversation where you also told

3   Agent Gonzalez that you were going to try to use another CS to

4   try to get the defendants to produce the merchandise, right?

5   A.  I didn't understand the question.

6   Q.  Right.  Later on after your initial conversations with

7   Agent Gonzalez you ended up meeting the defendants, right?

8   A.  Some days later, yes.

9   Q.  One of the things that you told Agent Gonzalez was that you

10  were going to use a different CS to try to get the defendants

11  to produce the merchandise to you, right?

12  A.  I don't remember.

13  Q.  You don't remember that?

14  A.  No, sir.

15  Q.  Do you remember Agent Gonzalez saying to you, "What an

16  idiot," referring to Mr. Campo Flores, when you described one

17  of your plans about how you were going to execute this?

18  A.  No, sir.  I don't remember that.

19  Q.  Okay.  Now, I am going to ask you to look at that same

20  document on page 60, in the middle of the page, and just tell

21  me if it refreshes your recollection about Agent Gonzalez

22  saying "what an idiot" to you.

23  A.  (No response).

24  Q.  Sir, yes or no, does that refresh your recollection?

25  A.  Yes, sir.

1  Q.  And Agent Gonzalez said, "What an idiot," right?

2  A.  Yes, sir.

3  Q.  And then you laughed?

4  A.  Yes, sir.

5  Q.  You said ha, ha, ha, ha, ha?

6  A.  Yes, sir.

7  Q.  Now, one of the things that you did in preparation for

8  going down there is that you had a number of meetings with

9  Sentado, right?

10  A.  No, sir.

11  Q.  You had some discussions with Sentado, right?

12  A.  Yes, sir.

13  Q.  Some of those were over texts?

14  A.  Yes, sir.

15  Q.  Some of those were over the phone?

16  A.  Yes, sir.

17  Q.  And the ones that were over the phone, those were not

18  recorded, right?

19  A.  No, sir.  I didn't record them.

20  Q.  One of the things that Sentado told you was that he had

21  never done any work with the defendants, right?

22          MR. QUIGLEY:  Objection.  Hearsay.

23          THE COURT:  Sustained.

24  Q.  Now, one of the other things that you talked about in your

25  discussion with Mr. Rody was the question of whether or not you

GBE9FLO5                          Santos Peña – cross

1    were instructed to record all meetings.  Do you remember that?

2    A.   Please repeat the question.

3    Q.   Do you remember the discussion that you had on

4    cross-examination about whether you were instructed to record

5    all meetings?

6    A.   I don't remember that.

7    Q.   Well, it's a fact, right, that apart from Agent Gonzalez

8    you also dealt with an agent that you referred to as Mateo,

9    right?

10   A.   Yes, sir.

11   Q.   Who is Mateo?

12   A.   He's my first agent.  He's in charge of my entire family.

13   Q.   What is his name?

14   A.   Mateo.

15   Q.   Do you know what his full name is?

16   A.   Yes, sir.

17   Q.   What is it?

18   A.   Mateo Mahoney.

19   Q.   And Agent Mahoney said to you explicitly that you were to

20   record all meetings, right?

21   A.   I don't remember.

22   Q.   You have no recollection of that?

23   A.   No, sir.

24   Q.   I want to show you a document that is marked as 3504-05.

25   And I just want to show it to you and ask you if it refreshes

1    your recollection.

2              MR. JACKSON:  May I approach, your Honor?

3              THE COURT:  Yes, you may.

4              THE WITNESS:  Yes, sir.

5    Q.  Does that refresh your recollection, sir?

6    A.  No, sir.

7    Q.  That doesn't refresh your recollection?

8    A.  No, sir.  I'm not that person.

9    Q.  Okay.

10             Now, let me ask you -- one of the other things that

11   you told us during your direct examination is that you

12   performed a certain test on a substance that you claim was

13   cocaine.  Do you remember that?

14   A.  Yes, sir.

15   Q.  And the test that you describe, it didn't involve any

16   special instruments, right?

17   A.  No, sir.

18   Q.  This is just a test that you supposedly learned in the

19   course of your work for the Sinaloa cartel, right?

20   A.  Yes, sir.

21   Q.  Where you rubbed a little bit on your hand?

22   A.  Yes, sir.

23   Q.  And some oils supposedly came out?

24   A.  Yes, sir.

25   Q.  Now, you have told the DEA agents in other contexts that

1    you can't actually get an accurate estimate of the purity of a

2    cocaine-like substance without using special instruments,

3    right?

4    A.  Probably I told them that.  I don't remember but it's very

5    likely.

6    Q.  It's very likely because that's true, right?

7    A.  The thing is to be able to know exactly you have to have

8    special equipment.  But with the test that I did it was enough

9    to know that it was cocaine and that it was high quality.  I've

10   used cocaine for many years.  I know what cocaine is.

11   Q.  Right.  You've used cocaine for most of your life, right?

12   A.  A large part.

13   Q.  There were years when you used it every single day, right?

14   A.  Yes, sir.

15   Q.  In fact, you used it the day you got arrested before this

16   case, right?

17   A.  Yes, sir.

18   Q.  And it's your testimony you've only snorted cocaine; you've

19   never smoked it, right?

20   A.  That's right.

21   Q.  And one of the things that didn't happen during the test

22   that you were describing of the cocaine that you allege you saw

23   in this case is you didn't actually take that cocaine, right?

24            THE INTERPRETER:  You didn't smell the cocaine?

25   Q.  You didn't actually take it?  You didn't actually ingest

GBE9FLO5                          Santos Peña – cross

1   it?

2   A.   No.  I smelled it.

3   Q.   The day before you had been snorting cocaine, right?

4   A.   Yes, sir.

5   Q.   For fun?

6   A.   Yes, sir.

7   Q.   And then when you went into -- you were snorting cocaine

8   out at the club that you were at, right?

9   A.   Yes, sir.

10  Q.   You were openly doing it?

11  A.   Not openly.  In the bathroom.

12  Q.   I see.  But you certainly didn't hide the fact that you

13  used cocaine, right?

14  A.   No, sir.

15  Q.   Right.  And so the next day when you got this bag of what

16  you claim was fresh cocaine you just held it in your hands and

17  you didn't actually ingest it?  That's your testimony?

18  A.   Are you referring to the kilo of cocaine that Mr. Campo

19  showed me?

20  Q.   I'm referring to the kilo of the substance you claim was

21  cocaine that the defendant showed you.

22  A.   I saw it, I smelled it, and I checked it with my test to

23  see if it was cocaine.

24  Q.   Right.  But you did not actually ingest it, did you?

25  A.   No.  I smelled it.  That's different.

1   Q.  In that one moment you decided that you weren't going to

2   take it?

3            MR. QUIGLEY:  Objection.

4            THE COURT:  Sustained.

5   Q.  Now, the test that you described, where did you learn that

6   test?

7   A.  In Sinaloa.

8   Q.  Right.  But who taught you that test?

9   A.  Sergio Fierro Chávez.

10  Q.  And why was it that you had to learn that test?

11  A.  Because when we received drug shipments from Colombia it

12  happened at daybreak and what we did is we very quickly opened

13  up one kilo just randomly.  We would open it to confirm that it

14  was cocaine.  And that was the test, the smell, by sight, by

15  color, and the quality.  We had the experience to do it.  We

16  could fail with two or three points of quality.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. JACKSON:

2   Q.  Right; and the reason that you did that is because even

3   with your trusted Colombian drug partners, you wouldn't accept

4   a shipment without confirming that it was actually cocaine,

5   right?

6   A.  Unless we saw it.

7   Q.  I'm sorry.  Could you say that one more time?

8           INTERPRETER:  Unless we saw it.

9   Q.  Right; you had to confirm that it was actually cocaine,

10  right?

11  A.  Yes, sir.

12  Q.  Right, because this is a known risk within the drug

13  business, isn't it?

14  A.  Yes, sir.

15  Q.  In fact, you described a couple of illegal deals that you

16  did to the prosecutors in recent times where people brought you

17  bad substances that weren't really cocaine, right?

18  A.  I didn't understand the question.

19  Q.  Well, do you remember telling the prosecutors that there

20  was an occasion where you asked Paul to pick up 12 kilos for

21  Javier with you?

22  A.  Not 12, I think it was four kilos.

23  Q.  Okay.  So, it was several kilos, right?

24  A.  Yes, sir.

25  Q.  And what happened is a friend of Javier's showed up and

1    took one of the kilos, right?

2    A.  Yes, sir.

3    Q.  And then what you told the prosecutors is that the guy came

4    back because the kilo was no good, right?

5    A.  That's correct.

6    Q.  There was another occasion when you were doing a drug deal

7    with a person known as Chino, right?

8    A.  Yes, sir.

9    Q.  And when Chino received the kilos in this situation, after

10   he examined it he said this is garbage, right?

11   A.  Correct.

12   Q.  And there was yet another occasion involving kilos with

13   Javi and when the person showed up it was essentially bricks of

14   loose flour, right?

15   A.  No, sir.

16   Q.  You described it as having appeared like bricks of loose

17   flour, right?

18   A.  The appearance.

19   Q.  Right; and on that occasion you told Javier that the kilos

20   were no good, right?

21   A.  That's correct.

22   Q.  Now, the oil in the test, the supposed test you told us

23   about, what is the oil that you claim you saw come out of the

24   substance that you saw on the video?

25   A.  The one that I saw in my hand when I rubbed the cocaine.

1    Q.  What is the oil?

2    A.  It's the grease that the cocaine releases.

3    Q.  What is that grease?

4    A.  It's oil.  It's buttery, it's greasy.

5    Q.  Sir, you have no idea what the actual substance is that you

6    are claiming you saw come out of this, right?

7    A.  Yes, sir, I do have.

8    Q.  And what is it?  What is that substance?

9    A.  It's oily.

10   Q.  Right, but what chemical is it?

11   A.  I don't know that.  It's oily.

12   Q.  Right.

13         You also don't know if there are any other substances

14   that an oily substance will come out of when you rub it, right?

15   A.  Referring to the cocaine?

16   Q.  No.

17         I'm saying you don't know whether there are other

18   substances that if you rub them on your hands, an oil will come

19   out, do you?

20   A.  I don't know.

21   Q.  Right; because you're not a chemist?

22         THE COURT:  You are not asking for the chemical

23   composition?

24         MR. JACKSON:  I am asking him what it is.

25         THE COURT:  He says it is oil.

GBe5flo6                          Santos Peña – cross

1                MR. JACKSON:  Right.

2                THE COURT:  You keep asking what kind of oil, he says

3      it is oil.

4                MR. JACKSON:  I agree, Judge; the witness knows

5      nothing.

6                MR. QUIGLEY:  Objection.

7                THE COURT:  The jury will disregard that.

8                MR. JACKSON:  By the way, a grilled cheese sandwich

9      will release oil if you rub it, right?

10               MR. QUIGLEY:  Objection.

11               THE COURT:  Sustained.

12     BY MR. JACKSON:

13     Q.  Sir, no one told you that you were not allowed to take a

14     sample of that kilo that you saw, right?

15     A.  In that moment?

16     Q.  Before you went down there, you previously testified, no

17     one told you that you could not take a sample, right?

18     A.  Take it to take it with me?  No.  But take it to check it

19     out?  Yes.

20     Q.  Right; but no one at the DEA said that you were not

21     permitted to take a sample, right?

22     A.  To bring it back to the United States?  I wasn't told and I

23     know that that should not be done.

24     Q.  Right.

25               No one at the DEA ever told you that you were not

GBe5flo6                          Santos Peña - cross

1   permitted to take a sample, yes?

2   A.  To test it?  Yes.  From Agent Gonzalez.

3   Q.  So, it is your testimony that Agent Gonzalez -- you are

4   saying Agent Gonzalez did not tell you, right, that you were

5   not allowed to take a sample?

6              MR. QUIGLEY:  Objection to form.

7              THE COURT:  Sustained.

8   Q.  Agent Gonzalez never said you can't take a sample, did he?

9   A.  I don't understand the question.

10  Q.  You had a number of conversations with Agent Gonzalez

11  before you went down to Venezuela, right?

12  A.  Yes, sir.

13  Q.  At no point did Agent Gonzalez say you may not take a

14  sample, right?

15             INTERPRETER:  You may or you may not?

16  Q.  You may not take a sample.

17  A.  I don't understand the question.

18  Q.  What I am saying is he never told you that you weren't

19  allowed to take a sample, right?

20  A.  To test it?  Yes.

21  Q.  Well, sir, you realize, you made a decision not to actually

22  take a sample out of that room and turn it over to DEA agents,

23  right?

24  A.  No, sir; I never did that.

25  Q.  Right; you made a decision not to do that, right?

GBe5flo6                          Santos Peña – cross

1   A.  Yes, sir.

2   Q.  And, in fact, that was your decision, correct?

3   A.  I had no permission to take it out.

4   Q.  Right.

5          Sir, at a prior proceeding -- I just want to ask you,

6   yes or no, did you give the following answers to these

7   questions:

8          INTERPRETER:  Excuse me.  I need a transcript or

9   something.

10         THE COURT:  He will go slowly.

11         MR. JACKSON:

12  "Q  To be clear, no one from the DEA told you not to take a

13  sample out of that room, right?

14  "A  No, sir.  No one told me."

15  A.  That's correct.

16  Q.  That was your testimony, correct?

17  A.  Yes, sir.

18  Q.  And then the question:

19  "Q  That's an independent decision that you made?

20  "A  Yes, sir, for my safety."

21  A.  Yes, sir.

22  Q.  That was your testimony, right?

23  A.  Yes, sir.

24  Q.  And that's still true, right?

25  A.  That's correct.

GBe5flo6                          Santos Peña - cross

1    Q.  Sir, one of the things that you testified earlier is that

2    you and your son were both arrested, right?

3    A.  Yes, sir.

4    Q.  And you had been preparing for your testimony in this trial

5    with the prosecutors, right?

6    A.  Reviewing the facts, recordings, messages, so what they

7    meant, and I had to explain it with words only.

8    Q.  And you have also been rehearsing the questions and answers

9    that you were going to give today, right?

10            MR. QUIGLEY:  Objection.

11            THE COURT:  Sustained.

12   Q.  You have been going over the questions and answers that you

13   were going to give today, right?

14   A.  The facts that happened in Venezuela and Haiti.

15   Q.  Right; the prosecutors went through a bunch of the

16   questions in preparation sessions that they went through with

17   you that they were going to ask you on the witness stand,

18   right?

19   A.  What they meant, a review of all the facts.

20   Q.  How many hours did you spend preparing with the

21   prosecutors?

22   A.  I don't know.

23   Q.  How many days would you estimate that you prepared with

24   them?

25   A.  Around eight days or 10?  I don't know.  I don't remember.

GBe5flo6                        Santos Peña – cross

1   Q.  Eight to 10 days is your best estimate?

2   A.  I don't remember exactly.

3   Q.  And you met with them for hours each time, right?

4   A.  Yes, sir.

5   Q.  And you talked about the specific questions they were going

6   to be asking you, right?

7   A.  A review of everything that was going to happen.

8   Q.  Right; you also went over some of the questions that would

9   be asked of you, correct?

10  A.  Yes, sir.

11  Q.  And you also practiced cross-examination, right?

12  A.  I don't understand.  What is cross-examination?

13  Q.  Well, during your preparation someone pretended to be a

14  defense attorney, right?

15  A.  Ah, okay.

16  Q.  Is that a yes?

17  A.  Not precisely like that.

18  Q.  Well, how precisely?

19  A.  About the questions or words that the defense may ask me,

20  what they meant, and they would ask me to explain it.

21  Q.  And they did it in cross-examination fashion, right?

22          MR. QUIGLEY:  Objection.

23          THE COURT:  Sustained.

24  Q.  Now, one of the things that the prosecutors told you is

25  that you were not allowed to communicate with your son about

GBe5flo6                          Santos Peña – cross

1     your testimony, right?

2     A.   Correct.

3     Q.   And that's something that you understood was one of your

4     obligations, right?

5     A.   Yes, sir.

6     Q.   But the truth is, you communicated with your son a bunch

7     since you have been in jail, right?

8     A.   No, sir.

9     Q.   Well, you must have at least talked to him since you have

10    been in jail, right?

11    A.   Only at the moment of arrival and then we were separated.

12    Q.   Okay.

13           Now, you have, since you have been in jail, had

14    conversations with individuals with whom you used to do drugs,

15    haven't you?

16    A.   I don't understand the question.

17    Q.   Well, you described -- Mr. Rody asked you about a number of

18    people that you did drug deals with, right?

19    A.   Yes, he did ask me several questions.

20    Q.   Sir, isn't it the truth that you have remained in contact

21    with those individuals even after you have gone into jail?

22    A.   No, sir.

23           MR. JACKSON:  May I have one moment, your Honor?

24           THE COURT:  Yes, you may.

25           (counsel conferring)

GBe5flo6                          Santos Peña - cross

1    Q.  Sir, even after being separated from your son you have

2    continued to communicate with him, haven't you?

3    A.  No, sir.

4    Q.  Well, you and your son have continued to do drug business

5    together since you have been in jail, haven't you?

6    A.  No, sir.

7    Q.  You have continued to engage in business transactions,

8    right?

9              MR. QUIGLEY:  Objection.

10             THE COURT:  Sustained.

11   Q.  Sir, at this point I would like to play a portion of a

12   recording and ask you if that is your voice on the recording.

13             MR. QUIGLEY:  Your Honor, we don't even know what this

14   is.  We have made several discovery requests, we don't know

15   what this is.

16             MR. JACKSON:  This is impeachment, your Honor.

17             MR. QUIGLEY:  Then it shouldn't be played to the jury.

18             THE COURT:  Can you go on to something else?  We will

19   discuss this at the end of the day.

20             MR. JACKSON:  Very well, your Honor.

21   Q.  There was a point earlier where there was a number of

22   confidential source agreements that you signed, correct?

23   A.  Yes, sir.

24   Q.  I just want to show you several of those confidential

25   source agreements marked as DX- 654 through 662 and I just want

1    to ask you if you recognize them.

2            MR. JACKSON:  Your Honor, may I approach?

3            THE COURT:  You may.

4            THE WITNESS:  Yes, sir.

5    Q.  Do you recognize all of those, sir?

6    A.  Yes, sir.

7    Q.  Those are all confidential source agreements that you

8    signed with the DEA, correct?

9    A.  Yes, sir.

10            MR. JACKSON:  Your Honor, the government offers --

11    sorry -- the defense offers those exhibits.

12            MR. QUIGLEY:  Your Honor, we have no objection to the

13    ones going back to 2012.

14            MR. JACKSON:  Your Honor, we are offering the ones

15    back to 2012, subject to discussion we will have with the Court

16    later.

17            THE COURT:  What is 2012 and after that?  I want the

18    record to reflect what we are admitting.

19            MR. JACKSON:  Yes, your Honor.

20            THE COURT:  654 to 662 from '12 forward is what

21    exhibits?

22            MR. JACKSON:  2012 starts with 657, your Honor.  657

23    through --

24            THE COURT:  Ladies and gentlemen, we will work this

25    out.  This will be the first thing we do tomorrow morning.

GBe5flo6                          Santos Peña – cross

1              Remember my instructions:  Don't do any research,

2      don't talk about the case, keep open minds.

3              We will resume tomorrow at 9:30.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Do you have an order for him to be

3    produced?

4              MR. QUIGLEY:  Yes, your Honor.

5              THE COURT:  Please, be seated.

6              If I am doing my math here correctly, Mr. Jackson, we

7    start year 2012 it is 657 and the year '16 should be 661, not

8    662.  So, can we get them lined up?

9              MR. RODY:  Your Honor, may I grab the exhibits and we

10   can be sure?

11             THE COURT:  I don't have them.

12             MR. RODY:  I think they're still up there.

13             THE COURT:  Help yourself, Mr. Rody.

14             MR. JACKSON:  Yes, your Honor; there is one more that

15   goes through 2017, so 662 is the last one.

16             THE COURT:  What year is 657, Mr. Jackson?

17             MR. JACKSON:  657 runs from 10/1/11 to 10/1/12 so it

18   covers most of the year 2012.

19             THE COURT:  I am going to admit 658 through 662.  That

20   will give you more than enough amplitude with Mr. Rody's

21   cross-examination to make any points you want to make.

22             MR. JACKSON:  Thank you, your Honor.

23             THE COURT:  Now, Mr. Quigley, you wanted to take

24   something else up?

25             MR. QUIGLEY:  Your Honor, we have asked for discovery

GBe5flo6                              Santos Peña - cross

1    in the case, we haven't gotten any.  If the document is being

2    played before the jury it is coming in for -- it is coming into

3    evidence.

4              THE COURT:  What is being played, Mr. Jackson?

5              MR. JACKSON:  Your Honor, we have a recording of this

6    witness speaking on a telephone call from prison engaging in

7    the specific activities that he denies -- that he has denied in

8    this.  Among other things, on the recording he can be heard

9    having a number of different conversations with his son

10   including conversations that he orchestrated by having a

11   third-party connect him to his son at a point where there is a

12   separation, there are also calls before that where they're

13   passing a phone, and there are calls where the subject matter

14   makes clear -- he is communicating with people he identified in

15   his testimony as people he is engaged in drug trafficking with

16   and there are calls where he is making reference to activities,

17   business activities that the only reasonable inference from

18   them is that he is engaging in continuing the orchestration of

19   drug trafficking from prison.

20             THE COURT:  What is the source of the document?

21             MR. JACKSON:  These are calls that we received via

22   subpoena to a correctional facility.

23             THE COURT:  Mr. Quigley?

24             MR. QUIGLEY:  One moment, your Honor?

25             (counsel conferring)

1          MR. QUIGLEY:  Your Honor, I think the issue would be

2     whether each of these calls that they seek to introduce goes to

3     a specific statement of the witness.  I don't think they can

4     just put in 10 hours of recordings.

5          MR. JACKSON:  Your Honor, we are only seeking to put

6     in three short calls.  There is ample evidence of this but we

7     are only going to put in three short calls.  In fact, we

8     identified the minute markers within the longer one.  It will

9     only be several minutes in total.  And we note, your Honor, we

10    also have translations -- transcripts and translations of these

11    calls that we would observe, subject to connection, for the

12    jury's assistance so that they can follow along with what the

13    witness is hearing here.

14         MR. QUIGLEY:  Your Honor, we would like to see what

15    they're offering first overnight.

16         THE COURT:  I think you ought to produce -- do you

17    have the transcripts?

18         MR. JACKSON:  We will produce it to the government,

19    your Honor.

20         THE COURT:  Frankly, Mr. Quigley, if they produce the

21    transcripts I don't see what the objection is.  He has taken a

22    position or made a statement on the stand that he did certain

23    things or he didn't do certain things and this contradicts them

24    so it goes to his credibility.  It is legitimate impeachment

25    material.

1         MR. QUIGLEY:  We will take a look at the transcript,

2    your Honor.

3         THE COURT:  All right.  Good.

4         Now, can you give me some kind of prediction as to

5    when we are going to finish?  Really I am trying to figure out

6    when it is we are going to have the jury charge conference.

7         MR. QUIGLEY:  Your Honor, I think it is, depending how

8    much longer we have with this witness, potentially we could

9    rest by late Wednesday, sometime on Thursday.

10        THE COURT:  Okay.

11        MR. JACKSON:  And, your Honor, I could tell you that

12   the defense team thinks that after this witness our crosses are

13   going to be substantially shorter so we think a Wednesday

14   projection makes sense.

15        THE COURT:  So, when do you want to do the jury

16   charge?  On Wednesday night?

17        MR. JACKSON:  Yes, your Honor.

18        MR. QUIGLEY:  That's fine with the government, your

19   Honor.

20        THE COURT:  And we can go to the jury with summations

21   and charge on Thursday?

22        MR. JACKSON:  Yes, your Honor.  We will have to just

23   confer but --

24        THE COURT:  I know you have to confer.

25        MR. JACKSON:  But we expect that is correct, your

GBe5flo6                        Santos Peña – cross

1    Honor; yes.

2            THE COURT:  So, tomorrow morning I will open up by

3    saying that the following exhibits have been received in

4    evidence, 658 through 652?  Is that right, Mr. Rody?

5            MR. RODY:  That's right, Judge.

6            Can I add one thing?

7            THE COURT:  Yes.

8            MR. RODY:  Obviously we haven't decided that we do not

9    have a case yet and that depends, in part, on how things play

10   out.

11           THE COURT:  I am not asking you to make

12   representations one way or the other.  So, you are free to make

13   whatever decisions you wish to make and we will be guided by

14   those decisions.

15           Okay.  And you will produce, Mr. Jackson, the

16   transcripts of the tapes you want to play tomorrow?

17           MR. JACKSON:  Yes, your Honor.

18           THE COURT:  Anything else?

19           MR. QUIGLEY:  Not from the government, your Honor.

20           THE COURT:  See you at 9:30 tomorrow morning.

21           (Adjourned to 9:30 a.m., November 15, 2016 .)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                Page

 DANIEL OGDEN

Direct By Mr. Bove . . . . . . . . . . . . . . 772

Cross By Mr. Zach  . . . . . . . . . . . . . . 835

Cross By Mr. Rody  . . . . . . . . . . . . . . 842

Redirect By Mr. Bove . . . . . . . . . . . . . 850

 JOSE SANTOS PEÑA

Cross By Mr. Rody  . . . . . . . . . . . . . . 854

Cross By Mr. Jackson . . . . . . . . . . . . . 902

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                              Received

 3    400    . . . . . . . . . . . . . . . . . 786

 4    1000 and 600 through 610  . . . . . . . . 791

 5    400-A  . . . . . . . . . . . . . . . . . 794

 6    410 through 417  . . . . . . . . . . . . 795

 7    400-C  . . . . . . . . . . . . . . . . . 801

 8    403 through 409  . . . . . . . . . . . . 805

 9    500    . . . . . . . . . . . . . . . . . 806

10    519 through 529  . . . . . . . . . . . . 807

11    502 through 517  . . . . . . . . . . . . 810

12    531-A, B, C and D  . . . . . . . . . . . 811

13    500-E  . . . . . . . . . . . . . . . . . 814

14    500-D  . . . . . . . . . . . . . . . . . 822

15    500-B  . . . . . . . . . . . . . . . . . 825

16    500-C  . . . . . . . . . . . . . . . . . 828

17    400-B  . . . . . . . . . . . . . . . . . 829

18    500-A  . . . . . . . . . . . . . . . . . 832

19                    DEFENDANT EXHIBITS

20   Exhibit No.                              Received

21    1000   . . . . . . . . . . . . . . . . . 903

22

23

24

25
```