GBH5flo1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                          15 Cr. 765 (PAC)
4
    EFRAIN ANTONIO CAMPO FLORES and
5   FRANQUI FRANCISCO FLORES DE FREITAS,
6              Defendants.
    ------------------------------x
7
                                          New York, N.Y.
8                                         November 17, 2016
                                          9:30 a.m.
9   Before:
10                  HON. PAUL A. CROTTY,
11                                        District Judge
12                       APPEARANCES
13  PREET BHARARA
         United States Attorney for the
14       Southern District of New York
    EMIL J. BOVE III
15  BRENDAN F. QUIGLEY
         Assistant United States Attorneys
16
    BOIES, SCHILLER & FLEXNER LLP
17       Attorneys for Defendant Campo Flores
    RANDALL W. JACKSON
18  JOHN T. ZACH
    JOANNA CHRISTINE WRIGHT
19
    SIDLEY AUSTIN LLP
20       Attorneys for Defendant Flores de Freitas
    DAVID M. RODY
21  ELIZABETH A. ESPINOSA
    MICHAEL D. MANN
22
    ALSO PRESENT:
23
    HUMBERTO GARCIA
24  MERCEDES AVALOS
    ERIKA DE LOS RIOS
25  MIRTA HESS
    Spanish Interpreters
```

GBH5flo1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, please, be seated.

3              The jury is all here, they're filling out their lunch

4    orders.

5              Before me I have a letter from the defendants, of

6    November 15th, dealing with conscious avoidance.  And as I said

7    last night, I would consider the matter.  I have considered it

8    overnight.  I have read the cases.  I am going to deny the

9    defendants' application and I am going to include a conscious

10   avoidance instruction to the jury and the government can

11   present a conscious avoidance argument to the jury.

12             As soon as they're ready to go, Marlon.

13             THE DEPUTY CLERK:  Okay.

14             THE COURT:  Are you going first, Mr. Quigley?

15             MR. QUIGLEY:  Yes, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning.

3          THE JURY:  Good morning.

4          THE COURT:  Please, be seated.  Thank you for being on

5     time.  As I told you yesterday, we are going to have summations

6     now from the parties.

7          Mr. Quigley?

8          MR. QUIGLEY:  Thank you, your Honor.

9          Good morning.

10          THE JURY:  Good morning.

11          MR. QUIGLEY:  At the beginning of this trial, Mr. Bove

12     told you that the evidence would show that the defendants were

13     drug traffickers who got caught red-handed trying to move a

14     huge shipment of cocaine to the United States and that is

15     exactly what the evidence showed.  The evidence showed that in

16     August and September 2015, well before the defendants met

17     anyone who was working with the DEA, they were trying to move

18     cocaine out of Venezuela on planes.  They had, in Defendant

19     Campo's words, "gold in our hands," because of their access to

20     the main airport in Caracas and their ability to operate with

21     impunity in their home country.  They worked hard to turn that

22     gold into cash pursuing multiple deals.  And in the fall of

23     2015, they repeatedly flew around the Caribbean meeting in

24     three different countries to discuss a particular deal to send

25     a large quantity of cocaine from Venezuela to Honduras, and on

GBH5flo1                    Summation - Mr. Quigley

to the United States.  They met with people who were working
with the DEA and they met with actual drug traffickers, people
like Roberto de Jesus Soto Garcia, who work at the airport in
Roatan, Honduras; Carlos Gonzalez, who testified at this trial
but who was an air traffic controller at the airport in Roatan,
Honduras at the time he met up with the defendants; Cesar
Orlando Daza, who introduced the defendants to El Sentado in
Honduras and who is not working for the DEA.  Those drug
traffickers had no idea that the DEA had gotten in the middle
of the defendants' plan and had every reason to believe that
this was a very real drug deal.  And, in November 2015, in
Port-Au-Prince, Haiti, the defendants were arrested.  Their
highly incriminating phones were seized and they confessed.  In
a few minutes I'm going to go through this and some of the
other evidence in the case in detail but first I want to take a
moment to focus on the crime that the defendants are charged
with.

         The defendants are charged with one count of
conspiracy.  As I expect Judge Crotty will instruct you,
conspiracy is simply another name or an agreement.  The
objectives and goals of the agreement were to import drugs into
the United States and to distribute drugs, knowing and
intending that at least some of those drugs would come to the
U.S.  I expect Judge Crotty will instruct you that to find the
defendants guilty you need to find that the conspiracy had only

GBH5flo1                    Summation - Mr. Quigley

one of those objectives and not both, and because this is a

conspiracy, the government does not need to show that any of

the drugs were actually distributed or imported into the United

States.

         Very briefly, you will be asked to make a finding on

something called venue, and here venue is satisfied because

after the defendants were in Haiti, they were first brought to

White Plains here in the Southern District.

         So, that's the law.  Let's talk about the evidence.

         I want to start at the end of the charged conspiracy,

a few hours after the defendants' arrests in Haiti on November

10, 2015, when both defendants confessed to their participation

in this conspiracy.  The defendants made these confessions

after signing written Spanish language Miranda forms.  And

these are not little boys, these are 30-year-old men, one of

them -- Defendant Campo -- is an attorney.  If you credit the

defendants' confessions, ladies and gentlemen, then this case

is over and the defendants are guilty.  That's it.  Full.

Period.  Stop.

         Let's talk first about Defendant Campo's confession.

The report of that confession is in evidence as Government

Exhibit 2001.  It is excerpted here up on the screen.  Agent

Gonzalez' contemporaneous notes are also in evidence as

Government Exhibit 2000.  What did Campo say?  He identified

someone named El Gocho as his cocaine supplier and said that

GBH5flo1                    Summation - Mr. Quigley

Gocho was getting the cocaine from the FARC, Colombian

paramilitary organization.  He said a man named Hamudi had put

him in touch with El Gocho and another man named Juan, also

known as Jose, was intermediary.  Hamudi had also put Campo in

touch with El Negrito, a/k/a Flaco, who was his contact in

Honduras.

　　　　Campo stated he could have gotten the drugs out of the

Caracas airport very easily because of who he was -- the nephew

of the first lady of Venezuela -- and the access he had at the

airport.  He acknowledged that the Mexican, who you know to be

Jose Santos Peña, was the intended recipient of the drugs, and

had said that the drugs were going to the U.S. but Campo says I

didn't emphasize it.

　　　　Campo stated that Hamudi had been killed 15 days ago.

That confession, right there, is alone enough to convict Campo.

He admits he is involved in this cocaine deal and also admits

that he acknowledges that he knew the drugs were going to the

United States.  It doesn't matter whether it was important to

Campo, whether he emphasized it or not.  All that matters is

that he knew.

　　　　Let's talk about Flores' confession.  The report is in

evidence as Government Exhibit 2003.  Agent Gonzalez'

contemporaneous notes are in evidence as Government Exhibit

2002.  He says the deal involved 800 kilos of cocaine.  He

expected to make $560,000 personally.  The buyer -- the

GBH5flo1                    Summation - Mr. Quigley

Mexican -- was paying $12,000 per kilo and he says that the

Mexican had said that the drugs were going to the United

States.  He identifies El Gocho as his supplier and says that

someone named Pepero had introduced him to El Gocho.  He adds

that Hamudi had introduced him to Sentado in Honduras via

El Flaco.

       So, Flores admits that he was involved in an

800-kilogram cocaine transaction which he expected to make

$560,000, and he knew the drugs were going to the United

States.  Again, that alone, is enough to convict him.

       Why should you credit this evidence?  For one, it is

corroborated by other evidence in the case, evidence that Agent

Gonzalez had no idea about on that plane flight from Haiti last

November.  We will talk more about the evidence throughout this

morning but the key fact is that the government at that point

had not searched the defendant's phones.  Agent Gonzalez had no

reason to know about Gocho who both defendants identified as

their supplier, but Gocho repeatedly comes up in the

Defendants' text message particularly in Government Exhibit

408-T and 518-T.  Agent Gonzalez had no reason to know about

this man named Hamudi but, again, Hamudi is all over both

defendants' phones.  And Agent Gonzalez certainly had no reason

to know that Hamudi had been killed just prior because the text

message in Government Exhibit 510-T, October 20th, 2015,

Defendant Flores tells Campo, apparently they killed Hamudi and

found him dead in *el cemeterio*.  Agent Gonzalez had no way of

knowing that unless Campo told him.  And he had no reason to

know about Jose, a/k/a "Pepero," a/k/a "PPR," who both

defendants identified as the middle man between themselves and

El Gocho and who also repeatedly appears in the defendants'

phones, particularly in Government Exhibit 408-T and 5815-T.

Agent Gonzalez had no reason to know about Flaco,

a/k/a "Negrito," who the defendants said was their connection

in Honduras.  The man's real name is Cesar Orlando Daza Cardona

and he was present at both the October 3rd meeting, which is

pictured on the right side of the slide, and the November 6th

meeting, which is pictured on the left side of the slide.

The reason these people appear in Agent Gonzalez'

notes and reports is because those documents reflect what the

defendants actually said in their confessions and what they

actually meant in their confessions.  Because of that, those

confessions standing alone, provide ample basis to convict

them.

Let's take a step back and look at the other evidence

in this case.

The evidence shows that the conspiracy between the

defendants began well before they met with anyone from the DEA.

Here is Government Exhibit 403-T, the September 29, 2015 chat

between Campo and someone named AM.  He says:  This is a home

run for us.  No one can get tickets to travel right now and we

GBH5flo1                    Summation - Mr. Quigley

1    have the connections ready and we are doing good.

2            And you can see that in August and September 2015 the

3    defendants repeatedly sought to leverage their connections and

4    their ability to move freely in Venezuela to move cocaine out

5    of the Caracas airport.

6            Here is an August 25th, 2015 chat from Campo's phone.

7    Campo and PPR, also known as Pepero, or Pepe, the same guy who

8    later served as the middle man with El Gocho, are talking about

9    one of their other associates who has a pilot and a co-pilot.

10   Campo says he is going to talk to one of his guys who is on

11   duty right now and Pepe responds:  Let's do this.

12           A few days later it is Defendant Flores talking to PPR

13   and he asks him:  Where do we send the GV to?

14           And you have seen a picture of a GV at this trial, it

15   is a jet plane.  Later, down on the page, PPR says it is going

16   to el sombrero, which we submit is a reference to Mexican drug

17   traffickers.  That was the condition on credit.

18           And here is a conversation between PPR and Campo,

19   Defendant Campo, about 45 minutes later where Defendant Campo

20   says he wants to get more involved than simply providing access

21   to the airport.  He says:  But the thing is that they are

22   practically doing everything because if they take it and they

23   place it, they're only going to pay us that bunch of money just

24   for the tickets.

25           Pepe says:  Are we DHL, we are business men?  We are

GBH5flo1                        Summation - Mr. Quigley

1    in the game, we do not do freight.  We have the contract for

2    the freight.  We are not making money from that.

3          Defendant Campo says:  Well, that is the attitude.

4    And all right, let's do it.

5          They continue on the next page and Pepe says:  Of

6    course, they must pay as soon as the nose starts lifting

7    otherwise there is no deal.

8          Further down on the page Pepe says:  I am not

9    mentioning any amount to them.

10          Campo says:  500 -- and then he gets to his big

11    concern -- and afterwards, how long for us to get paid?

12          Pepe says:  This is menial details.

13          Campo says:  No, that's the most important part, the

14    part that I'm most interested in.

15          You continue on and, again, more -- even in late

16    August it is clear this wasn't their first time doing this.

17    Campo says:  We are doing this because we have done this a

18    couple of times already and the last time they left us hanging

19    and we had to pay for the pork chops.  Understand?

20          And this continues a few days later, about a week

21    later.  The fact is that the pace doesn't even move fast enough

22    for the defense.  Flores says to Campo:  I want to start

23    working.  And me too.

24          Campo says:  I gave an earful to PP -- Pepero.  And

25    Campo talks about already, in early September, doing it through

GBH5flo1                    Summation - Mr. Quigley

1    another channel.

2            They continue to explore their options.  Here is a

3    conversation from September 16th, 2015, again between,

4    involving Defendant Flores and PPR.  They talk with their other

5    associate, Mayweather, they talk about having a 402 and a 404

6    available which are both planes, as we will see in a second

7    here, and Flores says:  404 is perfect.  Both of them work.

8            The one with more room for passengers will be best.

9            Flores:  We are ready, buddy.

10           Again, more conversation about planes; no pistons, it

11   has to be turbine, no propeller.  Mayweather:  I am on move

12   already for a big one.

13           They continue talking and here, on September 20th,

14   2015, Flores is looking at a Learjet that's in stock in

15   California.  Things continue to move slow for them and PPR

16   reaches out and says:  The taco people will be arriving

17   already.  PPR instructs Flores to talk to Efrain -- Defendant

18   Campo -- already.

19           Defendant Flores says:  We don't have anything by

20   tomorrow.  Efrain is already looking to figure out something

21   else elsewhere because we are looking really bad in front of

22   the people who really want to work.

23           Again, Campo says:  This is a home run for us right

24   now.  No one can get tickets for us to travel and we have the

25   connections and we are doing really good.

1           What is the point of all of this?  The point of all

2      this is that weeks and months before the defendants have any

3      communication with anyone working with the DEA they were

4      attempting to facilitate drug shipments using their access to

5      the main airport in Caracas.  In his opening Mr. Zach said this

6      was just talk, just about a few flights on planes as if it is

7      perfectly normal to fly around the Caribbean on private jets

8      and meet with drug dealers and that the defendants had been

9      targeted by conniving informants.

10          This evidence, prior to the defendants meeting with

11     El Sentado in Honduras on October 3rd, 2015, shows that the

12     defendant had been working hard and with people who had no

13     association with the DEA to put together deals involving

14     plane-loads of drugs, the kinds of deals you heard them talking

15     about on tape at this trial.

16          So, the defendants explore their options and as they

17     admitted in their confessions, they link up with somebody named

18     El Sentado through another person named Negrito Nico.  Here is

19     a chat between Campo and Negrito on October 2nd and 3rd, 2015.

20     Negrito tells Campo that he will be wearing a dark shirt and

21     white pants.  And there he is to the right of Sentado in

22     Government Exhibit 110 from October 3rd, 2015.

23          The defendants fly to San Pedro Sula, Honduras on

24     October 3rd in a private plane that their partner Gilson helps

25     them get.  They pay $20,000 to go there.  They get there on

GBH5flo1                    Summation – Mr. Quigley

October 3rd and are there just a few hours and they met with

El Sentado.  And the DEA instructed El Sentado to record this

meeting but he didn't and that's wrong, but there is no mystery

about what happened here because Defendant Campo described this

extensively on other recordings in this case.

          So, if we can play this now, Mr. Calabrese?  Thanks.

          (Audiofile played)

          MR. QUIGLEY:  So, he describes how dangerous it was

when he got there and how, when they got there, Sentado made

them wait.

          If we can play this clip?

          (Audiofile played)

          MR. QUIGLEY:  And he says the meeting lasted about two

hours and Campo made clear that he was not merely a middle man

between Sentado and the Venezuelan government but that he was

in charge on the Venezuelan side.

          (Audiofile played)

          MR. QUIGLEY:  Sentado also told the defendants that

the price of cocaine in Honduras would be $12,200 which is per

kilo, which is consistent with the expert testimony you heard

from Agent Dan Mahoney about the price of cocaine in Central

America.  He also said that there was a flat landing and

unloading fee of $900,000.  And Sentado also told the

defendants that this unloading and landing fee was standard for

Central America, the Central American route over which Agent

GBH5flo1                          Summation - Mr. Quigley

1    Mahoney told you that 90 percent of the cocaine flows to the

2    United States.  And it is pretty explicit here in this

3    recording we are about to play that the defendants were well

4    aware that this shipment was not going to Europe.

5                (Audiofile played)

6                MR. QUIGLEY:  The defendants also told Sentado that

7    they may have the possibility of providing a car -- meaning the

8    plane -- but that they had no availability of cars right now on

9    October 3rd in Honduras.  They also discussed the fact that

10   Sentado was going to send someone named Rayo to Venezuela to

11   help them link up with Sentado's cocaine supplier.  But, weeks

12   later, Rayo still hadn't made it to Venezuela.

13               (Audiofile played)

14               MR. QUIGLEY:  They also discussed the fact that the

15   cocaine would arrive in Roatan, the same place where Carlos

16   Gonzalez was an air traffic controller, okay, and that the

17   cocaine would eventually plan to be shipped to.

18               What do they do after this meeting with Sentado?

19   Ladies and gentlemen, one of the key aspects or things that

20   shines the most light on the defendants' knowledge and intent

21   in this case is the things they do after their meetings with

22   confidential informants and other people working at the

23   direction of the DEA.  Do they go home to Venezuela and say,

24   wow, that was scary, I don't want to be a pretend drug dealer

25   anymore?  No.  They continue to push the pace of this deal.

GBH5flo1                    Summation - Mr. Quigley

1           Here is a text message between Campo and Sentado on or

2    about October 5, 2015, after the defendants had gotten back to

3    Venezuela.  Campo says:  But I want to start work because the

4    electoral campaign is almost here and I always contribute with

5    money, if you know what I mean.  That is why I want to start

6    work.

7           And they also make security and logistical

8    preparations.  Here are both defendants talking on October 4th,

9    the day they got back -- the day after they got back from

10   Honduras saying that they're going to check with Felix and

11   Tortuga and one of the guards and they were going to include

12   another one of their guards, Samia, in the security logistics.

13   And they also discuss practicing operational security,

14   communication security.  Again, the day after they got back

15   from Honduras they're looking for six BlackBerries; Campo says

16   two for Flores, three for me and one for the Anana Capichi, the

17   BlackBerry, because that's the real thing we can use.

18          They also discuss keeping their options open.  Flores

19   refers to PPR, a/k/a Pepero, and Campo says we can use him as a

20   bridge in case Sentado's supplier doesn't pan out.  And that

21   way we don't have to depend on anyone.  What do you think?

22          They also discuss continuing to do other deals.  Here,

23   Flores and a guy named Chichi Smith are talking about equipment

24   that is going to France.  They're paying 29 for it.  And a week

25   later Chichi Smith and Flores have a conversation that Flores

1    is in dire need of chairs.  He is not talking about furniture

2    here, ladies and gentlemen, because he says let me get another

3    number to not talk on this one.

4            Again, they're continuing to talk with other partners

5    in crime throughout this time.  Flores tells Rayo:  Brother, we

6    called that off because we have a huge issue with

7    communication -- meaning the deal with Sentado.

8            And Campo is in touch with somebody else named Gallo.

9    He says:  And everything with the car is already set up?

10           Yes, everything is ready.  Just about going out.

11           Is everything here taken care of at FBO?

12           We know FBO is reference to an airport ramp.

13           So, again, this guy Rayo never makes it to Venezuela

14   to meet with the defendants.  Flores says we are waiting and

15   waiting, and Flores says we confirmed another trip that we had

16   pending, meaning they started to do another deal.  And around

17   this time the DEA sends Jose Santos Peña to Venezuela, and his

18   son, to pose as Sentado's associates as Mexican drug

19   traffickers and they have three recorded meetings with the

20   defendants.

21           Now, obviously Jose Santos Peña and his son loom large

22   at this trial.  Their unauthorized drug dealing was

23   reprehensible and that's why we put them in jail.  And you all

24   saw what happened in court the other day and Santos Peña is now

25   going to have to face the consequences of having breached his

1   cooperation agreement.  But, the evidence of what happened

2   during those meetings in Venezuela comes not from Santos Peña's

3   mouth but from the recordings.  The defendants' own statements

4   on the recordings speak for themselves on the central issues in

5   this case regarding what was in the defendants' heads regarding

6   their knowledge and intent.  The recordings from Venezuela are

7   clear and consistent throughout.  The defendants were eager and

8   enthusiastic to do drug deals.  They're going about it in an

9   organized, methodical way.  Campo even brought a checklist to

10  one of the meetings.  Did they have questions about certain

11  aspects of the deal?  Sure -- as anyone would, who is getting

12  involved in a multi-million dollar multinational transaction.

13          The first time the defendant met with the sources was

14  on October 23rd and, once again, the defendants are pushing the

15  pace of this deal.  Early on Campo is complaining that Sentado

16  disappeared on him and you can't disappear for that long in

17  this business.  Campo says he had started to look around

18  elsewhere for other deals like we just saw in the text messages

19  from a few minutes ago.  And right off the bat Campo makes

20  clear why he is in such a rush.  He needs $20 million -- in

21  other words, the issue is money.  We need it by September and

22  he says in row 1:  My mom -- my mom is running for the

23  election.

24          And early on in the meeting the parties make their

25  roles in this transaction known.  Campo identifies Flores as:

1    This is my cousin, this is my brother.  This is my partner.

2            Santos Peña says:  I'm the person who buys everything

3    from Sentado and I am the person who is responsible for taking

4    everything to the United States.

5            They discuss who will be providing the plane.  Campo

6    says -- probably referencing some of the conversations that he

7    had with Pepero back in September regarding the taco people

8    says:  We had some cars and I was working with some people from

9    over there where you guys are from -- meaning Mexico -- and

10   people didn't come through for us.  They came by to pay us and

11   it didn't work out.

12           Campo also adds that in the past he has worked with a

13   G2 and we know that a G2 is a type of airplane that is about 80

14   feet long.  Campo says he is going to meet with somebody about

15   the car and he is assuming that he can get it.

16           The defendants also tout their most valuable asset,

17   the ability to operate at the main airport in Venezuela.

18   They're not operating out of some dusty landing strip in the

19   mountains.  The defendants have assured the sources of their

20   ability to get the drugs safely out of Venezuela and they say

21   not even a colonel or general is going to be able to interfere

22   because of who they are.

23           (Audiofile played)

24       MR. QUIGLEY:  They also assure the sources that

25   Venezuela is an extra safe place to do business because the DEA

GBH5flo1                    Summation – Mr. Quigley

1    doesn't come in here and the Americans aren't here.

2                    (Audiofile played)

3           MR. QUIGLEY:  By the way, why does Defendant Flores

4    make assurances about the DEA and not NASA or the Fish &

5    Wildlife Service or the Haitian BLTS?  Because everybody knows

6    that this is a drug transaction and everybody knows that a

7    significant amount of the drugs shipped out of this part of the

8    world end up in the United States, the world's single largest

9    consumer of cocaine.  And they also discuss at this first

10   meeting the possibility of Campo actually getting the drugs and

11   not waiting for Sentado's contact, Rayo, to arrive.  Now, to be

12   fair, Santos Peña suggests this but Campo responds readily:

13                    (Audiofile played)

14          MR. QUIGLEY:  They meet again on October 26th, a few

15   days later after Campo had a chance to meet with his people,

16   and they continue discussing doing multiple cocaine loads

17   including the first one for 800.  And Campo ultimately agrees

18   that he will be responsible for getting the plane and he says:

19   We can get a G2 and, if not, we can get a Falcon.  You know

20   what a Falcon is?  There is a picture right there.

21          More discussions.  Campo confirms or Santos Peña says:

22   I know that in all probability we are going to do it with your

23   plane here in order to go and depart very cleanly.

24          Campo:  Of course.

25          Here with are all set with the topic of the car,

1    meaning the plane.

2              By the way, at this October 26 meeting Campo actually

3    has a list.  If there is any question about his seriousness in

4    engaging in this drug transaction, it is clear that he has a

5    list of certain points.  He has a point about the landing and

6    unloading on his list, he has a point about the product and he

7    has a point about the plane.

8              Again, they continue discussing the landing and the

9    unloading fee and the pricing in Honduras.

10             And if we can play this clip, Mr. Calabrese?

11             (Audiofile played)

12             MR. QUIGLEY:  Again, here they're discussing the most

13   valuable asset, the ability to take this out of the main

14   airport in the country.  They also discuss timing.  And what is

15   Campo's timing issue?  He emphasizes that he is using the funds

16   he hopes to get from this deal to make payments to political

17   allies to buy votes.  And the defense will say this is all

18   bluster but this isn't some 5-second aside.  This is well

19   thought out, reasoned, and it is that way because that's what

20   Campo was actually doing.  This is what was actually in his

21   head:

22             (Audiofile played)

23             MR. QUIGLEY:  So, that's the defendants' big timing

24   restriction, they need to get people paid after the December

25   elections so they need to get this payment relatively soon but

1    Santos Peña's big timing restriction, let's look at Government

2    Exhibit 206-T page 33 line 24, which comes after Campo's

3    explanation about the political process and he says:  And I'll

4    explain.  I stop during that time because starting December 8th

5    or 12th I will stop putting anything into the United States.

6    Why?  Because the border gets very harsh surveillance then.

7         He is not going to work after December 8th or 12th

8    because he is not going to put anything into the United States

9    at that point.  It is important because it shows that his

10   business, his drug business, is in the United States.

11        Then Campo goes to his next point, his next topic on

12   his list and you will see here in a second that he is worried

13   about bringing it up.  He will say he doesn't have a problem

14   providing the birds -- meaning the plane -- and he is fine with

15   providing the drugs.  In fact, he will say that his supplier

16   can get him the drugs by the shovelful.

17        So what is his concern?  Is he not a real drug dealer?

18   That he has scruples about sending the drugs to the United

19   States?  No.  He wants to get 50 percent payment up front.

20             (Audiofile played)

21        MR. QUIGLEY:  All right.  Ultimately Santos Peña

22   agrees initially to make a $5 million payment in Venezuela,

23   roughly half of the price of the first drug load before the

24   load ships out.  Then they continue to discuss how this amount

25   is going to be paid in Venezuela and in the context of this

discussion, Campo explains that it is important to be careful

because a lot of people don't know that he, as a member of the

presidential family, is involved in the drug business:

           (Audiofile played)

           MR. QUIGLEY:  Now, at the end of this meeting, Campo

explains why he kept Santos Peña waiting for four days when

Santos Peña arrived in Venezuela on October 19th.  He explained

that he got frustrated for waiting for Sentado and he called

the whole thing off which is consistent with what you have seen

in those text messages.  He was planning other things and

taking this deal out of play but then he decided to re-engage:

           (Audiofile played)

           MR. QUIGLEY:  That's at the end of the October 26th

meeting.  And there is just one last thing left to do in

Venezuela, and that's for the defendants to get a sample of the

cocaine that they'll be selling and that happens the next night

on October 27th.  There is no question that this is cocaine.

There is extensive discussion about getting a sample in the

October 23rd and October 26th meetings because Campo had

previously gotten bad quality cocaine the last time he

purchased directly, as he put it.  And we heard references to

that in some of the recordings we heard a few minutes ago.

           So, how does Defendant Campo refer to this substance

when he brings it out of his bag?  He says I have a "little

animal," and a "little animal" is one of his code words for

GBH5flo1                         Summation - Mr. Quigley

1   cocaine.

2         Where are some other places he uses little animal?

3   Here is Government Exhibit 201-T which is from the October 23rd

4   meeting, he says:  The topic in regards to the little animals.

5         Now he is talking about his supplier:  He told me that

6   he had them.

7         And he said:  Over here we work with a person that

8   receives from us.

9         But the one who gives him the little animals, his

10  supplier is different and then down there on line 13 he is

11  talking about a certain purity.

12        And this is another excerpt from Government Exhibit

13  201-T and this is right before the place where Campo and Flores

14  talk about how the load will be safe even if a colonel or

15  general arrives at the airport.  And he says when the little

16  animals leave on their way there, we will be there.

17        So, let's take a look at Government Exhibit 210-S.

18  And Campo also jokes around about how he was going to send this

19  kilo back to the hotel because he is obviously not going to do

20  that with cocaine:

21        (Audiofile played)

22        MR. QUIGLEY:  And he takes it out of the bag and they

23  inspect the kilo:

24        (Audiofile played)

25        MR. QUIGLEY:  And after they get done with the kilo

 1    inspection, Campo helps tape up the cocaine and everyone in the

 2    room discusses the market for two other drugs -- 2Cs and

 3    heroin -- and that's significant for a couple of reasons.

 4            First, clearly, these guys know about the drug

 5    business.  And moreover, you will see that the defendants talk

 6    about the U.S. market for the drugs and that's important

 7    because it shows they believe, in talking to their sources,

 8    they are talking to other people in the U.S. drug market:

 9            (Audiofile played)

10            MR. QUIGLEY:  So, what happens after these meetings?

11    After the sources leave Venezuela do the defendants say, wow,

12    that was fun while it lasted.  Let's go back to our peaceful,

13    law-abiding lives?  No.  Once again, their actions after they

14    meet with the informants provide great evidence of their intent

15    in this deal.  They continue to prepare in earnest for the

16    shipment and they push to pace.

17            Here is a text message between our old friend Pepero

18    and Defendant Flores from October 29th, 2015, two days after

19    the sources left Venezuela:  Buddy, but anyway, we are going to

20    meet with El Gocho or we'll see them tomorrow.  Efra --

21    Defendant Campo -- wants to go see the house.  He is going to

22    send us information.  This is the same Gocho who both

23    defendants identified in their confessions as their cocaine

24    supplier.

25            And Pepe, also known as PPR, sends this text to

GBH5flo1                    Summation - Mr. Quigley

Flores, showing him that he has repeatedly called El Gocho on
November 1st.  16 minutes later PPR sends Flores the same
screenshot, again, to show that he has called El Gocho.  And he
says.  There it is, he talked to Elias.  I called him and he is
the one who has the fruits over there.  And later that day PPR
tells Flores that El Gocho has something ready for this week.

Flores says:  Awesome.

And again, same day, a few minutes later PPR tells
Flores:  And he said -- referring to El Gocho -- he is going to
put down the 800 for us without putting down a single bolivar.

This represents the defendants getting the 800
kilograms of cocaine after they met with the sources, the 800
kilograms of cocaine that they were going to send to Honduras
and on to the United States.

Campo also continues to communicate with Santos Peña
and, again, here again he references 800.  He says:  At the
moment, I have only one; and no problem, I will send you 800
head of cattle weekly.  That is all I can fit in those trucks.

And again, are the defendants reluctant to participate
in this deal?  Are they just being roped in by the sources?
No.  They're pushing the pace.  This is Campo:  I need for you
to get going with the events, sir.  Remember, this is a bit
urgent for me, sir.

Yes, exactly.

But it's very urgent for me that you welcome my

GBH5flo1                    Summation - Mr. Quigley

1    drivers over there right now.

2            I'm most interested in speeding this up, sir.

3            And Campo and Flores want to send their drivers --

4    their drug pilots -- to Honduras to discuss logistics of the

5    flight.  And they actually try to do this not once, not twice,

6    but three different times; once on November 4th, when a storm

7    gets in the way, once on November 5th, when the pilots have

8    trouble with the Honduran authorities, and finally on November

9    6th, when Flores himself goes back to Honduras and meets with

10   Daza, Soto, Sentado, and Juan Gomez who testified at this

11   trial.

12           First, November 4th Campo sells Santos Peña that there

13   is a storm and they have to change course and it will take 30

14   minutes and that's what the control tower there is informing

15   them.

16           And then Campo and Flores have a chat later that day

17   where Campo says:  The mechanics that we sent over there to

18   check out are not even going to be able to get there.  A bit of

19   rain and they don't even answer my calls.

20           Campo reaches back out to Santos Peña and he says:  I

21   need a final answer about whether you will be able to welcome

22   my guys over there in Honduras tomorrow.  I'm sorry about today

23   but, darn, it was out of my hands, it was god's will --

24   referring to the weather.

25           Here is attempt 2.  On November 5th, Campo says:

1   They're already there and they're going through immigration.

2   You heard testimony that this was the same day, November 5th,

3   that Carlos Gonzalez -- the air traffic controller -- met with

4   Roberto de Jesus Soto Garcia, Sentado, and Juan Gomez to talk

5   about this drug load that was coming into Honduras from

6   Venezuela.  The defendants' pilots were supposed to be at that

7   meeting and here they are trying to get there.  But, there is a

8   hitch:  The pilots don't have the correct paperwork.  Campo

9   says they're telling me these guys need an overflight permit

10  and they didn't get it and they need to depart.

11          Campo says he told Flores to take care of it and he is

12  so committed in fact that he decides to send another plane to

13  Honduras the next day.  He said let the passengers talk and

14  that's it.  I will send another car, another plane with

15  different passengers.  We have plenty of that here.

16          And then he shows his true feelings about the pilots

17  who couldn't make it into Honduras.  He says give me a few days

18  and I will send you photos of those guys.  Wait.  They say the

19  pilot should be sent back and the airport authority is not

20  letting the guys go out because of the flight plan already?

21  What a mess.  Look, sir.  I swear by God that I will kill those

22  pilots.  I will kill them.  I am going to place an alert on

23  that car here.  As soon as they get here, they should be

24  brought to me.  And then he says at the bottom:  The cousin --

25  referring to Defendant Flores -- is going in person.  And the

GBH5flo1                    Summation - Mr. Quigley

1    next day, this is from Defendant Flores' phone at 3:17

2    Venezuela time, there he is driving on the tarmac to get on the

3    plane to Honduras.

4         You see his passport stamp leaving Venezuela on

5    November 6th, and Campo passes to Santos Peña the tail number

6    of the plane that Flores was on.

7         I want to back up a second and talk briefly about the

8    meeting that happened the previous day where the defendants'

9    guys couldn't make it, that was the meeting involving Soto

10   Garcia, Carlos Gonzalez, the air traffic controller, and

11   Sentado.

12        You recall yesterday during the cross-examination of

13   Carlos Gonzalez and actually Juan Gomez, the confidential

14   source, there was some discussion of who was suggested that the

15   load was going to be sent out on November 15.  And here is how

16   that developed.  You can see it on Government Exhibit 215-T at

17   6.  This is Carlos Gonzalez, the air traffic controller.  He

18   says:  We are shifts.  Up until we have shifts on Monday,

19   Thursday, Friday, and Sunday afternoon of next week.  Of next

20   week.

21        Then Soto says that Sunday is an ideal day because

22   everyone is distracted.  And here Sunday afternoon of next

23   week -- this is on November 5th -- Sunday afternoon of next

24   week is November 15th.  It was due to the scheduling at the

25   airport.

GBH5flo1                        Summation – Mr. Quigley

1              Let's talk about the meeting that Flores was at in

2     Venezuela –– I'm sorry –– in Honduras on November 6th, 2015.

3     Let's play this recording, Mr. Calabrese.   Thank you.

4                   (Audiofile played)

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. QUIGLEY:  (Continuing) Remember the main

2     participants.  So who are the main participants in this

3     conversation?  You have Flores and you have Soto.  Remember

4     what's significant here is that Soto is not working at the

5     direction of the DEA.  He's a criminal who is currently in jail

6     in Honduras.  He and defendant Flores are not talking about

7     some imaginary fantasy drug flight here.  They're talking about

8     a flight that they have every expectation will actually happen,

9     a plane full of cocaine coming from Venezuela to Honduras.  You

10    just saw and heard Flores confirm that Soto's guys will receive

11    it from me and will unload the merchandise immediately.  And

12    Flores goes on to assure everyone of his control over the

13    airport at the Venezuela end.

14          (Recording played)

15          Again, a few pages later after this Flores reiterates

16    that the plane is departing from the president's hangar in

17    Venezuela.  And then Soto explains the timing of the arrival in

18    Roatan to Flores.

19          (Recording played)

20          Here's one last recording from Honduras.  This is 223,

21    a continuation of the meeting.  Flores confirms that the drug

22    load will be on November 15 and discusses briefing the pilots

23    who will be flying the plane.

24          (Recording played)

25          What happens next?  Flores flies back to Venezuela on

GBH9FLO2                    Summation - Mr. Quigley

 1    November 7 and three days later defendants get back on a plane
 2    and fly to Haiti.  While all the this was going on in Honduras,
 3    Santos Peña, at the direction of the DEA, had invited Campo to
 4    come to Haiti so they could finally get their hands on an
 5    eleven-million-dollar payment for the cocaine load.  The
 6    payment had been increased from five million in government's
 7    301-T on page 11.  And Campo readily accepted and they
 8    discussed meeting in Haiti on November 9 or 10.
 9              What do the defendants say when they get to Haiti?
10    Well they say the load is going out on the 15th just like had
11    been discussed in Honduras.
12              (Recording played)
13              A few minutes after this the defendants are arrested.
14              So that's what happened here.  The defendants sought
15    to leverage their connections in Venezuela so they could make
16    millions of dollars by trafficking in huge quantities of
17    dangerous drugs.  Their actions and their words we have leave
18    no question about doing this.
19              This was just not just a few meetings.  This went back
20    once to August.  This was a months-long commitment, even an
21    obsession.  They pursued multiple the deals for months starting
22    long before they met with anyone from the DEA.  And between
23    October 3 and November 10 they participated in at least six
24    different meetings in three different countries including
25    multiple trips to Honduras, one of the most dangerous places on

GBH9FLO2                    Summation - Mr. Quigley

earth.  During these hours of meetings they touted and flaunted

their political connections and their ability to operate with

impunity in their home country.  They engaged in detailed

discussions about timing and logistics like the one we just

heard in Honduras that would make no sense unless they were

truly committed to this deal.  And in between these meetings

they communicated with Pepero and their other partners in crime

in Venezuela about this deal and other deals.  There really

could be no serious question about the defendants' intent here.

          Finally, I want to talk about the evidence that shows

that the defendants knew that at least some of the drugs at

issue were destined for the United States.

          First, the recordings.  Jose Santos Peña is repeatedly

explicit on these tapes that his business is in the U.S.  This

evidence involves no assessment of his credibility.  It's a

matter of listening to the tapes and seeing what's on the page.

          Here are some examples.  Government Exhibit 203-T, the

October 23 meeting.  "I'm the person who buys everything from

Sentado.  I am the person who is responsible for taking

everything to the United States."

          Government Exhibit 206-T, the October 26 meeting.  "I

keep putting money into it until it gets to Mexico.  I keep

putting money into it to get it over there, and I keep putting

money into it to get it into the Americans, to cross it over."

          Government Exhibit 206-T again.  We talked about this

one earlier.  "Because starting December 8 or 12th I'll stop

putting anything into the United States because the border gets

very harsh surveillance there."

Government Exhibit 231-T from November 10 in Haiti.

"I can buy it from them but the merchandise is going to belong

to me.  It's the same to me because that business I have it's

up there in the United States."  In response to some discussion

about Canada, he says "I sell very little in Canada.  I sell

almost everything in the United States, the East Coast,

New York, all of Chicago."

The defendants' own words also show their awareness of

where drugs were going to go.  This is from the October 26

meeting in Venezuela.  We talked about this one before.  Campo

is recounting his meeting with Sentado and they're talking

about the loading and the unloading fee in Honduras.  And Campo

says it's -- he was told that it was nine hundred thousand --

or it was $900,000 to 102 million tops in the Central American

countries but that the price, if it's going out to Europe,

would be a lot higher.

Here is from the meeting in Haiti.  Campo asked

Santos Peña:  You don't like working in Europe.  And

Santos Peña says:  No, I don't work there because it requires

too much of me.  Campo says:  I used to have some contacts

there and they got a bit nervous.

You also know this from the expert testimony and your

GBH9FLO2                    Summation - Mr. Quigley

1    common sense.  The plan which was for these drugs to go from
2    Venezuela east to Honduras.  That's at three-hour flight.  It's
3    discussed in the text messages surrounding the October 3
4    meeting.  You heard that 90 percent of the drugs that make it
5    that far in Central America go to the U.S. and that makes
6    sense.  They're not going to turn around and go thousands of
7    miles back off the right side of the map to Europe.  Those
8    drugs are going up north to Mexico -- bless you -- and into the
9    United States.  This fact is well known in the drug world.
10   Agent Mahoney testified to that based on his debriefing of
11   numerous informants in Central America.  Carlos Gonzalez the
12   air traffic controller testified that he was well aware that
13   the drugs coming into Honduras were going to the U.S.  He
14   didn't need anyone to layout for him the fact that large
15   shipments of cocaine that end up in Honduras go north, up the
16   Central America isthmus, and into the United States.  Finally,
17   how do the defendants expect to be paid out?  They expect to be
18   paid out not in Mexican pesos, bolívars, euros or some other
19   currency.  The payment for this deal was always in U.S.
20   dollars.  And how do drug dealers get U.S. dollars?  From the
21   proceeds of drug sales in the United States.  So that's yet
22   another way the defendants knew that the drugs would be going
23   to the U.S.
24           The defendants thought they were above the law.  They
25   thought they could operate with impunity in Venezuela because

GBH9FLO2

1    of who they were and who they were related to.  They thought

2    they could easily make tons of money sending drugs out of the

3    country because, as defendant Flores said, the DEA is not here

4    and the Americans don't come in here.  But they were wrong.

5    You have their confessions.  You have the recordings, the five

6    different meetings.  You have their phones, two of their phones

7    anyway, where they were working for months to set up plane

8    loads of drug deals, phones that corroborate what was said on

9    the tapes and what the defendants said in their confession.

10          When you go back to the jury room and you decide this

11   case, you will find that there's only one verdict that is

12   consistent with the evidence and reflects what actually

13   happened here and that is that the defendants are guilty as

14   charged.

15          Thank you.

16          THE COURT:  Thank you, Mr. Quigley.  Ladies and

17   gentlemen, we'll take a morning break.  We'll resume at eleven

18   o'clock.  Please rise.

19          (Continued on next page)

20

21

22

23

24

25

GBH9FLO2

```
 1              (Jury not present)
 2              THE COURT:  Are you going next, Mr. Rody?
 3              MR. RODY:  I am, Judge.
 4              THE COURT:  I don't know how long you're going to be.
 5    I'm not going to ask you how long you're going to be but we're
 6    going to take a break at 12:30 because that's when lunch is
 7    going to be served.
 8              MR. RODY:  That's fine, Judge.  If I'm within a few
 9    minutes of finishing --
10              THE COURT:  You'll let me know.
11              MR. RODY:  I think I'm going to be longer than
12    Mr. Quigley, but I'm not sure.
13              THE COURT:  As I say, we're planning on 12:30.  If
14    you're close and you want to go to conclusion, you'll let me
15    know.  If not, we'll just break at 12:30.
16              MR. JACKSON:  Your Honor, just out of curiosity if we
17    start lunch at 12:30 what time will we resume?
18              THE COURT:  1:30.
19              MR. JACKSON:  Thank you, your Honor.
20              THE COURT:  Thank you.
21              (Recess)
22              THE COURT:  We're waiting for the interpreters.
23              THE INTERPRETER:  Interpreter ready.
24              THE COURT:  Marlon, call in the jury.
25              THE DEPUTY CLERK:  Yes, your Honor.
```

1            (Jury present)

2            THE COURT:  Mr. Rody.

3            MR. RODY:  Thank you, Judge.

4            THE COURT:  You're welcome.

5            MR. RODY:  Good morning, everybody.  It's good to

6    finally get a chance to talk to you directly.  We've got a lot

7    to talk about.  But first I want to take a moment to thank you

8    very much for your careful attention during this trial.  It's

9    been obvious to all of us who are working here in the well of

10   the courtroom that you take your jobs as jurors very seriously

11   and that means a whole lot to us.  We're working hard to defend

12   our clients, but it means the world to those two guys there.

13   Mr. Zach said in his opening this is the single most important

14   thing that's ever happened in their lives, and it is.  So it

15   means a lot to all of us.

16           So, you know from jury selection I'm Dave Rody.  I am

17   so proud to represent that guy over there, Franqui Flores.  He

18   and his cousin, Efrain, are not guilty of the crime charged,

19   which is a conspiracy to import cocaine into the United States.

20   They're not guilty because they never had the intent or the

21   ability to deliver a huge amount of drugs, the eight hundred

22   kilograms of cocaine that are at issue here.  They're not

23   guilty because they never agreed or knew or intended that any

24   drugs were going to go into the United States.  And they're not

25   guilty because they were induced and tricked and entrapped by

1    the government's corrupt informants.

2          Look, our government does many, many good things.  But

3    they overreached here, tried to make a federal drug case out of

4    a bunch of conversations, a bunch of talk between people in

5    restaurants and around tables a thousand miles away from here.

6    Nobody ever did anything other than talk.  They flew on some

7    planes so they could go talk.  Certainly nobody ever got any

8    eight hundred kilos of cocaine.  There is no proof of that in

9    the record.  And nobody ever delivered any eight hundred kilos

10   of cocaine.  And the government here relied on some of the

11   worst most conniving, deceitful informants hopefully you'll

12   ever see.

13         Now, Mr. Quigley gave a very fine summation for the

14   government.  It was a seamless presentation.  All the pieces

15   fit together.  It was coherent.  It was cohesive.  It was a

16   compelling presentation.

17         The problem is that's not the case you heard from the

18   witness stand.  That's not the gap-filled, inconsistent,

19   sometimes blatantly incorrect, and sometimes also perjurious

20   case you heard from the witness stand.

21         Remember how much of the evidence revolves around

22   CS-1, Jose Santos Peña.  Now we predicted this would happen,

23   and it did.  He came into court, raised his right-hand, he

24   swore to tell the truth, and he lied in your face; lied in your

25   face.  And you saw a remarkable thing, a very rare thing.  You

1    saw a government cooperator get ripped up in open court.

2              Now I commend the government for doing that.  I don't

3    think they had much choice, but nonetheless that's commendable.

4              The question is why did it take them so long?  Why did

5    they wait?  Why did they keep giving this guy chance after

6    chance.  With any reasonable diligence, the DEA would have

7    found out that this guy was double dealing for years and years

8    if they had been on top of it, but they weren't.  They were

9    asleep at the switch.  So they didn't know that he was

10   committing crimes.

11             And then when the government does find out -- you

12   remember it was in April of 2016 the government learns this guy

13   and his son are double dealing.  They don't do anything.  They

14   don't arrest him.  They say they need time to investigate it.

15   Then in June 2016 they confront him and son and they let him

16   go.  They don't arrest him.  And then finally they do arrest

17   him in August 2016 and CS-1 gets his big second chance.  I

18   don't know why.  He's this former Sinaloa cartel member, and

19   we'll talk some more about his activities later.  But he gets

20   had big second chance.  He's allowed to proffer with the

21   government and sign up to a cooperation agreement.  Okay.

22   Maybe he gets a second chance.  But then you heard about this

23   prior proceeding that took place in this case and you heard --

24   maybe it was a little tough to follow -- but you heard that

25   both CS-1 and CS-2, Jose Santos Peña and his son, lied on the

1    stand right before getting on the stand.  It didn't matter.

2    They lied in connection with that proceeding about this issue

3    about Paul, the son's friend Paul, this guy they deal drugs

4    with out in L.A., they had been dealing drugs with, who they

5    brought down to the meetings in Venezuela, brought into the

6    meetings with the defendants and they never told the DEA about.

7         So at that point he was going to get ripped up, right.

8    You would think they were going to rip up Jose Santos Peña.

9    But they didn't.

10        So the question is why?  Why didn't they rip him up?

11   Why did we have this spectacle of this man lying to you in

12   court?  And I think the reason is actually quite simple.  It's

13   because they needed him.  They needed him.  Their case depends

14   on him.  And you know Mr. Quigley said don't worry about Jose

15   Santos Peña, don't look at the man behind the curtain.  Just

16   look at the recordings.  It's all in the recordings.  Well,

17   he's in the recordings.  And it's what he says in those

18   recordings.  And it's all the other -- his text messages.  He

19   is the center of this case.  The case revolves around him.

20   Don't think for a minute it doesn't depend on him.  Because

21   without him, what's their case?  You got guys like Gonzalez who

22   never met either defendant.  What in the world does he know

23   about what's in their head, about what they think and what they

24   intend?  Zero.

25        I don't know why we saw Gonzalez.  He's irrelevant to

1    the case.

2            And they also showed you lots of pictures off the

3    internet.  Photos of planes, maps.  That's their case without

4    Jose Santos senior, CS-1.

5            They still need him today.  He infects every aspect of

6    this case, the government's case even as he sits hopefully

7    rotting in some jail.

8            So, I would suggest to you that Mr. Quigley's

9    presentation shows you the difference between evidence and

10    argument.

11            Now, defense has no burden here.  We don't have to

12    prove anything.  Defendants don't have to prove they're

13    innocent.  But we have tried, through our cross-examinations,

14    to get you to focus on the evidence or, more precisely, the

15    gaps in the evidence, the absence of evidence in the

16    government's case.

17            I suggest to you that what you heard from Mr. Quigley

18    was argument.  He is asking you to speculate; speculation, to

19    fill in the gaps in their proofs; speculate to make up for

20    these disconnected text messages between people who weren't at

21    trial, didn't testify, you don't even know who they are.  And

22    there is no one here to interpret what they mean, these vague

23    coded texts.  And they're asking you to speculate, to smooth

24    over all the rough patches caused by liars like CS-1.

25            The government always talks about common sense.  Use

1    your common sense.  Well, they don't have a monopoly on that.

2    We want you to use your common sense too.  But I think when the

3    government says use your common sense they mean speculate and

4    smooth over the rough patches.  That's not the way it works.

5              Now, the judge will instruct you that the government

6    is not required to use any particular investigative techniques.

7    Totally true.  But where there are gaps in the evidence, it's

8    fair to take a look at those gaps.  And where there are gaps

9    caused by investigative failures, it's fair to take a look at

10   those investigative failures and see what produced those gaps.

11             The government has a very high burden here.  The

12   highest burden in the law, to prove their case beyond a

13   reasonable doubt.  And they can't do it here on the evidence

14   they presented you.

15             Government counsel, very able attorneys right here.

16   But they're not magicians.  They can't conjure up the proof

17   that they need to fill in the gaps.

18             So what I want to do is take a look at some of the

19   proof you saw in the case and point out what we believe are the

20   significant gaps, the significant failures of proof and why

21   they will show you that the government cannot carry their

22   burden.

23             And one theme you're going to see emerge throughout

24   this little tour we'll take is this toxic combination of lying,

25   corrupt cooperators and lack of supervision and lack of

1    judgment by the DEA.  And that's what led to the debacle we saw

2    here with CS-1.

3         So, I'm going to start the place -- well one of the

4    same places the government started, which was with the meeting

5    with Sentado in Honduras on October 3, 2015.

6         A little background on Sentado.  You remember Sentado

7    was a real drug dealer.  Sentado was a major narcotics

8    trafficker in Honduras.  He was charged by the government

9    sometime in 2015.  But he was given a great deal which was he

10   wasn't arrested.  Sentado gets to live, wherever he lived out

11   in Honduras, with all his men as long as he did two things:

12   Turn over marks, you know, give information on people,

13   suspects, targets, to the DEA; and two, don't commit anymore

14   crimes, don't deal any drugs.

15        Everybody who thinks that Sentado stopped dealing

16   drugs illegally while he was left on his own in Honduras, raise

17   your hand.

18        Agent Gonzalez said that he didn't meet Sentado even

19   once during the summer and fall of 2015.  There is no agent

20   that any -- no evidence that any other agent met with him

21   during that time period either.  Agent Gonzalez kept very close

22   tabs on him, however, with a series of BlackBerry messages.

23   That's how the DEA supervised the arch drug dealer Sentado who

24   was left out on his own in Honduras.

25        So, it's no surprise that when it comes to this

meeting that the defendants had with Sentado we have virtually
no usable evidence out of that meeting.  And we'll talk about
why that's so important.

So Agent Gonzalez says that he was contacted by
Sentado on October 3 saying some Venezuelans were coming to see
him that day.  And you have to ask yourself what's going on
here?  How did this come about?

Well Sentado is supposedly trying to cooperate with
the government.  He needs to provide information on drug
dealers to the DEA.  And I submit to you he does not want to
give up any of his important drug dealing partners in Honduras
or elsewhere.  So he needs some easy marks.  And he has these
men that work for him.  One of them is this guy Flaco.  And I
would say to you that he and his men set out to find some
people for Sentado to turn over to the DEA.

And we've thrown up here Government Exhibit 608 which
is a little note that Efrain made to himself on September 30
you can say -- you can see.  And highlighted down below is
"Orlando Daza alias El Flaco."

So I submit to you that this reflects that Sentado and
his men had reached out to Efrain and they've made contact with
him.

Flaco gives Efrain the outlines of a proposal.  He
proposes a meeting in Honduras with his boss, El Sentado, and
Franqui and Efrain at the time are -- you've heard, working

GBH9FLO2                    Summation - Mr. Rody

1    different jobs, trying to keep their families fed.  And they

2    are ripe for someone to come along and propose a get-rich-quick

3    scheme to them.  And that's exactly what the proposal here is.

4    It's a proposal to make an enormous amount of money for very

5    little work.  And they think about it for a few days, between

6    September 30 and October 3.  And then they make the very bad

7    and very dumb decision to take the meeting.  They decide to go

8    to Honduras and meet with Sentado.

9              Now, let me take a moment first before we get to the

10   actual meeting with Sentado.  Because Mr. Quigley referenced in

11   his summation some -- what he said were prior deals that the

12   defendants were involved in in September and August of 2015

13   before the Sentado meeting.  And he said that they were doing

14   this and they were attempting to facilitate drug shipments.

15   And the question is:  What drug shipments?  What drug shipments

16   and where?  Because I didn't hear anything in that discussion,

17   in Mr. Quigley's summation, and you will not see anything in

18   the evidence the government has shown you that any of those

19   communications in August and September talk about importing

20   drugs into the United States.  Take a look.  You will not see

21   it.

22             So, back to the meeting with Sentado on October 3.

23   After Gonzalez learns from Sentado that these two Venezuelans

24   are coming, Gonzalez tries, however ineffectively, to get some

25   control over the situation.  He sends Sentado some very

1    specific and important instructions.  And the first thing is he

2    tells him, as you can see in the transcript, to record the

3    meeting.  He tells him to record the meeting with his phone.

4    And Sentado says okay.  I'll do it.  I'll record it.  And

5    Sentado also says he's going to take some photos and he says

6    that the meeting is going to be at a restaurant near a lake.

7         Now Agent Gonzalez also told you there was some things

8    that he couldn't do, right.  He couldn't get another

9    cooperating witness there to sit with Sentado at the meeting

10   and maybe record it.  He couldn't get any DEA agents there to

11   cover the meeting because it was a Saturday and I guess they

12   don't work the same hours we do here in New York.  And he said

13   he couldn't even get any agents there to surveil what was going

14   on.  So it's just Sentado on his own with his men.

15        Now, it turns out that that didn't matter, however,

16   that there were no agents there because old Sentado had his own

17   ops team working the meeting.  This photo right here wasn't

18   taken by Agent Gonzalez.  It wasn't taken by any other DEA

19   agents.  It was taken by somebody somewhere up on the grassy

20   knoll with a camera or a video camera or who knows what working

21   for master criminal Sentado in the wheelchair.

22        And you know you can take a look at this photo.  You

23   don't see anything obstructing the front view from the camera.

24   And it looks like it's straight on but nobody is looking at the

25   photographer.  So I suggest to you this suggests that this was

1    taken surreptitiously possibly with some sophisticated

2    equipment.  Do we know whether this is a photograph from a

3    camera or whether it's a still from a video?  We do not.  Is

4    there a full-on video and audio recording of this meeting?  We

5    don't know.  But we do know that Sentado had people working the

6    meeting for him.

7         Now, Sentado did tell Gonzalez that he took a bunch of

8    photos, supposedly at the meeting.  But he only ever sent them

9    that one.  And he never provided any recording of it.

10        Now, I would suggest to you, however, that the

11   evidence reflects that Sentado did record the meeting.  And one

12   of the main reasons for that is the excuse that Sentado gives

13   to Agent Gonzalez for why he doesn't have a recording of it is

14   because he said it was impossible to do that in that

15   restaurant.  Well, that's a lie.  Right.  Because the meeting

16   wasn't in a restaurant.  The meeting is out in that open area

17   by the lake.

18        So, Sentado is lying to his absentee DEA handler about

19   what he did and why he did it.  He is providing the DEA with

20   only the information that he wants to provide.

21        And if you remember, Sentado, there's evidence, was

22   unreliable in lots of ways.  Gonzalez couldn't get ahold of him

23   frequently.  He deleted texts he was supposed to send to Agent

24   Gonzalez.  Even CS-1, Jose Santos Peña, thought he was

25   unreliable and boy, howdy, if CS-1 thinks you're unreliable,

GBH9FLO2                          Summation – Mr. Rody

1    you must be unreliable.  Even heard that Sentado misidentified

2    photographs of the defendant.  Just to be clear.  Agent

3    Gonzalez sent him photographs and said are these the guys you

4    met with?  And Sentado said:  Yep, that's them.  And it was two

5    totally different people.  So he's a liar or he's stupid or

6    he's intentionally trying to do things that he thinks will

7    please the government.  And we'll talk about that in a moment.

8    But in any event he's out there on his own doing whatever he

9    wants.

10            Now I suggest to you that the reason why he destroyed

11   the recording that he made of that meeting, and there's strong

12   evidence that someone who can put somebody somewhere

13   surreptitiously with a camera who was recording the meeting, is

14   what he did during the meeting.  The reason he destroyed the

15   recording is because of what he did during the meeting; and

16   that is he entrapped the defendants.  He induced them and he

17   entrapped them.

18            Now, Mr. Quigley said Sentado didn't record it and

19   that's bad.  You think so?  You know, no DEA agent went to try

20   to cover -- to try to recover any recordings from Sentado in

21   the fall of 2015.  No DEA agent went to Sentado to even debrief

22   him fully in the fall of 2015.  So all we have is that single

23   photograph and a few text messages.

24            We do know what came out of the meeting, however.

25   What came out of the meeting was the defendants' understanding

GBH9FLO2                    Summation - Mr. Rody

that they stood to make $20 million for virtually no work.
$20 million for arranging a flight, a single flight of a big
amount of drugs from Venezuela to Honduras.

          We'll talk more about entrapment later and the judge
will give you full instructions on it at the end of the case.
But offering an enormous amount of money for doing virtually no
work is what's called inducement.  And during that meeting in
Honduras Sentado induced the defendants to engage in a
narcotics transaction.  He induced them to arrange this
delivery of drugs, this specific big load of drugs from
Venezuela to Honduras where previously there had been no such
plan.

          Now, because there is no recording we don't know what
exactly Sentado said to them, how he pressured them, how he
lied to them, what he said to get them to do this deal.  But,
that shows why the government can't carry their burden here.
They can't prove that the defendants were not entrapped.

          Now, the evidence shows that the defendants -- really
the main thing they were bringing to the table was that they
could arrange a white flight.  Right.  They supposedly could
arrange a flight that would have a flight plan.

          And if you remember, Sentado told the defendants --
sorry, yeah, Sentado told Gonzalez that the defendants didn't
have any airplanes.  Right.  You remember that testimony.
Sentado and Gonzalez talked about the fact that the defendants

1    didn't have any airplanes.

2            And you can recall in the initial videos CS-1 says

3    basically it would be great if you could supply the cocaine and

4    the airplane.  So that's a change in the initial arrangement

5    with Sentado.  That's a change that CS-1 instituted.

6            Did we lose the screen?  Okay.

7            So CS-is saying basically if you can supply the

8    cocaine and the planes that would be great, suggesting that the

9    original deal with Sentado was that the defendants would supply

10   neither the cocaine nor the planes.  And the defendants never

11   actually do find the source of supply for the eight hundred

12   kilograms.

13           A couple more things about the meeting with Sentado.

14   There is zero evidence, zero that there is any discussion about

15   that load of drugs going to the United States.  So, complete

16   absence of evidence on that.

17           The defendants I would suggest to you coming out of

18   that meeting have no agreement or knowledge or intent that this

19   load of drugs they are talking about is going to go into the

20   United States and that becomes crystal clear in the later

21   recordings, especially the recording regarding the meeting in

22   Haiti.

23           Something else that comes out of the meetings with

24   Sentado is that he concludes they are complete amateurs.

25   Again, he talks about the fact that they don't have planes.

1   And I would suggest to you that as a result of that Sentado

2   suggests to the defendants that they cannot engage in the

3   discussions they will need to engage in to carry out this deal

4   if they're going to walk around sounding like complete amateurs

5   who don't know anything.  And I think the evidence of this is

6   during those recordings you see these ridiculous boasts by

7   Efrain Campo Flores about all these other deals he's done and

8   about his experience when clearly he doesn't know anything.

9   And we'll point to those examples.  But at one point he

10  actually says to CS-1:  He's 30 years old and he's been doing

11  this since he's 18.  And that's obviously not true.  And we'll

12  talk about the examples to show why that's not true.

13          So, Mr. Quigley talked about what the defendants did

14  after this meeting.  What did they do?  Did they go home and

15  sit around and do nothing?  And he was talking about this deal.

16  But, again, what is this deal?  There is no evidence that

17  whatever they talked about with Sentado involved the United

18  States in any way, shape, or form.

19          Now, the next thing that happens is Agent Gonzalez

20  gets CS-1 and CS-2, the dynamic duo, father/son team, to go

21  down to Venezuela and engage in a couple of meetings, a series

22  of meetings with the defense.

23          Before I talk about that I want to spend a few minutes

24  talking to you about confidential sources, what that means,

25  what a confidential source is; cooperating witnesses, what that

GBH9FLO2                    Summation - Mr. Rody

means and what makes all these people tick.  Because this is
really critical to your understanding of this case.

There were a number of confidential sources in this
case.  CS-1 who you saw testify.  CS-3, that's this guy Juan
Gomez.  And CS-2, who is on the videos.  He's Jose Santos
Senior's son who you didn't see testify but I would suggest to
you he's just as much of a liar as his father.

Now confidential sources are paid informants.  They
are paid by the government and by the DEA a lot of money, a
lot, a lot of money to provide information about potential drug
suspects.

And you saw in evidence a stipulation regarding how
much money they have been paid.  Between state and local law
enforcement Jose, Sr. has made over a million bucks and his son
has made a lot of money.  And I can't add it up because my math
is terrible.  Gomez also made I think he said four hundred
thousand dollars.  So these guys make a good living ratting out
other people.

And they are incentivized I would suggest to you to
set up as many people as they can because the more people they
set up, the more people they help the DEA to arrest, the more
money they will make.

And I would suggest to you they're also incentivized
to get high profile targets because the bigger the person, the
bigger the payday, they think.  And this case is a perfect

GBH9FLO2                    Summation – Mr. Rody

1    example.  You heard how excited Jose, Sr. was, CS-1, when he

2    learned from Agent Gonzalez that the targets of this sting

3    investigation, were related to the First Lady of Venezuela.  He

4    said "whoa."  He said, when Agent Gonzalez said:  I have a job

5    for you, he said:  Those are the jobs I like.  Give me the

6    relatives of the First Lady of Venezuela.  Because he knows

7    that means a potential big payday for him.

8            And by the way, Agent Gonzalez I would suggest to you

9    was just as excited as CS-1 to go after the defendants.

10   Because it's good for him too.  Think about it.  He wants to be

11   successful in his career, of course.  He's bounced around from

12   a couple different DEA offices.

13            MR. QUIGLEY:  Objection.

14            THE COURT:  Overruled.

15            MR. RODY:  And finally he makes it to the big time,

16   the elite SOD unit, the Special Operations Division, and he is

17   eager to make this case against the defendants.  He is invested

18   in it.  It's important to him.

19            So that's confidential sources.

20            Cooperating witnesses are different.  Cooperating

21   witnesses are people who have pled guilty to crimes and are

22   assisting the government either on the outside, someone like

23   Sentado, or once they've been arrested like CS-1.

24            MR. QUIGLEY:  Objection.

25            THE COURT:  What's the objection?

1           MR. QUIGLEY:  Reference to Sentado, your Honor.

2           THE COURT:  Overruled.

3           MR. RODY:  So Sentado in the fall of 2015, on the

4  outside working, or someone like CS-1 who, after he got

5  arrested finally, is a cooperating witness while in jail.

6           So for these guys the motivation is different.  The

7  incentives are different.  They are hoping to get a reduced

8  sentence.  Eventually a cooperating witness is someone who

9  pleads guilty to their crimes.  And you heard that from

10 Gonzalez, Carlos Gonzalez, and from CS-1; that they've pled

11 guilty to their crimes, they haven't been sentenced yet, and

12 they're hoping to get a reduced sentence.

13          Now, I would suggest to you that that incentive is

14 just as powerful, if not more powerful, than the monetary

15 incentive because this is their liberty, their freedom.  They

16 think, you know, by cooperating I'm going to get out of jail

17 sooner.  They're saving their own skin, saving themselves from

18 spending years in jail.

19          And CS-1, you know, really has the worst of both

20 motivations.  He set these guys up for money and he came in

21 here to try to put them down to save his own skin.

22          And you cannot underestimate how powerful that

23 motivation is, the motivation of people who are trying to save

24 their own skin.  And you saw the results of it here.

25          Witnesses who have these motivations are compromised.

1    They are compromised witnesses because they're beholden to the

2    government.  They are beholden to the government because the

3    government has what they need.  Whether it's money or freedom,

4    the government has what they need.  The government determines

5    whether they get it.  The government determines whether they

6    don't.  The government can give it and the government can take

7    it away.

8         So it is a very powerful motive and incentive to

9    please the government for them to do what they think pleases

10   the government.

11        It doesn't have to do with these guys, the

12   prosecutors.  It has to do with the cooperating witnesses, the

13   cooperating sources, what's in their head, what they think will

14   help the government.

15        And it's dangerous.  And you saw it on the stand in a

16   couple of different ways.  And not just from CS-1 who is an

17   obvious liar.  But you saw it from some of the others too.  It

18   is a motive that causes them to exaggerate and manipulate and

19   lie in their effort to please the government.

20        CS-1 it's not even really worth talking about how you

21   saw those motives in operation here for him.  You know, getting

22   his story straight with his son about Paul.  They were talking

23   about their testimony that was supposed to be for this trial

24   about Paul, their testimony for this trial that would help in

25   their minds hopefully convict those two young men.  That's what

1    that conversation was about.

2            But you also saw it with some of the others.  Let's

3    take CS-3, Juan Gomez.  CS-3 comes in here at first.  He seems

4    very calm and cool.  He's got no motive.  He's got no axe to

5    grind.  He sat up there.  Remember, Juan Gomez is the fellow

6    who was in these two meetings in Honduras.

7            I would suggest to you the whole Honduras meeting

8    episode is a sideshow and doesn't prove anything.  But in any

9    event, that's what Juan Gomez was here to testify about.  And

10   he seemed almost reasonable as he sat up there, especially on

11   direct examination.  And then you saw his testimony on

12   cross-examination.  And you saw the motives and the incentives

13   come out.

14           He was asked this dumb throw-away question about

15   whether this line here, "We are very twisted," what that means.

16   And he said immediately Flores is saying he's a crook.  That's

17   what I understand that to mean.  Why?  Because that's bad for

18   the defendants.  Okay.

19           Now this is a particular page of that exhibit which

20   was one of the transcripts.  That's page 24.

21           Let's go back to page 23.  Mr. Mann showed him this

22   and said:  This is about politics in Venezuela, sir.  Isn't it?

23   Look at you saying how are things going for the elections,

24   blah, blah, blah.  They talk about the elections.  And then can

25   we just go back.  And then you get back to him saying, "We're

1    very twisted."  It's about politics, right, Mr. Gomez?  No, no,

2    no, no, no.  That's the defendant saying he's a crook.  Okay.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. RODY:  (Continuing)

2          Okay.  Then the government showed him the next page.

3          Can we go to that, please?

4          This is actually the next recording, the next

5     transcript and we have this:  *We cheat, do stuff, blah, blah,*

6     *blah, it the administrator of the national assembly.*  Hello?

7     They're talking about the political situation in Venezuela.

8     And do you remember what Gomez said?  The man doubled down on

9     this dumb, dumb point and he said:  I understand Spanish very

10    well and he was talking about himself.  He is a crook.  And

11    that's what he meant.  That's my story and I'm sticking with

12    it.

13         That shows you the motives and incentives of Gomez.

14    Those may have been the words that he said -- I understand

15    Spanish very well -- and he was talking about himself but what

16    he was really telling you was I work for the DEA and the

17    government.  I know what side my bred is buttered on and I am

18    telling you something right now that I believe is good for me

19    because I believe it will please the government.  I am doing

20    what I think is bad for the defendants.  And that's why these

21    motivations of both cooperating sources and cooperating

22    witnesses is so dangerous.

23         Gomez, you know, the humble, wholesale clothier,

24    according to him, makes a very odd career choice in his early

25    40s.  He goes from being, supposedly, a wholesale clothier,

GBH5flo3                    Summation - Mr. Rody

1    into the line of work of a cooperating source for the DEA.  And

2    how is he able to pull this off?  How does he have so much

3    knowledge about narcotics trafficking that he can sit down at

4    the table with any drug target and not be found out?  Because

5    where he grew up in Colombia, he knew a lot of drug dealers.

6    But, he swears he wasn't involved in the drug business.

7         Raise your hand if you think Juan Gomez wasn't

8    involved in the drug business in Colombia before he became a

9    DEA CS.

10        I don't think so.

11        Carlos Gonzalez also seemed very reasonable on direct.

12   Gonzalez, I have to say, I'm not sure why he was here.

13   Gonzalez never met either defendant, never met them, never sat

14   in a meeting with them, never spoke to them, never exchanged

15   text messages with them, never spoke to them on the phone.  I

16   have no idea why we saw him.  He can tell you 0.0 about what

17   was in their heads, what they understood, and what they knew.

18   Anyway, but we saw him.

19        Gonzalez seemed believable until he started fighting,

20   again, about dumb things; about Spanish.  Can one Spanish word

21   mean something in one country and mean something else different

22   in another?  No.  It doesn't mean that.

23        That's news to the government's Harvard-trained

24   Spanish expert.  Carlos Gonzalez must know something she

25   doesn't.

GBH5flo3                    Summation – Mr. Rody

1          But, something else you saw about Gonzalez, you saw

2     from his cooperation agreement, there was a forfeiture

3     provision.  Wow.  There was a forfeiture provision.  So, all

4     the proceeds you made, sir, from your dirty deeds, your illegal

5     drug dealing for all those years, you are going to have to

6     forfeit that all to the government, aren't you?

7          Yes.

8          How much have you actually forfeited to the

9     government?

10          Nothing.

11          Why not?

12          Because I spent it all.

13          He doesn't have any of the drug money.  The government

14     is never going to get a dime out of that guy.

15          So, it is a bogus thing that is designed to make it

16     look like he is suffering from real penalty.  And something

17     else about Carlos Gonzalez.  The man said that he voluntarily

18     surrendered to the DEA and came into the United States to get

19     arrested and face 10 to life.  And he says I have no idea what

20     sentence I am going to get, no idea.  Could be life.  It is up

21     to the Judge.  I have no idea.

22          Does that make sense to you?  It's false.  He knows.

23     Who would do that?  Who in the world would do that?  He gets on

24     a plane and comes to the United States because he knows -- he

25     has been assured, he thinks, he has got a deal which is going

1    to let him get out in far, far less than 10 years.

2              So, all these witnesses are compromised and the key to

3    these compromised witnesses is you cannot rely on them.  It is

4    all about reliability here, folks; whether they're mistaken,

5    where they're stupid, whether they're just wrong, or whether

6    they're lying -- they're unreliable.  They're unreliable.  You

7    can't rely on them to make a decision this important.  You

8    don't get a second chance here.  You are being asked to make a

9    monumental decision here and you don't get a second chance and

10   you can't rely on people like this.

11             You know, sometimes in cases like this the government

12   will say the defense wants it both ways.  The defense lawyers

13   want you to believe the cooperating witnesses when they talk

14   about all the bad stuff they did but don't believe them when

15   they talk about the bad stuff that the defendants did.

16             Well, we are not saying that at all.  We don't want

17   you to believe a damned thing they say.  We don't want you to

18   rely on, we don't endorse anything they say.  You can take

19   their testimony and throw it on the garbage heap.  To the

20   extent that we talk about testimony of the sources and the

21   cooperating witnesses, it is only to point out how inconsistent

22   and unreliable they are.  Did they get some things right?  Of

23   course, because many, many things in this case are not in

24   dispute.  There were meetings, people attended them.  We all

25   know this is true.  And, it is fair to point out what they say

1    because that's the case the government chose to present.  The

2    government presented their testimony to you.

3            I suggest to you it is actually the government that

4    wants it both ways.  They want to put these compromised

5    witnesses on the stand, tell you about all the lies they have

6    told, all the crimes they have committed, and then they want

7    you to believe they're telling the truth.  Now they're truth

8    tellers.  They used to be liars and criminals but now they're

9    truth-tellers.  And what, you may ask, is the magic elixir that

10   has transformed them into truth-tellers?  It is the cooperation

11   agreement.  The cooperation agreement that they signed means

12   they're telling the truth because of the incentives in the

13   cooperation agreement say if you lie it will get ripped up.

14   So, that is what guarantees they're telling the truth.  And you

15   saw it doesn't work because CS-1 had one of those agreements

16   and he lied in your face.  And they ripped them up, which is

17   what they should have done, but he lied in your face.

18           There is something else about a confidential source.

19   Think about what these people do for a living.  They lie for a

20   living.  *What do you do for a living?  I lie.  I play a role.*

21   *I pose as something I'm not.  I talk about things that aren't*

22   *happening.  I invent a whole life.*

23           You know, it just becomes second nature for these

24   people.

25           Another word about Jose Santos Peña.  The man works

for years for one of the most powerful drug syndicates in the

world, right, the Sinaloa Cartel.  He is involved in shipping

thousands of kilograms of cocaine.  You saw in court here

according to him, what he says -- we didn't put the testimony

on, the government did -- he used to transport load for Pablo

Escobar.  He had drug deals blessed by El Chapo, the guy who

tunneled out of his own cell.

So, this guy he says, is at the highest levels of the

narcotics profession.  And then he tells you that he was

involved in a kidnapping and murder in 2000 in Mexico,

something like that, where people were tortured -- which he

said so casually.  You know?  Of course they were tortured.

And he said that's the only kidnapping murder that I ever did.

And think about that for a minute.  Think about who

the Sinaloa Cartel sends to supervise a team of sicarios -- hit

men -- and dirty government troops to round up people they

think have stolen drugs from the cartel to torture them and

find out where the drugs are.  Who do they send to be in charge

of that crew?  They send one of their most trusted people, they

send someone they know is going to get the job done right.  You

don't get sent on that job when it is your first rodeo.

That was the only one he was caught for.  There is

documentation of it, he was arrested in 2000.  But, I suggest

to you that's not the only one he has ever did.  I think on

that score CS-1 wanted you to believe that he was the

GBH5flo3                    Summation - Mr. Rody

1    unluckiest man in the world.  Right?  He goes on his first

2    kidnapping and murder and he gets caught.  What dumb luck, poor

3    guy.

4            You know, sometimes the government will say the

5    defendants would suggest to you that they're the unluckiest men

6    in the world because they got arrested in this case.  I have to

7    tell you, it is not crazy for Mr. Campo and Mr. Flores to think

8    that the government is really gunning for them when you see how

9    excited the government agents and the government informants

10   were to go gunning for them.  It is not a crazy conspiracy

11   theory if there are people really out to get you.

12           Anyway, I'm glad you weren't deceived by CS-1, Jose

13   Santos Peña.  He looked like a nice old grandfather up there

14   and he is someone who has lost the ability to tell the

15   difference between the truth and a lie.  But, here is the thing

16   about all of these witnesses -- CS-1, Gomez, Gonzalez -- I

17   would suggest to you that Gomez and Gonzalez are this far away

18   from CS-1.  CS-1 is them in a couple of years.  They're all

19   compromised.

20           And you need to think about what the task is that you

21   face, very carefully.  You have to ask yourself a very

22   important question:  Would you base any decision of importance

23   in your own life on the word of one of these men:  CS-1, Gomez,

24   Gonzalez?  Would you buy a house, buy a car, invest your kids'

25   college money, give a loan to someone -- think of something

1    else like that -- on the word of one of these men?  You

2    wouldn't.  You couldn't.  They're unreliable, you can't trust

3    them, and if you wouldn't trust them in your own lives how can

4    you trust them with someone else's life?

5              Okay, sorry.  That took me a little longer than I

6    wanted.  Let's get back to the evidence here or the absence of

7    evidence.

8              The next thing that happens is we have these meetings

9    in Venezuela.  There is a series of three meetings in

10   Venezuela.  Gonzalez selects CS-1 and CS-2 to be the informants

11   who are going to go down, participate in the sting operation

12   and attend meetings with the defendants in Caracas.  And you

13   heard that the defendants flew down on or around October 19th,

14   2015 and what you didn't hear, though -- not on direct

15   testimony from Agent Gonzalez -- was that the informants were

16   already lying to him because, of course, this is when they

17   brought their buddy Paul down with them.  And you heard how

18   they planned this out.  Remember, CS-1, I think, flew straight

19   to Mexico City, meanwhile CS-2, his son, went to Los Mochis

20   where Paul and I think they are all originally from, and he

21   meets up with Paul and then they go down to Mexico City, and

22   the three of them go to Mexico City down to Caracas together.

23   Why all of this planning just to go down there to Caracas?

24             Remember, Paul is a guy who CS-1 and CS-2 were dealing

25   drugs with in L.A.  They used DEA money to buy his plane

1    tickets and they brought him into the meetings with the

2    defendant and they worked very hard to keep this secret from

3    the DEA.  Didn't tell the DEA for a long time.  Nobody knew,

4    except for them, that they had brought him into the meetings

5    with the defendants until this pretrial proceeding in this

6    case.

7         You learned that these three guys stayed at the same

8    hotel there together for about 10 days.  They were there from

9    October 19th to October 29th and they met with the defendants a

10   total of four times, right?  There were three recorded meetings

11   plus one time they went out to a club.  And you heard those

12   four meetings in total were what?  The three recorded meetings

13   were maybe six hours; how long were they in the club, a couple

14   hours, right?  So what was it, six hours, eight hours, 10

15   hours -- who knows -- out of 10 days.

16        So, what were they doing the rest of the time down in

17   Caracas?  One thing they were doing is partying on the DEA

18   dime, right?  DEA's time -- cocaine, prostitutes, food,

19   lodging.  But I would suggest to you that it was not just a

20   sightseeing pleasure trip for those three guys.  They were

21   there to investigate other drug dealing opportunities.  This is

22   a guy they deal with back in L.A.

23        We don't know exactly what they were doing because

24   they deleted -- the CSs did, they deleted their text messages

25   with each other so we won't know what they were doing.  That is

GBH5flo3                    Summation - Mr. Rody

another example of corrupt C.I.s and negligent DEA supervision, I would suggest.

So, we have the series of three recorded meetings. I'm not going to go through each meeting individually, I just want to point out a theme across all three of the meetings in Caracas and there is four common things I would like to point out.

First of all, the recordings themselves are very, very poor quality. People are speaking very fast, multiple speakers, people talking over one another all the time.

Now, the government did their best putting in subtitles and bringing in translators and stuff but I would suggest to you it is still hard to make those recordings understandable. And you saw that at times they had to read the transcripts because the actual recordings are so difficult to hear.

The transcripts are also so broken up because everybody is talking over one another and you saw this repeatedly, that it is like chopped salad. It was very difficult to take away from them what any individual participating in those conversations could have understood from those conversations. So, the recordings were bad.

Another thing is that the recordings show that the defendants are amateurs and really have no clue about international drug dealing. Time and again CS-1 has to explain

GBH5flo3                      Summation – Mr. Rody

to them basic things.  This was this one about the unloading
and the landing, the *bajada*.  And he says I have to explain
this to you and he goes through the whole explanation about the
costs of the unloading.

Another one he has to explain the effective radar
range of these countries' drug enforcement flights.  These guys
don't have clue about that because they don't do this kind of
thing.  They don't ship drugs to these places and there is no
proof that they ever did.

Another point that actually came after the meetings,
this is actually a text from after the meetings, you can see it
is October 30th but, again, this is when CS-1 had said -- had
raised the fee that they were going to pay up front from $5
million to $11 million and Campo is saying, I don't understand
what are you talking about with the 11 girls.  Can you explain
it better?  So, constantly CS-1 has to educate Campo about what
is going on.

You heard the defendants talk about a good game about
the supposed prior deals but you saw zero evidence -- there is
no evidence -- that they ever conducted a prior deal.  There is
no evidence of any seizures, there is no evidence that they
actually completed a deal successfully.  It is just a bunch of
talk and bluster and bragging.

We showed you the line earlier about Efrain saying I
have been doing this since I was 18.  And when you see how

little they know -- and there is some other examples of it in
the recordings -- you know that is not true.  And you know that
CS-1 and Gonzalez reached the same conclusion.  They were
calling them idiots.  Gonzalez called them idiots, he reached
the same conclusion.  CS-1 said they were new and they lacked
knowledge.  Okay?  And you know it is true from other evidence.
Agent Gonzalez and CS-1 had a dinner bet that CS-1 couldn't get
these two fools to show up in Haiti to pick up what they
thought was actually going to be money.  They thought no one
could believe -- no one would be so stupid to believe that was
actually going to happen.  Let me say a few words about that.

          We heard from Agent Mahoney, who is the government's
drug trafficking expert, that real drug dealers essentially
never give drugs or money on credit to anyone that they have
not worked with closely in the past.  Right?  And he never
heard of anybody putting up as much money as these guys stood
to make in this case.  Agent Mahoney is a very well-spoken guy,
he showed you a bunch of very fancy looking maps.  He talked
about the Central American corridor and drugs going up that
route to the United States, and Mr. Quigley said in his
summation:  Everybody knows the drugs in central America are
all going up to the U.S.  Well, I would suggest to you that the
first time these two guys ever heard anything about the Central
American corridor was when Agent Mahoney said it sitting right
up there.  Maybe there are experienced drug dealers in the

world who know about that and know that the drugs go up through

this corridor but that's not these guys.  They are not

experienced drug traffickers.  And you also heard Agent Mahoney

say that 70 percent of all drugs leaving Venezuela go to

Europe.  70 percent of all drugs leaving Venezuela go to

Europe.  And you saw questions in the recordings from the

defendants about Europe.  So, in fact, the defendants' default

expectation would be that any drugs they did distribute would

be going to Europe.

        Again, back to the series of meetings and this

Mr. Quigley focused on, in those meetings the defendants --

sorry -- the informants inserted into those conversations

references to the United States.  And Agent Gonzalez -- this is

critical -- Agent Gonzalez said earlier in the case that he

understood it was necessary in this type of sting operation in

order to be able to charge a federal crime, a U.S. federal

crime.

"Q  So, it is important that the informants ask questions or

make references as to drugs going into the United States during

those conversations with targets, correct?

"A  Yes."

        And earlier, standing alone on itself:

"Q  That wouldn't be something you can charge in United States,

right?

"A  Standing on its own, no."

GBH5flo3                     Summation – Mr. Rody

1           So, Agent Gonzalez knows that you have to get

2    references to the United States in the recordings.  Okay?  So,

3    what does CS-1 and CS-2 do?  They insert references to the

4    United States.  They pepper the conversations with references.

5    Now, having said that, these references are few and far

6    between; there are sporadic references in hours and hours of

7    tape.

8           So, we have a chart here, there is six recordings and

9    this includes the Honduras recording and the Haiti recording.

10   Do you see the dates at the top?  There is six recordings:

11   October 23rd, 26th, and 27th down in Venezuela; November 5th

12   and 6th in Honduras; and November 10th in Haiti over six-plus

13   hours of recording.  The number of references to importation of

14   cocaine into the United States by CS-1:  12; number of

15   representations of importation of cocaine into the U.S. by

16   CS-2, his son:  One; references by the defendants:  Zero.

17          Here is the thing.  They talk about Americans at

18   different times but a lot of that is -- or most of that is

19   things like the DEA interdicting flights in Central America and

20   that kind of stuff but actually saying something about

21   importing drugs in the U.S., that's what we have.

22          And if you take a look at that compared to the total

23   number of time -- can we go to the next chart -- compared to

24   the total number of time of recordings, you have got over six

25   hours of recordings and you have got three minutes when there

 1    is discussion of drugs going into the U.S.

 2             So, how important was this to the deal?  Did it

 3    register with anybody?  Did anybody even hear it?  Did they

 4    understand it?  Did it register with them?  Did it mean

 5    anything to them?  Unlikely, when you see the comparison.

 6             Another thing about these references to the United

 7    States.  The defendants basically never respond.  I will point

 8    out a couple of examples of that.  One of them is one that

 9    Mr. Quigley pointed to himself.  I believe Mr. Quigley pointed

10    to this one.

11             In the middle of this long soliloquy here CS-1 says:

12    I'm the person who buys everything from him -- who I think is

13    Sentado -- and I'm the person who is responsible for taking

14    everything to the United States.  I'm the one who works on --

15    whatever.  And the problem that they have there right now in

16    that town you went to in Honduras -- and then he is talking

17    about something totally different, I think he is talking about

18    how unreliable Sentado is, I scold him sometimes -- he is going

19    on to something different and Campo eventually says, of course.

20    And he is saying that in response to CS-1 saying that sometimes

21    he disappears on me for two or three days.

22             So, whatever he said, whatever CS-1 said about the

23    U.S. is lost in the ether.  There is no response.  There

24    certainly isn't, *oh yes, that's great.  Great.  We are psyched*

25    *the drugs are going to the U.S.  I get it.  I see that now.*

GBH5flo3                        Summation - Mr. Rody

1    Nothing like that.

2              There are some other examples.  This is a longer one

3    but just to illustrate you might have noticed that Mr. Campo

4    talks a little bit; he likes to talk, that's okay.  And he is

5    very eager here to explain something to CS-1 and CS-2 but CS-2

6    inserts in there you know we send a lot of that to New York.

7    Okay?  Take a look at what Efrain is doing.  That's the same

8    thing we just saw but now we have highlighted what Campo is

9    saying.  He is talking about something he said to somebody.

10             So I said to him let's do something

11             So what did I say to him?

12             Let's get to the next page.

13             Of course.  So, no.  What did I say to him?

14             Can we go to the next page?

15             I said to him, I told him -- this is going page after

16   page.  He is still trying to get the same story out.

17             Keep going and go on to the next one.

18             Anyway, he is going on and on telling some other

19   story.  He is not listening to what CS-2 said and that little

20   reference he dropped in there, I don't think he heard it

21   because he is talking about something totally different.

22             Okay.  Let's get to 29.  And the other thing is --

23   this is another one that Mr. Quigley pointed to, I believe,

24   this is the one about they stop around Christmas.  You know,

25   I'm not sure how this is a reference to selling drugs in the

1    United States but in any event, look at Efrain's reaction to
2    this one and he basically is saying -- please, go back for a
3    second -- he says, CS-1 is talking about he stops in early
4    December because the border gets very harsh.  And then Efrain
5    says right after that:  I'm going to say it to you nicer.  Do
6    you know why I closed?  Because it is family season.  It is
7    Christmas.  I mean, you know.  It is not registering with him
8    at all what CS-1 is trying to inject into the conversation.

9          Also, with respect to these references to the United
10   States, however many times CS-1 or CS-2 talk about the United
11   States, they talked about other places far more frequently.
12   The prospect of drugs going to other countries other than the
13   United States was discussed far more frequently.  35 references
14   by CS-1, five by CS-2, 18 by Efrain and one by Franqui.

15         We have another chart here showing a comparison.  On
16   the left you have got references of drugs going to the U.S., on
17   the right references to drugs going into other countries.  And
18   you saw that in the recordings.  They're talking about Canada,
19   Europe, other places in south and Central America.  None of
20   this is registering with these guys that are supposed to be
21   thinking, oh yes, these drugs are going to the United States.
22   Not happening

23         And the final point about these references to the U.S.
24   is that they're all in the abstract.  CS-1 talks at various
25   times about prices he could get or prices he does get at

various places in the United States and elsewhere for drugs
that he had sold in the past and it is not connected to
whatever transaction they're talking about here.  Nothing is
concrete in terms of what are we talking about in this deal for
these 800 kilos.  And he is saying right here:  If I sell in
New York, I sell it for 47.  If I tell in Canada, I sell for
60.  In Ottawa, I sell it for 90,000.  Okay.  This is what drug
prices are in various places.

          Here is what you never see in the recordings.  Are you
ready?  You don't see this:  You don't see CS-1 say:  *Hey,
guys.  After you drop the load in Honduras, after you deliver
the drugs in Honduras, our guys are going to pick it up and
they're going to have it in the U.S. in two days.*  He never
says a simple declarative statement like that.  He never says
that's great, bring it on the 15th because the next day my guys
are going to pick it up and take it into the United States.

          Did you see that?  No.  He doesn't say it.

          You have watched a lot of video, including here on the
summation from the government, and that is never said.  And you
never see these guys saying hey, can't wait.  Great.  Let's
sell the drugs in the U.S.

          And you have to ask yourself why does CS-1 not say
that?  I think it is because he knows that the defendants have
no such intent, no such knowledge, and if he says something
like that they are going to say something like what, what are

1    you talking about.

2          Okay.  The Judge will instruct you that it is not

3    important whether government agents introduce the concept of

4    drugs going into the United States, as long as the defendants

5    then took a voluntary action in connection with the conspiracy.

6    And I suggest to you you can see from those references in

7    response to CS-1 inserting comments about the United States

8    that they take no action, they do nothing in response to those

9    references.  They don't react.

10          One other thing that we know about the meetings in

11   Venezuela is that the defendants -- sorry, not of the

12   defendants, the CSs, some of whom are also defendants --

13   destroyed evidence.  They destroyed evidence relating to those

14   meetings.  Again, they and only they were the ones who

15   determined when to start and when to stop the recordings.

16   Right?

17          Do we have a chart of the recordings?  And the

18   recordings are all different times, all different random times,

19   okay, because these guys start it and stop it when they want

20   to.  And what are they leaving out?  Who knows.  CS-1 is a

21   liar's liar.  So these guys start it and stop it whenever they

22   want to.  Maybe some of that is unintentional but again, it is

23   about the reliability and you can't rely on those recordings.

24   There is no question, I would suggest to you that the

25   recordings do not capture all of the conversations between the

1    defendants and the informants.

2         What else do we know?  The informants deleted and

3    destroyed text messages.  They destroyed their text messages

4    between each other so we have no way to know what they were

5    communicating to each other.  And I bet you those texts

6    reflected potential drug deals they were planning on doing with

7    Paul.

8         And we know that they destroyed this alleged kilogram

9    of cocaine, the sample that they took of it, they didn't

10   preserve it.  Right?  They took a sample of it and they didn't

11   preserve it.  The question is Why.  You remember, CS-1 has

12   spent a lifetime dealing drugs and he is also a cocaine addict.

13   Right?  And Mr. Quigley said there is no question it was

14   cocaine.  Really?  How does he know that?  Did he test it?  Did

15   any agent test it?  Did CS-1 even test it?  Maybe he sniffed it

16   but nobody tested it.  There is no proof that's cocaine.  Oh.

17   Wait.  There is -- because CS-1 said it was.  So we can believe

18   CS-1 and we can rely on CS-1.  And think what is in that

19   twisted man's head about the cocaine.  He knows that if he goes

20   back to the DEA and says they don't have real coke, these guys

21   don't have real coke, that's bad for the case.  Bad for the

22   case is bad for CS-1.  Bad for the case means CS-1 doesn't get

23   paid.  He doesn't get a big payday for trying to bring down or

24   helping the DEA bring down the nephews of the First Lady of

25   Venezuela.  He looks at it; maybe he sniffs it, maybe not.  The

GBH5flo3                    Summation - Mr. Rody

world will never know because he is a total liar.  But he knows

it is not real drugs and so he destroys the sample and there is

no proof that it is drugs.

Now, you also know, because some of the reasons that

CS-1 gave and some of the testimony that Agent Gonzalez gave

about why he couldn't preserve a sample.  They said he couldn't

carry a sample of drugs around in Venezuela.  The guy's --

first of all, he did have drugs in Caracas, the drugs he was

doing in the clubs, so what's the big deal?

Second, this guy has been transporting drugs his whole

life.  He can't take a -- what would it be, one gram?  Two

grams?  He can't take a tiny sample of drugs.  This guy doesn't

know how to secret a tiny sample of drugs on him somewhere?

That doesn't hold any water.

And also, Agent Gonzalez says that DEA agents in

Venezuela weren't authorized to sort of be engaging with the

informant, but I suggest to you those are not the real reasons.

CS-1 could have done a field test to determine on the spot

whether it was drugs.  He could have taken some back to his

hotel and tested it there.  And also, you know, these guys are

walking around with some of the most sophisticated spy

equipment known to man, right?  These sophisticating recording

devices.  They're taking them on airplanes, going into airports

with it, they're walking around in Venezuela.  You think if the

Venezuelan police or military find them with this spy equipment

1    they're not going to get in serious, serious trouble for having

2    that on them?  But, they can't take a gram of cocaine because

3    it would be too risky.  I suggest to you is it defies belief.

4          By the way, the government keeps showing this

5    photograph of Mr. Campo Flores holding this alleged brick of

6    cocaine and putting on the gloves.  They love that.  Putting on

7    the gloves, it looks so official.  Does that meeting take place

8    in Miami?  Does anybody say anything that that meeting about

9    can't wait until this coke gets into the United States?  No.

10         Okay.  One point after the meetings in Venezuela -- we

11   can take that down.

12         After the meetings in Venezuela, CS-1 and his son go

13   back to the DEA and they get de briefed by the DEA and they

14   give their version of what happened in the meetings.  And you

15   know they lied, they lie to the DEA right then and there.  They

16   don't say anything about the fact that Paul was there.  And we

17   showed examples of how they're exaggerating about what went on

18   in the meetings.  But I would suggest to you the DEA believes

19   them, Agent Gonzalez said he didn't listen to the recordings

20   for a long time but they charged the case before they listened

21   to the recordings.  They charged the case based on the word of

22   CS-1.

23         Now we are up to the meetings in Honduras in early

24   November 2015.  And here is what I have to say about those

25   meetings:  Not much.  They're a side show.  They shed zero

GBH5flo3                    Summation - Mr. Rody

1    light on what these guys knew and intended in this case.

2            There was a meeting on November 5th with Sentado,

3    CS-3 -- that's Gomez -- and Gonzalez and Soto and there is a

4    meeting on November 6th with Sentado, CS-3, and Franqui Flores,

5    but not Gonzalez.  So, again, Gonzalez never met my client, he

6    never met Mr. Campo Flores.  Both of these meetings involve the

7    same plan to send -- sorry, the same plan that Sentado proposed

8    to defendants back in Honduras in October which was that they

9    would deliver a load of cocaine from Venezuela to Honduras, and

10   there is no discussion of the United States in those meetings.

11   There just isn't.  At one point they talk about the gringos and

12   how you have to watch out for the gringos but they're talking

13   about whether the DEA will stop a flight or come into the

14   airport in Honduras.  It has nothing to do with taking drugs

15   into the United States.

16           So, I suggest to you the conversations, all that

17   evidence they put on about Honduras and the meetings in

18   Honduras is window dressing.  It sheds no light on the

19   questions that you are going to have to answer in this case

20   about whether the government has proved beyond a reasonable

21   doubt a conspiracy to import drugs into the United States.

22           You know, Gonzalez says -- when he is up there,

23   remember the cooperator Carlos Gonzalez, the air traffic

24   control guy -- he is sure the drugs that he was -- you know he

25   thinks he was in a plan to distribute, he is sure the drugs

going into the United States.  All the drugs go to the United

States, right?  He talked about this detailed thing about some

incident where the boats came up to the runway and then they

went from the boats to some place else in Honduras and then

they got trucked into the interior and then they went into the

United States.  Right?  My clients don't know anything about

that.  Whoop dee doo for him, he knows about that.

        And, I have to say, Mr. Quigley talked about Gonzalez'

testimony for maybe a minute and a half because it says nothing

about our defendants' knowledge.

        Okay.  I have to say, though, the meetings in Honduras

did confirm to us that the defendants are complete amateurs

because we see my client, Franqui Flores, taking selfies of

himself before he goes on the airplane and sending it to his

sister, Herma, which is short for Hermana; and then he takes

another photo of -- oh, look!  There's the airplane, that's the

plane I'm going to go on.  And he sends that to his aunt, Tia

Mayerlin.  What kind of narco trafficker does this?

        Then we have the video.  Then we have the video, this

is Franqui Flores' excellent adventure.

        (Audiofile played)

        MR. RODY:  Look, I'm in a plane!

        You know, real drug dealers don't do this.  That's not

the way CS-1 operated when he was a member of the Sinaloa

Cartel.  They operate in stealth and secrecy.  These guys have

1    no clue.

2            The whole Honduras episode is, I would suggest to you,

3    an example -- I am going to get to this photo in a second -- of

4    what I would call oak tree corroboration.  Okay?

5            Mr. Quigley talked a little bit about corroboration

6    and he talked about it in connection in particular with Agent

7    Gonzalez but talked about how there is corroboration of what

8    people like CS-1 said.  So, do you know what oak tree

9    corroboration is?  Okay.

10           So, Farmer Joe goes and tells the sheriff, that I saw

11   Bobby and Billy down behind the Widow Johnson's barn planning

12   to rob the bank under the old oak tree.  The sheriff goes down

13   to Window Johnson's barn and, sure enough, there is an old oak

14   tree.  Well, dad gum!  That must mean that Billy and Bobby are

15   the ones that robbed the bank.

16           That is not the way it works.  But, in this case what

17   do we get?

18           Let me get the photo of the air field.

19           And then Gonzalez told you, had talked about this

20   thing about boats that came up and it happened on runway 25.

21           And dad gum!  Runway 25, right there like he said it

22   was.

23           Now, does that prove that Gonzalez is right about the

24   boats and the trucking into Mexico or anything like that?  No.

25   It doesn't prove that at all and, much less, doesn't prove

 1    anything about the defendants.

 2              That's oak tree corroboration.  It doesn't

 3    substantively corroborate the testimony of the cooperators in a

 4    way that helps you answer the questions you are going to need

 5    to answer.

 6              Okay.  Let's shift to the meeting in Haiti on November

 7    10th.  Before we get to that you know, of course, the

 8    defendants go there, they think, to pick up $11 million from

 9    CS-1 but they in fact get arrested.  And let's talk about what

10    happens in the days leading up to that meeting because it is

11    critical to the case.

12              So, on October 30th, CS-1 sends text, chat -- I don't

13    know what you people call it today -- sends a message -- young

14    people -- to Efrain, and says I'm not going to just give you $5

15    million up front, I'm going to give you 11.  He changes the

16    deal, I would suggest to you, at the instruction of Agent

17    Gonzalez.  CS-1 changes the deal we are not going to give you

18    $5 million up front, we are going to give you 11.  And

19    Mr. Quigley said and Campo readily accepts.  Well, hell yes he

20    readily accepted.  Because he doesn't have to do anything.  You

21    mean all I have to do is fly to Haiti and I get $11 million?

22    Okay.  He is not supposed to be bringing any drugs.  But what

23    happens right after that?  What do you see in the texts right

24    after that?  So, this is October 31st, the next day, and Efrain

25    starts saying:  We have the drugs.  I have the tables and

1    chairs ready here.  They were already delivered to me.

2              This is critical, folks.  It's October 31st.  *They*

3    *were already delivered to me, I have the drugs.*  More from the

4    same chat, I believe:  *I have the chairs and tables, the table*

5    *cloths.  Everything.*

6              Right?  It continues into November.  This is November

7    6th:  I have all the bouquets here.  We have the ladder ready.

8              Another one I believe from November 6th:  As I was

9    telling you, we have the chairs and tables here already packed

10   for 800 people.  The ladder is all set.

11             This is all leading up to November 10th.  He is

12   telling CS-1 repeatedly, after the deal changes and all of a

13   sudden he is going to get $11 million, he is now saying we have

14   got the drugs.  Right?  So what is going on here?  What is

15   happening?  I would suggest to you that this is proof that they

16   have zero intent -- no intent whatsoever -- to deliver any

17   drugs.  They just want to get the money.  He is telling him

18   that they have the drugs and the proof shows they don't have

19   the drugs.  He is trying to fool CS-1.  Now, he doesn't know

20   CS-1 was trying to fool him back, but he is lying to CS-1

21   telling him that he has the drugs -- talk in a minute -- he

22   doesn't have the drugs.

23             They have offered him $11 million up front for doing

24   nothing; for not delivering any drugs, for just showing up in

25   Haiti, and these guys have no intent to deliver any drugs.

1              And, Mr. Quigley mentioned during his summation that
2    Mr. Campo Flores' big concern was getting the money up front,
3    right?  And that was back in Venezuela:  I need the money up
4    front.  They never intended to deliver the drugs.  They have no
5    intent to deliver the drugs.
6              So, how can I say this?  We have been saying this from
7    the beginning:  There is no intent or ability to deliver any
8    800 kilos of cocaine.  And there is not a single piece of
9    evidence that shows that they ever actually obtained the drugs
10   or they ever actually delivered it.  They've certainly shown
11   you no drugs, nothing about any seizure or anything like that.
12   And they also haven't shown you any communication showing that
13   they got the drugs or they had the drugs or had delivered the
14   drugs.
15             You have seen some recordings where the defendants
16   talk about past deals they supposedly did but you haven't seen
17   any proof those deals actually occurred.
18             You have seen some chats where the defendants appear
19   to be talking to people who know drug dealers but you haven't
20   seen any evidence from any witness, from any chat, from any
21   text, from any recording that the defendants actually ever took
22   possession of drugs.
23             So, it is one thing to have a conversation or chat
24   with someone like Pepero who appears to know drug dealers, and
25   it is a totally different thing to actually get drugs.  Think

GBH5flo3                    Summation – Mr. Rody

about the logistics involved in acquiring and moving 800

kilograms of cocaine.

Do you remember Agent Mahoney's testimony about the

volume of 800 kilograms of cocaine, right?  I think I was

standing maybe here and Agent Mahoney got off the stand and was

standing there.  And he said 800 kilos of cocaine, if you had

it in 25 kilo bundles would be 32 bundles.  He said three and a

half feet off the ground, maybe a couple feet wide from the

witness stand to here.  He said it is 2.2 pounds per kilogram,

that's at least 1,600 pounds of cocaine.  It is an enormous

quantity, it is an enormous substance, it is an enormous

anything.  It is an absolutely enormous quantity of drugs.  And

think about what it would take to actually acquire that amount

of drugs and deliver it.  Okay?  It would take logistics.

Mr. Quigley talked about logistics and, yeah, these

guys had some conversations about logistics flights but those

are flights to go meet with somebody to talk.  They're talking

about going to meet someone to talk.  Where are the

communications, the texts, the chats that talk about the

logistics involved in getting that?  By the way, do you see the

drugs?  Do you see the 800 kilos?  Do you see that?  You don't

see it?  Neither did the DEA because it didn't exist, it was a

figment of everybody's imagination.  But, if you were actually

going to get it you would have to have communication about it.

You would have to be discussing this with your people.

1      They're getting ready to fly to Haiti to pick up the

2    money?  Where are all the conversations?  Guys, get ready.

3    We're getting the money today.  Get yourselves in gear, get

4    ready to spring into action.  Where are all the texts?  Who is

5    going to pick up the drugs for us?  Where are they going to

6    pick up the drugs?  When are they going to pick up the drugs?

7    How are you going to pick up the drugs?  Are you going to get a

8    truck?  Are you going to buy a truck?  Are you going to rent a

9    truck?  Are you going to put it in a warehouse?  How are you

10   going to get the warehouse?  Are you going to rent the

11   warehouse?  Are you going to buy the warehouse?   Where are you

12   going to store it?  How are you going to get it from the

13   warehouse to the plane?  Where are all the discussions about

14   that?  Hey, we got 800 kilos, like Efrain is saying to CS-1, we

15   got it?  Where are the texts showing that?  Where are the

16   communications showing that he got it?  He is fooling him.

17   They don't have it, they never got it.

18       And the fact that the total absence of any

19   communication like that proves it.  And this all comes up to a

20   head in the meeting in Haiti because they're going there to

21   supposedly get the money, and that is precisely when you would

22   expect to see all those logistical conversations.  Okay?  And

23   you don't see them.  They don't exist anywhere.  And no one --

24   there is nothing -- you know, they have shown this guy a couple

25   times, Tortuga, who is a body guard for one of the defendants

GBH5flo3                        Summation - Mr. Rody

1    and where are the things saying Tortuga, did you get it?  Did

2    you pick it up?  Great.

3                Never happens.

4                Can we take a look, I think it is no. 49.

5                So this is, yes, November 1st, after Efrain has been

6    telling CS-1 I have got it, and there is a chat between Franqui

7    and Pepero saying -- he said he is going to put down 800

8    without putting down a single bolivar.  Okay.  But there is no

9    follow up to that.  There is nobody saying, hey, and we got it.

10   And we got the 800.  And we're storing it at such and such a

11   place.  And these guys went and picked it up.

12               There is nothing like that.  They don't have the

13   drugs, they never had it, and they're telling CS-1 they do so

14   they can go get the money and that's it.  Maybe the government

15   has proved a conspiracy to pick up money.  That's all the

16   evidence shows.

17               These guys talked a good game but they never did

18   anything and they don't have any communications to reflect that

19   they did anything to ever actually acquire the product they're

20   supposed to be selling.

21               I would suggest to you the sample kilogram, whatever

22   it is, is the same thing.  CS-1 is asking for a sample so they

23   have to produce a sample.  They produce a sample so maybe he

24   thinks they're serious about this.  Okay?  It is perfectly

25   consistent with them having no intent to deliver a load of 800

1    kilograms.

2              How else do you know that the defendants never

3    actually intended or agreed to deliver 800 kilograms of

4    cocaine?  Because the DEA knew it.  The DEA knew it.  The DEA

5    figured out eventually these guys don't have the drugs.  These

6    guys are never going to get the drugs so they arrested them

7    without getting the drugs.  What kind of sting operation is it

8    where you don't get the drugs?

9              Now, we have been very critical of the DEA

10   supervision, here, of their sources, but give the DEA its due,

11   this is what they do for a living.  The DEA knows when someone

12   is actually going to get the drugs and they knew that these

13   guys couldn't do it so they took it down.

14             I would suggest to you, as I said before, that Agent

15   Gonzalez was the one who told CS-1 to raise the offer to $11

16   million for nothing, just flying to Haiti and, you know, as

17   Agent Mahoney -- as Agent Mahoney's testimony suggests, if you

18   are a real drug dealer that would tip you off that something is

19   wrong here.  But these guys aren't real drug dealers and they

20   don't know what Mahoney knows.

21             So, we get to the meeting in Haiti and there is really

22   not that much to say about it.  We are going to walk through

23   the conversation in detail but I would suggest to you that the

24   conversation between the defendants and CS-1 in Haiti proves

25   conclusively that they had no intent or agreement to import

1    drugs into the United States.

2          Remember, this is the end of the case, right?  This is

3    the end of the conspiracy.  This is when the conspiracy should

4    be at its most -- its fullest state, most fully formed.  Right?

5    We have been through hard times, you and I, together, but now

6    here we are at the end of the conspiracy and we all know what

7    we are talking about and we are ready to consummate this deal.

8    We are all on the same page.  Right?  Drugs into Honduras and

9    then CS-1 is going to take them into the United States, right?

10   And what do they say in the conversation?  Efrain says:  What

11   price are they paying you for that in Canada?

12          And CS-1 says:  Uh, in Canada, buddy, you will fall

13   off your chair.  Oh.  And then he said:  Actually, I sell very

14   little in Canada -- at the top of the page.  I sell almost

15   everything to the United States, East Coast, New York and he

16   says -- and Efrain says:  And how much are they paying you for

17   that in Canada?

18          He has no clue.

19          And then CS-1 has to say:  Well, actually look, in

20   Canada it depends, you know.  And he is talking about drug

21   prices again and it goes on -- can we get to the next page?

22   And then he says:  And you don't like working in Europe?  And

23   CS-1 at this point is so startled he is like uh, excuse me?

24   Europe?  Who is talking about Europe?  He is like, dude, I'm

25   trying to set you up here.  Play along.

GBH5flo3                    Summation - Mr. Rody

1          And you don't like working in Europe?  Uh, excuse me?

2   In Europe?  No, I don't really work there.  Campo says:  I used

3   to have some contacts over there.  Who knows whether that is

4   true.  It is not.

5          But, the point is these guys have no idea.  They do

6   not intend -- it is not within their knowledge, they have not

7   agreed to sell drugs into the United States and that shows it.

8          Do we have another slide of it or is that it?

9          Okay.  And Mr. Quigley talked about how these other

10  conversations that they have at one point about other drugs,

11  heroin and some pills, 2C or something going into the United

12  States -- that has nothing though do with this case.  Okay?

13  Put it out of your mind.

14         Another one in abstract.  Oh, you sell heroin?  Great

15  for you.  And these are the prices you get in the United

16  States?  Great.  It has nothing to do with whether these guys

17  intend to import a massive load of cocaine into the United

18  States.

19         And then, minutes after this -- and I mean minutes --

20  these guys get arrested, the defendants get arrested.  So, it

21  is not like they have a long time to sit around and ruminate

22  about what the plan is.

23         The defendants have no burden here, they have

24  absolutely no burden to prove that they're innocent, so I would

25  suggest to you that that conversation is about as close as it

GBH5flo3                    Summation - Mr. Rody

 1   gets for a defendant to proving that they don't have the

 2   illegal agreement that is alleged.

 3          Okay.  Let's talk about the defendants' supposed

 4   post-arrest confessions on the plane when they fly from Haiti

 5   to the United States.  And Mr. Quigley said if you credit those

 6   confessions, the case is over, they're guilty.  Those

 7   confessions, alone, are enough to convict I think he said.  And

 8   the point is you have every reason to doubt the reliability of

 9   those supposed confessions.  The government has made a big deal

10   out of this aspect of the case, out of this aspect of their

11   proof.  And I would suggest to you it is because the recordings

12   are vague and coded and hard to understand and their key

13   witness, their chief witness is an affirmed liar who blew up on

14   the stand.  So, the government is focused on these confessions.

15          Okay.  Let's talk procedure, first of all.  Why are

16   the confessions suspect, procedurally?  Agent Gonzalez told you

17   that he was questioning the defendants in Spanish while

18   simultaneously recording what they wrote in English.  Okay?  He

19   is doing both things at the same time.  They're speaking

20   Spanish, he is writing in English.  He is asking questions

21   presumably in Spanish, they're answering in Spanish, he is

22   translating and writing it down in English.  Right?  So in

23   fact -- in fact -- what he writes in English is not what they

24   said because what they said was in Spanish.

25          And you heard from the government's own translation

GBH5flo3                    Summation – Mr. Rody

1    expert that is exactly not the way to do it.  Ms. Alvarado said

2    basically, that's the one thing you don't do.

3                    (Continued on next page)

1          MR. RODY:  (Continuing)  She says it's a very

2    important part of the process because first you have to be very

3    sure what the Spanish says before you can start translating

4    them into English.  She said it's two completely different

5    skills.  She appeared to be surprised that even that someone

6    would even consider the notion of this.

7          But Agent Gonzalez, he said that his translations of

8    what the defendants said, remember what he said, he said they

9    were perfect.  His translations were perfect.  So he obviously

10   knows something that, again, the government's Harvard-trained

11   translation expert doesn't know.  When you're at 30,000 feet in

12   the DEA Learjet it is possible to get perfect simultaneous

13   translations.  I suggest to you that is not credible, not where

14   the actual words spoken are so important.

15         And one more reason, which we talked about a lot, why

16   Agent Gonzalez's feat of doing this translation was so

17   remarkable is that he did it while he was under mortal fear for

18   his life from the handcuffed, manacled, shackled, defendants on

19   the plane.  Right.  Here I'm talking about Agent Gonzalez's

20   ridiculous excuse for not recording the defendants' interviews.

21         He said he couldn't do this because of safety

22   concerns.  And if he said it once, he said it five times.  He

23   said we don't take that lightly.  Okay.  Fair enough.  But that

24   excuse for not recording the interviews does not pass the red

25   face test.  Everybody in the world has one of these, right.

1          And could we get Government Exhibit 59 up.  I keep

2     going back to the coffee cup on the ledge.  Why can't they take

3     the coffee cup off the ledge and put this on the ledge and

4     record and at least get audio?  Why can't Agent Zach, who is in

5     the seat across from him, film it?

6          The excuse about safety concerns is ludicrous.

7     There's four agents.  There's two snooki guys who are

8     handcuffed and shackled.  They're not going anywhere.  And you

9     got Mo Brooks who can tackle them if anything actually did

10    happen which, of course, it wasn't.

11         And you also know the agents had the secret special

12    recording devices on the plane.  It's not like they don't know

13    how to turn them on and record a postarrest interview because

14    you heard that's exactly what they did when they arrested

15    finally CS-1 and CS-2.  They recorded those interviews with

16    their super secret spy equipment surreptitiously.

17         So, it can be done.  It can be done on a plane.  Of

18    course it should be done.  Why not?  What's the reason not to?

19    What are you trying to hide?

20         Why Agent Gonzalez chose not to record those

21    interviews I suggest to you had nothing to do with safety and

22    had everything to do with his own motivations in this case.

23    Agent Gonzalez is highly motivated I would suggest to achieve a

24    successful prosecution here.  There are high profile targets.

25    It's a high profile case.  He is working for the elite SOD

1  unit.  He previously worked for the DEA in Venezuela.  At one

2  point he said this case means no more to me than any other

3  case.  It's not a big deal.  Don't believe it.

4         And look at his relationship with CS-1, his

5  inappropriate relationship with CS-1 that you heard come out

6  during both the testimony of Agent Gonzalez and the testimony

7  of CS-1.  Remember their completely inappropriate

8  communications mocking the defendants, talking about how they

9  were the shit; Agent Gonzalez and CS-1 were the shit, no one

10  could escape from them, how they were a great team, how CS-1

11  made Agent Gonzalez look good in this case, how they had to

12  organize their thing with the nephews very well.  I suggest

13  that is CS-1 talking about getting their stories straight.  And

14  Agent Gonzalez responded to these things affirmatively;

15  emoticons, ha, ha, ha.

16         When you see that stuff, I would suggest to you that

17  it shows that Agent Gonzalez crossed a line.  He got too close

18  to his source.  He lost objectivity and he lost control of the

19  case.  And that has got to color your view about what he says

20  they said on the plane.

21         So why did he really not record the interviews?  It is

22  so that he could control what comes out of them.  Because he

23  knows he's the only qualified Spanish-speaker on the plane, so

24  the only version of the postarrest statements that anybody

25  would ever hear, the only version you would get to hear is what

GBH9FLO4                    Summation – Mr. Rody

he says they said.  Not an objective recording of what they

said.  And the lame excuse about the safety concern is what

puts the lie to it.  It's so obviously false, which suggests

you cannot credit his testimony on those postarrest statements.

          Let's talk about the statements substantively.

          You can take that down.

          When we're talking about Mr. Campo's confession Agent

Gonzalez first asked him if he knew the drugs were coming into

the U.S.  And he said no at first, right.  But then, according

to Agent Gonzalez's testimony, his notes he pushes him, he

pressures him, he's asking him leading questions.  And

eventually Efrain says:  Yes, I knew.

          Mr. Flores' statement is much shorter, right.  Because

they didn't have a lot of time.  The statement is signed at

something like 7:37 and they land at 8:10.  So they only talk

for maybe 20, 25 minutes.  But the way Agent Gonzalez writes it

is Mr. Flores just came right out and said it:  Yes, of course

I knew they were sending drugs into the United States.

          And think about, if that rings true, from what you

know about this case.  Franqui Flores is the quiet guy, the guy

who never says anything on any of the recordings.  Now he's in

Honduras at the one meeting and he's the only defendant there,

so he says some stuff there.  But every other meeting he's the

guy who never says anything for hours at a time.  Once in a

while he makes a statement.  But, according to Agent Gonzalez,

1    he comes right out with:  Of course, I knew they were sending

2    drugs right into the United States.  And it just doesn't make

3    sense that at this moment of all moments he becomes the

4    talkative guy.

5          I would suggest to you that Agent Gonzalez didn't have

6    as much time with him.  He didn't bother to write down the back

7    and forth, whatever leading questions he asked him, however he

8    pressured him, however he pushed Franqui Flores.  And, of

9    course, we don't know what was actually said by either Agent

10   Gonzalez or by the defendants because he didn't record it.  He

11   chose not to record it.

12         Judge, I think I can be done in ten or fifteen

13   minutes, if that's okay.

14         THE COURT:  I just got a note, Mr. Rody, that the

15   lunch will be here in about five minutes so do you want to

16   finish?

17         MR. RODY:  It may take me a few more minutes than

18   five.

19         THE COURT:  That's okay.

20         MR. RODY:  Great.  Thanks.

21         Now, the critical issue in the case, maybe the single

22   most important issue in the case, is the defendants' knowledge

23   about the destination of the drugs here, whether the defendants

24   agreed, knew, intended that the drugs were going into the

25   United States.  And it's on that question that Agent Gonzalez I

1    would suggest to you is pressuring the defendants.

2            Mr. Quigley said at the beginning of his summation, he

3    was talking about how there are examples of corroboration that

4    support the postarrest statements.  And he pointed to things

5    like the fact that they mentioned El Gocho and they know that

6    Hamudi died.  And that was information that how could they have

7    known that because they hadn't looked at their phones.  So that

8    corroborates what Agent Gonzalez said.  That's oak tree

9    corroboration.

10           So they say Hamudi, and then Hamudi died.  Okay.  You

11   know, and he said Agent Gonzalez had no reason to know that

12   stuff.  But what does Agent Gonzalez know?  What's the critical

13   thing that Agent Gonzalez does know?

14           Can we get slide 21.

15           He knows what's important in a federal sting case out

16   of the country.

17           Line 8.  "Standing alone on itself that wouldn't be

18   something you could charge in the United States, right?

19           "Standing on its own, no.

20           "So it's important that the informant asks questions

21   or makes references to drugs going into the United States

22   during those conversations with targets, correct?

23           "Yes."

24           That's at the forefront of his mind.  He's a DEA agent

25   in the SOD and he knows that if anything has got to come out of

1  these meetings the defendants have got to know that the drugs

2  are going into the United States.  That's the critical point.

3  Who cares about Gocho and Hamudi.  That's the point he needs to

4  have come out of the interviews.

5          And I would suggest to you that his testimony and his

6  reports on those confessions are unreliable.  You cannot credit

7  them.

8          So that is the government's case.  And I would suggest

9  it is filled with gaps and holes and failures of proof.  They

10  showed you lots of chats.  Lordy, did they show you chats.

11  Talking with people who aren't here, people who they don't even

12  know, in vague and coded terms about who knows what, with no

13  one here to interpret them.  They showed you a lot of maps and

14  photos, but not evidence that goes to the important substantive

15  issues you have to decide.

16          I won't bother to go into the law on entrapment

17  because that's not my place.  That's the judge's role.  But we

18  have entrapment here.  At the beginning of the case there's

19  inducement.  And the government cannot carry their burden.

20          It's the government's burden -- you have to understand

21  that -- the government has to disprove entrapment beyond a

22  reasonable doubt.  They have to prove that the defendants were

23  predisposed and were not entrapped and they have to prove that

24  beyond a reasonable doubt.  The defendants never have to prove

25  anything.

1     And here's the thing -- we can take that down off the

2     screen.

3     Here's something that's absolutely critical.  If you

4     think that the government is probably right that they are

5     guilty, then we win.  Everybody got that?  If you think it's

6     most likely true that they knew the drugs were going into the

7     United States, then under your oaths as jurors you must acquit.

8     Because they have a burden of proof beyond a reasonable doubt.

9     So close doesn't count.  They have to prove it beyond a

10    reasonable doubt.  You can't vote to convict unless the

11    government persuades you with evidence of such a convincing

12    character that the defendants are guilty beyond a reasonable

13    doubt.  And they can't do it.

14    So what's going to happen next?  Well, first you're

15    going to have lunch and then I think Mr. Jackson is going to

16    get up and deliver his summation on behalf of his client Efrain

17    Campo Flores.  And he's going to knock your socks off.  So,

18    buckle up.

19    But then after that the government gets to stand up

20    and give what's called a rebuttal summation.  Now, that's the

21    law.  Those are the rules.  That's the way it works.  And it's

22    appropriate.  The government has the burden of proof.  They get

23    to go first.  They get to go last.  But it's a huge advantage

24    and you know that from your own lives.  When you're having a

25    discussion with your sister or your spouse it helps to get the

1   last word.  Okay.  It's a huge advantage.

2          And lawyers, we get paid to make arguments.  That's

3   our job.  So there's nothing that any lawyer can say in a jury

4   address that some other taller lawyer can't get up and give a

5   response to.  That's the way it works with lawyers.

6          So I fully expect that when Mr. Bove stands up before

7   you he is going to have a response to everything I say.

8   Because that's the way it works with lawyers.  But when we get

9   to rebuttal see if the arguments sound good to you just because

10  it's a sort of a snappy response to something I said or

11  Mr. Jackson said, because we're not there to respond again, or

12  whether it provides a real substantive response to our

13  arguments that goes to the heart of the questions you are going

14  to have to answer:

15         What is the proof that shows that they knew, that they

16  intended, that they agreed to import drugs into the United

17  States.  Keep your eye on the ball.  Don't get distracted by

18  Google Earth maps and stock photos of types of planes.

19         A rebuttal that doesn't answer your substantive

20  questions is just argument.  We have asked you to focus on the

21  evidence and the absence of evidence to help you determine the

22  critical questions you face.

23         So, one of the greatest things about this country is

24  that the Constitution says you can't be convicted unless twelve

25  citizens -- I'm sorry for the folks in the back row -- but if a

1    jury of twelve citizens comes to an agreement unanimously that

2    the government has proved their guilt beyond a reasonable doubt

3    on each and every element of the crime.  And that guarantee

4    protects all of us.  It's a wonderful thing.  And it even

5    protects Franqui Flores and Efrain Campo even though they're

6    not from here, even though they were brought here against their

7    will, and even though they're not U.S. citizens.  They still

8    get the protection of the United States Constitution.

9         Hold the government to their burden.  Parse the

10   evidence.  Scrutinize their witnesses.  Look hard at the proof.

11   Do your part to uphold that constitutional guarantee.

12        And, please, understand that a vote to acquit is not a

13   failure of the system.  It's not a failure to do your job.

14   Quite the opposite.  A vote to acquit is a vindication of the

15   system.  It's a vindication that the system works.  It's a

16   vindication of the constitutional rights that protect all of

17   us.  It's a verdict you can take pride in.

18        Think for a second about how these guys feel.  They

19   are in a foreign country.  They are in a foreign court system.

20   They are hoping you'll be courageous enough to look past

21   nationality, race, politics, the nonsense, concentrate on the

22   facts and the law.  They're hoping you decide the case without

23   fear, without passion, without prejudice, but based solely on

24   the evidence or the lack of evidence.

25        We urge you to send these young men home to their

1    families and their kids.  Send them home to their country of

2    Venezuela, yes, as troubled as it may be.  Franqui Flores and

3    Efrain Campo are not guilty of the crime charged and we ask you

4    most respectfully, most humbly, to return a verdict of not

5    guilty and set them free.

6            Thank you so much for your attention.

7            THE COURT:  All right.  Thank you, Mr. Rody.  We'll

8    resume in an hour.  Take our luncheon recess now.

9            Please rise.

10           (Jury not present)

11           THE COURT:  Can I see counsel at sidebar, please.

12           (Sidebar discussion off the record).

13           (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             1:49 p.m.

3          THE COURT:  Please be seated.

4          May I see counsel at the sidebar.

5          (Sidebar discussion off the record).

6          (Jury present)

7          THE COURT:  Mr. Jackson, are you ready?

8          MR. JACKSON:  Thank you very much.

9          THE COURT:  You're welcome.

10         MR. JACKSON:  Ladies and gentlemen, I'm going to try

11    to be at quick as possible because it's past time for you to

12    get the opportunity to deliberate and bring this thing to an

13    end.

14         Now, when I listened earlier today, and I think you

15    were all listening, I was watching as everyone was paying close

16    attention to the government's summation.  I heard words that I

17    found deeply surprising.  There were words that appeared in the

18    opening statement of the government.  And in Mr. Bove's opening

19    statement what he said is that "The defendants were caught

20    red-handed joining this conspiracy."  Red-handed.  And after

21    everything that we saw during the course of this case, after

22    the shocking lack of evidence that you saw in this courtroom in

23    what was supposed to be a diligently done federal

24    investigation, I did not think you would hear someone claim

25    that the defendants were caught red-handed.

1        Red-handed is a term that goes back to ancient

2   Scotland and it refers to the situation of a person literally

3   caught walking out of a murder scene with the blood on their

4   hands.  It refers to indisputable proof.

5        The DEA constructed this investigation in a way that

6   made it impossible for there to be indisputable proof through

7   their own decisions.  They decided to arrest two men and expel

8   them here to the United States to face a federal prosecution

9   here before receiving any drugs, much less the eight hundred

10  kilograms of cocaine that they allege was at the heart of this

11  conspiracy.  That is a shocking failure on the part of the DEA

12  and it is a million miles away from red-handed.

13       They also in what was the -- in what would be the two

14  critical -- the most critical moments in terms of this

15  investigation, the beginning and the end of this investigation.

16  A DEA operative destroyed the recording that he made or

17  whatever record he made of the first critical meeting in this.

18  And then at the very end a federal agent whose entire job is

19  securing recordings, whose entire life is securing recording,

20  who is so tied up in recordings that literally every

21  interaction that you heard about him in terms of the way he

22  interacted with various confidential informants during the

23  course of the case, him saying:  Did you record it?  You need

24  to record it.  Please record it.  When he got to the moment at

25  the end of what was obviously a botched investigation in which

1  the DEA received no drugs whatsoever, when he got to that, and

2  he knew that this was critical, a critical moment, that he was

3  going to try to obtain a statement that he was going to use in

4  court to try to implicate men who were going to be on trial for

5  their lives, he made a decision.  And he told you that.  It was

6  not negligence.  He told you that he thought about it and

7  decided that he was not going to record that meeting.

8          Ladies and gentlemen, we are a million miles away from

9  red-handed.  And the fact that in this government summation we

10  would hear that, after everything that you saw and more

11  importantly everything that you did not see during the course

12  of this case, just underscores the extent to which this is a

13  prosecution and an investigation where the government is

14  attempting to get you to disregard all of the things that

15  you've seen and common sense.

16          I think in terms of government summations there had to

17  be less reference to common sense in that summation than

18  anything I've ever heard.  The government's attempting to get

19  you to disregard common sense.  Common sense says when the most

20  important witness in the case, the guy who set up all of the

21  meetings, the guy who handled the only alleged meaningful

22  supposed physical evidence, the guy who was their expert

23  essentially saying there was real cocaine here, when that guy

24  gets on the stand, perjures himself, and the prosecutors have

25  to walk up and do this theatrical thing where they rip him up

on the stand and say a guy perjured himself, common sense tells

you:  That's it.  This is not a real -- this is not a case

where they can say with a straight face that anyone was caught

red-handed or that this is proof beyond a reasonable doubt that

a jury that is taking its oath seriously, that is taking

seriously the fact that two men's lives are in their hands can

say that there is proof beyond a reasonable doubt.  There is

not.

         All I want to focus on during the limited time that

I'm going take today are the eight, what I would submit to you

are eight sources, eight reasonable doubts, any one of which

you can focus on and know this is a case where there has to be

an acquittal.

         Now I would submit to you if, as we have observed, you

have been paying attention, there are about a million

reasonable doubts in this case.  We don't have time for that.

The case has been eight days.  I'm going to focus on eight

reasonable doubts, and I'm going to humbly submit to you that

you can look to the government's own witnesses, their

testimony, the evidence that they put in, and they prove up --

they proved up the reasonable doubt in this case.

         Now what is the first -- before we talk about that.

Let's just take a brief moment to just talk about what

reasonable doubt is.  Because it's a concept that's been

discussed and the judge is going to give you instructions on

1    it.  I want to just give you a portion of what I expect the

2    judge is going to give you on that and submit to you what I

3    think should be the framework in terms of the way that you

4    think about this.

5        What I expect the judge is going to say to you is that

6    the government must prove each defendant guilty beyond a

7    reasonable doubt.  The question then is:  What is reasonable

8    doubt?  The words almost define themselves.  It is a doubt

9    based upon reason.  It is a doubt that a reasonable person has

10   after carefully weighing all of the evidence.  A doubt that a

11   reasonable person has after carefully weighing the evidence.

12       So, ladies and gentlemen, I respectfully submit to you

13   in terms of reasonable doubt there are only two questions that

14   you have to ask yourself and I'm going to ask you to use this

15   as the lens that you have as you examine these arguments from

16   the lawyers and as you go to your deliberations, which I don't

17   think will be complicated here.

18       the first question is:  Do I view myself as a

19   reasonable person?  If you answer that question yes, the second

20   question is:  Do I have a doubt?  If you answer that question

21   yes, there is reasonable doubt.

22       Now, the first reasonable doubt is that the defendants

23   in this case, it has been demonstrated by the government's own

24   proof, they did not have the ability to deliver eight hundred

25   kilograms of cocaine.  The government has utterly failed to

1  demonstrate anything to the contrary.

2        This is -- this is just some of the testimony that you

3  heard from Mr. Santos Peña.  I think Mr. Rody talked about the

4  fact that the government likes to sometimes say we want it both

5  ways.  The reason that we will focus on some of the things that

6  Mr. Santos Peña said that are true, that you should rely on,

7  isn't because we think he's a truth-teller.  The man is

8  probably the biggest liar to ever get to raise his right hand

9  in a federal courtroom.  However, just think about how damning

10 it is when that guy is saying things that are exculpatory of

11 the defendants.  This is a guy who you know from observing him

12 will say anything that he can get away with in order to try to

13 implicate the defendants.  And even he could not stretch to

14 come up with the lie that these were experienced drug

15 traffickers that you had here with Efrain and Franqui.

16        This is what he said in his testimony early on.  This

17 is at page 864 of the transcript.

18        Now once you started meeting with the defendants in

19 Venezuela you realized they were very inexperienced, right?

20        And he wouldn't fight on it.

21        Compared to me, yes.

22        Compared to you they were inexperienced, right?

23        Yes, sir.

24        You discussed with Agent Gonzalez that they were young

25 guys, right?

1          Yes.

2          You discussed with Agent Gonzalez that they didn't

3    really know what they were doing, right?

4          Well do you remember saying to Agent Gonzalez that you

5    thought that they were new and lacked knowledge.

6          That they were new.  I remember that.

7          And that they lacked knowledge too.

8          Compared to me.

9          I mean think about what we're talking about here.

10         This is a guy who, as Mr. Rody explained to you, is

11   essentially an expert witness in terms of drug trafficking.

12   This is a guy who has seen everything in the world of drug

13   trafficking.  As he told you, he was operating at one of the

14   higher levels of the Sinaloa cartel, overseeing kidnappings to

15   secure hundreds of kilograms stolen, the torture and murder of

16   individuals, you know, he knows about the acid that they use on

17   bodies.  The guy knows everything.  And he looked at these guys

18   and in five seconds knew:  These guys were posers.  They were

19   inexperienced.

20         We talked a little bit about the fact that this is

21   something that Agent Gonzalez acknowledged, that he came to

22   that conclusion.

23         And you very quickly came to the conclusion that they

24   were amateurs, right?

25         I'm not sure if I very quickly came to that conclusion

1    or not.

2                    But you came to that conclusion, right?

3                    Yes.

4                    and you discussed that with Jose, Sr., right?

5                    Possibly.

6                    Well you called them idiots in your communications

7    with him?

8                    It's possible.

9                    I direct you to page 60 of the exhibit you have there.

10   Let me know if that refreshes your recollection that you called

11   them idiots.

12                   Answer:  Yes.

13                   The suggestion that is being pushed here, that these

14   were anything other than -- and I want to just very briefly say

15   something.

16                   We've used some harsh language, I know, in reference

17   to our clients.  I know that we have talked about them as, you

18   know, stupid and idiots.  That's not -- that's not us saying --

19   that's not us trying to be derisive.  It is definitely not us

20   saying that we don't care about our clients.  Okay.  That is us

21   trying to be real with you about what is going on here.  These

22   guys, in terms of what actually happened, are idiots, okay.

23   They didn't understand what they were getting into.  And they

24   got roped into a situation where they thought that they could

25   take advantage of more than what was there.  But they don't

1   know anything.  So it's not -- you know, I beseech you to

2   recognize.  These are two individuals and we fully -- we hope

3   that as you're going into your deliberations you're going in

4   thinking about the actual humanity of both of these people and

5   the fact that you're dealing with real lives.  They are not

6   targets.  These are not defendants.  These are two men who have

7   lives and families.  And so when we say that, it's only to try

8   to get through that we understand in the context of what

9   happened here, it was incredible stupidity.  It's what Mr. Zach

10  said at the beginning.  There's some very bad men taking

11  advantage of some very stupid men.

12          Now, what else showed you in the testimony that the

13  defendants did not have the ability to deliver eight hundred

14  kilograms of cocaine?  Well, there was a bunch of discussion

15  about what happened with Sentado.  And I hope that this hasn't

16  been lost in the shuffle because it comes in, in a few

17  different places.  But if you look at what happened in the

18  Sentado meeting, it is completely obvious that Sentado

19  essentially promised the defendants a wild amount of money,

20  millions, upon millions, upon millions of dollars to do

21  nothing.  That's how he roped them in.

22          This is one of the communications where Agent Gonzalez

23  is talking about the fact that -- we asked him:  There was a

24  communication on October 23, wasn't there, where you said to

25  Jose, Sr. a/k/a CS-1 he told Sentado they don't have airplanes,

1    right?

2            And CS-1's response, you see a little further down,

3    was:  Ha, ha, ha, ha, ha.

4            They were laughing.  They were laughing during the

5    course of the investigation.  This is supposed to be a serious

6    federal investigation.  We have real problems in this country.

7    We have limited resources.  This is supposed to be serious.

8    They are laughing during -- this is a long-term DEA CS, which

9    essentially means he's a DEA employee.  You should reject the

10   idea that there's a distance there.  This is a guy who was

11   working hand-in-hand with the agents everyday.  And he and the

12   agent that he's working most closely with are laughing about

13   the fact that one of their other cooperating witnesses have

14   communicated to him that these guys are so lacking in the

15   ability to do what they're going to try to structure with this

16   sting.  They don't even have airplanes.  And you know that to

17   be true.  Yes, they flew on some airplanes.  We'll talk about

18   that a little bit more later.

19           So, the point that I'm making is Sentado at the very

20   beginning is acknowledging with them.  They don't have

21   airplanes.  They don't have the means of transport.

22           Then this is something that Mr. Santos Peña told us.

23   Did you also understand that the original plan was that Sentado

24   would locate the drug supplier for the defendants?

25           Yes, sir.

1    So, he was going to provide, according to what was the

2    original plan, the planes, the drug supplier, and the person

3    who was going to be buying them.

4         What were the defendants supposed to do?  It's not

5    clear at all.  All that we know is that they were just brought

6    in with this outrageous thing.  And there's -- there is -- I'm

7    not going to address it much because Mr. Rody already talked

8    about it, but there's a point to some of the text messages with

9    people like Flaco that happened a little bit before this

10   meeting.  We have no idea how long before the first meeting in

11   October, before Sentado started structuring this thing.  We

12   know that Flaco was working at his direction.  We know that at

13   the time that he had that meeting he had at least one woman who

14   was working for him who was apparently ready and who was

15   videotaping.

16        MR. QUIGLEY:  Objection.

17        THE COURT:  Overruled.

18        MR. JACKSON:  So we don't know the answer to that.

19   None of those communications that you've seen earlier tell us

20   anything about when this thing started to be orchestrated.  But

21   if you believe the idea that he was able to set this all up in

22   one day, as opposed to the idea that he was setting it up for a

23   long time and decided to tell Agent Gonzalez in one day so that

24   Agent Gonzalez would have limited opportunity to come and mess

25   up the plan, I leave that to your discretion.

1           Now, what else do we know about the defendants'

2   inability to actually produce eight hundred kilograms of

3   cocaine?  Well this is another one of the I think very

4   important, amazing things that Mr. Santos Peña told us.

5           This is at page 909 and 910 of the transcript.  We

6   asked him:  Now up until the time of your arrest I think what

7   you told Mr. Rody is that you still maintain contact with

8   numerous drug dealers in the Sinaloa cartel?

9           That in and of itself is amazing, but we don't have

10  time to address that.

11          Yes, sir.

12          You also have contact with a number of people who

13  imported drugs throughout the entire United States?

14          Yes.

15          You have contacts throughout California?

16          You had contacts in the importation of drugs

17  throughout California?

18          Yes, sir.

19          And then he says:  And throughout the rest of the

20  southwest of America?

21          Yes, sir.

22          And also on the east coast of America?

23          Yes, sir.

24          By the way, we know he's telling the truth about that

25  because he got ratted out by another CS and ended up getting

1    caught for actual massive drug dealing that stretched all over

2    the place.  This guy had drug importation contacts all over the

3    states.

4              And then we get to this amazing point.

5              You told the prosecutors everything.  That was what

6    they told you you were required to do.

7              The first time that you ever heard of Mr. Campo or

8    Mr. Flores de Freitas was when they were introduced to you by

9    Sentado and Agent Gonzalez?

10             Answer:  Yes, sir.

11             Ladies and gentlemen, again, this is a man who will

12   tell any lie that he can get away with.  He will tell any lie

13   that he can get away with.  And we know that because he lied

14   over and over and over again to the government.  He kept

15   getting more and more chances, right up until the time that he

16   lied on the witness stand, perjured himself in this courtroom.

17   And he can't even muster the lie that he ever heard of these

18   defendants before they were introduced to him by Sentado and

19   Agent Gonzalez.

20             Now, that is stunning, ladies and gentlemen, because

21   they are suggesting that these are guys who had the capability

22   to send 800 kilograms of cocaine into the United States.  Don't

23   you think that if they were that level of players in the game,

24   if they were actually drug traffickers like that, don't you

25   think he would have at least heard of them?  Don't you think

1    someone in the Sinaloa cartel would have mentioned these two

2    guys who do this big stuff out of Venezuela?

3         Of course they would.  It's not there because it's not

4    there.

5         And, you know, the reality of the situation is that

6    these -- this testimony I think underscores any number of

7    problems that we'll get to in a moment.

8         Who else did we ask about that?

9         We asked the cooperator, Mr. Gonzalez, who is the

10   dirty air traffic controller that we got to hear from.  And he

11   was posed a similar question:  It's true that he was someone

12   who had worked in the drug business before, right, and you

13   arranged drug deals with him for years.

14        And we're talking about Mr. Soto, the guy who was sort

15   of an important pivot point and knew all about drug trafficking

16   and flights all over the place and was informing this guy.

17        Again, Gonzalez knew nothing about these defendants.

18   It was basically a waste of time to call him.

19        But this was interesting.  He said:  And he never once

20   mentioned these two defendants to you, right?

21        He says:  No.  Never mentioned them.

22        In all the years of your dealings with him, right?

23        No, sir.  Never once.

24        Don't you think that if they had any involvement with

25   the transshipment corridor of Honduras that we've heard so much

1    about during the course of this case, don't you think that Soto

2    would have said something at least once?  Nobody had heard of

3    them because this was all a fantasy.  This was all made up and

4    ridiculous.

5        Now, there was another point, how else do you know

6    that they didn't have the ability?  Well, Agent Gonzalez also

7    told us when we were talking to him, we asked him:  Sir, in

8    your career, investigating real drug deals, you never heard of

9    a real drug deal where somebody put up $20 million in cash in

10   advance, have you?

11       20 million.  I don't recall.  No.  No.

12       Of course not.  That's ridiculous.

13       And if they were -- if these gentlemen were anything

14   like what they are accused of in this case they would have

15   immediately known that that was preposterous.

16       By the way, the other point on that.  The only way

17   that you can disregard that is if you accept some notion that

18   Mr. Campo Flores and Mr. Flores de Freitas were so super

19   smooth, so Keyser Söze-esque that they were able to just stay

20   under the radar the whole time so no one would know what they

21   were up to.  Ladies and gentlemen, did you see that during the

22   course of this case?  Did either of these gentlemen seem like

23   they were so super smooth that they would have been able to

24   stay under the radar?

25       It was idiotic.  Mr. Flores de Freitas is on flights

1    taking selfies of himself sending it all over the world.

2    They're using their own names. They're talking about their

3    real lives.

4         What else do we know? We know from common sense that

5    if the DEA actually believed that these guys had the ability to

6    produce any real cocaine they could have asked for a sample.

7    They could have asked for some portion of it at least to be

8    sent on one of these flights that we're talking about here.

9         We actually asked Agent Gonzalez about that. We asked

10   him: In fact, you could have actually asked the defendants to

11   bring a sample of that cocaine 30, 40 kilograms to Haiti when

12   they flew there for the supposed money pickup, right?

13        No.

14        There is no way you could have requested that?

15        Answer: That wasn't part of the negotiations.

16        My question again: Could you have requested that,

17   sir?

18        Agent Gonzalez says: Okay. I guess we could have

19   requested that.

20        I guess?

21        I mean this is not -- this is not to disparage anyone.

22   But this is a time for us to be real, for us to be serious with

23   one another and to talk in common sense.

24        That's absurd. For him to, at this stage of the

25   investigation, by the time that he's testifying in court, to be

reacting as if he never once thought about the idea that they

could have requested that some portion of the drugs be brought.

Of course he thought about that. How could you not?

You saw that in some of the communications that we

talked about between him and CS-1. They didn't do it because

they knew the defendants would not be able to produce what they

wanted to produce and it would undermine the investigation.

Just to be clear also Agent Gonzalez testified that

there is no rule that would have prevented them from actually

at least having Jose, Sr. and Jose, Jr., the arrested

individuals, go actually see the eight hundred kilograms of

cocaine. There is no rule. But they didn't attempt to do that

because they knew that these guys did not actually have it.

We also heard a little bit about the test flight which

was supposedly a major event where we had the only test drug

flight in history that failed with no drugs on it and I guess

the pilots never even met anyone. There was a bunch of like

huffing on text messages that amounted to nothing.

And in terms of the aircraft evidence. What do we

get? No actual proof of any planes that they could identify

that had ever actually exported any cocaine on them on behalf

of these gentlemen. Nothing like that. No forensics that they

did on the plane that came to Haiti to try to figure out had

that plane ever carried cocaine. No. They didn't do that

because they knew they wouldn't find anything. Instead, we got

all these government exhibits, the bulk of which are just

clippings that Mr. Calabrese pulled off of the internet of

random planes.

        That's not real evidence.  That's not evidence of the

character that can prove beyond a reasonable doubt.  When you

are holding two actual individuals' lives in your hands, when

they're asking you to say that those individuals should be

going to prison, this is not acceptable.

        Now, during the course of Mr. Quigley's summation I

think it was probably obvious to each of you that there was

this attempt to pivot away from the witnesses in this case who

are a mess.  They tried to suggest to you that you can just

focus on these text messages and recordings of conversations

and that that would be sufficient.  That is not what the

government said to you at the beginning of the case.

        This is what Mr. Bove said to you.  He said at the end

of the trial the question won't be whether you like these

witnesses; it will be whether you believe their testimony.

        That means at the beginning of the case they

acknowledged the witnesses are important here.  They're

critical.  And the question is:  Do you believe their

testimony?  And you don't even have to answer that question.

Because they answered it for you when they acknowledge that

their most important witness had perjured himself on the stand

and only got caught because he got caught in an incredible lie

1    and then they had to rip up his cooperation agreement.  I

2    submit to you that you should reject all of his testimony and

3    everything connected to it if you're taking your oath seriously

4    in terms of presumption of innocence that's supposed to

5    attached to people in this country who are on trial.

6         What's the second reasonable doubt that I think you

7    should focus on?  It's one that I'm not going to belabor but

8    it's simply the fact that the entire case is based on

9    confidential informants who cannot be trusted.  The only thing

10   that we have, the only thing that they have given you in terms

11   of assurances that the confidential informants here did not

12   destroy important evidence, did not destroy important

13   communications, did not engage in meetings that were not

14   recorded in which they twisted what was going on are the words

15   of those people in the various agreements that the government

16   has with them which they suggest provide an incentive for them

17   to do something.

18        Well you saw how much these agreements are worth.  I

19   mean this is the confidential source agreement of the most

20   trusted person that the DEA was dealing with in this.  That's

21   his signature right there.  It meant nothing.  It was trash.

22   It's paper.

23        Mr. Rody already addressed this, but it really can't

24   be understated -- I mean overstated, how amazing it is that at

25   the very beginning of this investigation the person who sets up

1    the most important meeting in any investigation like this, any

2    sting investigation, the most important meeting, that first

3    critical meeting, the guy lied, just told a flatout whopper to

4    the agent.  He said he couldn't record it because he was in a

5    restaurant.  And then when the agent was pressing him:  Can I

6    get the pictures.  Can I get the pictures.  Finally, finally he

7    sent one picture.  There were multiple, he acknowledged.  But

8    he sent one.  And it was this one.

9            And, ladies and gentlemen, you couldn't imagine, just

10   based on what we're seeing, a more per location for recording

11   something.  This is not a -- this is not your favorite

12   restaurant in Manhattan on a Friday night.  This is an open

13   field where people are sitting there.

14           That should have been a point where Agent Gonzalez

15   took a look at what was happening and said there's a real

16   problem.  It should have been a point where he said I have a

17   confidential -- I have a witness, a cooperating witness who is

18   setting up something and he is telling me a bold lie about what

19   happened and why he wasn't able to record it.  That should have

20   been a point that triggered something.  It didn't trigger

21   anything.  The botched investigation continued.

22           By the way, Agent Gonzalez told you that he had at

23   least two phones of his own and a third person working the op.

24   The meeting was recorded.

25           What else do we know?  The financial incentives in

1    this case are preposterous.  Okay.  You saw -- you heard the

2    stipulation that we've talked about, where these individuals

3    literally received millions of dollars from the United States

4    government.  When you think about, just putting everything else

5    aside, the fact that that kind of incentive was given to a guy

6    like CS-1 who had admitted that he was a sociopath, okay.  It

7    was known that he had come out of this high level of the

8    Sinaloa cartel, paying him millions of dollars to try to set

9    people up and not engaging in the most basic level of due

10   diligence and supervision that you would need to, in order to

11   responsibly handle an investigation like this and maintain the

12   integrity of the investigation.

13           And then when we asked Mr. Santos Peña:  How much

14   money of the one million dollars that you received from law

15   enforcement have you given back to law enforcement since your

16   many crimes were committed?  His answer:  I don't understand

17   the question.

18           The Court asked him:  It's pretty simple.  How much

19   money did you give back?

20           Give back to who?

21           The government.

22           I don't know.  I don't remember.

23           And then I said:  Sir, you haven't given any back,

24   have you?

25           Answer:  Very little.

1           This is a guy that they let come into this courtroom

2    as the most important witness to testify before you.  And they

3    were allowing -- he hadn't even done the most basic thing that

4    you would expect a person like that to do if they were showing

5    some sort of good faith in terms of like turning the corner on

6    not being completely corrupt.

7           The guy hadn't given anything back.

8           It was also true of Mr. Gonzalez.

9           Have you actually forfeited any money?

10          No.

11          He has no money allegedly.

12          Now, one of the other things that we know in terms of

13   these cooperating witnesses and -- this cooperating witness,

14   these confidential sources, is -- let me just ask you, ladies

15   and gentlemen, please do not accept the idea that this is just

16   normal, okay, that this is just something that just happens.

17   There is a certain degree, and I think it's very professional

18   in the way that the prosecutor handled his summation, but

19   there's a certain degree of evenness and sort of even tone

20   which suggests this is business as usual.

21          This is not business as usual.  Even before you saw

22   what never happens in federal court, a witness caught

23   red-handed engaging in perjury, even before we got there, Agent

24   Gonzalez acknowledged:  It is an exceptional event, isn't it,

25   when the DEA has to throw in jail two long-term cooperating

GBH9FLO4                         Summation - Mr. Jackson

1    sources?  That's not something that happens everyday?

2            No, it is not.

3            So, ladies and gentlemen, even before we got -- like

4    at the start of this case in terms of the way that the evidence

5    got to you, in terms of the way that the sausage was made, got

6    through the sausage, the DEA sausage factory, and it ends up

7    before this jury being served to you, that was exceptional

8    because the confidential sources, the people who were allowed

9    to handle all the evidence, all the interactions with the

10   defendants, they had to be thrown in jail for committing

11   literally years of fraud against the DEA.

12           I mean that is astounding.  I think that your common

13   sense tells you that you would be appalled in any other context

14   in your life to hear that an investigative agency was

15   proceeding in a matter of importance relying on individuals who

16   had been caught engaging for years in fraud against the agency.

17   That would appall you.  If there were federal -- if it was the

18   FDA -- if you found out that there were federal meat inspectors

19   who had been caught lying about inspecting the meat and had to

20   plead guilty to lying about inspecting the meat and letting

21   spoiled meat go by, if those individuals were allowed to

22   continue being meat inspectors, you would be appalled.  And you

23   can at least cook meat.  This is a one-shot situation where my

24   client's life is on the line here.  This is unacceptable.

25           By the way, Agent Gonzalez also acknowledged knowing

 1    what he knows now, he would not have put -- they would not have

 2    been confidential sources.

 3              Now we can't turn back the clock.  But that's an

 4    exceptional admission that the case agent is saying that the

 5    main people who handled the investigation, if the DEA knew what

 6    they knew now, they couldn't even have been allowed to handle

 7    the investigation.

 8              How can they say in that situation that this is

 9    something that you should just look past?  They can't.

10              What's the third reasonable doubt that you should

11    focus on?  Well, it's the idea that in a supposedly massive

12    cocaine conspiracy the government failed to obtain any drugs.

13    You've seen this picture over and over again of Mr. Campo

14    Flores holding a substance.  In your everyday lives you would

15    never accept the idea, even if you're sitting on a jury for a

16    small, small thing where someone was caught supposedly -- some

17    small amount of drugs, you wouldn't find it to be acceptable

18    proof, no testing results, no chemistry, nothing, just a

19    photograph and an individual who has told so many lies as the

20    only supposed expert who is testifying about this being actual

21    drugs.

22              Why did they show that to you, by the way?  Because

23    they know that the capacity of the defendants to actually

24    engage in this is something that they have to prove in order to

25    cross the threshold in terms of --

1              MR. QUIGLEY:  Objection.

2              THE COURT:  Overruled.

3              MR. JACKSON:  -- your understanding that these are --

4    that they actually had an intent to engage in this crime.

5              And, you know, AUSA Quigley said there is no question

6    that was real cocaine.

7              Let's look back at what Mr. Santos Peña told us.  He

8    admitted on the stand that in some of the drug deals that he

9    had to admit to the government, multiple drug deals -- this is

10   just one guy -- multiple drug deals where people that he had

11   been dealing with, you know, people that he actually knew, that

12   he had long-term interactions with, that they had brought fake

13   drugs.  And we talk about the fact that in any one of the deals

14   they had to confirm that it was actually cocaine because this

15   is a known risk in the drug business.  He talked about the time

16   that he went with Paul to pick up twelve kilos and he said it

17   was four, but we'll never know.  It was several kilos.  And a

18   friend of Javier's showed up and took one of the kilos.  And

19   the guy came back because the kilo was no good.

20             And then there was another drug deal with a person

21   known as Chino.  And Chino received the kilos and he examined

22   it and he said this is garbage.

23             And then on another occasion with somebody named Javi,

24   the person showed up, and it was essentially bricks of loose

25   flour.

1          And, again, Javier said the kilos were no good.

2          Ladies and gentlemen, this is not -- these are the

3    government's witnesses talking about the fact that it is a

4    known risk in the drug world, all the time, the substance that

5    is brought is not actually cocaine.  We didn't have to call

6    anyone to say that.  Their own witness said that.  And, of

7    course it's true.

8          You can't ask a jury to convict someone, based on the

9    reasonable doubt standard, to say that there's proof beyond a

10   reasonable doubt, when there is absolutely no evidence to

11   suggest that there was ever any real cocaine.

12         The only thing that they have that suggests that is

13   the guy that -- the ripped-up cooperator who said that he

14   performed this supposed magical test where he could tell that

15   it was cocaine because there was oil coming out of it.

16         And we asked him:  What is that grease?

17         And he's says:  It's oil.  It's buttery.  It's greasy.

18         Sir, you have no idea what the actual substance is

19   that you're claiming you saw come out of this, right?

20         Yes, sir.  I do.

21         What is the substance?

22         It's oily.

23         Right.  But what chemical is it?

24         I don't know that.  It's oily.

25         Ladies and gentlemen, this is not proof of a character

1 that, again, if you are taking your oath seriously, you are

2 dealing with real human beings, real human beings with real

3 lives, they are asking you, a very serious charge, that is not

4 proof of the character that you can accept even if Jose Peña

5 Santana was not the most corrupt witness to ever sit in that

6 jury box -- in that witness stand. Excuse me.

7        Now, there is something I would say, I would just

8 think about like in your normal everyday lives. I conjure the

9 situation, because we talk about common sense, and what does

10 common sense mean? I think it means trying to apply what we've

11 seen to your everyday lives.

12        If there was a pizza place in your neighborhood called

13 Jose's Pizza. And you went in there one day and you asked --

14 you see that it looks a little weird in the back. And you're

15 like: Jose, is there somewhere back there for people to wash

16 their hands? And he's like: Yes, of course. We have a

17 state-of-the-art bathroom back there, Dyson dryers. And, you

18 know, you see the guys tossing the pizza, putting the

19 pepperoni. It looks good. He shows you they have

20 certifications on the wall where they make all the workers sign

21 and certify that they wash their hands thoroughly. See all the

22 certifications.

23        You saw that. And you had some pizza there. You

24 started eating there. Occasionally go into Jose's Pizza in

25 your neighborhood every now and then. That went on for a few

1    years.  And then one day when you back from Jose's Pizza you

2    became violently ill.  Food poisoning.  You went back to Jose's

3    Pizza after you got better and you're like:  Jose, I got very

4    sick from this pizza.  Are people actually washing their hands

5    back there?  He was like:  We got this state-of-the-art

6    bathroom.  Look at certifications.

7            You went back there.  You peaked.  And you decided

8    just to brush past him.  And he was like:  Oh, where are you

9    going?  And you saw that, in fact, there was no bathroom.

10   Instead there was just a rancid porta potty, nowhere to wash

11   your hands.  It was filthy.  Flies.  All of that.

12           And you turned to him.  And you said:  Jose, I cannot

13   believe that you were lying to me for years about this.  And I

14   became sick.

15           If that happened and he admitted.  Yes, yes, you got

16   me.  There was no bathroom.  No one ever washed their hands.

17   We've been lying for years.

18           If in that situation, if that happened, if the next

19   week, as you were walking by, Jose popped out to you and was

20   like:  Hey, hey, guess what.  We're opening Jose's Tacos right

21   down the street.  This one is going to have a state-of-the-art

22   bathroom.  It's going to be fantastic.  Total hygiene.  There

23   is a zero percent chance that you would go eat at Jose's Tacos.

24           And that's just to say you don't take the word, any

25   part of it, you don't take any part of the word of a person who

1  is engaged in years of fraud.  And the government is asking you

2  to do that.  They're asking you to disregard everything that he

3  did in terms of this investigation and everything that he

4  didn't do.  And that's not acceptable.

5        What else do we know?  Critical evidence is missing.

6  And there is no reasonable explanation for it.

7        Now, Mr. Rody talked a little bit about this so I

8  won't belabor the point.  But Agent Gonzalez testified that the

9  only reason he didn't record it -- record the meeting is

10  because he was afraid for his safety.  And we asked him about

11  it for a while for a reason.  We asked him, tried to get him to

12  give some kind of explanation as to what that meant.  And these

13  were not leading questions.  Right.  The question was -- I

14  asked him, I said:  I'm trying to understand what the safety

15  issue would have been with regard to recording.

16        And he said if I am holding a recording device then I

17  am exposed.  If someone else is holding a recording device,

18  they're exposed.  I was sufficiently exposed sitting next to

19  him taking notes.

20        I say:  Sir, it would have been completely possible,

21  right, for you to press record on any of the several devices

22  and then put it off to the side.

23        He said it would have been possible.

24        The defendants wouldn't even have known that you were

25  recording using certain of the devices that you had on the

1  plane, right?

2          Yes.

3          And so help me out.  I'm trying to understand.  How

4  could that possibly have amplified the safety situation on the

5  plane?

6          And his answer was:  To be honest, to be honest, I

7  didn't think of using the surreptitious recording devices.

8          Now, ladies and gentlemen, there is no one who has

9  more respect, I assure you, than us for the work of federal law

10 enforcement.  But you are charged as a jury.  You have a

11 responsibility.  I have a responsibility.  Okay.  You're

12 charged as a jury with fulfilling your oath, treating the

13 presumption of innocence and the burden of the government

14 seriously.  And if you treat that seriously and you apply your

15 common sense you know for a fact that that is just completely

16 made up.  Okay.

17         There was no safety rationale for not recording it.

18 It wasn't recorded because it was a botched investigation and

19 Agent Gonzalez did not want anyone to hear the complete story

20 that the defendants were going to tell on that airplane.

21 That's the only logical explanation.

22         You know that from the -- you know that from some of

23 the ways that it was described in terms of what was said.

24 According to Agent Gonzalez's testimony, the defendant said

25 something like -- Mr. Campo Flores said something like well

what would happen if a person went part of the way and then

turned their back and then just admitted everything, just very

clearly -- I knew it was coming to the United States, this is

what happened, blah, blah, blah, blah, blah.

Ladies and gentlemen, does that sound like anything

that you have ever heard of?  Does it comport with your common

sense that someone would give this weird philosophical half,

you know, denial and then just give this fulsome, you know,

very clear and complete confession?  No, it doesn't make any

sense.  He explained to Agent Gonzalez that he was never going

to do this deal.  And that's not on the recordings.

By the way, even this guy, even this guy whose only

job as far as we can tell was safety, who is in cammo and all

of this stuff, thought it was a sufficiently safe situation,

before the defendants are even in all of the gear in terms of

chains and stuff that they end up in on the plane, to take a

selfie on the tarmac.  I mean this guy could take a selfie and

Agent Gonzalez can't record the meeting?  It's that dangerous?

No.  That's not common sense.  That's something quite

different.

(Continued on next page)

1          MR. JACKSON:  (Continuing)

2          Critical evidence is missing.  There is no reasonable

3     explanation for it.  Take a look at this part of the

4     transcript.  This is the part where we talked with Agent

5     Gonzalez about the fact that CS-1 had actually erased certain

6     communications that he had and he told Agent Gonzalez, sorry I

7     erased the last one.  And Agent Gonzalez' response was --

8     pardon my language -- but his response was:  Fuck.  And we

9     asked him do you remember that?  And we showed it to him and he

10    said it did refresh his recollection.

11         He said that because it is unacceptable, in an

12    investigation like this, an interview of important

13    communications between the source who was running the

14    investigation and defendants for them not to be preserved.

15    That's reasonable doubt.

16         We asked him:

17    "Q  It was information that should have been sent to you, yes?

18    "A  This information?  No, it was not.

19    "Q  You have no idea what was in it because it was deleted,

20    right?

21    "A  I know what he told me was in it.

22    "Q  And when you said he, you're referring to the informant who

23    has pled guilty of four years of lying to the DEA?

24    "A  Yes, sir.

25    "Q  Okay.  And at this point you have confidence in the

GBH5flo5                        Summation - Mr. Jackson

communications that he gave to you about what happened during

the time period are reliable?

"A   Yes, sir."

          Now, that was, of course, before he was caught on the

witness stand engaging in just straight up perjury.  Agent

Gonzalez, even after everything that happened, said that he was

confident that whatever Jose, Sr. told him about this was legit

and it turned out that that was just wrong.

          We also talked to Mr. Santos Peña about that, the fact

that he did not record an entire night when they went out to

the club with the defendants.  And, you know, there has been an

attempt to suggest that during this night, where they

apparently talk about he is Sinaloa Drug Cartel connection that

it was a fun night, no business, there was no need to record

it.  Ladies and gentlemen, that was 25 percent, at least, of

the known interactions that he had with defendants.  You would

not accept 75 percent of a hamburger, okay, if you got it from

a restaurant and there were, like, three bites taken out of it.

You would say that is unacceptable.  And they are asking you to

take a situation where these individuals intentionally failed

to record a quarter of their admitted communications.  And we

have no idea what the total extent was of the communications --

but a quarter of them, just gone.  They intentionally failed to

record it in spite of instructions that they were supposed to

record everything and you are being asked to believe that that

1    is proof beyond a reasonable doubt.  That's wrong.

2           What is the fifth reasonable doubt that I would ask

3    you to focus on?  It is the fact that the recordings in this

4    case show that there was never a meeting of the minds necessary

5    to show the charged conspiracy existed.  Again, Mr. Rody

6    addressed some of this, I am just going to address it very

7    briefly.  But you saw, this is November 10th.  I mean this is

8    the end of this thing when there is supposedly a deal that is

9    already in place because they arrested these guys five minutes

10   later.

11          This is the end, the last meeting, and

12   Mr. Campo Flores is still asking him, You work in Europe,

13   right?

14           He said:  Excuse me?

15           In Europe.

16           And he said:  No, no.  It is too much work.

17          How is that the discussion at the last meeting and

18   they're telling you that there is proof beyond a reasonable

19   doubt of a conspiracy to import into the United States?  I am

20   going to get to that in a moment that this is ridiculous.  But,

21   even if you accept the idea, even if you accept the idea that

22   there was an actual intent to engage in a drug deal going on,

23   which there was not, but even if you accept that, they cannot

24   establish what is an element here, the idea that there was

25   knowledge and intent to have stuff come into the United States

1    when they're talking about Europe and prices in Canada at the

2    very last meeting, five minutes before they arrest them.

3            And, by the way, this gets to a very important point

4    that I hope is not missed which is it is not just that Canada

5    was mentioned, okay.  It is what that says about what the

6    communications were and whether there was a meting of the

7    minds.

8            Mr. Campo Flores and Mr. Flores de Freitas did not

9    believe Jose, Sr. when he was talking about sending stuff to

10   the United States.  It didn't matter because they were not

11   going to actually produce any drugs, but it was important

12   because it related to the amount of money that they could

13   extract out of him and they did not believe him when he said it

14   was going to the United States.  Why?  Common sense.

15           I mean, imagine two bank robbers rob a bank and they

16   split the money up.  One of the bank robbers, they don't know

17   each other very well, they just got together for the heist.

18   One bank robber says to the other one:  With my portion of the

19   money, I shall deposit it in my son's mattress.  It is going to

20   be in my son's mattress in my upper bedroom.  That's where I

21   will hide my money.  And the other bank robber is like, oh,

22   okay.  And then, as they're driving away in the get-a-way car

23   he says, Did I tell you I was going to hid the money in my

24   son's mattress?  Did I mention that?  And the guy is like, yes,

25   you did mention that.  Okay.  And then a little further he's

1   like, yup, that's where it will be —— in my son's mattress

2   right in my house on Bank Robber Lane.

3           Do you think that anyone in that situation will

4   believe that this is a guy who is actually telling him the

5   truth about what the location is of the destination of where he

6   sends his drugs?  No.  And their expert told you why.  Their

7   expert told you that drug traffickers keep very secret

8   destinations that they are sending, the methods that they are

9   using to send stuff, the corridors that they use.  They don't

10  share that information freely.  Of course they don't.  And

11  there was a reason for Mr. Campo Flores and

12  Mr. Flores de Freitas to believe that he was lying beyond the

13  fact that he is throwing this out there on occasion whenever

14  they do hear it, and it is because the prices were higher in

15  Canada.  And you see that here.  It says:  Uh Canada.  Buddy,

16  you will fall off your seat.  That's where Mr. Campo Flores is

17  asking this must be going to Canada.  He is saying U.S.

18          This is the last communication.  That, in and of

19  itself, is reasonable doubt.

20          I mean, they're talking about their cousin who is in

21  Canada.  And by the way, this is another thing that underscores

22  the fact that these gentlemen are really clueless.  Not only

23  are they using their real names just talking openly about who

24  they are, they are talking about their family members.  *We have*

25  *a cousin up in Canada.*  No real drug traffickers give up that

1   much information to guys they don't even know.  It is

2   ridiculous.

3            By the way, we talked about this briefly but I mean in

4   the midst of the communications, the sensitive communications,

5   there actually was communication where Mr. Campo Flores is so

6   clueless about the way that you actually interact that he is

7   asking this guy -- and this is in Government Exhibit 301, he is

8   asking CS-1, this isn't a code, he is actually asking him if he

9   can bring cubs -- like lion cubs and stuff like that.  And the

10  guy is like yeah, hippopotamus.  Anything.  At some point

11  Mr. Campo Flores says:  I would love to have a leopard cub.  I

12  will give you a call.  And he says I'm going to clean out some

13  space in my shack for the leopard cub or the lion cub.

14           And, again, this is not me trying to disparage my

15  client but this is what I mean:  My client is an idiot.  Okay?

16  He does not understand that this is an absurd thing to say in a

17  discussion with someone who is from the Sinaloa Cartel.  And

18  this guy realizes that he has such a pawn in his hand and he is

19  like hippopotamus.  Anything.

20           What else do we know?  In these long, meandering

21  soliloquies in the recordings we heard which are hard to

22  understand even given all the benefit of the doubt, they're

23  talking about gifts.  My friends -- not a payment, it's a gift

24  for you to support.  They're saying things like:  It's not a

25  commitment.  It's not a commitment.

1       It is completely -- there is no clear plan in place in

2  terms of any sort of distribution of drugs to the United States

3  even if you take these seriously.

4       I mean, this is on October 23rd.  Mr. Campo Flores is

5  saying.  Sentado told me that you guys had the possibility of

6  getting cars.  And they're like of course.  We'll have to

7  check.

8       What else do we know?  The sixth reasonable doubt.

9  The evidence and the lack of evidence demonstrates that the

10 defendants intended to keep the money and never deliver any

11 drugs.  Now, Mr. Rody talked about this a little bit already

12 but it is painfully obvious for all the reasons that he was

13 talking about -- the type of logistics that you would actually

14 need to deal with this are painfully absent from anything that

15 we see here much less any indication that they actually

16 possessed the drugs.  I mean, this is just a picture of the

17 government's aircraft but I imagine it is similar to the

18 aircraft that the defendants flew to Haiti on which was

19 similarly empty of drugs.

20      Do you remember that Agent Gonzalez testified that in

21 the supposed confession, Mr. Campo Flores said that he barely

22 even knew the individual named Gocho.  And Mr. Mahoney talked

23 about the fact that it is, as a general matter, organizations

24 are not going to be willing to front cocaine or money to

25 somebody they don't already have an intimate relationship with.

1    "Q  One of the risks, one of the reasons for that is because,

2    in your opinion, the person who is providing that without

3    payment or the cash, without cocaine is at risk, right?

4    "A  That's correct.

5    "Q  And the risk is that someone will just keep the money?"

6           And the expert Mr. Mahoney said:

7    "A  Yes.  They will be ripped off, if you will."

8           That's not something that we suggested to him.  We

9    never met Mr. Mahoney before but anyone, it is just -- it is

10   common sense.  No one delivers $11 million or $20 million or $5

11   million in cash in Haiti to someone and expects that that

12   person is going to actually give them what they're supposed to

13   get.  And if you accept the idea, as the government is trying

14   to suggest, that they were going to take this money and then go

15   buy a bunch of drugs with it from individuals that they barely

16   knew and bring it back and then deliver it to these guys, you

17   have to believe that these two individuals would have thought

18   that it would have been a reasonable decision to walk in with

19   real drug traffickers, with millions of dollars in cash and say

20   we have cash, now give us 800 kilograms of drugs.  They would

21   have been insane.  And they knew that and they were never going

22   to do that.  Okay?  For the same reason that if you see a

23   sketchy ad on Craigslist for somebody selling a piece of

24   jewelry that you like and they're like show with cash to a

25   sketchy apartment with $5,000; not are going to do that because

1  you know that's a situation that is not going to end well for

2  you.

3           MR. JACKSON:  What is the seventh reasonable doubt?

4  It is that even if you accept the government's and ignore all

5  of the problems with the case, ignore all of the problems with

6  all the witnesses, even if you accept that -- and I submit to

7  you you shouldn't even get to this -- the Judge is going to

8  instruct you on this but you shouldn't even get to it, the law

9  of entrapment.  What it means is even if you accept everything

10 that they're saying about the proof of intent and get past all

11 of those problems, you have to look and ask yourself, has the

12 government proven beyond a reasonable doubt -- beyond a

13 reasonable doubt -- that these defendants were not entrapped?

14          Now, it is a fail safe.  You don't need to get to the

15 entrapment analysis.  You shouldn't get to it but if you do get

16 to it, there is no question.  They don't even have the critical

17 first meeting where Sentado lays the trap and it is proven that

18 he lays the trap here.  It is proven that some of the

19 communications even before that meeting are from his

20 associates.  He is working this for a while before you even get

21 to that meeting.  They cannot prove beyond a reasonable doubt

22 that these defendants were not entrapped and that means that

23 you have to acquit if you are taking your oaths seriously.

24          I mean, this was an amazing bit of testimony where

25 Mr. Santos Peña was talking about the fact that the $20 million

1   that he mentioned at some point weren't even connected to

2   whatever amount that he was talking about, the $11 million.

3   There is another $20 million that was just going to be given as

4   sort of a good faith payment.  I mean, they are promising guys

5   who live in a country -- and yet they're related to some

6   powerful people -- they're not powerful.  They live in a

7   country that is so damaged, okay, whatever $20 million, $30

8   million means in the United States, it means infinitely more in

9   Venezuela where the murder rate is about a hundred times what

10  the murder rate is in New York.  People just die.  And yet he

11  you heard a lot about, you know, guns which, you know, saw the

12  ridiculous communication with Gilson, he says these are toys,

13  he says all the plastic.  And you saw the testimony of the

14  person who talked about that was wrong.  There are Airsoft

15  rifles.  That doesn't even matter because it is a fact that

16  Mr. Campo Flores and Mr. Flores de Freitas actually did have

17  bodyguards at different points.  They were provided to them

18  because they were -- the state provided bodyguards to everyone

19  who is family members of the president there and that's because

20  the risk of kidnapping is so high that you have to be insane to

21  walk around Caracas without some protection.

22          The reason that we showed you those Airsoft weapons

23  wasn't to show you that he had never been around a gun.  Of

24  course he had.  In Venezuela people are around guns.  The

25  reason is because we are pointing to the extent to which the

1  evidence in this case is really just a lot of

2  misinterpretation, a lot of them asking you to take a ginormous

3  leap from stuff that they pulled off a phone when there is no

4  real evidence.

5         Agent Gonzalez acknowledged that it very well could be

6  Sentado that Mr. Campo Flores was talking about when he talked

7  about the person in the drug business who told him that he

8  needed to make up a story, create bluster in order to seem like

9  a more real, significant drug trafficker when he was dealing

10  with people.  Of course that was Sentado.

11         What is the final reasonable doubt?  I am coming close

12  to the end.

13         The final one, the eighth.  The government has

14  produced none of the evidence that you would expect to see in a

15  case where they are trying to demonstrate beyond a reasonable

16  doubt -- beyond a reasonable doubt -- that there was an actual

17  conspiracy that these gentlemen entered into, knowingly, to

18  ship 800 kilograms of cocaine to the United States and that

19  they were people who were engaged in this business.  Where are

20  the financials?

21         Where are the indications of massive amounts of money

22  laundering that you would expect from people who were in the

23  business to have money coming back from the United States?

24         Where are the contacts?  Where are the people who ever

25  received anything from them in the United States?  I mean, the

GBH5flo5                              Summation – Mr. Jackson

1    DEA has cooperating witnesses and sources all over the country.

2    There is no one that raises their hand but this air traffic

3    controller who never met them, had no interaction with them and

4    said that he never heard his criminal associates ever mention

5    them?

6        None of the evidence; no go-fast boats, no actual

7    planes that they owned and, most importantly, no cocaine.  The

8    investigation and the question of whether or not there is

9    reasonable doubt begins and ends with the question of whether

10   or not they can prove to you that 800 kilograms of cocaine ever

11   existed.

12       They were supposed to do one thing in this sting,

13   there was one critical thing they were supposed to do in this

14   sting:  Complete the sting, actually have the drugs delivered.

15   They didn't even have a portion of them delivered.  They had

16   nothing delivered.  They arrested them because they wanted to

17   get these guys before it was clear that they had no way of

18   doing this.  That's reasonable doubt, ladies and gentlemen.

19       And Mr. Gonzalez acknowledged, in most investigations

20   there is a seizure.  That's his testimony.  This is an

21   aberration, this entire case, this entire investigation, where

22   you have a complete lack of the type of evidence that you would

23   expect to see in this and the integrity of the investigation is

24   completely undermined by what happened with the witnesses.  It

25   is -- it is a travesty.

1              And so the last thing I will say to you, ladies and

2    gentlemen, is that, you know, you are going to deliberate on

3    this.  I don't think it is a close question.  I don't think

4    that this requires a lot of deliberation because there is so

5    much reasonable doubt.  And if you were to go back and you were

6    to take a look at this situation, take it seriously, take very

7    seriously Mr. Campo Flores and Mr. Flores de Freitas are human

8    beings with real lives who your decision is going to impact

9    greatly.

10             The government has no right to ask you, in an

11   investigation like this, to look past everything that happened

12   in this case which is so many degrees removed from what is

13   supposed to happen in this kind of case.  They have no right.

14             Mr. Campo Flores and Mr. Flores de Freitas are not

15   guilty.  I ask you to apply the law, I ask you to take your

16   oaths seriously and I ask you to return a verdict, very humbly

17   of not guilty.

18             Thank you.

19             THE COURT:  Thank you, Mr. Jackson.

20             Mr. Bove?

21             MR. BOVE:  Yes, your Honor.

22             THE COURT:  Do you want to go forward?

23             MR. BOVE:  Okay.

24             THE COURT:  Are those your books, Mr. Jackson?

25             MR. JACKSON:  Yes, your Honor.  Thank you.

GBH5flo5                        Rebuttal - Mr. Bove.

1          THE COURT:  Okay.

2          MR. BOVE:  May I proceed, your Honor?

3          THE COURT:  Yes, you may.  Thank you, Mr. Bove.

4          MR. BOVE:  Mr. Calabrese, can we take a look at

5     Government Exhibit 64, please?

6          Ladies and gentlemen, what Mr. Jackson just asked for,

7     on behalf of the two defendants in this case, was a free pass.

8     He just spent over an hour arguing that because Mr. Santos Peña

9     lied you should let his clients go.  Please listen to the

10    instructions that Judge Crotty gives you.  That's not the law.

11    That's not what he is going to say.  He is going to ask you to

12    look at the evidence in this case.

13         Now, at the beginning of the trial I did say that

14    these two men were caught red-handed.  This is what I was

15    talking about.  That is Efrain Campo Flores holding a kilo of

16    cocaine in his hand.  How do you know that?  Because of

17    everything that happened before October 27th and because of

18    everything that happened after.  And frankly, ladies and

19    gentlemen, it doesn't matter whether or not there is cocaine in

20    that package.  What matters is that the defendants deeply

21    believed that there was cocaine.  So, let's talk about the

22    sequence of events here.

23         You heard a lot about Sentado.  Ladies and gentlemen,

24    the evidence shows that it's Cesar Daza that connected the

25    defendants with Sentado.  And listen to the Judge's

1    instructions about entrapment.  There is no evidence in this

2    case that Daza was acting at the direction of the government.

3    He was a drug trafficker in Honduras, he is a co-conspirator in

4    this case, and to the extent anyone linked up these defendants

5    with Sentado it was another criminal.  That's not entrapment.

6            And so the defendants, they're in touch, and they

7    traveled, on October 3rd, to Honduras.  There is a meeting

8    there, no dispute about it, it is Government Exhibit 110, and

9    that is a highly incriminating photo because Daza is standing

10   right there physically -- let's take a look -- he is standing

11   physically between Sentado and these two men.  He is the

12   bridge, ladies and gentlemen.  This is not entrapment.

13           And Mr. Quigley explained to you this morning about

14   all the reasons that you do in fact know what happened at this

15   meeting and those reasons come from the recordings that are in

16   evidence because Mr. Campo talked a great, great deal about

17   exactly what happened at this meeting.  They talked about

18   sending cocaine from Venezuela to Honduras.

19           Now let's take a look at Government Exhibit 207-T.

20   This is one of the recordings from the October 26th meeting.

21   If we can go to page 4, look at row 5, ladies and gentlemen.

22   Two defense lawyers spent several hours today telling you that

23   their clients lacked the capacity to put together a cocaine

24   shipment.  This is Mr. Campo saying, on tape, that he has a

25   contact and he can get cocaine "by the shovelful."

1          This is the real evidence in this case, ladies and

2   gentlemen; this is a recording, a recording that is not subject

3   to challenge.

4          I want to talk to you a little bit more about what the

5   real evidence is in this case.  There are three pieces that we

6   are asking you to look at; the phones that were seized in

7   Haiti, the defendants' confessions, and the recordings that I

8   just mentioned.  Those three pieces of evidence, when you look

9   at them and you apply the Judge's instructions, demonstrate

10  that these men are guilty.

11         First, let's talk about the phones.  These were seized

12  on November 10th in Haiti and Mr. Rody made a joke this morning

13  about the lack of operational security by these defendants.

14  Ladies and gentlemen, one of the most damaging mobile devices

15  in this case, Mr. Campo was smart enough not even to bring to

16  Haiti.  Let's take a look at Government Exhibit 416, if we can

17  look at the actual photo, please.

18         There is a photo, right here, inside Mr. Campo's

19  phone.  This, this BlackBerry on the screen, this is

20  Mr. Campo's drug phone and he was smart enough, notwithstanding

21  what his lawyers say, to leave it in Venezuela when he came to

22  Haiti on November 10th.  Because what kind of information is in

23  this phone?  There is that HRCF screen name.  And let's take a

24  look at 3508-38.  There is that HRCF screen name again.  And

25  you know what this is?  This is a chat with Sentado on October

GBH5flo5                        Rebuttal - Mr. Bove.

1    5th, two days after the meeting in Honduras.

2            Can we take a look at the translation?

3            Mr. Campo says:  What I want is to start work because

4    the electoral campaign is almost here and I always contribute

5    with money, if you know what I mean.

6            Ladies and gentlemen, right after the meeting in

7    Honduras, on October 3rd, Mr. Campo was committed to this

8    transaction.  He was committed to the deal, he talked all about

9    it on the tapes in Caracas, and he described to you exactly

10   what his intentions were.

11           Mr. Rody also said that there should be more chats in

12   the phones.  There is enough in the binder in the jury box,

13   there should be more if these guys really intended to do what

14   the government has alleged that they did.  That's not right at

15   all, ladies and gentlemen, because as much as the lawyers want

16   to say that these guys were stupid, they were actually pretty

17   careful about their communications.

18           Let's take a look at 502-T, at page 3, the 6:19:18

19   entry.  This is Flores:  Talk is getting a little dirty on this

20   line, let's get on another one.  Let me get another number.

21           Let's take a look at 515-T at 6.  If we can go up to

22   the 5 first?  Here they are.  This is Pepero, one of the

23   co-conspirators look at the entry 8:40:04, Pepero is talking

24   about a GV jet with 3,000 kilos of cocaine.

25           That's a pretty dangerous conversation to have.

GBH5flo5                          Rebuttal - Mr. Bove.

1    Certainly one that the defendants didn't want you to see.  And

2    what did they say about it on page 6?  Let's get it on another

3    phone, this is frank's private number.

4              Now if we can take a look at 515, page 31?

5              This morning Mr. Rody showed you a part of this page.

6    I think it is about to become really clear why.  At 2:1:16

7    Pepero says:  He said he is going to put down the 800 without

8    putting down a single bolivar.  And what that he means on

9    November 1st, 2015, is that these two men did have access to

10   800 kilos of cocaine.  It is not a joke, ladies and gentlemen.

11   This is with Pepero, this is the person that the defendants

12   described in their confession as being one of the

13   intermediaries to their source of supply.  But Mr. Rody didn't

14   show you the rest of the chat.  Look at 2:14:36 Frank says:

15   Not through here.  We are not going to talk about this on this

16   line.

17             Ladies and gentlemen, in addition to chats like this

18   there are numerous references, even in the defendant's

19   confessions, to in-person meetings because they were smart

20   enough to negotiate the features of this deal in person, not

21   over these phones.  These phones are damning evidence, they're

22   not the complete story because you also have the defendants'

23   confessions.

24             Now, you have heard a lot of attacks on the motives of

25   Special Agent Gonzalez.  These confessions took place on

GBH5flo5                          Rebuttal - Mr. Bove.

November 10th of 2015.  Special Agent Gonzalez, for better or

worse -- and he has explained to you that there are lessons to

be learned from this -- Special Agent Gonzalez had no idea what

was going on with Mr. Santos Peña on November 10th.  He had no

motive to fabricate anything with respect to these confessions.

          The defense has presented an argument based on the

testimony of Ms. Alvarado, the expert witness.  She explained

during that part of her testimony about taking notes and

transcriptions how to prepare an exhibit for court.

Mr. Gonzalez didn't purport to be an expert in this case, he

didn't purport to be creating a document for court.  He had no

motive to fabricate anything.  This is somebody who has spoken

Spanish for almost his entire life.  He told you that he used

to be a DEA contract linguist.  There is nothing in the way

that he performed this process in taking notes to suggest that

he left anything out.

          How do you know that?  Mr. Quigley talked about this

already, it is the references in the report to the

co-conspirators -- Hamudi, Gocho, Pepero.  There is no way for

him to know about that and it is not, ladies and gentlemen, oak

tree corroboration, just the fact that these are also contacts

that we found in the phones.  They're not just contacts, ladies

and gentlemen.  The summary charts that we put in through

Mr. Calabrese last night, they're sort of like baseball cards

take a look at those during your deliberations.

GBH5flo5                        Rebuttal - Mr. Bove.

1            It is not just that there was a saved phone number in

2       these phones.  The people that defendants identified in their

3       confessions were actively in contact with the defendants about

4       this deal.  The biggest example is Pepero.  He is the PPR on

5       the screen here and he shows up throughout the chats and he is

6       the intermediary to El Gocho.

7            Now, you heard Special Agent Gonzalez tell you, and it

8       is also in his report, in his notes, that Mr. Campo

9       acknowledged that Gocho was affiliated or connected to the

10      FARC, the Colombian paramilitary organization that's one of the

11      largest suppliers of cocaine in the world.  With a connection

12      like that, ladies and gentlemen, an admitted connection, the

13      argument that these men didn't have the capacity to procure

14      this cocaine and go through with this deal is ridiculous.

15           Special Agent Gonzalez didn't make up this FARC

16      reference.  Let's take a look at 230-T at page 3.  Look at row

17      7.  This is Campo in a recorded meeting, he doesn't know it is

18      being record and he says look, he is the one commander for the

19      FARC.

20           Row 11:  And the guy is supposedly a high-ranked one.

21           Special Agent Gonzalez had no way of knowing that this

22      had already been admitted.  This corroborates the confessions

23      and it shows you that you can trust them, you can rely on the

24      documents that are in evidence and, as Mr. Quigley said, if you

25      credit the confessions -- and you should -- I agree with

1    Mr. Jackson that your deliberations should be brief.

2            Now let's talk a little bit about the recordings that

3    are in evidence.  A lot was said about Special Agent Gonzalez'

4    failure to record the confessions but then, when we start to

5    talk about the recordings, it is a different type of attack.

6    Here the argument is basically somehow these were altered or

7    fabricated, there was a reference to a fourth meeting in

8    Venezuela and maybe that was the meeting where they said

9    actually, we don't really mean what we are saying, let's go

10   back after this night out at the club, we will continue playing

11   a part but we don't mean any of this.  Ladies and gentlemen,

12   that's not what happened here.

13           First, with the night at the club, let's take a look

14   at 510-T at page 20.

15           Ladies and gentlemen, this is a chat between Campo and

16   Flores on October 23rd.  This happened on the night after the

17   first meeting between the confidential sources and the

18   defendants.  They're talking about getting ready to go to the

19   club with the confidential sources.  Mr. Rody made some

20   comments today about who paid for the cocaine and the

21   prostitutes in Venezuela.  If you look at the bottom here of

22   page 20 and scroll on to page 21, the defendants made those

23   payments, the defendants provided the prostitutes and the

24   drugs.

25           But what is more important here, ladies and gentlemen,

GBH5flo5                          Rebuttal - Mr. Bove.

is that meeting -- this unrecorded meeting happened on the

night of October 23rd.  But what happened after that?  October

26; a long detailed, recorded meeting.  Look at those

transcripts, ladies and gentlemen.  If you want to watch the

subtitled files it is just as good.  In that meeting Mr. Campo

went on at length about not only what had happened in Honduras

with Sentado but about exactly what he wanted to do to make

this transaction work.

         As Mr. Quigley said this morning, he actually brought

deal points to this meeting.  You can hear him referencing

those deal points as he is working through the agreement that

he reached between him and Flores to provide these drugs.

         We have also have in evidence for you, so you can get

a better sense of the recordings, Government Exhibit 700, I

believe it is 700-A right now.  That's a summary that shows you

the different types of recordings that are in evidence and the

lengths of those recordings.  You heard some testimony about

that yesterday.  There are known risks, without a doubt, of

using a man like Santos Peña and his son in investigations like

this.  To try and address those risks, to make sure that there

is real, actual evidence to present to you, to jurors like you

in cases like this, the DEA sends these men with recording

devices, recording devices that they don't know how to operate,

they don't know how to download these files.  They explain that

to you but, more importantly, ladies and gentlemen, if you

GBH5flo5                          Rebuttal - Mr. Bove.

think about some of the transcript excerpts that you were shown

after lunch today for Mr. Santos Peña, is that really a guy who

was able to screw around with a high-tech recording device?

Absolutely not.  There is no evidence of that and just his

demeanor on the witness stand and the way he was unable to

answer questions demonstrates to you this is not somebody who

was sophisticated enough to mess with these recordings.  These

recordings are critical evidence in this case because they show

you exactly what the defendants were doing.

         Now let's take a step back and talk about the crime

here that's been charged.  The charge is a conspiracy; as I

said in the beginning of the case, an agreement.  And I expect

Judge Crotty will explain to you that there are two elements

here that you have to consider:  The first is whether there was

an agreement between two or more people to either import

cocaine into the United States; or manufacture or distribute

cocaine intending and knowing that the cocaine would be

imported into the United States.

         The defense lawyers, I submit, intentionally haven't

even mentioned that second object because that's the one that

fits most clearly on these facts.  The defendants in Venezuela

agreed to distribute cocaine north to Honduras so that it could

be brought to the United States.

         Now, with respect to this first element it is clear

that there was such a conspiracy.  The two defendants were made

GBH5flo5                          Rebuttal - Mr. Bove.

part of it but you also have people in Venezuela like Pepero

and Gocho and Hamudi.  In Honduras, you learned yesterday, you

had Roberto Soto and Carlos Gonzalez.  Those are the men who

agreed to receive the defendants' cocaine shipment.

Now, the second element that I expect Judge Crotty

will instruct you about is that each defendant must be proven

beyond a reasonable doubt to have participated in the

conspiracy with knowledge of its unlawful purpose and in

furtherance of its unlawful objective.

Here the Judge, I expect, is going to instruct you

about something called conscious avoidance.  I expect the

instruction will sound something like this:  In considering

whether the defendants acted knowingly and intentionally

regarding the purpose of the conspiracy you may consider

whether the defendants deliberately closed their eyes to what

otherwise would have been obvious.

When you hear that instruction, ladies and gentlemen,

think back to the chart that Mr. Rody showed you this morning

where it is conceded that there are at least 13 times, on tape,

that the sources said "we bring drugs to the United States."

Think about that.  Whether it took five seconds to say United

States, whatever the proportion of the length of those

meetings, these defendants were told repeatedly that that was

where these drugs were going and I submit to you that they

joined this conspiracy to conspire with each other and with

GBH5flo5                          Rebuttal - Mr. Bove.

1    others to distribute cocaine knowing and intending that it

2    was -- and believing that it was going to these sources to be

3    brought to the United States.

4              Let's talk a little bit about the witnesses at this

5    trial.

6              A lot has been said about Mr. Santos Peña.  I'm not

7    going to say much more.  I stand by what I said in the

8    beginning of the trial.  It is going to be up to you to decide

9    which witnesses' testimony to credit and which not to credit.

10   We trust you with respect to that decision for all of our

11   witnesses including with Mr. Santos Peña, stand by the decision

12   that was made during his testimony, and we ask you to evaluate

13   it pursuant to the Court's instructions.

14             Now, you heard references to Sentado and to

15   Mr. Santos Peña' son, Santos Hernandez.  Neither of them

16   testified at this trial.  I expect Judge Crotty will instruct

17   you that uncalled witnesses are equally available to both sides

18   and that you should not speculate about what their testimony

19   would have been had they been called.  And think about that

20   instruction, ladies and gentlemen, when you consider the

21   arguments that were made today about how there must have been a

22   recording of that October 3rd meeting.  It must have been the

23   case that this man in a wheelchair operated a recording device

24   at that meeting but somehow decided afterwards that the

25   conversation wasn't good enough and he was going to delete it.

GBH5flo5                        Rebuttal - Mr. Bove.

There is zero support in the record for that argument.  My

arguments are not evidence, their arguments are no evidence;

granted.  That argument was made up.

You heard about Juan Gomez, the confidential source

who testified yesterday.  Mr. Rody suggested this morning that

he had a big incentive to try and earn a large payment in

connection with this case.  We concede and agree that these men

are paid confidential sources.  Mr. Gomez, true.  He testified

yesterday that he had no idea who these guys were.  He had no

idea what was really at stake or whether there was a chance

that he would get a significant payment from this.  He was

doing his job, he did his job as he always did, and you saw the

fruits of his labor.

And this was kind of an interesting point.  I think

you heard it in both defense summations.  They don't seem to

not understand why we presented the evidence of what happened

in Honduras.  Let me break that down for you.  On November 4th,

2015, the defendants sent pilots to Honduras to nail down the

details for how to send this shipment.  You know that those

flights cost about $20,000 because that's in the chats with

Gilson for how much the plane on October 3rd cost.  You also

know that those pilots didn't make it.

On November 5th they tried again, another $20,000.

Those pilots didn't make it.  What that reflects, ladies and

gentlemen, is that these men were committed to this conspiracy,

GBH5flo5                          Rebuttal - Mr. Bove.

committed to seeing this crime through.  Day after day they're
trying to get the pilots to Honduras to figure out the precise
details so they can make this shipment and so that they can get
paid.

          November 6, 2015.  You know why we showed you that
tape, ladies and gentlemen.  That is Mr. Gomez sitting about
three feet away from Franqui Flores talking, in detail, for
quite some time.  We played you a lot of those tapes yesterday.
There are more in evidence.  They talked for quite some time
about how and when that drug shipment was going to be sent.  It
is November 6th and they nailed it down, November 15th, late in
the afternoon, we are sending the drugs.

          And there is also some questions in the defense
summations about why Carlos Gonzalez testified at this trial.
You heard that this man surrendered to come address his legal
problems in the United States.  That's an extraordinary
acceptance of responsibility and it would be nonsensical for
him to come here to lie to you.  He could have just stayed in
Honduras.

          Like Gomez, Mr. Gonzalez has no idea who the
defendants are and so there is no real incentive for him to
have inflated his testimony.  He told you about that meeting in
mid-October of 2015.  At that meeting Sentado was there, Soto
was there, a co-conspirator, and so were three Mexican drug
traffickers who referenced the defendants.  That's because in

GBH5flo5                          Rebuttal – Mr. Bove.

mid-October 2015 the defendants were working hard to capitalize

on their access to the Caracas airport by sending out drug

loads, even with people who were not confidential sources.

          Those three Mexicans, ladies and gentlemen, I submit

to you they are drug traffickers and it is another critical

blow to the argument in this case from the defense that there

was any kind of entrapment.

          The other reason that you heard testimony from

Mr. Gonzalez is that it established that this conspiracy was

very, very real.  The plan was in place among numerous people

at the airport in Honduras to receive this drug load.  He took

a trip back to San Pedro Sula to discuss that with the

co-conspirators and he actually came and told you, with a plan

to meet the pilots, the pilots that the defendants were

supposed to send.

          His testimony is important because it demonstrates

that the conspiracy was real.  It also helps you to understand

the conversation on the following day because he told you

exactly what Mr. Soto meant on November 5th, and so when you

listen to that tape on November 6th, you know what he meant.

You know that they had shifts at the airport, they decided the

shifts worked out so that November 15th was the right day and

they had to come late in the afternoon but the plane had to

leave before the lights were out.  That all made better

sense -- it all makes perfect sense because you heard from

GBH5flo5                         Rebuttal – Mr. Bove.

1    Mr. Gonzalez.

2            And one of the things that was suggested to you this

3    afternoon was that these defendants did not intend to provide

4    any drugs.  The way that I understand that argument is

5    essentially they were going to show up in Haiti,

6    notwithstanding the meeting on November 6th where Flores

7    commits them to sending these drugs on a date certain, they

8    were going to show up in Haiti and steal $11 million from

9    Mr. Santos Peña.

10           This is where the defense arguments start to run into

11   each other a little bit because you have heard a lot about the

12   Sinaloa Cartel at this trial.  You heard a lot about acid,

13   marring bodies, murders, violence.  These are men who operate

14   without regard to borders.  But, what the defense would have

15   you believe is that the two defendants in this case flew to

16   Haiti to rob them; to take their money and not provide any

17   drugs.  That's a ridiculous argument in the context of this

18   case with the record about who the Sinaloa Cartel is.  And

19   whether or not Mr. Santos Peña was being honest when he

20   described himself as a member what matters here is what was in

21   the defendant's head.  They knew who he was, they believed he

22   was a member of the Sinaloa Cartel, and there is zero chance

23   that they had a plan to steal that money from him and just hide

24   out in Venezuela.

25           We have already talked a little bit about this but

GBH5flo5                          Rebuttal - Mr. Bove.

another one of the arguments relating to the defendants'
intent, you heard from defense counsel, focuses on whether or
not they could have actually come up with 800 kilos.

First, please listen to Judge Crotty's instructions on
this point.  There don't need to be drugs seized.  There didn't
need to be 800 kilos any place.  But, more importantly, these
men repeatedly said that they had the capacity to do this.  I
have already talked about the relationship with the FARC, but
let's take a look at 203-T at page 27.  Let's try 24.  Here at
row 7 Mr. Campo said:  It's all right.  I have no problem
with -- with the quantity.

He has committed to this, ladies and gentlemen, and
that's what matters.  What matters is not what Mr. Santos Peña
believed about these defendants' ability.  It doesn't matter
what Special Agent Gonzalez believed about these defendants'
ability.  It doesn't matter what Sentado thought about whether
or not they had planes.  What matters, ladies and gentlemen, is
what was in the defendants' heads and this is a pretty good
indicator of what was in the defendants' heads.  *We don't have
a problem with the quantity.  We agree to provide these drugs.*

Now let's take a look at page 27.  Here in row 1:
Regarding the quantities, we don't have too much of a problem
with that anymore.  Then there is a reference to give you a
sample.  You know what that means, ladies and gentlemen.  First
of all, Mr. Campo -- and remember, Flores is at the table right

GBH5flo5                         Rebuttal - Mr. Bove.

1    next to him, they're in the room together discussing this and

2    he says, look.  We can provide the drugs in quantity and we

3    will get you a sample.  And you know that they did just that.

4    And again, to come back to this kilo, this is why it doesn't

5    matter whether there was actually cocaine in that package.

6    What matters is what the defendants believed about what was

7    inside the brick.  What matters is what it demonstrates about

8    their intentions for how this was going to be carried out.

9          What it shows, ladies and gentlemen, when these two

10   defendants brought that kilo to the meeting, is that they were

11   committed to the objectives of the conspiracy.  They were

12   committed to providing these drugs, to distributing them to men

13   who had made abundantly clear that they were going to bring

14   these drugs to the United States.

15         Now, there were some arguments made about whether or

16   not there was a sufficient nexus to the United States in these

17   negotiations.  If you take a look at the transcripts of the

18   first meeting in Caracas on October 23rd, you have already seen

19   this entry before, one of the first things that Santos Peña

20   said -- and again, you don't have to believe him, it is on

21   tape, it is recorded -- he says I bring everything to the

22   United States.

23         You have heard a fair amount today about whether or

24   not it was possible to also bring drugs to Canada.  This is one

25   that I do leave to your common sense.  Where is Canada on the

GBH5flo5                              Rebuttal - Mr. Bove.

map?  How are drugs going to get from Mexico to Canada?

        Mr. Mahoney, the expert witness, told you about the
main route into Canada; it is over land through the United
States.  It involves an act of importation.  It is not at all
exonerating for these men that they asked questions about
bringing drugs to Canada.  And, to the extent they asked
questions about bringing drugs to Europe, ladies and gentlemen,
that's of no help, either, because first of all it demonstrates
they understood Mr. Santos Peña's main line of work.  They
understood his bread and butter -- Central America, Mexico,
United States.  Hey, what about Europe?  Do you guys do
anything over there?  That's because they talked about doing
additional loads.

        You heard yesterday on the tape in Honduras Mr. Flores
says:  All right.  There is the first one but when can we get
the second?  These men had in mind doing as many drug loads as
possible from November 15th until the elections in
mid-December.  Period.  And when they're talking about multiple
loads, please take that into account as you consider whether or
not there is sufficient evidence of their intent to join this
conspiracy.

        Finally, ladies and gentlemen, I will talk a little
bit more about entrapment.  I think Mr. Quigley made the
evidence on these points pretty clear and I have already said a
lot about Sentado.  That is point one when you consider the

GBH5flo5                        Rebuttal - Mr. Bove.

1  Court's instruction and the evidence on the entrapment defense.

2  The evidence is that it is not Sentado that linked these

3  defendants to the Honduras meeting; it is Daza.  Daza was not

4  acting at the direction of the United States and I ask you to

5  consider that when you think about whether there was

6  inducement.

7          In terms of predisposition, think about that chat that

8  I showed you with the GV and the 3,000 kilos, the references to

9  the tacos -- the people with the tacos, to the sombreros.

10  These are the defendants talking in August and September of

11  2015 long before they knew of Sentado, long before they went to

12  that meeting, about doing drug deals in the Central America

13  corridor.  That is evidence, ladies and gentlemen, of their

14  predisposition.

15          Another way you know that they were predisposed to

16  commit this crime is by looking at how they reacted once they

17  were given the option to work with Santos Peña because you can

18  tell what was in their heads before that proposal was made by

19  what they did after.  And so again, on October 23rd, 2015,

20  Mr. Santos Peña comes to Caracas -- excuse me, met with the

21  defendants in Caracas -- he had been there a few days

22  already -- and he says I bring everything to the United States.

23          In that meeting there is no backing out.  They commit

24  there.  They have another meeting on the 26th.  Ladies and

25  gentlemen, if you have any doubt about predisposition, look at

GBH5flo5                          Rebuttal - Mr. Bove.

the transcripts of the meeting on the 26th.  One of the things
that you will see is that towards the end of the meeting there
is a conversation where Campo says:  Look.  I was kind of upset
when we went to Honduras -- and he was talking about the
October 3rd meeting -- because Sentado disrespected us; he made
us wait a little bit and he watched the soccer game.  Look, I
can like the Red Sox but that was offensive.

         Then he expresses a little more frustration about the
pacing of what's going on.  He says look, we started to pursue
other avenues but now we have come back to you.  And so, three
days after being told explicitly that they are working with men
who intend to bring these drugs to the United States, on that
understanding that these were the people who were going to help
them bring the drugs, to distribute these drugs, Mr. Campo says
we thought about walking away but now we've come back.

         Ladies and gentlemen, you don't need anything else to
find beyond a reasonable doubt that these men were predisposed
to commit this crime.  But if you did, think about what
happened on the 27th with the kilo, think about November 4th
with the first flight with the pilots, November 5th with the
second flight with the pilots, November 6th.  They actually
send Mr. Flores -- and you know, because you saw it in the
chats, they didn't want to go back to Honduras.  It was a
violent place, they were intimidated when they got there
because of the murder rate.  They sent him back, ladies and

gentlemen, to demonstrate that they were fully committed to
seeing this through.

Think about the sequence of events and how quickly
this all played out:  October 23rd, 26th, 27th, 4th, 5th, 6th,
and then Haiti on the 10th.

Ladies and gentlemen, the defendants' reactions to the
proposal that was made in the October 23rd meeting demonstrate
that they are guilty that they entered this conspiracy, they
demonstrate that they were not at all entrapped.  These were
men who were doing everything they could in this time period in
the late summer and early fall of 2015 to send large loads of
cocaine out of the Caracas airport that they repeatedly said
they controlled, into Central America so that those drugs could
be brought to the United States.

We appreciate all the attention that you have given to
the evidence and to the witnesses during this trial and I am
going to sit down now.  I am going to ask that you listen to
the Judge's instructions carefully on the law.  Keep in mind
that no matter what I have said or what any other lawyers' have
said, it is the government's burden to establish these charges
beyond a reasonable doubt but, ladies and gentlemen, that
happened here, that happened in this courtroom.  The evidence
that I described, the phones, the confessions, and the
recordings, that's the evidence.  That's the evidence we ask
you to focus on in your deliberations.  We leave to you the

GBH5flo5

1    assessment of witness credibility and I submit that when you do

2    that and when you apply the Judge's instructions on the law,

3    these men are guilty as charged.

4            Thank you.

5            THE COURT:  Thank you, Mr. Bove.

6            Ladies and gentlemen, you have heard almost five hours

7    of argument in summation.  I think I am going to let you go

8    home now.  And remember the instructions:  Don't do any

9    research, keep open minds, and don't talk about the case.

10           We will resume tomorrow morning at 9:30.  I will

11   charge you and that will take about an hour, hour and 15

12   minutes, and you can begin your deliberations.

13           Thank you.

14           (Continued on next page)

GBH5flo5

1            (Jury not present)

2            THE COURT:  Please, be seated.

3            We sent around the final version of the charge last

4    night.  If there is any further comments, you can submit them

5    in writing.

6            I would ask you tonight to start preparing the

7    exhibits to be sent into the jury room.  It is my practice to

8    send in all the exhibits that have been received in evidence

9    into the jury room, so it is best that both sides agree as to

10   what can go in.

11           We will see you tomorrow morning at 9:30.

12           Mr. Rody?

13           MR. RODY:  Judge, I know you have to run across the

14   street.  I didn't want to interrupt counsel's summation and we

15   can send a letter on it tonight, but I believe we need an

16   instruction along with your Honor's instructions tomorrow.

17   What Mr. Bove said is that there was an instruction that an

18   uncalled witness was equally available to both sides.  CW 1 --

19   Sentado -- was not available to the defense, and I think --

20           THE COURT:  He wasn't available to the prosecution

21   either.

22           MR. RODY:  That's fine, but he is not equally

23   available and I think that should be corrected in your Honor's

24   instruction.

25           THE COURT:  All right.  Well, you will submit it?

GBH5flo5

1         MR. RODY:  Yes.

2         THE COURT:  Thank you very much.

3         MR. RODY:  Thanks.

4         MR. JACKSON:  Your Honor, just to let you know, we

5    prepared redacted version of the transcript that we have shared

6    with the government.  We will be preparing that in case there

7    are any requests for transcript cites; we will have that ready

8    for the Court.

9         THE COURT:  The transcript --

10        MR. JACKSON:  Of the trial.

11        THE COURT:  -- of the recordings or the transcript of

12   the trial?

13        MR. JACKSON:  Of the Trial.  We have redacted all the

14   colloquy and shared that with the government.  I just wanted to

15   let the court know that we will be prepared with that if there

16   are any requests.

17        THE COURT:  All right.

18        MR. JACKSON:  Thank you.

19        THE COURT:  For readback you mean?  I don't intend to

20   send the transcript in.

21        MR. JACKSON:  Okay.  Well then it's no issue then.

22   Thank you, your Honor.  That's great.

23        THE COURT:  We are going to send in the verdict sheet,

24   one copy of that, 12 copies of the indictment, and 12 copies of

25   the jury charge and the exhibits.  That's what goes in.

GBH5flo5

1          MR. JACKSON:  Thank you, Judge.

2          THE COURT:  Thank you.

3          Mr. Rody, when do you think you will get your letter

4     in?

5          MR. RODY:  In a couple of hours probably, Judge.

6          THE COURT:  Thank you.

7          (Adjourned to 9:30 a.m., November 18, 2016.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25