UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>EFRAIN ANTONIO CAMPO FLORES and<br>FRANQUI FRANCISCO FLORES DE FREITAS,<br><br>                            Defendants. | S5 15 Cr. 765 (PAC) |

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Brendan F. Quigley
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................... 2

ARGUMENT ................................................................................................................... 5

   I. The Government Should Be Permitted to Offer Certain Evidence Regarding the October 3, 2015 Meeting Between CW-1 and the defendants in Honduras .................................. 5

      A. Relevant Facts ........................................................................................... 5

      B. Applicable Law .......................................................................................... 6

      C. Statements by CW-1 to Agent Gonzalez and Agent Gonzalez's Instructions to CW-1 .... 7

      D. The Photo of the October 3, 2015 Meeting .................................................. 9

   II. CS-1 and CS-2 Should Be Permitted to Testify that They Believed That the Substance at the October 27, 2015 Meeting Was Cocaine ................................. 10

   III. Evidence of the Defendants' Efforts to Obtain and Smuggle Weapons is Admissible as Direct Proof of the Charged Conspiracy .......................................... 12

      A. Relevant Facts ......................................................................................... 12

      B. Applicable Law ........................................................................................ 14

      C. Discussion ............................................................................................... 14

   IV. The Defendants' Should Be Precluded from Referring to the DOJ Policy Concerning Recording of Custodial Interviews .................................................... 18

   V. The Defendants Should Not Be Allowed to Admit Self-Serving Portions of Their Prior Statements ............................................................................................ 21

   VI. The Court Should Employ the Use of Certain Protective Measures at Trial .................... 23

      A. The Court Should Reject the Defendants' Argument that No Protective Measures Are Appropriate ...................................................... 24

      B. Certain Witnesses Should Be Allowed to Testify Under Pseudonyms and Not Have Their Likeness's Sketched or Otherwise Recorded ........................... 26

      C. A Protective Order for the 3500 and *Giglio* Material is Appropriate .............. 33

      D. The Court Should Prohibit Reference to the Sensitive Features of the Recording Devices ...................................................................................... 35

   VII. The Court Should Preclude the Defendants from Offering an Entrapment Defense ........ 38

      A. Applicable Law ........................................................................................ 38

      B. Discussion ............................................................................................... 39

VIII. The Government Will Elicit Testimony Regarding the Defendants'
Confessions in Compliance with *Bruton* v. *United States* ........................................................ 42

CONCLUSION ................................................................................................................................ 45

## **TABLE OF AUTHORITIES**

### **Cases**

*Alford* v. *United States*, 282 U.S. 687 (1931) ................................................................ 28

*Bruton v. United States*, 391 U.S. 123 (1968) ............................................................. 42

*Clark* v. *Ricketts*, 958 F.2d 851 (9th Cir. 1991) ......................................................... 29

*Hardee* v. *Kuhlman*, 581 F.2d 330 (2d Cir. 1978) ...................................................... 26

*Holbrook* v. *Flynn*, 475 U.S. 560 (1986) ..................................................................... 26

*In re City of New York*, 607 F.3d 923 (2d Cir. 2010) ...................................... 35, 36, 37

*Mata* v. *Johnson*, 99 F.3d 1261 (5th Cir. 1996) ......................................................... 25

*Mathews* v. *United States*, 485 U.S. 58 (1988) ........................................................... 38

*Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009) ............................................. 11

*Old Chief* v. *United States*, 519 U.S. 172 (1997) ........................................................ 10

*Siegfriedt* v. *Fair*, 982 F.2d 14 (1st Cir. 1992) ......................................................... 28

Smith v. Illinois, 390 U.S. 129 (1968) ......................................................................... 28

*United States* v. *Black*, No. 13 Cr.316, 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) ................ 22

*United States* v. *Brand*, 467 F.3d 179 (2d Cir. 2006) ................................................. 38

*United States v. Briggs*, No. 10 Cr. 184, 2011 WL 5881593 (W.D.N.Y. Nov. 23, 2011) ........... 37

*United States* v. *Bruce*, 550 F.3d 668 (7th Cir. 2008) ............................................... 19

*United States* v. *Bumagin*, 136 F. Supp. 3d 361 (E.D.N.Y. 2015) ............................. 22

*United States* v. *Celis*, 608 F.3d 818 (D.C. Cir. 2010) .............................................. 24

*United States* v. *Celis*, 608 F.3d 818 (D.C. Cir. 2010) .............................................. 29

iii

*United States* v. *Coonan*, 938 F.2d 1553 (2d Cir. 1991) .............................................................. 14

*United States* v. *Cromitie*, 727 F.3d 194 (2d Cir. 2013) .............................................................. 41

*United States* v. *Durham*, 464 F.3d 976 (9th Cir. 2006) ............................................................. 11

*United States* v. *Fabian*, 312 F.3d 550 (2d Cir. 2002) ................................................................ 16

*United States* v. *Ferguson*, 758 F.2d 843 (2d Cir. 1985) ............................................................ 25

*United States* v. *Gagliardi*, 506 F.3d 140 (2d Cir. 2007) ........................................................... 38

*United States* v. *Gaskin*, 364 F.3d 438 (2d Cir. 2004) ............................................................... 11

*United States* v. *Glover*, 101 F.3d 1183 (7th Cir. 1996) ............................................................. 22

*United States* v. *Glover*, 153 F.3d 749 (D.C. Cir. 1998) ............................................................. 40

*United States* v. *Hurtado*, 47 F.3d 577 (2d Cir. 1995) ............................................................... 42

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ................................................................. 22

*United States* v. *Jass*, 569 F.3d 47 (2d Cir. 2009) ..................................................................... 43

*United States* v. *Johnson*, --- F. App'x ----,
    15-2367-cr, 2016 WL 4533485 (2d Cir. Aug. 30, 2016) ......................................................... 16

*United States* v. *Johnson*, 507 F.3d 793 (2d Cir. 2007) ............................................................ 22

*United States* v. *Johnson*, No. 10 Cr. 184,
    2011 WL 7782624 (E.D.N.Y. Oct. 24, 2011) ...................................................................... 35

*United States* v. *Kadir*, 718 F.3d 115 (2d Cir. 2013) ................................................................. 21

*United States* v. *Khalil*, 214 F.3d 111 (2d Cir. 2000) ................................................................... 8

*United States* v. *Levin*, No. 15 Cr. 101 (KBF),
    2016 WL 299031 (S.D.N.Y. Jan. 25, 2016) ......................................................................... 6

*United States* v. *Lopez*, No. 09 Cr. 525 (JFK),
    2010 WL 3452380 (S.D.N.Y. Sept. 1, 2010) ...................................................................... 14

iv

*United States* v. *Lubrano,* 529 F.2d 633 (2d Cir. 1975) ........................................................ 7, 8, 9

*United States* v. *Marin*, 669 F.2d 73 (2d Cir. 1982) ................................................. 21

*United States* v. *Martinez-Montilla*, 135 F. Supp. 2d 422 (S.D.N.Y. 2001) ................................ 43

*United States* v. *Mayo*, 705 F.2d 62 (2d Cir. 1983) ................................................. 42

*United States* v. *McKinley*, 70 F.3d 1307 (D.C. Cir. 1995) ...................................... 40

*United States* v. *Mendoza-Salgado*, 964 F.2d 993 (10th Cir. 1992) ................................ 40

*United States* v. *Mercado*, 573 F.3d 138 (2d Cir. 2009) ........................................... 16

*United States* v. *Midyett*, No. 07-CR-874 (KAM),
2010 WL 1992191 (E.D.N.Y. May 14, 2010) ........................................... 34

*United States* v. *Mitchell*, 328 F.3d 77 (2d Cir. 2003) .................................. 15

*United States* v. *Moon*, 802 F.3d 135 (1st Cir. 2015) .............................. 11

*United States* v. *Morgan*, 786 F.3d 227 (2d Cir. 2015) ............................ 28

*United States* v. *Palermo*, 410 F.2d 468 (7th Cir. 1969) ........................... 28, 29

*United States* v. *Ramos-Cruz*, 667 F.3d 487 (4th Cir. 2012) ...................... 29

*United States* v. *Regan,* 103 F.3d 1072 (2d Cir. 1997) ............................ 7

*United States* v. *Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................... 18

*United States* v. *Roy*, 444 F. App'x 480 (2d Cir. 2011) ........................... 7

*United States* v. *Salerno*, 66 F.3d 544 (2d Cir. 1995) ............................. 39

*United States* v. *Taylor*, 707 F. Supp. 696 (S.D.N.Y. 1989) ..................... 30

*United States* v. *Taylor*, 745 F.3d 15 (2d Cir. 2014) ............................... 44

*United States* v. *Terry*, 702 F.2d 299 (2d Cir. 1983) ............................... 22

*United States* v. *Tracy,* 12 F.3d 1186 (2d Cir. 1993) ................................................... 7, 8

*United States* v. *Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015) ................................. 17

United States v. Van Horn, 789 F. 2d 1492 (11th Cir. 1986) ..................................... 37

*United States* v. *Wilkerson*, 84 F.3d 692 (4th Cir. 1996) .......................................... 22

*United States* v. *Yang Chia Tien*, 638 F. App'x 19 (2d Cir. 2015) (summary order) .................. 41

*United States* v. *Young*, 78 F.3d 758 (1st Cir. 1996) ................................................ 40

## Rules

Fed. R. Evid 701 ........................................................................................................ 11

Fed. R. Evid. 403 .................................................................................................. 6, 20

Fed. R. Evid. 701 ...................................................................................................... 11

Fed. R. Evid. 801 .................................................................................................. 6, 21

## Other Authorities

Marco Cáceres, *Drugs, Violence and Immigration: Think Twice, America*,
    Huffington Post (July 9, 2014), http://www.huffingtonpost.com/marco-caceres/drugs-
    violence-and-immigr_b_5571077.html ...................................................................... 30

U.S. Dep't of State, *Narcotics Rewards Program: Hermagoras Gonzalez Polanco*,
    http://www.state.gov/j/inl/narc/rewards/115395.htm ................................................ 4

U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 1 (2014) ...................... 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                              Defendants.

S5 15 Cr. 765 (PAC)

The Government respectfully submits these motions *in limine*[1] seeking the

following rulings with respect to the upcoming trial of defendants Efrain Antonio Campo Flores

("Campo") and Franqui Francisco Flores de Freitas ("Flores"):

1.  The photograph of the defendants' October 3, 2015 meeting in Honduras, as well as
    limited testimony from Special Agent Sandalio Gonzalez about the initiation of the
    investigation are admissible at trial;

2.  CS-1 and CS-2 may testify that they believed the kilogram package that the defendants
    brought to their October 27, 2015 meeting in Venezuela contained cocaine;

3.  Evidence of efforts by the defendants to obtain weapons and smuggle them into
    Venezuela, between at least approximately May 2015 and approximately August 2015, is
    admissible as direct proof of the charged conspiracy;

4.  The defendants should not be permitted to refer to the Department of Justice's policy
    concerning recording custodial interviews;

5.  The defendants cannot offer their own out-of-court statements, including from their
    confessions, the recordings, or their electronic communications;

---

[1] Pursuant to the Court's October 19, 2016 Order, and in an abundance of caution with respect to
the concerns raised by the defendants, the Government is submitting these motions for *in camera*
review and will await further instructions from the Court with respect to filing.

6. Security measures similar to those employed at the suppression hearing are appropriate at trial and can be implemented without notifying the jury; and

7. The defendants should not be permitted to present an entrapment defense to the jury unless and until they proffer evidence to the Court that is capable of supporting such a defense.

Finally, the Government also describes herein its proposal for offering testimony regarding the defendants' confessions in a manner consistent with *Bruton* v. *United States*, 391 U.S. 123 (1968).

## BACKGROUND

Superseding Indictment S5 15 Cr. 765 (PAC) charges the defendants with participating in a conspiracy, between in or about August 2015 and in or about November 2015, to import cocaine into the United States, and to distribute cocaine knowing that it would be unlawfully imported into the United States. The Government will establish at trial—through witness testimony, recordings, and communications obtained from the defendants' phones (the "Campo Phone" and the "Flores Phone")[2]—that by August 2015 the defendants were working together to further enrich themselves in Venezuela by using their political access, ties to military and law enforcement personnel, and perceived impunity to try to dispatch large quantities of U.S.-bound cocaine from Caracas, Venezuela via official flights on private aircraft departing Simón Bolívar International Airport

---

[2] On November 10, 2015, Haitian authorities seized and provided to the DEA two Samsung cellular telephones—the Campo Phone and the Flores Phone—and the contents of the phones demonstrate that they were used by the defendants. This evidence includes, among other things, photographs on the phones that the defendants took of themselves and of documents bearing their names, as well as communications on the phones in which they identified themselves.

2

("CCS").  The defendants and their access to CCS were at the hub of the charged conspiracy, which included, but was not limited to, the defendants' negotiations with individuals acting at the direction of the DEA.

Indeed, beginning at least weeks before the defendants traveled to Honduras to meet for the first time with the DEA cooperating witness known as "Sentado" ("CW-1"), they sought to facilitate other huge cocaine loads with other drug traffickers—including co-conspirators who also agreed to participate in the deal that the defendants negotiated with CW-1 and DEA confidential sources.  In August and September 2015, Flores and Campo both communicated via WhatsApp Messenger with a drug-trafficking associate, whom Flores identified during his confession as "Pepero," about using various aircraft to transport cocaine from Venezuela.  For example, Flores and Pepero communicated regarding sending a Gulfstream V jet ("G5") to transport up to three tons of cocaine ("3.000" // "3000") from Venezuela to Mexican drug traffickers ("*los sombreros*" // "*la gente de los tacos*").[3]  The defendants indicated that they were seeking an advance payment of at least approximately one million dollars, as well as an interest in the cocaine load that was to be sent from Venezuela, in exchange for assistance in dispatching the load from CCS and securing the release from Venezuelan prison of an individual whom Pepero identified to Campo as "[H]ermagoras Gonzalez."[4]

---

[3] The descriptions of communications set forth herein, which were initially in Spanish, are based on draft translations that are in the process of being finalized as the Government prepares for trial.

[4] A Colombian national named Hermagoras Gonzalez Polanco is charged in the United States with money-laundering and drug-trafficking offenses, and he was arrested by Venezuelan authorities in

On September 26, 2015, Pepero informed Flores that he was going to travel to La Guajira, Colombia, to meet with "el gocho."[5]   On September 28, Pepero indicated that he was "grabbing the telephone to write to el gocho" because the Mexican drug traffickers ("*la gente de los tacos*") would be arriving that day, and he urged Flores to "[t]alk to efra early."   On September 29, Flores wrote to Pepero:   "If we don't have anything by tomorrow efra is already looking to figure something out elsewhere . . . . [b]ecause we are looking very bad with the people who really want to work."

The defendants made good on Flores' threat to seek assistance elsewhere by traveling to Honduras on October 3, 2015 to meet with CW-1 and others.   As the negotiations progressed, including during recorded meetings with DEA confidential sources in Caracas in late October 2015, the defendants continued to communicate with Pepero about their drug-trafficking activities. For example, on November 1, 2015, as the defendants were making arrangements with the confidential sources to dispatch an 800-kilogram load of cocaine from CCS, Pepero wrote to Flores that "el gocho" was "the best" because he had offered to provide 800 kilograms of cocaine ("the 800" // "the chairs") and "the transportation fee" on consignment ("without putting up a single bolivar").   On November 6, 2015, Flores traveled to Honduras to meet with CW-1 and others regarding the pending deal.   On November 10, 2015, both defendants traveled to Haiti with the

---

approximately 2008.  *See* U.S. Dep't of State, *Narcotics Rewards Program: Hermagoras Gonzalez Polanco*, http://www.state.gov/j/inl/narc/rewards/115395.htm.

[5] Both defendants identified a co-conspirator named "El Gocho" during their confessions.

intention of picking up millions of dollars in cash to facilitate the transaction.  The defendants were instead arrested and brought to this District.

## ARGUMENT

### I.  The Government Should Be Permitted to Offer Certain Evidence Regarding the October 3, 2015 Meeting Between CW-1 and the defendants in Honduras

The Government seeks to offer three categories of evidence regarding the October 3, 2015 meeting in Honduras involving the defendants, CW-1, and others: (i) testimony from Agent Gonzalez regarding certain statements of CW-1, which are admissible as non-hearsay, limited background evidence to explain the initiation of the investigation and subsquent steps by Agent Gonzalez and others; (ii) testimony from Agent Gonzalez regarding certain investigative decisions and instructions he gave to CW-1 with respect to the meeting; and (iii) the photograph of the meeting sent by CW-1 to Agent Gonzalez.

#### A.  Relevant Facts

In early October 2015, CW-1 informed Agent Gonzalez, via BlackBerry Messenger ("BBM"), that a Venezuelan official named Vladimir Flores was sending a nephew to Honduras to discuss a drug-trafficking venture.  Suppression Hr'g Tr. ("Tr.") 30.  On October 3, 2015, CW-1 informed Agent Gonzalez that he planned to participate in the meeting that day in the vicinity of Lago de Yojoa, outside of San Pedro Sula.  Tr. 30-31.  Agent Gonzalez instructed CW-1 to gather evidence relating to the meeting, including by recording it and locating another cooperating witness to assist.  Tr. 32-33.  Later on October 3, CW-1 informed Agent Gonzalez via BBM that he had participated in the meeting, and although he was unable to record it, an associate took photographs of the gathering.  Further, CW-1 told Agent Gonzalez that the indiviudals with whom

5

he had met, later identified as the defendants, requested that CW-1 "send representatives to Venezuela to meet with them and see their control of the aiport." Tr. 35. Agent Gonzalez later contacted CS-1 and CS-2 and asked them go to Venezuela, posing as CW-1's associates. Tr. 35-36. On or about October 5, CW-1 transmitted to Agent Gonzalez via BBM a single photograph of the meeting (the "Photograph"), which depicts, among others, CW-1, the defendants, and at least one other male who also attended a subsequent meeting with CW-1 in San Pedro Sula Honduras on or about November 6, 2015. Tr. 33-34; GX 4.

## B. Applicable Law

"Rule 401 defines relevant evidence as that which 'has any tendency to make a fact more or less probable than it would be without the evidence,' so long as 'the fact is of consequence in determining the action.'" *United States* v. *Levin*, No. 15 Cr. 101 (KBF), 2016 WL 299031, at *6 (S.D.N.Y. Jan. 25, 2016) (quoting Fed. R. Evid. 401). "To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting *McKoy* v. *North Carolina*, 494 U.S. 433, 440 (1990)). Under Rule 403, relevant evidence may nevertheless be deemed inadmissible where "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The rules against hearsay prohibit only testimony by an out-of-court declarant that is offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(a)-(c). However, testimony

regarding the "background" of an investigation is not considered hearsay, because it is offered to provide context for a law enforcement officer's future actions. *See, e.g.*, *United States* v. *Roy*, 444 F. App'x 480, 482 (2d Cir. 2011) (detective's statement about what an informant told him about the defendant not hearsay where "offered to show that the statement was made and to provide background information explaining the impetus for and the sequence of the investigation"); *United States* v. *Regan,* 103 F.3d 1072, 1082-83 (2d Cir. 1997) (allegations of misconduct were not admitted for truth of matter asserted, but rather "simply as 'background evidence' of the events that led to the investigation"); *United States* v. *Tracy,* 12 F.3d 1186, 1201 (2d Cir. 1993) (information received from confidential informants during course of investigation was properly admitted as background to investigation).  Relatedly, an investigating agent's instructions to a confidential informant are not hearsay and can be admissible.  *United States* v. *Lubrano,* 529 F.2d 633, 636-37 (2d Cir. 1975).

## C.   Statements by CW-1 to Agent Gonzalez and Agent Gonzalez's Instructions to CW-1

First, the Government seeks to elicit the following testimony from Agent Gonzalez regarding statements by CW-1:  (i) in early October 2015, CW-1 reported to Agent Gonzalez via BBM that CW-1 had been contacted regarding potential cocaine transations involving Venezuelan nationals; (ii) on October 3, 2015, CW-1 reported to Agent Gonzalez via BBM that one or more Venezuelans were coming to meet with him that day, near Lago de Yojoa, about a drug-trafficking venture; (iii) CW-1 informed Agent Gonzalez that the Venezuleans with whom he met had requested that he send representatives to Venezeula; and (iv) CW-1 informed Agent Gonzalez that he did not record the meeting but had obtained multiple photographs of it.

These statements from CW-1 to Agent Gonzalez are relevant for the non-hearsay purpose of providing background for the DEA's investigation.  Specifically, statements (i), (ii), and (iii) all explain how and why Agent Gonzalez ended up sending CS-1 and CS-2 to meet with the defendants in Venezuela, and statement (iv) provides context for why Agent Gonzalez received a photograph from CW-1 on October 5, just two days after the meeting.  *See Tracy*, 12 F.3d at 1201 (reasoning that agent's testimony "describing information received from informants during the course of the government's . . .  investigation" properly "received as background information").

The Government also seeks to elicit testimony from Agent Gonzalez regarding his instructions to CW-1—*i.e.*, to contact another cooperating witness to obtain his assistance in collecting evidence, and to record the meeting.  These instructions are not "assertion[s]" under the hearsay rules.  Even if they were, the instructions are not being offered to establish the truth of any matter, but rather to provide context and background as to the investigative efforts taken by the DEA.  *Lubrano*, 529 F.2d at 636-37 (agent's instructions to informant admissible as non-hearsay background evidence because they "were relevant to aid the jury in understanding the background events leading up to the crimes in question").  Indeed, all of the statements cited above are also admissible to rebut the defense's anticipated arguments regarding the integrity of the investigation, entrapment, and the alleged politically motivated targeting of the defendants.  *See, e.g.*, *United States* v. *Khalil*, 214 F.3d 111, 122 (2d Cir. 2000) (reasoning that evidence was relevant "to rebut the defense portrayals of [the defendant] as having no destructive objective and posing no real threat").  For example, the proffered testimony from Agent Gonzalez about his interactions with CW-1 contradicts the defendants' assertions that the DEA initiated the cocaine deal that is central

8

to this case.[6]  In addition, to the extent the defendants "open the door" to evidence regarding the current status of CW-1 by asking, for example, whether Agent Gonzalez made additional efforts to obtain information from CW-1 about the October or November 2015 meetings in Honduras, the Government reserves the right to elicit testimony that CW-1 died in December 2015 (but not that he was murdered).  *See, e.g.*, *Lubrano*, 529 F.2d at 637 (when cross-examination of agent "injected into the case" agent's opinion of what proportion of cocaine was attributable to defendant, redirect examination could elicit agent's complete understanding, which was based on hearsay).

Acordingly, the Court should admit the above statements by CW-1 regarding the October 3 meeting, and permit the Government to offer limited evidence regarding the death of CW-1 in the event that the defendants open the door through arguments or cross-examination.

### D.   The Photo of the October 3, 2015 Meeting

The Photograph sent by CW-1 to Agent Gonzalez is also admissible.  The Photograph is relevant because its shows the defendants and CW-1, who are identifiable in the Photograph,[7] met in Honduras.  Fed. R. Evid. 401 (defining "relevant evidence" as evidence that "has *any* tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action" (emphasis added)).  This fact in turn helps explain the defendants' repeated references to CW-1 during their meetings with confidential sources in

---

[6] *See* Defs. Joint Motion to Suppress Evidence on the Basis of Spoliation at 3 ("The initial conversations between the informants and the Defendants left largely unclear, however, what the Defendants were intended to contribute to this informant-crafted 'conspiracy.'") (dkt. no. 48).

[7] *See* Tr. 34 (Agent Gonzalez testimony identifying the defendants and CW-1).

Caracas during late October 2015; Flores' return to Honduras to meet with CW-1 and others on November 6, 2015; and, more generally, why the defendants agreed to participate in a cocaine shipment that was to be routed through Roatan, Honduras—as opposed to some other location—on its way to the United States. *See Old Chief* v. *United States*, 519 U.S. 172, 189 (1997) (emphsizing the importance of permitting the prosecution to maintain "the natural sequence of narrative evidence" in proving its case).[8]  Accordingly, the Court should admit the Photograph.

## II.  CS-1 and CS-2 Should Be Permitted to Testify that They Believed That the Substance at the October 27, 2015 Meeting Was Cocaine

As the Court is aware, on October 27, 2015, CS-1, CS-2, and the defendants met in Caracas, Venezuela, and defendant Campo "brought a block of a white powdery substance" to this meeting.[9] CS-1 examined this substance, and both CS-1 and CS-2 believed the substance was cocaine.  Tr. 363 (CS-2 testimony that the substance "looked to be like cocaine, one kilo"); Tr. 410 (CS-1 testimony that the substance appeared to be cocaine).

The Court should allow CS-1 and/or CS-2 to testify at trial, consistent with their suppression hearing testimony, that they believed the substance was cocaine.  Such testimony would be proper lay opinion testimony.  Federal Rule of Evidence 701 provides that such testimony

---

[8] The Government does not intend to introduce any evidence as to what CW-1 told Agent Gonzalez about the Photograph, but expects that other evidence will establish that the first meeting between CW-1 and the defendants occurred on October 3, 2015, including electronic communications between the defendants and others, stamps on the defendants' passports, and photographs from the Campo Phone.

[9] July 1, 2016 Decl. of Efrain Antonio Campo Flores in Support of Defendants' Joint Motion to Suppress Evidence on the Basis of Spoliation ¶ 6.

is admissible if it is: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

All of Rule 701's requirements are met here.  Both CS-1 and (to a lesser extent) CS-2 have experience in cocaine trafficking, are familiar with the appearance and texture of cocaine, and both personally observed the substance that defendant Campo brought to the October 27 meeting.  Thus, their opinions are "rationally based on [their] perception" and do not involve "specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(a), (c); *United States* v. *Moon*, 802 F.3d 135, 148 (1st Cir. 2015) (finding "[t]he officers' testimony, based on their extensive experience, that the substances appeared to be heroin and crack cocaine . . . properly admitted under Rule 701"); *United States* v. *Durham*, 464 F.3d 976, 982-83 (9th Cir. 2006) (permissible for lay witness to opine that substance was marijuana because she was previously familiar with marijuana and had "first-hand, multi-sensory interaction with the substance in question"); *see also Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 329 n.14 (2009) (rejecting the suggestion that "only an analyst's testimony suffices to prove the fact that the substance is cocaine" (internal citations and alterations omitted)); *United States* v. *Gaskin*, 364 F.3d 438, 460 (2d Cir. 2004) ("'Lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction.'" (quoting *United States* v. *Bryce*, 208 F.3d 346, 353-54 (2d Cir.1999)).  Further, such testimony would be helpful to the determination of whether the defendants agreed to import, and to manufacture and possess, with intent to import, cocaine.  Fed. R Evid 701(b).  Accordingly, the

11

Court should allow CS-1 and/or CS-2 to testify that they believed the substance brought to the October 27 meeting was cocaine.

### III.   Evidence of the Defendants' Efforts to Obtain and Smuggle Weapons is Admissible as Direct Proof of the Charged Conspiracy

The Government seeks to offer in its case-in-chief—as direct evidence of the charged conspiracy—evidence relating to the defendants' efforts to obtain weapons from the United States and smuggle them into Venezuela between at least approximately May 2015 and approximately August 2015.  These activities occurred during, and immediately before, the charged narcotics-trafficking conspiracy, and they illustrate efforts by the defendants to obtain weapons to be used to guard the cocaine and drug proceeds that they planned to distribute with the confidential sources and other drug traffickers.  This evidence is therefore admissible as background to the charged conspiracy, and to explain the development of the defendants' criminal relationship and the mutual trust between themselves and others, and it is not unduly prejudicial in the context of this international drug-trafficking case.

#### A.   Relevant Facts

On or about May 15, 2015, Campo used WhatsApp Messenger to send an individual identified as "Gilson Nuevo" ("Gilson") a photograph of a weapon that he described as a "Mini uzi," indicated that the firearm belonged to "Irving" and that he was "checking it out" with his "uncle," and directed Gilson to "Get me one."  On or about July 12, 2015, Gilson sent Campo a series of photographs of firearms, including one that resembled the "Mini uzi" from the photograph that Campo sent to Gilson on May 15.  At least two photographs were obtained from the Flores Phone that appear to depict the same firearms.  Gilson subsequently sent photographs reflecting

12

an individual handling and disassembling at least one of the firearms, and two packages that appear to be the firearms wrapped in duct tape and other coverings.  With respect to the latter photographs, Gilson confirmed that they depicted the "toys."

On or about August 3, 2015, Gilson sent Campo photographs of a disassembled firearm and a large volume of currency that appears to include both dollars and Venezuelan bolivares. Campo directed Gilson to transport the weapon "[o]n the plane," by either carrying it himself or secreting it inside a baby stroller.  When Gilson resisted Campo's instructions, Campo directed him to "[c]all . . . a general" and to "leave it on the plane and later go by to grab it."  On August 6, 2015, Gilson indicated that he may fly into the airport in Caracas, and Campo instructed him to bring the firearm ("the beta") because "[w]e can pass it through around there."[10]  Also on August 6, however, Campo wrote to Flores that Gilson did not bring the weapon to Venezuela:  "I told him to take the mini uzi on the plane and the fucker didn't bring it."

Subsequent communications between Gilson and Campo indicate that Gilson remained a close associate of the defendants and assisted them in traveling to Honduras to meet with CW-1 and others.  Specifically, on October 1, 2015, Campo sent Gilson a photograph describing weather conditions in San Pedro Sula, Honduras.  Gilson subsequently informed Campo that, for approximately $20,000, he could provide access to a Cessna Citation aircraft that would travel to San Pedro Sula.  For example, at approximately 8:50 p.m. Venezuela time, Gilson wrote to Campo

_____

[10] Travel databases indicate that on August 6, 2015, the individual believed to be Gilson departed Miami-Opa Locka Executive Airport in Florida for an unknown location.

13

that it would take approximately eight hours to fly to San Pedro Sula.  Campo relayed the exact text of Gilson's message to Flores at approximately 8:57 p.m.  As discussed above, the Government will establish at trial that the defendants traveled together to San Pedro Sula on a private aircraft on October 3, 2015.

### B.   Applicable Law

"'The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.'"  *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).  Moreover, "[o]ther-act evidence" is not subject to a Rule 404(b) analysis "if it: (1) 'arose out of the same transaction or series of transactions as the charged offense'; (2) 'is inextricably intertwined with the evidence regarding the charged offense'; or (3) 'is necessary to complete the story of the crime on trial.'"  *United States* v. *Lopez*, No. 09 Cr. 525 (JFK), 2010 WL 3452380, *1 (S.D.N.Y. Sept. 1, 2010) (quoting *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

### C.   Discussion

Campo's communications with Gilson regarding obtaining weapons and smuggling them into Venezuela, as well as the photographs of some of the same weapons seized from the Flores Phone, are admissible for at least four reasons.

14

First, the communications, which took place in the months immediately before and during the charged conspiracy, are admissible as direct proof of the charged offense.  "[T]he Second Circuit has repeatedly ruled that firearms are admissible as direct evidence in narcotics cases as tools of the trade."  *United States* v. *Santillan*, No. 13 Cr. 138 (RWS), 2015 WL 6444628, at *2 (S.D.N.Y. Oct. 23, 2015) (internal quotation marks omitted); *see also United States* v. *Mitchell*, 328 F.3d 77, 83 (2d Cir. 2003) ("[O]ur circuit has long recognized the connection between drug trafficking and firearms, repeatedly permitting firearms into evidence as proof of narcotics conspiracies 'because drug dealers commonly keep firearms on their premises as tools of the trade.'" (quoting *United States* v. *Becerra*, 97 F.3d 669, 671-72 (2d Cir.1996))).  "This is because 'the guns themselves, in context, [a]re probative of the narcotics conspiracy charged.'"  *United States* v. *Santillan*, 2015 WL 6444628, at *2 (quoting *United States* v. *Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)).  This established case law is based on logic about the drug trade that is well-founded in the context of the huge international cocaine deals at issue in this case.  The evidence of the defendants' ongoing efforts to obtain weapons suggests that they were seeking to maintain a sufficient arsenal to provide security while they obtained, transported, and distributed the hundreds of kilograms of cocaine and millions of dollars that they discussed with other drug traffickers and on tape with the confidential sources.[11]  As noted above, evidence from the

---

[11] The Government will establish that the defendants employed armed security personnel, including Jesfran Moreno Soto, a/k/a "Tortuga," who accompanied Flores to San Pedro Sula on November 6, 2015, and both defendants to Haiti on November 10, 2015.  For example, on or about May 5, 2015, an associate identified as "Chicho" on WhatsApp Messenger sent Campo a photograph that depicts Moreno Soto standing guard with a pistol and other tactical gear.

defendants' phones shows that no later than late August 2015, just weeks after Campo's communications with Gilson about bringing firearms into Venezuela, the defendants communicated via WhatsApp Messenger with a drug-trafficking associate about using various aircraft to transport cocaine from Venezuela to Mexican drug traffickers. Therefore, the firearms evidence is admissible as direct proof of the crime on trial.

Second, Campo's communications with Gilson also provide background and context for the charged conspiracy because they are probative of Campo's belief that he could easily transport contraband over the Venezuelan border because of his political access and connections, which is an ability he touted to the confidential sources when they met with him during recorded meetings in Caracas. *E.g.*, *United States* v. *Johnson*, --- F. App'x ----, 15-2367-cr, 2016 WL 4533485, at *2 (2d Cir. Aug. 30, 2016) (summary order) ("Background evidence is admissible if it is relevant 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" (quoting *United States* v. *Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000)).

Third, because Campo discussed Gilson's efforts to obtain firearms with Flores, this evidence demonstrates the relationship of trust between the defendants and also with Gilson. *See United States* v. *Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (reasoning that evidence of "prior dealings between two conspirators show 'the basis for the trust between' the co-conspirators" (quoting *United States* v. *Brennan*, 798 F.2d 581, 590 (2d Cir. 1986))); *United States* v. *Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and

16

"made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"), *abrogated on other grounds by United States* v. *Parkes*, 497 F.3d 220, 230 (2d Cir. 2007).

Finally, the Government respectfully submits that this evidence would be admissible evidence of predisposition in the event the defendants are permitted to present an entrapment defense.  Specifically, the evidence shows that months before their first meeting with CW-1 on October 3, 2015, the defendants had taken preparatory steps to engage in drug-trafficking activities by acquiring weapons for themselves and/or their co-conspirators. [12]

In light of the probative value of this evidence, it cannot be said that the communications are unfairly prejudicial under Rule 403.  Courts have so found in drug-trafficking cases with respect to evidence of weapons possession and even acts of violence.  *E.g.*, *United States* v. *Ulbricht*, 79 F. Supp. 3d 466, 487 (S.D.N.Y. 2015) ("Exclusion of the murder-for-hire evidence is not warranted under Rule 403.  Since drug trafficking is often attended by violence, courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." (internal quotation marks omitted)).  The jury will hear evidence of the defendants' participation in an international conspiracy to import hundreds of kilograms of cocaine into the United States,

---

[12] 

including Campo's admission to the DEA that he understood the cocaine at issue was supplied by the FARC, a designated foreign terrorist organization. In this context, it cannot be said that the defendants' efforts to obtain weapons are "any more sensational or disturbing" than the crime charged in the Indictment. *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

Accordingly, the Court should admit the evidence that the defendants attempted to obtain and smuggle firearms in time leading up to the charged conspiracy.

## IV.  The Defendants' Should Be Precluded from Referring to the DOJ Policy Concerning Recording of Custodial Interviews

At the suppression hearing on September 8 and 9, 2016, defense counsel asked four of the five DEA agents who testified about a Department of Justice policy regarding the recording of custodial interviews (the "Recording Policy"). The Court should preclude references to the Recording Policy at trial.

The Recording Policy creates a "presumption that the custodial statement of an individual *in a place of detention* with suitable recording equipment, following arrest but prior to initial appearance will be electronically recorded." *See* Ex. A at 2 (emphasis added). The Policy further defines "place of detention" as a "structure where persons are held in connection with federal criminal charges" and provides examples including "detention facilit[ies]," "jail[s]," and "holding cell[s]." *Id.* The Recording Policy does not, however, apply "while a person is . . . en route to a place of detention." *Id.* Nor does the Recording Policy "apply outside of the United States." *Id.* at 4.

Consistent with the Recording Policy, Agent Leith Habayeb and Group Supervisor Robert Zachariasiewicz both indicated they did not believe the Recording Policy applied on the flight

18

from Haiti because the Policy does not apply outside the United States, Tr. 232-33, and the Policy does not apply while defendants are being transported, Tr. 353-55.  Agent Brooks indicated he did not know whether the Recording Policy applied on the plane.  Tr. 259-60.[13]

The Court should preclude any references to the Recording Policy at trial.[14]  *United States v. Bruce*, 550 F.3d 668 (7th Cir. 2008) is analogous to the situation here.  In *Bruce*, the defendant was initially arrested by local police in Wisconsin and interviewed.  560 F.3d at 670.  Although a Wisconsin state law arguably required the recording of the entirety of post-arrest interviews, the officers recording only a portion of the interview.  *Id*.  The Seventh Circuit held the district court properly precluded cross examination about the officers' compliance with the Wisconsin law.  *Id.* at 673-74.  The Seventh Circuit held that the state law was irrelevant in a federal prosecution and also indicated that—given that Wisconsin's recording requirement contained a number of exceptions—cross-examination about the policy would have required a "mini-trial" as to the application of the policy.  *Id.* at 673-74 & n.3 ("[The defendant's] position would require the judge either to hold a mini-trial on the alleged state law violation, or to allow the parties to submit

---

[13] Agent Gonzalez was not directly asked about whether the Recording Policy applied on the plane but was asked simply whether, under the Policy, "there is presumption that a postarrest interview should be recorded except in certain limited exceptional situations."  Tr. 122.

[14] To be clear, the Government does not mean to suggest that it would necessarily be improper for defendants to ask Government witnesses whether it was possible to record the defendants' confessions or whether they had equipment on the plane, such as smartphones, that could have been used to record the interviews.

19

sufficient evidence to allow the jury to weigh whether there was such a violation. We do not believe that the court was obligated to go so far afield from the central issues in the case.").

So too here.  The only potential basis for asking questions about the Recording Policy is for the defense to suggest to the jury that the agents violated the Recording Policy during the flight from Haiti to New York.  They did not.  The Recording Policy applies only in a "place of detention," and does not apply "while a person is . . . en route to a place of detention" or "outside the United States."  It is therefore irrelevant to the facts of this case.  Any questioning that even suggested that the Recording Policy applied—for example, asking whether "there is a presumption that a post-arrest interview should be recorded *except in certain limited exceptional situations*"[15]— would only risk misleading or confusing the jury without any probative value.  *See* Fed. R. Evid. 403.  Indeed, such questioning could lead to a mini-trial about the application of the Recording Policy to the circumstances here, *see, e.g.*, Tr. 233 (question and answer between Mr. Jackson and Agent Habayeb about whether "the plane was within the United States" for a portion of the post-arrest interviews and whether Special Agent Habayeb had "taken a look at the flight path"), including evidence offered by the Government of the agents' compliance with DEA policy to rebut this inappropriate suggestion by the defense.

In sum, to the extent the defendants wish to argue that the fact that the agents could have recorded the interviews, but chose not to do so, goes to the reliability of the agents' testimony regarding the confessions and/or the weight the jury should afford them, they are permitted to do

---

[15] *See* Tr. 122 (cross-examination of Special Agent Gonzalez (emphasis added)).

20

so. *See supra* footnote 14.  However, the existence of the Recording Policy and questions regarding whether the agents complied with it are not relevant.  And any marginal relevance the defendants can identify for this line of questioning—particularly in view of the defendants' conceded ability to cross-examine regarding the agents' decision not to record—is far outweighed by the risk of jury confusion and unfair prejudice that would result from having a mini-trial on the agents' compliance *vel non* with the Recording Policy.

## V.   The Defendants Should Not Be Allowed to Admit Self-Serving Portions of Their Prior Statements

The Government's proof at trial will consist, in large measure, of the defendant's own statements—including the defendant's confessions, recorded meetings involving the defendants, and text messages between the defendants and others.  These statements of the defendants are admissible when offered by the Government because, pursuant to Federal Rule of Evidence 801(d)(2), "[a] statement that meets the following conditions is not hearsay: . . . [t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity. . . ."  Fed. R. Evid. 801(d)(2)(A).

However, "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *see also United States* v. *Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)).

Further, as a general matter, the rule of completeness, Federal Rule of Evidence 106 "does not render admissible evidence that is otherwise inadmissible."  *United States* v. *Terry*, 702 F.2d

21

299, 314 (2d Cir. 1983).  Instead, the rule of completeness requires admission of a hearsay statement only when the statement is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  *United States* v. *Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quoting *United States* v. *Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).[16]

Accordingly, courts have routinely precluded defendants from offering their own self-serving statements, including attempting to offer their own statements through cross-examination of the Government's witnesses.  *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (no abuse of discretion to preclude portion of tape that included defendant's "own self-serving statements"); *United States* v. *Bumagin*, 136 F. Supp. 3d 361, 375 (E.D.N.Y. 2015) ("Defendant is precluded from cross-examining the Government's witnesses in an effort to elicit exculpatory statements made by Defendant because such statements are inadmissible hearsay"); *United States* v. *Black*, No. 13 Cr.316, 2014 WL 5783067, at *1 (E.D.N.Y. Nov. 5, 2014) (granting government's motion *in limine* to preclude defendant from eliciting self-serving statements from law enforcement on grounds that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible"); *United States* v. *Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) (noting that during direct examination, the government "could have introduced

---

[16] Moreover, the defendant bears the burden of showing that the portions of the statement he seeks to offer are necessary to clarify or explain the portions offered by the Government.  *See United States* v. *Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

inculpatory statements made by [the defendant]" but also recognizing that the Federal Rules of Evidence "do not provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party").

Under this well-settled law, the defendants should be precluded from eliciting any self-serving exculpatory statements made during recorded conversations, text message exchanges, or during their post-arrest interviews with law enforcement to the extent they would not otherwise be admissible pursuant to a hearsay exception.

## VI.   The Court Should Employ the Use of Certain Protective Measures at Trial

For the reasons set forth below, in the October 20, 2016 Declaration of DEA Special Agent Stephen Fraga (the "October 20 Fraga Declaration"), and in Special Agent Fraga's August 31, 2016 Declaration (the "August 31 Fraga Declaration," and collectively the "Fraga Declarations"), there is ample basis to employ courtroom security measures at trial, similar to those used in the suppression hearing in this case, as the Court deems appropriate.[17]  *See* Ex. B (Oct. 20 Fraga Decl.). Accordingly, the Court should deny the defendants' Motion to Preclude the Use of Visible Security Measures at Trial, and impose the following security measures:  (i) allow certain witnesses (the "Protected Witnesses") to testify using pseudonyms, preclude defense questioning that would reveal personally identifiable information or the true identities of the Protected Witnesses, and prohibit the use of non-official recording equipment to capture or create any likeness of the

---

[17] On October 17, 2016, the Government provided the August 31 Fraga Declaration to the defense on an attorneys'-eyes-only basis.  After reviewing the August 31 Fraga Declaration, the defense informed the Government that they are unwilling to consent to any protective measures.

Protected Witnesses; (ii) limit the dissemination of 3500 material produced to the defense; and (iii) prohibit reference to the manner in which recording devices used by the confidential sources were concealed.  *See* Ex. C (proposed order).  The Government submits that these measures would be appropriate even absent the information contained in the Fraga Declaration and are all the more appropriate under the circumstances of this case.

### A.   The Court Should Reject the Defendants' Argument that No Protective Measures Are Appropriate

The defendants' Motion to Preclude Visible Security Measures rests primarily on the idea that the defendants are not dangerous because "no acts of violence have been alleged in connection with the conspiracy at issue," and because a Haitian police officer, who had no involvement in this case other than being part of the team that arrested the defendants, indicated the defendants were "not dangerous."  Defs.' Mot. at 5.  ███████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████  In addition, a cooperating witness, CW-1, who met with the defendants in Honduras in October and November 2015, was murdered in December 2015.  *See* Aug. 31 Fraga Decl. ¶¶ 12-14.

In any event, the appropriateness of using security measures to protect witnesses and the public "does not depend on whether the threat . . . comes directly from a defendant or from another source."  *United States* v. *Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010).  ██████████████████
███████████████████████████████████████████████████████

24

███████████████████████████████████████████████

████████████████████

Further, despite the title of defendants' motion—a Motion to Preclude Visible Security Measures—the security measures at issue, such as a magnetometer and potentially extra courtroom security—need not be "visible," much less unfairly prejudicial.  If used, the metal detector can be placed in a location where it cannot be seen by jurors as they enter and exit the courtroom.  *United States* v. *Ferguson*, 758 F.2d 843, 855 (2d Cir. 1985) (explaining that the effects of protective measures were "somewhat ameliorated because[,]" among other things, "the metal detector was out of the jur[y]'s view . . .").[18]  Similarly, again consistent with the standard practice in this District, the Government anticipates that any additional Deputy U.S. Marshals assigned to the courtroom will be in plainclothes and that none of the Marshals or Court Security Officers ("CSOs") will be openly carrying firearms.  *See id.* (fact that "the marshals were not uniformed" also helped to ameliorate effect of security measures").[19]  Moreover, jurors are unlikely to have a frame of reference as to the "normal" number of Marshals or CSOs who are present for a criminal

---

[18] For example, as has been the case in other trials at the 500 Pearl Street courthouse, the metal detector can be placed in the alcove at the end of the hallway outside the courtroom and that area can be covered with a curtain as the jury is entering or exiting.  Similarly, the jurors could be instructed to assemble on another floor of the courthouse and brought together to the courtroom, to avoid any juror noticing spectators emerging from the screening area.

[19] *Mata* v. *Johnson*, 99 F.3d 1261 (5th Cir. 1996), cited by the defendants, involved "heavily armed, specialized security forces were stationed throughout the courtroom, [and] between thirty and forty fully uniformed prison guards . . . in regular attendance as spectators throughout the proceedings."  99 F.3d at 1264-65.  Those are not the kind of measures used in this District or envisioned by the Government in this case, and *Mata* is thus clearly distinguishable.

trial. *Holbrook* v. *Flynn*, 475 U.S. 560, 571 (1986) ("Even had the jurors been aware that the deployment of [uniformed, armed state] troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes with an unmistakable mark of guilt."); *see also Hardee* v. *Kuhlman*, 581 F.2d 330, 332 (2d Cir. 1978) ("[T]he jury must have known that the presence of police officers in a courtroom was normal expectancy"). Further, security measures do not necessarily suggest to the jury that the defendants themselves are dangerous. *Holbrook* v. *Flynn*, 475 U.S. at 569 ("[T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence . . . .").

As such, and for the reasons set forth in the Fraga Declarations, the Court should employ reasonable security measures in connection with the trial and reject the defendants' motion that such measures are inappropriate here.

### B. Certain Witnesses Should Be Allowed to Testify Under Pseudonyms and Not Have Their Likenesses Sketched or Otherwise Recorded

The Court should permit three confidential sources ("CS-1," "CS-2," and "CS-3" at the suppression hearing in this case), one cooperating witness ("CW-2"), and Haitian law enforcement officers (the "Officers" and collectively, the "Protected Witnesses") to testify under pseudonyms, specifically using actual first and last names different than their real names. In addition, the Government respectfully requests that, outside the presence of the jury, the Court direct courtroom sketch artists or others not to sketch or record the Protected Witnesses.

26

### 1.   Background on the Protected Witnesses

CS-3 has been a DEA confidential source since 2009.   Tr. 469.   In this case, CS-3 participated in meetings in Honduras on November 5 and 6, 2015.  ██████████████████ ███████████████████████████████████████.   As evidenced by his work in this case, CS-3 has the skills necessary to pose as a sophisticated narcotics trafficker and operate far from DEA supervision.

CS-1 and CS-2 were DEA confidential sources for approximately 13 and four years respectively, before their arrests in 2016.   In addition to this case, CS-1 and CS-2 worked as DEA confidential sources in multiple cases targeting high-level public officials in a Central American country, which resulted in multiple arrests and prosecutions.

CW-2 is a Honduran national, who surrendered to the Government in mid-2016, ██████ ████████████████████.   CW-2 pled guilty to drug-trafficking charges in this District pursuant to a cooperation agreement in the fall of 2016.   Due to safety risks associated with his cooperation, the charges are presently filed under seal, ██████████████████████████ ██████████████████████████.

The Officers are one or more members of the Haitian Police who may testify about the arrest of the defendants and related events on November 10, 2015.

### 2.   Applicable Law

A defendant does not have an absolute right to publicly disclose the identity of the Government's potential witnesses at trial; rather, he must be given an opportunity "to place the prosecution's witness in their proper setting and to test the weight of their testimony and their

credibility before the jury." *Alford* v. *United States*, 282 U.S. 687, 692 (1931).  In *dicta*, the

Supreme Court in *Smith* v. *Illinois* suggested that a demonstrated risk to the safety of a witness

could, in an appropriate case, justify some curtailment of the accused's right to a full disclosure of

the witness's identity.  390 U.S. 129, 133-134 (White, J., joined by Marshall, J., concurring).

Courts have therefore found that the confrontation rights of the accused are not absolute and should

yield where threats to a witness are "actual and not the result of conjecture."  *United States* v.

*Palermo*, 410 F.2d 468, 472 (7th Cir. 1969); *see also Siegfriedt* v. *Fair*, 982 F.2d 14, 17-18 (1st

Cir. 1992) (Confrontation Clause does not require disclosure of witness's name or address).

Courts in this in this District have allowed Government witnesses to testify at trial without

disclosing their true identity.  *See, e.g.*, *United States* v. *Muntslag*, No. 13 Cr. 635 (SAS) (dkt. no.

78) (S.D.N.Y. 2016); *United States* v. *Urena*, 8 F. Supp. 3d 568, 572-73 (S.D.N.Y. 2015); *United*

*States* v. *Garavito Garcia*, 12 Cr. 839 (JSR) (S.D.N.Y. 2015); *accord United States* v. *Naseer*, No.

10 Cr. 19 (E.D.N.Y. 2015) (dkt. no. 382) (permitting members of the United Kingdom Security

Service to testify at trial using pseudonyms based on concerns relating to safety and ongoing

investigations).[20]

---

[20] The defendants cite *United States* v. *Morgan*, 786 F.3d 227 (2d Cir. 2015) for the proposition that the Court of Appeals recently "held that the use of a pseudonym 'amplified' the message to the jury that the defendant was dangerous." Defs.' Mot. at 5.  *Morgan*, which primarily concerned the admission of evidence of a death threat under Rule 404(b), is readily distinguishable.  While the *Morgan* opinion provides no details on the informant's use of an alias and a disguise, the appellant's brief explains that:  (i) the AUSA asked the informant on direct examination "Is Louis Davidson your real name or is it a pseudonym you're using for testifying today"; and (ii) the informant testified wearing, what the AUSA later described in summation as, "'crazy dark sunglasses and a hat over his eyes.'"  *See* Brief and Appendix for Defendant-Appellant, *United*

Courts outside this Circuit have similarly concluded that a witness's use of a pseudonym is appropriate under certain circumstances, particularly where those witnesses had ties to foreign countries.  *See United States* v. *Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) (affirming district court decision to allow two government witnesses from El Salvador to testify under pseudonyms without revealing their names, home and work addresses, or dates and places of birth due to safety concerns); *United States* v. *Celis*, 608 F.3d 818, 832-34 (D.C. Cir. 2010) (holding, in the context of trial of defendants with ties to a Colombian terrorist organization, that a protective order allowing government witnesses from Colombia to testify under pseudonyms, and limiting disclosure of their true identities, did not impermissibly intrude upon defendants' confrontation rights); *Clark* v. *Ricketts*, 958 F.2d 851, 855 (9th Cir. 1991) (finding no violation of the Confrontation Clause where a DEA confidential informant testified at trial under a pseudonym, because the defendant knew the witness's name before testifying and, therefore, had an opportunity to investigate and conduct cross-examination).

### 3.  Discussion

Here, with respect to each of the Protected Witnesses, the threats to them and their loved ones—both generally and under the circumstances of this case—are "actual and not the result of conjecture."  *Palermo*, 410 F.2d at 472.

---

*States* v. *Morgan*, No. 12-3231, 2014 WL 3686474, at *16 n.8 (2d Cir. July 21, 2014).  The Government will not be asking any such question in this case, nor will it ask that the Protected Witnesses be permitted to wear any disguise.

To begin with, this is a drug-trafficking case, which, by its nature increases the potential for retaliation against Government witnesses and their relatives. *See, e.g.*, *United States* v. *Santos*, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force."); *United States* v. *Taylor*, 707 F. Supp. 696, 703 (S.D.N.Y. 1989) (noting, where defendant requested a witness list, that "[e]specially in narcotics cases . . . the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great").

Often, these retaliatory interactions occur in countries and locales where the risk of threats and violence is higher than in the United States. Here, all of the Protected Witnesses have significant ties to foreign countries. ███████████████████ ███████████████████ Honduras, one of the most violent nations in the world,[21] and the country where another cooperating witness in this case, CW-1, was murdered in December 2015. Further, the Officers

---

[21] *See* U.S. Dep't of State, *Honduras 2014 Human Rights Report* at 1 (2014) ("Pervasive societal violence persisted. Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders."); *see also* Marco Cáceres, *Drugs, Violence and Immigration: Think Twice, America*, Huffington Post (July 9, 2014), http://www.huffingtonpost.com/marco-caceres/drugs-violence-and-immigr_b_5571077.html ("'By U.N. statistics, Honduras is the most violent nation on the planet with a rate of 90 murders per 100,000 citizens. . . . These figures become more shocking when compared to those of declared combat zones such as Afghanistan or the Democratic Republic of the Congo (28 in 2012). Profits earned via the illicit drug trade have corrupted and destroyed public institutions . . . , and facilitated a culture of impunity—regardless of crime—that delegitimizes the state and erodes its sovereignty, not to mention what it does to human rights.'" (quoting General John F. Kelly, of the U.S. Southern Command, *Central America Drug War a Dire Threat to US National Security*, Mil. Times (July 8, 2014))).

work in Haiti, where they are subject to a constant threat of violence that requires them to conceal their appearances during the course of their ordinary police work.  *See* Tr. 8 (testimony from Haitian officer that he and his fellow officers wear masks to protect their identities).  Finally, while CS-1 and CS-2 are currently incarcerated, ████████████████████████████████████ ████████████████ they face deportation to Mexico after they complete their sentences.

Further, CS-1, CS-2, and CS-3 have worked in an undercover capacity in investigations for the DEA, including, most recently, for the DEA's Special Operations Division ("SOD") Bilateral Investigations Unit ("BIU").  As demonstrated by the instant case, which is reflective of the CSes work, the CSes' roles in these investigations required the CSes to interact regularly with individuals believed to be involved in large-scale narcotics and/or weapons trafficking, often with ties to political, military, or law enforcement entities in foreign countries.  Such individuals, and their associates, moreso than the overwhelming majority of criminal defendants, are likely to possess the means, the motivation, and the ability to locate the CSes and their families should their true identities be revealed.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[22] ████████████████████████████████████.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

Under these circumstances, the issues surrounding the safety of the Protected Witnesses and their families outweigh any interest in public disclosure of their names. The Protected Witnesses' observations and roles in the investigation, which will be public and revealed in open court, are crucial to their testimony. Their real names are not—the defendants were almost certainly unaware of any of the Protected Witnesses full names, and these names add nothing of value to the substance of the Protected Witnesses' testimony or to the defense's cross-examination. For example, the CSes were role players who used false identities when interacting with the defendants. As such, the CSes are situated quite differently than a typical cooperating witness in a gang prosecution or an organized crime case, where the witness's identity was likely known to members of the organization (including the defendant(s)).

In addition, allowing the Protected Witnesses to testify under pseudonyms will not violate the defendants' rights pursuant to the Confrontation Clause. Here, over two months before trial, in connection with the suppression hearing, defense counsel was told the actual names of the Protected Witnesses who testified at that hearing, and the dates of birth of the CSes. The Government will tell defense counsel CW-2's actual name (and the name of any other foreign law enforcement officer) in connection with the production of 3500 material before trial, providing the defendants with the means to investigate the witnesses in connection with the preparation of a defense. The defendants will have the opportunity to confront in open court and to cross-examine

32

Protected Witnesses, and the jury will have a full opportunity to assess each witness's demeanor and credibility.  In addition, each witness will give his testimony under oath, subject to the penalty of perjury.  Hence, there will be no curtailment of the defendant's Confrontation Clause rights.

Accordingly, the Court should allow the Protected Witnesses to testify under pseudonyms. And, in light of these same concerns, the Court should preclude any person from attempting to sketch or otherwise capture a likeness of the Protected Witnesses during trial.

### C.   A Protective Order for the 3500 and *Giglio* Material is Appropriate

The Government also seeks a protective order for the 3500 and *Giglio* material (collectively, "3500 material") to be produced in advance of trial.  Much of the 3500 material relating to this trial was already disclosed in connection with the suppression hearing, and the Government respectfully submits that the same protective measures used for that material at the suppression hearing should apply here.  Specifically:

- The names and (to the extent applicable) criminal histories of the Protected Witnesses shall be deemed "Restricted Materials."  Access to the Restricted Materials shall be limited to attorneys from defense counsels' law firms as well as U.S.-based investigators and interpreters working for those firms;

- The defense shall not show or disseminate any of the 3500 Material to anyone other than the defendants, attorneys from defense counsels' law firms, and U.S.-based paralegals, investigators, and interpreters working for those firms;

- The defense shall not transport or transmit any of the 3500 Material outside of the United States;

- The defendants shall not possess any of the 3500 Material, either before, during, or after the trial, except when reviewing the 3500 Material in the presence of attorneys from defense counsels' law firms, or U.S.-based paralegals, investigators, or interpreters working for those firms; and

33

- The defense shall return to the Government, or destroy, all of the 3500 Material at the close of the trial or when any appeals have become final.

In addition to the safety concerns outlined above in the section regarding the use of pseudonyms and in the Fraga Declarations, the Government has also learned, through its experience in prosecuting cases involving drug trafficking and the violence that often goes along with the narcotics business, that 3500 material such as this is actively used by some defendants to harass, threaten, and retaliate against witnesses. Recognizing the danger posed by allowing defendants to possess 3500 material beyond the need to review it with their attorneys in preparing for trial, several judges in this District have issued orders consistent with that proposed by the Government here, *i.e.*, precluding defendants from taking 3500 material with them back to their home or into prison. *See, e.g.*, *United States* v. *Muntslag*, No. 13 Cr. 635 (SAS) (dkt. no. 79); *United States* v. *Garavito-Garcia*, No. 12 Cr. 839 (JSR) (dkt. no. 70); *United States* v. *Georgescu*, No. 14 Cr. 799 (RA) (dkt. 71); *United States* v. *Gracesqui*, No. 10 Cr. 74 (PKC) (dkt. no. 69).

These limited protections will not prejudice the defendants. *See United States* v. *Midyett*, No. 07-CR-874 (KAM), 2010 WL 1992191, at *2 (E.D.N.Y. May 14, 2010) (rejecting argument that protective order for 3500 material similar to that proposed here violated defendant's right to a fair trial). Much of the 3500 material was provided in connection with the suppression hearing, almost two months before trial. The remaining 3500 material will be produced on October 28, approximately ten days before trial. As such, counsel will have ample time before the start of trial to review the 3500 material, including with the defendants (except for the Protected Witnesses' names and identifying information). Accordingly, the Court should grant the proposed 3500 Protective Order.

34

## D. The Court Should Prohibit Reference to the Sensitive Features of the Recording Devices

Finally, the Government respectfully requests that the Court prohibit disclosure of:  (i) the physical appearance of the recording devices used by CSes in this case (referred to at the hearing as Device-1, Device-2, and Device-3 (collectively "the Devices")); and (ii) the manner in which the Devices conceal recording equipment.

### 1.  Applicable Law

The law enforcement privilege protects, among other things, "information pertaining to law enforcement techniques and procedures," "information that would undermine the confidentiality of sources," "information that would endanger witness and law enforcement personnel," and "information that would seriously impair the ability of a law enforcement agency to conduct future investigations."  *See In re City of New York*, 607 F.3d 923, 948 (2d Cir. 2010). Once a court has determined that a law enforcement privilege applies, there is a "'strong presumption against lifting the privilege.'"  *Id*. at 944 (quoting *Dellwood Farms* v. *Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997)).  A criminal defendant can overcome that presumption by showing "an authentic and sufficient need and no adequate alternative means to obtain the information."  *United States* v. *Johnson*, No. 10 Cr. 184, 2011 WL 7782624, at *7 (E.D.N.Y. Oct. 24, 2011) (citing *In re City of New York*, 607 F.3d at 944-47). However, "demonstrating a 'compelling need' does not automatically entitle a litigant to privileged information.  Rather, disclosure is required only if that compelling need outweighs the public interest in non-disclosure." *In re City of New York*, 607 F.3d at 945 (granting writ of mandamus compelling district court to deny a motion to compel the City of New York to produce undercover police reports).

35

## 2. Discussion

The law enforcement privilege applies to the Devices, and protects against public disclosure of their sensitive features.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████.[23]  Information concerning the appearance and manner of concealing the Devices clearly pertains to "law enforcement techniques and procedures."  *In re City of New York*, 607 F.3d at 948.  Sharing such information concerning the sensitive features of the Devices would endanger numerous people using the Devices in ongoing criminal investigations, including but not limited to law enforcement personnel using the Devices while acting in an undercover capacity and others acting at the direction of law enforcement.  Causey Decl. ¶ 12.  Moreover, disclosing information concerning the sensitive features of the Devices could compromise ongoing and future investigations.  Causey Decl. ¶ 13.  As such, information about the sensitive features of the Devices is also subject to the law enforcement privilege because it is "information that would undermine the confidentiality of sources," "information that would endanger witness and law enforcement personnel," and, thus, "information that would seriously impair the ability of a law enforcement

---

[23] The Government has provided the defense the Causey Declaration and the Fraga Declarations, with their consent, on an attorneys'-eyes-only basis.  Because of the sensitive nature of the information in these Declarations, the disclosure of which could pose a risk to the safety of others and compromise ongoing investigations, the Government respectfully requests, also on consent, that the three Declarations be maintained under seal.

agency"—indeed, multiple agencies—"to conduct future investigations." *In re City of New York*, 607 F.3d at 948 (internal quotation marks omitted).

As the Eleventh Circuit explained in *United States* v. *Van Horn*, in holding the privilege allowed the Government to protect information about where a microphone was hidden in a defendant's office:

> We hold that the [law enforcement] privilege applies equally to the nature and location of electronic surveillance equipment. Disclosing the precise locations where surveillance devices are hidden or their price specifications will educate criminals regarding how to protect themselves against police surveillance. Electronic surveillance is an important tool of law enforcement, and it's effectiveness should not be unnecessarily compromised. Disclosure of such information will also educate persons on how to employ such techniques themselves[.]

789 F. 2d 1492, 1508 (11th Cir. 1986); *see also, e.g.*, *United States v. Briggs*, No. 10 Cr. 184, 2011 WL 5881593, at *5-6 (W.D.N.Y. Nov. 23, 2011) (holding that information concerning Voicebox system used to implement wiretaps, including manuals and reports, protected by law enforcement privilege).

Finally, the defendants cannot show a compelling need that overcomes the public interest in non-disclosure. Even without questioning witnesses about the appearance of the Devices, the defense is free to cross-examine witnesses or to make arguments about the content of the recordings themselves, the audibility of the recordings, or similar issues that do not require any description of the appearance of the Devices or the manner in which they conceal recording equipment. Accordingly, the Court should prohibit disclosure of the sensitive features of the Devices.

37

**VII.   The Court Should Preclude the Defendants from Offering an Entrapment Defense**

In their pretrial motions, the defendants suggested that they were likely to pursue an entrapment defense at trial.[24]   The defendants have pointed to no evidence supporting such a defense, and they should be precluded from making the argument to the jury unless and until they do so.

**A.   Applicable Law**

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews* v. *United States*, 485 U.S. 58, 63 (1988).

"[A] defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence."  *United States* v. *Brand*, 467 F.3d 179, 190 (2d Cir. 2006).  "While stealth and strategy are necessary weapons in the arsenal of the police officer, and artifice and stratagem may be employed to catch those engaged in criminal enterprises, that the government employed either does not necessarily mean that it was the government that initiated the crime."  *Id.* (internal quotation marks omitted).  If a defendant establishes inducement, "[t]he burden then shifts to the government to show that the defendant was predisposed to commit the crime beyond a reasonable doubt."  *United States* v. *Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007).

---

[24] *See, e.g.*, Defendants Joint Motion for a Bill of Particulars at 2 ("[A] key issue at trial is likely to be whether the Government's confidential informants committed entrapment as to a critical element of the offense—specifically, by attempting to induce an agreement among the defendants to import drugs *into the United States* . . . ." (emphasis in original) (dkt. no. 44)).

"A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." *United States* v. *Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (internal quotation marks omitted).

> The government may show that a defendant was predisposed to commit the crime charged by demonstrating: "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement."

*Id.* (quoting *United States* v. *Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)).

### B.  Discussion

The defendants cannot establish an entrapment defense.  Communications obtained from their phones reflect contact with drug traffickers, and about drug-related activities, as early as April 2015.  By August 2015, the defendants were communicating with Pepero about sending a multi-ton load of cocaine from Venezuela to Mexican drug traffickers.  For example, on September 1, 2015, Campo wrote to Pepero:

> the truth is that because of you is that we are doing this because we've already done it a couple of times and the last time they failed us and we had to pay some money for the pork chops [*i.e.*, the cocaine] understand me

On October 3, 2015, the defendants traveled to San Pedro Sula to meet with CW-1 about another cocaine deal.  Government agents did not initiate those negotiations or the defendants' trip to Honduras, and the defendants did not suggest in their pretrial motions that there was any evidence to the contrary.  Thus, the defendants were not induced to engage in the charged drug-trafficking crime, and their actions demonstrate that they were both predisposed to do so.

39

The defendants' interactions with the confidential sources further demonstrate the absence of inducement by the Government.  A promise of monetary compensation for participation in a drug deal—"the typical benefit of participating in this type of criminal enterprise"—is "a form of reward that is not sufficient, by itself, to establish inducement."  *United States* v. *McKinley*, 70 F.3d 1307, 1312 (D.C. Cir. 1995) (citing *United States* v. *Ellis*, 23 F.3d 1268, 1273 (7th Cir. 1994) ("'If the ordinary profits of crime as offered by the government agent are what induced the defendant to commit the crime, that defendant has not been entrapped.'")).[25]  On October 23, 2015, CS-1 informed the defendants in a recorded meeting that he was the "person who is responsible for taking everything to the United States."  CS-1 also indicated that "[t]he only way to do well with the Americans is time-wise . . . and you have to do well.  I arrive with the work [*i.e.*, cocaine] because the paper [*i.e.*, drug proceeds] is there . . . ."  Neither defendant bristled at the express indication that the cocaine at issue would be imported into this country.  Indeed, during the same recorded meeting, Campo explained:  "We're at war with the United States."  Under these circumstances, the fact that CS-1 explained to the defendants that the cocaine he worked with was destined for the United States alone is insufficient to establish inducement.

---

[25] *Accord United States* v. *Glover*, 153 F.3d 749, 755 (D.C. Cir. 1998) (holding minimal evidence of reluctance and no evidence of "'persuasive overtures' that go beyond those ordinarily present in a drug transaction" to be insufficient to merit an entrapment instruction); *United States* v. *Young*, 78 F.3d 758, 762 (1st Cir. 1996) (finding no inducement where there was no evidence of "coercion, intimidation or any promise of benefits other than the opportunity to commit the crime"); *United States* v. *Mendoza-Salgado*, 964 F.2d 993, 1004 (10th Cir. 1992) (finding no inducement where "the government informer did no more than advertise [an Agent's] interest in purchasing cocaine" and setting up the controlled buy).

The defendants' immediate acceptance of the confidential sources' October 23 proposal also demonstrates their predisposition.  *United States* v. *Cromitie*, 727 F.3d 194, 206 (2d Cir. 2013) ("[T]he Supreme Court has stated that if the defendant 'had promptly availed himself of the criminal opportunity' presented by government agents, 'it is unlikely that his entrapment defense would have warranted a jury instruction.'" (quoting *Jacobson* v. *United States*, 503 U.S. 550, 548 (1992))); *see also United States* v. *Yang Chia Tien*, 638 F. App'x 19 (2d Cir. 2015) (summary order) ("A defendant's ready response to a government agent's proposition may show the defendant's predisposition, even where the government agent, rather than the defendant, first broaches the subject of the illegal scheme.").  Following the October 23 meeting—during which CS-1 made clear his intentions to import some of the cocaine sent by the defendants into the United States—the defendants met with the confidential sources to further discuss the cocaine deal on October 26 and October 27.  They went so far as to bring a sample of cocaine to the October 27 meeting.  Following the meetings in Caracas, Campo stayed in close contact with CS-1 via BBM, and Flores traveled to Honduras to meet with CW-1 and others regarding the cocaine transaction on November 7.  On November 10, both defendants traveled to Haiti intending to pick up millions of United States dollars for use in furtherance of the deal.  Under these circumstances, an entrapment defense is unavailable to the defendants as a matter of law.

Without a factual basis from which to argue entrapment, any attempt by the defendants to assert this defense at trial (during opening statements or cross-examination) would confuse the jury and prejudice the Government—especially if no entrapment charge is ultimately provided by the Court.  Thus, the Court should preclude the defendants from relying on the defense unless and

41

until they proffer evidence supporting such an argument. *See United States* v. *Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995) ("If the government . . . presents uncontradicted proof of predisposition, the entrapment defense is precluded as a matter of law." (citing *United States* v. *Dunn*, 779 F.2d 157, 159 (2d Cir. 1985))); *United States* v. *Mayo*, 705 F.2d 62, 70 (2d Cir. 1983) ("[T]he entrapment defense will not go to the jury in the face of substantial evidence of propensity unless the defendant produces some evidence to contradict directly the prosecution's showing . . . . where the government has established a track record of criminal activity on the part of the accused that matches the conduct for which he is charged, he is not entitled to have the entrapment defense go to the jury upon the mere showing that he was initially reluctant to commit the crime.").  In the alternative, if the defense is permitted to make this argument but the evidence at trial is insufficient to support an entrapment charge, the Government respectfully requests that the Court instruct the jury that entrapment is not a defense in this case with the following curative instruction:

> There has been some mention in this trial about entrapment. Entrapment is a complicated legal doctrine, but it has nothing at all to do with this case. I am instructing you as a matter of law that entrapment is not a defense in this case and you are not permitted to consider it during your deliberations.

The proposed instruction is adapted from the charge given by the Court in *United States* v. *McDarrah*, No. 05 Cr. 1182 (PAC) (S.D.N.Y. Dec. 19, 2006).

## VIII.  The Government Will Elicit Testimony Regarding the Defendants' Confessions in Compliance with *Bruton* v. *United States*

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court ruled that the Sixth Amendment's Confrontation Clause precludes the admission of a non-testifying co-defendant's co-implicating confession.  However, subsequent case law has made clear that in a multi-defendant

42

case, where the Government seeks to offer a statement from a non-testifying defendant that specifically inculpates a co-defendant, the statements by the first defendant can be redacted in a way that eliminates the use of a co-defendant's name and, in conjunction with limiting instructions, alleviates concerns raised by *Bruton*. *See, e.g.*, *United States* v. *Jass*, 569 F.3d 47, 61 (2d Cir. 2009) (upholding district court's admission of a co-defendant's post-arrest confession where court instructed the jury not to use the confession in any way against the defendant, and the confession was redacted in a way that permitted the jury to follow the limiting jury instruction). This is true even when co-defendants' redacted statements interlock with each other and additional evidence to implicate one another. *United States* v. *Martinez-Montilla*, 135 F. Supp. 2d 422, 424 (S.D.N.Y. 2001) ("[The] *Bruton* rule is not violated even where the interlocking of the redacted statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the codefendant").

As the Court is aware, both defendants confessed while they were being transported from Haiti to this District. However, Campo did not refer explicitly to Flores during his confession. *See* Ex. E (DEA report regarding Campo's confession). Thus, the Government submits, testimony regarding Campo's confession raises no *Bruton* issue. During Flores' confession, he referred explicitly to Campo when describing his co-conspirators' interest in an 800-kilogram load of cocaine that they planned to dispatch from Venezuela. *See* Ex. F at 2 ¶ 4 (DEA report regarding Flores' confession). Flores stated, in substance, that he expected the deal to involve 800 kilograms of cocaine, that it would generate approximately $5 million, and that he expected to make approximately $560,000. With respect to the 800 kilograms, Flores explained that 100 kilograms

43

belonged to him, 100 kilograms belonged to Campo, 200 kilograms belonged to "El Gocho," and 400 kilograms belonged to "the Mexican" (*i.e.*, CS-1).  Flores explained further that the Mexican was to pay a price of $12,000 per kilogram of cocaine, and that an associate named "Pepero" introduced Flores to El Gocho in Venezuela after Flores told Pepero about a potential cocaine deal.

With respect to these statements by Flores, in an effort to address any potential *Bruton* issue, the Government seeks only to elicit from Agent Gonzalez that Flores admitted that:  (i) the initial transaction was to involve 800 kilograms of cocaine and to generate approximately $5 million; (ii) Flores expected to make approximately $560,000; (iii) "the Mexican"—whom Agent Gonzalez understood to be CS-1—was to pay a price of $12,000 per kilogram for the cocaine; and (iv) an associate named Pepero introduced Flores to El Gocho in Venezuela after Flores told Pepero about a potential cocaine deal.  The Government will not elicit testimony from Special Agent Gonzalez regarding Flores' statements about the shares of cocaine belonging to each participant in the deal (including Campo), or Flores' use of the term "they" during his confession to refer to himself and Campo.  *See United States* v. *Taylor*, 745 F.3d 15, 28-30 (2d Cir. 2014). The Government respectfully submits that this modification, combined with a limiting instruction that neither defendant's post-arrest statement can be used against the other defendant, adequately addresses any *Bruton* concern.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated:  New York, New York
        October 20, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:  _____
     Emil J. Bove III
     Brendan F. Quigley
     Assistant United States Attorneys

Cc:    Defense Counsel
       (Via Email)