UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>EFRAIN ANTONIO CAMPO FLORES and<br>FRANQUI FRANCISCO FLORES DE FREITAS,<br><br>Defendants. | S5 15 Cr. 765 (PAC) |

## THE GOVERNMENT'S OPPOSITION TO THE
## DEFENDANTS' POST-TRIAL MOTIONS

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States*
*of America*

Emil J. Bove III
Brendan F. Quigley
   Assistant United States Attorneys
      *Of Counsel*

# TABLE OF CONTENTS

TRIAL EVIDENCE ................................................................................................................. 3

  I. The Defendants' Drug-Trafficking Activities with Pepe and Mexican Drug Traffickers ...... 4

  II. The Defendants' Transition to Drug Trafficking with Daza and Sentado .......................... 10

  III. The Defendants' October 3, 2015 Meeting with Daza and Sentado in Honduras.............. 13

  IV. The Defendants' Initial Preparations for the First Cocaine Shipment to Honduras .......... 15

  V. The Defendants' October 2015 Meetings with CS-1 and CS-2 in Venezuela.................... 19

    A. The October 23, 2015 Meeting ................................................................................ 19

    B. The October 26, 2015 Meeting................................................................................. 22

    C. The October 27, 2015 Meeting................................................................................. 23

  VI. Gocho's Agreement to Provide the Defendants with 800 Kilograms of Cocaine.............. 24

  VII. The Defendants' Attempts to Send Drug Pilots to Honduras to Coordinate Logistics..... 25

  VIII. Flores's November 6, 2015 Meeting with Daza, Soto, and Sentado in Honduras .......... 29

  IX. The BLTS's November 10, 2015 Arrests of the Defendants in Haiti ............................... 32

  X. The Defendants' Confessions ......................................................................................... 35

LEGAL STANDARDS ......................................................................................................... 37

  I. Rule 29............................................................................................................................ 37

  II. Rule 33 .......................................................................................................................... 37

ARGUMENT ....................................................................................................................... 38

  I. CS-1's Testimony Did Not Result in Manifest Injustice to the Defendants ....................... 38

    A. Relevant Facts ........................................................................................................ 38

      1. Pretrial Proceedings ............................................................................................ 38

      2. The Government's Opening Statement .................................................................. 40

      3. The Direct Examination of CS-1 ........................................................................... 40

      4. The Cross-Examination of CS-1 ........................................................................... 42

      5. The Redirect Examination of CS-1 and Subsequent Litigation.................................. 44

      6. Summations......................................................................................................... 44

    B. Applicable Law ....................................................................................................... 46

C. Discussion ............................................................................................................ 47

    1. *Cromitie* Demonstrates that the Defendants' Claims Are Meritless............................ 47

    2. CS-1's Lay Opinion Regarding the Defendants' Cocaine
    Was Not False or Perjurious ...................................................................................... 49

    3. The Government Was Not Aware of the Allegedly Perjured Testimony
    Prior to CS-1's Cross-Examination ........................................................................... 53

    4. The Defendants Used the Prison Calls Strategically and
    Sufficient Corrective Measures Were Employed .......................................................... 58

    5. Any Perjury Was Immaterial in Light of the
    Independent Evidence of the Defendants' Guilt ............................................................ 63

II. The Evidence Overwhelmingly Established the Defendants' Guilt ..................................... 65

  A. Applicable Law ...................................................................................................... 66

  B. Discussion ............................................................................................................ 66

    1. The Defendants Joined the Conspiracy to Import Cocaine into the United States ....... 66

    2. The Government Established the Defendants' Specific Intent .................................... 69

    3. The "Unproved-Element Theory" Is Inapposite ..................................................... 72

    4. The Court Should Not Usurp the Jury's Function .................................................... 75

III. The Defendants Were Not Entrapped ......................................................................... 78

  A. Applicable Law ...................................................................................................... 79

  B. Discussion ............................................................................................................ 80

    1. The Defendants Were Not Induced to Commit a Drug-Trafficking Crime ................. 80

    2. There Was Extensive Evidence of the Defendants' Predisposition............................. 84

    3. The Interests of Justice Weigh in Favor of Respecting the Jury's Conclusions ........... 91

IV. There Was a Sound Basis for a Conscious Avoidance Instruction ................................... 95

  A. Relevant Facts ....................................................................................................... 95

    1. Opening Statements ............................................................................................ 95

    2. The Cross-Examination of Special Agent Mahoney ................................................ 97

    3. Summations ....................................................................................................... 97

  B. Applicable Law ...................................................................................................... 98

  C. Discussion ............................................................................................................ 98

CONCLUSION............................................................................................................. 105

## TABLE OF AUTHORITIES

### Cases

*Conteh* v. *United States*, 226 F. Supp. 2d 514 (S.D.N.Y. 2002)....................................................... 59

*Drake* v. *Portuondo*, 553 F.3d 230 (2d Cir. 2009) ........................................................................ 53

*Harris* v. *United States*, 9 F. Supp. 2d 246 (S.D.N.Y. 1998) ................................................. 51, 52

*Herrera* v. *Collins*, 506 U.S. 390 (1993) ...................................................................................... 51

*Jacobson* v. *United States*, 503 U.S. 540 (1992) ...................................................................... 79, 90

*Jeffreys* v. *City of New York*, 426 F.3d 549 (2d Cir. 2005)............................................................ 76

*M. Kraus & Bros.* v. *United States*, 327 U.S. 614 (1946)............................................................... 92

*Mathews* v. *United States*, 485 U.S. 58 (1988)............................................................................... 79

*Mesarosh* v. *United States*, 352 U.S. 1 (1956)............................................................................... 76

*Tankleff* v. *Senkowski*, 135 F.3d 235 (2d Cir. 1998)...................................................................... 57

*Turner* v. *Schriver*, 327 F. Supp. 2d 174 (E.D.N.Y. 2004)...................................................... 56, 57

*United States* v. *Addario*, --- F. App'x ----, 2016 WL 6106896 (2d Cir. Oct. 18, 2016) .......... 101

*United States* v. *Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ................................................. 73, 91, 93

*United States* v. *Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ............................................. 83, 84, 86

*United States* v. *Arbane*, 446 F.3d 1223 (11th Cir. 2006) ........................................................... 72

*United States* v. *Archer*, 486 F.2d 670 (2d Cir. 1973)................................................................... 73

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)........................................................... 76, 77

*United States* v. *Autuori*, No. 96 Cr. 161, 1998 WL 774232
   (D. Conn. Aug. 28, 1998) ..................................................................................................... 76, 77

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998)................................................................. 55

*United States* v. *Baldeo*, No. 13 Cr. 125 (PAC), 2014 WL 6807833
  (S.D.N.Y. Dec. 3, 2014)..................................................................................... 37, 38

*United States* v. *Barcelo*, No. 13 Cr. 38, 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014)............. 55

*United States* v. *Birbal*, 113 F.3d 342 (2d Cir. 1997)..................................................... 83

*United States* v. *Blair*, 958 F.2d 26 (2d Cir. 1992)...................................................... 59, 63

*United States* v. *Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ........................................ 90

*United States* v. *Bonventre*, No. 10 Cr. 228, 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ........ 58

*United States* v. *Brand*, 467 F.3d 179 (2d Cir. 2006) .................................................. 90

*United States* v. *Brown*, 937 F.2d 32 (2d Cir. 1991) .................................................. 68

*United States* v. *Cherico*, No. 08 Cr. 786, 2012 WL 1755749
  (S.D.N.Y. May 16, 2012)...................................................................................... 76

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2012). ....................................... 80, 81

*United States* v. *Cromitie*, 727 F.3d 194 (2d Cir. 2013)........................................ passim

*United States* v. *Cruz*, 363 F.3d 187 (2d Cir. 2004) .................................................. 37

*United States* v. *Cuti*, 720 F.3d 453 (2d Cir. 2013) ................................................. 102

*United States* v. *Damblu*, 134 F.3d 490 (2d Cir. 1998) ............................................ 54

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001)................................. 37, 46, 75

*United States* v. *Ferrarini*, 29 F.3d 145 (2d Cir. 2000)............................................ 98

*United States* v. *Galestro*, No. 06 Cr. 285, 2008 WL 2783360
  (E.D.N.Y. July 15, 2008)...................................................................................... 55

*United States* v. *Gambino*, 59 F.3d 353 (2d Cir. 1995) ............................................ 37

*United States* v. *Ghailani*, 733 F.3d 29 (2d Cir. 2013)............................................ 100

*United States* v. *Gore*, 154 F.3d 34 (2d Cir. 1998)................................................... 69

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) ......................................... 37

*United States* v. *Harvey*, 991 F.2d 981 (2d Cir.1993) ................................................. 90

*United States* v. *Hassan*, 578 F.3d 108 (2d Cir. 2008) ................................................. 72

*United States* v. *Henareh*, 563 F. App'x 808 (2d Cir. 2014) ...................................... 102

*United States* v. *Jackson*, 345 F.3d 59 (2d Cir. 2003) ...................................... 79, 80, 86

*United States* v. *Josephberg*, 562 F.3d 478 (2d Cir. 2009) ......................................... 59

*United States* v. *Kaplan*, 490 F.3d 110 (2d Cir. 2007) ............................................... 50

*United States* v. *Karlov*, No. 09 Cr. 515, 2012 WL 3297728 (S.D.N.Y. Aug. 6, 2012) .............. 49

*United States* v. *Kopstein*, 759 F.3d 168 (2d Cir. 2014) ............................................. 79

*United States* v. *Kozeny*, 667 F.3d 122 (2d Cir. 2011) ............................................. 100

*United States* v. *Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................ 98, 99

*United States* v. *Levy*, No. 11 Cr. 62 (PAC), 2013 WL 3832718
    (S.D.N.Y. July 15, 2013) ....................................................................... 66

*United States* v. *McCourty*, 562 F.3d 458 (2d Cir. 2009) ............................................ 37

*United States* v. *McIntosh*, No. 11 Cr. 500, 2014 WL 199515
    (S.D.N.Y. Jan. 17, 2014) ....................................................................... 77

*United States* v. *Merlino*, 349 F.3d 144 (3d Cir. 2003) ............................................. 55

*United States* v. *Mora*, 152 F.3d 921, 1998 WL 398802 (2d Cir. 1998) ............................... 59

*United States* v. *Olazabal*, 610 F. App'x 34 (2d Cir. 2015) ........................................ 75

*United States* v. *Podolsky*, 798 F.2d 177 (7th Cir. 1986) .......................................... 73

*United States* v. *Rajaratnam*, No. 09 Cr. 1184, 2010 WL 1691745
    (S.D.N.Y. Apr. 27, 2010) ....................................................................... 57

*United States* v. *Razzoli*, No. 12 Cr. 550, 2012 WL 12881963
    (S.D.N.Y. Nov. 8, 2012) ........................................................................ 59

*United States* v. *Rivera Pedin*, 861 F.2d 1522 (11th Cir. 1988) .................................... 60

*United States* v. *Rivera*, No. 13 Cr. 149, 2015 WL 1540517
(E.D.N.Y. Apr. 7, 2015)................................................................................ 54

*United States* v. *Robinson*, 430 F.3d 537 (2d Cir. 2005) ............................. 75

*United States* v. *Rodriguez*, 983 F.2d 455 (2d Cir. 1993)......................... 103

*United States* v. *Rosario*, No. 11 Cr. 91,
2013 WL 4078354 (S.D.N.Y. Aug. 5, 2013)............................................ 47, 63

*United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) .................................. 81

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ........................ 46, 78

*United States* v. *Santillan*, No. 13 Cr. 138, 2015 WL 6444628
(S.D.N.Y. Oct. 23, 2015) ............................................................................ 67

*United States* v. *Spivack*, 376 F. App'x 144 (2d Cir. 2010) ...................... 55

*United States* v. *Stein*, 428 F. Supp. 2d 138 (S.D.N.Y. 2006) ................... 92

*United States* v. *Stewart*, 433 F.3d 273 (2d Cir. 2006).............................. 46

*United States* v. *Svoboda*, 347 F.3d 471 (2d Cir. 2003) ............... 98, 99, 101

*United States* v. *Truman*, 688 F.3d 129 (2d Cir. 2012) ................... 63, 65, 75

*United States* v. *Valenzuela*, No. 07 Cr. 011,
2009 WL 2095995 (C.D. Cal. 2009)........................................................... 55

*United States* v. *Valle*, 301 F.R.D. 53 (S.D.N.Y. 2014) ........................... 61

*United States* v. *Wallace*, 85 F.3d 1063 (2d Cir. 1996).......................... 73, 74

*United States* v. *Wallach*, 935 F.2d 445 (2d Cir. 1991).............................. 63

*United States* v. *White*, 972 F.2d 16 (2d Cir. 1992)................................... 60

*United States* v. *Whitehead*, 165 F. Supp. 3d 281 (E.D. Pa. 2016)............. 55

*United States* v. *Williams*, 23 F.3d 629 (2d Cir. 1994).............................. 79

*United States* v. *Wong*, 78 F.3d 73 (2d Cir. 1996)..................................... 64

*United States* v. *Yang Chia Tien*, 638 F. App'x 19 (2d Cir. 2015).................................................. 90

*United States* v. *Zeneski*, 125 F.3d 845, 1997 WL 626380 (2d Cir. 1997)................................... 59

*United States* v. *Zichettello*, 208 F.3d 72 (2d Cir. 2000) ............................................................ 59

## Other Authorities

A. Smith, M. V. Wilson, M. Trauernicht, A. E. Holmes, Abby Jackson, *Improved
    Image Analysis of DETECHIP Allows for Increased Specificity in Drug Discrimination*,
    J. OF FORENSIC RES. (2012)..................................................................................................... 52

Joint App'x, *United States* v. *Cromitie*, 11-2763-cr
    (2d Cir. Feb. 1, 2012) (Dkt. No. 70-1) ....................................................................................... 65

Order, *United States* v. *Lorenzana-Cordon*, No. 03 Cr. 331-13-14
    (D.D.C. Mar. 8, 2016) (Dkt. No. 747) ....................................................................................... 64

U.S. Dep't of State, *Narcotics Rewards Program: Hermagoras Gonzalez Polanco*,
    http://www.state.gov/j/inl/narc/rewards/115395.htm .................................................................. 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

Defendants.

S5 15 Cr. 765 (PAC)

The Government respectfully submits this memorandum of law in opposition to the defendants' Joint Post-Trial Rule 29(c) Motion for Judgment of Acquittal and Rule 33 Motion for a New Trial ("Def. Mem." (Dkt. No. 158)).[1]

The Government established at trial that the defendants worked together and with others to dispatch hundreds of kilograms of cocaine from Venezuela so that the drugs could be imported into the United States. The evidence showed that the defendants committed this crime in an effort to enrich themselves and to help fund the December 2015 campaign of their aunt, Venezuelan First Lady Cilia Flores, for a seat in the National Assembly of Venezuela.

The defendants' words and actions reflected their firmly held belief that, by virtue of their political connections and power, they could act with impunity. But the rule of law does apply to these two men, and they were lawfully convicted by a jury. The Government did not rely on one "star" witness; there were several. The lack of seized narcotics evidence is neither "rare"

---

[1] In light of the need to describe and discuss the trial evidence in response to the defendants' sufficiency arguments, as well as other parts of the record in light of the defendants' Rule 33 claims, the Government respectfully requests permission to file this brief in excess of the page limitations set forth in the Court's Individual Practices.

nor relevant in an international-narcotics conspiracy case where the defendants were found guilty at trial. Try as they might to impugn the Government's investigation, the efforts of the Drug Enforcement Administration ("DEA") generated a surfeit of highly incriminating evidence that persuaded the jury of the defendants' guilt. The defendants were caught red-handed, on tape, committing this crime. They confessed. And their phones were littered with additional evidence of their guilt.

The defendants' motions focus understandably on Jose Santos-Pena ("CS-1"). There is no dispute that the defendants' cross-examination of CS-1 revealed issues with his credibility, but that is also one of the reasons that the defendants' post-trial perjury claims lack merit: the finders of fact were made aware of the issues before they rendered their decision. Specifically, the defendants possessed the prison calls that served as the foundation for their attack on CS-1 weeks before trial, they made the strategic decision not to disclose the calls to the Government until after they commenced cross-examination of CS-1, the calls were received in evidence without objection so that the jury could consider them as it evaluated CS-1's credibility, and the Court later called the jurors' attention to the Government's determination, revealed earlier in their presence, that CS-1 had "lied."

Witness credibility is an issue for the jury, and the jurors in this case agreed with the Government's arguments about the strength of the overall proof. Because that is inescapably true at this juncture, the defendants now ask the Court to usurp the jury's function based on their belief that a "lay jury" could not appreciate the subtlety and merit of their arguments. (*See* Def. Mem. at 13 n.3, 43). But the defense theories were not beyond the ken of the jury pool in this District, and the defendants' post-trial motions run headlong into bedrock principles establishing the institutional role of jurors. Put simply, the evidence at trial was sufficient and there was no

manifest injustice during these proceedings.  Accordingly, the defendants' post-trial motions should be denied.

## **TRIAL EVIDENCE**

Defendants Efrain Antonio Campo Flores ("Campo") and Franqui Francisco Flores de Freitas ("Flores") were convicted at trial of participating in a conspiracy to import more than five kilograms of cocaine into the United States, in violation of Title 21, United States Code, Section 963.  The Government established that the charged conspiracy involved a core group of co-conspirators—including Campo, Flores, and a man referred to at various times as "Pepero," "Ppr," and "Pepe" ("Pepe")—with others joining the agreement as the defendants progressed with their efforts to capitalize on their political power in Venezuela by sending large loads of cocaine from Simón Bolívar International Airport in Maiquetía (the "Maiquetía Airport").

Beginning in at least August 2015, the defendants and Pepe worked with individuals known as "Mayweather Jr.," "Elio," and "El Samurai" to free an incarcerated drug trafficker named Hermagoras Gonzalez Polanco ("Polanco"),[2] in exchange for a payment to the defendants of approximately $1 or $2 million, and to send cocaine-laden aircraft from Venezuela to Mexican drug traffickers referred to as the "taco people" based in "*el sombrero*" (the "Sombrero Organization").  Continuing until at least October 2015, the defendants, Pepe, and members of the

---

[2] (*See, e.g.*, GX 408-T at 4, 24-25 ("Mayweather Jr.."); *id.* at 12-13, 27 ("Elio," a/k/a "Elias Tarrat"); *id.* at 15 ("hermagoras Gonzales"); GX 515-T at 15 ("El Samurai")).  The jury could infer from the defendants' communications with Pepe, and the fact that associates of the Sombrero Organization were trying to secure Polanco's release, that Polanco was incarcerated based on drug-trafficking activities.  (*E.g.*, GX 408-T at 8).  In fact, Polanco is charged in the United States with money-laundering and drug-trafficking offenses, and he was arrested by Venezuelan authorities in approximately 2008.  *See* U.S. Dep't of State, *Narcotics Rewards Program: Polanco Gonzalez Polanco*, http://www.state.gov/j/inl/narc/rewards/115395.htm.

Sombrero Organization attempted, but apparently failed, to use Cessna propeller-based aircraft and later a Gulfstream jet to dispatch up to three tons of cocaine from the Maiquetía Airport. This was not a sting, and CS-1 played no role in these activities.

By approximately late September 2015, a Venezuelan known as "Hamudi" had connected the defendants with a Honduras-based drug trafficker named Cesar Orlando Daza Cardona, a/k/a "Flaco," a/k/a "Negrito," a/k/a "Negrito Nico" ("Daza"). Daza, who was not acting at the direction of the DEA, introduced the defendants to Carlos Amilcar Leva Cabrera, a/k/a "Sentado" ("Sentado"), who was attempting to cooperate with the Government at the time. Daza and Sentado met with the defendants in Honduras on October 3, 2015, and they discussed sending hundreds of kilograms of cocaine from the Maiquetía Airport to Juan Manuel Gálvez International Airport in Roatán, Honduras (the "Roatán Airport"). Following the meeting, the defendants and Pepe shifted the focus of their drug-trafficking conspiracy to sending huge amounts of cocaine to the Roatán Airport—which was controlled by, among others, co-defendants Roberto de Jesus Soto Garcia ("Soto") and Carlos Gonzalez, who later became a cooperating witness—so that CS-1 and his son ("CS-2") could import the drugs into the United States.

## I.  The Defendants' Drug-Trafficking Activities with Pepe and Mexican Drug Traffickers

On August 7, 2015, Flores wrote to Campo that he "ran into" Pepe, and that Pepe was "[l]ooking for work." (GX 405-T at 5).[3]  Campo responded that he had previously broken off contact with Pepe "because of that mexican snitch and his friend, el pollo." (*Id.*).  An associate sent Pepe's phone number to Flores on August 18, and Campo contacted Pepe at a WhatsApp

_____

[3] "GX" refers to Government Exhibits received in evidence at trial; "DX" refers to defense exhibits received in evidence at trial; and "Tr." refers to the trial transcript, except where preceded by a date, in which case the date indicates the day on which the proceeding in question took place.

Messenger account associated with that number on the same day.  (GX 512-T at 2; GX 408-T at 2).

On August 25, 2015, Pepe sent Campo an exchange of messages with Mayweather. (GX 408-T at 4).  Pepe wrote to Campo that "he has two with a pilot and co-pilot," and Campo responded "this is going to work out for us."  (GX 408-T at 4-5).  On August 27, Pepe informed Campo that he had communicated with potential drug-trafficking partners and directed them to "hand over a mil and then we can talk."  (GX 408-T at 6).  Pepe also indicated that he had relayed the same information to Flores, and that he was going "on a trip" to meet with associates of the Sombrero Organization.  (GX 408-T at 6).  Campo responded that the payment was necessary because "we have to send a big gift to the big guys so to open the door because last time I was made [to] look bad."  (GX 408-T at 6).  Approximately one hour later, Campo wrote to Flores about a meeting with Pepe ("pp"), and indicated that he and Pepe had already discussed the "friend" who Pepe "wanted to get out of prison," *i.e.*, Polanco.  (GX 405-T at 6; *see also* GX 408-T at 15).[4]  Flores subsequently responded, "we'll talk once he has the money in his hand," and Campo indicated that he already told Pepe "they would have to send a million to be able to reinitiate that."  (GX 405-T at 6).

On August 31, 2015, Pepe communicated with both Campo and Flores, who were together at the time, while Pepe was returning from his meeting with associates of the Sombrero Organization.  (GX 408-T at 8; GX 515-T at 2-6).  The exchange began with Flores at approximately 7:34 p.m. Venezuela time.  (GX 515-T at 2).  Flores asked Pepe to "[t]ry to set up

---

[4] On September 1, 2015, Pepe confirmed to Campo that "hermagoras Gonzales" was "the dude that is locked up."  (GX 408-T at 15).

the thing with our buddy in jail"— Polanco—so "we can use that coin for work." (GX 515-T at 2). Pepe told Flores that "[t]he one putting the money" in an effort to secure Polanco's release wanted to dispatch 3,000 kilograms of cocaine from Venezuela and was willing to further compensate the defendants by offering them a stake in the load "on credit." (GX 515-T at 2 ("take one out with 3000 too"); *see also id.* at 3 ("Buddy with the 3000 they'll give us credit")). Flores asked where the Gulfstream jet ("g5") with the cocaine needed to be sent, and Pepe responded that it was "going for *el sombrero*," *i.e.*, Mexico. (GX 515-T at 3). Flores then indicated that he and Campo had a meeting with "a magistrate" to discuss Polanco's "case," and asked Pepe whether they could offer the magistrate a "million that they have in hand right away in order to start the negotiation." (GX 515-T at 3-4). Pepe responded that he would ask Elio, an associate of the Sombrero Organization, and replied about 15 minutes later that "[t]hey already have the mil." (GX 515-T at 4-5; *see also id.* at 28 (Pepe indicating that he "talked to Elias" and sending a screenshot reflecting a call to "Elias Tarrat")). Around the time of this exchange, Campo took control of Flores's phone. (GX 515-T at 5 ("It's *efrain* buddy")). Campo proposed that they tell the magistrate they were prepared to pay the $1 million that they had "in hand," "plus one more" if Polanco was released. (GX 515-T at 5). Pepe asked if he should tell Elio "two mil" and continued:

| Pepe | If it is more they will get it out |
| Pepe | They have a g5 with 3000 to take it out whenever we tell them to |
| Pepe | And they are giving us credit without putting anything down |

(GX 515-T at 5). At approximately 8:40 p.m., Campo—still using Flores's phone—responded with concern about the level of detail in Pepe's communications: "Fucker this is frank's private number." (GX 515-T at 6).

6

Approximately one minute later, Pepe sent a message to Campo's phone apologizing: "Since we were talking so much I let myself go." (GX 408-T at 8). Campo directed Pepe to tell Polanco's associates that it would cost at least $2 million to secure his release ("Tell them two mil"), and asked Pepe if "[t]hey are the same ones for the job" involving the 3,000 kilograms of cocaine. (GX 408-T at 8). Pepe responded in the affirmative: "[H]e told me that they had that in hand and that if we could take it out for him," *i.e.*, Polanco. (GX 408-T at 8). Campo asked how many of the 3,000 kilograms the defendants would be provided on "credit," and Pepe responded that he would "ask them for 500." (GX 408-T at 9). Campo replied that he "like[d] that number 500." (GX 408-T at 9). He also insisted that "something has to be paid in advance"— specifically, "a million of security" relating to their efforts to secure Polanco's release—and expressed concern that they would be paid only for the costs associated with transporting the drugs out of Venezuela rather than being given an equity stake in the load. (GX 408-T at 9-10). Campo also asked Pepe if he knew "how to locate them" in case they "tried to play smart," and Pepe responded, "yes of course it is the convict's people," referring to associates of Polanco and the Sombrero Organization. (GX 408-T at 10).

Later in the evening of August 31, 2015, Pepe sent Campo an exchange of messages with Elio, in which Pepe indicated that their plan to use a Gulfstream jet ("the G") to dispatch 3,000 kilograms of cocaine was a "done deal," and Elio agreed "to see if they have the whole million ready." (GX 408-T at 12-13). Campo responded:

| Campo | . . . the truth is because of you is that we are doing this because *we've done this a couple times already and the last time they left us hanging* and we had to pay some money for the pork chops understand me[?] This was your friend juan carlos |
| Campo | So it pisses me off to work to have fucking problems do you understand me[?] |
| Campo | That is why I prefer you to come back here [to Venezuela] |

| Pepe | With the portuguese guy |
|------|-------------------------|
| Campo | The one that is locked [*i.e.*, Polanco] cut up some people there for us and at the end it just was all baloney |

(GX 408-T at 14 (emphasis added)).

On September 7, 2015, Pepe wrote to Campo that the associates of Polanco wanted to dispatch three tons of cocaine, with an initial load involving one ton, and asked Campo if they could charge $200 per kilogram for a total of $200,000 in proceeds on the first load.  (GX 408-T at 16 ("how much should I tell them for doing the first one thousand they wanted 3" // "we can charge them 200 per unit if it's 1000 we will be left with 200 thousand")).  Campo responded that he wanted a financial stake in the cocaine shipment, not just reimbursement for transport costs, because "we are businessmen" rather than "messengers." (GX 408-T at 16).  Later on September 7, Campo wrote to Flores that he "gave a fucking earful" to Pepe and threatened to work with other drug traffickers if Pepe could not facilitate drug-trafficking activities with the Sombrero Organization.  (GX 405-T at 8 ("do it through another channel")).  Campo indicated that he told Pepe:  "I am fucking broke because of you because from the moment I had that arranged I would have made some gains." (GX 405-T at 8).

On September 16, 2015, Pepe sent Flores an exchange of messages in which Mayweather had asked Pepe if they could use either a Cessna 402 or a Cessna 404 for the drug loads because "[t]hose are the ones which are available."  (GX 515-T at 7; *see also* Tr. 205; GX 71; GX 72).  Pepe wrote to Flores that "they have those two lifts" and asked if "that model can make it to [the] ramp" at the airport.  (GX 515-T at 7).  Flores initially responded that "[b]oth of them would work," but he told Pepe on the following day that the Cessnas were not acceptable because they needed to use a jet.  (GX 515-T at 8-9 ("No pistons it has to be turbine" // "No PROPELLER")).  Pepe relayed the message to Mayweather, indicating that it would "look weird

getting permits for one of those so frequently," and Mayweather responded that he was "on the move already" looking for a jet, a "big one . . . [w]ith turbines." (GX 515-T at 10). Pepe sent the exchange to Flores and added, "better that way we can fit more" drugs. (GX 515-T at 10).

On September 20, 2015, Pepe informed Flores that Mayweather had secured a jet. (GX 515-T at 11 ("The other big lift is ready")). Flores responded, "[a]wesome" and told Pepe that he and Campo were "waiting to purchase one as soon as we are able to." (GX 515-T at 11). Within seconds, Flores then sent Pepe a photograph of a U.S.-registered Learjet. (GX 515-T at 11).

On September 25, 2015, Pepe sent Flores a series of exchanges with Mayweather in which Mayweather indicated that his "captain" had been unable to obtain the necessary permit for the anticipated drug flight from "inac."[5] (GX 515-T at 16-17). Less than 45 minutes later, Campo wrote to Pepe that he learned from Flores that their planned drug shipment was not going to happen "tomorrow," and that the shipment had been "postponed twice already." (GX 408-T at 18). Referring to Daza, Campo told Pepe that he had "someone else to do it with and you are still coming with me." (GX 408-T at 18). Pepe urged Campo to meet with his associate from the Sombrero Organization to inspect his plane ("see the bird"), and he indicated that the associate "has 800" kilograms of cocaine from which Campo would "get 100 or more on credit" because "of that mishap" involving the lack of a flight permit. (GX 408-T at 21-22; *see also id.* at 21 ("[H]e told me that 450 chairs arrived and 400 more will be arriving this week . . . .")). Later that

---

[5] The use of the term "inac" appears to have been a reference to the Venezuelan *Instituto Nacional de Aeronáutica Civil* ("*INAC*"). (*See* GX 407-T at 16 (Gilson Barroeta Flores telling Campo that he "nee[ed] to call the president of the inac so they can let that [Dassault] [F]alcon fly tomorrow from" Barquisimeto to Maiquetía in Venezuela, and referring to *INAC* President Jorge Luis Montenegro)).

night, Campo asked Pepe for the "plane's registration number," which Pepe obtained from Mayweather and relayed to Campo:  YV-2708, a Venezuela-registered aircraft as indicated by the "YV" prefix.  (GX 408-T at 23-24; Tr. 113).

On September 28, 2015, an individual using a BlackBerry Messenger ("BBM") account with screen name "A.m" asked Campo for the "transport's model," referring to a plane. (GX 403-T at 4).  On September 29, Campo indicated that the defendants did not have a plane, but wanted to use their access at the airport—which Campo referred to as a "homerun"—to facilitate the dispatch of drug-laden aircraft:

| Campo | Listen we don't have the bird |
|-------|-------------------------------|
| Campo | We only got the tickets you understand me |
| Campo | This is a homerun for us no one can get tickets right now to travel and we have the connections ready we're doing good |
| Campo | Let's do it |
| A.m | Let's meet up tomorrow, can you? |
| Campo | On the other hand it's all bs and shit I'm already fucking tired of this so because this sucks |

(GX 403-T at 4).  Campo described his connections at the airport as akin to having "gold in our hands" because "nobody has it what we have," and expressed frustration that "we're throwing it away."  (GX 403-T at 5).  Referring to the October 3 trip to Honduras, Campo indicated that he planned on "traveling by myself to take care of everything on my own."  (GX 403-T at 4).

## II.  The Defendants' Transition to Drug Trafficking with Daza and Sentado

On September 28, 2015, Pepe wrote to Flores that Mexicans aligned with the Sombrero Organization ("the taco people") were "arriving today."  (GX 515-T at 19).  Flores asked about potentially scheduling a meeting, but also warned, "[i]f we don't have anything by tomorrow [Campo] is already looking to figure something out elsewhere . . . . [b]ecause we are looking very bad in front of people who really want to work."  (GX 515-T at 19-20).  Flores nevertheless assured

Pepe that "[a]nyway you are with us don't worry about that." (GX 515-T at 20). Pepe indicated that if they had been able to use the Cessnas ("one with pistons"), they would have "done two" drug shipments "already." (*Id.*). Flores later sent Campo part of his exchange with Pepe. (GX 405-T at 10).

On September 29, 2015, Pepe tried to identify the defendants' new drug-trafficking partnership, asking Flores, "who is offering you guys the other arrival[?]" (GX 515-T at 22). Flores did not answer the question, and Pepe suggested that the Sombrero Organization would continue to try to make arrangements for a cocaine shipment from Venezuela. (GX 515-T at 22). The next day, Pepe indicated that he was "waiting for *el gocho* to meet" and would "call [Flores] when I am with him." (GX 515-T at 23).

On October 1, 2015, each of defendants reiterated to Pepe that they had initiated drug-trafficking negotiations with "other people," referring to Daza and Sentado. For example, Campo wrote to Pepe:

| Campo | We'll talk when I get there since you had not written to me anymore and I asked you when we could meet and we agreed that you were going to let me know and since you did not say anything I thought that it wasn't on anymore and *right now I am on a trip making arrangements with other people like I told you before you're in right next to me* |
|-------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Campo | But I was fucking tired of waiting my brother |
| Campo | Let me get there and I will let you know |

(GX 408-T at 26 (emphasis added)). Flores also told Pepe that the defendants were "going out on a trip." (GX 515-T at 24). Pepe responded that the Sombrero Organization—including "the man we need to get us through" and "[t]he one who needed the permit" from *INAC*—was "ready." (GX 515-T at 24). Pepe indicated that they were prepared to pay the $2 million ("take out the two") that had been discussed previously, and then dispatch the cocaine load to Mexico ("the following

week *el sombrero*").  (GX 515-T at 24).  Flores responded that they could "get together" when the defendants returned from Honduras "on sunday," October 4.  (GX 515-T at 24).

Underscoring the fact that Campo was referring to Daza and Sentado in Honduras when he mentioned "other people" to Pepe, Campo and an associate named Gilson Barroeta Flores ("Barroeta") exchanged messages about flying to San Pedro Sula on October 1, 2015.  (GX 407-T at 19-22).  Barroeta, who had sought to assist the defendants in obtaining weapons during the summer of 2015, helped them make travel plans for the October 3, 2015 meeting.  (GX 407-T at 3-15 (weapons-related communications); *id.* at 19-22 (travel and aircraft-related communications)).  Campo sent Flores some of the information provided by Barroeta, including that it would cost approximately $20,000 to travel on a private jet.  (GX 405-T at 15).  Flores expressed concern about the cost, but Campo insisted that it was important to travel that way and asked Flores to send him "copies of the guys' passports" so that they would not "have to wait there in Maiquetía" at the airport.  (GX 405-T at 14-15).  Campo later expressed frustration to Flores that Sentado viewed him as a "middle man," as opposed to being in charge, of their operations in Venezuela.  (GX 510-T at 11; *see also* GX 201-T at 33:39 (Campo telling CS-1 "there are no middlemen here")).

On October 2, 2015, Campo exchanged messages with Daza about the trip to San Pedro Sula, and made plans for Daza to pick up Campo and Flores when they arrived.  (GX 409-T at 2).[6]  Referring to Sentado as Daza's "dad" and "father," Campo also asked Daza to see if Sentado would schedule more time for the meeting so that they would have "at least one more

---

[6] The photograph of the October 3, 2015 meeting shows Daza wearing the outfit—"dark khaki shirt and white pants"—that he described to Campo on the day before the trip.  (Tr. 180, 1231; *see also* GX 110; GX 409-T at 3).

hour . . . to relax and sit down to talk about everything so we may be clear on everything." (GX 409-T at 3).

### III.  The Defendants' October 3, 2015 Meeting with Daza and Sentado in Honduras

In early October 2015, as the defendants planned to travel to San Pedro Sula, Sentado reported to Special Agent Gonzalez for the first time about a potential meeting involving as-of-yet unidentified Venezuelans. (Tr. 167-68, 172-73). Sentado contacted Special Agent Gonzalez on October 3 about his anticipated meeting with the defendants. (Tr. 173).

On the morning of October 3, 2015, Flores exchanged text messages about the defendants' anticipated departure to San Pedro Sula with a contact saved in his phone as "Rondon Casa Militar" ("Rondon"). (GX 518-T). Flores sent Rondon the registration number of their plane ("yV570t") and asked to meet at "the health inspection area at the international airport," *i.e.*, the Maiquetía Airport. (GX 518-T at 2). Rondon responded, "I'm already here where is the car[?]" (GX 518-T at 2). The defendants entered Honduras, at San Pedro Sula, at approximately 1:30 p.m. local time. (GX 104 at 7; GX 105 at 7). About an hour later, Campo notified Daza that he and Flores were at the airport. (GX 409-T at 6).[7]

Special Agent Gonzalez instructed Sentado to record the meeting, but Sentado did not do so. (*See* Tr. 173). However, Sentado later provided a photograph of the meeting that depicted the defendants, Daza, and Sentado, among others. (Tr. 179-80; GX 110). The defendants also described their meeting with Sentado in detail to CS-1 and CS-2 in Caracas. The defendants

[7] The time between the defendants' arrival in Honduras and Campo's initial contact with Daza appears to have resulted, at least in part, from the fact that the defendants did not have vaccinations for yellow fever. (GX 208-T at 35:5-9). Campo also told CS-1 that there was a miscommunication with Daza ("my guy") about their planned meeting point in Honduras. (GX 208-T at 29:24-31:29).

indicated that they traveled to San Pedro Sula on October 3 in their own names ("very white"), and were concerned about the level of violence in Honduras.  (GX 208-T at 29:2-20).  Both defendants expressed displeasure that they were required to wait for Sentado until approximately 6:00 p.m., apparently because Sentado was "watching a soccer match."  (GX 208-T at 35:9-36:17). Despite their frustration, the defendants told CS-1 that Sentado "welcomed us very nicely" and was "straight with us" once the meeting started.  (GX 208-T at 36:17).  Campo also explained that "his people" in Honduras—principally, Daza—had vouched for Sentado by stating:  "'Look, that man [Sentado] is in a very good position over here, the thing is, that it has been really hot around here so he had to disappear . . . you only have to talk to him.'"  (GX 208-T at 37:2).

        Campo also provided CS-1 and CS-2 with specific details about the defendants' negotiations with Sentado in Honduras on October 3, explaining that he spoke with Sentado for "about two hours" and "cleared . . . several things."  (GX 201-T at 32:1).  Campo emphasized during his negotiations with Sentado that he was "the one in charge," and that the drug shipments would involve him "personally" and "all of [his] support," but not "the government" or Venezuelan President Nicolás Maduro ("the number one over here").  (GX 201-T at 32:1-13, 33:3, 34:5). Sentado told Campo that he would pay between $12,000 and $12,200 per kilogram of cocaine in Honduras, but would charge a flat rate of $900,000 for the "landing and unloading," which would have been higher "[i]f we were going to Europe" as opposed to the United States.  (GX 206-T at 4:21, 7:26-34).  Sentado told the defendants that they would be paid "via Mexico" three days after the shipment of cocaine was sent.  (GX 203-T at 13:1-11; *see also* GX 207-T at 9:19 ("[H]e told me a week to bring money down from the M . . . .")).  Campo told Sentado that the defendants "may have the possibility of providing" an aircraft in the future for a cocaine shipment, but that they did not have access to one at present.  (GX 203-T at 25:11, 26:1).  Sentado also told Campo

14

that Rayo, one of Sentado's associates, would facilitate an introduction to a source of cocaine, who could provide "as much as we want."  (GX 202-T at 21:20-38; *see also* GX 201-T at 10:1, 19).

## IV.  The Defendants' Initial Preparations for the First Cocaine Shipment to Honduras

The defendants returned to Venezuela early in the morning on October 4.  (GX 104 at 7; GX 105 at 7).  That day, they designated at least four guards to lead the "security logistics" for the cocaine shipment:  Jesfran Josnel Moreno Sojo, a/k/a "Tortuga," a/k/a "Tortuha" ("Moreno"); "felix," "semilla," and "neike."  (GX 402-T at 2).[8]  Campo also asked Flores to purchase six BlackBerry devices to be used to communicate about the deal.  (GX 402-T at 3; *see also* GX 510-T at 16).

Flores also informed Pepe that the defendants had returned to Venezuela on October 4.  (GX 515-T at 26).  Pepe indicated that the Sombrero Organization was prepared to "finalize things" and just needed to know "which day."  (GX 515-T at 26).  Flores responded, however, by informing Pepe that the defendants had agreed to work with Daza and Sentado:  "We need to talk . . . . we already did it somewhere else."  (GX 515-T at 26).  Pepe suggested that "[w]e can do both," and Flores responded that they could "talk in person" the next day.  (GX 515-T at 26).

Flores later forwarded part of his exchange with Pepe to Campo.  (GX 510-T at 15).  But Campo suggested to Flores that they use Pepe and his associates to obtain the cocaine in an effort to recoup the existing debt from the prior failed drug deal:

---

[8] Contact information for several of these individuals was saved in one or both of the defendants' phones.  (*See, e.g.*, GX 400 (entry 1734, "Tortuha"); GX 500 (entry 2690, "Semilla"; entry 2341, "Ne Ke"); *see also* GX 508-T at 2 (photograph of Moreno armed with pistol)).  Another individual known as "Chicho" also appears to have been a member of the defendants' security team.  (GX 500 (entries 1270-74, "Chicho"); GX 508-T; GX 510-T at 2-3).

| Flores | Ppr [*i.e.*, Pepe] |
| Campo | I'm thinking |
| Campo | If we use him as a bridge |
| Flores | With whom[?] |
| Campo | Since they left us hanging they will have to give us something in return understand |
| Campo | Do you understand me[?] |
| Flores | Yes of course |
| Campo | We do that and split the spoils |

(GX 510-T at 14, 16).

On October 5, 2015, Campo sent Sentado the following messages:

| Campo | What I want is to start work because the electoral campaign is almost here and I always contribute |
| Campo | With money if you know what I mean that is why I want to start work |

(GX 3508-38-T at 2; Tr. 481). The defendants also met with Pepe that day. (*See* GX 402-T at 4 ("We will meet with pr [*i.e.*, Pepe] after 2")). And Flores complained to Rayo—an associate of Sentado—that Sentado ("The Man") had "not given the name of the contact to primo," *i.e.*, Campo. (GX 504-T at 2). Rayo responded that he would remind Sentado, and over an hour later wrote to Flores that Sentado was "going to send the invitation shortly." (GX 504-T at 2). On October 12, Flores wrote to Rayo "we're ready," but indicated that Campo had only been in touch with Daza ("flaco") and not Sentado ("the man"). (GX 504-T at 3). Flores explained that "[w]e already have the fbo" and that he and Campo were "just waiting to receive your visit over here." (GX 504-T at 3).[9]

---

[9] Generally speaking, an "FBO," or fixed-base operator, is a business granted permission to operate in an airport. (*See* Tr. 1120).

On October 7, 2015, Flores sent Campo an exchange in which Pepe indicated that an associate of the Sombrero Organization had traveled to Venezuela to meet with them. (GX 405-T at 16 ("the gentleman is already in vene")). Flores had insisted to Pepe that they either meet on October 8 or abandon the plan because Flores and Campo "cannot wait for your people forever." (GX 405-T at 16).

On October 14, 2015, Flores wrote to an individual using BBM screen name "Chicha Smith" that he was in "dire need of some chairs" for the cocaine shipment that Flores had "pending." (GX 502-T at 3).[10] When Smith asked if they could talk on the phone, Flores responded that he needed to "get another number to not talk on this" phone, presumably because he was seeking to avoid using the phone to have an explicit conversation about drug trafficking. (GX 502-T at 3).

On October 15, 2015, Campo wrote to "A.m" that he was "working on the deal like crazy." (GX 403-T at 8). On October 16, however, Flores notified Rayo that the defendants had "called [it] off" with Sentado because of his lack of responsiveness:

| Rayo | The man [*i.e.*, Sentado] says for you to contact him |
| Flores | Brother we called that off because we have a huge issue with communication |
| Flores | There's no communication and we can't do it that way brother the man always has a lot of things to do |
| Flores | When he has the time required for this we will always be here |
| Flores | But he has not written to primo [*i.e.*, Campo] |

---

[10] Flores also communicated with Smith about separate drug-trafficking negotiations involving a potential deal in France, which Campo later described to CS-1 and CS-2. (GX 502-T at 2; GX 206-T at 24:14-20; GX 230-T at 6:2-16).

17

(GX 504-T at 5; *see also* GX 203-T at 10:11-12:1 (Campo explaining to CS-1 that defendants had "started to look around elsewhere")).  Within half an hour, Rayo indicated that they wished to resume working and asked for assistance with obtaining visas to enter Venezuela.  (GX 504-T at 7-8).  Flores responded that they could help get Venezuelan visas "in the usa" but not in Honduras.  (GX 504-T at 8).[11]  Rayo later confirmed, to both Flores and CS-1, that he could not travel to Venezuela as planned because he did not have a visa.  (GX 504-T at 9, 11; GX 300-T at 2:16-20).

On October 19, 2015, Campo exchanged messages with "Gallo" about an upcoming meeting with an "investor."  (GXs 416-T, 417-T).[12]  Gallo wrote to Campo that "everything is ready" with the aircraft ("car"), and that the "investor wants to see how everything is being handled."  (GX 416-T at 2; 417-T at 2).  In roughly the same timeframe, during the third week of October 2015, Sentado summoned Soto and Carlos Gonzalez, who was an air traffic controller at Roatán Airport and who testified at trial as a cooperating witness, to a meeting in San Pedro Sula.  (Tr. 1042-43).  The meeting took place at a house controlled by Sentado; in addition to Soto and Gonzalez, the participants in the meeting included Sentado, a Honduran police officer, and three Mexicans (other than CS-1 and CS-2).  (Tr. 1043-45).  One of the Mexicans explained that they were seeking assistance with a drug shipment to be sent from Venezuela to Roatán using a

---

[11] Campo later told CS-1 that he could "get the visa for them, but in the United States," and offered to help Rayo and/or an associate enter Venezuela via plane arriving at the Maiquetía Airport.  (GX 201-T at 50:14; GX 202-T at 15:3-13).

[12] Campo exchanged these messages using a BBM account with screen name "HRCF," the initials of former Venezuelan president Hugo Rafael Chávez Frías (Tr. 189), which Campo also used to communicate with CS-1.  (*Compare* GX 416-T, *with* GX 301-T).  The Government did not seize the device that Campo used to access the "HRCF" BBM account, and therefore did not obtain additional content from that account.  But Campo used his other phone, GX 100, to take pictures of his exchange with "Gallo" using the "HRCF" BBM account.  (*See* GX 416; GX 417).

Gulfstream jet dispatched—as the defendants touted separately to DEA confidential sources—"from the presidential hangar" at the Maiquetía Airport. (Tr. 1044-45). Soto then described the established procedures for drug-related operations at the Roatán Airport. (Tr. 1045). Following the meeting, Carlos Gonzalez returned to Roatán and "spoke to the airport personnel regarding the [drug] shipment that we were going to receive," including the chief of security, another air traffic controller, and a flight plan officer. (Tr. 1046-47).

## V. The Defendants' October 2015 Meetings with CS-1 and CS-2 in Venezuela

On October 21, 2015, Rayo informed Flores that CS-1 had arrived in Caracas and was trying to contact Campo. (GX 504-T 9 ("the person is already there in your country" // "Because he's already there.")). CS-1 and CS-2 participated in recorded meetings with the defendants in Caracas on October 23, 26, and 27, 2015.

### A. The October 23, 2015 Meeting

During the defendants' October 23, 2015 meeting, Campo described Flores as his "cousin," "brother," and "partner." (GX 203-T at 21:3). CS-1 told the defendants that he "buys everything" from Sentado, and was "the person who is responsible for taking everything to the United States." (GX 203-T at 6:1).[13]

Campo indicated that the defendants were driven by a specific motive: "[M]y mom"—Venezuelan First Lady Cilia Flores—"is running for the election and . . . I need twenty million dollars" by December 2015. (GX 203-T at 11:1-9; *see also id.* at 12:1, 22:30). Campo added: "[W]e want to take possession again of the . . . [Venezuelan] National Assembly and

---

[13] GX 203-T is a translation of an audio-only recording from the earliest segment of the October 23 meeting, GX 201-T is the translation of a video from a middle segment of the meeting, and GX 202-T is the translation of a video from the final segment.

several . . . places with power . . . ."  (GX 201-T at 22:17; *see also id.* at 201-T at 2:4-10 (Campo

referring to Venezuelan President Nicolás Maduro as his "father" and explaining to CS-1 that

"what we want is for him to take control again of the . . . National Assembly")).  Campo explained

further:

> But we need the money.  Why?  Because the Americans are hitting us hard with money.
> Do you understand?  The opposition . . . is getting an infusion of a lot of money . . . and so
> . . . it's also us . . . that's why we are at war with them.

(GX 201-T at 24:31-25:4).  Flores opined that the DEA had no presence in Venezuela, and Campo

reiterated that the defendants were "at war with the United States."  (GX 201-T at 48:11, 49:6; *see*

*also id.* 47:23).

       Similar to his above-described October 16 communications with Rayo, however,

Campo expressed frustration to CS-1 and CS-2 about Sentado's non-responsiveness since the

October 3 meeting.  (GX 203-T at 4:2-5:15).  He stated that he had "started to look around

elsewhere" for drug-trafficking partners and had "met up separately" with another drug trafficker,

but that the defendants were going to "dismiss" his proposal because the trafficker lacked "the

capability of receiving from us."  (GX 203-T at 10:16, 11:17, 12:1).  In other words, according to

Campo, the defendants were looking for drug traffickers who could facilitate the receipt of a

legitimate-seeming drug flight dispatched from the Maiquetía Airport at a real airport rather than

a clandestine airstrip.  (*See* Tr. 555-57).  In response to Campo's concerns about Sentado, CS-1

indicated that he (CS-1) would be in direct contact with the defendants.  (GX 203-T at 20:32).

       The defendants said they would be present at Maiquetía Airport during the dispatch

of the drugs ("when the little animals leave"), and receipt of drug proceeds, in case a "colonel" or

a "general" tried to inspect the contraband-laden plane.  (GX 203-T at 15:5; GX 201-T at 42:37,

43:39-45:33; *see also* GX 201-T at 8:17 ("We do have some power here.")).[14]  Campo told CS-1

that the drug-laden plane "won't be followed because it departs from here as if . . . someone from

our family were on the plane."  (GX 201-T at 39:9).

       Campo indicated that he had "worked" with Gulfstream jets previously, and was

"assuming" that he would have access to a "G2."  (GX 203-T at 26:13, 28:17-19).  With respect

to "the quantities," Campo said the defendants did not "have too much of a problem with that

anymore" and indicated that they could provide a "sample."  (GX 203-T at 27:18; *see also id.* at

24:7 ("I have no . . . problem with, with the quantity")).  CS-1 proposed an initial load consisting

of "a thousand" kilograms.  (GX 203-T at 28:21).  Campo indicated that he still had to meet with

the owner of the Gulfstream, but "obviously he is going to ask me to fill it up" with cocaine.  (GX

203-T at 28:23-27).  Campo also said that he wanted to conduct a "test" so that "the pilots" would

know "where they will park the car" in Honduras "so that everything goes according to plan."  (GX

203-T at 24:7-19).  Finally, CS-1 asked Campo to "bring one" kilogram of the "merchandise" to

their meeting place "so that it's very secure," and indicated that he would be able to assess the

quality of the drugs after he "touch[ed] it with these hands."  (GX 202-T at 6:26-8:19).  Campo

agreed to "meet with the people" the next day and to ask for "some material so I can see what it's

like."  (GX 202-T at 10:5-9).

       After the meeting, Campo and Flores discussed taking CS-1 and CS-2 to a club

named Holic and paying for "candy" at a cost between "$100" and "70 grand."  (GX 510-T at 20-

21).

---

[14] On October 26, 2015, Campo suggested that he would kidnap, and ask CS-1 to murder, anyone
who interfered with the dispatch of a cocaine shipment.  (GX 207-T at 20:23-21:31 ("pinch him
over there and send him out in little pieces")).

### B.  The October 26, 2015 Meeting

The defendants met with CS-1 and CS-2 for a second time on October 26, 2015. After some preliminary conversation, Campo began to work from a set of "points" about the deal that, based on the conversation at the meeting, he appeared to have written out beforehand.  (GX 205-T at 11:25).

Campo first raised the "issue in regards to the plane."  (GX 205-T at 16:12; *see also id.* at 12:7).  Campo explained that he had not been able to secure an aircraft for their use, and discussed purchasing a plane with CS-1 and CS-2.  (GX 205-T at 12:7, 17:15-23, 30:11-31). Campo suggested that they buy either a Gulfstream or a Dassault Falcon, including potentially in the United States, for approximately $600,000.  (GX 205-T at 32:22-34, 37:1-16, 38:11-41).

After declaring "we are all set with . . . the topic of the car," Campo transitioned to CS-1's request for a cocaine sample and stated that he would "buckle down so that they have it ready for me for tomorrow."  (GX 205-T at 39:21, 43:31).  Campo joked that he would have the kilogram brought to the airport before CS-1's departure flight and placed "at your seat on the plane."  (GX 205-T at 44:7-21).  Following additional conversation, Campo indicated that they had "wrapped it up" with the issues of the "car" and the "test."  (GX 206-T at 3:5).

Next, Campo asked again about "the price for landing and unloading" cocaine in Honduras.  (GX 206-T at 3:5-9).  Campo indicated that Sentado had quoted him a price of $900,000, whether the defendants sent one kilogram or 5,000.  (GX 206-T at 3:29-4:3).  Campo suggested that with other drug traffickers he had been able to "negotiate" this cost "depending on where we are going," but agreed to pay the $900,000 fee because "that's not expensive."  (GX 206-T at 5:25-6:3, 8:5, 22:1-11).  CS-1 then told the defendants that he had to continue spending

money on transportation costs once the cocaine reached Honduras, in order to "cross it over" and "get it in to the Americans."  (GX 206-T at 22:14).

After discussing costs, Campo turned to scheduling:  "[L]et's get started right away."  (GX 206-T at 28:25).  Campo referred to the anticipated first cocaine shipment as a "measly ten million dollar deal" and later reiterated that he "need[ed] twenty million by December tenth at the latest," explaining that the money was necessary to pay bribes in Venezuela relating to the upcoming elections.  (GX 207-T at 6:16, 30:18-33:4; GX 208-T at 21:16).

Campo also demanded a partial upfront payment for the drugs during the meeting, delivered in cash in Venezuela, at the time the cocaine was sent out of Maiquetía Airport—"at least the two first times" that the defendants dispatched drug loads.  (GX 207-T at 4:17, 5:1, 11:18).  Campo explained that the defendants planned to provide the cocaine ("put up the sweets"), which they would obtain from a supplier who could provide "very solid stuff" by the "shovelful."  (GX 207-T at 3:2, 3:18, 4:5).  He then indicated that he wanted to use the up-front payment to pay his costs, and would expect to be paid the remainder of his share within approximately five to eight days of the shipment.  (GX 207-T at 5:1; GX 208-T at 19:4-26).  CS-1 agreed to provide $5 million—half of the first $10 million cocaine transaction—"[w]hen the job is about to be done." (GX 208-T at 14:20).  Flores stated that the defendants would "go for the other one immediately," which Campo estimated would take approximately three or four additional days.  (GX 208-T at 19:22-20:22).

C.  The October 27, 2015 Meeting

On the evening of October 27, 2015, the defendants met at a gas station in Caracas after Campo did what Flores described as "some business with the truck."  (GX 510-T at 22).

23

Campo subsequently informed CS-1 that he would send his security team to pick up CS-1 and CS-2 after they finished dinner at a restaurant in Caracas called El Alazán.  (GX 301-T at 3:6-26).[15]

At some point on the night of October 27, the defendants met with CS-1 and CS-2. After some preliminary conversation that focused principally on food, Campo announced that he had brought the cocaine sample:  "I have a little animal."  (GX 210-T at 15:20).   They opened the cocaine package and discussed exercising caution because, in Campo's words, "[y]ou don't know in whose hands this will end up."  (GX 210-T at 21:30; *see also id.* at 22:27, 23:15-31).  CS-1 commented on the color, odor, and moisture content of the cocaine, and told the defendants that their drugs were between 95% and 97% pure.  (GX 210-T at 26:11, 27:29; GX 211-T at 2:16; GX 212-T at 2:16-20; GX 213-T at 2:10-16, 3:20-40).   CS-1 subsequently stated that the cocaine in the sample was "ready to work with."  (GX 213-T at 4:21).  Campo responded, "we are closing a deal," but warned that they would not provide samples in connection with future drug loads.  (GX 213-T at 4:35, 5:4 ("this is not something we will do anymore")).

## VI.   Gocho's Agreement to Provide the Defendants with 800 Kilograms of Cocaine

In the days after the meeting, CS-1 reported that he was having trouble getting on a flight out of Venezuela.  (*E.g.*, GX 301-T at 4:6).  Campo told CS-1 to "get going" because he was "making commitments anticipating the party"—*i.e.*, the first cocaine shipment—"will be next week."  (GX 301-T at 6:7).  CS-1 replied that he was preparing to provide the $5 million ("The. 5. Mexican. Girls") that they had discussed at the October 26 meeting.  (GX 301-T at 6:11).

---

[15] The dates on the cover pages of the translations in the GX 300 series reflect the dates on which CS-1 sent the communications to Special Agent Gonzalez rather than the date of the communications.  (Tr. 188-89).

On October 29, 2015, Flores and Pepe exchanged messages about setting up a meeting with "*el gocho*." (GX 515-T at 27). Approximately three days later, Pepe sent Flores a screenshot reflecting calls by Pepe to Elio ("Elias Tarrat") and Gocho ("Gocho N."). (GX 151-T at 28). Pepe explained: "I talked to Elias and then I called him"—Gocho—because "he is the one who has the fruits over there," *i.e.*, the cocaine. (GX 515-T at 28; *see also* GX 408-T at 27 (Pepe sending same call-history screenshot to Campo)). Approximately three hours later, Pepe reported to Flores: "*El gocho* has something ready for this week." (GX 515-T at 29). Later in the conversation, Pepe indicated that Gocho was willing to supply 800 kilograms of cocaine on consignment: "[H]e said he is going to put down the 800 without putting down a single bolivar." (GX 515-T at 31; *see also* GX 301-T at 12:21 (Campo informing CS-1 that the defendants were prepared to send "800 head of cattle" on a "weekly" basis)).

## VII.  The Defendants' Attempts to Send Drug Pilots to Honduras to Coordinate Logistics

In approximately late October 2015, Campo reiterated to CS-1 that completion of the first cocaine shipment was "urgent for me," and asked when he could send his drug pilots ("drivers") to Honduras "so they can check how everything is there." (GX 301-T at 9:2). Campo subsequently asked CS-1 to deliver $10,000 to Daza, who he described as his "one person by himself there," and urged CS-1 to set up the meeting in Honduras with the pilots "to check out all the logistics" because Campo was "pressed" to collect drug proceeds due to the upcoming election. (GX 301-T at 10:1, 10:23, 11:18). Campo explained: "[W]e are at an event here and we are taking commitments from people over here that I told you about remember for the thing with my mom." (GX 301-T at 11:18). CS-1 wrote to Campo that he was waiting for Sentado to set up the next meeting and now planned to provide $11 million up front rather than $5 million. (GX 301-T at 10:15, 11:6 ("11"), 11:26 ("My 11. Girls")). Campo confirmed that: (i) there was a plane available

for the initial shipment, and he expected to have another aircraft in January 2016 ("I will get you the other car in January" // "At the moment I only have that one"); and (ii) he was prepared to send 800 kilograms of cocaine ("800 head of cattle") on a "weekly" basis. (GX 301-T at 12:13, 21). Campo also reiterated that it was "urgent" that they set up a meeting in Honduras with the drug pilots. (GX 301-T at 12:27).

After a break for a "meet[ing]," Campo reported to CS-1 that he was prepared to send the cocaine shipment by November 6, 2015. (GX 301-T at 13:19, 14:3 ("in regards to the delivery of the chairs I will send them the latest on the 6")). Campo directed CS-1 to start making preparations to pay him the $11 million in Venezuela and again expressed interest in sending additional cocaine loads after they completed the first one. (GX 301-T at 14:3, 14:9-13 ("we are here not just for this but for many other things")). Campo again explained that he planned to use the cocaine shipment ("party") and resulting proceeds from CS-1 ("girls") to help fund the campaign ("race") of Cilia Flores ("mom"):

| Campo | . . . I'll make the arrangements with my mom's people to start paying them in advance because she's getting offers from elsewhere for the end of next week |
| Campo | To start making good on our word it's for mom and we are all interested in her getting first place in the race . . . so the girls will keep coming |
| CS-1 | That's right. Yes. Sr. And. You. Can count. With my full. Support. For that. Sr |
| Campo | Don't you worry sir that as long as we keep the party going as it should I will not have a problem taking care of everything the day I need your help I will let you know. |

(GX 301-T at 16:17-25).

Campo subsequently asked CS-1 about the price of cocaine in Honduras with respect to the 800 kilograms of cocaine that he planned to send in early November 2015:

| Campo | What is the price today in the h's stockmarket because you are saying 11 to me and my calculations are showing a much lower number |
|-------|-------------------------------------------------------------------|
| Campo | I mean at 12 I get 9.6 and at 12.5 I get exactly 10. |

(GX 301-T at 18:33-35). In this exchange, Campo expressed concern that CS-1 did not actually owe him $11 million ("you are saying 11 to me") because—without factoring in the $900,000 transportation fee—800 kilograms at a price of $12,000 per kilogram ("12") would generate only $9.6 million ("9.6"), and even a price of $12,500 per kilogram ("12.5") would only generate $10 million for the load ("exactly 10"). CS-1 responded that any "surplus" funds in the $11 million could be used to finance the next load of cocaine, and Campo responded "that's fine then I wanted to have that clear." (GX 301-T at 19:1-7).

In approximately the end of October 2015, Campo again expressed frustration that Sentado was not responsive enough to him or CS-1 and indicated that he wanted to work with CS-1 "directly." (GXs 301-T at 19:23-29; GX 302-T at 2:2-20). Campo continued to push for a meeting in Honduras involving his drug pilots on November 1 or 2, so that they could send the drugs on November 6 and CS-1 could pay him. (GX 302-T at 8:11, 9:9-11). Campo also indicated that the cocaine for the first shipment was ready to be dispatched. (GX 302-T at 9:15-21 ("I already have the tables and chairs ready here" // "They were already delivered to me" // "I am only waiting for my guys to check the place there where the party is going to take place and the whole logistics")).

Campo attempted to send his drug pilots to San Pedro Sula, Honduras, for the first time on or about November 4, 2015. (*See, e.g.*, GX 303-T at 2). However, Campo's pilots failed to attend the meeting because their flight was delayed, and later cancelled, due to a "storm." (GX 303-T at 2:2; GX 304-T at 2:4). With respect to this incident, Campo wrote to Flores: "The

27

mechanics that we sent to check out the shitzness are not even going to be able to get there" because of "a bit of rain." (GX 510-T at 25). After the pilots failed to make their anticipated trip, Campo wrote to CS-1 that he was "the most interested in speeding this up" and asked whether the pilots could come to Honduras the next day for the meeting. (GX 304-T at 2:4-6). Campo assured CS-1 that the pilots would arrive at approximately 3:00 p.m. Honduras time, and reiterated that the urgency resulted from his efforts to support Cilia Flores's campaign:

| Campo | I'm working here for my mom to win the competition which is what matters the most right now. To have the power from my father's side and from my mother's side |
|---|---|

(GX 304-T at 10:21; *see also id.* at 5:17-27).

Juan Gomez ("CS-3") traveled to Honduras at the direction of the DEA to participate in, and record, the anticipated meeting with the defendants' drug pilots on November 5, 2015. (Tr. 1144-45). That same day, Campo's pilots arrived in San Pedro Sula. (GX 305-T at 2:5-9). Campo referred to Marco Tulio Uzcategui Contreras ("Uzcategui") as "the bald pilot" and the "most trustworthy," and indicated that Daza ("the old man with them") would also participate in the meeting. (GX 305-T at 3:28). However, Uzcategui and the other pilot arrived in Honduras without the proper flight permit, and were denied entry into the country. (GX 305-T at 4:8; GX 306-T at 5:17).[16] When Campo learned that his pilots missed the meeting on November 5, 2015, he wrote to CS-1 that he would "kill them," and that Flores would come to Honduras on November 6 "so you guys may see how serious we are." (GX 306-T at 5:17, 6:5-25, 7:25-29, 11:5).

---

[16] Carlos Gonzalez explained that pilots seeking to enter Honduras are required to obtain a permit from a civil aeronautics agency in Honduras, at least approximately 24 hours in advance of the flight. (Tr. 1031).

In the absence of Campo's pilots on November 5, 2015, CS-3 and Sentado met with Soto and Carlos Gonzalez, who had both traveled to San Pedro Sula on the understanding that they would be discussing the same drug shipment that they had discussed with the three Mexicans during the third week of October 2015. (GX 215-T; GX 216-T; Tr. 1047). Soto and Gonzalez again described the procedures for drug-trafficking operations at the Roatán Airport. (*E.g.*, Tr. 1053-67). Following the meeting, Soto remained in San Pedro Sula and Gonzalez returned to Roatán expecting that he and other co-conspirators at the Roatán Airport would be paid a total of approximately $600,000 to facilitate receipt of the drug shipment. (Tr. 1070-71).

Around this time, Campo indicated to CS-1 that he was going to speak with an associate about obtaining a Dassault Falcon jet to use in drug-trafficking operations, and that despite the problems setting up the meeting with the pilots in Honduras, the cocaine was ready to be shipped. (GX 306-T at 12:15-19 ("I'll meet with a person who has a falcon 200 so we can work with that one" // "I have all the bouquets here we have the ladder ready"); *see also id.* at 13:9 ("Well as I was telling you we have the chairs and the tables here already packed for 800 people the ladder is all set and you guys are ready to roll there")). But Campo acknowledged that the delay with the pilots would prevent them from sending the first cocaine shipment on November 6. (GX 306-T at 14:26). Instead, Campo agreed to meet CS-1 in Haiti on November 9 or 10 to pick up his payment, and to send the first cocaine shipment on November 13. (GX 306-T at 15:15-29).

## VIII.   Flores's November 6, 2015 Meeting with Daza, Soto, and Sentado in Honduras

On November 6, 2015, Campo wrote to CS-1 that Flores would be arriving in San Pedro Sula via a private plane bearing registration number YV-570T, the same plane that the defendants took to Honduras on October 3. (GX 307-T at 2; *see also* GX 518-T at 2). Flores also confirmed the trip with Rayo. (GX 504-T at 13).

Flores and his bodyguard Moreno arrived in San Pedro Sula at approximately 7:20 p.m., and proceeded to a meeting at a restaurant with Daza, Soto, CS-3, and Sentado. (GX 105 at 7; *see* Tr. 1148-49). Sentado introduced CS-3 as a representative of CS-1. (GX 221-T at 7:33-8:3). Sentado subsequently indicated that he would act as a "moderator" for Flores's conversation with CS-3 and Soto, so that they could "understand each other and start trusting each other." (GX 222-T at 6:1). At least twice during the meeting, Flores apologized for the pilots' failure to attend the meeting on November 5. (GX 223-T at 20:31; GX 224-T at 17:1). Consistent with Campo's communications with CS-1, Flores indicated that the defendants were prepared to proceed with the first shipment on "Friday the thirteenth" of November. (*Compare* GX 222-T at 6:9, *with* GX 306-T at 15:15). Soto and CS-3 responded, however, that the shipment needed to arrive in Honduras on Sunday, November 15. (GX 222-T at 7:5-7).

Soto further explained that the cocaine-laden aircraft needed to arrive at the Roatán Airport on November 15 between approximately 4:30 p.m. and approximately 5:20 p.m., so that there was enough time to unload the drugs, refuel the plane, and dispatch the aircraft before it got dark. (GX 222-T at 7:23-8:2, 9:13). He said that the entire operation at the Airport could be completed in approximately 20 minutes, including 10 minutes "to remove the sweets." (GX 222-T at 15:12; *see also id.* at 9:5). Soto also indicated that it was necessary for the plane to leave by approximately 6:00 p.m. because the lights on the runway were broken. (GX 222-T at 7:29, 8:24-28, 15:2, 19:20).

Flores asked Soto: "How would you be doing it? The plane arrives . . . you guys receive it for me," and "unload the merchandise [*i.e.*, cocaine] for me immediately." (GX 222-T at 9:19-27). Soto confirmed, indicating that the plane would have a seemingly legitimate flight plan and that "all the Hondurans are all set" at the Roatán Airport "except for the Americans,

30

because nobody can negotiate with them." (GX 222-T at 9:33-10:1; *see also* 15:12-20). Soto stated that if there was an "alarm" relating to the defendants' drug plane, the warning would "go to the same authorities that we already have made arrangements with." (GX 222-T at 10:5). He later indicated that the Honduran police would likely conduct a sham inspection of the plane because "they have to do a job for the cameras and all of that," but that the drugs would be unloaded from the plane at a location on the runway where "there are no cameras." (GX 223-T at 3:25-5:5). Flores asked Soto what would happen if "they are unloading that and so . . . something comes up. How do you guys fix that?" (GX 223-T at 7:8). Soto indicated that, in the event of such a disturbance while they were unloading the cocaine, even the "chief of police" would simply be told "Sir, nothing is going on here." (GX 223-T at 7:18-8:4). Flores replied, "I understand perfectly." (GX 223-T at 8:6).

   Several times during the meeting, Soto requested that the drug plane drop off passengers at the Roatán Airport, which would enhance the appearance of legitimacy for the flight and create an opportunity to do "two hits" by dropping off a second load of cocaine when the plane returned for the purported purpose of picking up the passengers. (*E.g.*, GX 222-T at 10:13-11:17). Soto also described a "Plan B," which would involve the use of a clandestine airstrip in the Mosquitia region of eastern Honduras, in case "the gringos . . . come up" or the plane arrived after 6:00 p.m. (GX 222-T at 16:4-32, 19:24). Soto said that he could not ensure the integrity of a plane landing on such a surface, and Flores said the defendants did not "like that, not even a little bit." (GX 222-T at 16:8, 30).

   Flores told the group that the defendants had "full command" at the Maiquetía Airport and could send the drug plane "at whatever time we want." (GX 222-T at 13:28-14:4; *see also* GX 223-T at 5:21 ("[W]e have the . . . control")). Flores indicated that the cocaine would be

31

loaded on the plane in "new suitcases," and clarified that the plane would be "departing from the, the President's hangar." (GX 223-T at 5:21; GX 222-T at 18:1). Throughout the meeting, Flores expressed satisfaction and certainty regarding the plan for the first cocaine shipment:

- "I don't have more questions" (GX 223-T at 5:21);

- "[N]ow it's clear to us that we have a, a precise time" (GX 223-T at 6:8);

- "[T]hat plane is coming totally clean, just as I said, it's coming totally clean. . . . You guys receive it and that's it. And if you have everything exactly as you're telling me, great." (GX 223-T at 6:18-24);

- "So, having cleared up this issue, on Sunday the fifteenth from four thirty to five in the afternoon they must be landing [U/I]." (GX 223-T at 8:16); and

- "[T]hat's why I will meet up with [the pilots] and, and I'll sit them down, and I'll make sure that they have a flight plan thirty minutes prior. . . . Flight plan thirty minutes prior, and as soon as we arrive we load and immediately depart." (GX 223-T at 9:4-8).

Flores also asked when the defendants could send another drug shipment to Honduras: "O.K. We have that point straight. After that Sunday [November 15], what other day can we work?" (GX 222-T at 22:11). He later brought up the point again, noting that "after that day [of the first shipment] it takes seven, eight days" to send another one, which would be "[v]ery good." (GX 223-T at 19:17-25).

Flores and Moreno returned to Venezuela the following day, November 7, 2015, departing Honduras around 11:00 a.m. (GX 105-T at 7; GX 531-A–D).

## IX.  The BLTS's November 10, 2015 Arrests of the Defendants in Haiti

On November 9, 2015, Campo informed CS-1 that he and Flores would be arriving in Port-au-Prince on a jet with registration number YV-2030. (GX 308-T at 2:2). The stated purpose of the meeting in Haiti was for the defendants to pick up the agreed-upon $11 million payment from CS-1, with $5 million representing the up-front payment Campo demanded during

the October 26 meeting to pay for costs associated with dispatching the first cocaine shipment (GX 208-T at 14:20; GX 301-T at 6:11), and the remainder constituting a payment to the defendants that could be used in their discretion to finance additional cocaine shipments (GX 301-T at 10:15, 11:6, 11:26, 18:33-19:7). Apparently not wanting to travel with the device he had been using to communicate with CS-1 about drug-trafficking, Campo told CS-1 that he would contact him "from another pin." (GX 308-T at 2:34). Later on November 9, Campo contacted CS-1 from the phone that he brought to Haiti, GX 100. (GX 404-T at 2-7).[17]

On November 10, 2015, Campo wrote to CS-1 when he and Flores arrived "in immigration" at the airport in Port-au-Prince. (GX 404-T at 8). The defendants brought with them Uzcategui, a pilot, and Moreno, a bodyguard, as well as two other men. (*See* Tr. 1003-04; GX 107; GX 108). But they left their contingent at the airport, and only the defendants met with CS-1 at the restaurant in the Servotel in Port-au-Prince. (Tr. 113-14).[18] After ordering food, Campo and CS-1 discussed a temporary cessation of their drug trafficking activities for the upcoming holidays, beginning on approximately December 12, 2015, resuming with additional cocaine shipment on Monday, January 18, 2016. (GX 231-T at 11:13-14:36).

The defendants then confirmed that they were prepared to send the first cocaine shipment as Soto and Flores had discussed in Honduras on November 6. Flores stated that the defendants had the cocaine shipment "set up for the fifteenth" of November "from there," *i.e.*,

_____

[17] Campo used the device marked as GX 100 to access the BBM account with screen name "e!". (*E.g.*, GX 309-T; GX 402-T; GX 403-T; GX 404-T). Campo had previously used the "HRCF" BBM account to communicate with CS-1 and others. *See* note 12, *supra*.

[18] GX 231-T is a translation of a recording from an earlier segment of the November 10 meeting, and GX 230-T is a recording from a later segment.

Venezuela.  (GX 231-T at 19:10-14).  Campo added:  "They told us . . . on Sunday the fifteenth, this Sunday."  (GX 231-T at 19:30).  Flores explained that the cocaine was packed in "suitcases," as he had promised in the November 6 meeting, with "false bottom[s]."  (GX 231-T at 20:17, 21:10).  Reiterating additional information from the November 6 meeting, Campo stated that "[t]hey set a time for us . . . between four thirty and five thirty," Flores confirmed that the airport was in "Roatán," and Campo then noted the issue with the lights not functioning at the Roatán Airport.  (GX 231-T at 21:26, 22:5, 22:17).

The conversation then turned to Campo's access, "through a friend," to cocaine produced at the direction of a "commander" in the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC"), a paramilitary organization that is one of the largest producers of cocaine in the world.  (GX 231-T at 27:3-13; Tr. 149, 555).  Campo described "the commander for the FARC" as being "supposedly high ranked," and suggested that he had provided the kilogram sample of cocaine that the defendants brought to the October 27 meeting in Caracas, "[t]he one that we brought to you all."  (GX 230-T at 3:3-11; GX 231-T at 27:21).

After describing his FARC connection, Campo asked CS-1 about drug trafficking in Canada and Europe.  (GX 230-T at 4:27).  CS-1 responded that he sold "very little in Canada" and "almost everything in the United States, the East Coast, New York."  (GX 230-T at 5:1).  Campo explained that he "used to have some contacts" in Europe, but the defendants "got a bit nervous" because of "crooked people."  (GX 230-T at 6:12-16).  The defendants also told CS-1 that they had a cousin who was a "consul" in Canada who they could talk to in order to "[s]ee what she can help us with."  (GX 230-T at 7:7-8:8).  CS-1 responded:  "[M]y business is right there inside the United States, which is your business as well because you are the owner of that work."  (GX 230-T at 8:10).  CS-1 continued that in their "next" cocaine shipment, "once you have finished

34

up your mom's commitments," he could pay the defendants for some of the kilograms of cocaine

based on the prices in New York rather than Honduras.  (GX 230-T at 8:10-24).  Flores responded,

"[s]ure" and "yes."  (GX 230-T at 8:24, 30).

## X.   The Defendants' Confessions

After CS-1 notified Special Agent Gonzalez that the meeting had concluded, BLTS

personnel entered the Servotel and arrested the defendants.   (Tr. 95-96, 114).   The Haitian

government expelled the defendants, and they were taken into custody by the DEA and flown from

Port-au-Prince to White Plains, New York.  (Tr. 123, 404).

Both defendants confessed during the flight.  After signing a *Miranda* waiver (GX

102), Campo made the following admissions:

- When Special Agent Gonzalez asked Campo about a photograph of Campo holding the kilogram of cocaine in the October 27, 2015 meeting in Caracas (GX 60), Campo "hung his head," said "it is me," and indicated with respect to the kilogram, "you know what that is," which Special Agent Gonzalez understood to be a reference to cocaine (Tr. 136-37);

- Campo stated that Gocho had supplied the cocaine sample and possessed the other 800 kilograms, which Campo believed Gocho had obtained from the FARC (Tr. 138-39, 148-49);

- Campo stated that two men named "Hamudi" and "Juan," a/k/a "Jose"—*i.e.*, Pepe— had served as intermediaries between Campo and Gocho, and that Campo had met with Gocho "approximately five times" (Tr. 147-48);

- Campo stated that Hamudi had also introduced him to a Colombian known as "Negrito" or "El Flacco"—*i.e.*, Daza—who in turn introduced Campo to drug traffickers in Honduras (Tr. 149-50);

- Campo stated that he met Daza in person for the first time in October 2015 when he traveled to Honduras (Tr. 150);

- Campo stated that he would not have needed assistance from other Venezuelan officials in dispatching cocaine from the Maiquetía Airport "because of who he was and the access that he had at the airport" (Tr. 150);

- Campo acknowledged that "the Mexican" (CS-1) told him that the cocaine was going to be imported into the United States, but indicated that Campo "didn't emphasize" that aspect of the transaction (Tr. 152-53); and

- Campo denied that he planned to use proceeds from the transaction to support the campaign of Cilia Flores, and claimed that he had only made those comments because "his friend in the drug business had told him to say that in order to protect himself from getting robbed" (Tr. 154).

Campo did not mention Sentado during the interview, and expressed some interest in attempting to cooperate by providing information relating to "money laundering." (Tr. 154-55).

Flores was also interviewed during the flight to White Plains. After signing a *Miranda* waiver (GX 103), he made the following admissions:

- Flores stated that he expected 800 kilograms of cocaine to be involved in the first shipment, and that "the Mexican" (CS-1) was going to pay approximately $12,000 per kilogram (Tr. 160-61);

- Flores stated that the "Mexican" (CS-1) "had told him the cocaine was going to Mexico and then to the United States, and several cities within the United States" (Tr. 161);

- Flores stated that "Pepero"—*i.e.*, Pepe—had been involved in the cocaine shipment and had introduced Flores to Gocho in Caracas (Tr. 162);

- Flores stated that "Hamudi" had introduced him to a Colombian in Honduras named "El Flacco"—*i.e.*, Daza, that Daza had introduced Flores to Sentado, and that Sentado had introduced Flores to "the Mexican" (CS-1) (Tr. 162-63);

- Flores stated that he had gotten involved in the cocaine transaction "to make money," that he expected the shipment to generate $5 million in proceeds, and that his share would have been approximately $560,000 (Tr. 160); and

- Flores stated that he had not planned to use Venezuelan officials to facilitate the dispatch of the cocaine, but that approximately six of "his bodyguards knew [about the shipment] and that they were going to help him load the cocaine onto the plane" (Tr. 163-64).

## LEGAL STANDARDS

### I.  Rule 29

"A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient."  *United States* v. *Cruz*, 363 F.3d 187, 197 (2d Cir. 2004). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

> The Court must credit every inference that the jury might have drawn in favor of the government, and review all the evidence in conjunction, not in isolation.  The Court must also be careful to avoid usurping the role of the jury, particularly when reviewing a conspiracy conviction because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.

*United States* v. *Baldeo*, No. 13 Cr. 125 (PAC), 2014 WL 6807833, at *1 (S.D.N.Y. Dec. 3, 2014) (internal quotation marks and citations omitted).

### II.  Rule 33

Rule 33 "motions for a new trial are disfavored in the Second Circuit."  *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ."  *United States* v. *McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict."  *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted).  "In order to grant a new trial, the Court must have 'a real concern that an innocent person may have been convicted.'"

*United States* v. *Baldeo*, 2014 WL 6807833, at *4 (quoting *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

## ARGUMENT

### I.  CS-1's Testimony Did Not Result in Manifest Injustice to the Defendants

The defendants' perjury claims do not warrant a new trial for at least four reasons: (i) all of the issues raised by the defense were known by the defendants prior to trial, and relied on by the defendants during cross-examination and arguments to the jury; (ii) the Government was not aware that any of CS-1's testimony was arguably false, or of potential issues with CS-1's post-arrest conduct, until the defendants produced the prison calls and corresponding translations for the first time during CS-1's cross-examination on November 14, despite having obtained the recordings weeks prior to trial; (iii) the defendants used the calls to cross-examine CS-1 during the trial, and adequate corrective measures were also taken; and (iv) the defendants cannot establish materiality because there was overwhelming evidence of their guilt independent of CS-1.

### A.  Relevant Facts

#### 1.  Pretrial Proceedings

Before trial, the defendants moved to suppress, *inter alia*, "all testimony regarding, and images of, the display of a purported brick of cocaine during a meeting between the Defendants and the informants." (Dkt. No. 48 at 2).  The Court granted the defendants' request for a pretrial hearing, which was conducted on September 8 and 9, 2016.  On September 9, 2016, both CS-1 and CS-2 testified that they believed the substance provided by the defendants during the meeting on October 27, 2015 was cocaine, and the defense was able to cross-examine each witness extensively regarding their opinion about the substance and other matters.  (*See* Sept. 9, 2016 Tr. 363-64; *id.* 410-11).  When questions arose during the hearing regarding the involvement of an

38

individual named "Paul" in the defendants' meetings in Caracas, the Government confronted CS-1 during a lunch break and turned over the notes from that confrontation before CS-1 started his direct examination. After the hearing, the Government investigated further and disclosed post-hearing statements by CS-2 regarding this issue. (Dkt. No. 64).

The parties submitted post-hearing briefs on September 26, 2016. (Dkt. Nos. 65, 66). The following day, the Court endorsed a subpoena from Campo's attorneys, directed to the facility where CS-1 was detained, seeking "[a]ll non-privileged emails and recorded phone calls, as well as phone longs and related information, to or from [CS-1]." The prison facility provided responsive materials to Campo's attorneys (but not the Government) on or about October 17, 2016.

The Court denied the defendants' pretrial motions on October 12, 2016. The Court found that "the brick of powdery substance, said to have been cocaine," that the defendants brought to the October 27 meeting was "highly inculpatory, that "[b]oth CSes thought the substance was cocaine, and said so at the time," and that there was "no indication that Defendants thought otherwise at the time they brought the substance to the meeting." *United States* v. *Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *4 (S.D.N.Y. Oct. 12, 2016). On October 20, 2016, the parties filed motions *in limine* seeking, *inter alia*, pretrial rulings regarding the scope of permissible testimony from CS-1 and CS-2 relating to the defendants' cocaine. (*See* Dkt. Nos. 91, 161). The defendants sought to characterize testimony relating to the identity of the cocaine as expert testimony pursuant to Rule 702—again underscoring, prior to trial, that they were cognizant of the Government's intention to offer CS-1's lay testimony on this point. (Dkt. No. 91 at 1, 7). The Government, on the other hand, sought to offer the testimony as lay opinion testimony pursuant to Rule 701. (Dkt. No. at 161 at 10-12). On November 2, 2016, the Court granted the

Government's motion, holding that CS-1 "may properly offer lay witness opinion testimony that the substance was cocaine." (Nov. 2, 2016 Tr. 5 (citing Advisory Committee Notes)).

### 2. The Government's Opening Statement

In its opening statement, the Government informed the jury that CS-1 had been arrested and convicted:

> You're also going to learn that after the defendants were arrested the DEA found out that two of these sources had been committing drug trafficking crimes and concealing those crimes from their handling agents. You will learn that those two sources were arrested. They've been convicted of serious crimes and they're in prison.
>
> None of the witnesses in this category are going to be testifying at the trial out of the goodness of their hearts. It's a confidential source's job to testify. And you'll learn that the cooperating witnesses have entered into agreements, agreements to provide information and testimony in the hopes that they'll receive less jail time when they're sentenced.
>
> At the end of the trial the question won't be whether you like these witnesses; it will be whether you believe their testimony about their dealings with the defendants and their partners in crime.
>
> So, please listen carefully when they testify. Scrutinize what they say. Ask yourselves whether that testimony is consistent with and supported by the other evidence in the case, things like the recordings of the defendants' meetings, the chats from their phones, and the defendants' confessions.

(Tr. 53-54).

### 3. The Direct Examination of CS-1

CS-1 testified at trial on November 9, 10, 14, and 15. On direct examination, CS-1 testified that he had personally abused cocaine since 1985, and started trafficking in cocaine in 1991. (Tr. 681, 685-86). He explained that he learned to "evaluate the quality" and identity of cocaine in Mexico, while working for the Sinaloa Cartel, "[i]n the 90s and 2000." (Tr. 693; *see also* Tr. 733-35 (CS-1 acknowledging on cross-examination that he had been involved in the distribution "many thousands" of kilograms of cocaine and operated "at the highest levels of the

cocaine profession")).  Campo's attorney later confirmed that CS-1 was "familiar . . . with the process by which cocaine is manufactured," and had handled cocaine that he himself used the day before the defendants provided the sample.  (Tr. 906, 918-19).[19]

With respect to the October 27 meeting in Caracas, CS-1 testified that he and Campo put on latex gloves, and opened the kilogram package that the defendants brought into the room.  (Tr. 688-89).  CS-1 described his examination of the cocaine as follows:

> I took a little bit with my hands.  I smelled it to see if it smelled of cocaine.  I looked at the color to see what kind of color it had.  I rubbed it a little on my hand so that it would release the oils on my hand and see how much oil it would release.

(Tr. 692).  CS-1 then testified that he concluded in the meeting "[t]hat it was cocaine and it was good quality."  (Tr. 693).  CS-1 told Campo during the October 27 meeting that he believed the cocaine was between 95% and 97% pure (GX 213-T at 3:34, 40); he explained during his testimony that he was referring to the purity of the cocaine when he made that comment during the meeting, but he did not testify that his estimate of the cocaine's purity the meeting was accurate.  (Tr. 693).

At the end of CS-1's direct examination, he testified regarding his understanding of the requirements of his cooperation agreement.  (Tr. 719-21).  He explained that in the absence of a "5k letter" at his sentencing, he was subject to a mandatory minimum sentence of ten years' imprisonment.  (Tr. 720).  He testified that he understood that the Government would not write a "5k letter" for him if he lied, and that he could not rescind his guilty plea if the Government decided not to write such a letter.  (Tr. 720-21).

---

[19] Campo's attorney elicited testimony relating to other occasions when CS-1 had examined cocaine and determined it to be of poor quality.  (Tr. 921-22).  Flores's attorney elicited CS-1's views about whether he had received "good quality heroin" or "bad heroin" in previous illegal drug deals.  (Tr. 885).

### 4.   The Cross-Examination of CS-1

Early in the cross-examination of CS-1, he responded affirmatively when Flores's attorney asked whether CS-1 "understood that once you pled guilty pursuant to your agreement if you lied your agreement would get ripped up." (Tr. 727; *see also* Tr. 900-01). CS-1 admitted that he had lied under oath during testimony in an unrelated matter in 2013, and to the Government in this case regarding an associate named "Paul" who traveled with him to Caracas. (Tr. 733, 893-94). CS-1 also answered "[y]es" when asked, "even though you're a cooperating witness for the government, you still keep in contact with members of the Sinaloa cartel?" (Tr. 743). He denied, however, that he was "continuing [his] illegal drug business even though [he was] a cooperating witness." (Tr. 743-44).

Campo's attorney cross-examined CS-1 extensively regarding his handling of the cocaine provided by the defendants. CS-1 admitted that he had learned to examine cocaine during his "work for the Sinaloa cartel," and did not use "any special instruments" when examining the defendants' cocaine. (Tr. 917). Describing the examination, which counsel referred to as a "test," counsel elicited affirmative responses indicating that CS-1 "rubbed a little bit on [his] hand" and "some oils supposedly came out." (Tr. 917).

> Q. Now, you have told the DEA agents in other contexts that you can't actually get an accurate estimate of the purity of a cocaine-like substance without using special instruments, right?
>
> A. Probably I told them that. I don't remember but it's very likely.
>
> Q. It's very likely because that's true, right?
>
> A. The thing is to be able to know exactly you have to have special equipment. But with the test that I did it was enough to know that it was cocaine and that it was high quality. I've used cocaine for many years. I know what cocaine is.

(Tr. 917-18). When asked why CS-1 learned the "test," he responded:

> Because when we received drug shipments from Colombia it happened at daybreak and what we did is we very quickly opened up one kilo just randomly. We would open it to confirm that it was cocaine. And that was the test, the smell, by sight, by color, and the quality. We had the experience to do it. We could fail with two or three points of quality.

(Tr. 920). CS-1 also described the "oil" that he had referenced as "grease that the cocaine releases" that appeared to be "oily," "buttery," and "greasy." (Tr. 922-23).

Near the end of the day on November 14, CS-1 denied that he had communicated with CS-2 "a bunch since [he was] in jail," and indicated that he only spoke to him "at the moment of arrival and then we were separated." (Tr. 929). CS-1 denied communicating with CS-2 after they were separated, and denied that he and CS-2 had "continued to do drug business together" after they were incarcerated. (Tr. 930). Campo's attorney then attempted to "play a portion of a recording," the Government objected, and the Court instructed counsel to transition to another topic. (Tr. 930). After the jury was dismissed, Campo's attorney explained that he wished to offer "three short calls" involving CS-1 that were "received via subpoena to a correctional facility," along with corresponding translations. (Tr. 934-35). The Court directed the defendants to produce the materials to the Government, which—notwithstanding repeated prior requests for reciprocal discovery pursuant to Rule 16(b)(1)—counsel did for the first time later that night. (Tr. 935-36).

Campo's attorney confronted CS-1 with the calls the following day. (Tr. 955; DX 529-34). The Government did not object to the authenticity of the recordings or the transcriptions and translations offered by the defense. (Tr. 980). The calls established that CS-1 and CS-2 discussed "Paul," after being connected by a third party, on September 13, 2016. (DX 533; Tr. 971-73). CS-1 also used suspicious language during parts of the calls, suggesting that CS-1 and/or CS-2 may have continued illicit activities following their arrests. (*E.g.*, DX 532 at 4:9-11, 6:2).

43

### 5.  The Redirect Examination of CS-1 and Subsequent Litigation

The Government's redirect examination of CS-1 consisted of the following:

Q.  Sir, you were told repeatedly that if you lied, your cooperation agreement would be ripped up and you wouldn't get a 5K letter, correct?

A.  Yes, sir.

Q.  And you now understand that your cooperation agreement is getting ripped up, correct?

A.  No, sir.

Q.  You understand that you are not getting a 5K letter, correct?

A.  No, sir.

Q.  You should.

(Tr. 984-85).  The defendants did not object to this line of questioning.  (*Id.*).

The Court subsequently requested briefing regarding "the consequences of ripping up a [5]k1 letter in front of the jury."  (Tr. 1037).  On the night of November 15, 2016, both parties submitted letters on the issue.  (Dkt. Nos. 128, 129).  The Court circulated a draft of its proposed instructions approximately an hour after the Government filed its letter, and the defendants subsequently indicated that they were "in agreement that the Court's proposed instruction on the issue is the best approach."  (Dkt. No. 129).  The Court later instructed the jury

You can also consider the fact that the government told Jose Santos Peña, CS-1, after he testified at length, that he would not receive a 5K1 letter because he had lied.  You may take that into consideration in your assessment of this witness's credibility.  And you are quite free to reject all or any part of his testimony.

(Tr. 1481-82).

### 6.  Summations

The Government described the situation with CS-1 and CS-2 as follows during its principal summation:

> Now, obviously [CS-1] and his son [CS-2] loom large at this trial. Their unauthorized drug dealing was reprehensible and that's why we put them in jail. And you all saw what happened in court the other day and [CS-1] is now going to have to face the consequences of having breached his cooperation agreement. But, the evidence of what happened during those meetings in Venezuela comes not from [CS-1] mouth but from the recordings. The defendants' own statements on the recordings speak for themselves on the central issues in this case regarding what was in the defendants' heads regarding their knowledge and intent.

(Tr. 1305-06). Later in the summation, the Government argued that CS-1 was "repeatedly explicit on these tapes that his business is in the U.S. This evidence involves no assessment of his credibility. It's a matter of listening to the tapes and seeing what's on the page." (Tr. 1321).

Defense counsel characterized the Government's decision to terminate his cooperation agreement during trial as "remarkable," "very rare," not "normal," "not business as usual," and something that "never happens in federal court." (Tr. 1327-28, 1415). Flores's attorney characterized the Government's actions as "commendable," but argued that the Government had failed to exercise "reasonable diligence" and had been "asleep at the switch." (Tr. 1327-28).

During rebuttal, the Government stated explicitly that it "stood by" the decision to terminate his cooperation agreement, and deferred entirely to the jury's judgment, without advocacy from the prosecution team, in assessing the credibility of CS-1:

> A lot has been said about [CS-1]. I'm not going to say much more. I stand by what I said in the beginning of the trial. It is going to be up to you to decide which witnesses' testimony to credit and which not to credit. We trust you with respect to that decision for all of our witnesses including with [CS-1], stand by the decision that was made during his testimony, and we ask you to evaluate it pursuant to the Court's instructions.

(Tr. 1449). The Government also reiterated that the jury did not have to believe CS-1 in order to convict the defendants:

> If you take a look at the transcripts of the first meeting in Caracas on October 23rd, you have already seen this entry before, one of the first things that [CS-1] said -- and again, *you*

45

*don't have to believe him, it is on tape, it is recorded* -- he says I bring everything to the
United States.

(Tr. 1455 (emphasis added)).

### B.  Applicable Law

The defendants seek post-trial relief relating to the testimony of CS-1 pursuant to
Rule 33, which requires a showing of "manifest injustice."  *United States* v. *Ferguson*, 246 F.3d
at 134.  With respect to such a motion, the Second Circuit has described the relevant question as
follows:

> Manifest injustice cannot be found simply on the basis of the trial judge's determination
> that certain testimony is untruthful, unless the judge is prepared to answer "no" to the
> following question:  "Am I satisfied that competent, satisfactory and sufficient evidence in
> this record supports the jury's finding that this defendant is guilty beyond a reasonable
> doubt?"  In making this assessment, the judge must examine the totality of the case.  All
> the facts and circumstances must be taken into account.  An objective evaluation is
> required.  There must be a real concern that an innocent person may have been convicted.

*United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  Thus, "[p]erjury in and of itself is
insufficient to justify relief under Rule 33."  *United States* v. *Stewart*, 433 F.3d 273, 297 (2d Cir.
2006).  "Even in a case where perjury clearly has been identified," the Second Circuit has indicated
"reluctance to approve the granting of a new trial unless we can say that the jury probably would
have acquitted in the absence of the false testimony."  *United States* v. *Sanchez*, 969 F.2d at 1413-
14.  More specifically, "[i]n order to be granted a new trial on the ground that a witness committed
perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged
perjury was material; (iii) the government knew or should have known of the perjury at [the] time
of trial; and (iv) the perjured testimony remained undisclosed during trial."  *United States* v.
*Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (quoting *United States* v. *Josephberg*, 562 F.3d 478,
494 (2d Cir. 2009)).

46

## C. Discussion

### 1. *Cromitie* Demonstrates that the Defendants' Claims Are Meritless

The Second Circuit's 2013 decision in *United States* v. *Cromitie* provides the governing legal framework and underscores the lack of merit in the defendants' perjury claims.

The defendants describe five categories of allegedly perjurious testimony from CS-1, with varying degrees of specificity. (Def. Mem. at 7). First, the Government concedes that CS-1's testimony during cross-examination regarding the "scope of his coordination with his co-defendant in prison" was false. (*Id.*). Second, although the defendants have not demonstrated that CS-1 engaged in "continuing drug trafficking activity in prison," the Government assumes, for purposes of the defendants' post-trial motions, that CS-1 also testified falsely regarding that subject during cross-examination. (*Id.*).[20] Third and fourth, as to CS-1's "expectations post-trial"[21] and unspecified "other matters," the defendants' vague claims are insufficient to carry their burden of establishing perjury and should be rejected summarily. *See United States* v. *Rosario*, No. 11 Cr. 91, 2013 WL 4078354, at *3 (S.D.N.Y. Aug. 5, 2013) ("Without more particularized assertions as to what testimony was untrue, it is difficult to establish the existence of perjury . . . . Because defendant's proffered evidence is merely a 'conclusory characterization,' the Court finds insufficient evidence of perjury." (internal quotation marks omitted)). Finally, as discussed in the

---

[20] The defense, however, has not carried its burden to establish that CS-1 committed perjury with respect to any post-incarceration drug dealing. Indeed, even the defendants acknowledge that the prison calls could be regarded as "equivocal" with respect to some aspects of their allegations. (Def. Mem. at 18). CS-1 maintains, through counsel, that he did not continue his drug-trafficking activities from prison.

[21] CS-1 admitted on cross-examination, for example, that he was "hoping to get a reduced sentence," which he "would like" to be a sentence of "time served." (Tr. 887-88, 901).

next section, despite having ample pretrial notice of CS-1's anticipated lay opinion testimony regarding the identity and general quality of the defendants' cocaine, the defense failed to rebut such testimony at trial and cannot now, in this procedural posture, establish that CS-1's opinion was incorrect much less perjurious.

In *Cromitie*, a confidential informant was found to have testified falsely at trial concerning: (i) "events occurring long before the sting operation," such as meetings with his attorney, the source of funds he had received, and his taxes; and (ii) an offer of $250,000 that he made to one of the defendants and recorded statements relating to that offer. 727 F.3d at 222-23. The *Cromitie* court found that the defendants' perjury argument arose "in a context quite different from that of most of the relevant cases" because, as in this case, "the evidence that [the informant] had lied was presented to the jury during the trial." *Id.* at 222. The *Cromitie* court applied the four-prong test set forth above without analysis of the "duty to correct" described by the defendants here, which correction did not occur in *Cromitie* with respect to the most challenged testimony because the prosecutor maintained at trial that the informant's explanation of the $250,000 offer was truthful. (Def. Mem. at 13-17). The *Cromitie* court concluded that the first category of lies was immaterial, reasoning, *inter alia*, that the falsehoods did not "relate[] to the defendants' offense conduct," and had "only minimal relevance to [the informant's] credibility in recounting the defendants' offense conduct in view of his admission of almost all of them in his trial testimony and the fact that the principal evidence of such conduct was the recorded words of the defendants themselves." *Cromitie*, 727 F.3d at 223. With respect to the informant's lies regarding the $250,000 offer, the court found that the challenged testimony was false, and the prosecution had formed a good-faith but objectively unreasonable belief that the informant's testimony was accurate. *Id.* at 224. The court rejected the defendants' argument, however, because the same

48

evidence that established that the prosecution "should have known" of the perjury was also "sufficient . . . to show that the jury had to recognize that the testimony was false." *Id.* at 224-25.

The Government respectfully submits that *Cromitie* serves as an important guidepost for the Court's exercise of discretion under Rule 33, and strongly supports denial of the defendants' motion. First, as in *Cromitie*, all of the subjects now challenged by the defendants were raised in front of the jury. Second, the testimony from CS-1 that is conceded, or assumed for present purposes, to have been perjurious related to CS-1's credibility but not to the investigation of the defendants or their offense conduct. Third, whereas in *Cromitie* the court found that the prosecutor should have known of the perjury, that is not true here as discussed below. Finally, the evidence at trial was even stronger than in *Cromitie*, as it included not only the defendants' recorded statements, but also their seized electronic communications and their confessions. Accordingly, the defendants' motion should be denied.

### 2. CS-1's Lay Opinion Regarding the Defendants' Cocaine Was Not False or Perjurious

Pursuant to the Court's pretrial ruling, CS-1 offered a permissible lay opinion— based on the color, smell, and feel of the defendants' cocaine, and his extensive experience handling cocaine in wholesale and personal-use quantities—that the substance "was cocaine and it was good quality." (Tr. 692-93). The defendants tried to persuade the jury that CS-1's opinion was incorrect, but they certainly thought otherwise when meeting a year earlier in Caracas and, in any event, have failed to meet their burden under Rule 33.

Even if CS-1's opinion regarding the cocaine was incorrect, the defendants have not demonstrated that this aspect of his testimony was perjurious. *See United States* v. *Karlov*, No. 09 Cr. 515, 2012 WL 3297728, at *1 (S.D.N.Y. Aug. 6, 2012) ("A witness commits perjury

when 'he gives false testimony concerning a material matter with the *willful intent to provide false testimony*, as distinguished from incorrect testimony resulting from confusion, *mistake*, or faulty memory.'" (quoting *United States* v. *Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (emphases added))). But the defendants did not even demonstrate in their post-trial submissions that CS-1 was incorrect, let alone put evidence before the jury to rebut or otherwise call into question his testimony on this point.

Most importantly, CS-1 did not testify regarding a "complex cocaine testing method." (Def. Mem. at 8). He testified about forming an opinion based on touching, smelling, and looking at the cocaine in connection with a physical inspection method that he learned as a drug trafficker in Mexico. (Tr. 692-93, 920).[22] CS-1 acknowledged on cross-examination that "you can't actually get an accurate estimate of the purity of a cocaine-like substance without using special instruments," and that he did not have the necessary "special equipment" in Caracas to conduct such a test. (Tr. 917-18). CS-1 suggested the same thing to the defendants in Caracas on October 27, 2015, when he explained that he would need other chemicals and a "resistance stove" to provide a better estimate of the cocaine's quality. (GX 213-T at 4:8). And when pressed by defense counsel at trial about the accuracy of his assessment, CS-1 specifically limited the extent of his opinion: "[W]ith the test that I did it was enough to know that it was cocaine and that it was high quality." (Tr. 918).

---

[22] Because CS-1's lay opinion was based on personal experience and a first-hand inspection of the cocaine, *United States* v. *Kaplan*, 490 F.3d 110 (2d Cir. 2007), cited by the defendants, is inapposite. (Def. Mem. at 8). In *Kaplan*, unlike in this case, the Government "failed to show that [the lay witness's] opinion . . . was rationally based on facts he had observed." *United States* v. *Kaplan*, 490 F.3d at 119. *United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992), also cited by the defendants, did not involve lay witness opinion testimony. (Def. Mem. at 8).

The Declaration submitted by Dr. Andrea Holmes does not advance the defendants'

position.  (Jan. 17, 2017 Decl. of Dr. Andrea Holmes ("Holmes Decl.") (Dkt. No. 159)).  The

defendants knew well in advance of trial that the Government planned to elicit a lay opinion from

CS-1 regarding the identity and quality of the cocaine that they brought to the October 27 meeting.

Specifically, CS-1 offered the opinion for the first time at the suppression hearing on September

9, 2016, almost two months before trial; his anticipated lay opinion was the subject of *in limine*

motions by the parties filed on October 20; and the Court issued a ruling on those motions on

November 2.  (*See* Dkt. Nos. 91, 161; Sept. 9, 2016 Tr. 410-11; Nov. 2, 2016 Tr. 5).  With that

notice, the defendants plainly could have obtained the information in the Holmes Declaration for

use at trial, whether during cross-examination, a defense case, or both.  *E.g.*, *Harris* v. *United*

*States*, 9 F. Supp. 2d 246, 255 (S.D.N.Y. 1998) ("[W]here at the time of trial a Rule 33 movant

knew or by the exercise of due diligence could have discovered (and consequently demonstrated)

a government witness's perjury, he cannot satisfy the first of the three requirements articulated in

[*United States* v. *Torres*, 128 F.3d 38, 48-49 (2d Cir. 1997)], and the evidence of perjury is not

'newly discovered' under the rule.").  Moreover, Dr. Holmes misapprehended the scope of CS-1's

testimony.  CS-1 did not testify that the defendant's cocaine "had a purity of ninety-five to ninety-

seven percent," and his recorded statements to the defendants regarding those figures were not

offered for their truth at trial (*see* Tr. 693).  (Holmes Decl. ¶¶ 3, 7, 8).[23]  Compounding that error,

---

[23] Dr. Holmes's lack of confidence in CS-1's opinion must be considered in the context of her
"multiple funded projects" involving "novel detection technologies, including drug detection,"
leaving her professionally and financially biased toward the position that it is impossible to identify
cocaine based on a physical inspection (Holmes Dec. ¶ 2).  *See Herrera* v. *Collins*, 506 U.S. 390,
417 (1993) ("In the new trial context, motions based solely upon affidavits are disfavored because
the affiants' statements are obtained without the benefit of cross-examination and an opportunity
to make credibility determinations.").  Specifically, perceiving a "need for a simple, cost effective,

Dr. Holmes further mischaracterizes CS-1's testimony by asserting that he testified about having conducted "the phase transition of a solid substance, here a white powder, to a liquid, here supposedly an 'oil.'" (*Id.* ¶ 5). The defendants then use Dr. Holmes's mischaracterization to assert, in essence, that if CS-1 had actually performed the "phase transition" that Dr. Holmes incorrectly attributes to him, the liquid cocaine would have burned his hand. (Def. Mem. at 8 n.1, 10). CS-1 did not testify that he *converted* the defendants' cocaine to oil; the import of his testimony was that he examined the substance for dampness and moisture, which in his experience tended to feel "oily," "buttery," and "greasy." (Tr. 922-23; *see also* GX 213-T at 3:30 (CS-1 noting that the cocaine contained "evidently pure oil," which he characterized as "the moisture")). Therefore, as the Court observed previously, the commentary to Rule 701 expressly authorizes the type of lay opinion offered by CS-1, and the defendants have not demonstrated that it was incorrect let alone perjurious. And even if it was, because the defendants had ample pretrial notice of this testimony, they cannot satisfy the requirements of Rule 33. *Harris* v. *United States*, 9 F. Supp. 2d at 255. Accordingly, the defendants are not entitled to a new trial based on their claims relating to the cocaine that they brought to the October 27 meeting in Caracas.

---

time efficient and easy-to-operate method for identifying controlled substances," Dr. Holmes and others have developed "DETECHIP technology." A. Smith, M. V. Wilson, M. Trauernicht, A. E. Holmes, Abby Jackson, *Improved Image Analysis of DETECHIP Allows for Increased Specificity in Drug Discrimination*, J. OF FORENSIC RES. (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3989891 (last accessed February 13, 2017).

### 3. The Government Was Not Aware of the Allegedly Perjured Testimony Prior to CS-1's Cross-Examination

The Government did not know, nor should it have known, that any of CS-1's testimony was arguably false before the defendants produced CS-1's prison calls for the first time on the evening of November 14, 2016.

First, the Government does not believe that CS-1's lay opinion regarding the defendants' cocaine was incorrect, and there is no basis in the record to conclude that the Government knew or should have known that this aspect of his testimony was perjurious. As explained above, the defendants have not established that CS-1's opinion was inconsistent with "basic scientific reality." (Def. Mem. at 10). But his opinion was entirely consistent with basic drug-trafficking reality. Specifically, CS-1 learned to identify cocaine and assess its quality while receiving large loads of the substance from Colombia, on behalf of Mexican drug traffickers whom defense counsel went to great lengths to point out to the jury were extremely violent. (*E.g.*, Tr. 909). Had CS-1 failed to develop the ability to accurately identify cocaine and ensure that it was of sufficient quality to satisfy his Mexican bosses, his career—and likely his life—would have been much briefer. Those circumstances, along with CS-1's admitted personal experience consuming the substance, Campo's confession, and the substantial additional evidence demonstrating that the defendants intended to supply CS-1 with an actual sample of cocaine, all provided a sufficient basis for the Government—and the jury—to credit CS-1's lay opinion.[24]

---

[24] Because it is the defendants, rather than CS-1 or the Government, seeking to attach the imprimatur of scientific certainty to CS-1's lay opinion, *Drake* v. *Portuondo*, 553 F.3d 230 (2d Cir. 2009), is inapposite. (Def. Mem. at 10). In *Drake*, an expert witness offered false testimony regarding "a fictional syndrome of sexual dysfunction" that was "medically speaking, nonsense." 553 F.3d at 233 (internal quotation marks omitted). Here, by contrast, CS-1 offered a subjective lay opinion regarding the cocaine based on his first-hand observations and personal experience.

Second, the Government was not aware of the claimed perjury by CS-1 regarding his conduct while incarcerated, or the substance of the prison calls at issue, until the defendants produced the recordings and corresponding translations for the first time on the evening of November 14, 2016. *Cf. United States* v. *Damblu*, 134 F.3d 490, 493 (2d Cir. 1998) ("Where the challenged false testimony was elicited by the defense, rather than the prosecution, that circumstance tends to establish the government's unawareness of the perjury."). The defendants all but concede the point, and argue instead that the information in CS-1's calls "should have been known to the Government far sooner," and that the Government's "failure to obtain the prison calls" reflects "negligen[ce]" and "willful blindness." (Def. Mem. at 9). These claims are insufficient to establish that the Government should have known that any of CS-1's challenged testimony was false.

The defendants' diligence argument is flawed because it focuses on the prison calls rather than the challenged testimony. Because the Government did not possess the calls that are the sole basis for the defendants' post-trial perjury arguments (and the defendants did, long before trial), there can be no serious claim that the prosecution team should have known that the challenged testimony was false—which is the relevant question. Moreover, the defendants obtained the prison calls of CS-1 and CS-2 from either the Bureau of Prisons ("BOP") or an entity contracted by the Marshals Service. Because these entities played no role in the investigation, they were not part of the prosecution team and, thus, the Government did not have a duty to learn of the information in the prison calls. *See United States* v. *Rivera*, No. 13 Cr. 149, 2015 WL 1540517, at *3 (E.D.N.Y. Apr. 7, 2015) ("[T]he court cannot find that the government is in constructive possession of [*inter alia*, prison calls and emails] where, as here, defendant has not presented any evidence suggesting that the BOP was involved in the investigation or prosecution of this case.");

54

*see also United States* v. *Barcelo*, No. 13 Cr. 38, 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15,

2014) ("The scope of the 'duty to learn' articulated in [*Kyles* v. *Whitley*, 514 U.S. 419 (1995)] is

not limitless."); *United States* v. *Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) ("The

constructive knowledge of the prosecutor is not limitless.  It does not encompass every agency and

individual within the federal government.").[25]   In support of their argument otherwise, the

defendants cite only *United States* v. *Spivack*, 376 F. App'x 144 (2d Cir. 2010), a case involving

a prosecutorial misconduct claim where the Second Circuit declined to order a new trial based in

part on the district court's curative instruction.  (Def. Mem. at 10).  In *Spivack*, the court found "no

evidence that the prosecutor knew that the [agent] witness's testimony was false"; to the extent the

prosecutor should have known about the perjury, which the court did not hold, the basis for such

a finding was the fact that the prosecutor *actually possessed* a report by the agent that demonstrated

the falsity of the agent's testimony.  376 F. App'x at 146.  *Spivack* says nothing about a duty to

---

[25] "[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."  *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citation omitted); *see also United States* v. *Merlino*, 349 F.3d 144 (3d Cir. 2003) ("In this case, the BOP was not part of the prosecutorial arm of the federal government as it was not at all involved in either the investigation or the prosecution of the defendants."); *United States* v. *Whitehead*, 165 F. Supp. 3d 281, 283 (E.D. Pa. 2016) ("Nor does *Brady* require prosecutors to search records of other agencies, even if prosecutors could easily acquire those records for their own purposes."); *United States* v. *Valenzuela*, No. 07 Cr. 011, 2009 WL 2095995, at *6 (C.D. Cal. 2009) ("As for telephone records or recordings the government did not request or receive, it is under no obligation now to try to obtain the records—most of which have long since been destroyed, and which defendants could easily have subpoenaed themselves"); *United States* v. *Galestro*, No. 06 Cr. 285, 2008 WL 2783360, at *19 (E.D.N.Y. July 15, 2008) ("Since defendant has not presented any evidence suggesting that prison authorities are part of the 'prosecution team' in this case, this Court cannot find that it would be appropriate to impute knowledge of whatever information the [BOP] may have collected in this case to the prosecutor.").

obtain prison calls or undertake particular investigative techniques with respect to Government witnesses, and is therefore unavailing to the defendants.

Moreover, while the defendants' criticism of the Government's diligence is based on hindsight, the record does not reflect indifference to issues with CS-1 and CS-2.  To the contrary, the prosecution team investigated and arrested CS-1 and CS-2 for illegal drug dealing while working for the DEA, obtained their criminal convictions, confronted CS-2 following his testimony at the suppression hearing, and immediately disclosed the substance of that interview. The prosecution team also admonished CS-1 and CS-2 about their obligations as cooperating witnesses, directed them not to communicate with each other, and caused them to be separated within the prison.  The Government is mindful that these efforts failed to prevent additional issues with CS-1 and CS-2, but it cannot reasonably be said that a blind eye was turned to these issues. More importantly for purposes of the defendants' motion, the defendants obtained the calls weeks before trial, withheld them from the Government, and presented them strategically to the jury, thereby revealing the substance of the calls to the Government for the first time mid-trial.  Before that disclosure, the Government did not know, nor should it have known, of the possibility that CS-1 arguably committed perjury during cross-examination on November 14.

Finally, this case is not "similar" to *Turner* v. *Schriver*, 327 F. Supp. 2d 174 (E.D.N.Y. 2004).  (Def. Mem. at 11).  In *Turner*, the prosecution failed to respond to a specific pre-trial request from the defense for a report relating to a victim-witness's criminal history, the victim-witness testified falsely that he had never been arrested or convicted, and, in summation, the prosecution relied on the false testimony when making the point that, unlike the defendant, the victim-witness had "no criminal record."  327 F. Supp. 2d at 178-79, 184.  The *Turner* court observed that the victim-witness's criminal history was "readily available to the prosecution had

56

it made the most modest effort." *Id.* at 185.  The defendants elide the fact that the *Turner* court only concluded that it was "obvious" that the "prosecutor should have known of the perjury" *because* the failure to disclose the witness's prior record was a "*Brady* violation." *Id.* at 187.  The defendants have not established, nor could they, that the Government violated *Brady* or *Giglio* by failing to obtain the prison calls under the circumstances of this case, and the *Turner* court's conclusion is therefore inapposite.  Unlike the prosecution team in *Turner*, the Government here timely advised the defendants of the criminal conduct of CS-1 and CS-2, and made additional pretrial disclosures pursuant to the Jencks Act and *Giglio*.  Moreover, obtaining, translating, and reviewing a large volume of foreign-language prison calls is also a far greater undertaking than printing a criminal history report; there is no dispute that the Government could have obtained the calls, but its failure to do so was not unreasonable in light of its admonishments to CS-1 and CS-2.  More broadly, the defendants have not demonstrated that the Government knew, or should have known, that any of challenged testimony of CS-1 was false prior to his cross-examination and the evening of November 14, 2016.[26]

_____

[26] The defendants' claim that the Government has failed to comply with its *Brady* and *Giglio* obligations with respect to CS-1, which is limited to a footnote, is meritless.  (Def. Mem. at 12 n.2).  As noted, the Government has provided extensive disclosures regarding CS-1 and CS-2, including their agreements with the DEA (*see* DX 658-662), and information sufficient to demonstrate that they both lied by omission for years in every interaction that they had with law enforcement.  (*See* Tr. 351 (Special Agent Gonzalez agreeing that CS-1 "fooled the DEA for years and years")).  Further disclosures would be duplicative and cumulative.  *See United States* v. *Rajaratnam*, No. 09 Cr. 1184, 2010 WL 1691745, at *2 (S.D.N.Y. Apr. 27, 2010) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."); *see also Tankleff* v. *Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

### 4. The Defendants Used the Prison Calls Strategically and Sufficient Corrective Measures Were Employed

When the Government learned of the calls at issue on the evening of November 14, the prosecution team facilitated the defense's strategic confrontation of CS-1 before the jury by forbearing on any challenge to the authenticity of the calls or the accuracy of the defendants' translations. On the morning of November 15, Campo's attorney used the calls and the translations to conduct an effective confrontation of CS-1. Following the cross-examination of CS-1, the Government made clear to the jury that it believed CS-1 lied during cross-examination by terminating his cooperation agreement in open court. The defendants did not object at the time and later commended the Government for its handling of the situation. During summations, defense counsel presented substantial arguments challenging the testimony of CS-1 and his credibility. The Court later drew the jury's attention to the Government's decision and instructed the jurors, without objection, that CS-1 had "lied" and they were "quite free to reject all or any part of his testimony." (Tr. 1482).

The defendants now claim that the Government had an "obligation to affirmatively stand before the jury and explain in unambiguous language what specific testimony was false and what was the truth." (Def. Mem. at 13). There is some tension in their arguments: the defendants characterize the Government's redirect examination of CS-1 as "arguably improper testimony" (*id.*), then fault the Government for *failing to vouch* for CS-1 by "correcting" his testimony (*id.* at 13-14), and then spend four pages of their brief mischaracterizing the record in an effort to criticize the Government for *vouching* for CS-1 during summations (*id.* at 14-17). *See United States* v. *Bonventre*, No. 10 Cr. 228, 2014 WL 3673550, at *5 (S.D.N.Y. July 24, 2014) ("The Second Circuit has warned prosecutors not to vouch for their witnesses' truthfulness . . . and has even

58

reversed a conviction when a prosecutor repeatedly told the jury that certain testimony was true."

(internal quotation marks omitted)). But no case the defendants cite, in any jurisdiction, establishes

a duty to correct with the scope they suggest. Rather, "[e]ven if it is clear that a witness has

committed perjury, 'cross-examination and jury instructions regarding witness credibility will

normally purge the taint of false testimony.'" *United States* v. *Razzoli*, No. 12 Cr. 550, 2012 WL

12881963, at *5 (S.D.N.Y. Nov. 8, 2012) (quoting *United States* v. *Joyner*, 201 F.3d 61, 82 (2d

Cir. 2000)); *see also United States* v. *Josephberg*, 562 F.3d 478, 494-95 (2d Cir. 2009). The

Second Circuit has "always assumed, though never expressly held, that perjured testimony must

have remained undisclosed during trial in order to require reversal of a conviction." *United States*

v. *Blair*, 958 F.2d 26, 29 (2d Cir. 1992); *see also United States* v. *Zichettello*, 208 F.3d 72, 102

(2d Cir. 2000) (explaining that where defendants had "ample opportunity to rebut [witness's]

testimony and undermine his credibility," the Second Circuit "will not supplant the jury as the

appropriate arbiter of the truth and sift falsehoods from facts" (internal quotation marks

omitted)).[27] The extent of defense cross-examination and arguments to the jury regarding the

challenged testimony is also relevant because "consideration must be given to whether the newly

discovered evidence is cumulative, that is simply additional evidence to that which was presented

---

[27] *Accord United States* v. *Mora*, 152 F.3d 921, 1998 WL 398802, at *1 (2d Cir. 1998) (unpublished opinion) ("In any event, [the defendant] introduced at trial the very evidence that proved that some (relatively inconsequential) testimony was perjured, and that cast doubt on the reliability of other testimony. Under these circumstances, a new trial is not required."); *United States* v. *Zeneski*, 125 F.3d 845, 1997 WL 626380, at *3 (2d Cir. 1997) (unpublished opinion) (stating that for reversal based on "use of perjured testimony" to be appropriate "the perjured testimony must have remained undisclosed during trial"); *Conteh* v. *United States*, 226 F. Supp. 2d 514, 520 (S.D.N.Y. 2002) ("[A] defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony.").

at trial as to a fact, or unique evidence that tends to prove a fact at issue." *United States* v. *White*, 972 F.2d 16, 21 (2d Cir. 1992). Thus, relief is unwarranted pursuant to Rule 33 because the challenged testimony was addressed adequately through cross-examination, summations, and the Court's instructions.

Four of the cases cited by the defendants relating to the supposed duty to correct— *Shih Wei Su*, *Sanfilippo*, *Mason*, and *Rivera Pedin*—are distinguishable on the basis that the falsehood at issue went "uncorrected" at least in part because, in those cases, the defense was either not aware of the falsehood or not in a position to challenge it effectively at trial. (Def. Mem. at 13-14). As suggested in *Cromitie*, 727 F.3d at 222, in most cases where cross-examination was deemed insufficient, the perjury was discovered *after* trial, and cross-examination *during* the trial pertained to matters not related to the newly discovered false testimony. (*See* Def. Mem. at 14). For example, in *United States* v. *Rivera Pedin*, cited by the defendants, the jury was never informed of perjurious testimony from a witness, which the prosecutor knew during the trial was false. 861 F.2d 1522, 1530 (11th Cir. 1988) ("Had the jury known that [the witness] spoke with [an investigator] about receiving money for not testifying, it might well have reached a different decision as to whether [the witness] had fabricated incriminating testimony about [the defendants].").  In contrast, where, as here, defendants obtain prior to trial, and use at trial, the same evidence that is later relied upon to support a post-trial perjury argument, the need for corrective measures by the Government during the trial is diminished substantially.

The Government's comments regarding CS-1 in summations were appropriate and did not exacerbate the challenged testimony. (*See* Def. Mem. at 14-17). "A defendant who seeks a new trial based on a prosecutor's improper closing argument 'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair

trial.' . . . A defendant who fails to object to a prosecutor's allegedly improper remarks faces a higher burden." *United States* v. *Valle*, 301 F.R.D. 53, 105 (S.D.N.Y. 2014) (quoting *United States* v. *Coplan*, 703 F.3d 46, 86 (2d Cir. 2012)).   The Government did not, by "implication" or otherwise, "endorse[] the truth of various of CS-1's statements."  (Def. Mem. at 15).   In the opening, the Government simply asked the jury to "listen carefully" when confidential sources and cooperating witnesses testified, to "[s]crutinze what they say," and to ask whether their testimony was "consistent with and supported by the other evidence in the case."  (Tr. 53-54).   During summations, the Government refrained from asking the jury to rely on CS-1's testimony and did not in any way vouch for his credibility.  Rather, the Government called the "unauthorized drug dealing" by CS-1 and CS-2 "reprehensible," reminded the jury about "what happened in court the other day" when the Government terminated CS-1's cooperation agreement, noted that CS-1 would "have to face the consequences of having breached his cooperation agreement," and argued that the jury should focus on the recordings rather than the testimony from CS-1.  (Tr. 1305-06).  In a subsequent argument regarding the U.S.-importation aspect of the crime, the Government stated explicitly that it was *not* relying on an "assessment of [CS-1's] credibility" during the trial, and asked the jury to instead focus on "listening to the tapes and seeing what's on the page" in the translations.  (Tr. 1321).

          In rebuttal, the Government fairly responded to defense arguments regarding the overall state of the proof and integrity of the investigation, as well as the cocaine that the defendants brought to the October 27 meeting.  The defendants seize on the Government's decision to "stand by" its opening statement during rebuttal, but the Government specified in the next sentence that this would entail leaving it to the jury "to decide which witnesses' testimony to credit and which not to credit."  (Tr. 1449).  The Government also again called the jury's attention to its

decision to terminate CS-1's cooperation agreement, and asked the jury to evaluate CS-1's credibility "pursuant to the Court's instructions"—which stated unequivocally that CS-1 had "lied." (Tr. 1449, 1482). Later in the argument, the Government told the jury "you don't have to believe" CS-1 because the pertinent evidence was "on tape" and "recorded." (Tr. 1455). The defendants did not object to any of these arguments, and the Government's approach was consistent with well-established law reserving credibility determinations for the jury.

Finally, the defendants' challenge to the Government's rebuttal argument regarding their cocaine is frivolous. As stated above, they have not established that CS-1's lay opinion was false or perjurious. But, in any event, the Government did not ask the jurors to credit CS-1's opinion. And they did not need to because substantial evidence supported the inference that the defendants brought cocaine to the meeting in Caracas on October 27. Specifically, the Government argued during rebuttal that Campo held a "kilo of cocaine" during the meeting, then asked "How do you know that?" and answered the question by reference to the sequence of events rather than CS-1: "Because of everything that happened before October 27th and because of everything that happened after." (Tr. 1438). The Government then told the jury—in the next sentence of the argument—that the actual identity of the cocaine "doesn't matter" because the issue was that "the defendants deeply believed that there was cocaine." (Tr. 1438). Accordingly, the defendants have not established that the Governments' arguments in summation were improper, or in any way compounded issues with the testimony of CS-1. More broadly, the actions by the Court and the parties sufficiently addressed issues relating to the challenged testimony of CS-1, and put the jury in a position to assess his credibility. No further corrective measures were required.

**5. Any Perjury Was Immaterial in Light of the Independent Evidence of the Defendants' Guilt**

In light of the independent evidence of the defendants' guilt, they cannot establish that CS-1's alleged perjury was material.

The standard for establishing materiality depends on "the extent to which the prosecution was aware of the perjury." *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). "Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (internal quotation marks omitted). In this case, however, because the Government was unaware of any arguable perjury by CS-1 until the defendants produced the recordings during cross-examination, the question is whether "the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* (internal quotation marks omitted); *see also United States* v. *Truman*, 688 F.3d 129, 141 (2d Cir. 2012) ("Even in cases involving a witness's perjured testimony, however, a new trial is warranted only if 'the jury probably would have acquitted in the absence of the false testimony.'" (quoting *Sanchez*, 969 F.2d at 1414)); *United States* v. *Rosario*, 2013 WL 4078354, at *3. The defendants cannot establish materiality under either standard.

The Court need not evaluate materiality in the abstract. With the exception of the Holmes Declaration (which contains information the defendants inexplicably failed to present at trial), the defense presented to the jury the evidence that serves as the basis for their post-trial perjury claims, and the jury was instructed that CS-1 had "lied." *See Cromitie*, 727 F.3d at 225 (reasoning that, in light of the evidence, the "jury had to recognize that the testimony [of the informant] was false"); *see also United States* v. *Blair*, 958 F.2d at 29 ("Once the perjury is

disclosed during trial . . . there is less likelihood that the verdict was tainted by the false evidence."). Therefore, in light of the evidence and instructions to the jury, its verdicts serve as a strong indication that the challenged testimony from CS-1 was not material.

Moreover, the *Cromitie* court found alleged perjury to be immaterial because "the principal evidence of [the defendants' offense] conduct was the recorded words of the defendants themselves." *Cromitie*, 727 F.3d at 223. The proof was even stronger in this case, *see* Trial Evidence, *supra*, as it included three sources of evidence that did not depend on an assessment of CS-1's credibility: the defendants' confessions, the corroborating evidence from their phones, and the recordings of their negotiations (including Flores's November 6 meeting in Honduras that did not involve CS-1). *Cf. United States* v. *Wong*, 78 F.3d 73, 82 (2d Cir. 1996) ("No doubt, new impeachment evidence may satisfy the 'reasonable likelihood' standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination. But where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." (citations omitted)). While this evidence was presented, the jury heard testimony from several critical witnesses, including: (i) Special Agent Gonzalez, who laid the foundation for admitting the recordings of the meetings in Venezuela and Haiti and testified regarding the defendants' confessions; (ii) Special Agent Mahoney, who described drug-trafficking patterns in the Americas region so that the jurors could evaluate the evidence in a context outside their ordinary experiences;[28] (iii) Daniel Ogden, who extracted the defendants'

---

[28] *See* Order at 2, *United States* v. *Lorenzana-Cordon*, No. 03 Cr. 331-13-14 (D.D.C. Mar. 8, 2016) (Dkt. No. 747) (reasoning with respect to similar anticipated testimony from Special Agent Mahoney that the jury was free to "take into consideration whether the specific cocaine trafficking

electronic communications from their phones; (iv) CS-3 and Carlos Gonzalez, who testified regarding, *inter alia*, the November 5 and 6 meetings in Honduras, which resulted in a detailed plan for the defendants' first cocaine shipment that Flores agreed to and later relayed to Campo; and (v) Maria Elena Alvarado and Henry Rugeles, who translated the defendants' Spanish-language text messages and recorded statements into English so that the jury could understand them. And although the defendants are correct that CS-1 testified at trial regarding his understanding of certain statements in the recordings and electronic communications, that was also true in *Cromitie* and apparently not a compelling a basis for relief. *See Cromitie*, 727 F.3d at 200 n.1, 202-03.[29] Therefore, in light of the entirety of the proof summarized in the Trial Evidence Section, the defendants cannot establish that the challenged testimony of CS-1 was material, and they have not shown that "the jury probably would have acquitted in the absence of [CS-1's] testimony." *Truman*, 688 F.3d at 141. Thus, their post-trial perjury claim fails in this respect as well.

## II. The Evidence Overwhelmingly Established the Defendants' Guilt

The defendants' sufficiency challenges proceed on the basis of a series of conclusory claims about a purported lack of evidence, and inexplicably ignore the tidal wave of proof that the jury used to convict them. The defendants are wrong in every respect, and the Court should reject their arguments regarding the sufficiency of the evidence.

---

activities" described in the evidence "conform to [Special Agent] Mahoney's testimony as to general drug trafficking activities").

[29] (*See, e.g.*, Joint App'x at 619-22 (informant testifying regarding translations of Arabic-language materials), 641-47 (informant testifying regarding recordings in evidence, including his understanding of what participants meant when they used certain phrases), *United States* v. *Cromitie*, 11-2763-cr (2d Cir. Feb. 1, 2012) (Dkt. No. 70-1)).

### A.  Applicable Law

"It is well-established that defendants 'bear[ ] a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'"  *United States* v. *Levy*, No. 11 Cr. 62 (PAC), 2013 WL 3832718, at *1 (S.D.N.Y. July 15, 2013) (quoting *United States* v. *Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  "[T]he Court must uphold the jury's verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *United States* v. *Cote*, 544 F.3d 88, 98 (2d Cir. 2008)).  "[T]he Court must also view the evidence in the light most favorable to the Government and draw all reasonable inferences in its favor."  *Id.* "The Court must further 'consider the evidence in its totality, not in isolation, and the [G]overnment need not negate every possible theory of innocence.'"  *Id.* (quoting *United States* v. *Cote*, 544 F.3d at 98).

### B.  Discussion

#### 1.  The Defendants Joined the Conspiracy to Import Cocaine into the United States

The defendants argue that they did not "manifest an intent to agree to the essential nature of the alleged scheme," and that the evidence "gives equal support" for a finding in their favor on this element.  (Def. Mem. at 20, 23).  The same arguments were made to, and rejected by, the jury.  And for good reason.  The defendants' contentions are frivolous when considered against the weight of the evidence offered at trial.

The evidence demonstrated that the defendants joined the conspiracy with each other as well as others, such as members of the Sombrero Organization, Pepe, Gocho, Daza, Soto, and Carlos Gonzalez, to violate Section 963.  Focusing on the defendants' agreement with each other, which was alone sufficient to convict them, the jury could infer that the defendants were working together, as early as May 2015, to arm their security teams in preparation for obtaining

and dispatching large loads of cocaine (GX 407-T at 3-4 (Campo requesting a "Mini uzi"); *id.* at 5, 7 (Campo requesting a "rifle" and asking about a "silencer"); *id.* at 9-11 (associate of Campo expressing concern about fingerprints on the weapons); GX 510-T at 5 (Campo informing Flores that the "mini uzi" was not smuggled into Venezuela); GXs 412-13, 522-24 (photographs of firearms from defendants' phones); *see also* Tr. 62, 81, 310-11, 1434 (defense concessions about defendants' bodyguards)).[30] *E.g.*, *United States* v. *Santillan*, No. 13 Cr. 138, 2015 WL 6444628, at *2 (S.D.N.Y. Oct. 23, 2015) ("[T]he Second Circuit has repeatedly ruled that firearms are admissible as direct evidence in narcotics cases as tools of the trade." (internal quotation marks omitted)). By at least August 2015, the defendants were working with Pepe and members of the Sombrero Organization to dispatch multiple tons of cocaine from Venezuela. *See* Trial Evidence, *supra*, Part I. On October 3, 2015, the defendants traveled to Honduras to meet with Daza and Sentado to discuss cocaine trafficking, and they welcomed Sentado's purported bosses (CS-1 and CS-2) for three meetings in Caracas shortly thereafter. *See* Trial Evidence, *supra*, Parts III, V. During the meeting on October 23, Campo described Flores as his "partner." (GX 203-T at 21:3). The defendants used those meetings to iron out the details of sending cocaine to Honduras, and

---

[30] In an argument that parallels the defendants' strained position regarding the kilogram of cocaine that they brought to the October 27 meeting in Caracas, the defendants argued at trial that the weapons in these photographs were either paintball guns or pellet guns (referred to as "airsoft" weapons). (Tr. 1443; DXs 334-39). There is no evidence to support that claim other than an undated photograph of Barroeta with what defense counsel asserted (without an evidentiary basis) was "a team of people with paintball gear on and the Venezuelan flag." (DX 326; Tr. 1246; *see also* Tr. 838 (cross-examination questions answered in the negative)). Daniel Ogden, who served in the Marines for six years and in law enforcement for 22 years thereafter, testified that the photographs appeared to depict actual firearms. (Tr. 831, 836-37, 850-51). Campo's requests for a "Mini uzi" and a "rifle," coupled with Barroeta's concerns about leaving fingerprints on the weapons and traveling with them, strongly support Mr. Ogden's assessment. (GX 407-T at 9, 12-13).

they manifested their agreement to do so by bringing a sample of cocaine to the third meeting, on October 27. *See* Trial Evidence, *supra*, Part V. In early November 2015, the defendants demonstrated their mutual agreement and commitment to the plan they discussed in Caracas by attempting—twice—to send drug pilots to Honduras to finalize the logistics for bringing cocaine to the Roatán Airport. *See* Trial Evidence, *supra*, Part VII. When those efforts failed, on November 6, Flores himself traveled to San Pedro Sula and agreed on behalf of the defendants to send the cocaine shipment to Honduras on November 15, 2015, arriving between approximately 4:30 p.m. and 5:20 p.m. (GX 222-T at 7:23-8:2, 9:13; *see also* GX 223-T at 6:8 ("[N]ow it's clear to us that we have a, a precise time")). *See* Trial Evidence, *supra*, Part VIII. Indeed, Flores went so far as to ask when the defendants could send the *second* cocaine shipment. (GX 222-T at 22:11). The defendants then traveled to Haiti together on November 10 expecting to pick up millions of dollars, some of which they planned to use to finance the cocaine shipment. *See* Trial Evidence, *supra*, Part IX. When the defendants were arrested, they both admitted that they agreed—including with each other—to send the cocaine to Honduras, and that CS-1 had told them that the cocaine was destined for the United States. (Tr. 153, 161). Based on this evidence, including the entirety of the defendants' statements on the recordings and to the DEA, the jury could easily infer that the defendants joined, and indeed formed, the charged conspiracy. *See, e.g.*, *United States* v. *Brown*, 937 F.2d 32, 37 (2d Cir. 1991) ("Juries are free to choose any one of a host of reasonable interpretations in inferring criminal intent.").

In support of their argument, the defendants cite to their references to drug trafficking in Canada and Europe during their meeting in Haiti on November 10. (Def. Mem. at 24-25). Stray remarks at that meeting are insufficient to negate the other evidence of the defendants' conspiratorial agreement, particularly in the context of a post-verdict sufficiency

68

challenge.  Moreover, the defendants were hardly equivocal about their intentions during the meeting that preceded their arrest.  They confirmed that the drug shipment was "set up for the fifteenth" of November, the cocaine was already loaded "in suitcases," and the drugs would arrive at the Roatán Airport "between four thirty and five thirty" (GX 231-T at 19:10, 20:17, 21:26).  *See* Trial Evidence, *supra*, Part IX.  Thus, the defendants' final meeting, like the rest of the evidence, establishes their conspiratorial agreement.

Because all of the evidence must be viewed in its entirety, *United States* v. *Gore* is inapposite.  (Def. Mem. at 23).  In *Gore*, the evidence was limited to a "vague statement made contemporaneously with a single heroin sale," which the court found to be consistent with a "buyer-seller relationship."  154 F.3d 34, 40-41 (2d Cir. 1998).  Here, by contrast, the defendants took numerous steps between August 2015 and November 2015 that the jury could have reasonably inferred reflected their agreement to work together to send cocaine from Venezuela to points north along a known pipeline for importing cocaine into the United States, and the defendants admitted to their agreement after they were arrested.  Accordingly, the defendants challenge to the sufficiency of the evidence demonstrating their conspiratorial agreement should be rejected.

## 2.  The Government Established the Defendants' Specific Intent

The defendants next argue that there was a dearth of evidence regarding their specific intent.  (Def. Mem. at 25).  Here too, they are wrong.

The Government was required to prove specific intent with respect to either of the two objects charged in the Indictment:  (i) "the importation of a controlled substance from a place outside the United States into the United States"; or (ii) "the manufacture and distribution of a controlled substance, with the knowledge or intent that some of the controlled substance would be

unlawfully imported into the United States." (Tr. 1496). The evidence established the defendants' intent with respect to both objects and, as the Government argued to the jury, was particularly strong with respect to the second. (Tr. 1447).

The jury could have found the defendants' confessions alone to be sufficient with respect to this element. Campo admitted following his arrest that CS-1—a Mexican—told him that the cocaine was going to the United States (even if he did not "emphasize it"), and Flores confessed that CS-1 "had told him the cocaine was going to Mexico and then to the United States, and several cities within the United States." (Tr. 152-53, 161). These admissions were also corroborated by numerous aspects of the proof at trial.

Beginning in at least August 2015, the defendants worked with Pepe in an effort to send cocaine shipments from Venezuela with Mexican drug traffickers associated with the Sombrero Organization. *See* Trial Evidence, *supra*, Part I. The testimony of Special Agent Mahoney established that these activities were entirely consistent with a group of men working together to import cocaine into the United States. Specifically, Special Agent Mahoney testified that approximately 80% or 90% of the cocaine shipped from Venezuela "along the Central American corridor" is destined for the United States. (Tr. 546, 562). He also explained that even cocaine that is ultimately brought from Central America to Canada is typically imported into the United States first. (Tr. 584). Further, Special Agent Mahoney testified that cocaine sold in the United States generates dollar-denominated proceeds, which "make their way back down south to the owners of the cocaine shipment" and "the transporters or anyone that incurred expenses to get the cocaine to the United States," just as the defendants hoped millions of United States dollars (not Euro) would be provided to them by the Sombrero Organization and, later, CS-1 or his associates. (Tr. 559).

70

On October 3, 2015, the defendants met with Daza and Sentado to discuss dispatching cocaine from Venezuela to Honduras, a location "along the Central American corridor" that Special Agent Mahoney described.  (Tr. 562).  On October 23, CS-1 left no room for doubt about the intended destination of the drugs he was discussing with the defendants, telling them explicitly that he was "responsible for taking everything to the United States."  (GX 203-T at 6:1; *see also id.* at 5:31-35 (CS-2 stating "we send a lot of that to . . . New York, all that")).  On October 26, Campo told CS-1 that Sentado had indicated that the $900,000 transportation fee would be even higher if they were "going to Europe" as opposed to the United States via "Central America."  (GX 206-T at 7:34-8:5).  In addition to explicit recorded statements, several aspects of the defendants' negotiations provided additional circumstantial evidence of the defendants' intention to cause cocaine to be sent to the United States, including: (i) the planned route for the cocaine shipment; (ii) the expectation of payment in United States dollars (GX 203-T at 11:5); (iii) the expectation that the dollars would be sent to the defendants via Mexico, a neighbor of the United States (GX 203-T at 13:1-11; *see also* GX 207-T at 9:19); (iv) Flores's suggestion to Pepe that the defendants were seeking to purchase a U.S.-registered jet for use in drug-trafficking operations (GX 515-T at 11-12); (v) the defendants' offers to secure visas in the United States for drug traffickers such as Rayo (GX 504-T at 8; GX 201-T at 50:14); (vi) Campo's statements indicating that the defendants were "at war with the United States" (GX 201-T at 47:23, 49:6); (vii) Flores's statement about the DEA's supposed lack of presence in Venezuela (GX 201-T at 48:11); (viii) Campo's recorded reference to "extraditables," *i.e.*, foreign nationals charged in the United States with drug-trafficking crimes (GX 205-T at 24:4); and (ix) discussion at the November 6 meeting regarding the DEA's ability to interdict drug shipments at the Roatán Airport (GX 222-T at 10:1, 15:20).

Despite this record, the defendants nevertheless claim that there is "no evidence" that they "even heard, much less understood or agreed to, the informants' supposed decision to target the United States." (Def. Mem. at 27). Their confessions directly refute this argument. *See* Trial Evidence, *supra*, Part X. And, in any event, they cannot prevail on such a claim at this stage of the proceedings. *Cf. United States* v. *Hassan*, 578 F.3d 108, 125 (2d Cir. 2008) ("A jury could reasonably conclude that he was present in the room when khat, drugs, and marijuana were referenced. This is close to sufficient circumstantial evidence from which a jury could rationally conclude that Hassan knew that khat contained a controlled substance."). In light of the proof at trial, *United States* v. *Arbane* is not at all "instructive." (Def. Mem. at 26). In *Arbane*, the Eleventh Circuit found that the prosecution failed to establish the existence of a second co-conspirator in a drug-importation case, reasoning that the record was "devoid of any evidence that [the alleged co-conspirator] knew of the existence of a plan to import the drugs into the United States, much less its purpose or his role in furtherance thereof." 446 F.3d 1223, 1231 (11th Cir. 2006). Here, on the other hand, both defendants toiled on the crossroads of a well-known route for importing cocaine into the United States, both were explicitly told multiple times that the cocaine they were working to ship was destined for the United States, and both admitted that they had been informed of this feature of their agreement. Therefore, the Government adduced sufficient evidence of the defendants' specific intent to join the charged conspiracy.

### 3. The "Unproved-Element Theory" Is Inapposite

The defendants argue that a judgment of acquittal is also appropriate under the "unproved-element theory" of manufactured jurisdiction. (Def. Mem. at 28). This is also a frivolous argument.

72

First, the defendants are wrong that the DEA "unilaterally supplied" the concept of importing cocaine into the United States. (Def. Mem. at 28). The jury could have reasonably inferred based on the testimony of Special Agent Mahoney and evidence of the defendants' efforts to send three tons of cocaine to associates of the Sombrero Organization, *i.e.*, the "taco people" in "*el sombrero*," that the defendants were working with Mexican drug traffickers and either knew, or consciously avoided knowing, that those Mexicans would import the cocaine into the United States. *See* Trial Evidence, *supra*, Part I.

Second, "'manufactured jurisdiction' as an independent doctrine is a dubious concept." *United States* v. *Wallace*, 85 F.3d 1063, 1065 (2d Cir. 1996). The "unproved-element theory" relied upon by the defendants originated in *United States* v. *Archer*, 486 F.2d 670 (2d Cir. 1973). *See United States* v. *Al Kassar*, 660 F.3d 108, 120 (2d Cir. 2011). In *Archer*, "undercover federal agents sought to transform a state crime into a federal offense by having the defendant participate in a call which, without his knowing, was interstate." *United States* v. *Al Kassar*, 660 F.3d at 120. Thus, *Archer* and the unproved-element theory are inapposite because there was more than enough evidence—including the defendants' confessions—for the jury to conclude that the defendants believed the cocaine was destined for the United States.

Finally, "[c]ourts that have construed *Archer* have taken pains to limit its applicability." *United States* v. *Wallace*, 85 F.3d at 1065; *see also, e.g.*, *United States* v. *Podolsky*, 798 F.2d 177, 180 (7th Cir. 1986) (Posner, J.) ("Although *Archer* was decided 13 years ago, no conviction has ever been set aside on the sole basis of the principle announced by it, even in the Second Circuit."). What matters is that "every element of the crime[] of conviction was established by evidence of voluntary action by the defendants." *Al Kassar*, 660 F.3d at 120. Thus, "[c]ourts have refused to follow *Archer* when there is any link between the federal element and a voluntary,

affirmative act of the defendant." *Wallace*, 85 F.3d at 1066. Here, even if it could be said that DEA sources unilaterally injected into the negotiations the concept of importing cocaine into the United States, the defendants thereafter took numerous voluntary, affirmative actions in furtherance of their agreement, including but not limited to the following: (i) the defendants continued to discuss the details of the cocaine shipment on October 23, 2015, as well as in subsequent meetings on October 26 and 27, *see* Trial Evidence, *supra*, Part V; (ii) the defendants obtained a kilogram of cocaine in Venezuela and brought it to the meeting on October 27 so that CS-1 could inspect it, *see* Trial Evidence, *supra*, Part V.C; (iii) Campo remained in contact with CS-1 in October and November 2015, via electronic communications, to coordinate the cocaine shipment, *see* Trial Evidence, *supra*, Part VII; (iv) the defendants reached agreement with a cocaine supplier, Gocho, capable of providing drugs by the "shovelful," *see* Trial Evidence, *supra*, Part VI; (v) the defendants twice attempted to send drug pilots to Honduras to further coordinate the logistics for the shipment, *see* Trial Evidence, *supra*, Part VII; (vi) Flores traveled to Honduras for the same purpose on November 6, *see* Trial Evidence, *supra*, Part VIII; and (vii) the defendants traveled to Haiti on November 10, anticipating that they would be provided with millions of United States dollars and in order to make final preparations before sending the shipment on November 15, *see* Trial Evidence, *supra*, Part IX. The evidence of these actions is more than sufficient so sustain the jury's verdicts because it shows that the defendants knowingly and willfully joined the conspiracy with knowledge that its unlawful objectives included importing cocaine into the United States. As such, this case is squarely outside of the "unproved element" theory of manufactured jurisdiction discussed in *Archer*.

### 4.  The Court Should Not Usurp the Jury's Function

The Court should reject the defendants' request that the testimony from CS-1 be "wholly disregarded for purposes of the sufficiency analysis." (Def. Mem. at 29). The defendants can only proceed with this argument under Rule 33, as the "stringent" standard of Rule 29 "precludes any substitution whatsoever by the court for the jury's determination of witness credibility." *United States* v. *Olazabal*, 610 F. App'x 34, 36 n.1 (2d Cir. 2015) (summary order). Rule 33 is broader, permitting the Court to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States* v. *Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). But a "district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *Ferguson*, 246 F.3d at 133.

In *United States* v. *Truman*, the Second Circuit offered guidance about the manner in which that balance is to be struck by reversing a district court's decision finding a witness "incredible as a matter of law," under circumstances that bear some similarities to CS-1's testimony in this case. 688 F.3d 129, 141 (2d Cir. 2012). Going further than CS-1, the witness in *Truman* refused to answer certain questions during his testimony, thereby preventing the defendant from fully cross-examining him. *See id.* at 139-40. The *Truman* court nevertheless held that "[a]lthough these factors surely impaired [the witness's] credibility, none of them rendered his testimony incredible as a matter of law," and the court also emphasized that "[a]ssessing his credibility was the province of a jury properly instructed . . . on those aspects of his testimony that might bear on the question." *Id.* at 140.

At trial, the Court properly instructed the jury that it was "quite free to reject all or any part of [CS-1's] testimony." (Tr. 1482). Having allowed the jurors to carry out this task, there is no valid basis to reject their work. The defendants rely principally on *United States* v. *Autuori*,

212 F.3d 105 (2d Cir. 2000). (Def. Mem. at 30).[31] There, however, the Second Circuit warned

that, under Rule 29, "'if the court concludes that either of the two results, a reasonable doubt or no

reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *United States*

v. *Autuori*, 212 F.3d at 114 (quoting *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)).

This is not a case where the evidence presented by the Government supported "either of the two

results"; the evidence overwhelmingly supported the jury's guilty verdicts. *Autuori* is also

factually distinguishable because the district court found testimony from the two witnesses at issue,

Googel and Gates, to be not credible on central issues in the case with respect to which those

witnesses provided the *only* evidence. *See United States* v. *Autuori*, No. 96 Cr. 161, 1998 WL

774232, at *30 (D. Conn. Aug. 28, 1998) ("Googel testified to several key meetings"); *id.* at *32

(noting that Gates testified regarding the "substance of his conversation with the Defendant").

Thus, the district court in *Autuori* held that the prosecution had failed to meet its burden on

essential elements of the charges. *See id.*[32] On appeal, the Second Circuit held that the district

---

[31] The defendants mischaracterize *United States* v. *Cherico*, No. 08 Cr. 786, 2012 WL 1755749 (S.D.N.Y. May 16, 2012), by eliding a quote and suggesting that it stands for the proposition that, "in Rule 29 context," courts "look[] to whether 'a reasonable trier of fact could have concluded that the Government's witnesses were credible.'" (Def. Mem. at 30 (purportedly quoting *Cherico*)). In *Cherico*, while addressing a challenge to witness credibility pursuant to Rule 33 rather than Rule 29, the court found that "a reasonable trier of fact could have concluded that the Government's witnesses were credible and that their testimony was consistent in all material respects with each other and with the inculpatory documentary evidence." 2012 WL 1755749, at *4. Thus, *Cherico* does not support the defendants' argument. Nor does *Mesarosh* v. *United States*, 352 U.S. 1 (1956), a case that involved newly discovered evidence that, unlike here, was not known to the parties at the time of trial or presented to the jury that convicted the defendants. (Def. Mem. at 30). Finally, *Jeffreys* v. *City of New York*, 426 F.3d 549 (2d Cir. 2005) is inapposite because, as the defendants acknowledge, it was a civil case involving summary judgment litigation. (Def. Mem. at 30).

[32] Specifically, in *Autuori* the district court found that: (i) "[w]ithout the testimony of Gates, there is no evidence that the Defendant" made a culpable misrepresentation regarding business projections; and (ii) "[w]ithout Googel's testimony there is no evidence from which a jury could

court's Rule 29 analysis had "impermissibly judged the credibility of witnesses, weighed the significance of evidence, and resolved conflicts in testimony against the verdict." *Autuori*, 212 F.3d at 117.  Although the *Autuori* court affirmed the district court's grant of a new trial pursuant to Rule 33, it did so based on two independent findings:  "[T]he credibility of the principal witnesses was weak" and "the soundness of the verdict is highly doubtful."  *Id.* at 121.

      The jury's verdicts in this case are not "highly doubtful" because they were supported strongly by independent evidence.  Unlike in *Autuori*, CS-1's testimony was not the cornerstone of the Government's case.  The defendants' post-trial challenge to CS-1's lay opinion regarding their cocaine is weak, and their other perjury allegations do not attack CS-1's testimony regarding their offense conduct or the elements of their crime.  Thus, in order to resolve the defendants' motion pursuant to Rule 33, the Court need not consider whether to reject all of CS-1's testimony as a matter of law.  This is because the defendants confessed to their crimes, *see* Trial Evidence, *supra*, Part X; several of their meetings related to the offense were recorded, *see, e.g.*, Trial Evidence, *supra*, Parts V, VIII, IX; and electronic communications in furtherance of the offense were seized from their phones, *see, e.g.*, Trial Evidence, *supra*, Parts I, IV, VII.  *See United States* v. *McIntosh*, No. 11 Cr. 500, 2014 WL 199515, at *9 (S.D.N.Y. Jan. 17, 2014) (finding "no exceptional circumstances exist that would warrant usurping the jury's role in assessing the witnesses' credibility" where "considerable portions of the witnesses' testimony were corroborated by surveillance videos").  The Government did not even "introduce[] its recordings" through CS-1; the recordings were received in evidence, without objection, during the testimony

---

reasonably infer the requisite criminal knowledge and intent."  *United States* v. *Autuori*, 1998 WL 774232, at *32.

of Special Agent Gonzalez. (Tr. 201). Moreover, CS-1's "*testimony* regarding the United States" was not "critical to the Government's case." (Def. Mem. 29 (emphasis added)). Rather, it was the *recordings* of the sources' statements to the defendants about the anticipated destination of the cocaine—and therefore the defendants' knowledge and understanding that it was destined for the United States—upon which the Government focused. (*See* Tr. 1321 ("This evidence involves no assessment of [CS-1's] credibility. It's a matter of listening to the tapes and seeing what's on the page.")). Thus, as explained above, the Government's crucial witnesses were Special Agent Gonzalez, Special Agent Mahoney, Mr. Ogden, and the translator experts.

The relevant question under Rule 33 is whether "[c]ompetent, satisfactory and sufficient evidence in th[e] record supports the jury's finding" in this case. *Sanchez*, 969 F.2d at 1414. Because the answer to that question is yes, and it is the province of the jury to determine which parts of a witness's testimony to accept or reject, no relief under Rule 33 is warranted.

## III.  The Defendants Were Not Entrapped

The defendants' entrapment argument failed at trial, and fails following their convictions, because they have declined to engage with the evidence and instead elected to proceed through bold and baseless claims against the Government and the DEA. The jury did just the opposite, and found sufficient evidence to conclude based on the Court's undisputedly correct entrapment instruction that this defense is meritless. While it is true that the DEA's sting investigation led to the defendants' arrests, the evidence established that they were working together and with other drug traffickers before they ever met Sentado. Therefore, the defendants were not induced to commit this crime, and even if they were, they were predisposed to do so. Accordingly, the defendants cannot establish that they were entrapped as a matter of law.

### A.  Applicable Law

The entrapment defense "has two related elements:  government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews* v. *United States*, 485 U.S. 58, 63 (1988).  "Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime." *United States* v. *Williams*, 23 F.3d 629, 635 (2d Cir. 1994).  "If the defendant sustains that burden, the prosecution must prove predisposition to commit the crime beyond a reasonable doubt." *United States* v. *Kopstein*, 759 F.3d 168, 173 (2d Cir. 2014).  "The government may do so by demonstrating '(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.'" *Id.* (quoting *United States* v. *Al-Moayad*, 545 F.3d 139, 154 (2d Cir. 2008)).

Where, as here, a properly instructed jury rejects an entrapment defense through its verdict, a defendant persisting in the defense must establish "entrapment as a matter of law." *Cromitie*, 727 F.3d at 209-10 (citing *Jacobson* v. *United States*, 503 U.S. 540, 553 (1992)).  Such a contention requires the defendants to establish that "[r]ational jurors could not say beyond a reasonable doubt that [the defendants] possessed the requisite predisposition prior to the Government's investigation." *Jacobson* v. *United States*, 503 U.S. at 553.  "In reviewing a challenge to the sufficiency of the government's evidence of predisposition, [the Second Circuit applies] the same rigorous standard applicable to other sufficiency claims." *United States* v. *Jackson*, 345 F.3d 59, 66 (2d Cir. 2003).

**B. Discussion**

**1. The Defendants Were Not Induced to Commit a Drug-Trafficking Crime**

The defendants did not prove by a preponderance of the evidence that they were induced to commit the charged crime, and their arguments to the contrary rely on inferences to which they are not entitled in light of the jury's verdict.

"[A]n entrapment defense may be precluded when there [is] ample proof that [the defendant] had been involved in drug dealing prior to any involvement with a government agent or informant." *United States* v. *Jackson*, 345 F.3d at 66 (internal quotation marks omitted). More than a month before the defendants met Sentado, they were working with Pepe and members of the Sombrero Organization to dispatch cocaine loads from the Maiquetía Airport. *See* Trial Evidence, *supra*, Part I. The defendants and Pepe solicited a $2 million payment in exchange for efforts to secure the release of Polanco, a drug trafficker incarcerated in Venezuela, and worked with the same individuals to try to send cocaine-laden Cessna aircraft, and later a jet, along a path that Special Agent Mahoney explained was a widely known cocaine-importation route to the United States. (*See generally* GX 515-T; 408-T; Tr. 546, 562). None of those individuals was acting at the direction of the DEA, and the defendants offered no evidence of inducement with respect to those activities.

The defendants dispute these arguments by challenging the Government's interpretations of their text messages. (Def. Mem. at 37-38). However, the Government's interpretations are "entirely consistent with the totality of the evidence" regarding the defendants' drug-trafficking activities. *United States* v. *Coppola*, 671 F.3d 220, 239 (2d Cir. 2012). In addition to common sense and consideration of the overall context of these communications, the inference that the phrase "taco people" was a reference to Mexicans, and "*el sombrero*" a reference to

80

Mexico, is further supported by the fact that Pepe was the main conduit between the defendants and the Sombrero Organization, and Campo referred in a chat message to a previous problem involving Pepe, a "mexican snitch" and "his friend, el pollo." (GX 405-T at 5). Campo also described the situation with the Sombrero Organization to CS-1 and CS-2, both Mexicans, as follows: "I had some cars and was working with some people from over there where you guys are from," but "the people didn't come through for us." (GX 203-T at 25:11-15). Finally, Flores indicated that they planned to use a Gulfstream V jet (GX 515-T at 3 ("g5")), which Special Agent Gonzalez explained possessed greater range and autonomy that made it useful in drug-trafficking operations (Tr. 259-60). Thus, the jury could infer that the defendants, Pepe, and the Sombrero Organization planned to use the Gulfstream to transport cocaine all the way to Mexico ("*el sombrero*"), as opposed to a Central American transshipment point.

"Insofar as [the defendants] hypothesize[] alternative" interpretations, "the task of choosing among permissible competing inferences is for the jury, not a reviewing court." *United States* v. *Coppola*, 671 F.3d at 239 (internal quotation marks omitted). The defendants were free to argue competing inferences to the jury, and they did to some extent, but they cannot establish that "a reasonable jury was compelled as a matter of law" to adopt their assertions. *Id.*; *see also United States* v. *Saget*, 377 F.3d 223, 231 n.3 (2d Cir. 2004) ("[The defendant] was of course free to argue to the jury that the statements were so ambiguous that they lacked significant probative value."). This is because many of the interpretations offered by the defense defy common sense. For example, the defendants now argue that Flores and Pepe were "plainly" communicating "about

a construction project involving a permit." (Def. Mem. at 38 (citing GX 515)).[33]  The defendants

did not mention this theory at trial.  Indeed, the defense was more comfortable discussing CS-1's

hypothetical management of taco and pizza restaurants than suggesting to the jury that the

defendants were talking with Pepe about construction.  (Tr. 1420-21).  In any event, the record

was more than adequate to permit the jury to infer that the only business ventures the defendants

discussed with Pepe involved cocaine shipments.  *See* Trial Evidence, *supra*, Part I.

       With respect to the defendants' inducement claim, the jury could also reasonably

infer from the defendants' communications with Pepe that it was the defendants who were

"looking" for a drug trafficker like Sentado, not Sentado looking for targets to bring to the DEA,

that led to their introduction in Honduras on October 3.  (*E.g.*, GX 515-T at 19 (Flores informing

Pepe on September 29 that Campo was "already looking to figure something out elsewhere")).

And that introduction was made by one of the defendants' associates, Daza.  Both defendants

admitted in their confessions that "Hamudi" introduced them to Daza and suggested that Daza had

introduced them to Sentado.  (Tr. 149-50, 162-63).  Campo described Daza to CS-1 as "*my guy,*

*the one who was going to receive me*" in San Pedro Sula on October 3.  (GX 208-T at 29:24

(emphasis added); *see also* GX 207-T at 18:11-21 ("I have a guy there . . . *he really is super loyal*

. . . *and he's a very responsible person . . . as a matter of fact, he's good friends with Sentado.*"

(emphasis added))).  Campo also indicated that it was the defendants, not Sentado, who were to

pay Daza for his role in the offense, and explained that the defendants had "worked well" with

---

[33] The defendants seize on the use of the term "permit" in that exchange, but the jury could infer that Pepe was actually referring to the flight permit from *INAC* necessary to use the Maiquetía Airport, which pilots ("engineers") from the Sombrero Organization had failed to obtain—much to the chagrin of the defendants—in connection with a previous attempted cocaine shipment on or about September 25, 2015.  (*See* GX 515-T at 10, 16-17, 20).

Daza previously.  (GX 205-T at 51:2; *see also id.* at 50:43 ("I even have to give a cut . . . to *my contact* in Honduras." (emphasis added))).

      Because neither Daza nor Rayo was authorized to act as an agent of the DEA, the defendants' interactions with these men cannot support a finding of inducement.  (Tr. 180, 188).  The DEA was not investigating the defendants prior to early October 2015, and thus did not direct Sentado to target the defendants, via his associates or otherwise.  (Tr. 169-70, 172.).  Moreover, Sentado was not authorized to initiate DEA investigations on his own, such as by deploying associates to act at his direction, or to communicate with Venezuelans about drug trafficking (Tr. 169-70, 172).  *Cf. United States* v. *Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) ("[A]n informant becomes a government agent . . . only when the informant has been instructed by the police to get information about the particular defendant.").  Sentado was not even able to identify the defendants in photographs shown to him by the DEA.  (Tr. 366).  There is also no evidence—and only self-serving speculation—that Daza was "serving as Sentado's henchman and following his instructions." (Def. Mem. 41).  Campo admitted to the DEA that Hamudi introduced him to Daza.  (Tr. 149-50).  Moreover, when Campo was frustrated with Sentado's non-responsiveness in late October 2015, Campo asked Daza to find him for CS-1, which further suggests that Daza was aligned more closely with the defendants than Sentado.  (GX 302-T at 2:6).  Therefore, Sentado did not set in motion a series of events that could be said to support a finding of inducement, even on a derivative entrapment theory, by using Daza.  *See United States* v. *Al-Moayad*, 545 F.3d 139, 158 n.15 (2d Cir. 2008).  Accordingly, the record establishes that the defendants sought out the opportunity to engage in criminal activity in Honduras through Daza, and were thus not induced by a Government agent.

Finally, the defendants argue that they were induced by unspecified "Government operatives" who "dangled the prospect of earning $20 million for doing almost nothing." (Def. Mem. at 32). Defendants bore the burden of establishing inducement at trial; they refer to the "record" being "clear" on this point, but they cite nothing. (*Id.*). In fact, it was Campo who demanded the $20 million and explained the urgency. First, on October 23, 2015, he told CS-1: "[M]y mom is running for the election and . . . I need twenty million dollars" by December 2015. (GX 203-T at 11:1-9). At the next meeting, on October 26, he reiterated the objective: "I will need twenty million by December tenth at the latest." (GX 208-T at 21:16). Therefore, in light of all of the evidence, the defendants failed to offer sufficient proof that they were induced to commit the charged crime.

### 2. There Was Extensive Evidence of the Defendants' Predisposition

The evidence establishing a lack of inducement also demonstrated that the defendants were predisposed to commit the offense. The defendants' references to prior drug-trafficking in Europe, their activities with Pepe and the Sombrero Organization, and their preexisting relationship with Daza, constituted evidence of two of the three recognized types of predisposition: (i) "an existing course of criminal conduct similar to the crime for which [the defendant] is charged"; and (ii) "an already formed design on the part of the accused to commit the crime for which he is charged." *United States* v. *Al-Moayad*, 545 F.3d at 154 (internal quotation marks omitted).

With respect to prior similar criminal conduct, both defendants mentioned a separate narcotics transaction that Flores described as "equipment . . . going to france" to people who were "paying 29 for it." (GX 502-T at 2). On October 26, Campo told CS-1 and CS-2 about the situation while negotiating shipments of cocaine to the United States via Honduras; he

indicated that "some French people" wanted the defendants to "pay" with "thirty percent of the cost of the product," *i.e.*, the cocaine.  (GX 206-T at 24:14-20).  Campo later told CS-1 that he "used to have some contacts" in Europe, but the defendants "got a bit nervous" because of "crooked people."  (GX 230-T at 6:12-16).

The jury was also entitled to find sufficient evidence of predisposition from the defendants' communications with Pepe regarding working with the Sombrero Organization to send huge quantities of cocaine to Mexico.  In light of Special Agent Mahoney's testimony about drug-trafficking patterns in the Americas, the fact that Mexico is adjacent to the United States, and the Court's well-founded and substantively accurate conscious avoidance instruction, the jury could conclude that the defendants' activities with the Sombrero Organization included an agreement to distribute cocaine while knowing that those narcotics would be imported into the United States. The defendants' communications also illustrate an "already formed design" to commit the crime: as with Sentado, Daza, CS-1, and others, the defendants planned to work with members of the Sombrero Organization to use their access to the Maiquetía Airport to dispatch large loads of cocaine from Venezuela so that those drugs could be imported into the United States.  On September 29, 2015, before Campo met Sentado, he characterized this preexisting plan as having "gold in our hands."  (GX 403-T at 5).

If the jury reached the issue of predisposition, numerous other statements by the defendants relating to prior drug-trafficking activities supported its conclusion.  Campo indicated that he and Flores had been "working with this," referring to cocaine trafficking, "since [he] was eighteen."  (GX 207-T at 6:12).  On August 31, 2015, Campo wrote to Pepe that the defendants had "done this a couple of times already."  (GX 408-T at 14).  Campo later told CS-1 about a "bad batch" of cocaine that he had obtained previously (GX 207-T at 3:6), and that he had "worked"

with "G2[]" jets before (GX 203-T at 26:13).  Campo also described his relationship with a cocaine

supplier, referred to as "the one who gives me the little animals," as well as "a person who receives

from us."  (GX 201-T at 4:9-23).  Campo told CS-1 that he had "no . . . problem with, with the

quantity" of cocaine that they were discussing, and in another meeting indicated that his contact

could supply cocaine "by the shovelful."  (GX 203-T at 24:7; 207-T at 4:5).  Campo described a

drug-trafficking associate with "thirty years" of experience.  (GX 205-T at 46:26-47:22; *see also*

GX 210-T at 24:39-25:4 ("that's why we do things like our friend" who is still able to "take his

kids to school"); Tr. 154 (Campo describing during his confession advice he received from "his

friend in the drug business")).  The jury was also entitled to infer predisposition, based on prior

drug-trafficking experience, from the defendants' statements and demeanor during recorded

meetings, and the manner in which the defendants supplied—and Campo handled—the kilogram

of cocaine that they brought to the October 27 meeting.  *See Jackson*, 345 F.3d at 66 ("The

videotapes and audiotapes revealed that [the defendants] demonstrated familiarity with the

terminology and operations of the drug trade.").  Therefore, the Government established that there

was both an existing course of criminal conduct, as well as a preexisting design or plan, prior to

any inducement by Sentado or the DEA.

   The Government also established predisposition by showing that the defendants

displayed "a willingness to commit the crime" through their "ready response" to any inducement.

*Al-Moayad*, 545 F.3d at 154.  To the extent Sentado offered inducement prior to October 3, 2015,

the defendants pivoted from their work with the Sombrero Organization to their trip to Honduras

in a matter of days.  (*See, e.g.*, GX 408-T at 26; GX 208-T at 34:13).[34]  Any inducement from Sentado during the October 3 meeting was met with urgency from the defendants.  Upon returning from Honduras, the defendants immediately established a team to handle "security logistics," and they took steps to enhance their communications security by purchasing new BlackBerry devices.  (GX 402-T at 2-3; GX 510-T at 16).  Flores told Pepe on October 4 that he had already reached an agreement with Honduran drug traffickers, explaining that the defendants "already did it somewhere else."  (GX 515-T at 26).  On October 5, Flores expressed frustration about Sentado's non-responsiveness, explaining to Rayo that Sentado had "not given the name of the contact to primo," *i.e.*, Campo.  (GX 504-T at 2).  On the same day, Campo wrote to Sentado that "[w]hat I want is to start work because the electoral campaign is almost here and I always contribute . . . . [w]ith money if you know what I mean that is why I want to start work."  (GX 3508-38-T).  On October 12, Flores informed Rayo that the defendants were prepared to proceed and "just waiting to receive your visit over here."  (GX 504-T at 3).

The defendants were in such a rush to commit this crime that neither Sentado nor the DEA could keep up with them.  *See Cromitie*, 727 F.3d at 215 (emphasizing that defendant "revealed his willingness, indeed his eagerness, to commit" the charged crimes "through his own recorded statements," and concluding that "[f]rom everything that [the defendant] said, the jury was entitled to find that he had a pre-existing 'design' and hence a predisposition").  Concerned

---

[34] Campo described his reaction to the opportunity to meet with Sentado on October 3 as follows:  "When I made up my mind to go over there [to Honduras], I told them:  'Look, tomorrow is already late, tell that man over there that I'm going to be there . . . .'  This was Thursday [October 1, 2015].  'On Saturday [October 3] I'm going to go over there. Tell him we can meet for an hour, if he is too busy, um, I will wait for him or I will arrive early, but I'm going to be there on Saturday.'"  (GX 208-T at 34:13).

with time pressures related to the upcoming election in Venezuela, the defendants felt so much pressure to begin sending cocaine shipments that, before the October 23 meeting with CS-1 and CS-2, the defendants "started to look around elsewhere" for other partners and "met up separately" with another drug trafficker. (GX 203-T at 10:16, 11:17). On October 26, Campo explained to CS-1 that the defendants had temporarily "pulled the plug" on their plans with Sentado and were "talking to other people." (GX 208-T at 34:5; *see also id.* at 38:15 ("[T]he truth is that . . . I had taken this out of play . . . .")). But the defendants further demonstrated their predisposition by returning to the negotiations, with vigor, at and after their meetings in Caracas. Campo described the defendants' approach to dispatching the first cocaine shipment as "a bit urgent," "urgent," and "pressed," and indicated that he was "the most interested in speeding this up." (GX 301-T at 9:2, 11:4, 11:18; GX 304-T at 2:6). The jury was entitled to consider these statements in furtherance of the conspiracy as reflecting evidence of both defendants' predisposition. In the approximately two weeks between providing a sample of cocaine on October 27 and their arrest on November 10, the defendants attempted to send drug pilots to Honduras twice, Flores traveled to Honduras himself, and the defendants then flew to Haiti. This ready response to any inducement, in an extremely compressed timeframe, was more than sufficient for a jury reasonably to conclude that the defendants were predisposed to commit the crime of which they are convicted.

The defendants begin their challenge to the Government's predisposition evidence by devoting approximately two pages to arguments about others' perceptions, from early in the investigation, of the defendants' capabilities and level of sophistication. (Def. Mem. at 34-36). The views of agents and confidential sources on these topics are of little relevance. To the extent others' perceptions of the defendants matter, Special Agent Gonzalez explained that, after reviewing the evidence, he determined that there were indicia of prior drug-trafficking experience

and sophistication for both defendants. (Tr. 477-79). In any event, the Government established the defendants' predisposition through evidence of their own words and actions, not preliminary assessments of law enforcement without access to the entirety of the proof that was presented to the jury.

The defendants also argue that "the failure to record the [October 3] meeting is fatal to the Government's attempt to rebut entrapment by proving the Defendants' predisposition." (Def. Mem. at 31). As the Court has already noted, "[t]he Government is not obligated to record every interaction between a confidential source and a suspect," and Sentado's failure to record the October 3 meeting "is not chargeable to the Government." *Campo Flores*, 2016 WL 5946472, at *3 (internal quotation marks omitted). There is also no mystery about what happened at the meeting because Campo described it to CS-1 in detail. *See* Trial Evidence, *supra*, Part III. Thus, the October 3 meeting—even in the absence of a contemporaneous recording—properly was presented to the jury and alone presents powerful evidence from which a reasonable jury could find a lack of inducement and/or predisposition in rejecting the defendants' entrapment argument.

The Government's rebuttal argument regarding the defendants' "reactions to the proposal that was made in the October 23rd meeting" was consistent with the Court's "legally correct" entrapment instruction and not improper. (Tr. 1459; Def. Mem. at 39).[35] First, the defendants' statements on the recordings were an appropriate area of focus because "what a defendant says after contacted by agents is generally admissible to prove predisposition," as "it

---

[35] The Court instructed the jury that: (i) the Government may demonstrate predisposition "where the defendant indicated his willingness to commit the charged crime by his ready response to the government agent's inducement"; and (ii) "[a]lthough you may consider the evidence relating to a defendant's conduct after he was first approached, you may do so only to the extent that it shows something about the defendant's state of mind before that point." (Tr. 1508-09).

will be a rare situation where a defendant can plausibly claim that the inducement caused him to say something that evidenced predisposition." *Cromitie*, 727 F.3d at 209.  Second, *Jacobson* v. *United States*, 503 U.S. 540 (1992), did not change the law regarding the Government's ability to establish predisposition where a defendant "*promptly* avails himself of a government-sponsored opportunity to commit a crime."  *United States* v. *Brand*, 467 F.3d 179, 192-93 (2d Cir. 2006) (internal quotation marks omitted and citing *Jacobson*, 503 U.S. at 550) (emphasis in original).  In *Jacobson*, law enforcement sought to induce the defendant "over the long span of two-and-one-half years."  *United States* v. *Brand*, 467 F.3d at 191.  On those facts, the inference of predisposition based on a prompt response was not available.  *See United States* v. *Harvey*, 991 F.2d 981, 993 (2d Cir. 1993); *see also United States* v. *Yang Chia Tien*, 638 F. App'x 19, 23 (2d Cir. 2015) (summary order) (characterizing *Jacobson* and its progeny as cases where "long periods of time pass between inducement and alleged criminal acts and the government thus fails to present sufficient evidence of predisposition" because defendants "over many months repeatedly rejected government propositions to engage in criminal behavior").  Here, in contrast, to the extent Sentado is deemed to have offered an inducement on October 3, evidence of the defendants' prompt response over the course of the approximately two weeks between October 23 and November 10 is not too remote to support the jury's finding of predisposition—especially in the context of the substantial amount of international travel involved, and the evidence that the defendants began to work on the Honduras-facing aspects of their mutually undertaken drug-trafficking venture as soon as they returned to Venezuela on October 4.

Lastly, the challenged portion of the Government's rebuttal was not improper because it was "directed to particular defense arguments," *United States* v. *Bonventre*, 646 F. App'x 73, 88 (2d Cir. 2016) (summary order), including not only the defendants' general

90

entrapment defense but also their entrapment theory of "manufactured jurisdiction." Prior to trial, the defendants declared that they would rely on a jurisdictional entrapment defense, *see Al Kassar*, 660 F.3d at 119 (reasoning that "'manufactured jurisdiction' concept" includes a "defense theor[y]" of "entrapment"). (Dkt. No. 44 at 2, 7-8, 9). At trial, they made good on that promise. The defendants argued, for example, that there was "no evidence" that their conversation with Sentado on October 3 "involved the United States," and that Special Agent Gonzalez instructed CS-1 and CS-2 to "pepper the conversations with references to the United States" during the meetings in Caracas so that the Government would "be able to charge a federal crime, a U.S. federal crime." (Tr. 1340, 1359-60). Thus, it was entirely proper for the Government to ask the jury to consider the defendants' prompt reaction to the offer conveyed in the October 23 and 26 meetings, where CS-1 and CS-2 told the defendants explicitly that the cocaine was destined for the United States, in order to establish predisposition on the part of the defendants in response to their jurisdictional entrapment argument.

### 3. The Interests of Justice Weigh in Favor of Respecting the Jury's Conclusions

Persisting in their request that the Court ignore the trial evidence, and citing no authority, the defendants ask that the jury's verdict be set aside in light of "the overall unreliability of the Government's case" and a purported "glut of evidence that the Government pursued the Defendants for reasons wholly unrelated to the charges in this case." (Def. Mem. at 42-43).

The defendants were obligated to present any "serious, unanswered questions regarding the DEA's investigation," or the "[]reliability of the evidence," to the Court during pretrial proceedings, *see* Fed. R. Crim. P. 12(b)(3), and/or to the jury during the trial. And they did. (*E.g.*, Dkt. No. 48 at 1-2; Tr. 1355-56 (referring to "another example of corrupt C.I.s and negligent DEA supervision"); Tr. 1378 ("Now, we have been very critical of the DEA supervision

here . . . .")).  The defendants failed—in pretrial motions, at a two-day suppression hearing, at trial, and in their post-trial motions—to present a persuasive basis to question the reliability of their recorded statements during meetings prior to their arrests, the communications seized from their phones, or their confessions.  The defendants simply cannot escape the objective evidence of their crime and the jury's well-supported conclusion.   And that evidence demonstrated that the defendants were trying to make millions of dollars through drug trafficking long before they spoke to anyone acting at the direction of the DEA.

   The defendants fail to explain why the purported "rar[ity]" of the Government's decision to terminate CS-1's cooperation agreement, relative to other cases, should have borne on the jury's assessment of the credibility of CS-1.  (Def. Mem. at 43).  They liked that argument enough, however, to present it to the jury emphatically, claiming that the situation with CS-1 was "remarkable," "very rare," not "normal," "not business as usual," and "never happens in federal court."  (Tr. 1327-28, 1415).  Those assertions having failed to achieve their desired effect, the defendants now argue that the jury could not "appreciate and appropriately weigh" their arguments regarding the "gravity and significance" of CS-1's conduct.  (Def. Mem. at 43).  This bold claim ignores the institutional role played by jurors in the justice system.  *See, e.g.*, *M. Kraus & Bros.* v. *United States*, 327 U.S. 614, 628 (1946) (Douglas, J., concurring) ("The jury under our constitutional system is the tribunal selected for the ascertainment of guilt."); *United States* v. *Cote*, 544 F.3d at 99 ("The court must give full play to the right of the jury to determine credibility."); *see also United States* v. *Stein*, 428 F. Supp. 2d 138, 140, 146 (S.D.N.Y. 2006) (finding "what has been called the largest criminal tax fraud case in history," involving 18 defendants, "not beyond the ken of our jury pool, particularly given the high caliber of the attorneys

92

involved"). The jury convicted the defendants. In light of the evidence presented at trial, the issues with CS-1 and CS-2 do not call into question the jury's verdicts.

To the extent the defendants' vague arguments are based on Sentado's limited role in the investigation, such claims lack merit. In connection with their motion to suppress evidence on the basis of alleged spoliation, Campo asserted that the defendants were instructed by Sentado "that we should make numerous statements in subsequent meetings." (Dkt. No. 51-1 ¶ 3). This allegation is unsupported by the record and, in any event, insufficient to establish manifest injustice. *See Al Kassar*, 660 F.3d at 121 (holding that "coaching in how to commit the crime do[es] not constitute outrageous conduct"). Prior to the suppression hearing, defense counsel argued that Sentado "orchestrated the entire event" involving the defendants' providing a cocaine sample to CS-1 on October 27, as well as "the entire stream of events that followed." (Sept. 7, 2016 Tr. 9). The defendants never substantiated any aspect of this far-fetched assertion, and Campo told the DEA during his confession that he obtained the kilogram of cocaine from Gocho rather than Sentado. (Tr. 138). During and after trial, the defendants have argued that Sentado offered them $20 million to participate in a drug transaction. (Tr. 1408, 1432-34). As explained above, that contention is in significant tension with Campo's twice-stated explanation that he needed $20 million by December 2015 to help support the campaign of Cilia Flores. (GX 203-T at 11:1-9; GX 208-T at 21:16). Moreover, *Al Kassar* makes clear that "cash inducement[s]" are insufficient to establish a due process violation. 660 F.3d at 121. Finally, although the defendants tried to mislead the jury into believing that the Government had the same access to Sentado during

the trial as it had to any other cooperating witness,[36] the Court is aware that he was murdered less

than 30 days after the defendants were arrested. Thus, "unanswered questions" about Sentado's

role in the investigation resulted in large part from his suspicious demise, but there was

nevertheless substantial evidence of the defendants' guilt, including with respect to the October 3

meeting.[37]

Finally, the defendants have claimed throughout these proceedings, including to

the jury, that the investigation was politically motivated. (Def. Mem. at 43; Tr. at 1392 (arguing

that defendants are "hoping you'll be courageous enough to look past . . . politics, the nonsense");

Dkt. No. 49 at 1 (arguing that the defendants were targeted "possibly for reasons of raw

international politics")). They are wrong. The investigation was motivated by the fact that the

defendants, having declared themselves "at war" with the United States (GX 201-T at 25:4, 47:23,

49:6), were seeking to employ a sophisticated drug-trafficking methodology involving the use of

their political connections to transport cocaine on seemingly legitimate flights through significant

international airports. The defendants were investigated because they are among the most culpable

---

[36] For example, Flores's attorney asked CS-1 whether he understood Sentado was a "cooperating witness," and argued during summation that Sentado "*gets to live*, wherever he lived out there in Honduras, with all his men . . . ." (Tr. 856, 1332 (emphasis added); *see also* Tr. 1342-43 (referring to Sentado as a "cooperating witness" and stating that "[e]ventually a cooperating witness is someone who pleads guilty to their crimes")).

[37] The Government also established at the suppression hearing, but not the trial, that Sentado reported to Special Agent Gonzalez in early October 2015 that "a Venezuelan official by the name of Vladimir Flores was going to send his nephew"—one of the defendants—"to Honduras to meet with CW-1." (Sept. 8, 2016 Tr. 30; *see also* GX 407-T at 3 (Campo requesting one "Mini uzi" for "me and one for my uncle" after inspecting an associate's "Mini uzi" while "[h]ere with my uncle")). Insofar as the defendants invoke the "interests of justice" and invite the Court to look beyond the trial record based on its "institutional understanding" (Def. Mem. at 43), this fact cuts against their inducement argument and further suggests that Sentado would have had only highly incriminating things to say about the defendants had he been available to testify at trial.

types of drug traffickers: two men abusing their wealth, authority, and access to official channels

to engage in a drug-trafficking crime on par with, in their attorneys' words, the activities of "the

most powerful drug traffickers in the world." (Dkt. No. 48 at 16 n.5). Thus, the defendants were

extremely appropriate targets for law enforcement resources and focus, and they have now been

convicted by a jury for their crimes. Not because of "raw international politics" or diplomatic

relations, which played no role in this prosecution, but rather because the defendants engaged in

criminality on a scale not attainable by most, and they did so without regard to those placed at risk

as a result of their actions.

## IV.  There Was a Sound Basis for a Conscious Avoidance Instruction

There was a sufficient factual predicate for a conscious avoidance instruction in

light of the defendants' arguments regarding their lack of knowledge, Special Agent Mahoney's

testimony regarding the intentionally segmented manner in which cocaine is sent from South

America to the United States, and evidence establishing that the defendants worked together on a

drug-trafficking scheme that fit that pattern by relying on compartmentalization—namely, a

transshipment point in Honduras—to send cocaine to the United States.

### A.  Relevant Facts

#### 1.  Opening Statements

During opening statements, Campo's counsel characterized the Government's

recording evidence as containing "meandering conversations in which the informants dominate

the talking" in a way that was "intentionally confusing." (Tr. 58-59). He continued:

> [N]owhere on those tapes that the government just talked about do either of the defendants
> say anything about intending to send narcotics to the United States. The closest the
> government will get are vague references made by the corrupt informants about imaginary
> buyers who are in locations such as Canada or other countries and some cities in America.
> It will all be vague, it will all be non-specific. It will not relate to any agreement.

(Tr. 59).   Counsel told the jury that "none" of the conversation during the recordings related to

"what the actual charges in this case are which is a conspiracy to import narcotics into the United

States."  (Tr. 59).   Counsel argued that:

> The evidence will show that Efrain never had any intention or ability to import 800 kilograms of cocaine into the United States.  He never made a single statement on those recordings saying he intended, that he wanted to have any narcotics shipped to the United States but he was targeted by these conniving informants.

(Tr. 62-63).   Counsel also emphasized that the Government lacks jurisdiction over drug trafficking

in South America absent a nexus to the United States:

> This is a very specific charge.  It requires proof of knowledge or intent to actually import drugs into the United States.  Why is that?  Well, the U.S. and the DEA do not generally have jurisdiction to go around arresting people in foreign countries.  They can prosecute narcotics trafficking only if it takes place here in the U.S. or if the trafficking involves intentional importation into this country.

(Tr. 70-71).

Flores's counsel proceeded in a similar fashion by arguing that the defendants

lacked the requisite knowledge despite the sources' statements in their presence relating to

importing cocaine into the United States:

> The only scattered bits of evidence here that in any way relate to the United States -- and you will see that they're only passing, isolate[d] and sporadic references -- were said by the government's own informants.  They tricked these guys.  They set them up.  And you can see it for yourself on the tapes.  Franqui and Efrain never demonstrate any intent to import narcotics into the United States.

(Tr. 79-80).  Flores's counsel also argued that "[o]n the tapes the defendants are talking about

moving drugs from Venezuela to Honduras," thereby further suggesting a lack of knowledge that

the cocaine would be imported into the United States.  (Tr. 80).

## 2.   The Cross-Examination of Special Agent Mahoney

The defendants used their cross-examination of Special Agent Mahoney to reinforce their argument that drug trafficking in South and Central America does not necessarily involve the importation of cocaine into the United States.  For example, Campo's attorney pointed out that the "majority of the cocaine" sent from Colombia and Venezuela "doesn't ultimately end up in the United States."  (Tr. 561-62).  Counsel also pointed out that "70 percent of the cocaine that leaves Venezuela ultimately ends up in Europe," and that the price of cocaine is higher in Europe and Canada.  (Tr. 563, 570).  Finally, Campo's attorney observed that not "every single person [who ever] had a connection to any drugs in South America is as familiar with the complex information about drug trafficking routes that you're talking about here," and that "people in the general public know that cocaine goes to the United States *and goes to Europe*."  (Tr. 578, 580 (emphasis added)).

## 3.   Summations

During summations, Flores's counsel argued that the evidence included 13 "references to importation of cocaine into the United States."  (Tr. 1360).  He then suggested that the U.S.-nexus feature of the negotiations was not understood or heard by the defendants because they "basically never respond[ed]."  (Tr. 1361).  Flores's attorney also argued that the references to the United States were not "concrete."  (Tr. 1363-64).

Campo's attorney argued that the defendants were "idiots" with respect to their knowledge of the conspiracy and that they "didn't understand what they were getting into."  (Tr. 1401-02).

In response, the Government argued during rebuttal summation—without objection—that, when the Court instructed the jurors regarding conscious avoidance, they should

"think back to the chart that Mr. Rody showed you this morning where it is conceded that there are at least 13 times, on tape, that the sources said 'we bring drugs to the United States.'" (Tr. 1448).

### B.    Applicable Law

"[T]he conscious avoidance doctrine may be invoked to satisfy the requirement that a defendant know of the unlawful aims of the conspiracy." *United States* v. *Svoboda*, 347 F.3d 471, 478-79 (2d Cir. 2003).

> There are two aspects of knowledge involved in a conspiracy: 1) knowing participation or membership in the scheme charged and 2) some knowledge of the unlawful aims and objectives of the scheme.  Conscious avoidance may not be used to support a finding as to the former, *i.e.*, intent to participate in a conspiracy, but it may be used to support a finding with respect to the latter, *i.e.*, knowledge of the conspiracy's unlawful goals.

*United States* v. *Ferrarini*, 29 F.3d 145, 155 (2d Cir. 2000).  Thus, "a conscious avoidance instruction is warranted (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction and (ii) the appropriate factual predicate for the charge exists." *United States* v. *Lange*, 834 F.3d 58, 77 (2d Cir. 2016) (internal quotation marks omitted).  "To establish a factual predicate, there must be evidence that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Id.* at 78 (internal quotation marks omitted).  "A factual predicate may be established where[] a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Id.* (internal quotation marks omitted).

### C.    Discussion

The Court's conscious avoidance instruction was appropriate in substance and warranted in light of the record.  Through jury addresses and cross-examination, the defendants

disputed the Government's proof regarding their actual knowledge of the unlawful objectives of the conspiracy:  to import cocaine into the United States, and to distribute cocaine while knowing and intending that the drugs would be imported into the United States.  *See, e.g.*, *Lange*, 834 F.3d at 78 ("[T]he charge was warranted because [the defendant] argued at trial that he lacked knowledge of the nature of the fraudulent schemes.").  The Government also established both of the two prongs of the factual predicate necessary for a conscious avoidance instruction.

The defendants cannot reasonably contend that there was a lack of proof relating to their awareness of a high probability of the disputed fact—namely, that the conspiracy, in their words, "targeted the United States."  (Def. Mem. at 44).  "[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct."  *See United States* v. *Svoboda*, 347 F.3d at 480 (citations omitted).  As discussed above in Argument, *supra*, Part II.B, the evidence of each defendant's actual knowledge was substantial.  Moreover, Campo's use of gloves to avoid leaving fingerprints on the cocaine sample during the October 27, 2015 meeting, in the presence of Flores, as well as the defendants' efforts to use communications security, further suggested that the defendants were aware of a high probability of the existence of illegal conduct.

The defendants' argument focuses on the second prong of the conscious avoidance factual predicate:  "[E]vidence that the defendant . . . deliberately avoided confirming" that the cocaine they planned to dispatch from Venezuela would be imported into the United States.  *Svoboda*, 347 F.3d at 480.  The defendants cite cases involving direct proof of conscious avoidance, through explicit admissions, in order to suggest that such evidence is necessary to warrant the instruction.  (Def. Mem. at 47-48).  But the Government may—and here, did—

99

establish the necessary factual predicate through circumstantial evidence. *See United States* v. *Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) ("It is not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence."). The features of the defendants' plan, coupled with testimony from Special Agent Mahoney regarding drug trafficking patterns, strongly supported inferences of both actual knowledge by the defendants, as well as a scheme by the defendants and others, like many drug traffickers, to deliberately avoid confirming that their cocaine would be imported into the United States after it reached Central America.

Special Agent Mahoney explained that drug traffickers intentionally adapted their distribution routes in the Americas region in response to law enforcement efforts in the United States and Colombia (including extraditions of Colombian citizens to the United States), as well as the North American Free Trade Agreement. (Tr. 544-45). These drug traffickers "were trying to recede from their role in getting the cocaine to the United States." (Tr. 544). They relied on segmentation and compartmentalization, including the use of transshipment points in Central America such as Honduras, and drug traffickers in Mexico took on a more prominent role in bringing cocaine into this country. (Tr. 543-45).

The jury could infer that the defendants knew of these drug-trafficking patterns and strategies for avoiding liability under United States law by virtue of their connection to the FARC and relationships with other drug-traffickers such as Pepe, Gocho, and Daza. *See United States* v. *Ghailani*, 733 F.3d 29, 53 (2d Cir. 2013) ("[The defendant] was well acquainted and associated closely with Al Qaeda members and operatives whom the jury reasonably could have found to have known of [Al Qaeda's U.S.-related] objectives and shared them with [the defendant]."). Moreover, consistent with this structure, the defendants agreed to ship cocaine from Venezuela to Honduras, and to accept payment based on the price of cocaine in Honduras rather than the price

in the United States.[38]  Especially in the context of CS-1's statements that the cocaine was going

to the United States, the jury could reasonably have inferred that the defendants' plan was a

"purposeful contrivance to avoid guilty knowledge" under United States law.  *Svoboda*, 347 F.3d

at 480 (citation omitted).   The evidence with respect to conscious avoidance was even more

powerful with respect to Campo, who stated initially during his confession that "he did not know

the drugs were going to the United States and that those words never came out of his mouth," and

then conceded that CS-1 had told him about the destination of the drugs but that he "didn't

emphasize" the United States-related aspects of the deal.  (Tr. 152-53; *see also* Tr. 262-63).

        The defense theories at trial cemented the appropriateness of the conscious

avoidance instruction by suggesting that even if the defendants planned to send drugs to Central

America, they did not know the cocaine was destined for the United States.  *See United States* v.

*Addario*, --- F. App'x ----, 2016 WL 6106896, at *2 (2d Cir. Oct. 18, 2016) (summary order)

(conscious avoidance instruction appropriate in light of "defense's theory").   At trial, the

defendants seized on the segmented nature of the cocaine shipments that they had negotiated,

arguing that "[o]n the tapes the defendants are talking about moving drugs from Venezuela to

Honduras" rather than the United States.  (Tr. 80).  Campo's attorney asserted during his cross-

examination of Special Agent Mahoney that drug trafficking is usually compartmentalized to such

an extent that "it's unlikely that a person in a drug organization," such as CS-1 or Sentado, "would

---

[38]  The defendants explained to CS-1 that they had an explicit conversation with Sentado about
being paid approximately $12,000, subject to market fluctuations.  (GX 206-T at 4:13-21, 12:20-
13:1, 17:29-19:29; GX 301-T at 18:33-35 (Campo referring to "h's stockmarket"); Tr. 160-61
(Flores confession)).   Special Agent Mahoney testified that the wholesale price of cocaine in
Honduras (and Guatemala) was in the range of between $10,000 and $12,000 per kilogram, as
opposed to a price in the United States of between $20,000 and $30,000.  (Tr. 547).

freely share information with someone outside of that organization," purportedly the defendants, "about where . . . their drug trafficking routes were." (Tr. 572). The defendants also argued that the recordings suggested that they did not understand, or did not respond, to the confidential sources' references to the United States. (*E.g.*, Tr. 67 (arguing that the defendants were "too stupid about the drug trade"); Tr. 1361 ("Another thing about these references to the United States. The defendants basically never respond.")). But the same features of the recordings upon which the defendants relied also permitted the jury to infer that the defendants—mindful of the jurisdictional limits on Title 21 that their attorneys pointed out (Tr. 356-57)—*intentionally* avoided confirming that their cocaine was destined for the United States by acting aloof, playing dumb, or obfuscating the sources' description of their plans for the drugs. Accordingly, based on the evidence and defense arguments, the Government established the factual predicate for a conscious avoidance instruction.

The Court's decision to give the instruction is supported by *United States* v. *Henareh*, 563 F. App'x 808 (2d Cir. 2014). In *Henareh*, the defendant was convicted of participating in a heroin-importation conspiracy and argued on appeal that there was an insufficient predicate for a conscious avoidance instruction. *Id.* at 810. The court found ample evidence of the defendant's actual knowledge because the "sources informed [the defendant] that the drugs were intended for the United States." *Id.* As to conscious avoidance, the court held: "Our review of the record confirms that this is the very instance when a defendant's '*purported lack of knowledge* defense, *despite* [*his*] *deep involvement in the transactions* that effectuated [the crime], all but invite[s] the conscious avoidance charge.'" *Id.* at 811 (quoting *United States* v. *Cuti*, 720 F.3d 453, 464 (2d Cir. 2013)) (emphases added); *see also United States* v. *Kozeny*, 667 F.3d at 133. The same reasoning applies in this case, with even greater force, based on the evidence of

the defendants' "deep involvement" in negotiations in Venezuela, Honduras, and Haiti, and the contours of the defendants' lack-of-knowledge defense.

Arguing otherwise, the defendants rely principally on language from *United States* v. *Rodriguez*, where the court noted that "the defendant must be shown to have *decided* not to learn the key fact," 983 F.2d 455, 458 (2d Cir. 1993) (emphasis in original). (Def. Mem. at 44). The *Rodriguez* court used that language, however, to make the point that the Government must establish a defendant's knowledge of the objects of the conspiracy—whether actual, or consciously avoided—beyond a reasonable doubt rather than under a "negligence standard." *United States* v. *Rodriguez*, 983 F.2d at 458 ("That emphasis on 'deliberate ignorance' was significant because it captured the thought, essential to the concept of conscious avoidance, that the defendant must be shown to have decided not to learn the key fact, not merely to have failed to learn it through negligence."). In this case, the Court addressed the concern raised in *Rodriguez* by instructing the jury during its conscious avoidance charge that negligence was insufficient. (Tr. 1504-05).[39] The *Rodriguez* court also made clear that the pertinent question is whether "a rational juror could find beyond a reasonable doubt that [the defendant] was aware of a high probability that the suitcase contained a controlled substance and consciously avoided confirming that fact." *Rodriguez*, 983 F.2d at 458. The court then held that there was a sufficient basis for a conscious avoidance charge where the defendant possessed a suitcase with cocaine secreted in the lining, in light of the

---

[39] First, the Court stated that "knowledge cannot be established by a showing that a defendant was careless or negligent." (Tr. 1504). Second, the Court noted that "if the defendants were merely negligent or careless with regard to the knowledge they had, they lacked the knowledge necessary to become a coconspirator." (Tr. 1505). The Court also emphasized to the jury that "[i]t is for you to determine whether the government has established to your satisfaction *beyond a reasonable doubt* that such knowledge and intent on the part of the defendants existed." (Tr. 1501 (emphasis added)).

"*inherent implausibility* of the claim that a four-pound quantity of concealed cocaine was accidentally acquired through purchase of an empty suitcase at a flea market." *Id.* (emphasis added). Thus, like *Henareh*, *Rodriguez* confirms that defense arguments—especially inherently implausible contentions, such as that a defendant did not hear something that was uttered several times in his presence—can play a significant role in creating a foundation for a conscious avoidance instruction.

Finally, the defendants also object, for the first time, to the Government's rebuttal argument relating to conscious avoidance. (Def. Mem. at 46-47). During the challenged portion of the argument, the Government simply called attention to the Court's instruction, and asked the jury to consider the arguments of defense counsel regarding the recorded references to the United States by CS-1 and CS-2 when applying it. (Tr. 1448). The Government was not obligated, particular in a rebuttal summation designed to respond to defense claims, to call attention to the evidence in support of every aspect of its position regarding the defendants' conscious avoidance or their guilt. The Government also twice pointed out during rebuttal, including in close proximity to the challenged reference to the conscious avoidance instruction, that it bore the burden of proof beyond a reasonable doubt. (Tr. 1448, 1458-59). Thus, the defendants are incorrect that the Government "invited" the jury to do anything improper (Def. Mem. at 47), and, in any event, the Court's accurate instruction relating to conscious avoidance cured any prejudice resulting from the Government's argument.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court

should deny the defendants' post-trial motions.

Dated:  New York, New York
        February 13, 2017

                                        Respectfully Submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                               By:      _____
                                        Emil J. Bove III
                                        Brendan F. Quigley
                                        Assistant United States Attorneys

Cc:     Defense Counsel
        (Via ECF)

105