UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                   :

UNITED STATES OF AMERICA,            :

                                     :

          - v. -               :  S2 15 Cr. 765 (PAC)

                                     :

EFRAIN ANTONIO CAMPO FLORES and    :
FRANQUI FRANCISCO FLORES DE FREITAS,  :

                                     :

           Defendants.         :

                                     :

                                     :

-----------------------------------------------------------------X

## **DEFENDANTS' JOINT REPLY IN SUPPORT OF THEIR RULE 29(C) MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 1

I.  THE GOVERNMENT'S RECITATION OF THE TRIAL EVIDENCE DEPENDS ON IMPERMISSIBLE INFERENCES AND MISCHARACTERIZATIONS OF THE EVIDENCE. ...................................................................................... 1

    A.  Applicable Law ............................................................................. 1

    B.  Discussion .................................................................................... 2

II.  *UNITED STATES V. CROMITIE* DOES NOT SUPPORT THE GOVERNMENT'S ATTEMPT TO EVADE THE CONSEQUENCES OF ITS WITNESS'S PERJURY. ...................................................................... 8

III.  THE GOVERNMENT HAS FAILED TO ADDRESS THE EVIDENCE OF PERJURY IN CS-1'S TESTIMONY, AS ESTABLISHED BY DR. HOLMES'S DECLARATION. ................................................................................. 12

IV.  THE GOVERNMENT CANNOT SIDESTEP THE IMPLICATIONS OF CS-1'S PERJURY, REQUIRING THAT THE DEFENDANTS BE GRANTED A NEW TRIAL. .......................................................................................... 18

    A.  Whether the Government Knew of CS-1's Perjury Prior to His Testimony Is Irrelevant. ........................................................................... 18

    B.  The Government's Argument that It Lacked Constructive Knowledge of the Falsity of CS-1's Testimony Is Not Supported by Case Law or Logic. .......... 20

    C.  The Government Should Have Known of the Falsity of CS-1's Testimony Because It Was on Notice that CS-1 Had Lied in the Past and Had an Obligation to Investigate His Veracity Before Putting Such a Critical Witness on the Stand. .................................................................................. 24

    D.  The Government Cannot Avoid Clear Precedent that Required It to Correct CS-1's False Testimony. .................................................................. 27

    E.  The Government's *Brady/Giglio* Obligations Are Ongoing and Additional Necessary Disclosures Cannot Be Dismissed As "Cumulative." ................... 31

V.  THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANTS WERE NOT ENTRAPPED .......................................... 33

    A.  The Defendants Were Induced Into Participating in the Sting. ..................... 34

i

**B.**     **The Government Failed to Prove Predisposition Beyond a Reasonable Doubt.** ................................................................................................ 38

      1.     Failure to Record the Meeting Undermines the Sufficiency of the Evidence.................................................................................. 38

      2.     The Defendants Did Not Readily Respond to the Inducement.................. 40

**C.**     **The Government's Reliance on *United States v. Cromitie* in Support of Its Entrapment Argument Is Unavailing.** ............................................................ 42

**VIII.**    **EVEN AT THIS LATE DATE, THE GOVERNMENT STILL CANNOT IDENTIFY WHAT EVIDENCE THERE WAS THAT THE DEFENDANTS DELIBERATELY AVOIDED GUILTY KNOWLEDGE, AS REQUIRED TO JUSTIFY CONVICTION ON A CONSCIOUS AVOIDANCE THEORY.** ............... 45

**CONCLUSION** ................................................................................................. 49

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belmontes v. Brown*,
   414 F.3d 1094 (9th Cir. 2005) ........................................................................28, 30

*Broam v. Bogan*,
   320 F.3d 1023 (9th Cir. 2003) ................................................................................32

*Commonwealth of N. Mariana Islands v. Bowie*,
   243 F.3d 1109 (9th Cir. 2001) ................................................................................28

*Drake v. Portuondo*,
   553 F.3d 230 (2d Cir. 2009)...............................................................13, 14, 27

*Harris v. United States*,
   9 F. Supp. 2d 246 (S.D.N.Y. 1998).........................................................................17

*Hayes v. Brown*,
   399 F.3d 972 (9th Cir. 2005) (en banc) ..................................................................27

*Jacobson v. United States*, 503 U.S. 540 (1992) .......................................................41

*Jenkins v. Artuz*,
   294 F.3d 284 (2d Cir. 2002)....................................................................................30

*Leka v. Portuondo*,
   257 F.3d 89 (2d Cir. 2001).....................................................................................32

*Mastracchio v. Vose*,
   274 F.3d 590 (1st Cir. 2001)...................................................................................22

*Napue v. Illinois*,
   360 U.S. 264 (1959)..........................................................................................27, 28

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
   818 F.3d 1320 (Fed. Cir. 2016)...............................................................................15

*Shakur v. United States*,
   32 F. Supp. 2d 651 (S.D.N.Y. 1999).......................................................................24

*Sherman v. United States*,
   78 S.Ct. 819 (1958).................................................................................................37

ACTIVE 220293490v.4

*Shih Wei Su v. Filion*,
    335 F.3d 119 (2d Cir. 2003)................................................................13

*In re Swearingen*,
    556 F.3d 344 (5th Cir. 2009) ...........................................................15

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998) .............................................31, 32

*United States v. Aina-Marshall*,
    336 F.3d 167 (2d Cir. 2003)..............................................................48

*United States v. Al-Moayad*,
    545 F.3d 139 (2d Cir. 2008)..............................................................34

*United States v. Bin Laden*,
    397 F. Supp. 2d 465 (S.D.N.Y. 2005)..........................................21, 22

*United States v. Birbal*,
    113 F.3d 342 (2d Cir. 1997)..............................................................36

*United States v. Brand*,
    467 F.3d 179 (2d Cir. 2006)..........................................................40, 41

*United States v. Burnside*,
    824 F.Supp 1215 (N.D. Ill. 1993) ...............................................23, 25

*United States v. Cromitie*,
    727 F.3d 194 (2d Cir. 2013)........................................................ *passim*

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)................................................................1

*United States v. Foster*,
    874 F.2d 491 (8th Cir. 1988) ...........................................................30

*United States v. Glover*,
    588 F.2d 876 (2d Cir. 1978)..............................................................28

*United States v. Greenidge*,
    100 F.3d 941 (2d Cir. 1996)..............................................................35

*United States v. Harvey*,
    991 F.2d 981 (2d Cir. 1993)..........................................................40, 41

*United States v. Henareh*,
    563 F. App'x 808 (2d Cir. 2014) ...................................................48, 49

iv

*United States v. Moore,*
   452 F.3d 382 (5th Cir. 2006) (per curiam)..............................................................22

*United States v. Pilarinos,*
   864 F.2d 253 (2d Cir. 1988)..................................................................................42

*United States v. Rivera,*
   No. 13 Cr. 149, 2015 WL 1540517 (E.D.N.Y. Apr. 7, 2015) ...........................20, 21

*United States v. Robinson,*
   545 F.2d 301 (2d Cir. 1976)....................................................................................2

*United States v. Salerno,*
   66 F.3d 544 (2d Cir. 1995)..............................................................................38, 39

*United States v. Santiago,*
   46 F.3d 885 (9th Cir. 1995)..................................................................................22

*United States v. Spagnoulo,*
   960 F.2d 990 (11th Cir. 1992) .............................................................................23

*United States v. Spinney,*
   65 F.3d 231 (1st Cir. 1995)....................................................................................2

*United States v. Thornton,*
   1 F.3d 149 (3d Cir. 1993) ....................................................................................24

*United States v. Valdez,*
   101 F.3d 684 (2d Cir. 1996)................................................................................35

*United States v. Valencia,*
   645 F.2d 1158 (2d Cir. 1980)..............................................................................34

*United States v. Vozzella,*
   124 F.3d 389 (2d Cir. 1997)................................................................................25

*United States v. Washington,*
   106 F.3d 983 (D.C. Cir. 1997).............................................................................35

*United States v. Wilson,*
   160 F.3d 732 (D.C. Cir. 1998)..........................................................................1, 22

*United States v. Wilson,*
   237 F.3d 827 (7th Cir. 2001) ...............................................................................22

*United States v. Yannotti,*
   415 F. Supp. 2d 280 (S.D.N.Y. 2005)....................................................................1

**Other Authorities**

U.S. Const. amend. VI ................................................................................................36

U.S. Const. amend. XIV ........................................................................................27, 28

Fed. R. Crim. P. 29 .......................................................................................... *passim*

Fed. R. Crim. P. 33 .......................................................................................... *passim*

ACTIVE 220293490v.4

## INTRODUCTION

In a transparent attempt to salvage an extraordinarily flawed investigation and prosecution in this case, in which its own star witness lied on the stand, the Government now mischaracterizes the record and misapplies the relevant case law.  But its attempts are unavailing.  As described below, the Government's Brief in Opposition ("Opp.") fails to rebut the arguments set forth in the Defendants' post-trial motions.  For the reasons set forth below, and in the Defendants' Rule 29 and 33 post-trial motions ("Mot."), the Defendants' motions should be granted.  This Court should, at a minimum, exercise its considerable discretion to grant a new trial, so that the Defendants may receive a fair trial free of the taint of the extraordinary perjury committed by the Government's key witness.

## ARGUMENT

I.    **THE GOVERNMENT'S RECITATION OF THE TRIAL EVIDENCE DEPENDS ON IMPERMISSIBLE INFERENCES AND MISCHARACTERIZATIONS OF THE EVIDENCE.**

A.    **Applicable Law**

The Government is not permitted to defend its conviction on the basis of alleged "inferences" that amount to speculation.  *See United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (reversing conviction that rested on impermissible inferences and noting that "a conviction based on speculation and surmise alone cannot stand").  A court "cannot sustain a jury's verdict when the government's web of inference is too weak to meet the legal standard of sufficiency." *United States v. Wilson*, 160 F.3d 732, 737 (D.C. Cir. 1998) (citation and internal quotation marks omitted).  "While a jury may draw reasonable inferences, it may not engage in impermissible speculation." *United States v. Yannotti*, 415 F. Supp. 2d 280, 289 (S.D.N.Y. 2005) (granting post-trial motion for judgment of acquittal).  Moreover, where the Government argues that the jury could have inferred a complex inference that was never argued to the jury,

1

the court should reject the Government's suggestion.  *See, e.g.*, *United States v. Robinson*, 545 F.2d 301, 304 (2d Cir. 1976) (reversing conviction and noting that "[t]he government's proof regarding the disbursement offices is based upon information printed on the checks that was never explained to the jury").  "Despite the deference that characterizes appellate [and post-trial] review of jury verdicts, juries do not have *carte blanche*. . . .  [T]he reviewing court [must] take a hard look at the record and . . . reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.  This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt."  *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995) (citations omitted).

### B.     Discussion

The Government's recitation of the trial evidence is riddled with arguments that depend on speculative, unsupported notions that the Government has attempted to frame as "inferences" that could have been drawn by the jury.  At the outset, the Government argues that "[t]he Government established that the charged conspiracy involved a core group of co-conspirators— including Campo, Flores, and a man referred to at various times as 'Pepero.'"  (Opp. 3).  There was absolutely no evidence introduced at trial, however, supporting the idea that "Pepero" was a member of the charged conspiracy.  The charged conspiracy was one to either import narcotics into the United States or to distribute narcotics with knowledge that the narcotics were being imported into to the United States.  Pepero was not present at any meetings with the confidential sources.  Pepero was not captured on any recording or other communication conversing about the transportation of narcotics to the United States.  And of course, because the alleged conspiracy in this case involved *no actual cocaine being shipped to the United States*, there is no evidence that Pepero was ever involved in importing any cocaine into the United States.

2

Likewise, nowhere in the record of the Defendants' alleged confessions is there any suggestion that Pepero was informed as to the ultimate destination of the imaginary cocaine that CS-1 claimed he was going to send to the United States.  (Tr. 147-55; 160-64).  In fact, contrary to the Government's suggestion in its recitation of the supposed confessions (Opp. 35), there was no testimony that Campo Flores mentioned any "Pepe" or "Pepero" at any point in his discussion with the DEA agent—the Government's basis for its claimed link between the post-arrest statement and the text messages is one witness's testimony that "Pepe" is a common nickname for "Jose" (Tr. 147-48 ("A. Campo mentioned that an individual, Juan Jose—he used both of those names—was an intermediary.  Q. Now, in Spanish are there any common nicknames associated with the name Jose?  A. Yes?  Q. What is that?  A. I know of one:  Pepe")).  "Pepe" is indeed a nickname for "Jose," but there are also many other common nicknames for "Jose," and Pepe is not a common nickname for "Juan Jose."  More importantly, there are literally millions of people named "Jose" in South America.  Without some testimony logically linking Pepero to "Juan Jose," it is improper for the Government to suggest that the two individuals are the same person.

Moreover, whoever "Juan Jose" was, the testimony about him includes no reference to any conversation that would allow the inference that he was ever informed about CS-1's statements regarding the United States or any other information that would give him the necessary knowledge to become a member of a conspiracy to import narcotics into the United States.  Thus, the Government has no basis for arguing at trial that Pepero was a member of the conspiracy, and the Government has no basis for advancing the notion here that the jury could have properly considered Pepero a member of the charged conspiracy.

3

The Government next launches into an unsupported narrative about a supposed plot to free an incarcerated drug trafficker, Hermagoras Gonzalez Polanco, and "to send cocaine-laden aircraft from Venezuela to Mexican drug traffickers." (Opp. 3). Putting aside the fact that there is no logical connection between any of this discussion and the charged conspiracy, the entire set of inferences urged by the Government here is impermissible. There is no actual reference to "Mexican drug traffickers" in any of the communications—this is pure speculation based on the Government reading the words "taco" and "sombrero" in text messages. (Opp. 80). The inferences upon inferences that underlie the Government's "taco" extrapolations are not based on any evidence. (*E.g.*, Opp. 80-81 ("In addition to common sense and consideration of the overall context of these communications, the inference that the phrase 'taco people' was a reference to Mexicans, and '*el sombrero*' a reference to Mexico, is further supported by the fact that Pepe was the main conduit between the defendants and the Sombrero Organization")).

Similarly, the Government argues in a footnote that "[t]he jury could infer from the defendants' communications with Pepe, and the fact that associates of the Sombrero Organization were trying to secure Polanco's release, that Polanco was incarcerated based on drug-trafficking activities." (Opp. 3). The jury could infer no such thing. There was no evidence in the record about the nature of any charges against Hermagoras Gonzalez Polanco. Indeed, the document the Government cites as evidence of the Defendants' supposed participation in a plot to "free an incarcerated drug trafficker" contains no reference to any actual actions taken to free Gonzalez, but rather features only a few lines of text in which Campo Flores simply asks, "Look what's the name of the dude that is locked up[?]" (GX 408-T at 15). The inferences that the Government is suggesting could be drawn from this exchange are more than speculative—they are illogical. They also do not bear on the question of whether there was

4

sufficient proof for a reasonable jury to conclude that the Government had met its burden.  Even if the Government could establish that the Defendants had conversed with someone about trying to secure the release of Polanco, this has no bearing on the conspiracy charged in this case.  The Government is not permitted to take any unexplained conversation in the Defendants' phones and argue as inferential proof a manner in which the conversation *might* have a relationship to drug trafficking and *might* be related to the charged conspiracy to import cocaine into the United States.

The Government further improperly asserts that a number of entirely speculative inferences could have been drawn by the jury regarding conversations between "Pepe" and Campo Flores in August of 2015.  For example, the Government asserts that during this time period, "Pepe informed Campo that he had communicated with potential drug-trafficking partners and directed them to [hand over money] . . . .  Pepe also indicated that he had relayed the same information to Flores, and that he was going 'on a trip' to meet with associates of the Sombrero Organization."  (Opp. 5 (citing GX 408-T at 6)).  Nowhere in the conversation cited by the Government is there a reference to the "Sombrero Organization."  (*See* GX 408-T at 6). The word "sombrero" does not even appear in the text messages cited by the Government.  (*See id.*)  "Pepe" does not say in these text messages that he is communicating with "potential drug-trafficking partners"—he says only that he spoke with some people about an unspecified business dealing—and there is no reference to "cocaine" or any other narcotic in the conversation.  (*See id.*)  Indeed, the word "cocaine" is sprinkled throughout the Government's casual recitation of the exchanges between the Defendants and "Pepe" (Opp. 3-10), but nowhere in any of these text messages does the word cocaine or any synonym for cocaine appear.  (*See*

5

*id.*)  At bottom, the narrative that the Government advances in its brief depends on pure speculation about the meaning of a number of facially benign statements.

It also cannot be overemphasized that, even accepting certain of the Government's improper interpretations, nowhere in the referenced text messages with "Pepe" is there any discussion of actual completed drug transactions—just banter over potential unspecified business with nebulous parties.  There are also no references to the United States.  The Government's extrapolations of these text conversations as evidence of the early stages of a complex and nefarious conspiracy to import drugs into the United States are unsupportable.

Later in its recitation of the supposed trial evidence, the Government asserts that in September of 2015, "Pepe wrote to Flores that Mexicans aligned with the Sombrero Organization ('the taco people') were 'arriving today.'"  (Opp. 10 (citing GX 515-T at 19)).  The Government cannot argue as a fair inference that the mere reference to "taco people" equals a reference to "Mexicans" aligned with a drug trafficking organization.  It is pure speculation. Later, the government argues that the phrase "take out the two" can be interpreted to mean that "Pepe" was indicating that the "Sombrero Organization" was prepared to pay Flores "$2 million . . . and then dispatch [a] cocaine load to Mexico."  (Opp. 11 (citing GX 515-T at 24)).  But "take out the two" could refer to anything—there is nothing in the text to indicate that this is a reference to money at all, much less to two million U.S. dollars, and there is certainly nothing in the text that justifies the speculation that this is a reference to an intention to pay $2 million and subsequently "dispatch" a "cocaine load to Mexico."  (*See* GX 515-T at 24).

Later in the Government's recitation of the "Trial Evidence," the Government misleadingly indicates that Campo Flores made a direct reference to his intention to ship a controlled substance to the United States, writing that Campo relayed to CS-1 and CS-2 that

6

"Sentado told Campo that he would pay between $12,000 and $12,200 per kilogram of cocaine in Honduras, but would charge a flat rate of $900,000 for the 'landing and unloading,' which would have been higher '[i]f we were going to Europe' as opposed to the United States."  (Opp. 14 (citing GX 206-T at 4, 7)).  The actual translation of this portion of the conversation, however, includes no reference to the United States.  (GX 206-T at 4, 7).  The Government in its brief actually cuts the quoted sentence off and injects "the United States" whereas in the actual transcript, what is written is "If we were going to Europe, then they would raise the cost . . . but for this area, at least Central America, all of those countries, it's one million two hundred tops." (GX 206-T at 7-8).  Thus, the conversation was explicitly contrasting the pricing of some service, as described by Sentado, in Europe versus Central America.  There is no reference here to the United States, and the Government's suggestion in its brief that one exists is improper.

In its recitation of the Defendants' supposed confessions, the Government also wrote that when "Special Agent Gonzalez asked Campo about a photograph of Campo holding the kilogram of cocaine in the October 27, 2015 meeting in Caracas (GX 60), Campo . . . indicated with respect to the kilogram, 'you know what that is,' which Special Agent Gonzalez understood to be a reference to cocaine."  (Opp. 35).  This is yet another improper "inference" upon which the Government relies.  Nothing in the logic or context of Special Agent Gonzalez's recitation of the conversation between himself and Campo Flores could justify the jump from "you know what that is" to "that is a block of cocaine."  (Tr. 136-37).  This is another instance of improper speculation on the part of the Government.

ACTIVE 220293490v.4

## II.   *UNITED STATES V. CROMITIE* DOES NOT SUPPORT THE GOVERNMENT'S ATTEMPT TO EVADE THE CONSEQUENCES OF ITS WITNESS'S PERJURY.

Much of the Government's opposition brief is devoted to advancing an unsound analogy between the instant case and the Second Circuit's decision in *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013).  (Opp. 47 ("The Second Circuit's 2013 decision in *United States v. Cromitie* provides the governing legal framework and underscores the lack of merit in the defendants' perjury claims.")).  *Cromitie* does not support the Government's position.  To the contrary, *Cromitie* further demonstrates why the Court should grant the Defendant's motions.  There are several serious problems with the Government's *Cromitie* arguments.

First, the idea advanced by the Government that "the evidence at trial was even stronger than in *Cromitie*" (Opp. 49), is false.  In the instant case, as the Court is well aware, the supposed objective of the conspiracy—the delivery of narcotics to the United States—*was never carried out*.  The Defendants never produced the shipment of hundreds of kilograms of cocaine that were supposedly intended for the United States.  No plane was ever loaded with narcotics.  This is the opposite of what occurred in *Cromitie*, where the Defendants fully executed their responsibilities in the terrorist operation that was the subject of the sting executed by the FBI.  *See Cromitie*, 727 F.3d at 203 ("After one missile and the bombs were loaded into Hussain's car, the four drove to a storage facility in New Windsor, NY . . . Hussain let Onta Williams, David Williams, and Payen out to take up their positions as lookouts.  Cromitie then placed one of the fake bombs in the trunk of the Pontiac and two others on the back seat of the Mazda.").  The Government cannot seriously argue, in a case where no cocaine was intercepted or sent to the United States, that the proof was "even stronger in this case [than in *Cromitie*.]"  (Opp. 64).

The communications in *Cromitie* also involved clear statements by the Defendants evincing an intent to engage in the specifically charged criminal activity.  *See Cromitie*, 727 F.3d

8

at 212 (describing various statements made by Cromitie evincing his intent to commit an act of terrorism against the United States, such as "If survival for me is taking out one of these American planes or whatever, that's my fight," "I'd like to get a synagogue," and "I would actually like to put a fucking bomb in the back of a cop car while he's sitting in the motherfucker and watch him just explode"). There is no comparison to the instant case, where the Government's entire proof of supposed intent to import drugs into the United States is based on statements of the confidential informant indicating his intent to distribute cocaine in the United States at some undetermined point in the future. Regardless of one's view of the sufficiency of that evidence, it simply cannot be said that the proof in this case was *stronger* than the proof in a case where the defendants actually placed explosive devices in locations with the expectation that numerous civilians would be killed.

Second, with regard to the analysis of whether the Government knew or should have known that CS-1 testified falsely, the Government has ignored the fact that the information that put it on notice of informant misconduct was significantly more powerful in this case than in *Cromitie*. The Government relies on the *Cromitie* court's finding that the prosecutors had a "good-faith but objectively unreasonable belief that the informant's testimony was accurate." (Opp. 48). But in *Cromitie*, the informant had not, as of the time of trial, been indicted for serially lying to members of the prosecution team during the course of the investigation. In *Cromitie*, the informant had not provided materially false information about his dealings during testimony in a pre-trial suppression hearing. Most importantly, in *Cromitie*, the duty to correct the testimony arguably had never arisen because the court found that the "prosecutor might have subjectively believed that the [informant's testimony] . . . was true, even though in the District Court's view, and in ours, there was not a reasonable basis for such a belief." *Cromitie*, 727 F.3d

9

at 224.  Here, of course, the prosecution could not have subjectively believed that CS-1's testimony denying his continued drug trafficking in jail or his improper communications with his co-defendant son were true.  Before the conclusion of the trial, the prosecution knew these aspects of the testimony were objectively false and it failed to correct them.  Moreover, relevant to CS-1's perjured testimony on the identification of the purported cocaine, the Second Circuit in *Cromitie* specially noted that the failure of the prosecution to understand the falsity of the testimony was excusable because the accuracy of the testimony was not reasonably capable of verification.  *See id.* ("We note that Hussain's testimony about the $250,000 was not the sort of assertion that could be verified by investigation.")  The opposite was true here.  After it became clear that CS-1 had engaged in a years-long pattern of lies and perjury, minimal diligence would have allowed them to discover that he was also lying about the most important aspect of his testimony—his supposed determination that the substance produced at the October meeting was cocaine.  The Government cannot shift to the Defendants its responsibility for offering testimony free of perjury by suggesting that the Defendants had "ample pretrial notice of CS-1's anticipated lay opinion testimony regarding the . . . cocaine."  (Opp. 48).  *Cromitie* makes clear that the prosecution's duties regarding false testimony extend to matters that the prosecution should have known were false.  *See, e.g.*, *Cromitie*, 727 F.3d at 224 ("Thus, even if the prosecution in good faith subjectively believed that Hussain's testimony about the $250,000 was true, *the prosecution 'should have known,' that it was false*" (emphasis added; internal citation omitted)).  For all of the reasons discussed in the Defendants' opening brief, it is clear that the Government either knew or should have known that CS-1's bogus cocaine identification testimony was false.

Third, the Government's argument that it had no duty to correct CS-1's testimony is misleading in its assertion that:  "[a]s suggested in *Cromitie*, 727 F.3d at 222, in most cases

10

where cross-examination was deemed insufficient, the perjury was discovered after trial, and cross-examination during the trial pertained to matters not related to the newly discovered false testimony." (Opp. 60 (emphasis omitted)). Although the Second Circuit noted that the typical false-testimony claim involves testimony whose falsity is discovered after the trial has already concluded, the court in no way held (as the Government claims) that "the need for corrective measures by the Government during the trial is diminished substantially" if the defendant uses during cross-examination the evidence "that is later relied upon to support a post-trial perjury argument." (*Id.*). The Government cites no authority for this proposition. In fact, at the very page of the *Cromitie* decision relied on by the Government for this point, the court of appeals quoted strong language from the Supreme Court underscoring that the need to correct false testimony is not diminished by the context of the false testimony. *See Cromitie*, 727 F.3d at 222 ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and [to] elicit the truth.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959)). Given this language in the case the Government asks the Court to view as "an important guidepost" (Opp. 49), it is perplexing that the Government refers in its brief to a "*supposed* duty to correct." (Opp. 60) (emphasis added).

Indeed, the *Cromitie* court did not cut short its analysis of the prosecution's responsibilities with its observations that a typical false testimony challenge will involve post-trial discovery of the falsity. Rather, the *Cromitie* court concluded that this was a basis for determining that the prosecution had "imputed knowledge" of the false testimony. *See Cromitie*, 727 F.3d at 224. The Government escaped the sanction sought by the defense in *Cromitie* only because the court ultimately concluded that there was no "likelihood that the false testimony

11

could have affected the judgment of the jury." *See id.* at 225.  For the reasons described in the Defendant's opening brief and *infra*, that simply cannot be said in this case.

Fourth, the Court should reject the Government's efforts to analogize to *Cromitie* in order to diminish the significance of CS-1's extensive testimony interpreting numerous statements of the Defendants throughout the recordings.  (Opp. 65 ("[A]lthough the defendants are correct that CS-1 testified at trial regarding his understanding of certain statements in the recordings and electronic communications, that was also true in *Cromitie* and apparently not a compelling basis for relief.")).  In fact, this claim was not addressed at all by the court in *Cromitie*.  The footnote upon which the Government relies refers only to the informant's uncontroversial testimony regarding the meaning of certain Arabic words.  *See Cromitie*, 727 F.3d at 200 n.1 ("Hussain testified that a 'shahid' was a 'person who dies in Islam as a soldier in jihad or soldier in warfare'").  For all of the reasons stated in the Defendants' opening brief, the testimony of CS-1 was meaningfully different in this case.

## III.   THE GOVERNMENT HAS FAILED TO ADDRESS THE EVIDENCE OF PERJURY IN CS-1'S TESTIMONY, AS ESTABLISHED BY DR. HOLMES'S DECLARATION.

Rather than substantively address the fact that a respected expert in the field of narcotics identification has submitted a sworn affidavit explaining why multiple aspects of CS-1's supposed cocaine identification testimony were false, the Government has advanced an absurd premise—that the Court should reject Dr. Holmes's testimony as biased but credit the conflicting testimony of convicted liar and serial perjurer Jose Santos Pena.  For several reasons, the Court should decline the Government's invitation.

First, the Government's argument that the "defendants knew well in advance of trial that the Government planned to elicit a lay opinion from CS-1 regarding the identity and quality of

12

the cocaine that they brought to the October 27 meeting" (Opp. 51), is completely irrelevant. The Government has cited no authority to support the idea that this fact could be relevant to the inquiry on false testimony.  The only question relevant to Dr. Holmes's Declaration is whether false testimony was introduced by the Government.  *See Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003) (observing that the first question the Court must answer is "whether false testimony was introduced").  The fact that the Defendants had some awareness of the expected contours of CS-1's expected testimony in no way alters the fact that CS-1 offered critical false testimony regarding his alleged cocaine identification.  The Defendants and the Court are now in possession of sworn testimony from a respected expert that demonstrates that CS-1 lied.  The Government has offered no evidence to the contrary—they have cited no study, no article, no other testimony supporting the idea that CS-1's testimony could be true.  They have submitted no affidavit from any DEA employee, any chemist, or any other credible source to lend support to CS-1's incredible testimony.

Instead, the Government argues that "regarding the identity and general quality of the defendants' cocaine, the defense failed to rebut such testimony at trial and cannot now, in this procedural posture, establish that CS-1's opinion was incorrect much less perjurious."  (Opp. 48).  The Government is wrong.  There is no legal or logical principle that supports the notion that testimony regarding the identification of cocaine could not be perjurious.  Indeed, the law is to the contrary.  As explained in the Defendant's opening brief, the Second Circuit in *Drake* made clear that the Court can and should interrogate whether opinion testimony is false, including the factual premises underlying opinion testimony.  *See Drake v. Portuondo*, 553 F.3d 230, 244 (2d Cir. 2009) (granting new trial upon noting that witness "testified that this case was replete with the tell-tale signs of picquerism—the nature of the bullet wounds, the stabbing, the

13

lack of sperm found on the slides from Smith's rectal cavity, the anal bruising, the breast bite

marks, the commando clothing . . . [the witness] had two weeks to conjure up his quackery.  His

direct testimony on picquerism, which spans twelve pages of trial transcript, consisted largely of

uninterrupted and prolix exposition, weaving the complicated facts of the case into a seemingly

coherent narrative, all pointing to the symptoms of the fictive syndrome called picquerism").

The Government attempts to distinguish *Drake* by arguing that the case involved a "fictional

syndrome" whereas in this case, the Government argues that "CS-1 offered a subjective lay

opinion regarding the cocaine based on his first-hand observations and personal experience."

(Opp. 53 n.24).  This is a meaningless distinction—whether it is a "fictional syndrome" or a

fictional method for identifying a controlled substance, the lesson of *Drake* is that a new trial is

required where the Government secures a conviction on the basis of supposed "opinion

testimony" that is, to use the word of the Second Circuit, "nonsense."  *Drake*, 553 F.3d at 233.

Moreover, regardless of whether CS-1's ultimate conclusion identifying the substance as

cocaine was true, Dr. Holmes's Declaration exposes a number of components of CS-1's

testimony that were false beyond his ultimate conclusion.  These false aspects of CS-1's

testimony are explained in detail in the Holmes Declaration as described in the Defendant's

opening brief.  The Government's attempts to suggest that Dr. Holmes mischaracterized the

testimony of CS-1 are flatly incorrect—and perplexing.  The Government's characterization of

CS-1's testimony has him saying merely that he "examined the substance for dampness and

moisture."  (Opp. 52).  That is not what the informant said.  He said "I rubbed it a little on my

hand so that it would *release the oils on my hand and see how much oil it would release*."  (Tr.

692 (emphasis added)).  The Government somehow ignores the literal explanation that CS-1

gave of the "test" that he performed in an attempt to undermine the straightforward analysis of

14

Dr. Holmes.  The Court should reject this attempt to disregard the actual testimony of the Government's witness.  The point of Dr. Holmes's analysis was that the release of oils could only occur if CS-1 had accelerated the powder to a temperature that would trigger the phase transition she described in her affidavit.  But this was only one part of Dr. Holmes's multifaceted explanation of why CS-1's testimony was false.  The Government has not even attempted to address the components of her Declaration explaining that even if CS-1 could somehow magically have triggered a powder to release oils, there is no way from the releasing of oils in this manner that anyone could determine that the substance was cocaine.  The point of Dr. Holmes's Declaration was that CS-1's entire method was yet another sham that he perpetrated right under the nose of the Government, one that the Government inexplicably defends today even as it insists that it has ripped up the cooperation agreement of this witness.

Courts have repeatedly endorsed the common sense principle that the integrity of a trial can be undermined by false testimony about facts related to an opinion ultimately offered by a witness.  *See, e.g.*, *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1323 (Fed. Cir. 2016) (reversing and granting new trial where "[a]fter trial, Rembrandt received information suggesting that Dr. Bielawski testified falsely at trial . . . Specifically, Dr. Bielawski repeatedly testified that he personally conducted X-ray photoelectron spectroscopy ("XPS") and time-of-flight secondary ion mass spectrometry ("TOF-SIMS") laboratory testing on JJVC's accused lenses when, in fact, the testing was conducted by Dr. Bielawski's graduate students and various lab supervisors"); *see also In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) (finding habeas petitioner made requisite "prima facie showing that but for the alleged constitutional error of the State sponsoring the false testimony" of medical

15

examiner where post-trial evidence demonstrated expert offered false testimony regarding amount of time body had been left in forest).

Second, the Court should reject the Government's argument that Dr. Holmes is biased based on the fact that some of her research, including research on cutting edge drug detection technologies, has received grant funding.  (Opp. 51 n.23 ("Dr. Holmes's lack of confidence in CS-1's opinion must be considered in the context of her 'multiple funded projects' involving 'novel detection technologies, including drug detection,' leaving her professionally and financially biased toward the position that it is impossible to identify cocaine based on a physical inspection.")).  This argument is absurd, in that it suggests that virtually any university professor who receives grant funding is subject to bias, rendering their opinions invalid in court.  The argument is particularly absurd in that the Government is pitting the credibility of Dr. Holmes against that of CS-1, an individual who has been convicted of lying to federal officers and who has now repeatedly perjured himself in the instant case.  To the extent that the Government believes that the bias and credibility of Dr. Holmes are in question, the Defendants invite any hearing on the issue that the Court deems necessary.

Finally, the Government is simply wrong in attempting to apply the Rule 33 "newly discovered" rules to the Declaration of Dr. Holmes.  (Opp. 51 (citing Rule 33 and arguing that "the defendants plainly could have obtained the information in the Holmes Declaration for use at trial, whether during cross-examination, a defense case, or both")).  Rule 33 does not require the evidence upon which a defendant relies in seeking a new trial to depend on "newly discovered evidence."  Fed. R. Crim. P. 33.  The only component of Rule 33 that even implicates "newly discovered evidence" is the component that provides that a defendant is entitled to a longer period of time to file a Rule 33 motion for a new trial where it is based on newly discovered

16

evidence.  *See id.* ("(b) Time to File.  (1) *Newly Discovered Evidence*.  Any motion for a new

trial grounded on newly discovered evidence must be filed within 3 years after the verdict or

finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until

the appellate court remands the case.").  That provision has no application to the instant motion,

which was filed pursuant to the Rule 33(b)(2) time period as extended by the Court immediately

after the verdict.  Indeed, the Government relies on *Harris v. United States* for this proposition,

(Opp. 51-52), but in *Harris* Judge Haight made explicit that he was dealing with the question of

whether the motion had been filed outside of the jurisdictional time periods set by Rule 33.  *See*

*Harris v. United States*, 9 F. Supp. 2d 246, 254-55 (S.D.N.Y. 1998) (observing that for a motion

for a new trial filed out of the then-seven day window for "other ground," "newly discovered

evidence" motion had strict requirements as "[t]hese time limits are jurisdictional").  The

Government has thus improperly relied upon *Harris*—so much so that the Government has an

obligation to clarify that *Harris* actually has no application to this case.  But even if *Harris* did

apply, the Government could scarcely argue that the Defendants' failed to exercise reasonable

diligence in securing the expert analysis that would have determined that their witness was lying

when they themselves were supposedly incapable of detecting this problem before trial.  This

was a responsibility of the Government.  The Defendants had no opportunity to identify this type

of expert testimony in the limited time before trial as it sorted through the voluminous Spanish

pre-trial discovery and addressed all of the other information indicating that the Government's

witnesses were engaged in perjury.  Regardless, reasonable diligence is not relevant because this

is a timely filed motion.

　　　　Dr. Holmes's Declaration demonstrates that CS-1 testified falsely on one of the most

important issues of the trial.  That the Government argues that CS-1 should be given the benefit

of the doubt on this issue is striking, given the witness's track record of false statements, given

the Government's own decision to rip up his cooperation agreement, and given the

Government's failure to offer any supporting information whatsoever for its claims.  The Court

should grant the Defendants' motions.

## IV.    THE GOVERNMENT CANNOT SIDESTEP THE IMPLICATIONS OF CS-1'S PERJURY, REQUIRING THAT THE DEFENDANTS BE GRANTED A NEW TRIAL.

In this trial, the Government's key witness lied repeatedly.  On this point there can be no

serious question, notwithstanding the Government's baffling attempt, after the fact, to re-

characterize CS-1's testimony as merely "arguably false."  (Opp. 38, 53, 56).  As explained in

their opening brief, (Mot. 6-19), the Defendants advance three related but distinct arguments in

connection with CS-1's perjury.  First, the Government should be deemed to have had

constructive knowledge of the facts that made CS-1's testimony false.  Second, whether or not

the Government should be deemed to have constructive "actual knowledge," the Government

clearly should have known that CS-1 was highly likely to commit perjury, in light of numerous

factors that collectively put the Government on notice that CS-1 was a wholly unreliable and

improper witness.  Third, the Government failed to comply with its well-established duty to

correct CS-1's false testimony.  In addition, as discussed below, the Government's suggestion

that further *Brady* and *Giglio* disclosures relating to CS-1 would have been "cumulative," simply

because prior, unrelated disclosures had already been made, also fails.

### A.    Whether the Government Knew of CS-1's Perjury Prior to His Testimony Is Irrelevant.

The Government argues that it "did not know, nor should it have known, that any of CS-

1's testimony was arguably false before the defendants produced CS-1's prison calls for the first

time on the evening of November 14, 2016."  (Opp. 53).  This argument is a distraction from the

18

central point.  As explained in the Defendants' opening brief, in light of the Government's obligation to correct false testimony of its witnesses, including false testimony about which the Government learned during trial, the Government was required to correct CS-1's false testimony before the jury after CS-1's testimony concluded.  (Mot. 13-14).  That the Government indicated it was going to rip up CS-1's cooperation agreement demonstrates that the Government knew he had provided false testimony.  At that point, the Government was required to make clear to the jury what testimony was false and what the truth was—the Government failed entirely to do so.

The Government is obviously wrong in its assertion that "the testimony from CS-1 that is conceded, or assumed for present purposes, to have been perjurious related to CS-1's credibility but not to the investigation of the defendants or their offense conduct."  (Opp. 49).  Rather, CS-1's elaborate, illegal coordination with the other principal informant in prison, in violation of his cooperation agreement, goes directly to the integrity of the investigation and the offense conduct.  This was a sting operation conducted primarily by two men—CS-1 and CS-2.  It is not simply a matter of credibility when they were engaged in an elaborate ruse to communicate in prison and coordinate continuing drug trafficking activity from a federal jail.

Regardless, the bottom line is that the Government unquestionably knew that some aspects of CS-1's testimony were perjurious by the conclusion of his testimony.  Otherwise, there would have been no need to announce before the jury that his cooperation agreement was being ripped up.  The Government was required to correct these aspects of his testimony and it failed to do so.  Now the Government engages in complicated parsing of which aspects of CS-1's testimony were supposedly true and which were not true.  But even accepting the Government's framework, as described below, to whatever extent the Government did not know that CS-1's testimony was false, the Government certainly should have known it was false.

19

**B.      The Government's Argument that It Lacked Constructive Knowledge of the Falsity of CS-1's Testimony Is Not Supported by Case Law or Logic.**

Putting aside the Government's actual knowledge, the Government suggests that it cannot be charged with constructive knowledge regarding CS-1's prison calls, which contained information making clear that CS-1's testimony was false.  The Government is wrong.  In its Opposition, (*see* Opp. 54-55), the Government relies on an unpublished decision from the Eastern District, *United States v. Rivera*, No. 13 Cr. 149, 2015 WL 1540517, at *3 (E.D.N.Y. Apr. 7, 2015), for the proposition that the scope of the Government's constructive knowledge does not extend to the Bureau of Prisons ("BOP") in the absence of any "suggesti[on] that the BOP was involved in the investigation or prosecution of th[e] case."  *Id*. at *3.  Yet there are numerous decisions—including from courts in this District and from multiple appellate courts— that make clear that information that is known to the relevant prison officials is properly imputed to the prosecution team in circumstances such as these.

First, prison officials did, in fact, play an important role in connection with the prosecution of this case, in particular with regard to CS-1's housing and production for trial. During the period prior to and during his testimony in the Defendants' trial, CS-1 (along with his son, CS-2) was housed in special conditions.[1]  The Government appears to have been in close contact with CS-1 during the pre-trial and trial period in this case in connection with, *inter alia*, the suppression hearing, pre-trial preparations and trial testimony, and other investigations and proceedings involving other defendants.  Indeed, the Government *concedes* that prison officials worked at the direction of the prosecution team to manage the conditions under which CS-1 was held in prison, in view of their upcoming testimony at trial, with prison officials taking actions directly at the behest of the prosecution team.  (*See* Opp. 56 ("The prosecution team . . .

---

[1] *I.e.*, in an alternative detention facility.

20

admonished CS-1 and CS-2 about their obligations as cooperating witnesses, directed them not to communicate with each other, and *caused them to be separated within the prison*.") (emphasis added)).

Second, the Government has failed to address the numerous cases—including in this District—indicating that, in circumstances such as these, knowledge on the part of prison officials may properly be imputed to the prosecution team. As noted above, the Government seizes on a single, unpublished district court decision, *Rivera*. But other cases are contrary to (or at least strongly in tension with) *Rivera* and the out-of-circuit district court cases relied upon in the Government's Opposition. (Opp. 55 & n.25).

For example, in *United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005), Judge Duffy concluded, in a lengthy and well-reasoned decision, that knowledge of recordings made by officials at the Witness Security Unit of the U.S. Marshals Service ("WitSec"), was properly imputed to the prosecution team. The court observed that "[a]lthough the Government's disclosure obligations are most frequently discussed in terms of a prosecutor's duty, . . . the Second Circuit has made clear [that] other agencies involved in the criminal justice system bear substantial responsibility for mandated disclosures." *Id*. at 483 (citing *United States v. Bufalino*, 576 F.2d 446 (2d Cir. 1978)). The court further stated that "[a] prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him—those variously referred to as an 'arm of the prosecutor' or part of the 'prosecution team.'" *Bin Laden*, 397 F. Supp. 2d at 481. In light of these principles, the court determined that the test for imputation of knowledge to the prosecution is whether, "under the totality of the circumstances, [the] WitSec team could be fairly described as part of the prosecution team." *Id*. at 484. Factors pertinent to this analysis included the fact that WitSec acted, in certain respects, "at the

21

prosecutors' request," *id.*, and that WitSec held itself out as working closely with prosecutors, *id.* at n.20.

A number of courts have squarely addressed this issue and have held that knowledge of such evidence is properly imputed to the prosecution team.  A Seventh Circuit case, *United States v. Wilson,* 237 F.3d 827 (7th Cir. 2001), is instructive.  *Wilson*—as in *Bin Laden* and this case—involved a prosecution witness under the Government's protection.  *Id.* at 831.  At trial, the witness testified that he had not failed any drug tests while in the WitSec program.  *Id.*  In fact, the witness had failed three such tests prior to his testimony, a fact known to the Marshals Service but unknown to the prosecutors.  *Id.*  The Seventh Circuit held that the Marshals Service's knowledge should be imputed to the prosecutors, explaining that, "imputation is proper in these circumstances; it is impossible to say in good conscience that the U.S. Marshals Service was not 'part of the team' that was participating in the prosecution *even if the role of the Marshals Service was to keep the defendants in custody rather than to go out on the streets and collect evidence.*"  *Id.* at 832 (emphasis added).

Other circuits also have reached similar conclusions.  The Fifth Circuit has held that tapes in the possession of the BOP were "in the possession" of the Government for *Brady* purposes, holding that "[t]he government possessed the tapes, though they were housed at the BOP, since the BOP acted as its investigatory agent."  *United States v. Moore*, 452 F.3d 382, 387 n.15 (5th Cir. 2006) (per curiam).  In *Mastracchio v. Vose*, 274 F.3d 590 (1st Cir. 2001), the First Circuit had little difficulty rejecting the prosecution's argument that it had no actual knowledge of undisclosed benefits conferred on a witness by the jailers who were holding him in protective custody, instead holding that the prosecution was chargeable with knowledge of the benefits received by its witness from his jailers.  *Id.* at 600-01.  In *United States v. Santiago*, 46 F.3d 885,

22

894 (9th Cir. 1995), the Ninth Circuit held that "the United States Attorney's Office had knowledge of and access to the inmate files held by the Bureau of Prisons," because "case law indicates that Bureau of Prison files are within the possession and control of the United States Attorney" and because, "[a]s a general matter, the fact that the Bureau of Prisons and the United States Attorney's Offices are both branches of the Department of Justice would facilitate access by federal prosecutors to prison files." *Accord United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992) (suggesting that, to the extent the prosecutor "had authority" over MCC officials, evidence in the possession of the MCC may be attributed to the "prosecution"); *United States v. Burnside*, 824 F.Supp 1215, 1256-57 (N.D. Ill. 1993) ("The government's Brief, in essence, claims that 'the . . . prosecution team' members had no duty to communicate with the personnel of any other federal agencies, such as the MCC's Warden or the WitSec Marshals, with whom the government prosecutors worked closely on a continuing basis and had authority over as related to obtaining information for court. The government's position that government personnel have no duty to inquire, no matter how much the known facts compel the inquiry, is inconsistent with the *Brady* doctrine which requires the government to provide due process.").

Here, CS-1 was housed in special conditions prior to and during his testimony in the Defendants' trial. The Government was indisputably in close contact with CS-1 during this period, for multiple purposes. And the Government, by its own admission, worked directly with and gave directions to the prison for purposes of managing the conditions under which CS-1 was held in prison. In addition, the Government unquestionably knew that CS-1's telephone calls while in prison were recorded, consistent with standard practices. Indeed, the Government concedes that it "could have obtained the calls" (Opp. 57), had it simply chosen to do so.

23

Accordingly, the Government should be deemed to have known the facts contained in the tapes in the prison's possession that made clear that CS-1's testimony at trial was false.

The rule the Government proposes—that the Government never has an obligation to know or learn what its own key cooperating witnesses are doing and saying in prison, if those records are in the possession of the MCC or Marshals Service—is not the law, and would, if adopted, be untenable as a matter of policy.  While "the boundaries of the government's knowledge—actual or constructive, real or presumed, direct or imputed—are not drawn with precision," *Shakur v. United States*, 32 F. Supp. 2d 651, 658 (S.D.N.Y. 1999), the facts of this case fall well within the bounds of the prosecution team's constructive knowledge.

### C. The Government Should Have Known of the Falsity of CS-1's Testimony Because It Was on Notice that CS-1 Had Lied in the Past and Had an Obligation to Investigate His Veracity Before Putting Such a Critical Witness on the Stand.

Particularly in light of CS-1's extraordinary track record of criminality and deceit—including *in this case*—it was the prosecutors' duty to make a reasonable inquiry into his conduct while in custody to determine if he was complying with the terms of his cooperation agreement and to obtain any information that might affect his credibility before calling him to the stand.

It is well established that "[t]he prosecutors have an obligation to make a thorough inquiry of all enforcement agencies that had a potential connection with the witnesses."  *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993).  The Government in this case failed to uphold this obligation.  The tapes that demonstrated the falsity of CS-1's testimony were readily available to the Government and were in the possession of the relevant prison officials (with whom the prosecutors worked closely); thus the contents of them plainly should have been known to the Government.

24

The Government suggests that "[t]he defendants' diligence argument is flawed because it focuses on the prison calls rather than the challenged testimony." (Opp. 54). But that is beside the point. What matters is this: The Government's star witness, CS-1, testified as to *facts* that the Government should have known were false—for example, that CS-1 was *not* still engaging in narcotics trafficking and that CS-1 and CS-2 were *not* colluding on the substance of their testimony even after they were separated in prison. The Government should have known the falsity of this testimony because the Government should have known of the contents of the prison recordings that made clear that CS-1 was lying. *See United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997) (holding that the Government "should have known" that evidence was false where, having been put on notice as to potential falsity, "the government simply ceased further inquiry"); *see also Burnside*, 824 F.Supp at 1257 ("The government's position that government personnel have no duty to inquire, *no matter how much the known facts compel the inquiry*, is inconsistent with the *Brady* doctrine which requires the government to provide due process.") (emphasis added). To hold otherwise would incentivize willful blindness on the part of prosecutors: a prosecutor would simply need to make sure that he not come into contact with any information suggesting that his star witness was lying. But that is not the prosecutor's duty.

Moreover, the Government's suggestion that it did comply with its due-diligence obligations with regard to CS-1 is wholly unpersuasive. The Government states:

> [W]hile the defendants' criticism of the Government's diligence is
> based on hindsight, the record does not reflect indifference to
> issues with CS-1 and CS-2. To the contrary, the prosecution team
> investigated and arrested CS-1 and CS-2 for illegal drug dealing
> while working for the DEA, obtained their criminal convictions,
> confronted CS-2 following his testimony at the suppression
> hearing, and immediately disclosed the substance of that interview.
> The prosecution team also admonished CS-1 and CS-2 about their
> obligations as cooperating witnesses, directed them not to

25

communicate with each other, and caused them to be separated within the prison.

(Opp. 56). Quite clearly, these measures were completely inadequate to prevent CS-1 from committing rampant perjury at trial. Indeed, from the Government's description above, it appears that virtually every time the prosecution team looked into CS-1 and CS-2, it emerged that they had lied or were lying. That hardly should inure to the benefit of the Government now.

The failure of the Government to comply with its due diligence obligations is even more striking in the context of the Government's failure to identify CS-1's false testimony regarding identification of supposed cocaine. In its opposition brief, the Government has not proffered that the Government spoke to any DEA chemists, any Department of Justice experts, or any other of the multitude of individuals who could have confirmed that it is literally impossible to test cocaine by rubbing it between one's fingers. It is deeply surprising that the Government would fail to take any such steps before trial, during trial, and even now in the face of evidence that their witness advanced false testimony on a critical point at trial. Instead, the Government argues that the incredible testimony of their proven liar witness simply *must have been true* because "[h]ad CS-1 failed to develop the ability to accurately identify cocaine and ensure that it was of sufficient quality to satisfy his Mexican bosses, his career—and likely his life—would have been much briefer." (Opp. 53). This is a circular argument bordering on sophistry. Whether CS-1 actually understood how to test cocaine is not the question—the question is whether the method he described in court was truthful. The Government has advanced literally nothing to support the idea that this was truthful testimony. That CS-1 had extensive experience in drug trafficking is not indicative of the idea that he was testifying truthfully on this point. This argument is akin to saying CS-1 had extensive experience as a law enforcement source and therefore he must have

ACTIVE 220293490v.4

been telling the truth when he described how he conducted himself as a witness and a cooperator. As is obvious, one can have deep experience on a subject matter and still lie about it.  Every indication here is that CS-1 lied. For all of the reasons explained in the Defendants' opening brief, the Government either knew or should have known that his testimony on the identification of the cocaine was false, along with his testimony on the other matters as described above and in the Defendant's opening brief.

### D. The Government Cannot Avoid Clear Precedent that Required It to Correct CS-1's False Testimony.

The Government seems to argue that it was under no duty to correct false testimony from one of its witnesses.  (*See, e.g.*, Opp. 60 (referring to the "*supposed* duty to correct") (emphasis added)).  The Government gravely misapprehends its obligations.  "[T]he rule has been clear for decades: a criminal defendant is denied due process of law when a prosecutor . . . fails to correct the record . . . when . . . false evidence is introduced at trial."  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).  Of course, "Supreme Court holdings have long 'established that a conviction obtained through use of false evidence, *known* to be such by representatives of the State, must fall under the Fourteenth Amendment," but, critically, "[t]he same result [also] obtains when the [Government], although not soliciting false evidence, allows it to go uncorrected when it appears."  *Drake*, 553 F.3d at 240 (quoting *Napue*, 360 U.S. at 269)).  The failure to correct CS-1's false testimony represented a serious error on the part of the Government—one which infected the trial and implicated the core responsibility of a prosecutor to correct false testimony offered by one of its own witnesses.

In *Napue*, 360 U.S. at 265, the Supreme Court made clear that "the failure of the prosecutor to correct the testimony of [a] witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment."  The Court explained: "A lie is a lie,

27

no matter what its subject, and, if it is in any way relevant to the case, the [government] has the responsibility and *duty to correct* what he knows to be false and elicit the truth." *Id*. at 269-70; *see also United States v. Glover*, 588 F.2d 876, 879 (2d Cir. 1978) ("[E]ven if . . . the government had not been aware of the inaccuracies until after the testimony was given, the government still would have a duty under the Fourteenth Amendment not knowingly to allow false testimony to go uncorrected.") (citing *Napue*, 360 U.S. at 269).

In light of these and other cases, therefore, it is well established that "[t]he prosecutor has an independent, constitutional duty to correct testimony he knows to be false." *Belmontes v. Brown*, 414 F.3d 1094, 1115 (9th Cir. 2005), *rev'd on other grounds sub nom. Ayers v. Belmontes*, 549 U.S. 7 (2006). This duty "requires a prosecutor to act when put on notice of the real possibility of false testimony," and "is not discharged by attempting to finesse the problem by pressing ahead without a diligent and a good faith attempt to resolve it." *Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117-18 (9th Cir. 2001). This is a duty that the Government failed to meet in this case.

The Government asserts, without authority, that "[n]o further corrective measures were required." (Opp. 62). The Government is wrong. As explained in the cases described in the Defendant's opening brief, there is a clear duty to correct false testimony, and the Government failed to satisfy that duty. Once the Government knew or should have known that the Government's own witness was lying to the jury, the Government should have specified to the jury exactly what the witness lied about, and what was false about that testimony. Such a correction coming directly from the Government would have been meaningful to the jury in a way that no argument advanced by the defense could have been. This is why the law requires

28

the Government to correct the testimony even where the falsity is arguably exposed by the defense.

On redirect, instead of unambiguously correcting the record and/or eliciting the correct, truthful testimony from CS-1, the Government merely asked CS-1 four short questions:  "Q. Sir, you were told repeatedly that if you lied, your cooperation agreement would be ripped up and you wouldn't get a 5K letter, correct?"; "Q. And you now understand that your cooperation agreement is getting ripped up, correct?"; "Q. You understand that you are not getting a 5K letter, correct?"; "Q. You should."  (Tr. 984-85; Opp. 44.)  Asking these questions, however, fell well short of an explicit, on-the-record, correction of CS-1's false testimony.  For one thing, the Court properly instructed the jury in this case not to treat statements made by the Government as evidence:

> The attorneys are not sworn as witnesses.  They do not testify.  The attorneys' statements and questions are not evidence either.  Let me emphasize this again.  It is not the question that the lawyer asks; what is important is the witness's answer to the question.

(Tr. 37.)  Following these instructions, there is no way to conclude that the jury clearly understood the Government's questioning on redirect as a clear repudiation of CS-1's false testimony.  Certainly it cannot be said that the jury could have taken from the Government's statements any guidance as to what specifically the Government was repudiating.

The Government suggests that "[f]our of the cases cited by the defendants relating to the supposed duty to correct" are distinguishable "on the basis that the falsehood at issue went 'uncorrected' at least in part because, in those cases, the defense was either not aware of the falsehood or not in a position to challenge it effectively at trial."  (Opp. 60).  This attempt to distinguish clear case law is, however, entirely unpersuasive.  Courts repeatedly have held that

29

knowledge on the part of defense counsel does not relieve prosecutors of their constitutional duty to correct false testimony. *See Jenkins v. Artuz*, 294 F.3d 284, 295-96 (2d Cir. 2002) (affirming grant of habeas relief where a prosecution witness falsely denied the existence of a plea agreement, despite the fact that defense counsel had been told pretrial about the agreement). In *Belmontes v. Brown*, a prosecution witness gave false and misleading testimony that he had never been "busted" before, when in fact he had two prior convictions. 414 F.3d at 1115. The State argued that it had no duty to correct the false testimony because "defense counsel was notified of the [arrest] at a pretrial hearing." *Id.* The court flatly rejected this argument, holding:

> Whether defense counsel is aware of the falsity of the statement is beside the point. The state overlooks the fact that the prosecutor's duty to correct false testimony arises, not simply out of a duty of fairness to the defendant, but out of "the freestanding constitutional duty of the State and its representatives to protect the system against false testimony." Therefore, regardless of whether defense counsel should have known that a state witness testified falsely, "[a] prosecutor's responsibility and duty to correct what he knows to be false and elicit the truth,' *Napue* . . . requires [him] to act when put on notice of the real possibility of false testimony."

*Id*. at 1115; *cf. United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) ("The fact that defense counsel was also aware of the letters but failed to correct the prosecutor's misrepresentation is of no consequence. This did not relieve the prosecutor of her overriding duty of candor to the court, and to seek justice rather than convictions.").

Likewise, the Government suggests that "the jury was instructed that CS-1 had 'lied,'" and urges that this indicates that no further actions on the Government's part were required. (Opp. 62; *see also* Opp. 58 ("The Court later drew the jury's attention to the Government's decision and instructed the jurors, without objection, that CS-1 had 'lied' and they were 'quite free to reject all or any part of his testimony.'") (citing (Tr. 1482)); Opp. 2 ("the Court later

30

called the jurors' attention to the Government's determination, revealed earlier in their presence, that CS-1 had 'lied'")).  Presumably, the Government is referring to this Court's instruction that provided as follows:  "You can also consider the fact that the government told Jose Santos Peña, CS-1, after he testified at length, that he would not receive a 5K1 letter because he had lied." (Tr. 1481-82).  But a statement from the Court to the jury that it "can . . . consider" an arguably ambiguous line of questioning from the Government in response to perjured testimony is simply not an adequate substitute for a clear, unambiguous, on-the-record correction on the part of the Government—and the Government cites no authority for the proposition that it is.

### E.    The Government's *Brady/Giglio* Obligations Are Ongoing and Additional Necessary Disclosures Cannot Be Dismissed As "Cumulative."

The Government argues that "[f]urther [*Brady* and *Giglio*] disclosures would be duplicative and cumulative."  (Opp. 57 n.26).  Specifically, the Government suggests that, because "the Government . . . provided extensive disclosures regarding CS-1 and CS-2, including their agreements with the DEA . . . , and information sufficient to demonstrate that they both lied by omission for years in every interaction that they had with law enforcement," further disclosures would be cumulative.  The Government's argument is in conflict with the law.

The Government is not allowed to prospectively withhold *Brady* and *Giglio* information under the theory that it is cumulative.  To the extent that there is any analysis of the cumulative nature of such information in cases, it is an analysis of whether prejudice arose from the subsequent discovery of information that arguably should have been disclosed earlier.  This was the situation in the principal case upon which the Government relies, *Tankleff v. Senkowski*, in which the court discussed a situation where "[a]fter trial, defense counsel discovered that the prosecution was aware of, but had failed to disclose, evidence that twelve years earlier, [a

31

witness] had hired Hell's Angels to attack union protestors outside his bagel store."  135 F.3d 235, 250-51 (2d Cir. 1998).  The court analyzed this new information in the context of the evidence that had been introduced at trial and concluded that it could not have altered the outcome of the trial, and that therefore the court would not order reversal.  *See id.  Tankleff* explained only that exculpatory material may be deemed "cumulative" where "[w]hen a witness's credibility has already been substantially called into question *in the same respects* by other evidence."  *Id.* (emphasis added).  It is impossible to determine whether any undisclosed materials would call CS-1's credibility into question in the same respects without examining the materials.  Nowhere in *Tankleff* did the Second Circuit suggest that the Government is permitted to ignore its continuing *Brady* obligations because any further information impeaching the witness would be cumulative.  No case has ever suggested this.

Moreover, it is clear that *Brady* and *Giglio* establish ongoing obligations on the part of the prosecution team, which extend even after the trial.  *See Leka v. Portuondo,* 257 F.3d 89, 100 (2d Cir. 2001) ("*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward"); *accord Broam v. Bogan,* 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under [*Brady* ].").  The Government cannot satisfy its obligation simply by pointing out that it has made other, unrelated disclosures earlier in the process.  Importantly, the Defendants transmitted a letter to the Government during the trial explicitly setting out the parameters of what additional materials the Defendants believed the Government was required to disclose pursuant to *Brady*.  *See* November 14, 2016 Letter from Defense Counsel, attached as Exhibit A to this Reply.  In this communication, the Defendants stated explicitly what the Government was required to produce:

32

> First, during the testimony of CS-1, he testified that he had
> testified previously in an unrelated case.  (Tr. at 684-85.)
> Defendants are entitled to all notes and materials related to this
> testimony and request all such documents and communications
> related to CS-1's prior testimony.  Defendants further request that
> the Government immediately produce all materials related to CS- 1
> containing materially false statements or omissions in other
> investigations and prosecutions, including any text messages,
> emails, memoranda, or DEA-6 reports containing information
> related to CS-1's statements.

*Id.* at 1.  The Government still has not specifically responded to this request, as is required.

Particularly given that the Government now presses the argument that the jury could have

credited the bulk of the testimony of CS-1, the notion that any further impeaching information

would have been "cumulative" is inconsistent.  Given what has transpired in this case, the

minimal production requested by the defense would constitute the bare minimum in terms of the

Government's *Brady* and *Giglio* obligations.  The Court should order the Government to produce

all of the materials specified in the November 14, 2016 letter, and to the extent that the

Government refuses to do so, the Court should order a new trial.

Finally, an additional word must be said about the suggestion in the Government's brief

that the testimony of CS-1 was only "arguably false." It is impossible for the Defendants to

independently examine the status of CS-1's ongoing prosecution for false statements and other

crimes.  To the extent that the Government has altered its position, stated during trial, that CS-1's

cooperation agreement has been terminated, the Defendants submit that the Court and the

Defendants should be notified.

## V.  THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANTS WERE NOT ENTRAPPED

In its opening brief, the Defendants argued that they were induced into participating in

the sting operation that was set up by the DEA and that they lacked any predisposition to engage

33

in the charged crime.  In opposition, the Government presents a number of specious responses.

Aside from a recitation of the trial record that is divorced from reality and relies upon

speculation and unsupported inference, the Government also makes a series of arguments that are

contradicted by the established legal principles governing entrapment.  For the reasons set forth

below, the Government has failed to meet its burden with respect to the Defendants' entrapment

defense.

### A.    The Defendants Were Induced Into Participating in the Sting.

The Government argues that the Defendants failed to meet their threshold burden of

demonstrating inducement.  (Opp. 80).  In doing so, the Government frequently conflates

inducement with predisposition and attempts to distance itself from the actions of Sentado and

his henchmen.  It should not be permitted to do so.

As its main argument, the Government makes the incorrect claim that "[b]ecause neither

Daza nor Rayo was authorized to act as an agent of the DEA, the defendants' interactions with

these men cannot support a finding of inducement."  (Opp. 83).  In the Government's view, as a

matter of law, the actions of Sentado's henchmen to lure the Defendants into the sting cannot be

attributed to the Government for purposes of the entrapment analysis.  That is simply wrong.

The Second Circuit has long recognized that "[i]f a person is brought into a criminal scheme

after being informed indirectly of conduct or statements by a government agent which could

amount to inducement, then that person should be able to avail himself of the defense of

entrapment just as may the person who receives the inducement directly." *United States v.

Valencia*, 645 F.2d 1158, 1168 (2d Cir. 1980), *amended*, 669 F.2d 37 (2d Cir. 1981); *see also

United States v. Al-Moayad*, 545 F.3d 139, 177 (2d Cir. 2008) (recognizing and analyzing the

derivate entrapment defense).  In these types of cases, the burden is on the defendant to show

34

some evidence of inducement on the part of a middleman.  *United States v. Valdez*, 101 F.3d 684 (2d Cir. 1996) (unpublished) ("To be entitled to a derivative entrapment defense, a defendant must demonstrate some evidence that he was induced to participate in the criminal scheme by conduct or statements by a government agent relayed by a middleman.").  Moreover, the Second Circuit has found that the middleman need not be a "witting" participant in the inducement.  *See United States v. Greenidge*, 100 F.3d 941 (2d Cir. 1996) (unpublished) ("this requirement may be satisfied even if the government's inducement is extended through an actor who is an unwitting middleman used as the government's pawn").

The "derivative entrapment defense" has not been limited to just the Second Circuit. Other circuits have adopted it as well.  One such case, *United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997), discussed the rationale for permitting such a defense.  The court explained that "the purpose behind allowing [derivative entrapment] is to prevent the government from circumventing rules against entrapment merely by deploying intermediaries, only one degree removed from the officials themselves, who carry out the government's explicit instructions to persuade a particular individual to commit a particular crime using a particular type of inducement."  *Id.* at 994.  The court then noted that "[t]his purpose could too easily be defeated by allowing the government to target specific individuals through unwitting go-betweens."  *Id.* Here, the entire sting operation was orchestrated by Sentado, who was himself a large-scale narcotics trafficker who had numerous henchmen working for him.  The DEA did not select the Defendants as targets; Sentado did and he, operating as a Government agent, set a meeting with them before even advising the supervising agent of his "operation."  (Tr. 172).  While Sentado was plainly running the key meeting at which the conduct at issue in this case was discussed (*see*

35

Tr. 172-74), the actions of his employees are nonetheless attributable to the Government for purposes of Defendants demonstrating the low threshold of inducement.

The case cited by the Government, *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997), is easily distinguishable.  It does not relate to the long-line of "derivative entrapment" cases set forth above, but instead involves a defendant's Sixth Amendment rights when they are approached by a jailhouse informant.  The quote offered up by the Government—that "[a]n informant becomes a government . . . agent only when the informant has been instructed by the police to get information about the particular defendant" (Opp. 83)—has nothing at all to do with entrapment.  Instead, it reiterates the concept that "[t]he Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." *Id.*  In short, the actions of Daza, Rayo, and others working at Sentado's direction are all relevant to the question of inducement.  The Government's effort to separate itself from their actions fails.

Moreover, the Government's argument that the actions of Sentado and his minions is irrelevant to the inducement analysis because "[t]he DEA was not investigating the defendants prior to early October 2015, and thus did not direct Sentado to target the defendants, via his associates or otherwise" (Opp. 83), is astounding.  The evidence at trial was clear that Sentado had been cooperating with the DEA for months beforehand.  (Tr. 169).  The evidence at trial also established that the DEA recklessly supervised Sentado, repeatedly failed to collect evidence from him, and permitted him to continue to cooperate despite his failure to follow the DEA's instructions and refusal to respond to the Government's agents for long periods of time.  (Tr. 314-22).  Now, in connection with the instant motion, the Government is claiming—without any

36

legal authority—that it is responsible only for actions that the DEA "directed" Sentado to perform.  In the circumstances of this case, that claim defies credulity.  Under the Government's theory, none of Sentado's actions (or those of his underlings) before the meeting that Sentado failed to record count toward inducement because they were not "directed" by the DEA.  (*See* Tr. 172-73 (DEA first learns about Venezuelans immediately prior to first meeting in October)).  It is particularly unpersuasive in this case, where the DEA purposely left Sentado out on his own in Honduras—with minimal, if any, agent supervision—to enable him to make cases against suspected drug traffickers.  Simply put, the Government is responsible for the actions of its agents, *see, e.g.*, *Sherman v. United States*, 78 S.Ct. 819, 820 (1958) ("The Government cannot make such use of an informer and then claim disassociation through ignorance."), and they cannot avoid responsibility for Sentado and his men here.

The Government also argues, briefly, that Sentado could not have induced Defendants into the sting operation because Sentado "was not even able to identify the defendants in photographs shown to him by the DEA."  (Opp. 83).  That argument borders on the disingenuous.  The record is replete with evidence that the Government's agents and informants recognized that the Defendants were related to the first family of Venezuela and understood them to be high-profile targets.  (Tr. 370, 396, 895-97).  The fact that Sentado made no visual identification of them does not negate the fact that he knew they were highly attractive targets for the DEA by virtue of their familial connections.

In any event, all of the Government's arguments ignore the overall framework in which inducement—the first step of the two part entrapment test—is analyzed.  Returning again to the Court's instructions to the jury on inducement: if the jury "find[s] some evidence that a Government agent initiated the criminal acts charged in the Indictment," then it must turn to the

37

question of predisposition and whether the Government has proved it beyond a reasonable doubt. (Tr. 1507-08); *see also, e.g.*, *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) ("When a defendant presents credible evidence of inducement by a government agent, the government is required to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.").  The question thus is  whether there is some evidence of inducement that compels, for purposes of this motion, an analysis of predisposition—and of course there is.  In its brief, the Government attempts—through tortured inferences from unrelated text messages and the baseless elimination of obvious proof of direct and derivate entrapment—to claim that there was not *any inducement at all*.  No reasonable reader of the record could reach such a conclusion. And, as discussed below, the fact that Sentado failed to record the first meeting requires a finding of inducement and a rejection of the Government's effort to prove predisposition beyond a reasonable doubt.

**B.     The Government Failed to Prove Predisposition Beyond a Reasonable Doubt.**

In its brief, the Government stitches together disparate text messages that it—not a cooperator, not a lay witness, nor even any sort of expert witness—claims prove *beyond a reasonable doubt* that Defendants were predisposed to commit the charged crime.  For the reasons set forth above, that recitation of the trial evidence depends on impermissible inferences and mischaracterizations of the evidence.  And, for those reasons, fails to meet the Government's burden.

**1.     Failure to Record the Meeting Undermines the Sufficiency of the Evidence.**

As an initial matter, with respect to both inducement and predisposition, the Government argues that the lack of a recording of the first meeting among Sentado, his henchmen, and the Defendants had no effect on the jury's verdict.  (Opp. 89).  That is wrong.  As set forth in the

38

Defendants' opening brief, the recording was a critical piece of evidence that speaks directly to how the entire sting operation was set up.  This meeting was the first direct interaction among Sentado, the mastermind of the sting, and the Defendants.  The DEA played almost no role in it except for telling Sentado to record the meeting, (Tr. 173-74), which he either failed to do or else decided later to destroy the recording.  Given Sentado's tremendous unreliability as an informant and the DEA's mismanagement of the entire set-up, the failure to capture that meeting is plainly "some" evidence of inducement that requires a reasonable jury to move on to the question of predisposition.  *See Salerno*, 66 F.3d at 547.  Moreover, with respect to the predisposition prong of the entrapment analysis, the failure to record raises compelling doubts as to whether the Government could possibly meet its burden of disproving it beyond a reasonable doubt.  The record is replete with evidence of the Defendants' lack of experience and sophistication.  (*See, e.g.*, Tr. 376 (DEA viewing Defendants as amateurs and mocking them as "idiots")).  Among other things, the recording would have demonstrated how naïve and unsophisticated the Defendants were and raised reasonable doubt as to their predisposition.  More importantly, the lack of a recording defeats the Government's attempt to rely on the "ready response" theory to meet its burden of proving predisposition beyond a reasonable doubt.

In any event, in response to these arguments in the Defendants' opening brief, the Government argues that the Court has already ruled that the failure to record "is not chargeable to the Government."  (Opp. 89 (quoting the Court's decision in *United States v. Campo Flores*, No. 15-cr-765, 2016 WL 5946472 (S.D.N.Y. Oct. 12, 2016)).  That misses the point.  The Court's prior decision related to the question of spoliation, *see id.* at *3, whereas this motion relates to the sufficiency of the evidence presented by the Government at trial.  The lack of a

39

recording, as explained above, is without doubt "some" evidence of inducement and powerful evidence of reasonable doubt as to predisposition.

2.    The Defendants Did Not Readily Respond to the Inducement.

In its papers, the Government essentially concedes the Defendants' argument, (Mot. 39-40), that the Government cannot ask the jury to infer predisposition based on the Defendants' conduct after the initial inducement.  That is because the law is undisputed on that point.  As the Second Circuit reiterated in *United States v. Brand*, 467 F.3d 179 (2d Cir. 2006), "the government's reliance on certain evidence of acts that occurred *after* Brand's initial contact with government agents is misplaced.  This evidence would not be probative of 'petitioner's state of mind *prior* to the commencement of the Government's investigation.'" *Brand*, 467 F.3d at 192.  The record is clear, however, that the Government in fact *argued this very thing to the jury at trial*.  (Tr. 1457-59).  To justify its incorrect argument, the Government contends that such references were necessary to show the Defendants' "ready response" to the inducement.  They were not.

The Government contends that the Defendants' willingness to commit the charged crime was demonstrated by their "ready response" to the inducement.  (Opp. 86).  In doing so, the Government principally relies on two cases: *Brand* and *United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993).  (Opp. 90).  In *Brand*, the timing of the inducement analysis was pinned to the defendant's initial chats with a purported thirteen-year old girl.  467 F.3d at 194-95.  The case involved child enticement and the Court noted that the transcripts of the chats reflected an "unhesitating response" from the defendant to engage in that crime in no uncertain terms.  *Id.* at 195.  In contrast, there is no such proof in this case and once again the significance of the lack of a recording of the first meeting is demonstrated.  Brand's response was immediate and the proof

40

obvious in his internet chats. Brand's predisposition was borne out in his explicit remarks made in real time with an undercover agent over the internet. Here, the Government has no proof whatsoever of what response the Defendants made upon inducement, much less of the amount of hesitancy there was (or was not)—because there is no evidence. Again, the Government bears the burden of proving predisposition, and the lack of a recording is a deficit it cannot overcome.

Likewise, in *Harvey*, the defendant's "ready response" was found sufficient where the defendant placed an order for child pornography a couple of days after receiving the invitation to do so. *Harvey*, 991 F.2d at 992-93. In that case, the inducement was a clear—an order form for "material featuring 'younger performers,' 'young performers,' and 'your youngest performers' w[as] [an] oblique request[] for child pornography" from a company located in Belgium. *Id.*at 992. As was the response—a mailed order form. *Id.*at 993. Again, both the timing and the content of the, as the court described it, "prompt response" were in evidence. *Id.* In this case, neither are because of the lack of a recording of the initial meeting.

Moreover, in trying to cobble together its ready response argument, the Government concedes that at least twenty days passed between the unrecorded meeting and the subsequent events orchestrated by the Government as part of the sting. (Opp. 90). The Government cites no case suggesting that 20 days is "prompt" for purposes of the "prompt response" or "ready response." That is because the "ready response" doctrine is a limited carve-out from the Supreme Court's decision in *Jacobson v. United States*, which requires that "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." 503 U.S. 540, 549 (1992); *see also Brand*, 467 F.3d at 191-93. Moreover, setting aside the promptness, the Government has no proof of the response itself sufficient to meet its burden to demonstrate the Defendants'

41

agreement, hesitancy, or lack thereof.  Accordingly, the Government cannot rely upon the ready response doctrine to meet its high burden to prove predisposition.

> ### C.       The Government's Reliance on *United States v. Cromitie* in Support of Its Entrapment Argument Is Unavailing.

In addition, the Government has misapplied *Cromitie*'s entrapment discussion in the instant case.  As discussed in the preceding sections, the Government's entire analysis of the entrapment issue is unsupported by case law.  It should be noted here that in *Cromitie*, the Second Circuit rejected the Government's argument that there was no inducement where it was clear that the informant had offered Cromitie $250,000 (a sum the Second Circuit noted was greater than any sum it had seen in an entrapment case) and where the record of Cromitie's immediate response to the informant's initial proposals was ambiguous.  *Cromitie*, 727 F.3d at 210-11.  In this case, of course, the informants offered the defendants tens of millions of dollars and there is no record of the defendants' immediate responses to Sentado or his employees' proposal, because the informants either intentionally failed to create these records or destroyed them.  The *Cromitie* panel also made clear that individuals not working at the direction of the Government can be the vehicles of Government inducement, if they unwittingly communicate the messages of government operatives.  *See id.* at 215 (accepting that "Government's inducement of Cromitie, some of which was undoubtedly relayed by him to the other three defendants, sufficed to show that they too were induced.  *See United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir. 1988) ('derivative entrapment defense available where government agents act through private citizens')").  Thus the Court must reject the Government's arguments that communications from Sentado's operatives, such as Daza, are not chargeable to the Government in the inducement analysis.  (Opp. 83 ("Because neither Daza nor Rayo was authorized to act as an agent of the DEA, the defendants' interactions with these men cannot support a finding of

42

inducement.")).  The Government cites no authority for the proposition that Daza or any other operative of Sentado's activities—directed by a government operative—are not relevant to the inducement analysis, and *Cromitie* indicates the exact opposite.  To the extent that *Cromitie* sheds light on the entrapment question, it shows that inducement was proven in this case.

 *Cromitie* also indicates that the Government failed to meet its burden on predisposition as a matter of law.  The court made clear that the relevant question in the context of the predisposition analysis is whether the Government established that the defendants were predisposed to engage in narcotics trafficking to the United States.  *See Cromitie*, 727 F.3d at 212 (assessing various statements Cromitie made to informant that revealed "pre-existing design to commit terrorist acts *against the interests of the United States*") (emphasis added).  In this case, in sharp contrast to the facts of *Cromitie*, the Government has identified no evidence whatsoever indicating any predisposition on the part of the defendants to engage in activities directed towards the United States.

 Relatedly, *Cromitie* makes clear that both the inducement and predisposition analysis must take into account the outrageous amounts of money that were offered to the Defendants.  The *Cromitie* court noted that prior to that case, "[o]ur Court has not encountered a government-offered cash inducement as large as $250,000," and observed that in other contexts due process concerns might be implicated by a significantly larger offer that was out of step with the reality of what might be offered from a nongovernmental source.  *See id.* at 220-21.  Here, of course, the Government's own expert said that he had never heard of someone being fronted tens of millions of dollars for a prospective drug transaction, particularly where the parties were not intimately acquainted.  (Tr. 575 ("Q. And in your time as special agent you have never worked on a case where someone fronted, that you learned about, where someone fronted $20 million

43

before receiving any drugs, have you?  A. That amount?  No.")).  This fact has heavy

significance to both the due process and entrapment arguments raised by the Defendants.

Finally, it must be noted that the *Cromitie* decision itself was the product of a split panel

that indicated it was dealing with the outer boundaries of what might be considered permissible

in terms of Government sting operations tending towards entrapment.  To the extent that the

Government asks the Court to consider *Cromitie* a "guidepost," the Court should take into

consideration then-Chief Judge Jacobs's dissent, which concluded that Cromitie had been

"entrapped as a matter of law."  *See Cromitie*, 727 F.3d at 227 (Jacobs, C.J., concurring in part

and dissenting in part).  Chief Judge Jacobs observed that the *Cromitie* majority had defined the

burden of the government in the context of predisposition in a manner that is significantly higher

than what the Government would urge the Court to adopt in the instant case, writing "[t]he term

'already formed design' is defined away by the majority:  it is 'only a rather generalized idea or

intent to inflict harm on' the *interests of the United States*."  *Id.* at 228 (emphasis added).

Although the Government now presses the idea that an "already formed design" was proven in

this case, there was absolutely no proof of any pre-existing design directed towards the United

States.  Judge Jacobs's dissent underscores the absurdity of the Government's attempts to spin

generalized ideas about drug trafficking into proof of a pre-existing design to import narcotics

into the United States.  *See id.* at 228 ("That definition of the term is more its converse because

an idea or intent does not amount to a design, and one that is 'generalized' is unformed; the

'generalized idea' of an act is not a disposition to do it; and entrapment is the very process of

mobilizing a generalized idea that otherwise would remain an idle thought").  At bottom,

*Cromitie* only further demonstrates that the Defendants' motions should be granted.

44

**VIII. EVEN AT THIS LATE DATE, THE GOVERNMENT STILL CANNOT IDENTIFY WHAT EVIDENCE THERE WAS THAT THE DEFENDANTS DELIBERATELY AVOIDED GUILTY KNOWLEDGE, AS REQUIRED TO JUSTIFY CONVICTION ON A CONSCIOUS AVOIDANCE THEORY.**

Based on the Government's opposition, there appears to be no material dispute between the parties about what is necessary before a court may give a conscious avoidance instruction. As a threshold matter, the Government correctly explains, a conscious avoidance instruction is, of course, only necessary or permissible when the defendants "disput[e] the Government's proof regarding their *actual* knowledge" of some element of the crime.  (Opp. 99 (emphasis added) (citing *United States v. Lange*, 834 F.3d 58 (2d Cir. 2016))).  Here, the Government is correct that the threshold was met because the Defendants disputed that they had "actual knowledge of the unlawful objectives of the conspiracy:  to import cocaine into the United States, and to distribute cocaine while knowing and intending that the drugs would be imported into the United States."  (Opp. 99).

Once that threshold is met, a conscious avoidance instruction may still only be given—as the Government accurately reports—when a two-part "'factual predicate for the charge exists.'" (Opp. 98 (quoting *Lange*, 834 F.3d at 77)).  The first part of the required factual predicate is that "'the defendant was aware of a high probability of the fact in dispute.'"  (Opp. 98 (quoting *Lange*, 834 F.3d at 78)).  The second part of the factual predicate is that the defendant "'consciously avoided confirming that fact.'"  (*Id.*).

As the Government correctly observes (Opp. 99), the Defendants are not (for purposes of this motion) challenging the proof supporting the first part of the factual predicate for a conscious avoidance instruction.  In other words, they do not contend here that there was insufficient proof from which a jury could conclude that they were aware of a high probability that the objective of the conspiracy was to import cocaine into the United States, or to distribute

45

cocaine while knowing and intending that the drugs would be imported into the United States. Instead, the Government is right that "[t]he defendants' argument focuses on the second prong of the conscious avoidance factual predicate," (*id.*); namely, the requirement of proof that the Defendants *deliberately* avoided confirming the existence of the fact in dispute.

Having correctly identified the proof that the Defendants are claiming was missing, and in light of the Defendants' argument in their moving papers that the Government never once at trial tried to identify that proof to either this Court or the jury (Mot. 46-47),[2] one would expect the Government now simply to identify the required proof and put the matter to rest. This the Government conspicuously does not do. Instead, it launches into a series of non-sequiturs and nonsensical arguments that merely highlight what the Defendants demonstrated in their moving papers (Mot. 46-48)—that the Government never gave any serious thought at trial to the need for evidence supporting the second prong of conscious avoidance and does not actually have any such evidence.

In attempting to show that a conscious avoidance instruction was properly given, the Government begins by offering the truism that "the Government may . . . establish the necessary factual predicate"—meaning, establish that the Defendants *deliberately avoided* confirming a suspicion that the conspiracy targeted the United States—"through circumstantial evidence." (Opp. 99-100). It is hard to quarrel with that. As the Court instructed the jury, the law draws no distinction between direct and circumstantial evidence. But circumstantial evidence is evidence

---

[2] As the Defendants observed in their moving papers, the Government discussed conscious avoidance with the jury in its rebuttal summation, but addressed only the first part of the factual predicate, not the second part. (Mot. 43-49). The Government defends this by asserting that it "was not obligated, particular[ly] in a rebuttal summation . . . , to call attention to the evidence in support of every aspect of its position regarding the defendants' conscious avoidance[.]" (Opp. 104). Fair enough. But the point remains that the Government did not once during trial identify to either the Court or the jury what evidence might be sufficient to establish the second prong of the conscious avoidance test, even though the defendants expressly flagged the absence of any such proof in their opposition to the Government's request for a conscious avoidance instruction. (Dkt. 123 at 2-3).

46

from which a jury could draw a logical, reasonable inference, and what the Government goes on to identify does nothing at all to support an inference that the Defendants deliberately avoided confirming that the conspiracy targeted the United States.

Indeed, the Government's principal factual argument is baffling.  The Government asserts that a particular "feature[] of the defendants' plan"—that "the defendants agreed to ship cocaine from Venezuela to *Honduras* [rather than to the United States], and to accept payment based on the price of cocaine in *Honduras* rather than the price in the United States"—somehow establishes that they deliberately avoided knowledge regarding the United States.  (Opp. 100-01 (emphasis added)).  In other words, the Government's theory is that because the Defendants conducted themselves as though drugs were *not* going to the United States—allegedly agreeing to ship them to Honduras and to accept payment based on Honduran prices—a jury could somehow infer that they therefore deliberately avoided knowledge that the drugs *were* going to the United States.  That type of illogic—that behaving as though something is *not* true is, in and of itself, proof that one has deliberately avoided the knowledge that the thing *is* true—is more at home in a Lewis Carroll story than a legal brief.  Were this the law, the predicates for conscious avoidance liability need no longer exist, because every defendant who established that he did not know some necessary fact would be simultaneously establishing that he consciously avoided knowing the fact.

The Government's other factual argument is that because the Defendants did not ask about the United States on the recordings, they must have "*intentionally* avoided confirming that their cocaine was destined for the United States[.]"  (Opp. 102).  But that argument proves too much.  Every potential conscious avoidance case involves—as here—a high probability of a fact and a failure by the defendant to ask about that fact.  If the mere fact that a defendant did not ask

47

the confirming question were enough, a conscious avoidance instruction could be given in every such case.  But the law requires more.  The second factual predicate for a conscious avoidance instruction requires that "a conscious avoidance instruction should be issued only where it can be shown that the defendant *decided* not to learn the key fact, not merely failed to learn it through negligence."  *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) (alterations and quotation marks omitted).  The fact that a question was not asked shows only that the question was not asked.  It does nothing to show, as the Government incorrectly argues, that the failure to ask was deliberate rather than negligent.

The Government's purported legal support for its position is similarly off-base.  In particular, the Government attempts to find support in *United States v. Henareh*, 563 F. App'x 808 (2d Cir. 2014).  (Opp. 102-03).  But *Henareh* was an unpublished summary order arising in the plain-error context, and contains little if any analysis and no relevant discussion of the specific facts that constituted the factual predicate in that case.  Indeed, the entire analysis in *Henareh* on the issue of conscious avoidance consists of the following statement:  "*Our review of the record* confirms that this is the very instance when a defendant's 'purported lack of knowledge defense, despite [his] deep involvement in the transactions that effectuated [the crime], all but invite[s] the conscious avoidance charge.'"  *Henareh*, 563 F. App'x at 811 (emphasis added) (citation omitted).  The *Henareh* court does not explain what aspects of the "record" in that case supplied the necessary factual predicate.

Suffice it to say, the Defendants are not arguing that a conscious avoidance instruction is *never* appropriate.  Indeed, one seems to have been appropriate in *Henareh*.  But absent more, the mere fact that a conscious avoidance instruction was deemed appropriate in *Henareh* is neither here nor there.  Since neither the Court of Appeals nor the Government have identified

48

what about the facts in *Henareh* made the instruction appropriate, it can hardly be maintained that the result in *Henareh* does anything to support the Government's contention that a conscious avoidance instruction was appropriate in this case.

In fact, there was no basis for a conscious avoidance instruction in this case.  The Government never even tried at trial to identify evidence to satisfy the second prong of the required factual predicate.  And now that it has tried for the first time to identify such evidence, it is clear that the evidence does not exist.  Because the instruction should not have been given, and because the error was not harmless—which would require "overwhelming" evidence of actual knowledge, not present here, (Mot. 48 (citing cases))—the Defendants are entitled to a new trial.

## CONCLUSION

For all of the reasons set forth above, the Defendants' motions pursuant to Federal Rules of Criminal Procedure 29(c) and 33 should be granted.

49

Dated:  March 6, 2017
New York, New York

                                        Respectfully Submitted,


                                              /s/ Randall W. Jackson
                                        _____
                                        Randall W. Jackson
                                        John T. Zach
                                        BOIES, SCHILLER & FLEXNER LLP
                                        575 Lexington Avenue
                                        New York, New York 10022
                                        Telephone:     (212) 446–2300
                                        Facsimile:     (212) 446–2350

                                        *Attorneys for Defendant Efrain Antonio
                                        Campo Flores*


                                              /s/ David M. Rody
                                        _____
                                        David M. Rody
                                        Michael D. Mann
                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone:     (212) 839–5300
                                        Facsimile:     (212) 839–5599

                                        *Attorneys for Defendant Franqui Francisco
                                        Flores de Freitas*

50