UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

Defendants.

---

S5 15 Cr. 765 (PAC)

**THE GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM AS TO
DEFENDANTS EFRAIN ANTONIO CAMPO FLORES AND
FRANQUI FRANCISCO FLORES DE FREITAS**

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
*Attorney for the United States
of America*

Emil J. Bove III
Brendan F. Quigley
    Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

DISCUSSION ............................................................................................................... 2

   I. The Seriousness of the Offense and Need to Promote Respect for the Law
   Are Significant Aggravating Considerations ........................................................ 2

   II. The Defendants Continue to Ignore the Record of Their Extensive Criminal Conduct ........ 4

   III. The Defendants' Personal Characteristics Do Not Warrant Leniency ................................. 8

   IV. Sentences of At Least 360 Months Would Not Cause
   Unwarranted Sentencing Disparities ........................................................................ 13

     A. Sentencing Statistics Refute the Defendants' Self-Serving Claims and
     Illustrate the Need for a Sentence Greatly in Excess of the Mandatory Minimum ............. 13

     B. The Cases Relied Upon by the Defendants Do Not Justify 10-year Sentences ............... 16

       1. *United States* v. *Fabio Lobo*, No. 15 Cr. 174 (LGS) .................................................. 16

       2. *United Sates* v. *Gabrielle Aguirre Cuero*, No. 15 Cr. 125 (PKC) .............................. 18

       3. *United States* v. *Djeme and Yala*, No. 12 Cr. 972 (RMB) ........................................... 20

       4. *United States* v. *Coke*, No. 07 Cr. 971 (RPP) ............................................................ 21

   V. Substantial Sentences Are Necessary to Achieve General Deterrence ............................... 21

CONCLUSION ............................................................................................................. 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

EFRAIN ANTONIO CAMPO FLORES and
FRANQUI FRANCISCO FLORES DE FREITAS,

                          Defendants.

S5 15 Cr. 765 (PAC)

The Government respectfully submits this memorandum in response to the December 1, 2017 letters filed by defendants Efrain Antonio Campo Flores (the "Campo Ltr.") and Franqui Francisco Flores de Freitas (the "Flores Ltr.").

While urging the Court to focus on "the reality of the situation" and the "actual facts and circumstances," the defendants' letters read as if the trial never happened (save for the cross-examination of CS-1), and the Court never ruled on the defendants' post-trial motions or the Sentencing Guidelines. (Campo Ltr. at 1; Flores Ltr. at 14). For example, the defendants continue to assert, despite ample evidence to the contrary, that each is a "novice" and there is no evidence of prior drug-trafficking activities or their ability to procure cocaine. Although both the jury and the Court rejected the defendants' entrapment defense, they continue to portray themselves as victims rather than convicted criminals. They persist in their now-refuted claim that the conspiracy at issue was a creation of the Government, and suggest illogically that the crimes of CS-1 and CS-2 should somehow offset or mitigate their prison terms. Seeking to distract the Court from their repeated use of private aircraft, as well as recorded statements and seized communications establishing their extremely privileged socio-economic status in Venezuela at the time of their offense, the defendants focus their "history and characteristics" arguments on the purported

circumstances of their childhoods, many years ago.  In sum, the defendants have made no effort to accept responsibility, or even acknowledge the evidence in this case.  They offer excuses, not remorse, for their conduct.  The only regret evident from their submissions is their decision to fly to Haiti rather than completing the offense from a politically protected location Venezuela where there is no extradition treaty.[1]

The "reality of the situation" and the "actual facts and circumstances" are these: the defendants were leaders in a conspiracy to move a massive amount of cocaine to the United States; they cultivated connections to at least one major cocaine supplier as well as a designated foreign terrorist organization in furtherance of what they described as "war" with this country; they relied on armed security terms during the offense; and they sought to use some of the proceeds of their crime to steal an election and prop up a corrupt regime.  In light of these realities, sentences of at least 360 months' imprisonment and significant fines for each defendant are sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## DISCUSSION

### I.  The Seriousness of the Offense and Need to Promote Respect for the Law Are Significant Aggravating Considerations

As discussed at length in two post-trial submissions describing the record, the defendants engaged in a course of extraordinarily serious criminal conduct involving significant, politically-connected drug-trafficking activities.  (*See* Gov't Opp'n to the Defs.' Post-Trial Motions (Dkt. No.

---

[1] (Campo Ltr. at 4 ("This case exposed novices who were foolish enough to travel to Haiti on the promise that they were going to receive millions of dollars having done virtually nothing."); *see also id.* at 3 ("[B]ecause Mr. Campo Flores was lured to a Caribbean island where he had never been and then brought extra-judicially to a country where he had never engaged in any crime, he is facing a prison sentence . . . .")).

162); Gov't Sentencing Mem. (Dkt. No. 180)).  During the course of a conspiracy to import huge volumes of cocaine into the United States, the defendants relied on their political power and impunity in Venezuela to try to dispatch drug-laden aircraft from and through significant international airports using a hangar controlled by the Venezuelan President.  The defendants cultivated a relationship with a cocaine supplier who could provide the substance by the "shovelful," as well as at least one connection to the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC").

Consistent with the FARC's agenda, Campo declared the defendants to be at "war" with the United States.  And the defendants pursued drug trafficking not only to enrich themselves, but also in an effort to maintain their family's political control by supporting a campaign of Venezuelan First Lady Cilia Flores.  In this regard, Campo emphasized to CS-1 that the drug-derived cash was urgently necessary.  His view was consistent with polls at that time showing that "70% of respondents expressing a preference will vote for opponents of" Nicolás Maduro's government in the then-upcoming elections.  *See* Muddled, Yet United; Venezuela's Legislative Elections, *The Economist*, Oct. 3, 2015.[2]  Opposition to the Maduro regime ran high, at least in part, because the Venezuelan people lacked basic necessities and had been victimized by

---

[2]  *Available at* https://www.economist.com/news/americas/21669929-voters-are-eager-end-chavismo-can-disciplined-diverse-opposition-coalition (last accessed Dec. 7, 2017); *see also* OFAC, *Treasury Sanctions the President of Venezuela*, July 31, 2017, https://www.treasury.gov/press-center/press-releases/Pages/sm0137.aspx (last accessed December 8, 2017) ("Under Maduro, the Venezuelan government has deliberately and repeatedly abused the rights of citizens through the use of violence, repression, and criminalization of demonstrations. . . . In addition to committing widespread human rights abuses, Maduro's regime has mismanaged the economy and engaged in systemic corruption.  Despite having among the world's largest oil reserves, tens of millions of Venezuelans are going hungry . . . .").

widespread corruption. *See id.* ("The public is enraged by shortages of everything from poultry to pharmaceuticals, by inflation approaching 200% and by rampant corruption and crime.").

Prior to and during the conspiracy, the defendants participated in additional corrupt conduct that was itself astonishing in scope, including soliciting million-dollar bribes from drug traffickers and debtors of Venezuela's state-owned oil company as well as conspiring to engage in acts of violence. (*See* Govt. Sentencing Mem. at 8-15). As the Government has already explained, in light of this conduct and under Section 3553(a), the seriousness of the offense and the importance of promoting respect for the law support substantial terms of incarceration and fines. (*See id.* at 62-76).

## II. The Defendants Continue to Ignore the Record of Their Extensive Criminal Conduct

The defendants' most recent submissions reflect dogged persistence in their efforts to ignore the evidentiary record developed during the trial and thus far at sentencing. These contentions should once again be rejected.

The DEA's investigation is not a mitigating consideration at sentencing. The Court has already noted that it "cannot agree" with the argument that the defendants "were induced to commit the crime." *United States* v. *Campo Flores*, No. 15 Cr. 765 (PAC), 2017 WL 1133430, at *3 (S.D.N.Y. Mar. 24, 2017); *see also id.* (referring to "evidence that Defendants sought to coordinate a similar drug trafficking arrangement with an individual identified as Pepe"). Moreover, "[t]here was significant evidence of Defendants' ready response to any inducement, and thus of Defendants' willingness to commit the charged crime." *Id.* at *4. The defendants continue to make superlative claims regarding CS-1 and CS-2, but those men will be sentenced separately and their crimes do not mitigate, offset, or counterbalance the need for substantial terms of

4

imprisonment in this case. The defendants also claim that the DEA's decision to arrest the defendants in Haiti instead of "wait[ing] to see if [they] could actually produce the drugs that were at the heart of the sting" was "contrary to everything we know about the way law enforcement typically conducts sting operations." (Campo Ltr. at 1). It is unclear who the "we" refers to in that argument, and Campo declines to identify the "sting operations" he or "we" view as "typical[]." (*Id.*). But permitting the defendants—for whom arrest warrants had been issued in this District—to leave Haiti and return to Venezuela would have allowed them to avoid accountability for their crimes, since Venezuela lacks an extradition agreement with the United States. Thus, there is nothing about the timing of the defendants' arrests, which resulted in a jury convicting them for violations of U.S. law in a U.S. court, that suggests the defendants are entitled to leniency.

The defendants also assert that the Guidelines in this case are "driven overwhelmingly by the quantity set for [a] fake drug deal" and "strongly dispute" the characterization that they "determined the amount of the deal." (Flores Ltr. at 4).[3] The objection has been duly noted. The Court, however, has also rejected it, reasoning that the drug quantity "was driven by the amount of money that the two defendants wanted for engaging in the drug transactions, the money drove the drugs . . . ." (Oct. 5, 2017 Tr. at 6-7).[4] Thus, the so-called stash-house sting cases cited by the

---

[3] Each defendant incorporated by reference his co-defendant's sentencing contentions.

[4] Notwithstanding this clear ruling, Flores boldly claims: "[*T*]*here can be no question* that the evidence fails to establish even by a preponderance that it was the Defendants, and not the informants, who set the amount of the supposed drug deal." (Flores Ltr. at 4 (emphasis added)).

defendants have little, if any, persuasive value—especially in this Circuit.[5]  The facts of those

cases do not resemble this case.  The "amount of drugs" in this case was not "arbitrary."  (Campo

Ltr. at 4).  The defendants set the quantity as part of their drive to generate $20 million, and before

any informants were involved in the investigation they discussed a separate potential transaction

involving 3,000 kilograms of cocaine.  (*See* GX 408-T at 8-12).  Nor was the "need for weapons

and extra associates" "illusory."  (Campo Ltr. at 5).  Rather, it was independently identified by the

defendants, who decided to include armed bodyguards in the "security logistics" aspect of their

plans by early October 2015.  (GX 503-T at 2-3).  In short, there was no imaginary stash house

here.  Instead, the defendants led a very real conspiracy to bring huge quantities of cocaine to

United States, which was fortuitously disrupted.

 The defendants also claim there is "no evidence that [they] have ever actually distributed

a single gram of cocaine to anyone."  (Flores Ltr. at 1; *see also id.* at 3).  They are wrong.  The

record is replete with the defendants' admissions regarding prior drug trafficking:

- In August 2015, Campo wrote to Pepe that "we've done this a couple of times already" and also referred to a prior failed drug deal.  (GX 408-T at 14 ("[T]he last time they left us hanging and we had to pay some money for the pork chops understand me.")).

---

[5] As Campo concedes, the primary case he relies on, *United States* v. *Hudson*, 3 F. Supp. 3d 772, 778 (C.D. Cal 2014), was later reversed by the Ninth Circuit in a summary order.  (Campo Ltr. at 4-5).  The defendants did not file a motion based on a theory of so-called "outrageous government conduct" because such a claim would have been frivolous in this Circuit.  *E.g.*, *United States* v. *Viera*, No. 14 Cr. 83 (ER), 2015 WL 171848, at *4 (S.D.N.Y. Jan. 14, 2015) ("*Hudson* applied a Ninth Circuit totality-of-the-circumstances standard that has never been adopted in the Second Circuit."); *see also United States* v. *Gomez*, 83 F. Supp. 3d 489, 492 (S.D.N.Y. Dec. 2, 2014) ("The Second Circuit has never found a violation of due process based on the government's outrageous conduct, and has described the claim as an issue frequently raised that seldom succeeds." (internal quotation marks omitted)).

- Campo proudly stated on a recording in Caracas: "I've been doing this work since I was eighteen." (GX 207-T at 6:12).

- Similarly, Campo told CS-1 that he had "worked" with "G2s" (GX 203-T at 26), and described a failed drug deal by referring to getting "a bad batch once" (GX 207-T at 3:6).

- Campo indicated that the same supplier who provided the "bad batch" had agreed more recently to provide "very solid stuff, the best you can get." (*Id.* at 3:18).

- Campo also said that "over here [in Venezuela] we work with a person that receives from us, but the one who gives me the little animals [*i.e.*, kilograms of cocaine] is a different one." (GX 201-T a 4:9).

- Campo later explained that "[i]t's been a long time since I've purchased directly, I mean, since we've gone ourselves and looked" for cocaine, but the defendants did just that when they procured the kilogram cocaine sample that they brought to the October 26, 2015 meeting in Caracas. (GX 202-T at 6:10).

- Also in October 2015, Flores exchanged communications with an associate who "explain[ed] about the equipment [*i.e.*, cocaine] that is going to france they are paying 29 for it," and invited Flores to an in-person meeting with "the colombian's right hand" to "[f]inalize everything." (GX 502-T at 2).

- Relatedly, Campo told CS-1 about negotiations "with some French people" who wanted to be paid "with thirty percent of the cost of the product," and referred to "some" drug-trafficking contacts in Europe during the November 10, 2015 meeting in Haiti. (GX 206-T at 24:14-20; GX 230-T at 6:12).

The defendants also "believe" it is "undisputed by the Government" that they did not "actually possess[] the 800 kilograms of cocaine that they were supposedly going to transport to Honduras." (Flores Ltr. at 3). Not so. Co-conspirator Gocho agreed to supply the defendants with 800 kilograms of cocaine on credit, without the defendants "putting down a single bolivar." (GX 515-T at 31). Campo also confessed that Gocho had the 800 kilograms at the time of the defendants' arrests (Tr. 148-49), thereby establishing the availability of the drugs and the defendants' access to them.

Finally, the defendants cannot escape the plain import of their seized electronic communications with the conclusory claim that they are "ambiguous." (Campo Ltr. at 3). Although the defendants suggest that the messages relate to "persons unknown" and "actions taken by individuals unknown," the "persons" and "actions" referenced are certainly known to the defendants as first-hand participants in the conversations. Moreover, despite being aware of these messages and the Government's interpretations of them for over a year, the defendants have never offered different translations of their Spanish or plausible alternative interpretations of their communications regarding, *inter alia*, payments in connection with the 450-kilogram seizure of cocaine in the Dominican Republic (Gov't Sentencing Mem. at 9-10); murders (*id.* at 12); "set[ting] off bomb[s]" and "begin[ing] killing" (*id.* at 14); and soliciting "advance[s]" from debtors of PDVSA, the Venezuelan state oil company (*id.* at 10).[6] The only logical reading of these messages is that the defendants are not the "loving and generous" victims they now purport to be. (Campo Ltr. at 4). Rather, the charged conspiracy in this case was the final segment in a pattern of criminal conduct.

## III.  The Defendants' Personal Characteristics Do Not Warrant Leniency

The defendants' most recent sentencing submissions embark on a strained effort to mislead the Court into believing they had ordinary, if not difficult, lives in Venezuela prior to their arrests. The record proves otherwise.

---

[6] In their post-trial motion pursuant to Rules 29 and Rule 33, the defendants asserted that certain September 2015 text messages with Pepe were "plainly" about an unspecified "construction project involving a permit." (Dkt. No. 158 at 38). They do not rely on that explanation at sentencing, which in any event related to only one of numerous highly incriminating exchanges that are part of the record.

The defense submissions focus on the defendants' childhood and upbringing in an effort to paint them as impressionable "young men." (Campo Ltr. at 1). But the defendants are not teenagers. Campo is 31. Flores is 32. While the information in the PSRs regarding the defendants' adult years is somewhat scant, it is clear that they have benefitted from educational and professional opportunities far beyond those available to most narcotics defendants. *E.g.*, U.S. Sentencing Comm'n, *Overview of Federal Criminal Cases, Fiscal Year 2016*, at 4 (explaining that "[a]lmost half of all federal offenders sentenced in fiscal year 2016 (46.7%) had not completed high school, and only 6.2 percent of offenders had completed college").[7] Taking their representations to the Probation Office at face value, Flores owned a food-distribution company and also worked as a car salesman. (Flores PSR ¶ 157). Campo has a law degree and a university degree in "Customs Administration." (Campo PSR ¶¶ 156-58). He also owned a cab company in Panama and worked in the Venezuelan legislature. (Campo PSR ¶¶ 159-162).

Campo nevertheless uses the term "modest" to describe his previous living conditions in Venezuela at least three times in his December 1, 2017 letter. The Probation Department took a different view. (Campo PSR at 36 ("The defendant presented himself as if he were from a middle-class family; however, it appears he is from a very wealthy family in Venezuela with powerful political connections.")). Prior to his arrest, Campo himself described his situation in strikingly different terms than he does now:

> I've been doing this work since I was eighteen. Due to God and the Virgin we have made money. And ever since we started making money, we've been flashy. . . . we

---

[7] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/FY16_Overview_Federal_Criminal_Cases.pdf (last visited Dec. 7, 2017).

> have Ferraris . . . . so, this level of comfort that I have here is not going to go away
> because of a measly ten million dollar deal . . . Because I make ten million with oil.

(GX 207-T at 6:12-22).  During the same meeting, Campo told the informants:

- "[S]ince we started making money many years ago, we have been careful and we have
  said, 'Well, let's invest in this, let's invest in this, let's invest in this, and let's invest in
  that.'"  (GX 208-T at 5:33).

- "It was very easy for us to make money here in the country . . . because we worked
  with anything.  We worked with gold, we worked with sweets [*i.e.*, drugs], we worked
  with iron, we worked with cement, [but] not anymore."  (GX 205-T at 28:13).

- "I mean, nobody can say . . . 'Look, how come this guy drives those trucks over here,
  look, even the bodyguards have three hundred thousand dollar trucks, how can that be?'
  But they have no way of knowing how it came to be.  How did it come to be?"  (GX
  208-T at 15:13).

And, notwithstanding his own financial position, Campo explained that Flores was "the one who

has the money."  (GX 405-T at 14; GX 407-T at 22; *see also* GX 515-T at 3 ("I need to sell a

ferrari that I have around somewhere.")).

Thus, although the defendants emphasize their humble origins, the evidence introduced at

trial demonstrates that they were among the elite of Venezuelan society.  In this regard, it is notable

that Campo described an "agreement" between members of the defendants' family and Venezuelan

official Diosdado Cabello,[8] which allowed his family to "control the oil completely" in Venezuela:

> And an agreement was, was reached, let's say behind closed doors, "You leave
> these three things to me and you can control the oil completely by yourselves."
> Great, because if I give them this, which was my job when Commander, uh . . .
> Chavez [*i.e.*, former Venezuelan President Hugo Rafael Chávez Frías, who died in
> March 2013] was in charge, this used to be a job shared by everyone.
>
> [. . .]

---

[8] Flores described Cabello as "[t]he most powerful guy in the country."  (GX 224-T at 6:26).

10

> So unfortunately, may he rest in peace, Chavez passes away and then this was left under his control, and then the oil was left under our control. "Well, if I give you this, you give me that." And we said, "Oh, well the profits are basically the same, maybe a bit more here than there, or there's more there than here, but . . . we're not going to get into your patch. . ."

(GX 207-T at 30:13-31:1). Campo also described a previous situation in which the defendants paid "a large sum of money" because "some points in the [Venezuelan] Constitution were going to be amended," but the measure "lost in some towns" where the bribes were paid in advance. (GX 206-T at 32:14-18). He indicated that the defendants were "forced to deal harshly with all these shitheads who defrauded us." (GX 206-T at 32:22). This experience led Campo to conclude that it was better to "wait for the election to take place" before paying bribes intended to secure victory. (GX 206-T at 33:4). When considering that conduct, his "war" with the United States, and his relationship with a member of the FARC, it is indeed difficult—despite counsel's urging—"to understand how gentle of a spirit Mr. Campo Flores possesses." (Campo Ltr. at 10).

The evidence establishes that the defendants were not living modestly relative to most Americans, much less Venezuelans, prior to their arrests. Indeed, at the time of the offense conduct in 2015, the salary for experienced school teachers in Venezuela was the equivalent of $35 a month, which was not enough to "even buy a used television." *See* Nathan Crooks, *et al.*, *Monthly Salary of $20 Shows Why Venezuelans Wait in Food Lines*, Bloomberg News (Mar. 6, 2015) (attached as Ex. A). During the period in question, the average Venezuelan did not regularly fly

11

around the Caribbean on private jets,[9] have an armed security detail (including guards who accompanied him on overseas trips), or take vacations to amusement parks in Florida (*see* Flores Ltr. at 7). Relatedly, the defendants' plea for leniency on the basis of their young children should be rejected. (*E.g.*, Campo Ltr. at 2; Flores Ltr. at 9). The defendants are asking the Court to give this consideration more weight than they themselves did, when they flew 1,300 miles from Venezuela to Honduras (a trip Flores made twice) and hundreds of miles from Venezuela to Haiti as they "actively sought out the charged conspiracy." *Campo-Flores*, 2017 WL 1133430, at *3. In light of the defendants' conscious decisions as adults to engage in this behavior, their absence from their children's lives, while tragic, is a circumstance that is not unique to this case and does not justify a variance from the otherwise-applicable Guidelines range.

The defendants also point out that neither of them has any reported criminal history and argue that this, too, merits leniency. However, the snapshot of the defendants' lives captured by the communications seized from their phones suggests that their lack of criminal history derives from their power and impunity in Venezuela rather than their moral integrity. For example, in the context of communications about efforts to shut down an investigation of a murder, Campo described connections with: (i) his "uncle Vladimir" who was acting as the Inspector General of a Venezuelan national police agency known as the *Cuerpo de Investigaciones Científicas, Penales y Criminalísticas*; and (ii) a "guy who handles things" for him at the *Dirección General de Contrainteligencia Militar*, a Venezuelan military counterinfluence agency referred to as the DIM

---

[9] The defendants flew to Honduras on October 3, 2015; then attempted to send, and sent, pilots to Honduras on November 4 and 5, 2015; Flores himself then flew to Honduras on November 6, 2015; and both defendants flew to Haiti on November 10, 2015.

or DGCIM.  (*See* Gov't Sentencing Mem. at 13).  He also indicated to CS-1 that the defendants could intimidate a "colonel" or "general" at the airport in Venezuela into refraining from further investigation if necessary.  (GX 201-T at 43:39).  Given these connections, the defendants' lack of prior arrests despite the conduct reflected in the evidence is hardly surprising and certainly not mitigating.

## IV.   Sentences of At Least 360 Months Would Not Cause Unwarranted Sentencing Disparities

The Court should reject the defendants' argument that sentences of 360 months would cause "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  Just the opposite is true.  The sentencing enhancements applied by the Court based on the evidence of the defendants' conduct, when viewed in context of nationwide sentencing statistics, illustrate how egregious their crime was relative to other drug-trafficking defendants.  And none of the cases cited by the defendants justifies the 120-month sentences they seek.

### A.   Sentencing Statistics Refute the Defendants' Self-Serving Claims and Illustrate the Need for a Sentence Greatly in Excess of the Mandatory Minimum

The defendants make a series of claims, based at most on anecdotal evidence, regarding "typical" drug-trafficking cases and sentences that they view as comparable.  (*E.g.*, Flores Ltr. at 3, 8, 10).  Actual statistics compiled by the Sentencing Commission, however, not only refute many of those contentions but also help to illustrate the seriousness and severity of the defendants' crime.

For example, Campo claims that "[i]n recent years, the overwhelming majority of federal sentences for drug offenses resulted in below-guidelines sentences."  (Campo Ltr. at 8).  That is

not true.  Between 2011 and 2016, approximately 43% of the 30,712 cases involving cocaine offenses that were reported to the Commission resulted in within-Guidelines sentences.[10]  (Ex. B at 1).  Of the remaining non-Guidelines sentences in that category, approximately 25% of them involved cooperation-related motions pursuant to U.S.S.G. § 5K1.1 and are therefore inapposite.  An additional approximately 7% involved below-Guidelines sentences advocated by the Government, which is also a factor not present here.  (*Id.*).  In other words, contrary to Campo's claim about the "overwhelming majority" of cases, only approximately 25% (7,410) of cocaine cases resulted in below-Guidelines sentences by virtue of a downward departure or variance that was unrelated to cooperation.  (*Id.*).[11]

Flores asserts that the defendants are "thoroughly atypical defendants in a narcotics conspiracy case in this District" because of, *inter alia*, their position in Criminal History Category I.  (Flores Ltr. at 8).  Between 2011 and 2016, criminal history information was reported to the Commission for 29,966 cocaine offenses.  (Ex. B at 2).  Of those cases, approximately 59% involved defendants in Criminal History Category I, like the defendants here.  (*Id.*).  Flores limits his criminal history claim to "cases in this District," but he is wrong in that respect as well.  (Flores Ltr. at 8).  Specifically, between 2011 and 2016, approximately 65% (672 of 1,033) of the defendants in cocaine cases from this District analyzed by the Commission were in Criminal

---

[10] The Commission distinguishes between powder cocaine and crack cocaine in its statistical analysis.  In this submission, the term cocaine is intended to refer to the Commission's powder Cocaine category.

[11] The 36.5% figure quoted in the *Washington Post* article cited by the defendant is taken from statistics issued by the Sentencing Commission, but fails to account for cooperation-related leniency that has no relevance to this case.

History Category I. (Ex. B at 3). Thus, even setting aside the likelihood that the defendants' Criminal History Category understates their past in light of their impunity in Venezuela, the defendants fit within the Category occupied by most defendants sentenced for this type of offense.

The Commission's statistical analyses also highlight some of the unique features of the defendants' crime, which underscores the extraordinary seriousness of the offense and the fact that the mandatory minimum sentence is insufficient to achieve the appropriate purposes of sentencing. For example, because the offense involved at least 800 kilograms of cocaine, the base offense level is 38. (*See* Dkt. No. 182 at 1). Of the 27,597 cocaine cases examined by the Commission between 2011 and 2016, only 7% of the defendants were assessed that offense level. (Ex. B at 4). This statistic helps to illustrate the comparatively enormous amount of cocaine that the defendants sought to send to the United States.

The Court has also appropriately applied a weapons enhancement based on the conclusion that "[t]he record is clear that the Defendants' security guards possessed firearms during the course of the charged offense" and the "Defendants have not established that the firearms were not issued in connection with the charged conspiracy." (Dkt. No. 182 at 2). The presence of armed guards as security for major international drug-trafficking activities is a unique aggravating consideration that is not at all common in cocaine cases. Indeed, approximately 83% of the 29,966 cocaine cases examined by the Commission on this topic did not involve a weapon. (Ex. B at 5).

Finally, the Court has applied an aggravating-role adjustment based on the determination that the defendants acted as "organizers and leaders of the charged offense." (Dkt. No. 182 at 3). This is another uniquely aggravating factor—only approximately 9% of the 29,966 cocaine cases reviewed by the Commission for this purpose involved such an adjustment. (Ex. B at 6). The

15

defendants' joint leadership roles, alone, demonstrate that a ten-year sentence is wholly inappropriate.

### B.   The Cases Relied Upon by the Defendants Do Not Justify 10-year Sentences

Scraping without success for precedent supporting the mandatory-minimum sentences they desperately seek, the defendants rely on a series of inapposite cases that further demonstrate the importance of significant terms of imprisonment.

### 1.   *United States* **v.** *Fabio Lobo*, No. 15 Cr. 174 (LGS)

Flores's reliance on the drug-trafficking prosecution of Fabio Lobo, the son of a former President of Honduras, is unavailing.  (Flores Ltr. at 11).  As the Government explained in its previous sentencing submission, the 24-year sentence imposed in that case serves as an important benchmark further indicating that sentences of at least 30 years are appropriate for the defendants here.  (*See* Gov't Sentencing Mem. at 68).

While the defendants have frequently emphasized the lack of a seizure in this case, there was no seizure in the *Lobo* case either.  Moreover, Lobo's role in his conspiracy offense was much more cabined than that played by Campo and Flores.  The defendants:  (i) negotiated and organized their anticipated drug loads with assistance from existing criminal contacts such as Pepero, Gocho, and Daza; (ii) had no plans to bear the risks of personally transporting cocaine; and (iii) commanded millions of dollars based on their unique ability to oversee the dispatch of large quantities of drugs on legitimate-seeming flights traveling under the auspices of the Venezuelan government from the largest airport in the country.  Unlike the defendants, Lobo lacked any connections to a foreign terrorist organization such as the FARC, and he did not have the ability to procure cocaine by the "shovelful" like the defendants did.  (GX 230-T at 3; GX 207-T at 4).

16

Also unlike the defendants, Lobo lacked discretion as to timing, location, or price of the drug transactions; he was paid a fixed price in the range of $50,000 for the two cocaine loads he assisted.

During that assistance, Lobo acted at the direction of a major Honduran drug-trafficking organization, and he escorted the drugs within Honduras using an SUV and his government security team. Although the defendants used and were prepared to use their official armed bodyguards in similar ways, they also agreed to take the further step of using facilities of the Venezuelan President, including his aircraft hangar, to dispatch the drugs. Moreover, whereas Lobo acted principally to enrich himself, the defendants were motivated by not only immediate greed but also their interest in supporting their family's political power by contributing drug proceeds to Cilia Flores's campaign. These distinctions between the offense conduct illustrate why Judge Schofield found that Lobo acted as a manager, and the Court determined that the defendants acted as organizers and leaders.

Judge Schofield's concerns about deterring politically connected drug trafficking involving privileged, elite members of South and Central American society apply to the defendants as well. These comments from Lobo's sentencing, the transcript of which was attached to the Government's prior sentencing submission in this case, bear repeating:

> The most damning fact in your background and in your participation in this is that . . . [y]ou were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials. And these included not only lowly officials, like customs people and military and law enforcement personnel, but also extremely high level officials. In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

17

(*See* Gov't Sentencing Mem. Ex. E (Dkt. No. 180-5 at 20:8-21)).  The court continued:  "The point is really that you abused who you are and the benefits and advantages that you had to further this crime. . . .  whether it was four tons [of cocaine], whether it was half a ton, *the fact that is most weighty in my mind was the abuse of your position and the privilege that you enjoyed*."  (*Id.* at 20:24-21:1, 21:6-8 (emphasis added)).  Judge Schofield's reasoning is compelling here as well.  In light of that consideration, and based on the Court's leadership findings, the defendants deserve a sentence greater than Lobo's.

### 2.  *United Sates* v. *Gabrielle Aguirre Cuero*, No. 15 Cr. 125 (PKC)

Both defendants falsely claim that the 144-month sentence in *United Sates* v. *Gabrielle Aguirre Cuero*, No. 15 Cr. 125 (PKC) provides a meaningful comparator for purposes of their sentencings.  (*See* Campo Ltr. at 8; Flores Ltr. at 11-12).

Cuero was the type of toiling drug transporter that the defendants would not have deigned to talk to while they *led* a group of major drug traffickers in Venezuela and Honduras in efforts to send huge loads of cocaine to this country.  Unlike the defendants, Cuero received no aggravating-role or weapons enhancements.  His role was more similar to that played by the drug pilots the defendants sent to Honduras than to the roles of the defendants.

The 350 kilograms of cocaine seized from the vessel in the *Cuero* case amounted to less than half of the first 800-kilogram cocaine load the defendants planned to send.  Whereas the defendants expected to make millions of dollars from their planned cocaine shipments, Cuero expected to make approximately $10,000.  Although common sense dictates that the cocaine seized in Cuero's case was destined for the United States, he was not convicted of the more serious offense of conspiring to import cocaine into this country, like the defendants, much less a cocaine-

18

importation conspiracy involving use of private aircraft dispatched from premises controlled by the President of Venezuela.

Finally, Cuero was prosecuted under the Maritime Drug Law Enforcement Act, *see* 46 U.S.C. § 70503. He pleaded guilty to a crime with a five-year mandatory minimum sentence rather than the 10-year mandatory minimum faced by the defendants, as well as a 40-year statutory cap as opposed to the life term authorized in this case by Title 21, United States Code, Section 960. After pleading guilty well in advance of trial, Cuero—in stark contrast to the defendants' post-trial approach—accepted responsibility for his crime at sentencing and apologized during a statement that Judge Castel credited as sincere. (*See* Transcript at 17, 21, *United Sates* v. *Gabrielle Aguirre Cuero*, No. 15 Cr. 125 (PKC) (S.D.N.Y. Jan. 20, 2017) (Dkt No. 36)). That being said, Judge Castel expressed concerns about Cuero's conduct that apply with even greater force to the defendants in light of their aggravating roles, the presence of weapons, their FARC ties, their "war" with the United States, and the other corrupt aspects of their drug-trafficking activities. Specifically, like Cuero, the defendants were "indifferent to the poison that was being distributed and ruining people's lives," and they sought to participate "in an important way in the distribution of a substance, which creates misery in the lives of the people who use it." (*Id.* at 22, 24). Indeed, based on the October 2015 recordings from Caracas, the defendants appeared to view drug trafficking and drug proceeds as weapons to be used against the United States. Thus, to an even greater extent than in Cuero's prosecution, "[t]here is important value in general deterrence in a case such as this." (*Id.* at 24). Accordingly, the balance of the Section 3553(a) factors supports the imposition of sentences for the defendants that greatly exceed Cuero's 144 months.

19

### 3.  *United States* v. *Djeme and Yala*, No. 12 Cr. 972 (RMB)

The defendants' reference to the sentences in *United States* v. *Djeme and Yala* is also unavailing.  (Flores Ltr. at 12; Campo Ltr. at 9).

Both Djeme and Yala pleaded guilty to lesser-included offenses without a mandatory-minimum sentence and a statutory cap of 20 years.  (*See* Sentencing Tr. 4, 5, *United States* v. *Yala*, No 12 Cr. 972 (RMB) (Dkt. No. 50) (the "*Yala* Tr.")); Sentencing Tr. *United States* v. *Dejme*, No. 12 Cr. 972 (RMB) (Dkt. No. 43) (the "*Djeme* Tr.")).  The Government supported below-Guidelines sentences in both cases based on mitigating considerations not present here.  (*Yala* Tr. 6; *Djeme* Tr. 11, 43).  For example, neither Djeme nor Yala received an aggravating-role adjustment.  Djeme "did not initiate or lead this narcotics conspiracy," and Yala "was not predisposed to commit the instant crime."  (*Djeme* Tr. 11-12, *Yala* Tr. 5).  The defendants did both of those things.  *See Campo Flores*, 2017 WL 1133430, at *4 ("There was significant evidence of Defendants' ready response to any inducement, and thus of Defendants' willingness to commit the charged crime."); *see also id.* at *5 ("[T]he Court concludes that there was sufficient evidence for a reasonable jury to find that Defendants were predisposed.").  Whereas the defendants brought cocaine-supply and FARC connections to their conspiracy, as well as the imprimatur of the sitting President of Venezuela, Djeme contributed "linguistic and computer acumen."  (*Djeme* Tr. 12).  Similarly, Yala contributed what were described as "language abilities" and "computer abilities."  (*Yala* Tr. 20).  Finally, Judge Berman credited Yala's "extreme" family circumstances—including caring for 14 people in his household—as warranting a significant variance to reach a 60-month sentence.  (*Id.* 17, 23-24).  Accordingly, the terms of imprisonment imposed on Yala and Djeme in the context of guilty pleas

20

to lesser-included offenses that lacked mandatory minimums, and Government-sponsored below-Guidelines sentencing advocacy, do not support leniency for the defendants.

### 4. *United States* v. *Coke*, No. 07 Cr. 971 (RPP)

Both defendants also cite to *United States* v. *Christopher Coke*, a case in which Judge Patterson sentenced a Jamaican drug lord to 23 years' in prison.  (Flores Ltr. at 13; Campo Ltr. at 9).  What both defendants omit, however, is that, Judge Patterson imposed the maximum sentence available to him in light of the plea agreement between Coke and the Government.  Specifically, Coke pled guilty to violating 18 U.S.C. § 1962(d), which carries a 20-year statutory maximum, and 18 U.S.C. § 1959(a)(6), which carries a three-year maximum.  Simply put, Judge Patterson sentenced Coke to the most time he possibly could.  Accordingly, in light of his plea agreement, Coke's sentence does not provide a meaningful basis for comparison to this case.[12]

## V.  Substantial Sentences Are Necessary to Achieve General Deterrence

In light of all of the above, as well as the information in the Government's prior sentencing submission, general deterrence is one of the most critical sentencing factors in this case.  The defendants used their privileged status and impunity to engage in significant criminal conduct in violation of United States law.  They did so from a location where the chances of detection and

---

[12] While the undersigned are not aware of what prompted the plea agreement with Coke—whom Campo's counsel now claim "ruled" a violent Jamaican drug-trafficking "with an iron fist" (Campo Ltr. at 9)—the defendants' failure to disclose the significance of Coke's statutory maximum to his sentence is particularly questionable in light of the fact that one of Campo's attorneys prosecuted the case and personally participated in both the guilty plea and sentencing. (*See* Minute Entry, *United States* v. *Christopher Coke*, No. 07 Cr. 971 (Aug. 31, 2011) ("AUSA[] . . . Zach present . . . . Defendant is arraigned on this Information and enters a plea of guilty to both counts."); Minute Entry, *United States* v. *Christopher Coke*, No. 07 Cr. 971 (June 8, 2012) ("Sentencing held on 6/8/2012 for Christopher Michael Coke . . .  AUSA[] . . . Zach present")).

apprehension were concededly remote.  Having now been not only caught but also convicted, it is crucial that their sentences reflect the fact that this type of drug trafficking will be met with significant consequences that make current and would-be drug traffickers facing similar circumstances think twice about committing this crime.

In seeking leniency, the defendants refer to "extensive media coverage" of the case and anticipated attention to their sentencings.  (Campo Ltr. at 8; Flores Ltr. at 10).  But the likelihood of publicity only underscores the need for substantial sentences.  A message will undoubtedly be sent; the question is its content.  The Government submits that any sentence approaching the mandatory minimum—which would be a substantial discount on the Guidelines range—would send the wrong message:  lead an international conspiracy to send a massive amount of cocaine to the United States, rely on your impunity and political connections in a foreign country to carry out that conspiracy, and express no discernible acceptance of responsibility or remorse, and you will be treated no differently than defendants who participated in conspiracies far lesser in scope and who had far fewer privileges, opportunities, and connections.[13]  On the other hand, a substantial sentence, of the kind sought by the Government, would communicate the seriousness of

---

[13] (*Cf. e.g.*, Amended Judgment, *United States* v. *Richards*, No. 14 Cr. 187 (SHS) (S.D.N.Y. July 6, 2017) (Dkt. No. 121) (sentencing former Jamaican policeman who brokered cocaine-importation conspiracy in dry sting case, pleaded guilty, and was in Criminal History Category I, to 120 months' imprisonment); Judgement, *United States* v. *Victor Barcelo*, No. 13 Cr. 38 (RJS) (S.D.N.Y. Aug. 15, 2014) (Dkt. No. 144) (sentencing truck driver who transported cocaine along with legitimate goods, was convicted at trial, and was in Criminal History Category I, to 14 years' imprisonment); Judgement, *United States* v. *Prince Awulye*, No. 13 Cr. 875 (RJS) (S.D.N.Y Apr. 9, 2015) (Dkt. No. 96) (sentencing drug courier who recruited another potential courier, was convicted at trial, and was in Criminal History Category I, to 120 months' imprisonment)).

participation in a conspiracy to make millions of dollars by sending poison to the streets of this country, the consequences of that conduct, and the importance of respect for the rule of law.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the Court should impose substantial terms of not less than 30 years of incarceration for both men, and impose fines within the applicable range of $50,000 and $10 million.

Dated:  New York, New York
        December 8, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

By:      ___/s/_____
        Emil J. Bove III
        Brendan F. Quigley
        Assistant United States Attorneys

Cc:    Defense Counsel
       (Via ECF)

23